**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

EMPLOYEES' RETIREMENT FUND OF THE
CITY OF FORT WORTH dba FORT WORTH
EMPLOYEES' RETIREMENT FUND,
Individually and on Behalf of All Others
Similarly Situated,

      Plaintiff,

v.

JAMES RIVER GROUP HOLDINGS, LTD.,
ROBERT P. MYRON, J. ADAM ABRAM,
FRANK N. D'ORAZIO, and SARAH C.
DORAN,

      Defendants.

Case:   3:21cv444

CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL
SECURITIES LAWS

JURY TRIAL DEMANDED

Plaintiff Employees' Retirement Fund of the City of Fort Worth dba Fort Worth Employees' Retirement Fund ("Plaintiff"), by and through its attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, its counsel's investigation, which includes without limitation: (a) review and analysis of public filings made by James River Group Holdings, Ltd. ("James River" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of press releases and other publications disseminated by Defendants and other related non-parties; (c) review of news articles, shareholder communications, conference call transcripts, and postings on James River's website concerning the Company's public statements; and (d) review of other publicly available information concerning James River and the Individual Defendants.

## NATURE OF THE ACTION

1.      This is a class action on behalf of all persons and entities that purchased James River common stock between August 1, 2019 and May 5, 2021, inclusive (the "Class Period"), against James River and certain of its officers (collectively, "Defendants") seeking to pursue remedies under the Securities Exchange Act of 1934, 15 U.S.C. § 78a, *et seq.* (the "Exchange Act").

2.      James River is a Bermuda-based holding company that owns and operates a group of specialty insurance and reinsurance companies. The Company's largest segment, Excess and Surplus ("E&S") Lines insurance, focuses on insureds that generally cannot purchase insurance from standard lines insurers due to perceived risks related to their businesses. Included in this E&S Lines segment is the Company's Commercial Auto Division.

3.      In 2014, James River ramped up its Commercial Auto Division by underwriting a new type of insurance policy that covered Rasier LLC ("Rasier"), a subsidiary of the ride-sharing

1

company Uber Technologies, Inc. (together with Rasier, "Uber").  Until that time, ride-sharing insurance had only covered claims incurred while ride-sharing drivers were transporting passengers for Uber, thus leaving a gap in coverage for accidents caused by ride-sharing drivers while they were not providing transportation services for hire but were still logged on to the Uber application and available to accept a ride.

4.      As a result of its arrangement with James River, Uber announced that it had become the first and only ride-sharing company to have insurance policies in place that covered this gap between personal and commercial insurance policies.  According to Uber, these new James River policies would give contingent coverage for a driver's liability that would meet the highest requirement of any state in the United States.  Uber was the Company's largest contract and accounted for more than 25% of the Company's premiums in 2019.

5.      Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose that: (1) James River had not adequately reserved for its Uber policies; (2) James River was using an incorrect methodology for setting reserves that materially understated the Company's true exposure to Uber claims; (3) as a result, James River was forced to increase its unfavorable reserves in subsequent quarters even after cancelling the Uber policies; and (4) as a result of the foregoing, Defendants' statements about James River's business, operations, and prospects were materially false and/or misleading and/or lacked a reasonable basis.

6.      At the beginning of the Class Period, Defendants assured investors that James River was adequately reserved against its Uber policies and that Defendants were "comfortable" with the Company's E&S Lines reserves.  However, after the market close on October 8, 2019, James

River announced that it had delivered a notice of early cancellation, effective December 31, 2019, for all insurance policies issued to Uber, though the Company would remain contracted to provide coverage for future claims related to the period the Company's Uber policies were in effect (known as "runoff"). The Company stated that "[the Uber] account ha[d] not met our expectations for profitability." In response to these developments, James River's stock price declined $11.06 per share, or 22.59 percent, to close at $37.88 per share on October 9, 2019. Significantly, despite the runoff coverage commitment, Defendants assured investors throughout the Class Period that James River's issues with Uber were behind it and the Company had adequately reserved. These misrepresentations and omissions caused the Company's stock to continue trading at artificially inflated prices.

