**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

|  |  |
|---|---|
| *In Re James River Group Holdings, Ltd. Securities Litigation* | 3:21-cv-00444-MHL |

**MEMORANDUM OF LAW IN SUPPORT OF
<u>DEFENDANTS' MOTION TO DISMISS</u>**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ............................................................................................. 1

STATEMENT OF FACTS ..................................................................................................... 4

I.   James River's Business............................................................................................... 4

II.  James River Underwrites Novel Policies for Uber .................................................... 6

III. Plaintiffs' Allegations Regarding the Reserves for the Uber Policies....................... 9

    A.  Plaintiffs Rely on 15 Anonymous Former Claims Department Employees
       With No Insight Into the Actuarial Process. ............................................................ 9

    B.  Plaintiffs Fail to Allege Facts Regarding Any Individual Defendant.................... 11

IV.  The Alleged Misstatements...................................................................................... 11

ARGUMENT ....................................................................................................................... 12

I.   Plaintiffs Fail to Plead That the Challenged Statements Were False or Misleading. ....... 12

    A.  Alleged Misstatements Regarding Loss Reserves Are Inactionable
       Statements of Opinion.......................................................................................... 13

       1.  Plaintiffs Fail to Plead Facts Demonstrating That Any Alleged
           Misstatement Was Not Genuinely Believed When Made. ....................... 13

           a.  Plaintiffs' Failure to Plead Facts Regarding Loss Reserves
               for the Uber Account Overall Is Fatal To Their Claims. .............. 14

           b.  The Accounts of the Anonymous FEs Should Be
               Disregarded. ................................................................................. 15

           c.  Plaintiffs Fail to Plead Any Facts To Suggest That Any
               Defendant Made Any Knowing Misstatement. ........................... 16

        2.  Plaintiffs Fail to Allege That Defendants Failed to Disclose Facts
           Rendering Their Statements False or Misleading. ................................... 17

    B.  Plaintiffs' Attempts to Plead Misrepresentations by Hindsight Also Fail. ........... 19

    C.  Defendants' Statements Regarding GAAP Were Not False or Misleading. ........ 20

    D.  Many Challenged Statements Are Inactionable Forward-Looking
       Statements .......................................................................................................... 21

II.  The Section 10(b) Claim Should Be Dismissed for Failure to Plead Particularized
    Facts Giving Rise to a Strong Inference of Scienter.................................................. 22

    A.  Plaintiffs Fail to Plead Facts Raising a Strong Inference of Scienter Based
       on the FE Allegations........................................................................................... 23

    B.  Plaintiffs' Remaining Theories of Scienter Cannot Save Their Claims. .............. 26

    C.  Plaintiffs Fail to Allege That the Corporation Acted with Scienter...................... 27

    D.  The Opposing Inference of Non-Fraudulent Intent Is More Compelling. ............ 28

III.     Plaintiffs Have Failed to Allege Loss Causation. .............................................................. 29

IV.     Plaintiffs Fail to Plead Control Person Liability as to the Individual Defendants............ 30

CONCLUSION ................................................................................................................................ 30

## TABLE OF AUTHORITIES

**CASES**

*Atl. Mut. Ins. Co. v. Comm'r*,
523 U.S. 382 (1998)..........................................................................................................4

*Chapman v. Mueller Water Prods., Inc.*,
466 F. Supp. 3d 382 (S.D.N.Y. 2020)............................................................................20

*Cozzarelli v. Inspire Pharms., Inc.*,
549 F.3d 618 (4th Cir. 2008) ...............................................................................4, 26, 27

*Gasner v. Bd. of Supervisors of Cnty. of Dinwiddie*,
103 F.3d 351 (4th Cir. 1996) ..........................................................................................22

*Greenhouse v. MCG Cap. Corp.*,
392 F.3d 650 (4th Cir. 2004) ............................................................................................8

*In re AmTrust Fin. Servs., Inc. Sec. Litig.*,
2019 WL 4257110 (S.D.N.Y. Sept. 9, 2019)..................................................................13

*In re PEC Sols., Inc. Secs. Litig.*,
418 F.3d 379 (4th Cir. 2005) ....................................................................................21, 26

*Katyle v. Penn Nat'l Gaming, Inc.*,
637 F.3d 462 (4th Cir. 2011) ..........................................................................................29

*KBC Asset Mgmt. NV v. DXC Tech. Co.*,
19 F.4th 601 (4th Cir. 2021) ...............................................22, 24, 26, 27, 28, 29, 30

*Maguire Fin., LP v. PowerSecure Int'l, Inc.*,
876 F.3d 541 (4th Cir. 2017) ....................................................................................12, 23

*Makor Issues & Rts., Ltd. v. Tellabs*,
513 F.3d 702 (7th Cir. 2008) ..........................................................................................28

*Malone v. Microdyne Corp.*,
26 F.3d 471 (4th Cir. 1994) ............................................................................................21

*Marsh Grp. v. Prime Retail, Inc.*,
46 F. App'x 140 (4th Cir. 2002) .....................................................................................22

*Matrix Cap. Mgmt. Fund, LP v. BearingPoint, Inc.*,
576 F.3d 172 (4th Cir. 2009) ........................................................................24, 26, 27, 28

*Nolte v. Cap. One Fin. Corp.*,
390 F.3d 311 (4th Cir. 2004) ................................................................................13, 18, 21

iii

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund,*
 575 U.S. 175 (2015)......................................................................3, 13, 14, 16, 17, 18, 21, 23

*Paradise Wire & Cable Defined Benefit Pension Plan v. Weil,*
 918 F.3d 312 (4th Cir. 2019) ............................................................................................18, 19

*Proter v. Medifast, Inc.,*
 2013 WL 1316034 (D. Md. Mar. 28, 2013)...........................................................................27

*Rombach v. Chang,*
 355 F.3d 164 (2d Cir. 2004)...................................................................................................21

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta,*
 552 U.S. 148 (2008)................................................................................................................12

*Teachers' Ret. Sys. of LA v. Hunter,*
 477 F.3d 162 (4th Cir. 2007) ......................................................................................15, 16, 19

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.,*
 551 U.S. 308 (2007)................................................................................................................22

*Tongue v. Sanofi,*
 816 F.3d 199 (2d Cir. 2016)...................................................................................................17

*Yates v. Municipal Mortg. & Equity, LLC,*
 744 F.3d 874 (4th Cir. 2014) .................................................4, 15, 16, 22, 23, 24, 25, 27, 28

**STATUTES**

15 U.S.C. § 78j(b).............................................................................................................................12

15 U.S.C. § 78t(a) ............................................................................................................................30

15 U.S.C. § 78u–5(c)(1)...................................................................................................................21

**OTHER AUTHORITIES**

Rule 9(b) ...........................................................................................................................................12

**PRELIMINARY STATEMENT**

Plaintiffs' Amended Complaint (the "AC") is a misguided attempt to manufacture a claim for securities fraud out of James River's good-faith efforts to estimate the insurance reserves backing an entirely new kind of insurance policy. In early 2014, James River created a new type of insurance coverage for Uber, then an up-and-coming ride-sharing company. Uber allowed passengers to book a ride using their cell phone through the Uber app, offering a popular alternative to traditional taxi service. However, this new ride-sharing phenomenon had an insurance "gap": there was no existing insurance product that covered an Uber driver while waiting to connect with or en route to pick up a passenger. James River crafted a new insurance policy to cover this "gap."