7.     For example, on November 7, 2019, shortly after terminating its relationship with Uber, James River held an investor conference call, wherein Company founder and then-Chief Executive Officer ("CEO") Defendant J. Adam Abram ("Abram") assured investors that the Company had renegotiated the pricing for its Uber contract for the years 2018 and 2019 and felt "comfortable with our pricing" for those years. Defendant Abram stated that the Uber policies had "created a situation where the risk became too large in absolute terms given the size of our company" such that "candidly, in some years, we mispriced the risk." However, Defendant Abram stated that the Company had ultimately "decided to cancel [its Uber policies] . . . even though we believe the risk is well-priced, because of further complications related to the passage of [a California bill affecting ride-sharing]," which the Company had not anticipated in its pricing.

8.     By April 2020, the Company claimed that it had been "[f]reed from the burden of the large commercial auto account . . . that had come to so heavily influence our results," that the Company "did not experience any material reserve development in our Commercial Auto line[,]"

and that "[t]he runoff of what was formerly our largest account is performing well within our expectations."

9.      Then, on May 5, 2021—eighteen months after the Company announced its cancellation of the Uber contract, and after repeated assurances to investors that the legacy contract posed no challenges—James River surprised the market by disclosing an additional $170 million of unfavorable reserves related to the Uber policies.  On a related conference call, James River revealed that the increase was due to a change from using "industry data, pricing data, experience data, average claim severity data, and blended methodologies" to "using only our own loss experience in our paid and incurred reserve projections . . . [to calculate] a better and more conservative estimate of ultimate losses on this account."  Simultaneously, in order to cover its losses, the Company announced that it was seeking to raise $175 million through a public equity offering, which was priced at "the sector's steepest discount ever" according to *Bloomberg*.

10.      In response to these revelations, James River's stock price dropped $12.27 per share, or 26.38 percent, from a closing price of $46.50 per share on May 5, 2021, to a closing price of $34.23 per share on May 6, 2021.

11.      As a result of Defendants' false and misleading statements and omissions, and the precipitous decline in the market value of the Company's common stock when the truth was disclosed, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

12.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

13.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

14.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Many of the acts and omissions charged herein, including the dissemination of materially false and misleading information to the investing public, and the omission of material information, occurred in this District as James River's E&S Lines business is headquartered in Richmond, Virginia.

15.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

16.     Plaintiff Employees' Retirement Fund of the City of Fort Worth dba Fort Worth Employees' Retirement Fund, as set forth in the accompanying certification, incorporated by reference herein, purchased James River common stock during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

17.     Defendant James River is a corporation organized under the laws of Bermuda and maintains its principal executive offices in Pembroke, Bermuda.  Additionally, James River's E&S Lines business is located in Richmond, Virginia, and operates under the subsidiary James River Insurance Company.  James River's common stock trades on the NASDAQ under the symbol "JRVR."

18.     Defendant Robert P. Myron was the CEO of James River from January 2017 to August 2019 and has served as the Company's President and Chief Operating Officer since August 2019.

19. Defendant Abram was the Company's CEO and Executive Chairman from August 2019 through October 2020 and has served as the Company's Non-Executive Chairman since November 2020.

20. Defendant Frank N. D'Orazio has served as the CEO of James River since November 2020.

21. Defendant Sarah C. Doran has been the Chief Financial Officer ("CFO") of James River since January 2017.

22. Defendants Myron, Abram, D'Orazio, and Doran (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of James River's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. They all served on the Company's Reserve Committee, which met quarterly to review the actuarial recommendations and determine the best estimate to be recorded for the reserve for losses and loss adjustment expenses on James River's quarterly balance sheets. Further, the Individual Defendants signed reports that James River filed with the SEC during the Class Period, including the Company's 2019 Annual Report on Form 10-K ("2019 10-K"), which was signed by Defendants Abram, Doran, and Myron, and the Company's 2020 Annual Report on Form 10-K ("2020 10-K"), which was signed by Defendants Abram, Doran, and D'Orazio, and thus were responsible for statements made therein. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and

were being concealed from, the public, and that the positive representations that were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

23. James River is a Bermuda-based holding company for a group of specialty insurance and reinsurance companies. The Company's largest segment is its E&S Lines insurance, which focuses on insureds that generally cannot purchase insurance from standard lines insurers due to a perceived risk related to their businesses. Included in this E&S Lines segment is the Company's Commercial Auto Division, which included all insurance policies related to Uber.