In connection with the issuance of these novel policies, James River estimated and set aside funds it believed were adequate, based on available information, to pay all *future* claims under the Uber policies—amounts known in the insurance industry as loss reserves. Because the total amount of future losses is not knowable until years later when all claims under a policy are made and resolved, insurers use actuarial judgment to estimate the amounts to be set aside as loss reserves to pay these future losses. While James River estimated loss reserves in good faith using its actuarial judgment, the novelty of the Uber policies—which had never been written before and insured an entirely new kind of risk—presented unique challenges and significantly greater uncertainty in estimating loss reserves than would a more established insurance product, as the Company frequently warned its investors. After several years of providing Uber this insurance coverage, in late 2019 James River announced that it would no longer issue new policies to Uber because the business had proven unprofitable. In 2020 and 2021, James River

1

determined that it needed to increase the reserves backing the Uber policies because its prior estimates proved to be insufficient to cover the unexpectedly high losses that ultimately emerged.

With a hindsight view of those losses, the AC attempts to twist the Company's good-faith efforts into a claim for securities fraud, asserting that Defendants must have known that the loss reserves for the Uber policies would be insufficient and therefore that the Company's financials and statements about reserves were false or misleading.  But while the AC contends that the Company's statements about its *loss reserves* for Uber policies overall were knowingly understated, Plaintiffs' factual allegations barely mention these loss reserves. Plaintiffs instead focus entirely on allegations regarding *case reserves* for individual claims reported to James River under the Uber policies, relying on the scattered accounts of 15 anonymous, low-level former employees who worked in the Company's claims department to suggest that the Company's processes for setting case reserves were deficient.

But Plaintiffs fail to plead any facts to connect these specific case reserves to the Company's loss reserves.  Plaintiffs say nothing at all about the Company's actuarial process for estimating loss reserves and allege no facts about the relationship between the case reserves on which they rely and the statements about overall loss reserves that they seek to challenge. Instead, Plaintiffs ask this Court to assume that loss reserves estimates—which predict the total losses for the Uber policies, including on claims that had not yet been reported—could have been derived from case reserves alone through simple arithmetic and that Defendants knew or recklessly disregarded known deficiencies.  The Fourth Circuit has repeatedly rejected similar attempts to plead securities fraud by stacking inference upon inference, and Plaintiffs' failure to allege any facts whatsoever about how the Company exercised its actuarial judgment in estimating the loss reserves necessary to cover future claims is fatal to their claims.  Plaintiffs

2

fall far short of the high bar imposed by the Private Securities Litigation Reform Act ("PSLRA") for several reasons.

*First*, Plaintiffs fail to plead any actionable misstatement, as required to state a claim. Plaintiffs' alleged misstatements concern the adequacy of the Company's reserve estimates and therefore are statements of opinion evaluated under the heightened pleading standard established by the Supreme Court in *Omnicare*. 575 U.S. 175 (2015). The AC does not meet that high bar, as it lacks any particularized factual allegation that the Defendants did not believe their statements when they made them or omitted known material facts regarding the basis for their opinions so as to render the statements misleading. Plaintiffs instead assert that because loss reserves ultimately needed to be increased, Defendants must have known at the time of each alleged misstatement that reserves were insufficient. This impermissible attempt to plead fraud by hindsight fails under Fourth Circuit law.

*Second*, Plaintiffs fall far short of the PSLRA's high bar for pleading scienter. Plaintiffs allege no facts at all regarding the process for estimating the loss reserves on which their claims are based, much less particularized facts supporting the required "strong inference" that Defendants knowingly or recklessly made any misstatement. Plaintiffs' effort to plead scienter based on the purported accounts of claims employees handling individual Uber claims fails because those allegations are not tied to the Company's actuarial process for estimating overall loss reserves and do not support any inference of fraud. On the contrary, many of those allegations actually paint the picture of a conservative process for estimating case reserves for Uber claims—for example, that case reserves were subject to multiple layers of review, that the Company had an approval process for increasing such reserves, and that the Company's Reserve Committee reviewed and monitored loss reserves and data from the Uber account. The far more

compelling inference to be drawn is that Defendants engaged in a good-faith exercise of actuarial judgment to estimate overall losses for the entirely new kind of insurance provided under the Uber account and that over time those estimates turned out to be inadequate.

*Finally*, several of Plaintiffs' alleged misstatements are also inactionable under the PSLRA's Safe Harbor because they addressed whether reserves would be adequate to cover *future* losses and were accompanied by meaningful cautionary language.  For these and other reasons, the motion to dismiss should be granted.

**STATEMENT OF FACTS**[1]

### I.   James River's Business

James River Group Holdings is a holding company that owns and operates a group of specialty insurance and reinsurance companies, including James River Insurance.  AC ¶ 35.[2] James River's products include property and casualty insurance policies that cover a particular risk for a given time period.  Claims under such policies may take many years to be reported, and it can take years for an insurer to determine the actual amount to be paid on a given claim.

Like other insurers, James River sets aside money—known as loss reserves—to estimate the total losses from insurance claims that have been and will be made under policies issued by the Company.  AC ¶¶ 37, 43; *see Atl. Mut. Ins. Co. v. Comm'r*, 523 U.S. 382, 384 (1998) ("Loss reserves are estimates of amounts insurers will have to pay for losses that have been reported but

---

[1] Plaintiffs' factual allegations are taken as true solely for purposes of this motion, except where those allegations contradict the contents of documents cited in the AC.  *Cozzarelli v. Inspire Pharms., Inc.*, 549 F.3d 618, 625 (4th Cir. 2008).  This court may also take judicial notice "of the content of relevant SEC filings and other publicly available documents." *Yates v. Municipal Mortg. & Equity, LLC*, 744 F.3d 874, 881 (4th Cir. 2014).  Copies of such documents are attached as exhibits to the accompanying Declaration of Susan Gittes.

[2] For purposes of this motion, "James River" or "the Company" refers to James River Group Holdings, its subsidiaries, or any of them.

4

not yet paid, for losses that have been incurred but not yet reported, and for administrative costs of resolving claims."); Ex. 2 at 18 ("[Reserve] estimates are by their nature subjective and imprecise, and ultimate losses and loss adjustment expenses may vary from established reserves."). James River's overall loss reserves are estimated by the Company's internal and external actuaries, with oversight from the Company's Reserve Committee. One component of the Company's loss reserves are case reserves, which are amounts set aside for each particular claim actually made under a given policy. *See, e.g.*, Ex. 2 at 18, 38–39. Case reserves are initially set by the Company's claims department and are periodically revised as additional information is obtained regarding a particular claim of loss; case reserves often undergo multiple layers of review. *Id.* at 13. The Company discloses that both individual case reserves and overall loss reserves are estimates based on data currently available to the Company and are subject to a number of uncertainties. *See id.* at 70–71, F-24.

As described in its financial statements, James River, like other insurers, has traditionally used a range of factors and actuarial methods to estimate overall loss reserves, weighing data from the insurance industry as well as its own historical experience. AC ¶ 186; *see also* Ex. 2 at 18. In estimating overall loss reserves, the Company must estimate both reserves for reported claims, which are derived from the Company's case reserves, and reserves for claims that have been "incurred but not yet reported" ("IBNR"). AC ¶ 186; *see also* Ex. 2 at 18; Ex. 37 at ¶ 4.33 (cited in AC ¶¶ 219–20). The estimation of IBNR reserves—which the Company by definition does not yet have any information about—is especially uncertain, as the Company has to estimate the number, timing and severity of incurred but as-yet unreported claims. *See* Ex. 18 at 19; Ex. 37 at ¶ 4.33.