24. In March 2014, Uber announced it was becoming the first and only company to have policies in place that expanded the insurance of ride-sharing drivers to cover any potential insurance gap for accidents that occur while drivers are not providing transportation service for hire but are still logged onto the Uber application and available to accept a ride. These new policies, issued by James River, gave contingent coverage for a driver's liability at the highest requirement of any state in the United States. By 2019, James River's Uber policies produced $374.2 million of gross written premiums, representing over 40% of the Company's E&S Lines segment's gross written premiums and over 25% of its consolidated gross written premiums for the year.

### Materially False and Misleading Statements
### and Omissions During the Class Period

25. The Class Period begins on August 1, 2019, the day after James River issued a press release, after market close, announcing its second quarter 2019 financial results (the "2Q 2019 Earnings Release"). The 2Q 2019 Earnings Release reported "unfavorable reserve development

of $2.3 million compared to unfavorable reserve development of $2.2 million in the prior year quarter (representing a 1.2 and 1.1 percentage point increase to the Company's loss ratio in the periods, respectively);" which included $1.2 million of unfavorable development in the Company's E&S Lines segment.

26.     During the Company's corresponding earnings conference call on August 1, 2019, Defendant Myron stated that, in the second quarter of 2019, "changes in our reserve estimates resulted in approximately $25 million of loss reserves shifting from the 2018 accident year to the 2016 and '17 accident years," which was "to address higher-than-expected loss emergence from the 2016 and 2017 accident years while the 2018 accident year continues to run well and we feel good about where we're booking the 2019 accident year loss ratio in this line." Defendant Myron also assured investors that "[w]hen we look at the E&S segment, we are comfortable with our loss reserves."

27.     However, just two months after assuring investors that the Company was comfortable with its loss reserves, on October 8, 2019, the Company issued a press release announcing it had delivered a notice of early cancellation of all insurance policies issued to Uber, effective December 31, 2019. The Company also advised of an adverse development between $55 million and $60 million—primarily related to Uber policies for the 2016 and 2017 underwriting years. In announcing the cancellation, James River's CEO, Defendant Abram said the Company cancelled the Uber policies because "[t]his account has not met our expectations for profitability."

28.     On this news, James River's stock price declined $11.06 per share, or nearly 23 percent, from a closing price of $48.94 per share on October 8, 2019, to a closing price of $37.88 per share on October 9, 2019. Despite this significant decline in James River's stock price, the

Company's shares continued to trade at artificially inflated prices throughout the remainder of the Class Period because of Defendants' continued misrepresentations and omissions concerning the full scope, severity, and consequences of James River's inadequate reserves related to the Uber policies.

29.     On November 6, 2019, James River issued a press release announcing its third quarter 2019 financial results (the "3Q 2019 Earnings Release").  The 3Q 2019 Earnings Release reported "overall unfavorable reserve development of $57.0 million compared to unfavorable reserve development of $12.2 million in the prior year quarter (representing a 26.7 and 6.0 percentage point increase to the Company's loss ratio in the periods, respectively)," which "included $50.0 million of adverse development in the [E&S] Lines segment, driven by the 2016 and 2017 accident years of its commercial auto line," that the Company said was "driven by one large account [Uber] in two prior underwriting years."

30.     On November 7, 2019, in the Company's corresponding earnings conference call, James River's CEO, Defendant Abram, told investors that "[i]n Uber, we wrote a new type of risk that initially seemed to be highly profitable based on the data available to us.  But Uber's business and the underlying risk evolved very quickly.  Our underwriting assumptions and the related pricing did not keep pace with changes in Uber's business."  Defendant Abram also stated that the risk associated with the Company's Uber policies shifted as Uber expanded its business, noting that it "created a situation where the risk became too large in absolute terms given the size of our company; and candidly, in some years, we mispriced the risk."

31.     Defendant Abram went on to say that James River was "comfortable with our pricing for the 2018 and 2019 years[,]" noting that "[i]n response to poor results in 2016 and 2017, we negotiated substantial pricing increase for the contract on the 2018 renewal and renewed at

similar rates for the 2019 renewal."  Finally, Defendant Abram stated that the Company decided to cancel its Uber insurance policies "even though we believe the risk is well-priced," due to the passage of a bill in California that required companies like Uber to reclassify its drivers as employees rather than independent contractors, a change that Defendants claimed had not been factored into the Company's pricing for 2019.