**II.    James River Underwrites Novel Policies for Uber**

In March 2014, James River began underwriting a new type of insurance policy covering then up-and-coming rideshare company Uber through its Commercial Auto Division.  AC ¶¶ 40–41.  James River's Commercial Auto business was part of the Company's excess and surplus ("E&S") lines segment, which insures "unique characteristics and risks" that standard insurance carriers will not cover. *Id.* ¶ 36.  As James River advises its investors, because of the "unique" risks insured, the E&S business necessarily involves a greater degree of risk than typical insurance reserves. *Id.* (quoting Ex. 2 at 9). For example, James River disclosed that for E&S lines, "we sometimes have to make estimates of future losses for risk classes with which we"—and the market as a whole—"do not have a great deal of experience."  Ex. 2 at 38.

In 2014, ridesharing companies such as Uber were a "relatively new phenomenon," (AC ¶¶ 40–41), and Uber's fast-growing business had an insurance "gap": There was no available, established insurance coverage for the periods when an Uber driver was driving around waiting for a fare or when a driver had been paired with a rider through the Uber app and was driving to pick up the customer.  James River contracted with Uber to fill this coverage gap through its E&S lines segment.  At the time, James River was the only company providing this type of insurance. *Id.* ¶ 41. Annually from March 2015 to March 2019, James River renewed its contract with Uber, offering coverage across varying states—which each presented its own risks. *See* AC ¶ 43; Ex. 25 at 3; Ex. 26 at 10; Ex. 27 at 2.

The market was aware of the uncertainties of the Uber business.  In the words of a 2019 analyst report cited in the AC, James River's "[n]ewer products bring less reserving certainty" because they "have less cost and claim data surrounding them, which increases the potential for adverse surprises down the road."  Ex. 34 at 4 (cited in AC ¶¶ 3, 45); *see also* Ex. 35 at 5 (analyst report listing as a "downside risk" the Company's "exposure to the rideshare market,

which pressures margins") (cited in AC ¶ 50).  Unfortunately, this statement proved to be prescient: in October 2019, James River announced that it was terminating the Uber contract because it had not "met our expectations for profitability."  AC ¶ 46.  Although the contract would be terminated at the end of 2019, the Company explained that it would still be responsible for claims that occurred during the periods covered by existing policies.  *Id.* James River simultaneously announced that it was increasing its reserves by around $55 to $60 million, principally due to the Uber contract, resulting in a net loss of $25.2 million.  *Id.* ¶ 46.

Defendant Abram, then Chairman and CEO, told investors that "we wrote a new type of risk that initially seemed to be highly profitable based on the data available to us, but Uber's business and the underlying risk evolved very quickly."  Ex. 27 at 2.  As he explained:

> Our underwriting assumptions and the related pricing did not keep pace with changes in Uber's business.  Uber created a new transportation model that altered the American transport system and presented new challenges and opportunities for the insurance industries.  The risk associated with the model shifted as the company expanded into new regions, added tens of thousands of drivers and evolved beyond just ride hailing.  All of these factors created a situation where the risk became too large in absolute terms given the size of our company.  And candidly, in some years, we mispriced the risk.

*Id.*  But he stated that, moving forward, he was "comfortable" that losses from the Uber account would be manageable.  *Id.*  On the same call, Defendant Doran stated that the Company believed loss reserves were sufficient based on then-current information but would be monitoring the Uber block closely for new data that might affect these estimates: "And we're certainly watching it very carefully and very closely, especially around claims and further development and behavior of that, but we feel that we have put up a number that is in response . . . to the data that we saw that we were presented with, and that's where we got to this quarter." *Id.* at 5.

In February 2021, the Company informed investors of $85–$90 million in additional adverse reserve development.  AC ¶ 145 (citing Ex. 17).  As Defendant D'Orazio explained on an investor call, the Company decided to increase loss reserves given "heightened reported losses

7

this quarter" in the Uber block, which had previously appeared to be trending down.  Ex. 30 at 3.

D'Orazio believed that "this trend reflect[ed] COVID-driven delays" in submitting claims after

the onset of the COVID pandemic, "possibly exacerbated by higher unemployment rates."  *Id.*

In May 2021, James River announced it had increased loss reserve estimates by $170

million.  AC ¶¶ 156–57 (quoting Ex. 20 at 1).  As D'Orazio explained, although the Company

had expected losses to taper off, the "continued heavy reported loss[es]" observed in early 2021

suggested "more inherent severity" from the Uber account than previously anticipated.  Ex. 31 at

3.  Given these sustained losses, James River decided to begin estimating loss reserves for the

Uber block "using only our own loss experience in our paid and incurred reserve projections

rather than the array of inputs that we had used in prior quarters[.]"  *Id.*  As repeatedly disclosed

to investors, the Company had previously estimated reserves by using both industry data and its

own historical data from the Uber account.  Ex. 2 at 71; Ex. 10 at 72; Ex. 18 at 75.  In light of

recent experience, the Company decided that focusing more on its own historical data in

estimating loss reserves "would give us a better and more conservative estimate of ultimate

losses on this account."  Ex. 31 at 2.

On September 30, 2021, James River announced its entry into a reinsurance agreement

that would provide "economic finality" on the Uber account.  Ex. 23 at 69.  In connection with

the transaction, the Company announced a *post-tax* charge of $23.5 million.  *Id.*  The market

reacted positively to this news, with the Company's stock price rising 11%.  Ex. 38.[3]  On October

26, 2021, James River announced preliminary third quarter results, which noted that the same

loss associated with the reinsurance of the Uber block announced the month before would total

$29.6 million *pre-tax*.  AC ¶ 62; *see* Ex. 24 at 4.  While Plaintiffs attempt to attribute a drop in

---

[3] *See Greenhouse v. MCG Cap. Corp.*, 392 F.3d 650, 655 n.4 (4th Cir. 2004) (taking judicial notice of published stock prices in context of a motion to dismiss).

share price to this disclosure, the charge had already been announced; indeed, the analyst report cited in the AC attributed the stock drop to news having nothing to do with Uber, as the analyst had "previously adjusted for the [reinsurance transaction]." Ex. 36 at 1; *see* AC ¶ 62; Ex. 24 at 4.

**III.    Plaintiffs' Allegations Regarding the Reserves for the Uber Policies**

**A.    Plaintiffs Rely on 15 Anonymous Former Claims Department Employees With No Insight Into the Actuarial Process.**

Although the AC asserts that the 2019–2021 increases in loss reserve estimates were the direct result of purported "systemic failures" in the Company's estimation of "reserves," AC ¶ 64, Plaintiffs do not plead any facts regarding the process they seek to challenge. In fact, Plaintiffs omit any mention of disclosures regarding James River's process for estimating loss reserves, which were estimated by actuaries weighing a range of factors and inputs, including the Company's own historical claims data, data from its peers, and forecasts of economic, social, or other factors, *see, e.g.*, Ex. 2 at 18, and were also reviewed by external actuaries biannually to give the Company "additional comfort on the adequacy of our reserves." *Id.* at 70.  Instead, Plaintiffs rely entirely on the accounts of 15 former employees from the claims department involved in setting *case reserves* on specific claims made under the policies issued to Uber. Notwithstanding that these employees had no actuarial expertise and nothing to do with estimating loss reserves, Plaintiffs rely on these accounts to claim that James River's loss reserves were knowingly understated and, specifically, that the Company lacked any methodology for setting reserves and intentionally hired claims adjusters with little claims experience and gave them inadequate training, all to keep Uber reserves low.  AC ¶¶ 64–102.