32.    Additionally, on the same conference call, the Company's CFO, Defendant Doran, stated that, "the large Commercial Auto account will roll-off by the end of this year."  Defendant Doran also provided additional color on the adverse development, noting that:

> We had $50 million of adverse development in the Uber book, most of which was focused on the 2017 underwriting year, with the balance in the 2016 underwriting year.  In the most recent quarter, we had losses in excess of expected for the 2016 and 2017 years, but we did not see this for the more recent 2018 and 2019 years.  So we took no action there.

33.    On February 20, 2020, James River issued a press release announcing its fourth quarter and year end results for 2019 (the "FY 2019 Earnings Release").  The FY 2019 Earnings Release reported "unfavorable reserve development of $8.8 million compared to unfavorable reserve development of $5.8 million in the prior year quarter (representing a 4.0 and 2.9 percentage point increase to the Company's loss ratio in the periods, respectively)," including favorable development of $46,000 in the Company's E&S Lines segment.

34.    On February 27, 2020, James River filed its 2019 10-K with the SEC.  The 2019 10-K stated that when the Company accepts risk in its E&S Lines segment:

> we are careful to establish terms that are suited to the risk and the pricing.  As an excess and surplus lines writer, we use our freedom of rate and form to make it possible to take on risks that have already been rejected by admitted carriers who have determined they cannot insure these risks on approved forms at filed rates.

Later in the 2019 10-K, James River represented that when setting its reserves, it uses a "blend of actuarial techniques that are chosen to reflect the nature of the lines of insurance we underwrite. We seek to be consistent and transparent in establishing our reserves." In describing why the Company decided to cancel Uber's policies before they were set to expire, the 2019 10-K stated that "[Uber's] business was new, complex, and rapidly changing, and the Company's underwriting assumptions and the related pricing of this risk did not keep pace with the insured's escalating loss trends."

35. On April 29, 2020, James River issued a press release announcing its financial results for the first quarter of 2020 (the "1Q 2020 Earnings Release"). The 1Q 2020 Earnings Release reported "overall unfavorable reserve development of $0.9 million compared to unfavorable reserve development of $1.0 million in the prior year quarter (representing a 0.6 and 0.5 percentage point increase to the Company's loss ratio in the periods, respectively)," including favorable reserve development of $3,000 in the Company's E&S Lines segment.

36. On April 30, 2020, James River held its earnings conference call for the first quarter of 2020. On the call, Defendant Abram stated that the Company's results reflected the strength of its franchise, boasting that, "[f]reed from the burden of the large commercial auto account . . . that had come to so heavily influence our results, our E&S division grew 37%[.]" Later, Defendant Abram stated that "[t]he runoff of the large commercial account is going well. We're settling commercial auto claims at a rapid pace for amounts that are consistent with our held reserves." During the same call, Defendant Doran averred that the Company "did not experience any material reserve development in our Commercial Auto line. The runoff of what was formerly our largest account is performing well within our expectations."

37.     On July 29, 2020, James River issued a press release announcing its financial results for the second quarter of 2020 (the "2Q 2020 Earnings Release").  The 2Q 2020 Earnings Release reported "overall unfavorable reserve development of $1.1 million compared to unfavorable reserve development of $2.3 million in the prior year quarter (representing a 0.8 and 1.1 percentage point increase to the Company's loss ratio in the periods, respectively)," including favorable reserve development of $2.85 million in the Company's E&S Lines segment.

38.     On October 28, 2020, James River issued a press release announcing its financial results for the third quarter of 2020 (the "3Q 2020 Earnings Release").  The 3Q 2020 Earnings Release reported "overall unfavorable reserve development of $4.2 million compared to unfavorable reserve development of $57.0 million in the prior year quarter (representing a 2.8 and 26.7 percentage point increase to the Company's loss ratio in the periods, respectively)" including unfavorable reserve development of $27,000 in the Company's E&S Lines segment.