Plaintiffs rely on the account of a former claims examiner, FE1, to claim that the Company had "no methodology" for setting loss reserves (AC ¶ 65), but this assertion mixes apples and oranges and is contradicted by Plaintiffs' own allegations elsewhere in the AC.  An employee's process for setting case reserves on a single known claim says nothing about the

9

Company's actuarial process for estimating loss reserves. Moreover, other FEs relied on by Plaintiffs describe numerous aspects of the Company's process for setting case reserves. For example, Plaintiffs allege that (*i*) the Company used the "Mitchell" system to estimate case reserves, which recommended a case reserve amount based on certain inputs, AC ¶ 92; (*ii*) that some case reserves received multiple layers of review by more senior employees, *id.* ¶¶ 95–102; and (*iii*) that processes existed for requesting reserve increases, such as by submitting a large loss report, AC ¶¶ 76–77.

Similarly, while Plaintiffs contend that claims examiners lacked adequate training and had a high turnover rate—for instance, asserting that the Company hired "300 to 400 adjusters just for the Uber Account," including "recent college graduates" and former Starbucks baristas, AC ¶¶ 84, 86–87—Plaintiffs fail to allege any facts supporting their assertion that this practice was designed to keep Uber reserves low. Plaintiffs do not explain what qualifications should have been required to work as a junior claims examiner, detail their job responsibilities, or describe any specific claims overseen by any particular witness. Instead, Plaintiffs resort to mixing together the accounts of different witnesses with little context or supporting detail. *See, e.g.*, AC ¶¶ 65–66, 69, 79.

While Plaintiffs contend that these processes and practices were designed to keep reserves low, Plaintiffs offer no facts in support of that claim and entirely ignore that the Company's prudent practice of limiting the authority of low-level claims employees to establish case reserves was repeatedly disclosed. *See* AC ¶ 96 (citing Ex. 10 at 14). Nor do Plaintiffs plead facts about claims overall for the Uber account or the financial effects of these purported issues, instead relying expressly on "rumors." *Id.* ¶ 94.

10

**B.**    **Plaintiffs Fail to Allege Facts Regarding Any Individual Defendant.**

Plaintiffs do not plead any facts connecting any Individual Defendant to these purported problems in the claims department, nor do they claim that any of their former employee witnesses had direct contact with any Individual Defendant or Company actuary.   Plaintiffs nonetheless attempt to connect the Individual Defendants to the purported issues with Uber claims by asserting that: (*i*) the Individual Defendants served on the Reserve Committee that was ultimately responsible for determining the Company's *loss reserve* estimates based on recommendations from the Company's internal and external actuaries, and (*ii*) certain non-defendant executives (specifically Courtenay Warren and Anita Rogers (who oversaw E&S claims) and Richard Schmitzer (the President of the Company's E&S division)) attended meetings regarding certain case reserves and reviewed a sampling of Uber claims, particularly those "over a certain threshold." AC ¶¶ 97, 254.  Plaintiffs lack any allegation about the content of these reports, except that they related to *case* reserves.  At most, Plaintiffs allege that non-Defendants Rogers and Warren received information about Uber claims that were potentially under- or over-reserved. *See id.* ¶¶ 96–100.  Plaintiffs do not explain why or how the after-the-fact criticisms of a few claims employees would have been raised to the Reserve Committee, which assessed the adequacy of the Company's reserves *overall. See* Ex. 2 at 18.

**IV.    The Alleged Misstatements**

Plaintiffs claim that James River's financial statements from February 2019 through October 2021 were false or misleading in light of the allegations described above, which in their view show that Defendants knew the Uber account was under-reserved and unprofitable.  AC ¶¶ 103–77.  They allege that the Company made misrepresentations concerning the adequacy of the Company's reserve estimates in calls with investors where they explained the Company's process for resolving Uber claims. *Id.* ¶¶ 185–203. Finally, Plaintiffs allege that Defendants

11

misrepresented their compliance with Generally Accepted Accounting Principles ("GAAP"). *See id.* ¶¶ 178–79; 227–31.

## ARGUMENT

To state a claim under Section 10(b), a plaintiff must adequately allege, among other things, that the defendant made a material misrepresentation or omission and that the defendant acted with scienter. *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008); 15 U.S.C. § 78j(b). Additionally, Rule 9(b) and the PSLRA impose a "heightened pleading standard" that a securities fraud plaintiff must meet to survive a motion to dismiss, which is designed "to protect defendants' reputations from baseless accusations, eliminate meritless suits brought only to extract a settlement [and] discourage fishing expeditions." *Maguire Fin., LP v. PowerSecure Int'l, Inc.*, 876 F.3d 541, 546 (4th Cir. 2017).[4] Plaintiffs have failed to allege with the requisite particularity that Defendants made false statements of material fact, much less set forth particularized facts sufficient to raise a strong inference that they did so with an intent to deceive investors. And because control-person liability requires a successful § 10(b) claim, Plaintiffs' failure to adequately plead a §10(b) claim dooms their § 20(a) claim as well.

## I.      Plaintiffs Fail to Plead That the Challenged Statements Were False or Misleading.

Plaintiffs' claims fail for the threshold reason that Plaintiffs cannot allege any actionable misstatement. Plaintiffs plead three categories of alleged misstatements: (*i*) statements derivative of Plaintiffs' core theory that the Company fraudulently understated its reserves; (*ii*) related opinion statements based on compliance with GAAP; and (*iii*) protected forward-looking statements. None of them are actionable.

---

[4] Internal quotation marks, brackets, and citations are omitted unless otherwise noted.

### A.    Alleged Misstatements Regarding Loss Reserves Are Inactionable Statements of Opinion.

Plaintiffs' purported misrepresentations are premised on the contention that the Company's reserves were understated.  The Fourth Circuit has made clear that reserve estimates must be evaluated as statements of opinion, not fact.  *Nolte v. Cap. One Fin. Corp.*, 390 F.3d 311, 315–16 (4th Cir. 2004).  This means that they are not actionable unless they meet the strict standard set forth by the Supreme Court in *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175 (2015).  Under *Omnicare*, statements of opinion like those regarding reserve estimates are not actionable unless the plaintiff pleads particularized facts indicating that the speaker (*i*) "did not hold the belief she professed" or (*ii*) omitted "particular (and material) facts" known to the speaker "going to the basis" of the opinion such that the statements are rendered misleading.  *Id.* at 185–86, 194.  This heightened standard to plead an actionable misstatement of opinion is akin to the stringent standard for pleading scienter.  *See In re AmTrust Fin. Servs., Inc. Sec. Litig.*, 2019 WL 4257110, at *17 (S.D.N.Y. Sept. 9, 2019).  Plaintiffs have failed to state a claim under either prong of *Omnicare*.

#### 1.    Plaintiffs Fail to Plead Facts Demonstrating That Any Alleged Misstatement Was Not Genuinely Believed When Made.

The AC lacks any factual allegations that Defendants did not genuinely believe in their reserve estimates and related statements at the time they were made, much less particularized factual allegations as required to state a claim.  As *Omnicare* explained, a "sincere statement" of opinion, "however irrational[]," is not actionable even if it later turns out to be incorrect or subject to revision.  575 U.S. at 186, 189.  Plaintiffs' attempts to allege that Defendants did not genuinely believe the Company's reserve estimates rest entirely on an assumption that Defendants knew that a material reserve charge would be required.  To support this claim, Plaintiffs rely on the irrelevant accounts of former employees in the claims department who were

13

not involved in the estimation of reserves for the Uber block overall. But none of these allegations come close to demonstrating that Defendants did not believe the Company's reserve estimates were sufficient at the time of any alleged misstatement, as required to challenge an opinion as a misstatement of fact under *Omnicare*. 575 U.S. at 186.