39.     On February 17, 2021, James River issued a press release providing "preliminary information" on its fourth quarter and full year 2020 results.  The press release reported "unfavorable development of prior year loss reserves of between $85 million and $90 million during the fourth quarter," which was "concentrated in the Company's Commercial Auto division within its E&S segment and its Casualty Re segment, with an offset of positive development in its Core E&S and Specialty Admitted Insurance segment."  In the press release, the Company's new CEO, Defendant D'Orazio, stated that the Company had "experienced a significant increase in reported losses in two areas of our Company – one large Commercial Auto account in runoff, and in our Casualty Reinsurance segment – and have meaningfully strengthened reserves in response." D'Orazio added, "[w]ith this strengthening of prior year reserves, I believe our franchise is

extremely well positioned to continue to take advantage of compelling market conditions across our business."

40.     On February 25, 2021, James River issued a press release announcing its financial results for the fourth quarter and full year 2020 (the "FY 2020 Earnings Release"). The FY 2020 Earnings Release reported "$62.3 million of unfavorable development in the E&S segment, inclusive of $75.8 million of unfavorable development in Commercial Auto and $13.5 million of favorable development in Core E&S," and reported that the unfavorable development in Commercial Auto was "principally from one large account." In the release Defendant D'Orazio commented, "we have meaningfully strengthened reserves in the Commercial Auto division of our E&S segment and our Casualty Reinsurance segment in response to a significant increase in reported losses," and added, "[w]hile our results for the fourth quarter and full year 2020 were very disappointing, the Company is extremely well positioned to take advantage of compelling market conditions across our segments."

41.     On February 26, 2021, James River filed the 2020 10-K with the SEC. The 2020 10-K stated that when the Company accepts risk in its E&S Lines segment:

> we are careful to establish terms that are suited to the risk and the pricing. As an excess and surplus lines writer, we use our freedom of rate and form to make it possible to take on risks that have already been rejected by admitted carriers who have determined they cannot insure these risks on approved forms at filed rates.

Later in the 2020 10-K, James River represented that when setting its reserves, it uses a "blend of actuarial techniques that are chosen to reflect the nature of the lines of insurance we underwrite. We seek to be consistent and transparent in establishing our reserves." In describing why the Company decided to cancel Uber's policies before they were set to expire, the 2020 10-K stated that "[Uber's] business was new, complex, and rapidly changing, and the Company's

underwriting assumptions and the related pricing of this risk did not keep pace with the insured's escalating loss trends."

42.     On February 26, 2021, James River hosted its fourth quarter and full year 2020 earnings conference call.  On his first call as the Company's CEO, Defendant D'Orazio stated that, during the quarter, James River strengthened its reserves by $75.8 million in its Commercial Auto runoff portfolio after the Company "saw emergence in the quarter, changed several assumptions, and acted immediately to bolster reserves, adding nearly 4% to our overall net reserve position for the group."  Defendant D'Orazio stated that the "Commercial Auto reserve increase primarily relates to the 2016 to 2018 years of the runoff portfolio where we've responded to heightened reported losses this quarter."

43.     The above statements identified in ¶¶ 25-42 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants failed to disclose: (1) James River had not adequately reserved for its Uber policies; (2) James River was using an incorrect methodology for setting reserves that materially understated the Company's true exposure to Uber claims; (3) as a result, James River was forced to increase its unfavorable reserves in subsequent quarters even after cancelling the Uber policies; and (4) as a result of the foregoing, Defendants' statements about James River's business, operations, and prospects, were materially false and/or misleading and/or lacked a reasonable basis.

## The Truth is Revealed

44.     The truth regarding James River's inadequate reserves was revealed after the close of the markets on May 5, 2021, when James River issued a press release announcing its first quarter 2021 results.  The Company's press release reported a first quarter net loss of $103.5 million,

driven by $168.7 million of unfavorable development in its largest segment, inclusive of $170.0 million of unfavorable development in the Commercial Auto Division, primarily due to the cancelled Uber account that had been in runoff since 2019. The press release quoted Defendant D'Orazio stating, "[d]uring the quarter, we continued to experience higher than expected reported losses in our large commercial auto account in runoff. In response, we meaningfully changed our actuarial methodology, resulting in a material strengthening of reserves. We believe this overhang has been eliminated, and that we are now fully able to focus on our prospective business and what continues to be a historically strong E&S [insurance] marketplace."

45.     In the corresponding earnings conference call held the same day, Defendant D'Orazio revealed that:

> In prior quarters, our actuarial work for this terminated Commercial Auto account have been based on industry data, pricing data, experience data, average claim severity data, and blended methodologies. However, the continuation of highly elevated reported losses in the first quarter of 2021 led us to conclude that using only our own loss experience in our paid and incurred reserve projections rather than the array of inputs that we had used in prior quarters, and giving greater weight to incurred methods would give us a better and more conservative estimate of ultimate losses on this account.