> **a.     Plaintiffs' Failure to Plead Facts Regarding Loss Reserves for the Uber Account Overall Is Fatal To Their Claims.**

While the AC contends that Defendants' statements regarding the loss reserves backing the Uber account and related statements were false, Plaintiffs fail to plead any facts regarding loss reserves for the Uber account overall.  Plaintiffs use the term "reserves" interchangeably to refer to both case reserves set by claims staff on individual Uber claims and the Company's actuarial estimates of loss reserves overall.  *See, e.g.*, AC ¶¶ 65, 252.  Under Plaintiffs' theory, because certain anonymous former employees working in the claims department believed case reserves were set too low on the individual claims that they personally oversaw—which they acknowledge were often "placeholders" and were subject to additional review—the Company's loss reserve estimates must have been knowingly false.  But Plaintiffs allege no facts whatsoever supporting this assumption, and the AC pleads no facts regarding which type of reserve(s) were ultimately increased by the Company.

Plaintiffs also fail to plead any facts regarding the Company's estimation of loss reserves. Indeed, Plaintiffs selectively quote the Company's disclosures to omit the Company's description of its actuarial process, which discloses that a variety of different factors and inputs were weighed in the Company's actuarial judgment, including trends in claim frequency and severity; emerging economic and social trends; changes in the regulatory and litigation environment; and discussions with third-party actuarial consultants.  *See* Ex. 2 at 18.

14

Plaintiffs' efforts to muddle the distinction between the case reserves set by claims adjusters and the Company's loss reserves fall apart the moment those quotations are put in context. For example, Plaintiffs selectively quote from the Company's disclosures to focus on purported misstatements regarding case reserves, *see, e.g.*, AC ¶¶ 68, 186, 195, but omit key language from the same sections making clear that there are other components to the Company's loss reserves, including reserve estimates for IBNR, *see, e.g.*, Ex. 2 at 7. Plaintiffs plead no facts in support of their apparent assumption that overall loss reserves can be estimated using simple arithmetic based on the anecdotal experiences of a small number of claims staff.

**b.      The Accounts of the Anonymous FEs Should Be Disregarded.**

In addition to these fundamental flaws, the anonymous accounts of 15 former employees are not sufficiently particularized under the law of this Circuit and should be disregarded. The Fourth Circuit has underscored that "[w]hen the complaint chooses to rely on facts provided by confidential sources, it must describe the sources with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged or in the alternative provide other evidence to support their allegations." *Yates v. Municipal Mortg. & Equity, LLC*, 744 F.3d 874, 885 (4th Cir. 2014); *see also Teachers' Ret. Sys. of LA v. Hunter*, 477 F.3d 162, 174–75 (4th Cir. 2007) (affirming dismissal under PSLRA for failure to plead why each statement was misleading and instead relying on confidential witnesses with insufficient knowledge of the facts). Plaintiffs fail to meet that standard.

The AC provides remarkably few details about these anonymous former employees, describing them as low-level claims examiners and their immediate supervisors. *See, e.g.*, AC ¶¶ 65–66, 79. By Plaintiffs' own allegations, there were hundreds of junior claims employees working on the Uber account alone, often for brief periods of time, and they allege no contact between these employees and the senior management who made the challenged statements. *See*

15

AC ¶¶ 87–90. The Court should "steeply discount" these reports from claims examiners who lacked any insight into the process of setting actuarial reserves as "lack[ing] sufficient indicia of reliability." *Yates*, 744 F.3d at 886; *see also Teachers' Ret. Sys.*, 477 F.3d at 179 (disregarding confidential sources without insight on the challenged matter).

The former employees offer little to corroborate their accounts beyond general criticisms, which boil down to the claim that their personal authorization to set case reserves should have been higher. FE 7, for example, was a claims examiner whose sole complaint is that some claim reserves were opened at $1 because that was "all that was needed to open a claim," but he concedes that these were simply "placeholder" reserves pending a fuller assessment. AC ¶ 69. Indeed, while Plaintiffs' confidential witnesses report their subjective belief that case reserves on unspecified claims they oversaw should have been higher, Plaintiffs' allegations elsewhere concede that setting higher case reserves required higher levels of authorization, exactly as described in the Company's disclosures. *See* Ex. 10 at 13 ("[w]e keep the settlement authority of front-line adjusters low to ensure the practice of having two or more members of the department participate in the decision as to whether to settle or defend") (quoted in AC ¶ 96). As is evident from Plaintiffs' allegations, junior claims staff, as the first of several layers of review, had a limited perspective on any particular claim and no insight into overall loss reserves.

### c.     Plaintiffs Fail to Plead Any Facts To Suggest That Any Defendant Made Any Knowing Misstatement.

Plaintiffs muster only conclusory allegations that any Defendant knew that the Company's loss reserves were inadequate, falling short of the standard imposed by *Omnicare*. Plaintiffs fail to plead any facts to even suggest that any Defendant was aware of alleged reserve deficiencies, and none of Plaintiffs' attempts to make up for this failure of pleading can salvage their claims. Plaintiffs heavily rely on the scattered accounts of claims employees to claim that

16

the problems with Uber claims were so obvious that Defendants must have known reserves were understated, but as described above, not one of those accounts even mentions any Individual Defendant.  Similarly, Plaintiffs' claim that "senior executives"—not including any Individual Defendant—at times reviewed specific *case reserves* does not suggest that any Defendant knew that *loss reserves* were insufficient, and in fact supports the opposite conclusion, that the Company had appropriate safeguards in place to ensure reserves were appropriately set.  *See* AC ¶¶ 11, 96–97. Finally, Plaintiffs allege that the Reserve Committee—which included (at various points) the Individual Defendants—met quarterly to review actuarial recommendations for the Company's loss reserves and that the Individual Defendants therefore must have known reserves were not sufficient.  *Id.* ¶ 252. Plaintiffs selectively quote from the Company's disclosures in support of this argument, *see id.* ¶ 96, but the Company's disclosures make clear that the role of the Reserve Committee was overseeing the Company's actuarial process, not micromanaging thousands of Uber claims on a claim-by-claim basis, and Plaintiffs fail to plead any facts suggesting otherwise. *See, e.g.*, Ex. 2 at 25.

> **2.      Plaintiffs Fail to Allege That Defendants Failed to Disclose Facts Rendering Their Statements False or Misleading.**

Nor have Plaintiffs plausibly "identif[ied] particular (and material) facts going to the basis for the issuer's opinion . . . whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context" as required to make an opinion actionable under *Omnicare*'s second prong.  575 U.S. at 194.  As the Supreme Court made clear, meeting this standard "is no small task for an investor."  *Id*.  Relevant context includes the statement's "surrounding text, . . . hedges, disclaimers, and apparently conflicting information," and "the customs and practices of the relevant industry."  *Id.* at 196; *see also Tongue v. Sanofi*, 816 F.3d 199, 211–12 (2d Cir. 2016) (holding that sophisticated institutional

17

investors like Plaintiffs cannot claim "ignorance" about the context of the defendant's disclosure).  A speaker need not disclose *all* facts cutting against an opinion; for example, a speaker need not disclose that a junior employee "expressed doubts" when "more senior colleagues gave a stamp of approval."  *Omnicare*, 575 U.S. at 190.