Defendant D'Orazio also stated that "[t]he result in the changed methodology is significant and also an acknowledgment that our recent loss emergence on the portfolio was likely more than what was originally thought to be a COVID-19 impacted catch up."

46.     Also on May 5, 2021, as a direct result of the losses attributable to the Uber account, James River announced that it had commenced an underwritten secondary public offering of approximately $175 million of its common shares, priced at $31.00 per share, with proceeds from the offering to be used for general corporate purposes. *Bloomberg* noted that the offering was priced at "the sector's steepest discount ever."

47.     On this news, James River's stock price dropped $12.27 per share, or more than 26 percent, from a closing price of $46.50 per share on May 5, 2021, to a closing price of $34.23 per share on May 6, 2021.

## CLASS ACTION ALLEGATIONS

48.     Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class, consisting of all persons and entities that purchased James River common stock between August 1, 2019 and May 5, 2021, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

49.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Throughout the Class Period, James River's common stock actively traded on the NASDAQ (an open and efficient market) under the ticker symbol "JRVR." Millions of James River shares were traded publicly during the Class Period on the NASDAQ. As of April 30, 2021, James River had more than 30.7 million shares of common stock outstanding. Record owners and other members of the Class may be identified from records maintained by James River or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

50.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

51.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests that conflict with those of the Class.

52.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.  whether Defendants violated the Exchange Act by the acts and omissions alleged herein;

b.  whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period misrepresented material facts about the business, operations, and prospects of James River;

c.  whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts about the business, operations, and prospects of James River;

d.  whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

e.  whether the market price of James River common stock during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations and omissions complained of herein; and

f.  the extent to which the members of the Class have sustained damages and the
proper measure of damages.

53.     A class action is superior to all other available methods for the fair and efficient
adjudication of this controversy because joinder of all members is impracticable. Furthermore, as
the damages suffered by individual Class members may be relatively small, the expense and
burden of individual litigation makes it impossible for members of the Class to individually redress
the wrongs done to them. There will be no difficulty in the management of this action as a class
action.

## UNDISCLOSED ADVERSE FACTS

54.     The market for James River common stock was open, well-developed, and efficient
at all relevant times. As a result of the materially false and/or misleading statements and/or
omissions particularized in this Complaint, James River common stock traded at artificially
inflated prices during the Class Period. Plaintiff and other members of the Class purchased James
River common stock relying upon the integrity of the market price of the Company's common
stock and market information relating to James River and have been damaged thereby.

55.     During the Class Period, Defendants materially misled the investing public, thereby
inflating the price of James River common stock, by publicly issuing false and/or misleading
statements and/or omitting to disclose material facts necessary to make Defendants' statements, as
set forth herein, not false and/or misleading. The statements and omissions were materially false
and/or misleading because they failed to disclose material adverse information and/or
misrepresented the truth about James River's business, operations, and prospects as alleged herein.
These material misstatements and/or omissions had the cause and effect of creating in the market
an unrealistically positive assessment of the Company and its business, thus causing the
Company's common stock to be overvalued and artificially inflated or maintained at all relevant

times. Defendants' materially false and/or misleading statements during the Class Period directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class who purchased the Company's common stock at artificially inflated prices and were harmed when the truth was revealed.

## LOSS CAUSATION

56.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss, *i.e.*, damages, suffered by Plaintiff and the Class.

57.     During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market. This artificially inflated the price of James River's common stock and operated as a fraud or deceit on the Class.   When Defendants' prior misrepresentations, information alleged to have been concealed, fraudulent conduct, and/or the effect thereof were disclosed to the market, the price of James River's stock fell precipitously, as the prior artificial inflation came out of the price.

## SCIENTER ALLEGATIONS

58.     As alleged herein, Defendants acted with scienter in that Defendants knew or were reckless as to whether the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew or were reckless as to whether such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

59.     As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding James River, their control over, receipt, and/or modification of James River's allegedly materially misleading statements and omissions, and/or

their positions with the Company, which made them privy to confidential information concerning James River, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

60.     The market for James River common stock was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose particularized in this Complaint, James River common stock traded at artificially inflated and/or maintained prices during the Class Period.  Plaintiff and other members of the Class purchased the Company's common stock relying upon the integrity of the market price of James River common stock and market information relating to James River and have been damaged thereby.