Plaintiffs cannot meet this high bar, as they plead no concrete or particularized allegations that, at the time of the challenged statements, Defendants possessed information relevant to the opinion statements at issue that they were required to disclose.  Rather, Plaintiffs again rely on allegations by former employees that James River lacked an appropriate process for setting claim reserves on the Uber contract.  But Plaintiffs nowhere allege concrete facts indicating that those alleged issues would have materially affected overall loss reserves, let alone that Defendants were aware of those problems at the time the challenged statements were made. *See Nolte*, 390 F.3d at 315–16 (affirming dismissal for failure to allege that employee informed defendants of his belief that reserves were inadequate).  And as the Supreme Court recognized in *Omnicare*, that junior employees may have disagreed with their managers on the adequacy of case reserves does not mean that the Individual Defendants were required to disclose those purported concerns, even if Plaintiffs had alleged that Defendants were aware of their views. *Omnicare*, 575 U.S. at 190.

The inadequacy of Plaintiffs' pleading comes into sharp relief when considering the context of the challenged statements, as *Omnicare* instructs is required.  *See Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 322 (4th Cir. 2019) (citing *Omnicare*, 575 U.S. at 191) ("[a] reasonable investor is expected to understand a statement of opinion in its full context and there will only be liability for 'the omission of material facts that cannot be squared with such a fair reading.").  James River repeatedly reminded investors that reserves

18

"represent an estimate of what we expect the ultimate settlement and administration of claims will cost us, and our ultimate liability may be greater or less than current reserves." Ex. 2 at 38; Ex. 10 at 38; Ex. 18 at 42. It explained that "there is always the risk that reserves may prove inadequate, and actual results *always* differ from our reserve estimates" and that, as was the case with Uber, "we sometimes have to make estimates of future losses for risk classes with which we do not have a great deal of experience. This lack of experience may contribute to making errors of judgment when establishing reserves." *Id.* The Company's disclosures therefore "address[ed] the very claims asserted" by Plaintiffs, further undercutting Plaintiffs' claim. *Paradise Wire*, 918 F.3d at 323.

## B.    Plaintiffs' Attempts to Plead Misrepresentations by Hindsight Also Fail.

Plaintiffs have also failed to allege that Defendants made false or misleading statements by telling investors that the Company monitored reserves, estimated losses for each individual claim, and based those estimates in part on historical information. *See* AC ¶¶ 185–88 (quoting 2018 10-K); *see also* AC ¶¶ 194–97, 205–08 (quoting identical statements from 2019 and 2020 10-Ks). Plaintiffs lack any particularized factual allegation that these statements were false, and thus rely on nothing more than "fraud by hindsight"—*i.e.*, that Defendants' statements *must have been* false simply because the Company's results were ultimately worse than expected. *Teachers' Ret. Sys.*, 477 F.3d at 183 (rejecting such a theory and affirming dismissal for failure to allege with particularity that statements were false or misleading). And, contrary to Plaintiffs' suggestion, James River's May 2021 announcement that it would place more weight on its own loss data (and less weight on other actuarial methodologies) when estimating loss reserves on the Uber account does not concede earlier descriptions of its reserving methodology were knowingly false. *See* AC ¶¶ 189(a), 193(a), 198(a), 209(a) (citing Ex. 31 at 2). Defendants never represented that James River *only* used its own historical data to set reserves; rather, Defendants

19

repeatedly explained that its reserves "are based on our own data and industry data." Ex. 2 at 71; Ex. 10 at 72; Ex. 18 at 75. And while Plaintiffs again insinuate that the Company lacked any reliable process for setting case reserves on individual Uber claims, Plaintiffs do nothing to connect that allegation to the judgment-based process of estimating reserves for the Uber block overall.

### C.    Defendants' Statements Regarding GAAP Were Not False or Misleading.

Plaintiffs further allege that the Company violated two provisions of GAAP, but those allegations are entirely derivative of Plaintiffs' other theories and fail to state a claim. First, Plaintiffs have not plausibly alleged that the Company failed to estimate its reserves "using past experience adjusted for current trends, and any other factors that would modify past experience." *See* AC ¶ 218 (quoting ASC 944-40-30-1). Plaintiffs' theory that ASC 944 required the Company to rely *solely* on its own historical data to estimate reserves is contrary to the plain language of the provision; experience is one of many permissible factors a company can weigh in its actuarial judgment under ASC 944.

Second, Plaintiffs have not plausibly alleged that the Company failed to reserve for loss contingencies that are both "probable" and can be "reasonably estimated." *See* AC ¶ 228 (quoting ASC 450-20-25-2). As explained above, the scattered accounts of the former employees who worked in the Company's claims department do not provide any insight into the Company's overall loss reserves, let alone support an inference that any loss reserve increases were "probable" and "reasonably estimable" before they were announced. Plaintiffs' theory is again "one of underestimation in hindsight, which relies on conclusory allegations to mask the legally insufficient contention at its core, which is that defendants could not possibly have believed their own estimates, since plaintiffs interpret those estimates to have proven inadequate." *Chapman v. Mueller Water Prods., Inc.*, 466 F. Supp. 3d 382, 404 (S.D.N.Y. 2020)

(rejecting allegation based on ASC 450-20-25-2 for failure to allege that Defendants "knew that a loss contingency" was probable and reasonably estimable).  These alleged GAAP violations "add[] nothing new; rather, [they] simply ride[] around in circles on the inadequate coattails" of Plaintiffs' other allegations.  *In re PEC Sols., Inc. Secs. Litig.*, 418 F.3d 379, 390 (4th Cir. 2005).[5]

> **D.      Many Challenged Statements Are Inactionable Forward-Looking Statements**

Many of the challenged statements are inactionable for the additional reason that they are forward-looking statements protected under the PSLRA's "Safe Harbor" provision.  15 U.S.C. § 78u–5(c)(1).  The Safe Harbor immunizes forward-looking statements if they are identified as such and "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement."  *Id.* § 78u–5(c)(1)(A)(i).  Many of the challenged statements in the AC relate to the adequacy of the Company's reserves and therefore are forward-looking because they necessarily forecast whether the reserves will be adequate to cover *future* losses.  *Compare, e.g.*, AC ¶ 200 (defendant Abram's statement that "[w]e feel confident about our reserves and the progress we are making in the run-off of the cancelled account") *with Malone v. Microdyne Corp.*, 26 F.3d 471, 479 (4th Cir. 1994) (holding that expressing "comfort" with an earnings projection was a statement about "future performance").  *See also, e.g.*, AC ¶¶ 188, 197, 207 (challenging similar statements).[6]

While Plaintiffs claim statements about reserves are "historical statements or statements of

---

[5] A statement regarding compliance with ASC 450-20-25-2 is also a quintessential opinion statement actionable only under *Omnicare*, because it reflects the speaker's *belief* whether a loss is probable and reasonably estimable.  *See Nolte*, 390 F.3d at 315–16 (treating statements about loss reserves as opinions).

[6] These statements are inactionable for the additional reason that they are "expressions of puffery and corporate optimism do not give rise to securities violations."  *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004).

21

purportedly current facts and conditions at the time the statements were made," (AC ¶ 319), the Fourth Circuit has rejected that cramped reading of the Safe Harbor, which would render it a nullity because "[a]ll projections can be characterized as presently held beliefs." *Marsh Grp. v. Prime Retail, Inc.*, 46 F. App'x 140, 146 (4th Cir. 2002). Moreover, these statements were accompanied by warnings that described "in specific detail the risks which a purchaser would assume by purchasing" the Company's stock, which constitutes "meaningful cautionary language." *Gasner v. Bd. of Supervisors of Cnty. of Dinwiddie*, 103 F.3d 351, 359 (4th Cir. 1996) (affirming dismissal where cautionary statements "were tailored precisely to address the uncertainty" inherent in purchasing company's securities). *See, e.g.*, Ex. 2 at 2 (statements denoted as forward-looking and identifying risk factors such as "the inherent uncertainty of estimating reserves and the possibility that incurred losses may be greater than our loss and loss adjustment expense reserves"); *id.* at 38 (collecting warnings about reserve calculations).