61.     At all relevant times, the market for James River common stock was an efficient market for the following reasons, among others:

> a.  James River was listed and actively traded on the NASDAQ, a highly efficient and automated market;
>
> b.  As a regulated issuer, James River filed periodic public reports with the SEC and/or the NASDAQ;
>
> c.  James River regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or
>
> d.  James River was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales

force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

62.    As a result of the foregoing, the market for James River common stock promptly digested current information regarding James River from all publicly available sources and reflected such information in James River's stock price.  Under these circumstances, all purchasers of James River stock during the Class Period suffered similar injury through their purchase of James River stock at artificially inflated prices and a presumption of reliance applies.

63.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business, operations, and prospects—information that Defendants were obligated to disclose during the Class Period but did not—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

64.    The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when

21

made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

65.     In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of James River who knew that the statement was false when made.

## FIRST CLAIM
### Violation of Section 10(b) of the Exchange Act and
### Rule 10b-5 Promulgated Thereunder
### Against All Defendants

66.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

67.     During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of James River common stock; and (iii) cause Plaintiff and other members of the Class to purchase James River common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each defendant, took the actions set forth herein.

68.     Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to

maintain artificially high market prices for James River common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

69.      Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about James River's business, operations and prospects, as specified herein.  Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of James River's business, operations, and prospects, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about James River and its business, operations, and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

70.      Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) each of the Individual Defendants was a high-level executive and/or director at the Company during the Class Period and a member of the Company's management team or had control thereof; (ii) each of the Individual Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development, and reporting of the Company's business, operations,

and prospects; (iii) each of the Individual Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of, and had access to, other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) each of the Individual Defendants was aware of the Company's dissemination of information to the investing public, which they knew and/or recklessly disregarded was materially false and misleading.

71.     Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing James River's operating condition, business practices, and prospects from the investing public and supporting the artificially inflated and/or maintained price of its common stock. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

72.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of James River common stock was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the stock trades, and/or in the absence of material adverse information that was

known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class purchased James River common stock during the Class Period at artificially high prices and were damaged thereby.

73.     At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that James River was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased their James River common stock, or if they had purchased such securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

74.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

75.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

**SECOND CLAIM**
**Violation of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

76.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

77.     The Individual Defendants acted as controlling persons of James River within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions in the Company, participation in, and/or awareness of the Company's operations and intimate knowledge of the false statements filed by the Company with the SEC and disseminated

to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading. Each of the Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected. Further, Individual Defendants Myron, Abram, and Doran signed the Company's 2019 10-K and Individual Defendants Abram, Doran, and D'Orazio signed the Company's 2020 10-K, and thus were responsible for the false and misleading statements made therein.

78.     In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

79.     As set forth above, James River and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

a. Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b.  Awarding Plaintiff and the other members of the Class damages in an amount that may be proven at trial, together with interest thereon;

c.  Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

d.  Awarding such other relief as this Court deems appropriate.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: July 9, 2021                Respectfully submitted,

By: */s/ Steven J. Toll*

**COHEN MILSTEIN SELLERS & TOLL PLLC**

Steven J. Toll (Va. Bar No. 15300)
Daniel S. Sommers
S. Douglas Bunch
1100 New York Ave. NW | Fifth Floor
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
stoll@cohenmilstein.com
dsommers@cohenmilstein.com
dbunch@cohenmilstein.com

*Liaison Counsel*

**SAXENA WHITE P.A.**

Steven B. Singer
Rachel A. Avan
10 Bank Street, 8th Floor
White Plains, NY 10606
Telephone: (914) 437-8551
Facsimile: (888) 631-3611
ssinger@saxenawhite.com
ravan@saxenawhite.com

--and--

Maya Saxena
Joseph E. White, III
Lester R. Hooker
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Telephone: (561) 394-3399
Facsimile: (561) 394-3382
msaxena@saxenawhite.com
jwhite@saxenawhite.com
lhooker@saxenawhite.com

*Counsel for Plaintiff Employees' Retirement Fund
of the City of Fort Worth dba Fort Worth
Employees' Retirement Fund*