## II.    The Section 10(b) Claim Should Be Dismissed for Failure to Plead Particularized Facts Giving Rise to a Strong Inference of Scienter.

Plaintiffs' claims must be dismissed for the additional reason that they plead no facts remotely approaching the "strong inference" of scienter required under the PSLRA, which requires particularized facts giving rise to a "strong inference" that the defendant acted with intent to defraud. *Yates*, 744 F.3d at 892. To qualify as "strong," the inference of scienter "must be more than merely plausible or reasonable—it must be ***cogent*** and at least as ***compelling*** as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007). Plaintiffs must allege that Defendants engaged in either intentional or "severely reckless" misconduct, requiring "an act so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff." *KBC Asset Mgmt. NV v. DXC Tech. Co.*, 19 F.4th 601, 608 (4th Cir. 2021).

22

Plaintiffs' core theory is that Defendants purposely misled investors by failing to disclose that reserves on the Uber contract were *always* insufficient.  But they plead no facts supporting an inference, much less a cogent or compelling one, that any Defendant disregarded a purported reserve deficiency and intentionally or recklessly deceived investors.  Instead, Plaintiffs rely on allegations from anonymous former employees—who do not claim to have had any contact with the Individual Defendants—to contend that the process for setting case reserves was mismanaged.  But as the Fourth Circuit has held time and again, such vague and conclusory allegations are insufficient to support a strong inference of scienter.  *See id.* at 609 (affirming dismissal because "Plaintiffs' allegations are vague and conclusory, and lack particularized facts demonstrating Defendants intentionally or recklessly misled investors"); *Yates*, 744 F.3d at 887 (same).[7]

And, having failed to plead scienter with respect to any individual, Plaintiffs likewise fail to plead it with respect to the Company.  Instead, as detailed below, the far more compelling inference is that the Defendants entered into a novel contract with Uber, the Company estimated reserves based on available information, and Defendants disclosed to investors as their good-faith judgment about the adequacy of reserves evolved.

### A. Plaintiffs Fail to Plead Facts Raising a Strong Inference of Scienter Based on the FE Allegations.

For many of the same reasons that Plaintiffs' claims fail under *Omnicare*, Plaintiffs fail to plead particularized facts sufficient to raise a "strong inference" of scienter as to any Individual

---

[7] Moreover, even if Plaintiffs had pled particularized factual allegations sufficient to permit an inference that Defendants should have known that their statements were false—which they have not—that would not be enough to allege scienter, since "scienter and knowledge with respect to misrepresentation are distinct components of the requisite analytical framework." *Maguire Fin.*, 876 F.3d at 548.  Plaintiffs have sought to "stack inference upon inference to satisfy the PSLRA's pleading standard," "violat[ing] the statute's mandate that the strong inference of scienter be supported by facts, not other inferences." *Id.*

Defendant, as required to state a claim.  The PSLRA "mandates that, 'with respect to *each act or omission alleged*' to constitute securities fraud, any prospective plaintiff must 'state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind.'"  *KBC Asset Mgmt.*, 19 F.4th at 607.  The AC fails to plead with particularity that Defendants acted with the requisite state of mind for each alleged misstatement.

First, Plaintiffs cannot raise a strong inference of scienter based on their generalized allegations that James River's claims reserve process was deficient.  *See* AC ¶¶ 264–78.  None of Plaintiffs' confidential witnesses (described in section I.A.1.b above) assert that they had any involvement with estimating the Company's loss reserves, much less "direct contact" with the Individual Defendants.  *KBC Asset Mgmt.*, 19 F.4th at 609; *Yates*, 744 F.3d at 885 ("Omissions and ambiguities count against an inference of scienter because a complaint's factual allegations must be stated with particularity.").  That is fatal to Plaintiffs' claims.

Plaintiffs also fail to specify precisely when or how each Individual Defendant was supposed to have realized that the Company's loss reserves were materially deficient.  *See Matrix Cap. Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 184 (4th Cir. 2009) (holding plaintiffs failed to plead scienter partly because "[p]laintiffs do not include a timeline for their allegations or otherwise allege facts that imply defendants were aware of OneGlobe problems prior to making or approving financial statements").  Rather, Plaintiffs rely on a mishmash of generalized allegations of purported awareness of wrongdoing, none of which advances their claims.  As discussed above, Plaintiffs fail to allege any connection between the allegedly inadequate process for setting case reserves and the challenged statements that Defendants made about overall loss reserves.  No strong inference of fraudulent intent with respect to loss reserves can be drawn from allegations merely criticizing the Company's process for setting case

24

reserves, especially absent factual allegations that any Defendant knew of the purported issues. *See Yates*, 744 F.3d at 893 (concluding that allegations of financial misstatements "at most" suggested that management "mistakenly" had "failed to have sufficient accounting controls and processes" but not a strong inference of scienter).

Plaintiffs attempt to solve their scienter problem by asserting that scienter can be inferred because the Company purportedly had a policy to keep claim reserves low. First, as discussed more fully in section I.A.1 above, Plaintiffs fail to plead sufficient facts to infer that any such "policy" existed, much less that any Defendant was aware of such a policy. To the contrary, many of the details provided by the confidential witnesses describe a conservative process for setting case reserves consistent with the Company's disclosures, further cutting against any inference that Individual Defendant knew or should have known that overall loss reserves were understated. For example, while Plaintiffs' confidential witnesses claim that Uber employees participated in the setting of case reserves for individual claims and demanded higher payouts on Uber claims, those allegations merely describe a process for estimating the case reserves for a claim that took into account multiple data points. *See* AC ¶ 81. And while certain former employees complain that higher-level employees placed limits on their ability to raise reserves above a certain level without supervisor approval, *see, e.g.*, AC ¶¶ 68, 71–76, they acknowledge that there were procedures to increase reserves, including by submitting a "Large Loss Report." *Id.* ¶ 76. While Plaintiffs claim these Large Loss Reports were overly time-consuming and leap to the conclusion that the Company was thus systemically under-reserving, Plaintiffs fail to allege any facts supporting this assumption.

Viewed holistically, the FE allegations support the more plausible, non-fraudulent inference that the Company had a system in place to ensure case reserves were appropriately set,

consistent with its disclosures. *Id.* ¶ 96 (quoting Ex. 10 at 14) ("[w]e keep the settlement authority of front-line adjusters low to ensure the practice of having two or more members of the department participate in the decision as to whether to settle or defend").  Plaintiffs cannot allege a strong inference of fraud based on a practice repeatedly disclosed to investors.  *See Matrix Cap. Mgmt. Fund*, 576 F.3d at 189 (disclosure "lends some weight to the inference that defendants were not acting with scienter but rather were endeavoring in good faith to inform investors").

> **B.    Plaintiffs' Remaining Theories of Scienter Cannot Save Their Claims.**

Plaintiffs' hodgepodge of other attempts to plead scienter—via the core operations theory, alleged violations of Sarbanes-Oxley and GAAP, and stock sales by Individual Defendants—fall equally flat.  First, Plaintiffs' attempt to save their claims by alleging that the Uber relationship constituted a "core business operation" for James River fails because that theory has been rejected by the Fourth Circuit (and is of questionable vitality nationwide after passage of the PSLRA).  *See* AC ¶¶ 288–92.  "[B]are allegations that officers have knowledge of key facts because of their positions or because such knowledge relates to the business's core operations are not enough, standing alone, to support a strong inference of scienter."  *KBC Asset Mgmt.*, 19 F.4th at 612.  Plaintiffs here also lack any "particularized allegations regarding Defendants' knowledge of shortcomings" for Uber-related reserves.  *Id.*

Second, the Individual Defendants' certification of the Company's compliance with Sarbanes-Oxley and GAAP adds nothing to Plaintiffs' scienter allegations, as these alleged violations are derivative of Plaintiffs' other meritless theories.  *See In re PEC Sols., Inc. Secs. Litig.*, 418 F.3d at 389–90 (rejecting inference of scienter based on alleged noncompliance with GAAP requirement that losses be reported when "reasonably estima[ble]"); *Cozzarelli v. Inspire*

26

*Pharms., Inc.*, 549 F.3d 618, 628 n.2 (4th Cir. 2008) ("bare allegation" of a false certification under Sarbanes-Oxley "does not provide independent support for an inference of scienter").

Finally, Plaintiffs cannot demonstrate scienter based on stock sales during the course of the 32-month class period by two Individual Defendants—Myron, who sold about $2.9 million of James River shares in August 2020 (approximately 20.6% of his holdings), and Doran, who sold about $700,000 of her shares in November 2020 (approximately 25% of her holdings).  AC ¶¶ 279–83.  There is no basis to conclude that the sale of 25% or less of a Defendant's holdings standing alone supports a strong inference of scienter.  *See KBC Asset Mgmt.*, 19 F.4th at 611 (citing *Proter v. Medifast, Inc.*, 2013 WL 1316034, at *21 n.20 (D. Md. Mar. 28, 2013) (collecting cases concluding larger percentages of stock sales did not warrant suspicion)).  Moreover, the Fourth Circuit has held that any inference of scienter is severely diminished when, as here, there is a particularly lengthy class period.  *Yates*, 744 F.3d at 891 (explaining that 15-month class period is "unusually long," as "it is not unusual for insiders to trade at some point during their tenure with a company").

### C.    Plaintiffs Fail to Allege That the Corporation Acted with Scienter

Having failed to allege a strong inference of scienter with respect to any corporate agent, Plaintiffs have likewise failed to do so for the Company as whole.  *See Matrix Cap. Mgmt. Fund*, 576 F.3d at 192 (explaining that complaint must allege that at least one authorized agent of the corporation acted with scienter).  Plaintiffs cannot hang their scienter allegations on non-parties Richard Schmitzer (the President of the E&S division) or Courtenay Warren and Anita Rogers (who oversaw E&S claims), who allegedly reviewed some Uber case reserves, circulated spreadsheets reporting on those reserves, and/or imposed limits on claim examiners' ability to increase case reserves without managerial approval.  *See* AC ¶¶ 76, 98, 100–01.  Plaintiffs do not allege that those employees made or authorized any alleged misstatement, as required to plead

27

corporate scienter. *See Matrix Cap. Mgmt. Fund*, 576 F.3d at 190 (corporate scienter assessed based on the state of mind of individual who authorized challenged statement) (citing *Makor Issues & Rts., Ltd. v. Tellabs*, 513 F.3d 702, 710 (7th Cir. 2008)).

### D. The Opposing Inference of Non-Fraudulent Intent Is More Compelling.

The inadequacy of Plaintiffs' allegations of scienter stands in sharp contrast to the competing inference in this case: that James River wrote a novel insurance policy for the rideshare industry, was taken aback when it proved costlier than expected, tried to put the matter behind it, and yet still had difficulty containing the losses. *See KBC Asset Mgmt.*, 19 F.4th at 608 ("courts must compare the malicious and innocent inferences from the facts pled and only allow the complaint to survive a motion to dismiss if the malicious inference is at least as compelling as any opposing innocent inference"). James River repeatedly disclosed adverse results from the Uber contract, "successive disclosures [that] suggest that its officers attempted to keep investors updated about [the Uber contract's] weaknesses." *Yates*, 744 F.3d at 894. While Plaintiffs attempt to cast the Company's statements regarding problems with the Uber block—such as Defendant Abram's comments upon the October 2019 announcement of the cancellation of the Uber policies that the "underlying risk evolved very quickly" and that "candidly, in some years, we mispriced the risk"—as admissions of wrongdoing (*see* AC ¶¶ 5, 48, 216), in fact they are the opposite: a good-faith acknowledgment that the Uber policies did not work out as anticipated. As time went on, James River expressed hope that the problem would improve, *see id.* ¶ 49; informed investors that further sustained losses were possible, which ultimately occurred in 2020 and 2021, *see, e.g.*, Ex. 10 at 38; Ex. 18 at 42 ("there is always the risk that reserves may prove inadequate, and actual results always differ from our reserve estimates"); and disclosed, over the course of many months, a continued need to increase reserve estimates related to the Uber policies.

These repeated disclosures are not the actions of a company with something to hide, but rather demonstrate that Defendants were seeking to inform investors in real time as additional claims were submitted and the full extent of the Company's losses became apparent. *See KBC Asset Mgmt.*, 19 F.4th at 613 ("when defendants disclose risks and newly discovered weaknesses to investors this counts against an inference of scienter"). Plaintiffs' allegations at most suggest that former employees believe that the Company made mistakes in how it dealt with the Uber contract, falling far short of the PSLRA's high bar. *Id.* at 610 ("Even if those employees were ultimately correct that Defendants made unwise business decisions . . . , that mistake does not support a strong inference of scienter.").

## III.    Plaintiffs Have Failed to Allege Loss Causation.

Plaintiffs have failed to allege loss causation given their failure to allege any material misstatement or omission. Nor can they claim that the October 26, 2021 press release, which reiterated that the Company would transfer Uber claims to a reinsurer, was a "corrective disclosure" sufficient to establish loss causation as to the October 26th drop. *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 473 (4th Cir. 2011). To constitute a corrective disclosure, the statement must have "present[ed] facts to the market that are new, that is, publicly revealed for the first time," *id.*, and the Company had disclosed that Uber claims would be transferred in September 2021. *See* Exs. 23, 24. Indeed, the analyst report upon which Plaintiffs rely did not attribute a decline in the Company's value to the old news about the Company's Uber claims—which it "previously adjusted for"—but rather to unrelated news. *See* Ex. 36 at 1 (cited in AC ¶ 62); *Katyle*, 637 F.3d at 473 ("The disclosure must *at least relate back to the misrepresentation* and not to some other negative information about the company.").

29

**IV.     Plaintiffs Fail to Plead Control Person Liability as to the Individual Defendants.**

Section 20(a) of the Exchange Act imposes liability on each person who "controls any person liable under any provision of this chapter or of any rule or regulation thereunder."  15 U.S.C. § 78t(a).  "Because § 20(a) liability is derivative of § 10(b) liability, Plaintiffs' failure to adequately plead a § 10(b) claim dooms their § 20(a) claim." *KBC Asset Mgmt.*, 19 F.4th at 614 n.4.

## CONCLUSION

For the reasons stated above, the AC fails and should be dismissed in its entirety.

Dated: Washington, D.C.
      January 18, 2022

|  |  |
|---|---|
| | /s/ *Carter Burwell* |
| Maeve O'Connor (*pro hac vice*) | Carter Burwell |
| Susan Reagan Gittes (*pro hac vice*) | Debevoise & Plimpton LLP |
| Debevoise & Plimpton LLP | 801 Pennsylvania Ave. N.W. |
| 919 Third Avenue | Suite 500 |
| New York, NY 10022 | Washington, D.C. 20004 |
| (212) 909-6000 | (202) 383-8000 |
| mloconnor@debevoise.com | cburwell@debevoise.com |
| srgittes@debevoise.com | |
| | *Counsel for Defendants* |

30