# EXHIBIT 2

10-K 1 jrvr10k12312018.htm 10-K

TABLE OF CONTENTS

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### Washington, DC 20549

### FORM 10-K

**FOR ANNUAL AND TRANSITIONAL REPORTS PURSUANT TO
SECTIONS 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**(Mark One)**

☒    **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the Fiscal Year Ended December 31, 2018**

or

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**Commission file number 001-36777**

# JAMES RIVER GROUP HOLDINGS, LTD.

(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Bermuda** | **98-0585280** |
| (State of Incorporation) | (IRS Employer Identification No.) |
| **Wellesley House, 2nd Floor** | |
| **90 Pitts Bay Road, Pembroke, Bermuda** | **HM 08** |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: **(441) 278-4580**

Securities registered pursuant to Section 12(b) of the Act:
**Common Shares, par value $0.0002 per share**
(Title of Class)

**NASDAQ Global Select Market**
(Name of Exchange on which Registered)

Securities registered pursuant to Section 12(g) of the Act: **None**

Indicate by check mark if the Registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☒  No ☐

Indicate by check mark if the Registrant is not required to file reports pursuant to Section 13 or 15(d) of the Securities Act.   Yes ☐  No ☒

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒  No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☒  No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.   ☐

Indicate by check mark whether the Registrant is a large accelerated filer, an accelerated filer, non-accelerated filer, a smaller reporting company, or emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act. (Check one):

**Large accelerated filer ☒        Accelerated filer ☐        Non-accelerated filer ☐        Smaller reporting company ☐        Emerging Growth Company ☐**

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the Registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐  No ☒

The aggregate market value of the Registrant's common shares held by non-affiliates of the Registrant as of June 30, 2018, computed by reference to the closing sales price on the NASDAQ Global Select Market on that date, was approximately $1,143,957,071.

The number of the Registrant's common shares outstanding was 30,067,545 as of February 25, 2019.

**DOCUMENTS INCORPORATED BY REFERENCE:**

Portions of the James River Group Holdings, Ltd. Proxy Statement to be filed with the Securities and Exchange Commission within 120 days after the year covered by this Form 10-K with respect to the 2019 Annual General Meeting of Shareholders are incorporated by reference into Part III hereof.

TABLE OF CONTENTS

*Unless the context indicates or suggests otherwise, references in this Annual Report on Form 10-K to "the Company," "we," "us" and "our" refer to James River Group Holdings, Ltd. and its consolidated subsidiaries.*

## SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS

This Annual Report on Form 10-K ("Annual Report") contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934. These statements may be identified by the fact that they do not relate strictly to historical or current facts. In some cases, forward-looking statements may be identified by the use of words such as "anticipates," "estimates," "expects," "intends," "plans", "seeks" and "believes," and similar expressions or future or conditional verbs such as "will," "should," "would," "may" and "could." These forward-looking statements include, among others, statements relating to our future financial performance, our business prospects and strategy, anticipated financial position, liquidity and capital needs and other similar matters. These forward-looking statements are based on management's current expectations and assumptions about future events, which are inherently subject to uncertainties, risks and changes in circumstances that are difficult to predict.

Our actual results may differ materially from those expressed in, or implied by, the forward-looking statements included in this Annual Report as a result of various factors, many of which are beyond our control, including, among others:

- the inherent uncertainty of estimating reserves and the possibility that incurred losses may be greater than our loss and loss adjustment expense reserves;

- inaccurate estimates and judgments in our risk management may expose us to greater risks than intended;

- the potential loss of key members of our management team or key employees and our ability to attract and retain personnel;

- adverse economic factors resulting in the sale of fewer policies than expected or an increase in the frequency or severity of claims, or both;

- a decline in our financial strength rating resulting in a reduction of new or renewal business;

- reliance on a select group of brokers and agents for a significant portion of our business and the impact of our potential failure to maintain such relationships;

- reliance on a select group of customers for a significant portion of our business and the impact of our potential failure to maintain such relationships;

- losses resulting from reinsurance counterparties failing to pay us on reinsurance claims, insurance companies with whom we have a fronting arrangement failing to pay us for claims, or an insured group of companies with whom we have an indemnification arrangement failing to perform their reimbursement obligations;

- changes in laws or government regulation, including tax or insurance law and regulations;

- the ongoing effect of Public Law No. 115-97, informally titled the Tax Cuts and Jobs Act, which may have a significant effect on us including, among other things, by potentially increasing our tax rate, as well as on our shareholders;

- in the event we do not qualify for the insurance company exception to the passive foreign investment company ("PFIC") rules and are therefore considered a PFIC, there could be material adverse tax consequences to an investor that is subject to U.S. federal income taxation;

- the Company or any of its foreign subsidiaries becoming subject to U.S. federal income taxation;

- a failure of any of the loss limitations or exclusions we utilize to shield us from unanticipated financial losses or legal exposures, or other liabilities;

- losses from catastrophic events which substantially exceed our expectations and/or exceed the amount of reinsurance we have purchased to protect us from such events;

- potential effects on our business of emerging claim and coverage issues;

- exposure to credit risk, interest rate risk and other market risk in our investment portfolio;

- our ability to obtain reinsurance coverage at prices and on terms that allow us to transfer risk and adequately protect our company against financial loss;

2

TABLE OF CONTENTS

- the potential impact of internal or external fraud, operational errors, systems malfunctions or cyber security incidents;

- our ability to manage our growth effectively;

- inadequacy of premiums we charge to compensate us for our losses incurred;

- failure to maintain effective internal controls in accordance with Sarbanes-Oxley Act of 2002, as amended ("Sarbanes-Oxley");

- changes in our financial condition, regulations or other factors that may restrict our subsidiaries' ability to pay us dividends; and

- other risks and uncertainties discussed under "Risk Factors" and elsewhere in this Annual Report.

Accordingly, you should read this Annual Report completely and with the understanding that our actual future results may be materially different from what we expect.

Forward-looking statements speak only as of the date of this Annual Report. Except as expressly required under federal securities laws and the rules and regulations of the Securities and Exchange Commission (the "SEC"), we do not have any obligation, and do not undertake, to update any forward-looking statements to reflect events or circumstances arising after the date of this Annual Report, whether as a result of new information or future events or otherwise. You should not place undue reliance on the forward-looking statements included in this Annual Report or that may be made elsewhere from time to time by us, or on our behalf. All forward-looking statements attributable to us are expressly qualified by these cautionary statements.

3

TABLE OF CONTENTS

**PART I**

**Item 1.        BUSINESS**

**General**

James River Group Holdings, Ltd. is a Bermuda-based holding company. We own and operate a group of specialty insurance and reinsurance companies. For the year ended December 31, 2018, approximately 67.6% of our group-wide gross written premiums originated from the U.S. excess and surplus ("E&S") lines market. Substantially all of our business is casualty insurance and reinsurance, and for the year ended December 31, 2018, we derived 98.5% of our group-wide gross written premiums from casualty insurance and reinsurance. Our objective is to generate compelling returns on tangible equity, while limiting underwriting and investment volatility. We seek to accomplish this by consistently earning profits from insurance and reinsurance underwriting and generating meaningful risk-adjusted investment returns, while managing our capital opportunistically. Our group includes three specialty property-casualty insurance and reinsurance segments: Excess and Surplus Lines, Specialty Admitted Insurance and Casualty Reinsurance.

We write very little property or catastrophe insurance and no property catastrophe reinsurance. For the year ended December 31, 2018, property insurance and reinsurance represented 1.5% of our gross written premiums. When we do write property insurance, we buy reinsurance to significantly mitigate our risk. We have structured our reinsurance arrangements so that our modeled net pre-tax loss from a 1/1000 year probable maximum loss ("PML") event is no more than $10.0 million on a group-wide basis.

We report our business in four segments: Excess and Surplus Lines, Specialty Admitted Insurance, Casualty Reinsurance and Corporate and Other.

The Excess and Surplus Lines segment sells E&S commercial lines liability and property insurance in every U.S. state and the District of Columbia through James River Insurance Company ("James River Insurance") and its wholly-owned subsidiary, James River Casualty Company ("James River Casualty"). James River Insurance and James River Casualty are both non-admitted carriers. Non-admitted carriers writing in the E&S market are not bound by most of the rate and form regulations imposed on standard market companies, allowing them flexibility to change the coverage terms offered and the rate charged without the time constraints and financial costs associated with the filing of such changes with state regulators. In 2018, the average account in this segment (excluding commercial auto policies) generated annual gross written premiums of approximately $20,000. The Excess and Surplus Lines segment distributes primarily through wholesale insurance brokers. Members of our management team have participated in this market for over three decades and have long-standing relationships with the wholesale brokers who place E&S lines accounts. The Excess and Surplus Lines segment produced 56.3% of our gross written premiums and 74.9% of our net written premiums for the year ended December 31, 2018.

The Specialty Admitted Insurance segment has two areas of focus. We write a select book of workers' compensation coverage for building trades, healthcare employees and light manufacturing, among other light to medium hazard risks in select Southeastern and Eastern U.S. states, as well as fronting business which has become a significant element of our revenues and profits in this segment. Starting in 2017, we have de-emphasized the program business, as we believe fronting offers better risk adjusted return potential. In our fronting business, we retain a small percentage of the risk, generally 10% or less, and seek to earn fee income by allowing other carriers and producers to access our licensure, ratings, and underwriting and claims expertise. In our program business, our historic net retention was more than 10%. The Specialty Admitted Insurance segment accepts applications for insurance from a variety of sources, including independent retail agents, program administrators and managing general agents ("MGAs"). The Specialty Admitted Insurance segment produced 32.1% of our gross written premiums and 7.3% of our net written premiums for the year ended December 31, 2018.

The Casualty Reinsurance segment provides proportional and working layer casualty reinsurance to third parties and to our U.S.-based insurance subsidiaries. Typically, we structure our reinsurance contracts (also known as treaties) as quota share arrangements, with loss mitigating features, such as commissions that adjust based on underwriting results. We frequently include risk mitigating features in our working layer excess of loss treaties, such as paid reinstatements, which allow the ceding company to capture a greater percentage of the profits should the business prove more profitable than expected, or alternatively, with additional premiums should the business incur higher than expected losses. We believe these structures best align our interests with the interests of our cedents. On a premium volume basis, treaties with loss mitigation features including sliding scale ceding commissions represented 81.7% of the gross premiums written by our Casualty Reinsurance segment during 2018. We typically do not assume large individual risks in our Casualty Reinsurance segment, nor do we write property catastrophe reinsurance. Most of the policies assumed by our Casualty Reinsurance segment have a $1.0 million per occurrence limit, and we typically assume only a portion of that exposure. We believe this structure reduces volatility in our underwriting results. We do not assume stand-alone third-party property business at our Casualty Reinsurance segment, but we do have a small amount of assumed business with ancillary property exposure. 83.7% of premiums written by our Casualty Reinsurance segment during 2018 were general liability accounts assumed from E&S carriers. The Casualty Reinsurance segment distributes through

4

TABLE OF CONTENTS

reinsurance brokers and produced 11.6% of our gross written premiums and 17.8% of our net written premiums for the year ended December 31, 2018.

The Casualty Reinsurance segment writes business through two entities, JRG Reinsurance Company Ltd ("JRG Re") and Carolina Re Ltd ("Carolina Re"). Through December 31, 2017, we had intercompany reinsurance agreements under which we ceded 70% of the net written premiums of our U.S. subsidiaries (after taking into account third-party reinsurance) to JRG Re. Effective January 1, 2018, we generally discontinued ceding 70% of our U.S.-written premiums to JRG Re and instead ceded 70% of our U.S.-written premiums to Carolina Re. This business is ceded under proportional, or quota-share, reinsurance treaties that provide for an arm's length ceding commission. We exclude the effects of intercompany reinsurance agreements from the presentation of our segment results, consistent with the way we manage the Company. At December 31, 2018, 54.9% of our cash and invested assets were held at JRG Re, which benefits from a favorable operating environment, including an absence of corporate income or investment taxes.

On December 22, 2017, the United States enacted Public Law No. 115-97, informally titled the Tax Cuts and Jobs Act (the "Tax Act"). The Tax Act significantly changed the U.S. Internal Revenue Code of 1986, as amended (the "Code"), including by reducing the U.S. corporate income tax rate from 35% to 21% and imposing a base erosion and anti-abuse tax ("BEAT"). In response to the Tax Act, we made changes to our structure in 2018 to minimize the impact of BEAT that included the formation of Carolina Re, a Bermuda-domiciled, wholly-owned subsidiary of James River Group, Inc. Carolina Re is a Class 3A reinsurer and made an irrevocable election to be taxed as a U.S. domestic corporation under Section 953(d) of the Code effective January 1, 2018. Carolina Re also entered into a stop loss reinsurance agreement with JRG Re.

The Corporate and Other segment consists of the management and treasury activities of our holding companies and interest expense associated with our debt.

In 2018, our operating subsidiaries wrote $1,166.8 million of gross written premiums, allocated by segment and underlying market as follows:

| Gross Written Premiums by Segment | | Gross Written Premiums Year Ended December 31, 2018 | % of Total |
|---|---|---|---|
| | | *(in thousands)* | |
| Excess and Surplus Lines segment | $ | 656,538 | 56.3% |
| Specialty Admitted Insurance segment | | 374,346 | 32.1% |
| Casualty Reinsurance segment | | 135,889 | 11.6% |
| | $ | 1,166,773 | 100.0% |
| **Gross Written Premiums by Market** | | | |
| Non-admitted markets | $ | 788,781 | 67.6% |
| Admitted markets | | 377,992 | 32.4% |
| | $ | 1,166,773 | 100.0% |

The A.M. Best Company ("A.M. Best") financial strength rating for our group's regulated insurance subsidiaries is "A" (Excellent). This rating reflects A.M. Best's evaluation of our insurance subsidiaries' financial strength, operating performance and ability to meet obligations to policyholders and is not an evaluation directed towards the protection of investors.

The financial strength ratings assigned by A.M. Best have an impact on the willingness of brokers and agents to submit applications for insurance and reinsurance to our regulated subsidiaries and on the risk profiles of the submissions for insurance that our subsidiaries receive. The "A" (Excellent) ratings assigned to our insurance and reinsurance subsidiaries are consistent with our business plans and we believe allow our subsidiaries to actively pursue relationships with the agents and brokers identified in their marketing plans.

**Our History**

In 2002, a group of experienced insurance executives with a history of starting and operating profitable specialty insurance operations created James River Group, Inc. ("James River Group"). James River Group was listed on the NASDAQ Stock Market (symbol: JRVR) in 2005 and consistently produced attractive underwriting results. James River Group had two insurance company subsidiaries, James River Insurance and Stonewood Insurance Company ("Stonewood Insurance"). Both of these subsidiaries as well as James River Group remain subsidiaries of ours.

Case 3:21-cv-00444-DJN   Document 55-2   Filed 01/18/22   Page 10 of 91 PageID# 612

TABLE OF CONTENTS

In 2007, James River Group's management team decided to enhance James River Group's long-term profitability by combining the earnings power of James River Group with the efficiency of an affiliated Bermuda domiciled reinsurer. A group of investors led by affiliates of D. E. Shaw & Co., L.P., a global investment and technology firm, acquired James River Group, at which point it ceased trading as a public company. Simultaneously, the investors and management founded and capitalized JRG Re, and we began the process of building our present company.

In December 2014, we completed an initial public offering of our common shares (the "IPO"). Affiliates of D. E. Shaw & Co., L.P. and another institutional investor and its affiliate sold all of the common shares in the IPO. Neither the Company nor any of its management or other shareholders sold shares in the IPO. D.E. Shaw & Co., L.P. sold its shares in our Company in a series of secondary offerings in 2016, 2017 and 2018 and no longer owns any of our shares.

**Our Competitive Strengths**

We believe we have the following competitive strengths:

*Proven and Strong Management Team Whose Financial Interests are Aligned with Shareholders.*   Our Chief Executive Officer, Robert P. Myron, who has served in various capacities with our group since 2010, has a history of working in a senior management capacity in the insurance and reinsurance industries in both the United States and Bermuda. Mr. Myron has significant experience working in operations, finance and underwriting of several different insurance and reinsurance companies over the course of his career. Our Chief Financial Officer, Sarah C. Doran, joined our group in January 2017. She has significant experience with capital markets and corporate development related to the insurance and financial services industry. Ms. Doran has a history of working in a senior capacity in finance and advisory both within the insurance and reinsurance industry and for various investment banks.

The President and Chief Executive Officer of our Excess and Surplus Lines segment, Richard Schmitzer, who has been with our group since July 2009, has a history of working in a senior management capacity in the E&S lines industry. Mr. Schmitzer has significant experience working in underwriting and operations of several different insurance companies over the course of his career.

The President and Chief Executive Officer of our Specialty Admitted Insurance segment, Terry McCafferty, has extensive experience as an insurance underwriter, operator and executive, and has deep experience and industry knowledge to continue to build out our business initiatives in the fronting and specialty admitted risk business.

The President and Chief Executive Officer of our Casualty Reinsurance segment, Daniel Heinlein, has significant experience as a broker and underwriter of specialty reinsurance risks, particularly in the small account market where we concentrate.

The Non-Executive Chairman of the Company's Board of Directors (the "Board"), J. Adam Abram, has a history of forming and managing profitable specialty insurance companies. He was a founder of the Company and a predecessor company, and he remains highly engaged as a key strategic contributor.

All members of our executive management and senior management have equity grants that we believe help align their interests with those of our long-term shareholders.

*Broad Underwriting Expertise.*   We strive to be innovative in tailoring our products to provide solutions for our distribution partners and insureds, and we are willing to entertain insuring many types of risk classifications. As a result, we believe we are a "go to" market for a wide variety of risks. We are able to structure solutions for our insureds and the wholesale brokers with whom we work because of our deep technical expertise and experience in the niches and specialties we underwrite.

*Emphasis on Lowering Volatility.*   We earn our profits by taking underwriting and investment risk. We underwrite many classes of insurance and invest in many types of assets. We actively seek to avoid underwriting business or making investments that expose us to an unacceptably high risk of large losses. We believe we have minimal exposure to material property risks and did not have material losses from property risks during 2018.

We seek to limit our catastrophic underwriting exposure in all areas, but in particular to property risks and catastrophic events. Our U.S. primary companies purchase reinsurance from unaffiliated reinsurers to reduce our net exposure to any one risk or occurrence. In addition, our policy forms and pricing are subject to regular formal analysis to ensure we are insuring the types of risks we intend and that we are being appropriately compensated for taking on those risks. When we write reinsurance, we seek to avoid catastrophic risks and contractually limit the amount of exposure we have on any one risk or occurrence. We prefer to structure our assumed reinsurance treaties as proportional or quota share reinsurance, which is generally less volatile than excess of loss or catastrophe reinsurance. We believe this structure aligns our interests with those of the ceding company.

*Meaningful Risk Adjusted Investment Returns.*   We seek to generate meaningful contributions to company profitability from our investment portfolio. We attempt to follow a diversified strategy that emphasizes the preservation of our invested

6

TABLE OF CONTENTS

assets, provides adequate liquidity for the prompt payment of claims and produces attractive results for our shareholders. Within that context, we seek to improve risk-adjusted returns in our investment portfolio by allocating a portion of our portfolio to investments where we take measured risks based upon detailed knowledge of certain niche asset classes. Investment grade fixed maturity securities make up the majority of our investment portfolio, and we are comfortable allocating a portion of our assets to non-traditional investments. Our non-traditional investments have generally not included a meaningful allocation to listed common equities. We consider non-traditional investments to include investments that are (1) unrated bond or fixed income securities, (2) non-listed equities or (3) investments that generally have less liquidity than rated bond or fixed income securities or listed equities. Non-traditional investments represented 19.9% of our total invested assets at December 31, 2018, consisting of syndicated bank loans (15.6%) and other invested assets (4.3%) that include interests in limited liability companies that invest in renewable energy opportunities, limited partnerships that invest in debt or equity securities, notes receivable for renewable energy projects, and a private debt security. While we are willing to make investments in non-traditional types of investments, we seek to avoid asset classes and investments that we do not understand. The weighted average credit rating of our portfolio of fixed maturity securities, bank loans and redeemable preferred stocks as of December 31, 2018 was "A". At December 31, 2018, the average duration of our investment portfolio was 3.4 years.

*Talented Underwriters and Operating Leadership.*   The managers of our 15 underwriting divisions have an average of over 25 years of industry experience, substantial subject matter expertise and deep technical knowledge. They have been successful and profitable underwriters for us in the specialty casualty insurance and reinsurance sectors. Our segment presidents all have extensive backgrounds and histories working in management capacities in specialty casualty insurance and reinsurance.

*Robust Technology and Data Capture.*   We seek to ground our underwriting decisions in reliable historical data and technical evaluation of risks. Our underwriters utilize intuitive systems and differentiated technologies, many of which are proprietary. We have implemented processes to capture extensive data on our book of business, before, during and after the underwriting analysis and decision. We use the data we collect to inform and, we believe, improve our judgment about similar risks as we refine our underwriting criteria. We use the data we collect in regular formal review processes for each of our lines of business and significant reinsurance treaties.

*Focus on Small and Medium-Sized Casualty Niche and Specialty Business.*   We believe that small and medium-sized casualty accounts, in niche areas where we focus, are consistently among the most attractive subsets of the property-casualty insurance and reinsurance market. We think the unique characteristics of the risks within these markets require each account to be individually underwritten in an efficient manner.

Many carriers have chosen either to reject business that requires individual underwriting or have attempted to automate the underwriting of this highly variable business. While we use technology to greatly reduce the cost of individually underwriting these accounts in our Excess and Surplus Lines and Specialty Admitted Insurance segments, we continue to have our underwriters make individual judgments regarding the underwriting and pricing of accounts. Our experience leads us to believe this approach is more likely to produce consistent results over time and across markets. In addition, while we believe that the insurance and reinsurance industry is generally overcapitalized at this time, we are currently achieving attractive, moderately increasing rates in our Excess and Surplus Lines and Specialty Admitted Insurance segments, which two segments combined represented 88.4% of our gross written premiums and 82.2% of our net written premiums for the twelve months ended December 31, 2018. We believe that there are compelling opportunities for measured but profitable growth in many sectors of the insurance markets we target.

*Active Claims Management.*   Our U.S.-based primary insurance companies actively manage claims as part of keeping losses and loss adjustment expenses low. We attempt to investigate thoroughly and settle promptly all covered claims, which we generally accomplish through direct contact with the insured and other affected parties. We have historically been able to close approximately 95% of claims within five years, and as of December 31, 2018, our reserves for claims incurred but not reported ("IBNR") were 61.5% of our total net loss reserves.

*Efficient Operating Platform.*   We have what we believe to be a sector leading expense ratio, as we carefully manage personnel and all other costs throughout our group while growing our business. For the year ended December 31, 2018, our expense ratio was 23%. Additionally, our Bermuda domicile and operations provide for capital flexibility and an efficient tax structure. At December 31, 2018, 54.9% of our cash and invested assets were held at JRG Re, which benefits from a favorable operating environment, including an absence of corporate income or investment taxes.

## Our Strategy

We believe our approach to our business will help us achieve our goal of generating compelling returns on tangible equity while limiting volatility in our financial results. This approach involves the following:

*Generate Consistent Underwriting Profits.*   We seek to make underwriting profits each and every year. We attempt to find ways to grow in markets that we believe to be profitable, but are less concerned about growth than maintaining profitability in

7

TABLE OF CONTENTS

our underwriting activities (without regard to investment income). Accordingly, we are willing to reduce the premiums we write when we cannot achieve the pricing and contract terms we believe are necessary to meet our financial goals.

*Maintain a Strong Balance Sheet.*    Balance sheet integrity is key to our long-term success. In order to maintain balance sheet integrity, we seek to estimate the amount of future obligations, especially reserves for losses and loss adjustment expenses, in a consistent and appropriate fashion. From December 31, 2007 through December 31, 2018, we have experienced $106.0 million of cumulative net favorable reserve development.

*Earn a Meaningful Contribution from Investments.*    We seek to earn a meaningful contribution to our overall returns from our investment portfolio activities each year. We attempt to balance the preservation of assets, liquidity needs and mitigation of volatility with returns across our portfolio. We believe our diversified portfolio and ability to source investment opportunities positions us well to generate returns while balancing the importance of maintaining a strong balance sheet.

*Focus on Specialty Insurance Markets and Fee Income.*    By focusing on specialty markets in which our underwriters have particular expertise and in which we have fewer competitors than in standard markets, we have greater flexibility to price and structure our products in accordance with our underwriting strategy. We believe underwriting profitability can best be achieved through restricting our risk taking on insurance and reinsurance to niches where, because of our expertise, we can distinguish ourselves in the underwriting and pricing process. We also believe that we can achieve attractive returns on capital through the growth of our fronting business, as we carefully manage credit and collateral to generate attractive fee income, while generally utilizing less capital than in our highly underwritten businesses.

*Use Timely and Accurate Data.*    We design our internal processing and data collection systems to provide our management team with accurate and relevant information in real-time. We collect premium, commission and claims data, including detailed information regarding policy price, terms, conditions and the nature of the insured's business. This data allows us to analyze trends in our business, including results by individual agent or broker, underwriter and class of business and expand or contract our operations quickly in response to market conditions. We rely on our information technology systems in this process. Additionally, the claims staff also contributes to our underwriting operations through its communication of claims information to our underwriters.

*Respond Rapidly to Market Opportunities and Challenges.*    We plan to grow our business to take advantage of opportunities in markets in which we believe we can use our expertise to generate consistent underwriting profits. We seek to measure rates monthly and react quickly to changes in the rates or terms the market will accept. For the year ended December 31, 2018, our Excess and Surplus Lines segment gross written premiums increased by 23.8% over the same period in 2017. In this favorable pricing environment, we have taken steps to grow and are increasing gross written premiums across most underwriting divisions in this segment. In 2018, our growth was focused in our Commercial Auto, General Casualty, Excess Casualty, Allied Health, Energy, Life Sciences, Small Business, Environmental, and Excess Property divisions within our Excess and Surplus Lines segment. During the same period, we felt rates and terms and conditions were generally less adequate for risks submitted to our Manufacturers & Contractors, Professional Liability, and Medical Professionals divisions, and we reduced our writings in those divisions. This very specific evaluation of each risk or class of risks is a hallmark of our underwriting.

When market conditions have been challenging, or when actual experience has not been as favorable as we anticipated, we have tried to act quickly to evaluate our situation and to make course corrections in order to protect our profits and preserve tangible equity. Our actions have included reducing our writings when margins tightened and exiting lines or classes of business when we believed the risk of continuing in a line outweighed the potential rewards from underwriting. We do not hesitate to increase loss estimates when we determine that it is appropriate.

*Manage Capital Actively.*    We seek to make "both sides" of our balance sheet generate better than average risk-adjusted returns. We invest and manage our capital with a goal of consistently increasing tangible equity for our shareholders and generating attractive returns on tangible equity. We intend to expand our premium volume and capital base to take advantage of opportunities to earn an underwriting profit or to reduce our premium volume and capital base if attractive underwriting opportunities are not available. We expect to finance our future operations with a combination of debt and equity and do not intend to raise or retain more capital than we believe we can profitably deploy in a reasonable time frame. We may not, however, always be able to raise capital when needed. We declared dividends to our shareholders of $36.3 million ($1.20 per share) during 2018, $50.7 million ($1.70 per share including a $0.50 per share special dividend) in 2017 and $66.3 million ($2.25 per share including a $1.35 per share special dividend) in 2016. While we have declared a special dividend in the past, we continue to find what we believe are attractive opportunities to earn a compelling return on our capital in the businesses that we target and therefore did not declare a special dividend in 2018. Our ratings from A.M. Best are very important to us, as are our relationships with our regulators, and maintaining them in good order is a principal consideration in our decisions regarding capital management.

8

TABLE OF CONTENTS

**Our Structure**

The chart below displays our corporate structure as of December 31, 2019 as it pertains to our holding and operating subsidiaries.



**Business Segments**

***Excess and Surplus Lines Segment***

We report our U.S.-based E&S lines of business in our Excess and Surplus Lines segment. We underwrite non-admitted business through our subsidiaries, James River Insurance Company and James River Casualty Company, from offices in Richmond, Virginia; Scottsdale, Arizona; and Atlanta, Georgia. James River Insurance is our largest subsidiary as measured by gross written premiums (62.7% of consolidated gross written premiums for the year ended December 31, 2019 came from our Excess and Surplus Lines segment) and has been engaged in E&S insurance for 17 years. James River Insurance has had a consistent record of underwriting profits since its second year of operation. We added James River Casualty in 2009 to give us the ability to write E&S risks in Ohio.

E&S lines insurance focuses on insureds that generally cannot purchase insurance from standard lines insurers typically due to perceived risk related to their businesses. Our Excess and Surplus Lines segment underwrites property-casualty insurance on an E&S lines basis in all states and the District of Columbia. Our Excess and Surplus Lines segment distributes its policies through a network of authorized independent wholesale brokers throughout the United States. In 2019, our Excess and Surplus Lines segment's gross written premiums grew by 40.5% over 2018 through growth across most underwriting divisions including our commercial auto division (with a focus on transportation network companies). Gross written premiums for our core Excess and Surplus Lines business, which excludes our commercial auto division, grew by 54.5% over 2018. The Excess and Surplus Lines segment produced an average combined ratio of 89.0% from 2010 through 2019.

Companies that underwrite on an E&S lines basis operate under a different regulatory structure than standard market carriers. E&S lines carriers are generally permitted to craft the terms of the insurance contract to suit the particular risk they are assuming. Also, E&S lines carriers are, for the most part, free of rate and form regulation. In contrast, standard market carriers are generally required to use approved insurance forms and to charge rates that have been authorized by or filed with state insurance departments. However, as E&S carriers, our insurance subsidiaries in the Excess and Surplus Lines segment are not backed by any state's guarantee fund, and in most states these subsidiaries may only write coverage for an insured after they have been denied coverage by the standard market and signed declarations stating that the insured is aware that it will not have access to any state guarantee funds should these subsidiaries be unable to satisfy their obligations.

Our Excess and Surplus Lines segment writes policies for a wide range of businesses and does not write personal lines insurance. Applications for insurance are presented to us by authorized wholesale brokers who are typically engaged by retail agents after their clients have been rejected by standard markets.

In late 2017, the Excess and Surplus Lines segment started a binding contract unit (as part of our Small Business underwriting division) where limited authority for underwriting is delegated to a select, but growing, group of agents on a limited number of General Liability classes through a company designed online portal.

TABLE OF CONTENTS

All claims for business written by the Excess and Surplus Lines segment are managed by its internal claims department although we use independent adjusters for inspection and payment of certain claims.

The chart below identifies the Excess and Surplus Lines segment's divisions and sets forth the amount of gross written premiums by each division.

| E&S Division | Gross Written Premiums Year Ended December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2018 | Percentage of Total 2018 | 2017 | 2016 | 2015 | 2014 |
| Commercial Auto | $ 322,126 | 49.1% | $ 247,960 | $ 110,050 | $ 73,770 | $ 34,605 |
| Manufacturers and Contractors | 79,160 | 12.1% | 85,719 | 83,279 | 78,315 | 72,063 |
| Excess Casualty | 66,452 | 10.1% | 51,160 | 43,574 | 32,458 | 31,688 |
| General Casualty | 54,127 | 8.2% | 38,097 | 36,858 | 30,972 | 25,853 |
| Energy | 33,942 | 5.2% | 29,704 | 29,709 | 30,623 | 28,980 |
| Allied Health | 30,450 | 4.6% | 19,181 | 14,413 | 13,513 | 9,707 |
| Excess Property | 16,963 | 2.6% | 14,447 | 14,083 | 12,498 | 11,795 |
| Life Sciences | 16,636 | 2.5% | 12,981 | 11,132 | 8,917 | 10,155 |
| Small Business | 14,808 | 2.3% | 11,307 | 9,104 | 6,916 | 6,971 |
| Environmental | 10,499 | 1.6% | 7,920 | 5,321 | 4,437 | 3,431 |
| Professional Liability | 5,916 | 0.9% | 6,326 | 8,361 | 10,046 | 10,784 |
| Sports and Entertainment | 3,685 | 0.5% | 3,021 | 2,221 | 2,667 | 2,753 |
| Medical Professionals | 1,774 | 0.3% | 2,297 | 2,739 | 3,585 | 3,922 |
| Total | $ 656,538 | 100.0% | $ 530,120 | $ 370,844 | $ 308,717 | $ 252,707 |

Commercial Auto underwrites primarily the hired and non-owned auto liability exposures for a variety of industry segments including package delivery services, food delivery services and livery service organizations, and has developed a particular niche for insuring organizations' operating networks connecting independent contractors with customers (transportation network companies and similar usage-based networks). One insured (Rasier LLC and its affiliates) produced $294.3 million of gross written premiums, representing 44.8% of the Excess and Surplus Lines segment's gross written premiums and 25.2% of our consolidated gross written premiums for the year ended December 31, 2018. The head underwriter in this division has 31 years of experience. Limits assumed are retained by the Company, in some cases subject to self-insured retentions of the insureds.

Manufacturers and Contractors writes primary general liability coverage for a variety of classes, including manufacturers of consumer, commercial, and industrial products and general and trade contractors. Typically, we issue a $1.0 million per occurrence limit in this division and we retain the entire $1.0 million limit. The individual overseeing this division has 35 years of industry experience.

Excess Casualty underwrites excess liability coverage for a variety of risk classes including manufacturers, contractors, distributors and transportation risks. Typically, we provide between $1.0 million and $10.0 million per occurrence limits above a $1.0 million attachment point. Of this amount, we retain up to $1.0 million of exposure per occurrence and cede the balance to our reinsurers. We write excess liability coverage above our own primary policies, as well as policies issued by third parties. When we write above others' policies, we are selective regarding underlying carriers, focusing on the nature of the business, the financial strength of the carrier, their pricing and their claims handling capabilities. The underwriter who heads this division has 35 years of industry experience.

General Casualty writes primary liability coverage on businesses exposed to premises liability type claims including real estate, mercantile and retail operations, apartments and condominiums, daycare facilities, hotels and motels, restaurants, bars, taverns and schools. The head underwriter in this division has 31 years of experience. Typically, we write $1.0 million per occurrence in limits, and we retain the entire $1.0 million limit.

Energy writes risks engaged in the business of energy production, distribution or mining, and the manufacture of equipment used in the energy business segment. Examples of classes underwritten by this division include oil and gas exploration companies, oil or gas well drillers, oilfield consultants, oil or gas lease operators, oil well servicing companies, oil or gas pipeline construction companies, fireworks manufacturing, mining-related risks, utilities, and utility contractors. We provide policy limits up to $11.0 million, with typical limits between $1.0 million and $5.0 million per occurrence, retaining up

10

TABLE OF CONTENTS

to $1.0 million in limit net on either a primary or excess basis. The underwriter leading this division has 47 years of experience in the business.

Allied Health underwrites casualty insurance for allied health and social service types of risks, such as long-term care facilities, independent living apartments, group homes, half-way houses and shelters, drug rehabilitation, home health care and medical staffing enterprises. We provide policy limits up to $11.0 million, with typical limits between $1.0 million and $5.0 million per occurrence, retaining up to $1.0 million in limit net. The underwriter responsible for this unit has 25 years of experience in the business. Approximately 89% of the premiums written by our Allied Health division from inception through 2018 have been written on a claims made and reported form. We believe this policy form significantly reduces our long-term exposure in this complicated class of business.

Excess Property writes property risks providing limits in various layers above the primary coverage layer for a variety of classes, including apartments, condominiums, resorts, shopping centers, offices and general commercial properties. Typical per risk limits offered range from $5.0 million to $30.0 million on a gross basis, and a maximum of $5.0 million on a net of reinsurance basis. The average net per risk limit is approximately $2.5 million as of December 31, 2018. We retain up to the first $5.0 million in any one event or catastrophe. The underwriter leading our Excess Property division has 33 years of experience in the industry.

Life Sciences underwrites general liability, products liability and/or professional liability coverage for manufacturers, distributors and developers of biologics (antibodies & vaccines used for the prevention of disease), nutraceuticals (health, nutrition and herbal supplements), human clinical trials, pharmaceuticals (mainly generics and over-the-counters) and medical devices. This division also writes a book of various types of business engaged in the medical and adult-use cannabis industry. We provide policy limits up to $11.0 million, with typical limits between $1.0 million and $5.0 million per occurrence, retaining up to $1.0 million in limit net. The underwriter at the head of this division has 35 years of experience in the industry.

Small Business concentrates on accounts with annual primary liability insurance premiums of less than $10,000. For these smaller risks, we limit flexibility in coverage options and pricing to facilitate quick turnaround and efficient processing. We generally write $1.0 million per occurrence limits and retain the entire amount. The underwriter leading this division has 25 years of industry experience.

Environmental underwrites contractors' pollution liability, products pollution liability, site specific pollution liability and consultant's professional liability coverage on a stand-alone basis and in conjunction with the general liability coverage. The underwriter heading our Environmental division has 47 years of experience in the business. Typically, we write environmental coverage for contractors who are not engaged in environmental remediation work on an occurrence form. We provide policy limits up to $11.0 million, with typical limits between $1.0 million and $5.0 million per occurrence, retaining up to $1.0 million in limit net on a primary or excess basis.

Professional Liability writes professional liability coverage for accountants, architects, engineers, lawyers and certain other professions. We provide policy limits up to $11.0 million, with typical limits between $1.0 million and $5.0 million per occurrence, retaining up to $1.0 million in limit net. The individual who directs our professional liability division has 25 years of industry experience. All of our professional liability coverage is written on a claims made and reported basis.

Sports and Entertainment underwrites primary liability coverage for sports and entertainment related risks, including special events, family entertainment centers, tourist attractions, health clubs and sport teams, leagues and complexes. Typical limits offered are up to $1.0 million per occurrence, and we retain the entire $1.0 million limit. The underwriter at the head of this division has 31 years of experience in the industry.

Medical Professionals underwrites non-standard physicians' professional liability for individuals or small groups. Our healthcare business is a mix of both surgical and non-surgical classes. We typically provide between $1.0 million and $3.0 million per occurrence limits and retain up to $1.0 million of exposure per occurrence and cede the balance to our reinsurers. All of the policies written by this division have been issued on a claims-made and reported basis. The underwriter leading this division has 25 years of experience.

11

The following table identifies the top ten producing states by amount of gross written premium for our Excess and Surplus Lines segment for the year ended December 31, 2018 and the amount of gross written premium produced by such states for the years ended December 31, 2017, 2016, 2015 and 2014. The table also shows the percentage of each states' gross written premium to total gross written premium in the Excess and Surplus Lines segment for the years ended December 31, 2018, 2017 and 2016.

| State | 2018 | | 2017 | | 2016 | | 2015 | 2014 |
|---|---|---|---|---|---|---|---|---|
| | Gross Written Premiums | % of Total | Gross Written Premiums | % of Total | Gross Written Premiums | % of Total | Gross Written Premiums | Gross Written Premiums |
| California | $ 213,729 | 32.6% | $ 153,340 | 28.9% | $ 114,107 | 30.8% | $ 125,343 | $ 94,837 |
| New York | 54,417 | 8.3% | 47,585 | 9.0% | 39,407 | 10.6% | 24,314 | 19,970 |
| Florida | 47,918 | 7.3% | 55,502 | 10.5% | 35,765 | 9.6% | 23,853 | 17,295 |
| Texas | 31,604 | 4.8% | 29,567 | 5.6% | 26,708 | 7.2% | 24,491 | 21,644 |
| Illinois | 20,893 | 3.2% | 25,853 | 4.9% | 16,548 | 4.5% | 8,335 | 7,295 |
| Massachusetts | 19,758 | 3.0% | 13,587 | 2.5% | 8,496 | 2.3% | 4,835 | 3,010 |
| Nevada | 19,484 | 3.0% | 8,144 | 1.5% | 4,452 | 1.2% | 3,460 | 3,472 |
| Washington | 17,329 | 2.6% | 13,697 | 2.6% | 10,270 | 2.8% | 7,069 | 6,094 |
| Virginia | 15,532 | 2.4% | 10,741 | 2.0% | 6,534 | 1.8% | 4,088 | 2,582 |
| Michigan | 14,290 | 2.2% | 4,218 | 0.8% | 3,189 | 0.9% | 3,580 | 2,047 |
| All other states | 201,584 | 30.6% | 167,886 | 31.7% | 105,368 | 28.3% | 79,349 | 74,461 |
| Total | $ 656,538 | 100.0% | $ 530,120 | 100.0% | $ 370,844 | 100.0% | $ 308,717 | $ 252,707 |

*Marketing and Distribution*

The Excess and Surplus Lines segment distributes its products through a select group of licensed E&S lines brokers that we believe can produce reasonable volumes of quality business for James River Insurance consistently. These brokers procure policies for their clients from us as well as from other insurance companies. At December 31, 2018, the segment had authorized 117 broker groups to work with us. The Excess and Surplus Lines segment generally makes broker authorizations by brokerage office and underwriting division. With the exception of one hired and non-owned auto program (combined premiums of approximately $8.0 million for 2018) the Excess and Surplus Lines segment does not grant its brokers underwriting or claims authority. In late 2017, we introduced a Binding Contract division where limited authority for underwriting is delegated to a select group of agents for a limited group of General Liability classes through a company designed online portal.

Our Excess and Surplus Lines segment selects its brokers based upon management's review of the experience, knowledge and business plan of each broker. While many of our Excess and Surplus Lines segment's brokers have more than one office, we evaluate each office as if it were a separate entity. Often, our Excess and Surplus Lines segment authorizes some but not all offices owned by a brokerage for specialized lines of business. Brokers must be able to demonstrate an ability to competently produce both the quality and quantity of business that we seek. Brokers unable to produce consistently profitable business, or who produce unacceptably low volumes of business, may be terminated. Our Excess and Surplus Lines segment's underwriters regularly visit with brokers in their offices to discuss the products that we offer and the needs of the brokers. We believe the personal relationships we foster with individual brokers and our ability to respond to a wide variety of risks placed by these brokers make us an important market for them.

Our Excess and Surplus Lines segment's two largest brokers produced $439.7 million of gross written premiums for the year ended December 31, 2018, representing approximately 67.0% of the Excess and Surplus Lines segment's gross written premiums for 2018. The two largest brokers produced $358.3 million (BB&T Insurance Services represented 30.7% of consolidated gross written premiums) and $81.4 million of gross written premiums for the year ended December 31, 2018, respectively. One insured (Rasier LLC and its affiliates) produced $294.3 million of gross written premiums (representing 25.2% of our consolidated gross written premiums) and $13.9 million of fee income for the year ended December 31, 2018.

In 2018 and 2017, our Excess and Surplus Lines segment paid an average commission to producers of 9.6% and 10.9%, respectively, of gross written premiums.

*Underwriting*

Our Excess and Surplus Lines segment's staff includes over 165 individuals directly employed in underwriting policies as of December 31, 2018. We are very selective about the policies we bind. Our Excess and Surplus Lines segment binds approximately 3% of new submissions and one out of every six new quotes. We realize all excess and surplus lines applications

12

TABLE OF CONTENTS

have already been rejected by the standard market. If our underwriters cannot reasonably expect to bind coverage at the combination of premiums and coverage that meet our standards, they are encouraged to quickly move on to another prospective opportunity. For the year ended December 31, 2018, we received approximately 222,000 submissions (new and renewal, excluding commercial auto policies), quoted over 51,000 policies and bound over 15,000 policies.

When we accept risk in our Excess and Surplus Lines segment, we are careful to establish terms that are suited to the risk and the pricing. As an excess and surplus lines writer, we use our freedom of rate and form to make it possible to take on risks that have already been rejected by admitted carriers who have determined they cannot insure these risks on approved forms at filed rates.

We attempt to craft policies that offer affordable protection to our insureds by tailoring coverage in ways that make potential losses more predictable and are intended to reduce claims costs. For example, we frequently use a "punitive damages exclusion" and "defense inside the limits" endorsements, intended to prevent excessive defense costs; "assault and battery" exclusions or sub limits that are less than the full policy limits which allows us to quantify and limit our losses more precisely than in policies without the exclusion; and "classification limitation" and "specified location" endorsements that limit coverage to known exposures and locations. We have no material exposure to asbestos, lead paint, silica, mold, or nuclear, biological, or chemical terrorism.

We design our internal processing and data collection systems to provide our management team with accurate and relevant information in real-time. We collect premium, commission and claims data, including detailed information regarding policy price, terms, conditions and the nature of the insured's business. This data allows us to analyze trends in our business, including results by individual broker, underwriter and class of business and expand or contract our operations quickly in response to market conditions. We rely on our information technology systems in this process. Additionally, the claims staff also contributes to our underwriting operations through its communication of claims information to our underwriters.

*Claims*

We believe that effective management of claims settlement and any associated litigation avoids delays and associated additional costs.

Our Excess and Surplus Lines segment's claims department consists of over 330 claims professionals as of December 31, 2018 with significant claims experience in the property-casualty industry.

Our excess and surplus lines business generally results in claims from premises/operations liability, professional liability, hired and non-owned auto liability, auto physical damage, first party property losses and products liability. We believe the key to effective claims management is timely and thorough claims investigation. We seek to complete all investigations and adjust reserves appropriately as soon as is practicable after the receipt of a claim. We seek to manage the number of claims per adjuster to allow adjusters sufficient time to investigate and resolve claims. Senior management reviews each case above a specified amount at least quarterly to evaluate whether the key issues in the case are being considered and to monitor case reserve levels. We keep the settlement authority of front-line adjusters low to ensure the practice of having two or more members of the department participate in the decision as to whether to settle or defend. In addition, cases with unusual damage, liability or policy interpretation issues are subjected to peer reviews. Members of the underwriting staff participate in this process. Prior to any scheduled mediation or trial involving a claim, claims personnel conduct further peer review to make sure all issues and exposures have been adequately analyzed.

Our claims staff also contributes to our underwriting operations through communication of claims information to our underwriters. The Senior Vice President and Chief Claims Officer heads our forms committee, which reviews and develops all policy forms and exclusions, and is also a member of the underwriting review committee.

Approximately 95% of all claims received are closed within five years in the Excess and Surplus Lines segment.

13

TABLE OF CONTENTS

The calendar year net loss ratios for the Excess and Surplus Lines segment for the last ten years were:

| | |
|---|---|
| 2009 | 62.6% |
| 2010 | 54.9% |
| 2011 | 48.5% |
| 2012 | 52.6% |
| 2013 | 40.4% |
| 2014 | 55.2% |
| 2015 | 54.5% |
| 2016 | 62.6% |
| 2017 | 80.2% |
| 2018 | 78.8% |

The 2018 and 2017 calendar year loss ratios for the Excess and Surplus Lines segment were impacted by adverse reserve development of $20.7 million and $38.7 million, respectively, in the commercial auto line of business. The adverse development was primarily related to the 2016 contract year with one insured.

### Specialty Admitted Insurance Segment

The Falls Lake Insurance Companies ("Falls Lake") comprise our other U.S. insurance segment, Specialty Admitted Insurance. Falls Lake consists of Falls Lake National Insurance Company (an Ohio domiciled company, licensed in 48 states and the District of Columbia and registered as a surplus lines company in California), and its subsidiaries Stonewood Insurance Company (a North Carolina domiciled company) and Falls Lake Fire and Casualty Company (a California domiciled company). The Specialty Admitted Insurance segment produced 32.1% of consolidated gross written premiums for the year ended December 31, 2018.

Our plan is to continue to use our broad licensure and significant management expertise to earn substantial fee income as well as underwriting profits. The Specialty Admitted Insurance segment consists of:

- Individual risk workers' compensation business, underwritten by our staff and generated by appointed agents in North Carolina, Tennessee, Virginia, South Carolina, Georgia, New Jersey, Missouri, Kansas, Pennsylvania, Massachusetts, Rhode Island, Alabama, Connecticut and Mississippi, produce 14.8% of 2018 gross written premiums in this segment, (13.9% in 2017, 21.7% in 2016, 39.5% in 2015 and 50.7% in 2014); and

- Fronting and program business written through selected MGAs, insurance carriers, and other producers which represented 85.2% of 2018 gross written premiums in this segment, (86.1% in 2017, 78.3% in 2016, 60.5% in 2015 and 49.3% in 2014).

### Traditional Workers' Compensation Business

Our individual risk workers' compensation business, produced through a distribution channel comprised of appointed independent retail agents and a limited number of appointed wholesale brokers, remains a regionally focused effort in select Southeastern and Eastern U.S. states. For the year ended December 31, 2018, approximately 49% of our retail produced workers' compensation direct written premiums were in North Carolina, 16% were in Virginia, 13% were in South Carolina, and 11% were in Georgia. Building trades represented approximately 28% of the direct premiums in force in our retail produced workers' compensation book in 2018. Other significant industry groups include healthcare employees (16%), goods and services (15%), manufacturing (11%), specialty transportation (11%) and agriculture (6%). We view our retail produced workers' compensation business as a core competency and seek to make consistent underwriting profits from it. We recognize the cyclical nature of this line and are prepared to contract the business rapidly when rates decline, or the regulatory or economic environment makes it difficult to contain costs.

### Fronting & Program Business

In our fronting business we issue insurance policies for another insurance company which may not have the licensure, product suite or rating to serve its desired market, or for a program supported by reinsurance or alternative capital provider(s). We generally retain 10% or less of the underwriting risk in our fronting business. The issuance of our policy makes us contractually responsible to the insured in the event they experience a covered loss. We enter into these arrangements selectively with counterparties which have significant experience and market presence in their desired segment of property-casualty, workers compensation or automobile business. Underwriting, claims and financial performance is subject to regular review by our staff, and we hold appropriate collateral to manage counterparty credit risk. We specifically grant limited authority for underwriting and claims administration and employ a rigorous review process to ensure the authority is

14

TABLE OF CONTENTS

collateral trust arrangement was approximately $1,099.2 million, which exceeds the amount of claims receivable and unpaid reported losses and loss adjustment expenses outstanding. The Company has ongoing exposure to estimated losses and expenses on these contracts growing at a faster pace than growth in our collateral balances. In addition, we have credit exposure if our estimates of future losses and loss adjustment expenses and other amounts recoverable, which are the basis for establishing collateral balances, are lower than actual amounts paid or payable. The amount of our credit exposure in any of these instances could be material. To mitigate these risks, we closely and frequently monitor our exposure compared to our collateral held, and we request additional collateral when our analysis indicates that we have uncollateralized exposure.

### *Reserve Policy*

We seek to establish reserves that will adequately meet our obligations. We have seven credentialed actuaries on staff, and we engage independent actuarial consultants to review our decisions regarding reserves twice a year.

We maintain reserves for specific claims incurred and reported, reserves for claims incurred but not reported ("IBNR") and reserves for uncollectible reinsurance when appropriate. Our ultimate liability may be greater or less than current reserves. In the insurance industry, there is always the risk that reserves may prove inadequate. We continually monitor reserves using new information on reported claims and a variety of statistical techniques and adjust our estimates as necessary as experience develops or new information becomes known. Such adjustments (referred to as reserve development) are included in current operations. Anticipated inflation is reflected implicitly in the reserving process through analysis of cost trends and the review of historical development. We do not discount our reserves for losses and loss adjustment expenses to reflect estimated present value.

When setting our reserves, we use a blend of actuarial techniques that are chosen to reflect the nature of the lines of insurance we underwrite. We seek to be consistent and transparent in establishing our reserves.

In many cases, several years may elapse between the occurrence of an insured loss, the reporting of the loss and our eventual payment of the loss. We establish loss and loss adjustment expense reserves for the ultimate payment of all losses and loss adjustment expenses incurred. We estimate the reserve for losses and loss adjustment expenses using individual case-basis valuations of reported claims. We also use statistical analyses to estimate the cost of losses that have been incurred but not reported to us. These estimates are based on historical information and on estimates of future trends that may affect the frequency of claims and changes in the average cost of claims that may arise in the future. We also consider various factors such as:

- Loss emergence and insured reporting patterns;

- Underlying policy terms and conditions;

- Business and exposure mix;

- Trends in claim frequency and severity;

- Changes in operations;

- Emerging economic and social trends;

- Inflation;

- Changes in the regulatory and litigation environments; and

- Discussions with third-party actuarial consultants.

The procedures we use to estimate loss reserves assume that past experience, adjusted for the effects of current developments and anticipated trends, is an appropriate basis for predicting future events. It also assumes that adequate historical or other data exists upon which to make these judgments. These estimates are by their nature subjective and imprecise, and ultimate losses and loss adjustment expenses may vary from established reserves.

Our Reserve Committee consists of our Chief Actuary, Chief Executive Officer, Chief Financial Officer, and Chief Accounting Officer. Additionally, the presidents and chief actuaries of each of our three insurance segments assist in the evaluation of reserves in their respective segments. The Reserve Committee meets quarterly to review the actuarial recommendations made by each chief actuary and uses its best judgment to determine the best estimate to be recorded for the reserve for losses and loss adjustment expenses on our quarterly balance sheet.

TABLE OF CONTENTS

The following table reflects our reserve development by segment during the calendar years 2018 to 2009 individually and in aggregate.

| Segment | Excess and Surplus Lines | | Specialty Admitted Insurance | | Casualty Reinsurance | | Grand Total | |
|---|---|---|---|---|---|---|---|---|
| Calendar Year | | | | | | | | |
| 2018 | $ | (15,012) [1] | $ | 5,560 | $ | (8,220) | $ | (17,672) |
| 2017 | | (20,023) [2] | | 2,721 | | (4,170) | | (21,472) |
| 2016 | | 24,079 [3] | | 3,822 | | (4,185) | | 23,716 |
| 2015 | | 25,424 [4] | | 3,531 | | (12,637) | | 16,318 |
| 2014 | | 27,283 [5] | | 5,854 | | (5,719) | | 27,418 |
| 2013 | | 40,734 [6] | | 1,410 | | (4,692) | | 37,452 |
| 2012 | | 20,122 [7] | | (4,898) | | (16,617) [8] | | (1,393) |
| 2011 | | 21,034 | | 1,712 | | (2,835) | | 19,911 |
| 2010 | | 10,922 | | (381) | | (857) | | 9,684 |
| 2009 | | 3,193 | | 1,591 | | (1,067) | | 3,717 |
| **Cumulative Development** | $ | 137,756 | $ | 20,922 | $ | (60,999) | $ | 97,679 |

(1) Includes $20.7 million of adverse development in the commercial auto line of business that was primarily related to the 2016 contract year with one insured, partially offset by $5.7 million of favorable development from other divisions.

(2) Includes $38.7 million of adverse development in the commercial auto line of business that was primarily related to the 2016 contract year with one insured, partially offset by $18.6 million of favorable development from other divisions primarily from the 2014 through 2016 accident years.

(3) Includes $10.0 million of favorable development from the 2015 accident year, $10.7 million from the 2014 accident year and $4.5 million from the 2013 accident year.

(4) Includes $17.3 million and $10.5 million of favorable development from the 2014 and 2013 accident year, respectively.

(5) Includes $7.9 million of favorable development from the 2011 accident year, $4.2 million from the 2007 accident year and $5.0 million from the 2009 accident year.

(6) Includes $11.8 million of favorable development from the 2009 accident year, $7.3 million of favorable development from the 2007 accident year and $5.8 million of favorable development from the 2008 accident year.

(7) Includes $8.0 million of favorable development from the 2009 accident year, $4.3 million of favorable development from the 2008 accident year and $4.1 million of favorable development from the 2007 accident year.

(8) Includes $9.0 million of adverse development on assumed crop business almost entirely from the 2011 accident year and $7.6 million of adverse development on other assumed business.

Among the indicators of reserve strength that we monitor closely are the number of claims outstanding from a given year and the amount of IBNR reserves held on our balance sheet for claims that have been incurred but not yet reported to us. As a general rule, every known claim has a specific case reserve established against it which management believes is adequate to resolve the claim and pay attendant expenses based on information available at the time.

A significant portion of reported claims from prior policy years were closed at December 31, 2018. The table below sets forth the percentage of claims closed by policy year for our Excess and Surplus Lines and Specialty Admitted Insurance segments for the policy years indicated.

19

TABLE OF CONTENTS

**Percentage of Claims Closed at December 31, 2018**

| Policy Year | Excess and Surplus Lines Segment Excluding Commercial Auto | Excess and Surplus Lines Segment Commercial Auto | Specialty Admitted Insurance Segment Individual Risk Workers' Comp | Specialty Admitted Insurance Segment Fronting and Programs |
|---|---|---|---|---|
| 2004 | 99.9% | — | 99.8% | — |
| 2005 | 99.8% | — | 100.0% | — |
| 2006 | 99.6% | — | 100.0% | — |
| 2007 | 99.3% | — | 100.0% | — |
| 2008 | 99.2% | — | 99.8% | — |
| 2009 | 99.0% | — | 99.9% | — |
| 2010 | 98.4% | — | 99.9% | — |
| 2011 | 97.4% | — | 99.7% | — |
| 2012 | 95.6% | — | 99.8% | — |
| 2013 | 95.0% | 99.4% | 100.0% | 98.8% |
| 2014 | 89.8% | 98.9% | 99.9% | 98.2% |
| 2015 | 86.2% | 99.7% | 99.1% | 95.4% |
| 2016 | 80.6% | 97.6% | 94.8% | 87.8% |
| 2017 | 74.5% | 95.1% | 77.3% | 74.7% |

Another indicator of reserve strength that we monitor closely is the percentage of our gross and net loss reserves that are comprised of IBNR reserves. The table below sets forth our IBNR, total gross reserves and the percentage that IBNR represents of the total gross reserves, in each case by segment and in the aggregate, at December 31, 2018. The percentage that IBNR represents of total gross reserves at December 31, 2018 is 62.4%.

| | Gross Reserves at December 31, 2018 | | |
|---|---|---|---|
| | IBNR | Total | IBNR % of Total |
| | (in thousands) | | |
| Excess and Surplus Lines | $ 608,548 | $ 960,563 | 63.4% |
| Specialty Admitted Insurance | 264,399 | 426,315 | 62.0% |
| Casualty Reinsurance | 164,242 | 274,581 | 59.8% |
| Total | $ 1,037,189 | $ 1,661,459 | 62.4% |

The table below sets forth our IBNR, total net reserves and the percentage that IBNR represents of the total net reserves, in each case by segment and in the aggregate, at December 31, 2018. The percentage that IBNR represents of total net reserves at December 31, 2018 is 61.5%.

| | Net Reserves at December 31, 2018 | | |
|---|---|---|---|
| | IBNR | Total | IBNR % of Total |
| | (in thousands) | | |
| Excess and Surplus Lines | $ 514,160 | $ 834,943 | 61.6% |
| Specialty Admitted Insurance | 56,951 | 89,298 | 63.8% |
| Casualty Reinsurance | 163,152 | 269,847 | 60.5% |
| Total | $ 734,263 | $ 1,194,088 | 61.5% |

**Investment Strategy**

We attempt to generate better than market average risk-adjusted returns in our investment portfolio by taking measured risks based upon detailed knowledge of certain niche asset classes. While we are willing to make investments in non-traditional types of investments, we avoid risks that we do not understand well, as well as structures or situations we think could cause

20

TABLE OF CONTENTS

## Item 1A.    RISK FACTORS

You should carefully consider the following risks, together with the cautionary statement under the caption "Special Note Regarding Forward-Looking Statements" above and the other information included in this Annual Report. The risks described below are not the only ones we face. Additional risks that are currently unknown to us or that we currently consider immaterial may also impair our business or materially adversely affect our financial condition or results of operations. If any of the following risks actually occurs, our business, financial condition or results of operation could be materially adversely affected.

### Risks Related to Our Business and Industry

***Our actual incurred losses may be greater than our loss and loss adjustment expense reserves, which could have a material adverse effect on our financial condition and results of operations.***

Our financial condition and results of operations depend upon our ability to assess accurately the potential losses and loss adjustment expenses under the terms of the insurance policies or reinsurance contracts we underwrite. Reserves do not represent an exact calculation of liability. Rather, reserves represent an estimate of what we expect the ultimate settlement and administration of claims will cost us, and our ultimate liability may be greater or less than current reserves. These estimates are based on our assessment of facts and circumstances then known, as well as estimates of future trends in claim severity, claim frequency, judicial theories of liability and other factors. These variables are affected by both internal and external events that could increase our exposure to losses, including changes in actuarial projections, claims handling procedures, inflation, climate change, economic and judicial trends, and legislative changes. We continually monitor reserves using new information on reported claims and a variety of statistical techniques.

In the insurance and reinsurance industry, there is always the risk that reserves may prove inadequate, and actual results always differ from our reserve estimates. It is possible for insurance and reinsurance companies to underestimate the cost of claims. Our estimates could prove to be low, and this underestimation could have a material adverse effect on our financial strength.

Among the uncertainties we encounter in establishing our reserves for losses and related expenses in connection with our insurance businesses are:

- When we write "occurrence" policies in our Excess and Surplus Lines segment, we are obligated to pay covered claims, up to the contractually agreed amount, for any covered loss that occurs while the policy is in force. Losses can emerge many years after a policy has lapsed. Accordingly, our first notice of a claim or group of claims may arise many years after a policy has lapsed. Approximately 93% of our net casualty loss reserves in this segment are associated with "occurrence form" policies at December 31, 2018.

- Even when a claim is received (irrespective of whether the policy is a "claims made" or "occurrence" basis form), it may take considerable time to fully appreciate the extent of the covered loss suffered by the insured and, consequently, estimates of loss associated with specific claims can increase over time.

- New theories of liability are enforced retroactively from time to time by courts. See also "The effect of emerging claim and coverage issues on our business is uncertain" risk factor herein.

- Volatility in the financial markets, economic events and other external factors may result in an increase in the number of claims and the severity of the claims reported. In addition, elevated inflationary conditions could, among other things, cause loss costs to increase.

- If claims became more frequent, even if we had no liability for those claims, the cost of evaluating these potential claims could escalate beyond the amount of the reserves we have established. As we enter new lines of business, or as a result of new theories of claims, we may encounter an increase in claims frequency and greater claims handling costs than we had anticipated.

- We regularly enter new lines of insurance, and as a consequence, we sometimes have to make estimates of future losses for risk classes with which we do not have a great deal of experience. This lack of experience may contribute to making errors of judgment when establishing reserves.

In addition, reinsurance reserve estimates are typically subject to greater uncertainty than insurance reserve estimates, primarily due to reliance on the original underwriting decisions made by the ceding company. As a result, we are subject to the risk that our ceding companies may not have adequately evaluated the risks reinsured by us and the premiums ceded may not adequately compensate us for the risks we assume. Other factors resulting in additional uncertainty in establishing reinsurance reserves include:

38

TABLE OF CONTENTS

- The increased lapse of time from the occurrence of an event to the reporting of the claim and the ultimate resolution or settlement of the claim.

- The diversity of development patterns among different types of reinsurance treaties.

- The necessary reliance on the ceding company for information regarding claims.

If any of our insurance or reinsurance reserves should prove to be inadequate for the reasons discussed above, or for any other reason, we will be required to increase reserves, resulting in a reduction in our net income and shareholders' equity in the period in which the deficiency is identified. Future loss experience substantially in excess of established reserves would also have a material adverse effect on future earnings and liquidity and financial rating, which would affect our ability to attract business and could affect our ability to retain or hire qualified personnel.

*Our risk management is based on estimates and judgments that are subject to significant uncertainties.*

Our approach to risk management relies on subjective variables that entail significant uncertainties. For example, we rely heavily on estimates of probable maximum losses for certain events that are generated by computer-run models. In addition, we rely on historical data and scenarios in managing credit and interest rate risks in our investment portfolio. These estimates, models, data and scenarios may not produce accurate predictions and consequently, we could incur losses both in the risks we underwrite and to the value of our investment portfolio.

Small changes in assumptions, which depend heavily on our judgment and foresight, can have a significant impact on the modeled outputs. Although we believe that these probabilistic measures provide a meaningful indicator of the relative risk of certain events and changes to our business over time, these measures do not predict our actual exposure to, nor guarantee our successful management of, future losses that could have a material adverse effect on our financial condition and results of operations.

*If we are unable to retain key management and employees or recruit other qualified personnel, we may be materially adversely affected.*

We believe that our future success depends, in large part, on our ability to retain our experienced management team and key employees. For instance, our specialty insurance operations require the services of a number of highly experienced employees, including underwriters, to source quality business and analyze and manage our risk exposure. There can be no assurance that we can attract and retain the necessary employees to conduct our business activities on a timely basis or at all. Our competitors may offer more favorable compensation arrangements to our key management or employees to incentivize them to leave our Company. Furthermore, our competitors may make it more difficult for us to hire their personnel by offering excessive compensation arrangements to certain employees to induce them not to leave their current employment and bringing litigation against employees who do leave (and possibly us as well) to join us. Although we have employment agreements with all of our executive officers, we do not have employment agreements with our senior underwriters or claims personnel. We do not have key person insurance on the lives of any of our key management personnel. Our inability to attract and retain qualified personnel and the loss of services of key personnel could have a material adverse effect on our financial condition and results of operations.

*Adverse economic factors, including recession, inflation, periods of high unemployment or lower economic activity could result in the sale of fewer policies than expected or an increase in frequency or severity of claims and premium defaults or both, which, in turn, could affect our growth and profitability.*

Factors such as business revenue, economic conditions, the volatility and strength of the capital markets and inflation can all affect the business and economic environment. These same factors affect our ability to generate revenue and profits. In an economic downturn that is characterized by higher unemployment, declining spending and reduced corporate revenues, the demand for insurance products is adversely affected, which directly affects our premium levels and profitability. Negative economic factors may also affect our ability to receive the appropriate rate for the risk we insure with our policyholders and may adversely affect the number of policies we can write, including with respect to our opportunities to underwrite profitable business. In an economic downturn, our customers may have less need for insurance coverage, cancel existing insurance policies, modify their coverage, self-insure their risks, or not renew with us. Existing policyholders may exaggerate or even falsify claims to obtain higher claims payments. These outcomes would reduce our underwriting profit to the extent these factors are not reflected in the rates we charge.

We underwrite a significant portion of our insurance in (i) the Excess and Surplus Lines segment in California, New York, Florida, Texas, and Illinois, (ii) the individual risk workers' compensation business of the Specialty Admitted Insurance segment in North Carolina, Virginia, South Carolina and Georgia, and (iii) the fronting and program business of the Specialty Admitted Insurance segment in California, Michigan, North Carolina, New York, Pennsylvania, and New Jersey. Any economic downturn in any such state could have a material adverse effect on our financial condition and results of operations.

39

TABLE OF CONTENTS

*A decline in our financial strength rating may result in a reduction of new or renewal business.*

Companies, insurers and reinsurance brokers use ratings from independent ratings agencies as an important means of assessing the financial strength and quality of reinsurers. A.M. Best has assigned a financial strength rating of "A" (Excellent), which is the third highest of 15 ratings that A.M. Best issues, to each of James River Insurance, James River Casualty, Falls Lake Fire and Casualty, Falls Lake National, Stonewood Insurance and JRG Re. A.M. Best assigns ratings that are intended to provide an independent opinion of an insurance or reinsurance company's ability to meet its obligations to policyholders and such ratings are not an evaluation directed to investors. A.M. Best periodically reviews our rating and may revise it downward or revoke it at its sole discretion based primarily on its analysis of our balance sheet strength (including capital adequacy and loss and loss adjustment expense reserve adequacy), operating performance and business profile. Factors that could affect such an analysis include but are not limited to:

- if we change our business practices from our organizational business plan in a manner that no longer supports our A.M. Best's rating;

- if unfavorable financial, regulatory or market trends affect us, including excess market capacity;

- if our losses exceed our loss reserves;

- if we have unresolved issues with government regulators;

- if we are unable to retain our senior management or other key personnel;

- if our investment portfolio incurs significant losses; or

- if A.M. Best alters its capital adequacy assessment methodology in a manner that would adversely affect our rating.

These and other factors could result in a downgrade of our rating. A downgrade of our rating could cause our current and future brokers and agents, retail brokers and insureds to choose other, more highly-rated competitors. A downgrade of this rating could also increase the cost or reduce the availability of reinsurance to us, increase collateral required for our assumed reinsurance business, or trigger termination of assumed and/or ceded reinsurance contracts.

In addition, in view of the earnings and capital pressures recently experienced by many financial institutions, including insurance companies, it is possible that rating organizations will heighten the level of scrutiny that they apply to such institutions, will increase the frequency and scope of their credit reviews, will request additional information from the companies that they rate and may increase the capital and other requirements employed in the rating organizations' models for maintenance of certain ratings levels. It is possible that such reviews of us may result in adverse ratings consequences, which could have a material adverse effect on our financial condition and results of operations. A downgrade below "A-" or withdrawal of any rating could severely limit or prevent us from writing new and renewal insurance or reinsurance contracts. See also "Management's Discussion and Analysis of Financial Condition and Results of Operations—Ratings."

*We distribute products through a select group of brokers and agents, several of which account for a significant portion of our business, and there can be no assurance that such relationships will continue, or if they do continue, that the relationship will be on favorable terms to us. In addition, reliance on brokers and agents subjects us to their credit risk.*

We distribute our products through a select group of brokers and agents. In 2018:

- the Excess and Surplus Lines segment conducted business with two brokers that produced an aggregate of $439.7 million in gross written premiums, or 67.0% of that segment's gross written premiums for the year;

- the Specialty Admitted Insurance segment conducted business with one agency that produced $201.7 million in gross written premiums, representing 53.9% of that segment's gross written premiums for the year; and

- the Casualty Reinsurance segment conducted business with two brokers that generated $96.4 million of gross written premiums, or 70.9% of that segment's gross written premiums for the year.

We cannot assure you that the relationship with any of these brokers will continue. Even if the relationships do continue, they may not be on terms that are profitable for us. The termination of a relationship with one or more significant brokers or agents could result in lower direct written premiums and could have a material adverse effect on our results of operations or business prospects.

There is a continuing trend toward consolidation among retail and wholesale brokers and agents. As brokers and agents consolidate and competition among them declines, they may seek and receive higher commissions. Increases in commission expense could reduce our underwriting profit.

TABLE OF CONTENTS

Certain premiums from policyholders, where the business is produced by brokers or agents, are collected directly by the brokers or agents and forwarded to our insurance subsidiaries. In certain jurisdictions, when the insured pays its policy premium to brokers or agents for payment on behalf of our insurance subsidiaries, the premiums might be considered to have been paid under applicable insurance laws and regulations. Accordingly, the insured would no longer be liable to us for those amounts, whether or not we have actually received the premiums from that broker or agent. Consequently, we assume a degree of credit risk associated with brokers and agents. Where necessary, we review the financial condition of potential new brokers and agents before we agree to transact business with them. Although failures by brokers and agents to remit premiums have not been material to date, there may be instances where brokers and agents collect premiums but do not remit them to us and we may be required under applicable law to provide the coverage set forth in the policy despite the absence of premiums.

Because the possibility of these events depends in large part upon the financial condition and internal operations of our brokers and agents (which in most cases is not public information), we are not able to quantify the exposure presented by this risk. If we are unable to collect premiums from brokers and agents in the future, underwriting profits may decline and our financial condition and results of operations could be materially adversely affected.

***We rely on a select group of customers for a significant portion of our business, and the loss of any of these customers, or a material reduction in business with any of these customers, would materially adversely affect our rate of growth, results of operations and financial condition.***

Our two largest customers accounted for approximately $294.3 million (Rasier LLC and its affiliates) and $201.7 million (Atlas General Insurance Services) of our gross written premium in 2018, representing 25.2% and 17.3% of our gross written premiums in 2018, respectively. No other insured generated 10.0% or more of consolidated gross written premiums for 2018. The loss of any of these customers, or a significant reduction in the amount of business that we conduct with such customers, could have a material adverse effect on our results of operations.

***We are subject to credit risk with regard to our reinsurance counterparties, insurance companies with which we have a fronting arrangement and an indemnification arrangement we have with an insured group of companies.***

Although reinsurance makes the assuming reinsurer liable to us to the extent of the risk ceded, we are not relieved of our primary liability to our insureds as the direct insurer. At December 31, 2018, reinsurance recoverables on unpaid losses from our three largest reinsurers was $243.6 million in the aggregate and represented 52.1% of the total balance. Additionally, prepaid reinsurance premiums ceded to three reinsurers at December 31, 2018 was $53.7 million in the aggregate, or 47.8% of the total balance of prepaid reinsurance premiums. At December 31, 2018, all of our material reinsurance recoverable amounts are from companies with A.M. Best ratings of "A-" or better or are collateralized by the reinsurer, but we cannot be sure that our reinsurers will pay all reinsurance claims on a timely basis or at all. For example, reinsurers may default in their financial obligations to us as the result of insolvency, lack of liquidity, operational failure, fraud, asserted defenses based on agreement wordings or the principle of utmost good faith, asserted deficiencies in the documentation of agreements or for other reasons. The failure of a reinsurer to pay us does not lessen our contractual obligations to insureds. If a reinsurer fails to pay the expected portion of a claim or claims, our net losses might increase substantially and materially adversely affect our financial condition. Any disputes with reinsurers regarding coverage under reinsurance contracts could be time-consuming, costly and uncertain of success.

Downgrades to the credit ratings of our reinsurance counterparties may result in the reduction of rating agency capital credit provided by those reinsurance contracts and could, therefore, result in a downgrade of our own credit ratings. In addition, under the reinsurance regulations, in many states where our U.S. insurance subsidiaries are domiciled, certain reinsurers are required to collateralize their obligations to us and to the extent they do not do so, our ability for regulators to recognize this reinsurance will be impaired. We evaluate each reinsurance claim based on the facts of the case, historical experience with the reinsurer on similar claims and existing case law and include any amounts deemed uncollectible from the reinsurer in our reserve for uncollectible reinsurance. See also "Business—Purchase of Reinsurance."

Similarly, in our fronting business, which we conduct through our Specialty Admitted Insurance segment, we are primarily liable to the insureds because we have issued the policies. While we customarily require a collateral trust arrangement to secure the obligations of the insurance entity for which we are fronting, we do not obtain collateral in every instance and in situations where we do obtain collateral for the obligations of the other insurance entity, it is possible that the collateral could be insufficient to cover all claims, either as a result of a decline in the value of the collateral, an increase in the obligation being collateralized, or a failure of management to monitor the adequacy of the collateral held. In that event, we would be contractually entitled to recovery from the entity for which we are fronting, but it is possible that, for any of a variety of reasons, the other party could default in its obligations. See also "Business — Business Segments—Specialty Admitted Insurance Segment—Fronting & Program Business."

In addition, we are exposed to credit risk relating to a set of insurance contracts with an insured group of companies under which the Company pays losses and loss adjustment expenses on the contracts. The insured group of companies are contractually obligated to reimburse us for a significant portion of the losses and loss adjustment expenses paid on behalf of the

TABLE OF CONTENTS

insured parties. This reimbursement obligation is supported by collateral posted for our benefit, which cash equivalent collateral had a balance of approximately $1,099.2 million as of December 31, 2018. If the insured group of companies fails to reimburse us, and the collateral posted for our benefit to support the insured group of companies' reimbursement obligations is insufficient, our financial condition and results of operations could be materially adversely affected. See "Business — Purchase of Reinsurance — Amounts Recoverable from an Indemnifying Party."

***The failure of any of the loss limitations or exclusions we employ, or changes in other claims or coverage issues, could have a material adverse effect on our financial condition or results of operations.***

Although we seek to mitigate our loss exposure through a variety of methods, the future is inherently unpredictable. It is difficult to predict the timing, frequency and severity of losses with statistical certainty. It is not possible to completely eliminate our exposure to unforecasted or unpredictable events and, to the extent that losses from such risks occur, our financial condition and results of operations could be materially adversely affected.

For instance, various provisions of our policies, such as limitations or exclusions from coverage or choice of forum, which have been negotiated to limit our risks, may not be enforceable in the manner we intend. At the present time, we employ a variety of endorsements to our policies that limit exposure to known risks.

In addition, we design our Excess and Surplus Lines segment's policy terms to manage our exposure to expanding theories of legal liability like those which have given rise to claims for lead paint, asbestos, mold, construction defects and environmental matters. Many of the policies we issue also include conditions requiring the prompt reporting of claims to us and entitle us to decline coverage in the event of a violation of that condition. Also, many of our policies limit the period during which a policyholder may bring a claim under the policy, which in many cases is shorter than the statutory period under which such claims can be brought against our policyholders. While these exclusions and limitations help us assess and reduce our loss exposure and help eliminate known exposures to certain risks, it is possible that a court or regulatory authority could nullify or void an exclusion or legislation could be enacted modifying or barring the use of such endorsements and limitations. These types of governmental actions could result in higher than anticipated losses and loss adjustment expenses, which could have a material adverse effect on our financial condition or results of operations. In some instances, these changes may not become apparent until sometime after we have issued insurance policies that are affected by the changes. As a result, the full extent of liability under our insurance contracts may not be known for many years after a contract is issued.

***We have exposure to losses arising from unpredictable natural disasters, terrorist acts, and other catastrophic events. Claims from these events could reduce our earnings and cause volatility in our results of operations.***

We have exposure to losses arising from unpredictable natural disasters, terrorist acts, and other catastrophic events. Natural disasters, terrorist acts, and other catastrophes can cause losses in a variety of our property-casualty lines and generally result in an increase in the number of claims filed as well as the amount of compensation sought by claimants.

The incidence and severity of catastrophes and terrorist acts are inherently unpredictable. The extent of losses from catastrophes is a function of the frequency of loss events, the total amount of insured exposure in the area affected by each event and the severity of the events. Claims from catastrophic events could exceed our amount of reinsurance purchased to protect us from such events, reduce our earnings and cash flows, cause volatility in our results of operations and cash flows for any fiscal period or materially impact our financial condition.

***Changing climate conditions may increase the frequency and severity of catastrophic events and thereby adversely affect our financial condition and results.***

Over the past several years, changing weather patterns and climatic conditions, such as global warming, appear to have contributed to the unpredictability, frequency and severity of natural disasters and created additional uncertainty as to future trends and exposures. There is a growing scientific consensus that global warming and other climate changes are increasing the frequency and severity of catastrophic weather events, such as hurricanes, tornadoes, windstorms, floods and other natural disasters. Such changes make it more difficult for us to predict and model catastrophic events, reducing our ability to accurately price our exposure to such events and mitigate our risks. Any increase in the frequency or severity of natural disasters may adversely affect our financial condition and results.

***We may have exposure to losses from terrorism for which we are required by law to provide coverage regarding such losses.***

U.S. insurers are required by state and federal law to offer coverage for terrorism in certain commercial lines, including workers' compensation. As discussed under "Business—Regulation—U.S. Insurance Regulation—Federal Regulation," the Terrorism Acts require commercial property and casualty insurance companies to offer coverage for acts of terrorism, whether foreign or domestic, and established a federal assistance program through the end of 2020 to help cover claims related to future terrorism-related losses. The impact of any terrorist act is unpredictable, and the ultimate impact on us would depend upon the nature, extent, location and timing of such an act.

TABLE OF CONTENTS

***The effect of emerging claim and coverage issues on our business is uncertain.***

As industry practices and legal, judicial, social and other environmental conditions change, unexpected and unintended issues related to claims and coverage may emerge. These issues may materially adversely affect our business by either broadening coverage beyond our underwriting intent or by increasing the number or size of claims. In some instances, these changes may not become apparent until sometime after we have issued insurance or reinsurance contracts that are affected by the changes. As a result, the full extent of liability under our insurance or reinsurance contracts may not be known for many years after a contract is issued.

Three examples of unanticipated risks that affected the insurance industry are:

- Asbestos liability applied to manufacturers of products and contractors who installed those products;

- Apportionment of liability for settlement assigned to subcontractors who may have been involved in mundane tasks (such as installing sheetrock in a home); and

- Court decisions, such as the 1995 <u>Montrose</u> decision in California, that read policy exclusions narrowly so as to expand coverage, thereby requiring insurers to create and write new exclusions.

***Our investment portfolio is subject to significant market and credit risks, which could result in a material adverse impact on our financial condition or results of operations.***

Our results of operations depend, in part, on the performance of our investment portfolio. We seek to hold a diversified portfolio of investments that is managed by professional investment advisory management firms in accordance with our investment policy and periodically reviewed by our Investment Committee. However, our investments are subject to general economic conditions and market risks as well as risks inherent to particular securities.

Our primary market risk exposures are to changes in interest rates and equity prices. See Item 7A, "Quantitative and Qualitative Disclosures About Market Risk." In recent years, interest rates have been at or near historic lows. A protracted low interest rate environment would continue to place pressure on net investment income, particularly related to fixed income securities and short-term investments, which, in turn, may materially adversely affect our operating results. Future increases in interest rates could cause the values of our fixed income securities portfolios to decline, with the magnitude of the decline depending on the duration of our portfolio and the amount by which interest rates increase. Some fixed income securities have call or prepayment options, which represent possible reinvestment risk in declining rate environments. Other fixed income securities such as mortgage-backed and asset-backed securities carry prepayment risk or, in a rising interest rate environment, may not pre-pay as quickly as expected. In addition, individual securities in our fixed income securities portfolio are subject to credit risk and default. Downgrades in the credit ratings of fixed maturities can have a significant negative effect on the market valuation of such securities.

The severe downturn in the public debt and equity markets beginning in 2008 resulted in significant realized and unrealized losses in our investment portfolio. In the event of another financial crisis, we could incur substantial realized and unrealized investment losses in future periods, which would have a material adverse impact on our financial condition, results of operations, debt and financial strength ratings, insurance subsidiaries' capital liquidity and ability to access capital markets.

The value of our investment portfolio is subject to the risk that certain investments may default or become impaired due to deterioration in the financial condition of one or more issuers of the securities held, or due to deterioration in the financial condition of an insurer that guarantees an issuer's payments of such investments. Such defaults and impairments could reduce our net investment income and result in realized investment losses.

We hold investments in actively-traded syndicated bank loans (15.6% of the carrying value of our invested assets as of December 31, 2018). Most of these loans are issued to sub-investment grade borrowers. While this class of investment has been profitable for us, a severe downturn in the markets could materially adversely affect the value of these investments, including the possibility that we would suffer substantial losses on this portfolio. As of December 31, 2018, the fair value of our investments in actively traded syndicated bank loans was $250.7 million.

As of December 31, 2018, we held equity investments of $29.8 million in non-public limited liability companies that have invested in renewable energy investments. These investments were sponsored and are managed by an entity for which two of our directors serve as officers. We invested in the equity of these projects because we anticipate earning attractive risk-adjusted returns from these investments. However, our investments in these projects are illiquid and the ultimate results from these investments may be unknown for some time.

We also invest in marketable equity securities. These securities are carried on the balance sheet at fair market value and are subject to potential losses and declines in market value. Our invested assets also include interests in limited partnerships and privately held debt investments totaling $42.5 million at December 31, 2018. These investments were designed to provide diversification of risk and enhance the return on the overall portfolio. However, these investments entail substantial risks and

43

TABLE OF CONTENTS

are generally illiquid. Our investment portfolio is subject to increased valuation uncertainties when investment markets are illiquid. The valuation of investments is more subjective when markets are illiquid, thereby increasing the risk that the estimated fair value (*i.e.*, the carrying amount) does not reflect prices at which actual transactions would occur.

Risks for all types of securities are managed through application of our investment policy, which establishes investment parameters that include (but are not limited to) maximum percentages of investment in certain types of securities and minimum levels of credit quality, which we believe are within guidelines established by the NAIC, BMA and various state insurance departments, as applicable.

Although we seek to preserve our capital, we cannot be certain that our investment objectives will be achieved, and results may vary substantially over time. In addition, although we seek to employ investment strategies that are not correlated with our insurance and reinsurance exposures, losses in our investment portfolio may occur at the same time as underwriting losses and, therefore, exacerbate the adverse effect of the losses on us.

***We may become subject to additional government or market regulation which may have a material adverse impact on our business.***

Market disruptions like those experienced during the credit-driven financial market collapse in 2008, as well as the dramatic increase in the capital allocated to alternative asset management during recent years, have led to increased governmental as well as self-regulatory scrutiny of the insurance industry in general. In addition, certain legislation proposing greater regulation of the industry is periodically considered by governing bodies of some jurisdictions as well as the U.S. federal government, and the credit-driven equity market collapse may increase the likelihood that some increased regulation of the industry is mandated.

Because we are a Bermuda company, we are subject to changes in Bermuda law and regulation that may have a material adverse impact on our operations, including through the imposition of tax liability or increased regulatory supervision. In addition, we will be exposed to any changes in the political environment in Bermuda.

Our business could be materially adversely affected by changes in state laws, including those relating to asset and reserve valuation requirements, surplus requirements, limitations on investments and dividends, enterprise risk and risk-based capital requirements and, at the federal level, by laws and regulations that may affect certain aspects of the insurance industry, including proposals for preemptive federal regulation. The U.S. federal government generally has not directly regulated the insurance industry except for certain areas of the market, such as insurance for flood, nuclear and terrorism risks. However, the U.S. federal government has undertaken initiatives or considered legislation in several areas that may affect the insurance industry, including tort reform, corporate governance and the taxation of reinsurance companies. The Dodd-Frank Act also established the Federal Insurance Office, which is authorized to study, monitor and report to Congress on the insurance industry and to recommend that the FSOC designate an insurer as an entity posing risks to U.S. financial stability in the event of the insurer's material financial distress or failure. In December 2013, the Federal Insurance Office issued a report on alternatives to modernize and improve the system of insurance regulation in the United States, including increasing national uniformity through either a federal charter or effective action by the states. Any additional regulations established as a result of the Dodd-Frank Act or actions in response to the Federal Insurance Office Report could increase our costs of compliance or lead to disciplinary action. In addition, legislation has been introduced from time to time that, if enacted, could result in the U.S. federal government assuming a more direct role in the regulation of the insurance industry, including federal licensing in addition to or in lieu of state licensing and reinsurance for natural catastrophes. We are unable to predict whether any legislation will be enacted or any regulations will be adopted, or the effect that any such developments could have on our business, financial condition or results of operations.

The Bermuda insurance and reinsurance regulatory framework has become subject to increased scrutiny in many jurisdictions. The BMA sought "regulatory equivalency" which enables Bermuda's commercial insurers to transact business with the European Union on a "level playing field". In connection with its initial efforts to achieve equivalency under Solvency II, the BMA implemented and imposed additional requirements on the companies it regulates, such as JRG Re and Carolina Re. On November 26, 2015, via delegated act, the European Commission granted Bermuda's commercial insurers full equivalence in all areas of Solvency II for an indefinite period of time. The European Commission's act was reviewed and approved by the European Parliament and Council. On March 4, 2016, the delegated act was published in the official journal of the European Union. The grant of full equivalence came into force on March 24, 2016 and applies from January 1, 2016.

Additionally, the regulatory environment surrounding information security and privacy is increasingly demanding. We are subject to numerous U.S. federal and state laws governing the protection of personal and confidential information of our clients and employees. We are subject to the New York Department of Financial Services' Cybersecurity Regulations, which came into effect on March 1, 2017. In addition, the NAIC adopted an Insurance Data Security Model Law on October 24, 2017, which would require licensed insurance entities to comply with detailed information security requirements. To date, Ohio and South Carolina have adopted the Insurance Data and Security Model Law. It is not yet known whether, and to what extent, other state legislatures or insurance regulators where we operate will enact the Insurance Data Security Model Law in whole or

44

TABLE OF CONTENTS

in part, or in a modified form. Such enactments, especially if inconsistent between states or with existing laws and regulations, could raise compliance costs or increase the risk of noncompliance, with the attendant risk of being subject to regulatory enforcement actions and penalties, as well as reputational harm. Any such events could potentially have an adverse impact on our business, financial condition or results of operations.

It is impossible to predict what, if any, changes in the regulations applicable to us, the markets in which we operate, trade and invest or the counterparties with which we do business may be instituted in the future. Any such regulation could have a material adverse impact on our business.

***We are subject to extensive regulation, which may materially adversely affect our ability to achieve our business objectives. In addition, if we fail to comply with these regulations, we may be subject to penalties, including fines and suspensions, which may materially adversely affect our financial condition and results of operations.***

Our admitted insurance and reinsurance subsidiaries are subject to extensive regulation, primarily by California (the domiciliary state for Falls Lake Fire and Casualty Company), Ohio (the domiciliary state for James River Insurance and Falls Lake National), North Carolina (the domiciliary state for Stonewood Insurance), Virginia (the domiciliary state for James River Casualty), Bermuda (the domicile of JRG Re and Carolina Re), and to a lesser degree, the other jurisdictions in the United States in which we operate. Most insurance regulations are designed to protect the interests of insurance policyholders, as opposed to the interests of shareholders. These regulations generally are administered by a department of insurance in each state and, in the case of JRG Re and Carolina Re, the BMA in Bermuda, and relate to, among other things, authorizations to write certain lines of business, capital and surplus requirements, reserve requirements, rate and form approvals, investment and underwriting limitations, affiliate transactions, dividend limitations, cancellation and non-renewal of policies, changes in control, solvency, receipt of reinsurance credit, accounting principles and a variety of other financial and non-financial aspects of our business. These laws and regulations are regularly re-examined and any changes in these laws and regulations or new laws or interpretations thereof may be more restrictive, could make it more expensive to conduct business or otherwise materially adversely affect our financial condition or operations. State insurance departments and the BMA also conduct periodic examinations of the affairs of insurance companies and reinsurance companies and require the filing of annual and other reports relating to financial condition, holding company issues and other matters. These regulatory requirements may impose timing and expense or other constraints that could materially adversely affect our ability to achieve some or all of our business objectives.

In addition, regulatory authorities have broad discretion to deny or revoke licenses for various reasons, including the violation of regulations. For example, an insurer's registration may be cancelled by the BMA on certain grounds specified in the Insurance Act, including failure by the insurer to comply with its obligations under the Insurance Act, or if the BMA believes that the insurer has not been carrying on business in accordance with sound insurance principles. In some instances, where there is uncertainty as to applicability, we follow practices based on our interpretations of regulations or practices that we believe are generally followed by the industry. These practices may turn out to be different from the interpretations of regulatory authorities. If we do not have the requisite licenses and approvals or do not comply with applicable regulatory requirements, insurance regulatory authorities could preclude or temporarily suspend us from carrying on some or all of our activities or otherwise penalize us. This could materially adversely affect our ability to operate our business.

The admitted market is subject to more state regulation than the E&S market, particularly with regard to rate and form filing requirements, restrictions on the ability to exit lines of business, premium tax payments and membership in various state associations, such as guaranty funds. Some states have deregulated their commercial insurance markets. We cannot predict the effect that further deregulation would have on our business, financial condition or results of operations.

The NAIC has developed a system to test the adequacy of statutory capital of U.S.-based insurers, known as risk-based capital or "RBC," that many states have adopted. This system establishes the minimum amount of risk-based capital necessary for an insurer to support its overall business operations. It identifies property-casualty insurers that may be inadequately capitalized by looking at certain inherent risks of each insurer's assets and liabilities and its mix of net written premiums. Insurers falling below a calculated threshold may be subject to varying degrees of regulatory action, including supervision, rehabilitation or liquidation. Failure to maintain adequate risk-based capital at the required levels could materially adversely affect the ability of our insurance subsidiaries to maintain regulatory authority to conduct their business. See "Business—U.S. Insurance Regulation—State Regulation."

In addition, the various state insurance regulators have increased their focus on risks within an insurer's holding company system that may pose enterprise risk to the insurer. In 2012, the NAIC adopted the NAIC Amendments. The NAIC Amendments, when adopted by the various states, are designed to respond to perceived gaps in the regulation of insurance holding company systems in the United States. One of the major changes is a requirement that an insurance holding company system's ultimate controlling person submit annually to its lead state insurance regulator an "enterprise risk report" that identifies activities, circumstances or events involving one or more affiliates of an insurer that, if not remedied properly, are likely to have a material adverse effect upon the financial condition or liquidity of the insurer or its insurance holding company

45

TABLE OF CONTENTS

system as a whole. Other changes include (i) requiring a controlling person to submit prior notice to its domiciliary insurance regulator of a divestiture of control, (ii) having detailed minimum requirements for cost sharing and management agreements between an insurer and its affiliates and (iii) expanding the types of agreements between an insurer and its affiliates to be filed with its domiciliary insurance regulator. The NAIC Amendments must be adopted by a state legislature and such state's insurance regulator in order to be effective in that state. Each of California, North Carolina, Ohio and Virginia, the states in which our U.S. insurance subsidiaries are domiciled, include this enterprise risk report requirement.

In 2012, the NAIC also adopted the ORSA Model Act. The ORSA Model Act, when adopted by the various states, will require an insurance holding company system's Chief Risk Officer to submit annually to its lead state insurance regulator an ORSA. The ORSA is a confidential internal assessment appropriate to the nature, scale and complexity of an insurer of the material and relevant risks identified by the insurer associated with an insurer's current business plan and the sufficiency of capital resources to support those risks. The ORSA Model Act must be adopted by a state legislature in order to be effective in that state. Each of California, North Carolina, Ohio and Virginia, the states in which our U.S. insurance subsidiaries are domiciled, adopted and require an ORSA filing.

We cannot predict with certainty the effect any enacted, proposed or future state or federal regulation or NAIC initiative may have on the conduct of our business. Furthermore, there can be no assurance that the regulatory requirements applicable to our business will not become more stringent in the future or result in materially higher cost than current requirements. Changes in regulation of our business may materially reduce our profitability, limit our growth or otherwise materially adversely affect our operations.

***We may be unable to obtain reinsurance coverage at reasonable prices or on terms that provide us adequate protection.***

We purchase reinsurance in many of our lines of business to help manage our exposure to insurance and reinsurance risks that we underwrite and to reduce volatility in our results. In addition, JRG Re has managed its risk through retrocession arrangements with third-party reinsurers. A retrocession is a practice whereby a reinsurer cedes risk to one or more other reinsurers.

The availability and cost of reinsurance are subject to prevailing market conditions, both in terms of price and available capacity, each of which can affect our business volume and profitability. The availability of reasonably affordable reinsurance is a critical element of our business plan. One important way we utilize reinsurance is to reduce volatility in claims payments by limiting our exposure to losses from large risks. Another way we use reinsurance is to purchase substantial protection against concentrated losses when we enter new markets. As a result, our ability to manage volatility and avoid significant losses, expand into new markets or grow by offering insurance to new kinds of enterprises may be limited by the unavailability of reasonably priced reinsurance. We may not be able to obtain reinsurance on acceptable terms or from entities with satisfactory creditworthiness. In such event, if we are unwilling to accept the terms or credit risk of potential reinsurers, we would have to reduce the level of our underwriting commitments, which would reduce our revenues.

Many reinsurance companies have begun to exclude certain coverages from, or alter terms in, the reinsurance contracts we enter into with them. Some exclusions relate to risks that we cannot in turn exclude from the policies we write due to business or regulatory constraints. In addition, reinsurers are imposing terms, such as lower per occurrence and aggregate limits, on direct insurers that do not wholly cover the risks written by these direct insurers. As a result, we, like other direct insurance companies, write insurance policies which to some extent do not have the benefit of reinsurance protection. These gaps in reinsurance protection expose us to greater risk and greater potential losses. For example, certain reinsurers have excluded coverage for terrorist acts or priced such coverage at unreasonably high rates. Many direct insurers, including us, have written policies without terrorist act exclusions and in many cases we cannot exclude terrorist acts because of regulatory constraints. We may, therefore, be exposed to potential losses as a result of terrorist acts. See also "Business—Purchase of Reinsurance."

***We, or agents we have appointed, may act based on inaccurate or incomplete information regarding the accounts we underwrite, or such agents may exceed their authority or commit fraud when binding policies on our behalf.***

We, and our MGAs and other agents who have the ability to bind our policies, rely on information provided by insureds or their representatives when underwriting insurance policies. While we may make inquiries to validate or supplement the information provided, we may make underwriting decisions based on incorrect or incomplete information. It is possible that we will misunderstand the nature or extent of the activities or facilities and the corresponding extent of the risks that we insure because of our reliance on inadequate or inaccurate information.

In addition, in the Specialty Admitted Insurance segment, MGAs and other agents have the authority to bind policies on our behalf. If any such agents exceed their authority or engage in fraudulent activities, our financial condition and results of operations could be materially adversely affected.

46

TABLE OF CONTENTS

***We rely on our systems and employees, and those of certain third-party vendors and service providers in conducting our operations, and certain failures, including internal or external fraud, operational errors, systems malfunctions, or cyber-security incidents, could materially adversely affect our operations.***

We are exposed to many types of operational risk, including the risk of fraud by employees and outsiders, clerical and recordkeeping errors and computer or telecommunications systems malfunctions. Our business depends on our ability to process a large number of increasingly complex transactions. If any of our operational, accounting, or other data processing systems fail or have other significant shortcomings, we could be materially adversely affected. Similarly, we depend on our employees and could be materially adversely affected if one or more of our employees causes a significant operational breakdown or failure, either as a result of human error, intentional sabotage or fraudulent manipulation of our operations or systems.

Third parties with whom we do business, including vendors that provide services or security solutions for our operations, could also be sources of operational and information security risk to us, including from breakdowns, failures, or capacity constraints of their own systems or employees. Any of these occurrences could diminish our ability to operate our business, or cause financial loss, potential liability to insureds, inability to secure insurance, reputational damage or regulatory intervention, which could materially adversely affect us.

We rely on our multiple proprietary operating systems as well as operating systems of third-party providers to issue policies, pay claims, run modeling functions and complete various internal processes. We may be subject to disruptions of such operating systems arising from events that are wholly or partially beyond our control, which may include, for example, electrical or telecommunications outages, natural or man-made disasters, such as earthquakes, hurricanes, floods or tornados, or events arising from criminal or terrorist acts. Such disruptions may give rise to losses in service to insureds and loss or liability to us. In addition, there is the risk that our controls and procedures as well as our business continuity, disaster recovery and data security systems prove to be inadequate. The computer systems and network systems we and others use could be vulnerable to unforeseen problems. These problems may arise in both our internally developed systems and the systems of third-party service providers. In addition, our computer systems and network infrastructure present security risks and could be susceptible to hacking, computer viruses, data breaches, or ransomware attacks. Any such failure could affect our operations and could materially adversely affect our results of operations by requiring us to expend significant resources to correct the defect, as well as by exposing us to litigation or losses not covered by insurance. Although we have business continuity plans and other safeguards in place, our business operations may be materially adversely affected by significant and widespread disruption to our physical infrastructure or operating systems and those of third-party service providers that support our business.

Our operations rely on the secure processing, transmission and storage of confidential information in our computer systems and networks. Our technologies, systems and networks may become the target of cyber-attacks or information security breaches that could result in the unauthorized release, gathering, monitoring, misuse, loss or destruction of our or our insureds' or reinsured's confidential, proprietary and other information, or otherwise disrupt our or our insureds', reinsured's or other third parties' business operations, which in turn may result in legal claims, regulatory scrutiny and liability, reputational damage, the incurrence of costs to eliminate or mitigate further exposure and the loss of customers. Although to date we have not experienced any material losses relating to cyber-attacks or other information security breaches, there can be no assurance that we will not suffer such losses in the future. While we make efforts to maintain the security and integrity of our information technology networks and related systems, and we have implemented various measures and an incident response protocol to manage the risk of, or respond to, a security breach or disruption, there can be no assurance that our security efforts and measures will be effective or that attempted security breaches or disruptions would not be successful or damaging. Our risk and exposure to these matters remains heightened because of, among other things, the evolving nature of these threats and the outsourcing of some of our business operations. As a result, cyber-security and the continued development and enhancement of our controls, processes and practices designed to protect our systems, computers, software, data and networks from attack, damage or unauthorized access remain a priority. As cyber-threats continue to evolve, we may be required to expend significant additional resources to continue to modify or enhance our protective measures or to investigate and remediate any information security vulnerabilities.

Disruptions or failures in the physical infrastructure or operating systems that support our business and customers, or cyber-attacks or security breaches of the networks, systems or devices that our customers use to access our products and services could result in customer attrition, regulatory fines, penalties or intervention, reputational damage, reimbursement or other compensation costs, and/or additional compliance costs, any of which could materially adversely affect our financial condition or results of operations.

***We may not be able to manage our growth effectively.***

We intend to grow our business in the future, which could require additional capital, systems development and skilled personnel. We cannot assure you that we will be able to meet our capital needs, expand and maintain our systems and our internal controls effectively, allocate our human resources optimally, identify and hire qualified employees or incorporate

47

TABLE OF CONTENTS

effectively the components of any businesses we may acquire in our effort to achieve growth. The failure to manage our growth effectively could have a material adverse effect on our business, financial condition and results of operations.

*If we are unable to underwrite risks accurately and charge competitive yet profitable rates to our policyholders, our business, financial condition and results of operations will be materially adversely affected.*

In general, the premiums for our insurance policies are established at the time a policy is issued and, therefore, before all of our underlying costs are known. Like other insurance companies, we rely on estimates and assumptions in setting our premium rates. Establishing adequate premium rates is necessary, together with investment income, to generate sufficient revenue to offset losses, loss adjustment expenses and other underwriting costs and to earn a profit. If we do not accurately assess the risks that we assume, we may not charge adequate premiums to cover our losses and expenses, which would materially adversely affect our results of operations and our profitability. Alternatively, we could set our premiums too high, which could reduce our competitiveness and lead to lower revenues.

Pricing involves the acquisition and analysis of historical loss data and the projection of future trends, loss costs and expenses, and inflation trends, among other factors, for each of our products in multiple risk tiers and many different markets. In order to accurately price our policies, we:

- collect and properly analyze a substantial volume of data from our insureds;

- develop, test and apply appropriate actuarial projections and rating formulas;

- closely monitor and timely recognize changes in trends; and

- project both frequency and severity of our insureds' losses with reasonable accuracy.

We seek to implement our pricing accurately in accordance with our assumptions. Our ability to undertake these efforts successfully and, as a result, accurately price our policies, is subject to a number of risks and uncertainties, including:

- insufficient or unreliable data;

- incorrect or incomplete analysis of available data;

- uncertainties generally inherent in estimates and assumptions;

- our failure to implement appropriate actuarial projections and rating formulas or other pricing methodologies;

- regulatory constraints on rate increases;

- our failure to accurately estimate investment yields and the duration of our liability for loss and loss adjustment expenses; and

- unanticipated court decisions, legislation or regulatory action.

*The insurance and reinsurance business is historically cyclical, and we may experience periods with excess underwriting capacity and unfavorable premium rates, which could materially adversely affect our business.*

Historically, insurers and reinsurers have experienced significant fluctuations in operating results due to competition, frequency and severity of catastrophic events, levels of capacity, adverse trends in litigation, regulatory constraints, general economic conditions and other factors. We have experienced these types of fluctuations during our Company's short history. The supply of insurance and reinsurance is related to prevailing prices, the level of insured losses and the level of capital available to the industry that, in turn, may fluctuate in response to changes in rates of return on investments being earned in the insurance and reinsurance industry. As a result, the insurance and reinsurance business historically has been a cyclical industry characterized by periods of intense price competition due to excessive underwriting capacity as well as periods when shortages of capacity increased premium levels. Demand for insurance and reinsurance depends on numerous factors, including the frequency and severity of catastrophic events, levels of capacity, the introduction of new capital providers, general economic conditions and underwriting results of primary insurers. All of these factors fluctuate and may contribute to price declines generally in the insurance and reinsurance industry.

We cannot predict with certainty whether market conditions will improve, remain constant or deteriorate. Negative market conditions may impair our ability to underwrite insurance and reinsurance at rates we consider appropriate and commensurate relative to the risk assumed. If we cannot underwrite insurance or reinsurance at appropriate rates, our ability to transact business will be materially adversely affected. Any of these factors could lead to a material adverse effect on our business, financial condition and results of operations.

TABLE OF CONTENTS

***Our reinsurance business is subject to loss settlements made by ceding companies and fronting carriers, which could materially adversely affect our performance.***

Where JRG Re enters into assumed reinsurance contracts with third parties, all loss settlements made by the ceding company will be unconditionally binding upon us, provided they are within the terms of the underlying policies and within the terms of the relevant contract. While we believe the ceding companies will settle such claims in good faith, we are bound to accept the claims settlements agreed to by the ceding companies. Under the underlying policies, each ceding company typically bears the burden of proving that a contractual exclusion applies to a loss, and there may be circumstances where the facts of a loss are insufficient to support the application of an exclusion. In such circumstances, we assume such losses under the reinsured policies, which could materially adversely affect our performance.

***Our operating results have in the past varied from quarter to quarter and may not be indicative of our long-term prospects.***

Our operating results are subject to fluctuation and have historically varied from quarter to quarter. We expect our quarterly results to continue to fluctuate in the future due to a number of factors, including the general economic conditions in the markets where we operate, the frequency of occurrence or severity of catastrophic or other insured events, fluctuating interest rates, claims exceeding our loss reserves, competition in our industry, deviations from expected renewal rates of our existing policies and contracts, adverse investment performance and the cost of reinsurance and retrocessional coverage.

In particular, we seek to underwrite products and make investments to achieve favorable returns on tangible equity over the long term. In addition, our opportunistic nature and focus on long-term growth in tangible equity may result in fluctuations in total premiums written from period to period as we concentrate on underwriting contracts that we believe will generate better long-term, rather than short-term, results. Accordingly, our short-term results of operations may not be indicative of our long-term prospects.

***We could be forced to sell investments to meet our liquidity requirements.***

We invest the premiums we receive from our insureds and ceding companies until they are needed to pay policyholder claims or until they are recognized as profits. Consequently, we seek to manage the duration of our investment portfolio based on the duration of our loss and loss adjustment expense reserves to ensure sufficient liquidity and avoid having to liquidate securities to fund claims. Risks such as inadequate loss and loss adjustment reserves or unfavorable trends in litigation could potentially result in the need to sell investments to fund these liabilities. Such sales could result in significant realized losses depending on the conditions of the general market, interest rates and credit issues with individual securities.

***Our associates could take excessive risks, which could negatively affect our financial condition and business.***

As an insurance enterprise, we are in the business of binding certain risks. The associates who conduct our business, including executive officers and other members of management, underwriters, sales managers, investment professionals, product managers, sales agents, and other associates, as well as MGAs, do so in part by making decisions and choices that involve exposing us to risk. These include decisions such as setting underwriting guidelines and standards, product design and pricing, determining which business opportunities to pursue and other decisions. We endeavor, in the design and implementation of our compensation programs and practices, to avoid giving our associates incentives to take excessive risks. Associates may, however, take such risks regardless of the structure of our compensation programs and practices. Similarly, although we employ controls and procedures designed to monitor associates' business decisions and prevent us from taking excessive risks, these controls and procedures may not be effective. If our associates take excessive risks, the impact of those risks could have a material adverse effect on our financial condition and business operations.

***We may require additional capital in the future, which may not be available or available only on unfavorable terms.***

Our future capital requirements depend on many factors, including our ability to write new and renewal business successfully and to establish premium rates and reserves at levels sufficient to cover losses. Our ability to underwrite depends largely upon the expected quality of our claims paying process and our perceived financial strength as estimated by potential insureds, brokers, other intermediaries and independent rating agencies. To the extent that our existing capital is insufficient to fund our future operating requirements, cover claim losses, or satisfy ratings agencies in order to maintain a satisfactory rating, we may need to raise additional capital in the future through offerings of debt or equity securities or otherwise to:

- fund liquidity needs caused by underwriting or investment losses;

- replace capital lost in the event of significant reinsurance losses or adverse reserve developments;

- satisfy letters of credit or guarantee bond requirements that may be imposed by our clients or by regulators;

- meet rating agency or regulatory capital requirements; or

- respond to competitive pressures.

TABLE OF CONTENTS

Any equity or debt financing, if available at all, may be on terms that are unfavorable to us. Further, any additional capital raised through the sale of equity could dilute shareholders' ownership interest in the Company and would likely cause the value of our shares to decline. Additional capital raised through the issuance of debt would most likely result in creditors having rights, preferences and privileges senior or otherwise superior to those of the holders of our shares and may limit our flexibility in operating our business and make it more difficult to obtain capital in the future. Disruptions, uncertainty, or volatility in the capital and credit markets may also limit our access to capital required to operate our business. If we are not able to obtain adequate capital, or obtain it on favorable terms, our business, financial condition and results of operations could be materially adversely affected.

*If we are unable to keep pace with the technological advancements in the insurance industry, our ability to compete effectively could be impaired.*

We are committed to developing and maintaining information technology systems that will allow our insurance subsidiaries to compete effectively. There can be no assurance that the development of current technology for future use will not result in our being competitively disadvantaged, especially with those carriers that have greater resources. If we are unable to keep pace with the advancements being made in technology, our ability to compete with other insurance companies who have advanced technological capabilities will be negatively affected. Further, if we are unable to effectively execute and update or replace our key legacy technology systems as they become obsolete or as emerging technology renders them competitively inefficient, our competitive position and our cost structure could be adversely affected.

*We operate in a highly competitive environment and we may not continue to be able to compete effectively against larger or more well-established business rivals.*

We face competition from other specialty insurance companies, standard insurance companies and underwriting agencies, as well as from diversified financial services companies that are larger than we are and that have greater financial, marketing and other resources than we do. Some of these competitors also have longer experience and more market recognition than we do in certain lines of business. In addition, it may be difficult or prohibitively expensive for us to implement technology systems and processes that are competitive with the systems and processes of these larger companies.

In particular, competition in the insurance and reinsurance industry is based on many factors, including price of coverage, the general reputation and perceived financial strength of the company, relationships with brokers, terms and conditions of products offered, ratings assigned by independent rating agencies, speed of claims payment and reputation, and the experience and reputation of the members of our underwriting team in the particular lines of insurance and reinsurance we seek to underwrite. See "Business—Competition."

A number of new, proposed or potential legislative or industry developments could further increase competition in our industry. These developments include:

- An increase in capital-raising by companies in our lines of business, which could result in new entrants to our markets and an excess of capital in the industry;

- The deregulation of commercial insurance lines in certain states and the possibility of federal regulatory reform of the insurance industry, which could increase competition from standard carriers for our E&S lines of insurance business; and

- Changing practices facilitated by the Internet may lead to greater competition in the insurance business. Among the possible changes are shifts in the way in which commercial insurance is purchased, which could affect both admitted and E&S lines.

We currently depend largely on the wholesale distribution model for our Excess and Surplus Lines segment's premiums. If the wholesale distribution model were to be significantly altered by changes in the way E&S lines risks are marketed, including, without limitation, through use of the Internet, it could have a material adverse effect on our premiums, underwriting results and profits.

There is no assurance that we will be able to continue to compete successfully in the insurance or reinsurance markets. Increased competition in these markets could result in a change in the supply and/or demand for insurance or reinsurance, affect our ability to price our products at risk-adequate rates, affect our ability to retain business with existing customers, or underwrite new business on favorable terms. If this increased competition so limits our ability to transact business, our operating results could be materially adversely affected.

50

TABLE OF CONTENTS

***If actual renewals of our existing contracts do not meet expectations, our premiums written in future years and our future results of operations could be materially adversely affected.***

Most of our contracts are written for a one-year term. In our financial forecasting process, we make assumptions about the renewal of our prior year's contracts. The insurance and reinsurance industries have historically been cyclical businesses with intense competition, often based on price. If actual renewals do not meet expectations or if we choose not to write a renewal because of pricing conditions, our premiums written in future years and our future operations would be materially adversely affected.

***We may change our underwriting guidelines or our strategy without shareholder approval.***

Our management has the authority to change our underwriting guidelines or our strategy without notice to our shareholders and without shareholder approval. As a result, we may make fundamental changes to our operations without shareholder approval, which could result in our pursuing a strategy or implementing underwriting guidelines that may be materially different from the strategy or underwriting guidelines described in the section titled "Business" or elsewhere in this Annual Report.

***Litigation and legal proceedings against our subsidiaries could have a material adverse effect on our business, financial condition and/or results of operations.***

As an insurance and reinsurance holding company, our subsidiaries are named as defendants in various legal actions in the ordinary course of business. We believe that the outcome of presently pending matters, individually and in the aggregate, will not have a material adverse effect on our consolidated financial position. However, the outcomes of lawsuits cannot be predicted and, if determined adversely, could require us to pay significant damage amounts or to change aspects of our operations, which could have a material adverse effect on our financial results.

***Changes in accounting practices and future pronouncements may materially affect our reported financial results.***

Developments in accounting practices may require us to incur considerable additional expenses to comply, particularly if we are required to prepare information relating to prior periods for comparative purposes or to apply the new requirements retroactively. The impact of changes in current accounting practices and future pronouncements cannot be predicted but may affect the calculation of net income, shareholders' equity and other relevant financial statement line items.

Further, our U.S. insurance subsidiaries are required to comply with statutory accounting principles ("SAP"). SAP and various components of SAP (such as actuarial reserving methodology) are subject to constant review by the NAIC and its task forces and committees, as well as state insurance departments, in an effort to address emerging issues and otherwise improve financial reporting. Various proposals are pending before committees and task forces of the NAIC, some of which, if enacted, could have negative effects on insurance industry participants. The NAIC continuously examines existing laws and regulations in the United States. We cannot predict whether or in what form such reforms will be enacted and, if so, whether the enacted reforms will positively or negatively affect us.

In addition, the NAIC Accounting Practices and Procedures manual provides that state insurance departments may permit insurance companies domiciled in their jurisdiction to depart from SAP by granting them permitted accounting practices. We cannot predict whether or when the insurance departments of the states of domicile of our competitors may permit them to utilize advantageous accounting practices that depart from SAP, the use of which may not be permitted by the insurance departments of the states of domicile of our U.S. insurance subsidiaries. Further, we cannot assure that future changes to SAP or components of SAP or the grant of permitted accounting practices to our competitors will not have a negative impact on us.

***Our ability to implement our business strategy could be delayed or adversely affected by Bermuda employment restrictions relating to the ability to obtain and retain work permits for key employees in Bermuda.***

Under Bermuda law, non-Bermudians (other than spouses of Bermudians and holders of permanent residents' certificates) may not engage in any gainful occupation in Bermuda without a valid government work permit. A work permit may be granted or renewed upon showing that, after proper public advertisement, no Bermudian, spouse of a Bermudian or a holder of a permanent resident's certificate who meets the minimum standards reasonably required by the employer has applied for the job. A work permit is issued with an expiry date (up to five years) and no assurances can be given that any work permit will be issued or, if issued, renewed upon the expiration of the relevant term. If work permits are not obtained or are not renewed for our key employees (other than our Chief Executive Officer, who holds Bermudian and United States citizenship and therefore is not required to have a work permit in Bermuda or in any other jurisdiction in which we operate), we would lose their services, which could materially affect our business.

51

TABLE OF CONTENTS

***If California, North Carolina, Ohio, or Virginia significantly increase the assessments our insurance companies are required to pay, our financial condition and results of operations will suffer.***

Our insurance companies are subject to assessments in California (the domiciliary state for Falls Lake Fire and Casualty Company), North Carolina (the domiciliary state for Stonewood Insurance), Ohio (the domiciliary state for James River Insurance and Falls Lake National) and Virginia (the domiciliary state for James River Casualty), for various purposes, including the provision of funds necessary to fund the operations of the various insurance departments and the state funds that pay covered claims under certain policies written by impaired, insolvent or failed insurance companies. These assessments are generally set based on an insurer's percentage of the total premiums written in the insurer's state within a particular line of business. As our U.S.-based insurance subsidiaries grow, our share of any assessments may increase. We cannot predict with certainty the amount of future assessments because they depend on factors outside our control, such as insolvencies of other insurance companies. Significant assessments could result in higher than expected operating expenses and have a material adverse effect on our financial condition or results of operations.

***Our use of third-party claims administrators in certain lines of business may result in higher losses and loss adjustment expenses.***

Historically, our Excess and Surplus Lines and Specialty Admitted Insurance segments handled all claims using employed staff. As we have entered new lines of business, we now use third-party claims administrators and contract employees to administer claims subject to the supervision of our employed staff. It is possible that these contract employees and third-party claims administrators may achieve less desirable results on claims than has historically been the case for our internal staff, which could result in significantly higher losses and loss adjustment expenses in those lines of business.

**Risks Related to Taxation**

***The ongoing effect of the 2017 Tax Act may have a significant impact on the Company.***

The Tax Act, enacted on December 22, 2017, introduced significant changes to the Code. The Tax Act contains provisions that reduce the highest marginal U.S. corporate tax rate from 35% to 21%, impose a BEAT on income of a U.S. corporation determined without regard to certain otherwise deductible payments made to certain foreign affiliates (including premium or other consideration paid or accrued to a related foreign reinsurance company for reinsurance), and accelerates taxable income with respect to certain controlled foreign corporations. These provisions could materially affect us or our shareholders. The Tax Act also includes provisions that could materially affect our shareholders as a result of provisions that broaden the definition of United States shareholder for purposes of the controlled foreign corporation ("CFC") rules and make it more difficult for a foreign insurance company to avoid being treated as a PFIC.

There is significant uncertainty regarding how these and other provisions of the Tax Act will be interpreted, and guidance may not be forthcoming. The ultimate impact of the Tax Act may differ from the Company's description below due to changes in interpretations, as well as additional regulatory guidance that may be issued. Any changes to, clarifications of, or guidance under the Tax Act could add significant expense and have a material adverse effect on our results of operations. Given the complexity of the Tax Act you are strongly encouraged to consult your own tax advisor regarding its potential impact on the U.S. federal income tax consequences to you in light of your particular circumstances.

*Base Erosion and Anti-Abuse Tax.* The Tax Act's BEAT provision imposes a minimum tax on "applicable taxpayers," which are generally corporations that are part of a group with at least $500 million of applicable annual gross receipts and that make certain payments to related foreign persons, including payments that are deductible for U.S. tax purposes, payments to purchase depreciable or amortizable property, and reinsurance payments. BEAT subjects the "modified taxable income" of an applicable taxpayer to tax at a rate of 10% in 2019-2025, and 12.5% in 2026 and thereafter. In general, modified taxable income is calculated by adding back to a taxpayer's regular taxable income the amount of certain "base erosion tax benefits" with respect to certain payments to foreign affiliates, as well as the "base erosion percentage" of any net operating loss deductions. BEAT applies only to the extent it exceeds a taxpayer's regular corporate income tax liability (determined without regard to certain tax credits).

In response to the Tax Act, we made changes to our structure in 2018 to minimize the impact of BEAT that included the formation of Carolina Re, a Bermuda-domiciled, wholly owned subsidiary of James River Group, Inc. Carolina Re is a Class 3A reinsurer that made an election to be taxed as a U.S. domestic corporation under Section 953(d) of the Code, effective January 1, 2018. In addition, as of January 1, 2018, we generally discontinued ceding 70% of our U.S.-written premiums to JRG Re and instead ceded 70% of our U.S.-written premiums to Carolina Re. Carolina Re also entered into a stop loss reinsurance agreement with JRG Re. As a result of these changes, we will not be subject to BEAT in 2019 if we have sufficient regular U.S. income tax liability compared to the BEAT liability. The applicability of BEAT depends on a number of factors, and absent regulations and other detailed guidance, it is uncertain whether we will be subject to BEAT in future periods.

TABLE OF CONTENTS

***U.S. persons who own our shares may be subject to U.S. federal income taxation on our undistributed earnings and may recognize ordinary income upon disposition of shares.***

If we are considered a PFIC as defined in Section 1297(a) of the Code for U.S. federal income tax purposes, a U.S. person who owns any of our shares could be subject to adverse tax consequences, including becoming subject to a greater tax liability than might otherwise apply and to tax on amounts in advance of when tax would otherwise be imposed, in which case your investment could be materially adversely affected. We believe that we are not and have not been, and currently do not expect to become, a PFIC for U.S. federal income tax purposes. Our belief that we are not and have not been a PFIC is based, in part, on the fact that the PFIC rules include provisions intended to provide an exception for qualifying insurance companies ("QIC") actively engaged in the conduct of an insurance business. Generally, a QIC is a company (i) that would be subject to tax under special provisions related to insurance companies if the company was a U.S. entity, and (ii) the applicable insurance liabilities of which constitute more than 25% of its total assets as reported on the company's applicable financial statement. We believe that we are a QIC, however the scope of this exception is not entirely clear, especially in its application to holding companies indirectly engaged in an insurance business, and there are no administrative pronouncements, judicial decisions or current regulations that provide guidance as to the application of the PFIC rules to insurance companies. New regulations or pronouncements interpreting or clarifying these rules may be forthcoming. We cannot predict what impact, if any, such guidance would have on an investor that is subject to U.S. federal income taxation. As a result, we cannot assure you that we, or one of our subsidiaries, will not be deemed a PFIC by the U.S. Internal Revenue Service (the "IRS"). If we, or one of our subsidiaries, were considered a PFIC, it could have material adverse tax consequences for an investor that is subject to U.S. federal income taxation.

A non-U.S. corporation generally will be classified as a CFC if U.S. persons, each of whom owns, directly, indirectly, or constructively, at least 10% of the voting power or value of such corporation's stock ("U.S. 10% Shareholders"), own in the aggregate more than 50% of the voting power or value of the stock of such corporation. The Tax Act eliminated the prohibition on "downward attribution" from non-U.S. persons to U.S. persons under the CFC constructive ownership rules. As a result, our U.S. subsidiaries are deemed to own all of the stock of our non-U.S. subsidiaries (other than James River Group Holdings UK Limited ("James River UK")) for purposes of classifying those non-U.S. subsidiaries as CFCs. The legislative history under the Tax Act indicates that this change to the CFC constructive ownership rules was not intended to cause our non-U.S. subsidiaries to be treated as CFCs with respect to a 10% U.S. Shareholder that is not related to our U.S. subsidiary. However, it is not clear whether the IRS or a court would interpret the change made by the Tax Act in a manner consistent with such indicated intent.

Under these rules, if a foreign corporation is a CFC, each U.S. 10% Shareholder who owns directly or indirectly shares of the CFC on the last day of the CFC's taxable year must annually include in its taxable income its pro rata share of the CFC's "subpart F income," even if no distributions are made. Subpart F income typically includes "foreign personal holding company income" (such as interest, dividends and other types of passive income), as well as insurance and reinsurance income (including underwriting and investment income). In general (subject to the special rules applicable to "related person insurance income" described below), for purposes of taking into account insurance income, a foreign insurance company will be treated as a CFC if U.S. 10% Shareholders collectively own more than 25% of the voting power or value of the company's shares at any point during any year. We cannot assure you that we are not and will not become a CFC. If you are a U.S. person, we strongly urge you to consult your own tax advisor concerning the CFC rules.

*Related Person Insurance Income.*   If (i) our gross income attributable to insurance or reinsurance policies pursuant to which the direct or indirect insureds are our direct or indirect U.S. shareholders or persons related to such U.S. shareholders equals or exceeds 20% of our gross insurance income in any taxable year; and (ii) direct or indirect insureds and persons related to such insureds own directly or indirectly 20% or more of the voting power or value of our shares (together, the "RPII Test"), a U.S. person who owns any of our shares directly or indirectly on the last day of such taxable year would most likely be required to include its allocable share of our related person insurance income for such taxable year in its income, even if no distributions are made. We do not believe that the 20% gross insurance income threshold has been, or will be, met. However, we cannot assure you that this will continue to be the case. Consequently, we cannot assure you that a person who is a direct or indirect U.S. shareholder will not be required to include amounts in its income in respect of related person insurance income in any taxable year.

*Dispositions of Our Shares.*   If a U.S. shareholder is treated as disposing of shares in a CFC of which it is a U.S. 10% Shareholder, or of shares in a foreign insurance corporation that has related person insurance income and in which U.S. persons collectively own 25% or more of the voting power or value of the company's shares, any gain from the disposition will generally be treated as a dividend to the extent of the U.S. shareholder's portion of the corporation's undistributed earnings and profits, as the case may be, that were accumulated during the period that the U.S. shareholder owned the shares. In addition, the shareholder will be required to comply with certain reporting requirements, regardless of the amount of shares owned by the direct or indirect U.S. shareholder.

TABLE OF CONTENTS

***The Company, JRG Re and James River Group Holdings UK Limited may be subject to U.S. federal income taxation.***

The Company and JRG Re are each incorporated under the laws of Bermuda and James River UK is incorporated under the laws of England and Wales. Carolina Re is incorporated under the laws of Bermuda, but will be taxed as a U.S. domestic corporation as a result of an election under Section 953(d) of the Code. In general, a corporation organized under the laws of a foreign country or U.S. possession is subject to U.S. federal income tax on its net income only if it is considered as engaged in a U.S. trade or business. We believe that the activities of each of the Company's non-U.S. holding companies and JRG Re, as contemplated, will not cause them to be treated as engaging in a U.S. trade or business and as such, will not be subject to current U.S. federal income taxation on their net income. However, there are no definitive standards provided by the Code, regulations or court decisions as to the specific activities that constitute being engaged in the conduct of a trade or business within the United States, and any such determination is essentially factual in nature and must be made annually. The IRS could successfully assert that our non-U.S. holding companies or JRG Re (or both) are engaged in a trade or business in the United States or, under the applicable income tax treaty, are engaged in a trade or business in the United States through a permanent establishment, and thus are subject to current U.S. federal income taxation. If our non-U.S. holding companies or JRG Re were deemed to be engaged in a trade or business in the United States (or, under the applicable income tax treaty, were deemed to be so engaged through a permanent establishment), our non-U.S. holding companies or JRG Re, as applicable, would become subject to U.S. federal income tax on income "effectively connected" (or treated as effectively connected) with the U.S. trade or business and would become subject to the "branch profits" tax on earnings and profits that are both effectively connected with the U.S. trade or business and deemed repatriated out of the United States. Any such federal tax liability could materially adversely affect our results of operations.

***U.S. tax-exempt organizations who own our shares may recognize unrelated business taxable income.***

A U.S. tax-exempt organization may recognize unrelated business taxable income if a portion of our subpart F insurance income is allocated to it. In general, subpart F insurance income will be allocated to a tax-exempt organization owning (or treated as owning) our shares if we are a CFC as discussed above and it is a U.S. 10% Shareholder or we earn related person insurance income and we satisfy the RPII Test. We cannot assure you that U.S. persons holding our shares (directly or indirectly) will not be allocated subpart F insurance income. U.S. tax-exempt organizations should consult their own tax advisors regarding the risk of recognizing unrelated business taxable income as a result of their ownership of our shares.

***We may become subject to U.S. withholding and information reporting requirements under the Foreign Account Tax Compliance Act ("FATCA") provisions.***

The FATCA provisions of the Code generally impose a 30% withholding tax regime with respect to (i) certain U.S. source income (including interest and dividends) ("withholdable payments") and (ii) "passthru payments" (generally, withholdable payments and payments that are attributable to withholdable payments) made by foreign financial institutions ("FFIs"). Under proposed regulations promulgated by the U.S. Department of the Treasury on December 13, 2018, on which taxpayers may rely until final regulations are issued, withholdable payments do not include gross proceeds from the sale or other disposition of property that can produce U.S. source interest or dividends. As a general matter, FATCA was designed to require U.S. persons' direct and indirect ownership of certain non-U.S. accounts and non-U.S. entities to be reported to the IRS. The application of the FATCA withholding rules were phased in beginning July 1, 2014, with withholding on foreign passthru payments made by FFIs taking effect after the date of publication of final regulations defining the term foreign passthru payment.

The United States has entered into intergovernmental agreements between the United States and Bermuda and between the United States and the United Kingdom (the "IGAs"), which potentially modify the FATCA withholding regime described above with respect to us and our common shares. There can be no certainty as to whether we, Carolina Re or JRG Re will be treated as a FFI under FATCA. We strongly urge you to consult your own tax advisor regarding the potential impact of FATCA, the IGAs and any non-U.S. legislation implementing FATCA.

***Changes in U.S. tax laws may be retroactive and could subject us and/or U.S. persons who own our shares to U.S. income taxation.***

Apart from enactment of the Tax Act, other legislative proposals or administrative or judicial developments could also result in an increase in the amount of U.S. tax payable by us or by an owner of our shares or reduce the attractiveness of our products. Any such developments could materially adversely affect our results of operations.

The Tax Act, other tax laws and interpretations thereof, including with respect to whether a company is engaged in a U.S. trade or business, is a CFC, has related party insurance income, is a PFIC, or is subject to BEAT, are subject to change, possibly on a retroactive basis. There are currently only proposed regulations regarding the RPII Test and the application of the PFIC rules to an insurance company. New regulations or pronouncements interpreting or clarifying such rules may be forthcoming from the IRS or the U.S. Department of the Treasury. We are not able to predict if, when or in what form such guidance will be provided and whether such guidance will have a retroactive effect.

TABLE OF CONTENTS

***If reinsurance premiums paid by our U.S. subsidiaries to Carolina Re or JRG Re do not reflect arm's-length terms, the IRS could seek to recharacterize the payments in a way that is unfavorable to us.***

The IRS is permitted to reallocate or recharacterize income, deductions or certain other items, and to make any other adjustment, to reflect the proper amount, source or character of the taxable income in respect of payments among related parties to reflect an arm's-length transaction. We have in place intercompany loans from our U.S. subsidiaries to our parent company and have intercompany reinsurance agreements among consolidated entities. We believe the terms of these transactions are appropriate and reflect arm's-length terms and are consistent with all applicable rules and regulations. It is possible, however, that the U.S. Department of the Treasury or the IRS may review our intercompany agreements and successfully assert, under Sections 482 or 845 of the Code, that they are not on an arm's-length basis and that as a result, we owe taxes on account of past or future periods.

***Reduced tax rates for qualified dividend income may not be available in the future.***

We believe that the dividends paid on our common shares should qualify as "qualified dividend income" as long as the common shares are listed on a national securities exchange and we are not a PFIC. Qualified dividend income received by non-corporate U.S. persons is generally eligible for long-term capital gain rates. While the Tax Act did not modify these rules, there has been proposed legislation before the U.S. Senate and House of Representatives that would exclude shareholders of certain foreign corporations from this advantageous tax treatment. If such legislation were to become law, non-corporate U.S. persons would no longer qualify for the reduced tax rate on the dividends paid by us.

***Our non-U.K. companies may be subject to U.K. tax that may have a material adverse effect on our operating results.***

We intend to operate in such a manner so that none of our companies other than our intermediate holding company incorporated in the United Kingdom should be resident in the U.K. for tax purposes or have a permanent establishment in the U.K. Accordingly, we expect that none of our companies other than James River UK should be subject to U.K. taxation. However, since applicable law and regulations do not conclusively define the activities that constitute conducting business in the U.K. through a permanent establishment, the U.K. HM Revenue & Customs might contend successfully that one or more of our other companies is conducting business in the U.K. through a permanent establishment in the U.K., and therefore such entities could become subject to U.K. taxation.

***We may become subject to taxes in Bermuda after March 31, 2035, which may have a material adverse effect on our results of operations and your investment.***

The Bermuda Minister of Finance, under the Exempted Undertakings Tax Protection Act 1966 of Bermuda, as amended, has given us an assurance that if any legislation is enacted in Bermuda that would impose tax computed on profits or income, or computed on any capital asset, gain or appreciation, or any tax in the nature of estate duty or inheritance tax, then the imposition of any such tax will not be applicable to us or any of our operations, shares, debentures or other obligations until March 31, 2035, except insofar as such tax applies to persons ordinarily resident in Bermuda or to any taxes payable by us in respect of real property owned or leased by us in Bermuda. We cannot assure you that we will not be subject to any Bermuda tax after March 31, 2035.

55

TABLE OF CONTENTS

**Risks Related to Ownership of Our Common Shares**

***The price of our common shares may fluctuate significantly and you could lose all or part of your investment.***

Volatility in the market price of our common shares may prevent you from being able to sell your common shares at or above the price you paid for your common shares. The market price for our common shares could fluctuate significantly for various reasons, including, without limitation:

- our operating and financial performance and prospects;

- our quarterly or annual earnings or earnings estimates, or those of other companies in our industry;

- failure to meet external expectations or management guidance;

- the loss of one or more individually large clients, and its impact on our growth rate, profitability and financial condition;

- exposure to capital market risks related to changes in interest rates, realized investment losses, credit spreads, equity prices, foreign exchange rates and performance of insurance-linked investments;

- our creditworthiness, financial condition, performance and prospects;

- termination of payment of dividends on our common shares, or payment of a reduced amount of dividends;

- actual or anticipated growth rates relative to our competitors;

- perceptions of the investment opportunity associated with our common shares relative to other investment alternatives;

- speculation by the investment community regarding our business;

- future announcements concerning our business or our competitors' businesses;

- the public's reaction to our press releases, other public announcements and filings with the SEC;

- changes in accounting standards, policies, guidance, interpretations or principles;

- market and industry perception of our success, or lack thereof, in pursuing our strategy;

- strategic actions by us or our competitors, such as acquisitions, restructurings, significant contracts or joint ventures;

- catastrophes that are perceived by investors as impacting the insurance and reinsurance market in general;

- changes in laws or government regulation, including tax or insurance laws and regulations;

- potential characterization of us as a PFIC;

- general market, economic and political conditions;

- changes in conditions or trends in our industry, geographies or customers;

- arrival and departure of key personnel;

- the number of common shares that are publicly traded;

- the offering and issuance of common shares by us, or sales of common shares by our directors or executive officers; and

- adverse resolution of litigation against us.

In addition, stock markets, including the NASDAQ Stock Market (the market on which our common shares are traded), have experienced price and volume fluctuations that have affected and continue to affect the market prices of equity securities issued by many companies, including companies in our industry. In the past, some companies that have had volatile market prices for their securities have been subject to class action or derivative lawsuits. The filing of a lawsuit against us, regardless of the outcome, could have a negative effect on our business, as it could result in substantial legal costs and a diversion of management's attention and resources.

56

TABLE OF CONTENTS

As a result of the factors described above, shareholders may not be able to resell their common shares at or above their purchase price or may not be able to resell them at all. These market and industry factors may materially reduce the market price of our common shares, regardless of our operating performance.

***If securities or industry analysts do not continue to publish research or publish misleading or unfavorable research about our business, our common share price and trading volume could decline.***

The trading market for our common shares depends in part on the research and reports that securities or industry analysts publish about us or our business. If one or more of these analysts downgrades our shares or publishes misleading or unfavorable research about our business, our share price would likely decline. If one or more of these analysts ceases coverage of our Company or fails to publish reports on us regularly, demand for our shares could decrease, which could cause our share price or trading volume to decline.

***Failure to maintain effective internal controls in accordance with Sarbanes-Oxley could have a material adverse effect on our business and common share price.***

As a public company with SEC reporting obligations, we are required to document and test our internal control procedures to satisfy the requirements of Section 404(b) of Sarbanes-Oxley, which require annual assessments by management of the effectiveness of our internal control over financial reporting.

During the course of our assessment, we may identify deficiencies that we are unable to remediate in a timely manner. Testing and maintaining our internal control over financial reporting may also divert management's attention from other matters that are important to the operation of our business. We may not be able to conclude on an ongoing basis that we have effective internal control over financial reporting in accordance with Section 404(b) of Sarbanes-Oxley. If we conclude that our internal control over financial reporting is not effective, we cannot be certain as to the timing of completion of our evaluation, testing and remediation actions or its effect on our operations. Moreover, any material weaknesses or other deficiencies in our internal control over financial reporting may impede our ability to file timely and accurate reports with the SEC. Any of the above could cause investors to lose confidence in our reported financial information or our common share listing on the NASDAQ Stock Market to be suspended or terminated, which could have a negative effect on the trading price of our common shares.

***Our bye-laws permit non-employee members of our board of directors and their affiliates to compete with us, which may result in conflicts of interest.***

Our bye-laws provide that members of our board of directors (other than those who are our officers, managers or employees) and their affiliates do not have any duty to (i) communicate or present to the Company any investment or business opportunity or prospective transaction or arrangement in which the Company may have any interest or expectancy or (ii) refrain from engaging, directly or indirectly, in the same business activities or similar business activities or lines of business in which we operate. Bryan Martin and David Zwillinger, each a Class I director of the Company, are officers of D. E. Shaw & Co., L.P. and its affiliates (collectively, "D. E. Shaw"). D. E. Shaw is a global investment and technology development firm, which among other things, is in the business of making investments in companies. Our bye-laws will not restrict our non-employee directors, or their affiliates, including D. E. Shaw, from acquiring and holding interests in businesses that compete directly or indirectly with us. For example, D. E. Shaw is currently engaged in the reinsurance business. Our non-employee directors and their affiliates, including D. E. Shaw, may also pursue acquisition opportunities that may be complementary to our business and, as a result, those acquisition opportunities may not be available to us. These potential conflicts of interest could have a material adverse effect on our business, financial condition, results of operations or prospects if we are unable to pursue attractive corporate opportunities because they are allocated by our non-employee directors to themselves or their affiliates instead of being presented to us.

***We depend upon dividends and distributions from our subsidiaries, and we may be unable to distribute dividends to our shareholders to the extent we do not receive dividends from our subsidiaries.***

We are a holding company that has no substantial operations of our own and, accordingly, we rely primarily on cash dividends or distributions from our operating subsidiaries to pay our operating expenses and any dividends that we may pay to shareholders. The payment of dividends by our insurance and reinsurance subsidiaries is limited under the laws and regulations of its applicable domicile. These regulations stipulate the maximum amount of annual dividends or other distributions available to shareholders without prior approval of the relevant regulatory authorities. As a result of such regulations, we may not be able to pay our operating expenses as they become due and our payment of future dividends to shareholders may be limited.

The payment of dividends by our subsidiaries to us is limited by statute. In general, the laws and regulations applicable to our U.S. insurance subsidiaries limit the aggregate amount of dividends or other distributions that they may declare or pay within any 12 month period without advance regulatory approval. In Ohio, the domiciliary state of Falls Lake National and James River Insurance, this limitation is the greater of statutory net income for the preceding calendar year or 10% of the statutory surplus at the end of the preceding calendar year, provided that such dividends may only be paid out of earned surplus of each of the companies, without obtaining regulatory approval. In North Carolina, the domiciliary state of Stonewood

TABLE OF CONTENTS

Insurance, this limitation is the greater of statutory net income excluding realized capital gains for the preceding calendar year or 10% of the statutory surplus at the end of the preceding calendar year, provided that such dividends may only be paid out of unassigned surplus without obtaining regulatory approval. In Virginia, the domiciliary state of James River Casualty, this limitation is the greater of statutory net income excluding realized capital gains for the preceding calendar year or 10% of the statutory surplus at the end of the preceding calendar year, provided that such dividends may only be paid out of unassigned surplus without obtaining regulatory approval. In California, the domiciliary state of Falls Lake Fire and Casualty Company, this limitation is the greater of statutory net income for the preceding calendar year or 10% of the statutory surplus at the end of the preceding calendar year, provided that such dividends may only be paid out of unassigned surplus without obtaining regulatory approval. Moreover, as a condition to obtaining its license in California, Falls Lake Fire and Casualty Company provided a commitment to the California Department of Insurance that it would not pay any shareholder dividends for a five-year period commencing January 1, 2016 without prior written approval. In addition, insurance regulators have broad powers to prevent reduction of statutory surplus to inadequate levels and could refuse to permit the payment of dividends calculated under any applicable formula. See "Business—Regulation—U.S. Insurance Regulation— State Regulation" for more information. In addition, dividends paid by our U.S. subsidiaries to our U.K. holding company are subject to a 5% withholding tax by the IRS. Under U.K. domestic law, no withholding tax is applied to dividends paid by U.K. tax resident companies.

JRG Re, which is domiciled in Bermuda, is registered as a Class 3B insurer under the Insurance Act. The Insurance Act, the conditions listed in the insurance license and the applicable approvals issued by the BMA provide that JRG Re is required to maintain a minimum statutory solvency margin of $103.1 million as of December 31, 2018. See "Business—Regulation—Bermuda Insurance Regulation—Minimum Solvency Margin and Enhanced Capital Requirements" for more information. A Class 3B insurer is prohibited from declaring or paying a dividend if it fails to meet, before or after declaration or payment of such dividend, its: (i) requirements under the Companies Act, (ii) minimum solvency margin, (iii) enhanced capital requirement or (iv) minimum liquidity ratio. If a Class 3B insurer fails to meet its minimum solvency margin or minimum liquidity ratio on the last day of any financial year, it is prohibited from declaring or paying any dividends during the next financial year without the approval of the BMA. In addition, JRG Re, as a Class 3B insurer, is prohibited from declaring or paying in any financial year dividends of more than 25% of its total statutory capital and surplus (as shown on its previous financial year's statutory balance sheet) unless it files (at least seven days before payment of such dividends) with the BMA an affidavit signed by at least 2 directors (one of whom must be a Bermuda resident director if any of the insurer's directors are resident in Bermuda) and the principal representative stating that it will continue to meet its solvency margin and minimum liquidity ratio. Where such an affidavit is filed, it shall be available for public inspection at the offices of the BMA. See "Business— Regulation—Bermuda Insurance Regulation—Restrictions on Dividends and Distributions" for more information.

The inability of our subsidiaries to pay dividends or make distributions to us, including as a result of regulatory or other restrictions, may prevent us from paying our expenses or paying dividends to our shareholders.

### We cannot assure you that we will declare or pay dividends on our common shares in the future.

We have paid dividends to our shareholders in each quarter since the first quarter of 2015, which was the first full quarter after completion of our IPO. The declaration, payment and amount of future dividends is subject to the discretion of our board of directors. Our board of directors may take into account a variety of factors when determining whether to declare any future dividends, including (1) our financial condition, liquidity, results of operations (including our ability to generate cash flow in excess of expenses and our expected or actual net income), retained earnings and collateral and capital requirements, (2) general business conditions, (3) legal, tax and regulatory limitations, (4) contractual prohibitions and other restrictions, (5) the effect of a dividend or dividends upon our financial strength ratings and (6) any other factors that our board of directors deems relevant. See "Item 5. Market For Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases Of Equity Securities - Dividends." We cannot assure you that we will continue to pay dividends in the future, or that the amount of any such dividend will not decline from prior dividends we have paid.

### Dividends paid by our U.S. subsidiaries to James River UK may not be eligible for benefits under the U.S.-U.K. income tax treaty.

Under U.S. federal income tax law, dividends paid by a U.S. corporation to a non-U.S. shareholder are generally subject to a 30% withholding tax, unless reduced by treaty. The income tax treaty between the United Kingdom and the United States (the "U.K. Treaty") reduces the rate of withholding tax on certain dividends to 5%. Were the IRS to contend successfully that James River UK is not eligible for benefits under the U.K. Treaty, any dividends paid by James River Group, Inc., our U.S. holding company, to James River UK would be subject to the 30% withholding tax. Such a result would substantially reduce the amount of dividends that our shareholder may receive.

58

TABLE OF CONTENTS

***Future sales of our common shares, or the possibility of such sales, may cause the trading price of our common shares to decline and could impair our ability to raise capital through subsequent equity offerings.***

Future sales of substantial amounts of our common shares in the public market, or the perception that these sales could occur, could cause the market price of our common shares to decline and impair our ability to raise capital through the sale of additional shares.

In the future, we may issue additional common shares or other equity or debt securities convertible into common shares in connection with a financing, acquisition or employee arrangement or otherwise. Any of these issuances could result in substantial dilution to our existing shareholders and could cause the trading price of our common shares to decline.

***Our bye-laws and provisions of Bermuda law may impede or discourage a change of control transaction, which could deprive our investors of the opportunity to receive a premium for their shares.***

Our bye-laws and provisions of Bermuda law to which we are subject contain provisions that could discourage, delay or prevent "change of control" transactions or changes in our board of directors and management that certain shareholders may view as beneficial or advantageous. These provisions include, among others:

- the total voting power of any U.S. person owning more than 9.5% of our common shares will be reduced to 9.5% of the total voting power of our common shares, excluding shareholders that held more than 9.5% of our common shares on the day of completion of our IPO;

- our board of directors has the authority to issue preferred shares without shareholder approval, which could be used to dilute the ownership of a potential hostile acquirer;

- our shareholders may only remove directors for cause;

- there are advance notice requirements for shareholders with respect to director nominations and actions to be taken at annual meetings; and

- under Bermuda law, for so long as JRG Re and Carolina Re are registered under the Insurance Act, the BMA may object to a person holding more than 10%, 20%, 33% or 50% of our common shares if it appears to the BMA that the person is not or is no longer fit and proper to be such a holder (See "— There are regulatory limitations on the ownership and transfer of our common shares.").

The foregoing factors could impede a merger, takeover or other business combination, which could reduce the market value of our shares.

***We may repurchase your common shares without your consent.***

Under our bye-laws and subject to Bermuda law, we have the option, but not the obligation, to require a shareholder, other than shareholders holding more than 9.5% of our common shares on the day of completion of our IPO, to sell to us at fair market value the minimum number of common shares which is necessary to avoid or cure any adverse tax consequences or materially adverse legal or regulatory treatment to us, our subsidiaries or our shareholders, if our board of directors reasonably determines, in good faith, that failure to exercise this option would result in such adverse consequences or treatment.

***Bermuda law differs from the laws in effect in the United States and may afford less protection to holders of our shares.***

We are organized under the laws of Bermuda. As a result, our corporate affairs are governed by the Companies Act, which differs in some material respects from laws typically applicable to U.S. corporations and shareholders, including the provisions relating to interested directors, amalgamations, mergers and acquisitions, takeovers, shareholder lawsuits and indemnification of directors. Generally, the duties of directors and officers of a Bermuda company are owed to the company only. Shareholders of Bermuda companies typically do not have rights to take action against directors or officers of the company and may only do so in limited circumstances. Class actions are not available under Bermuda law. The circumstances in which derivative actions may be available under Bermuda law are substantially more proscribed and less clear than they would be to shareholders of U.S. corporations. The Bermuda courts, however, would ordinarily be expected to permit a shareholder to commence an action in the name of a company to remedy a wrong to the company where the act complained of is alleged to be beyond the corporate power of the company or illegal, or would result in the violation of the company's memorandum of association or bye-laws. Furthermore, consideration would be given by a Bermuda court to acts that are alleged to constitute a fraud against minority shareholders or, for instance, where an act requires the approval of a greater percentage of the company's shareholders than that which actually approved it.

When the affairs of a company are being conducted in a manner that is oppressive or prejudicial to the interests of some shareholders, one or more shareholders may apply to the Supreme Court of Bermuda, which may make such order as it sees fit, including an order regulating the conduct of the company's affairs in the future or ordering the purchase of the shares of any shareholders by other shareholders or by the company. Additionally, under our bye-laws and as permitted by Bermuda law,

59

TABLE OF CONTENTS

each shareholder has waived any claim or right of action against our directors or officers for any action taken by directors or officers in the performance of their duties, except for actions involving fraud or dishonesty. In addition, the rights of holders of our common shares and the fiduciary responsibilities of our directors under Bermuda law are not as clearly established as under statutes or judicial precedent in existence in jurisdictions in the United States, particularly the State of Delaware. Therefore, holders of our common shares may have more difficulty protecting their interests than would shareholders of a corporation incorporated in a jurisdiction within the United States.

### *There are regulatory limitations on the ownership and transfer of our common shares.*

Common shares may be offered or sold in Bermuda only in compliance with the provisions of the Investment Business Act 2003 and the Exchange Control Act 1972 and related regulations of Bermuda, which regulate the sale of securities in Bermuda. In addition, the permission of the BMA is required under the provisions of the Exchange Control Act 1972 and related regulations for all issuances and transfers of shares of Bermuda companies to or from a non-resident of Bermuda for exchange control purposes, other than where the BMA has granted a general permission. The BMA, in its notice to the public dated June 1, 2005 has granted a general permission for the issue and subsequent transfer of any securities of a Bermuda company from and/or to a non-resident of Bermuda for exchange control purposes for so long as any "equity securities" of such company are listed on an appointed stock exchange, which includes the NASDAQ Stock Market. This general permission will apply to our common shares, but would cease to apply if we were to cease to be listed on the NASDAQ Stock Market.

In connection with the IPO, we received consent from the BMA to issue and transfer freely any of our shares, options, warrants, depository receipts, rights loan notes, debt instruments or other securities to and among persons who are either residents or non-residents of Bermuda for exchange control purposes.

The Insurance Act requires that where the shares of the registered insurer, or the shares of its parent company, are traded on a recognized stock exchange, and a person becomes a 10%, 20%, 33% or 50% shareholder controller of the insurer, that person shall, within 45 days, notify the BMA in writing that he has become such a controller. In addition, a person who is a shareholder controller of an insurer whose shares or the shares of its parent company (if any) are traded on a recognized stock exchange must serve on the BMA a notice in writing that he has reduced or disposed of his holding in the insurer where the proportion of voting rights in the insurer held by him will have reached or has fallen below 10%, 20%, 33% or 50% as the case may be, not later than 45 days after such disposal. This requirement will apply to us as long as our shares are listed on the NASDAQ Stock Market or another stock exchange recognized by the BMA. The BMA may, by written notice, object to a person holding 10%, 20%, 33% or 50% of our common shares if it appears to the BMA that the person is not fit and proper to be such a holder. The BMA may require the holder to reduce its shareholding in us and may direct, among other things, that the voting rights attaching to its shares shall not be exercisable. A person that does not comply with such a notice or direction from the BMA will be guilty of an offense.

JRG Re and Carolina Re are also required to notify the BMA in writing in the event any person has become or has ceased to be a controller or an officer of it (an officer includes a director, chief executive or senior executive performing duties of underwriting, actuarial, risk management, compliance, internal audit, finance or investment matters).

Except in connection with the settlement of trades or transactions entered into through the facilities of the NASDAQ Stock Market, our board of directors may generally require any shareholder or any person proposing to acquire our common shares to provide the information required under our bye-laws. If any such shareholder or proposed acquiror does not provide such information, or if our board of directors has reason to believe that any certification or other information provided pursuant to any such request is inaccurate or incomplete, our board of directors may decline to register any transfer or to effect any issuance or purchase of our common shares to which such request is related.

In addition, the insurance holding company laws and regulations of the states in which our insurance companies are domiciled generally require that, before a person can acquire direct or indirect control of an insurer domiciled in the state, and in some cases prior to divesting its control, prior written approval must be obtained from the insurer's domiciliary state insurance regulator. In addition to insurance holding company laws and regulations, under the Organizational Permit issued by the California Department of Insurance to Falls Lake Fire and Casualty Company, Falls Lake Fire and Casualty Company, as a new insurer, was required to enter into an agreement with Falls Lake National restricting the transfer of Falls Lake Fire and Casualty Company's shares for a five-year period commencing January 1, 2016. Specifically, under the agreement, the restriction on share transfer is released automatically without further approval or consent by the California Department of Insurance, or any other party, at the following respective times: 5% at the end of the first year of the 5-year restriction period; an additional 5% at the end of the second year; an additional 10% at the end of the third year; an additional 20% at the end of the fourth year; and the remainder at the end of the fifth year. Therefore, under the Organizational Permit and the Agreement Restricting Shares, Falls Lake National's ability to directly or indirectly transfer the shares of Falls Lake Fire and Casualty Company to anyone without the prior written approval of the California Department of Insurance is limited. These laws and the similar conditions applicable to Falls Lake Fire and Casualty Company's shares may discourage potential acquisition proposals and may delay, deter or prevent an investment in or a change of control involving us, or one or more of our regulated

TABLE OF CONTENTS

subsidiaries, including transactions that our management and some or all of shareholders might consider desirable. Pursuant to applicable laws and regulations, "control" over an insurer is generally presumed to exist if any person, directly or indirectly, owns, controls, holds the power to vote or holds proxies representing, 10% or more of the voting securities of that reinsurer or insurer. Indirect ownership includes ownership of the Company's common shares.

### Item 1B.    UNRESOLVED STAFF COMMENTS

Not applicable.

### Item 2.    PROPERTIES

We lease office space in Bermuda, where our principal executive office is located and our casualty reinsurance segment is based. We also lease offices in (1) Chapel Hill, North Carolina, where our U.S. holding company, James River Group is based, (2) Raleigh, North Carolina, Santa Margarita, California, Princeton, New Jersey, and Saratoga Springs, New York where we conduct business in our Specialty Admitted Insurance segment and (3) Richmond, Virginia, Scottsdale, Arizona and Atlanta, Georgia for the conduct of business in our Excess and Surplus Lines segment. We believe that our facilities are adequate for our current needs and that suitable additional or substitute space will be available as needed.

### Item 3.    LEGAL PROCEEDINGS

We are party to legal proceedings which arise in the ordinary course of business. We believe that the outcome of such matters, individually and in the aggregate, will not have a material adverse effect on our consolidated financial position, results of operations or cash flows.

### Item 4.    MINE SAFETY DISCLOSURE

Not applicable.

61

TABLE OF CONTENTS

**Item 7.**    **MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

*The following discussion and analysis contains forward-looking statements and involves numerous risks and uncertainties, including those described under the heading "Risk Factors." Actual results may differ materially from those contained in any forward-looking statements. You should read this discussion and analysis together with our audited consolidated financial statements and related notes included elsewhere in this Form 10-K.*

**Overview**

James River Group Holdings, Ltd. is a Bermuda-based holding company. We own and operate a group of specialty insurance and reinsurance companies with the objective of generating compelling returns on tangible equity while limiting underwriting and investment volatility. We seek to accomplish this by consistently earning profits from insurance and reinsurance underwriting and generating meaningful risk-adjusted investment returns, while managing our capital opportunistically.

For the year ended December 31, 2018, approximately 67.6% of our group-wide gross written premiums originated from the U.S. E&S lines market including business assumed by our Casualty Reinsurance segment. We also have a specialty admitted insurance business in the United States. We intend to concentrate substantially all of our underwriting in casualty insurance and reinsurance, and for the year ended December 31, 2018, we derived 98.5% of our group-wide gross written premiums from casualty insurance and reinsurance. We focus on writing business in specialty markets where our underwriters have particular expertise and where we have long-standing distribution relationships; maintaining a strong balance sheet with appropriate reserves; monitoring reinsurance recoverables carefully; managing our investment portfolio actively without taking undue risk; using technology to monitor trends in our business; responding rapidly to market opportunities and challenges; and actively managing our capital.

We report our business in four segments: Excess and Surplus Lines, Specialty Admitted Insurance, Casualty Reinsurance and Corporate and Other.

The Excess and Surplus Lines segment offers E&S commercial lines liability and property insurance in every U.S. state and the District of Columbia through James River Insurance and its wholly-owned subsidiary, James River Casualty. James River Insurance and James River Casualty are both non-admitted carriers. Non-admitted carriers writing in the E&S market are not bound by most of the rate and form regulations imposed on standard market companies, allowing them flexibility to change the coverage terms offered and the rate charged without the time constraints and financial costs associated with the rate and form filing process. In 2018, the average account in this segment (excluding commercial auto policies) generated annual gross written premiums of approximately $20,000. The Excess and Surplus Lines segment distributes primarily through wholesale insurance brokers. Members of our management team have participated in this market for over three decades and have long-standing relationships with the wholesale agents who place E&S lines accounts. The Excess and Surplus Lines segment produced 56.3% of our gross written premiums and 74.9% of our net written premiums for the year ended December 31, 2018.

The Specialty Admitted Insurance segment focuses on niche classes within the standard insurance markets, such as workers' compensation coverage for building trades, healthcare employees, goods and services, manufacturing, specialty transportation, and agriculture, and on the fronting and program business. In our fronting business, we retain a small percentage of the risk and seek to earn fee income by allowing other carriers and producers to use our licensure, ratings, and infrastructure. Given market conditions and availability of reinsurance for program opportunities, we began de-emphasizing program business in 2017. Through Falls Lake National and its subsidiaries, this segment has admitted licenses in 49 states and the District of Columbia and distributes through a variety of sources, including independent retail agents, program administrators and MGAs. The Specialty Admitted Insurance segment produced 32.1% of our gross written premiums and 7.3% of our net written premiums for the year ended December 31, 2018.

The Casualty Reinsurance segment provides proportional and working layer casualty reinsurance to third parties and to our U.S.-based insurance subsidiaries. Typically, we structure our reinsurance contracts (also known as treaties) as quota share arrangements, with loss mitigating features, such as commissions that adjust based on underwriting results. We frequently include risk mitigating features in our working layer excess of loss treaties, such as paid reinstatements, which allow the ceding company to capture a greater percentage of the profits should the business prove more profitable than expected, or alternatively, with additional premiums should the business incur higher than expected losses. We believe these structures best align our interests with the interests of our cedents. On a premium volume basis, treaties with loss mitigation features including sliding scale ceding commissions represented 81.7% of the gross premiums written by our Casualty Reinsurance segment during 2018. We typically do not assume large individual risks in our Casualty Reinsurance segment, nor do we write property catastrophe reinsurance. Most of the policies assumed by our Casualty Reinsurance segment have a $1.0 million per occurrence limit, and we typically assume only a portion of that exposure. We believe this structure reduces volatility in our underwriting results. We do not assume stand-alone third-party property business at our Casualty Reinsurance segment, but we do have a small amount

67

TABLE OF CONTENTS

of assumed business with ancillary property exposure. 83.7% of premiums written by our Casualty Reinsurance segment during 2018 were general liability accounts assumed from E&S carriers. The Casualty Reinsurance segment distributes through reinsurance brokers. The Casualty Reinsurance segment produced 11.6% of our gross written premiums and 17.8% of our net written premiums for the year ended December 31, 2018.

The Casualty Reinsurance segment writes business through two entities, JRG Re and Carolina Re. Through December 31, 2017, we had intercompany reinsurance agreements under which we ceded 70% of the net written premiums of our U.S. subsidiaries (after taking into account third-party reinsurance) to JRG Re. Effective January 1, 2018, we generally discontinued ceding 70% of our U.S.-written premiums to JRG Re and instead ceded 70% of our U.S.-written premiums to Carolina Re. This business is ceded under proportional, or quota-share, reinsurance treaties that provide for an arm's length ceding commission. We exclude the effects of intercompany reinsurance agreements from the presentation of our segment results, consistent with the way we manage the Company. At December 31, 2018, 54.9% of our cash and invested assets were held at JRG Re, which benefits from a favorable operating environment, including an absence of corporate income or investment taxes.

On December 22, 2017, the United States enacted Public Law No. 115-97, informally titled the Tax Cuts and Jobs Act (the "Tax Act"). The Tax Act significantly changed the U.S. Internal Revenue Code of 1986, as amended (the "Code"), including by reducing the U.S. corporate income tax rate from 35% to 21% and imposing a base erosion and anti-abuse tax ("BEAT"). In response to the Tax Act, we made changes to our structure in 2018 to minimize the impact of BEAT that included the formation of Carolina Re, a Bermuda-domiciled, wholly-owned subsidiary of James River Group, Inc. Carolina Re is a Class 3A reinsurer and made an irrevocable election to be taxed as a U.S. domestic corporation under Section 953(d) of the Code effective January 1, 2018. Carolina Re is also the cedent on a stop loss reinsurance treaty with JRG Re.

The Corporate and Other segment consists of the management and treasury activities of our holding companies and interest expense associated with our debt.

The A.M. Best financial strength rating for our group's regulated insurance subsidiaries is "A" (Excellent). This rating reflects A.M. Best's opinion of our insurance subsidiaries' financial strength, operating performance and ability to meet obligations to policyholders and is not an evaluation directed towards the protection of investors.

## Critical Accounting Policies and Estimates

We identified the accounting estimates below as critical to the understanding of our financial position and results of operations. Critical accounting estimates are defined as those estimates that are both important to the portrayal of our financial condition and results of operations and which require us to exercise significant judgment. We use significant judgment concerning future results and developments in applying these critical accounting estimates and in preparing our consolidated financial statements. These judgments and estimates affect the reported amounts of assets, liabilities, revenues and expenses and the disclosure of material contingent assets and liabilities. Actual results may differ materially from the estimates and assumptions used in preparing the consolidated financial statements. We evaluate our estimates regularly using information that we believe to be relevant. For a detailed discussion of our accounting policies, see the Notes to Consolidated Financial Statements included in this Form 10-K.

### *Reserve for Losses and Loss Adjustment Expenses*

The reserve for losses and loss adjustment expenses represents our estimated ultimate cost of all reported and unreported losses and loss adjustment expenses incurred and unpaid at the balance sheet date. We do not discount this reserve. We estimate the reserve using individual case-basis valuations of reported claims and statistical analysis. We believe that the use of judgment is necessary to arrive at a best estimate for the reserve for losses and loss adjustment expenses given the long-tailed nature of the business we write and the limited operating experience of the Casualty Reinsurance segment and of the fronting and program business in the Specialty Admitted Insurance segment and the commercial auto business in our Excess and Surplus lines segment. In applying this judgment, we frequently establish reserves that differ from our internal actuaries' estimate. We seek to establish reserves that will ultimately prove to be adequate. If we have indications that claims frequency or severity exceeds our initial expectations, we generally increase our reserves for losses and loss adjustment expenses. Conversely, when claims frequency and severity trends are more favorable than initially anticipated, we generally reduce our reserves for losses and loss adjustment expenses once we have sufficient data to confirm the validity of the favorable trends.

Our Excess and Surplus Lines and Specialty Admitted Insurance segments generally are notified of losses by our insureds or their brokers. Based on the information provided, we establish case reserves by estimating the ultimate losses from the claim, including administrative costs associated with the ultimate settlement of the claim. Our claims department personnel use their knowledge of the specific claim along with internal and external experts, including underwriters and legal counsel, to estimate the expected ultimate losses.

Our Casualty Reinsurance segment generally establishes case reserves based on reports received from ceding companies or their brokers. For excess of loss contracts, we are typically notified of insurance losses on specific contracts, and we record

68

case reserves based on the estimated ultimate losses on each claim. For proportional contracts, we typically receive aggregated claims information and record case reserves based on that information.

We also use statistical analysis to estimate the cost of losses and loss adjustment expenses that have been incurred but not reported to us. Those estimates are based on our historical information, industry information and estimates of future trends that may affect the frequency of claims and changes in the average cost of claims (severity) that may arise in the future.

The Company's gross reserve for losses and loss adjustment expenses at December 31, 2018 was $1,661.5 million. Of this amount, 62.4% relates to IBNR. The Company's gross reserve for losses and loss adjustment expenses by segment are summarized as follows:

| | Gross Reserves at December 31, 2018 | | | |
| | Case | IBNR | Total | IBNR % of Total |
|---|---|---|---|---|
| | ($ in thousands) | | | |
| Excess and Surplus Lines | $ 352,015 | $ 608,548 | $ 960,563 | 63.4% |
| Specialty Admitted Insurance | 161,916 | 264,399 | 426,315 | 62.0% |
| Casualty Reinsurance | 110,339 | 164,242 | 274,581 | 59.8% |
| Total | $ 624,270 | $ 1,037,189 | $ 1,661,459 | 62.4% |

The Company's net reserve for losses and loss adjustment expenses at December 31, 2018 was $1,194.1 million. Of this amount, 61.5% relates to IBNR. The Company's net reserve for losses and loss adjustment expenses by segment are summarized as follows:

| | Net Reserves at December 31, 2018 | | | |
| | Case | IBNR | Total | IBNR % of Total |
|---|---|---|---|---|
| | ($ in thousands) | | | |
| Excess and Surplus Lines | $ 320,783 | $ 514,160 | $ 834,943 | 61.6% |
| Specialty Admitted Insurance | 32,347 | 56,951 | 89,298 | 63.8% |
| Casualty Reinsurance | 106,695 | 163,152 | 269,847 | 60.5% |
| Total | $ 459,825 | $ 734,263 | $ 1,194,088 | 61.5% |

Our Reserve Committee consists of our Chief Actuary, President and Chief Executive Officer, Chief Financial Officer, and Chief Accounting Officer. Additionally, the presidents and chief actuaries of each of our three operating segments assist in the evaluations of their respective segments. The Reserve Committee meets quarterly to review the actuarial recommendations made by each chief actuary and uses its best judgment to determine the best estimate to be recorded for the reserve for losses and loss adjustment expenses on our balance sheet. The Reserve Committee believes that using judgment to supplement the actuarial recommendations is necessary to arrive at a best estimate given the nature of the business that we write and the limited operating experience of the Casualty Reinsurance segment, the fronting and program business in the Specialty Admitted Insurance segment and the commercial auto underwriting division in the Excess and Surplus Lines segment.

The process of estimating the reserve for losses and loss adjustment expenses requires a high degree of judgment and is subject to a number of variables. In establishing the quarterly actuarial recommendation for the reserve for losses and loss adjustment expenses, our internal actuaries estimate an initial expected ultimate loss ratio for each of our product lines by accident year (or for our Casualty Reinsurance segment, on a contract by contract basis). Input from our underwriting and claims departments, including premium pricing assumptions and historical experience, are considered by our internal actuaries in estimating the initial expected loss ratios. Our actuaries generally utilize five actuarial methods in their estimation process for the reserve for losses and loss adjustment expenses. These five methods utilize, to varying degrees, the initial expected loss ratio, detailed statistical analysis of past claims reporting and payment patterns, claims frequency and severity, paid loss experience, industry loss experience, and changes in market conditions, policy forms, exclusions, and exposures. The five actuarial methods that we use in our reserve estimation process are:

*Expected Loss Method*

The Expected Loss method multiplies earned premiums by an initial expected loss ratio.

TABLE OF CONTENTS

*Incurred Loss Development Method*

The Incurred Loss Development method uses historical loss reporting patterns to estimate future loss reporting patterns. In this method, our actuaries apply historical loss reporting patterns to develop incurred loss development factors that are applied to current reported losses to calculate expected ultimate losses.

*Paid Loss Development Method*

The Paid Loss Development method is similar to the Incurred Loss Development method, but it uses historical loss payment patterns to estimate future loss payment patterns. In this method, our actuaries apply historical loss payment patterns to develop paid loss development factors that are applied to current paid losses to calculate expected ultimate losses.

*Bornhuetter-Ferguson Incurred Loss Development Method*

The Bornhuetter-Ferguson Incurred Loss Development method divides the projection of ultimate losses into the portion that has already been reported and the portion that has yet to be reported. The portion that has yet to be reported is estimated as the product of premiums earned for the accident year, the initial expected ultimate loss ratio and an estimate of the percentage of ultimate losses that are unreported at the valuation date.

*Bornhuetter-Ferguson Paid Loss Development Method*

The Bornhuetter-Ferguson Paid Loss Development method is similar to the Bornhuetter-Ferguson Incurred Loss Development method, except this method divides the projection of ultimate losses into the portion that has already been paid and the portion that has yet to be paid. The portion that has yet to be paid is estimated as the product of premiums earned for the accident year, the initial expected ultimate loss ratio and an estimate of the percentage of ultimate losses that are unpaid at the valuation date.

Different reserving methods are appropriate in different situations, and our actuaries use their judgment and experience to determine the weighting of the methods detailed above to use for each accident year and each line of business and, for our Casualty Reinsurance segment, on a contract by contract basis. For example, the current accident year has very little incurred and paid loss development data on which to base reserve projections. As a result, we rely heavily on the Expected Loss Method in estimating reserves for the current accident year. We generally set our initial expected loss ratio for the current accident year consistent with our pricing assumptions. We believe that this is a reasonable and appropriate reserving assumption for the current accident year since our pricing assumptions are actuarially driven and since we expect to make an acceptable return on the new business that we write. If actual loss emergence is better than our initial expected loss ratio assumptions, we will experience favorable development, and if it is worse than our initial expected loss ratio assumptions, we will experience adverse development. Conversely, sufficient incurred and paid loss development is available for our oldest accident years, so more weight is given to the Incurred Loss Development method and the Paid Loss Development method than the Expected Loss method. The Bornhuetter-Ferguson Incurred Loss Development and Paid Loss Development methods blend features of the Expected Loss method and the Incurred and Paid Loss Development methods. The Bornhuetter-Ferguson methods are typically used for the more recent prior accident years.

In applying these methods to develop an estimate of the reserve for losses and loss adjustment expenses, our internal actuaries use judgment to determine three key parameters for each accident year and line of business: the initial expected loss ratios, the incurred and paid loss development factors and the weighting of the five actuarial methods to be used for each accident year and line of business. For the Excess and Surplus Lines and Specialty Admitted Insurance segments, the actuary performs a study on each of these parameters annually and makes recommendations for the initial expected loss ratios, the incurred and paid loss development factors and the weighting of the five actuarial methods by accident year and line of business. Members of the Reserve Committee review and approve the parameter review actuarial recommendations, and these approved parameters are used in the reserve estimation process for the next four quarters at which time a new parameter study is performed. For the Casualty Reinsurance segment, periodic assessments are made on a contract by contract basis with the goal of keeping the initial expected loss ratios and the incurred and paid loss development factors as constant as possible until sufficient evidence presents itself to support adjustments. Method weights are generally less rigid for the Casualty Reinsurance segment given the heterogeneous nature of the various contracts, and the potential for significant changes in mix of business within individual treaties.

We engage an independent internationally recognized actuarial consulting firm to review our reserves for losses and loss adjustment expenses twice each year, once prior to closing the third quarter and once for the closing of the fourth quarter. This independent actuarial consulting firm prepares its own estimate of our reserve for loss and loss adjustment expenses, and we compare their estimate to the reserve for losses and loss adjustment expenses reviewed and approved by the Reserve Committee in order to gain additional comfort on the adequacy of our reserves.

The table below quantifies the impact of extreme reserve deviations from our expected value at December 31, 2018. The total carried net reserve for losses and loss adjustment expenses is displayed alongside 5th, 50th and 95th percentiles of likely

TABLE OF CONTENTS

ultimate net reserve outcomes. The estimates of these percentiles are a result of a reserve variability analysis using a simulation approach.

| Sensitivity | 5th Pct. | 50th Pct. | Carried | 95th Pct. |
|---|---|---|---|---|
| | *(in thousands)* | | | |
| Reserve for losses and loss adjustment expenses | $ 1,061,245 | $ 1,191,249 | $ 1,194,088 | $ 1,337,509 |
| Changes in reserves | (132,843) | (2,839) | — | 143,421 |

The impact of recording the net reserve for losses and loss adjustment expenses at the highest value from the sensitivity analysis above would be to increase losses and loss adjustment expenses incurred by $143.4 million, reduce after-tax net income by $133.0 million, reduce shareholders' equity by $133.0 million and reduce shareholders' tangible equity by $133.0 million, in each case at or for the period ended December 31, 2018.

The impact of recording the net reserve for losses and loss adjustment expenses at the lowest value from the sensitivity analysis above would be to reduce losses and loss adjustment expenses incurred by $132.8 million, increase after-tax net income by $123.2 million, increase shareholders' equity by $123.2 million, and increase tangible equity by $123.2 million, in each case at or for the year ended December 31, 2018. Such changes in the net reserve for losses and loss adjustment expenses would not have an immediate impact on our liquidity, but would affect cash flow and investment income in future periods as the incremental or reduced amount of losses are paid and investment assets adjusted to reflect the level of paid claims.

Loss reserve estimates are subject to a high degree of variability due to the inherent uncertainty of ultimate claims settlement values. In recording our best estimate of our reserve for losses and loss adjustment expenses, our Reserve Committee typically selects an amount above the actuarial recommendation due to the inherent variation associated with our reserve estimates and the likelihood that there are unforeseen or under-valued liabilities in the actuarial recommendations. We believe that the insurance that we write is subject to above-average variation in reserve estimates. The Excess and Surplus Lines market is subject to high policyholder turnover and changes in underlying mix of exposures. This turnover and change in underlying mix of exposures can cause actuarial estimates based on prior experience to be less reliable than estimates for more stable, admitted books of business. As a casualty insurer, losses on our policies often take a number of years to develop, making it difficult to estimate the ultimate losses associated with this business. Judicial and regulatory bodies have frequently interpreted insurance contracts in a manner that expands coverage beyond that which was contemplated at the time that the policy was issued. In addition, many of our policies are issued on an occurrence basis, and insureds suffering a loss frequently seek coverage beyond the policies' original intent. The difficulty in pinpointing actual ultimate losses and loss adjustment expenses ("LAE") is illustrated by the fact that at December 31, 2018, 61.6% of our net reserve for losses and loss adjustment expenses in the Excess and Surplus Lines segment is for claims that have not been reported.

Our reserves are driven by a number of important assumptions, including litigation and regulatory trends, legislative activity, climate change, social and economic patterns and claims inflation assumptions. Our reserve estimates reflect current inflation in legal claims' settlements and assume we will not be subject to losses from significant new legal liability theories. Our reserve estimates also assume that we will not experience significant losses from mass torts and that we will not incur losses from future mass torts not known to us today. While it is not possible to predict the impact of changes in the litigation environment, if new mass torts or expanded legal theories of liability emerge, our cost of claims may differ substantially from our reserves. Our reserve estimates assume that there will not be significant changes in the regulatory and legislative environment. The impact of potential changes in the regulatory or legislative environment is difficult to quantify in the absence of specific, significant new regulation or legislation. In the event of significant new regulation or legislation, we will attempt to quantify its impact on our business but no assurance can be given that our attempt to quantify such inputs will be accurate or successful.

IBNR reserve estimates are inherently less precise than case reserve estimates. A 5% change in net IBNR reserves at December 31, 2018 would equate to a $36.7 million change in the reserve for losses and loss adjustment expenses at such date, a $32.6 million change in after-tax net income, a 4.6% change in shareholders' equity and a 6.6% change in tangible equity, in each case at or for the year ended December 31, 2018.

Although we believe that our reserve estimates are reasonable, it is possible that our actual loss experience may not conform to our assumptions. Specifically, our actual ultimate loss ratio could differ from our initial expected loss ratio or our actual reporting and payment patterns could differ from our expected reporting and payment patterns, which are based on our own data and industry data. Accordingly, the ultimate settlement of losses and the related loss adjustment expenses may vary significantly from the estimates included in our financial statements. We regularly review our estimates and adjust them as necessary as experience develops or as new information becomes known to us. Such adjustments are included in current operations.

TABLE OF CONTENTS

$17.7 million of adverse development was experienced in 2018 on the reserve for losses and loss adjustment expenses held at December 31, 2017. This adverse reserve development included $15.0 million of adverse development in the Excess and Surplus Lines segment, including $20.7 million of adverse development in the commercial auto line of business that was primarily related to the 2016 contract year with one insured. The adverse development for commercial auto was partially offset by $5.7 million of favorable development in other Excess and Surplus Lines underwriting divisions primarily from favorable development in the Excess Property underwriting division related to the 2017 hurricanes. Favorable reserve development in the Specialty Admitted Insurance segment was $5.6 million and primarily came from accident years 2014 through 2016, as loss emergence on our workers' compensation business written prior to 2016 continued to develop more favorably than we had anticipated. In addition, $8.2 million of adverse development occurred in the Casualty Reinsurance segment, with a majority of this adverse development coming primarily from accident years at least four years old and in treaties the Company has since non-renewed.

$21.5 million of adverse development was experienced in 2017 on the reserve for losses and loss adjustment expenses held at December 31, 2016. This adverse reserve development included $20.0 million of adverse development in the Excess and Surplus Lines segment, including $38.7 million of adverse development in the commercial auto line of business that was primarily related to the 2016 contract year with one insured. The adverse development for commercial auto was partially offset by favorable development of $18.6 million in other Excess and Surplus Lines underwriting divisions primarily from the 2014 through 2016 accident years. This favorable development occurred because our actuarial studies at December 31, 2017 for the Excess and Surplus Lines segment indicated that our loss experience on our casualty business excluding commercial auto continued to be below our initial expected ultimate loss ratios. The Company also experienced $2.7 million of favorable development on prior accident years in the Specialty Admitted Insurance segment primarily from accident years 2010 through 2015, as losses on our workers' compensation business written prior to 2016 continued to develop more favorably than we had anticipated. The Casualty Reinsurance segment experienced $4.2 million of adverse development on prior accident years primarily from two contracts from 2010 through 2013 that had higher than expected reported losses in 2017.

A $23.7 million redundancy developed in 2016 on the reserve for losses and loss adjustment expenses held at December 31, 2015. This favorable reserve development included $24.1 million of favorable development in the Excess and Surplus Lines segment. The Excess and Surplus Lines segment favorable development included $10.0 million of favorable development from the 2015 accident year, $10.7 million of favorable development from the 2014 accident year and $4.5 million from the 2013 accident year. This favorable development occurred because our actuarial studies at December 31, 2016 showed that the experience on our casualty business continued to be below our initial expected ultimate loss ratios driven by favorable calendar year emergence. Favorable reserve development in the Specialty Admitted Insurance segment was $3.8 million, and primarily came from accident years 2010 through 2014, as losses on our workers' compensation business written prior to 2015 continued to develop more favorably than we had anticipated. The Specialty Admitted Insurance segment's favorable development from accident years 2010 – 2014 was partially offset by unfavorable development for the 2015 accident year. In addition, $4.2 million of adverse development occurred in the Casualty Reinsurance segment, with the majority of this adverse development coming from two contracts from the 2012 and 2013 underwriting years that experienced higher loss development in 2016 than expected.

## Investment Valuation and Impairment

We carry fixed maturity securities classified as "available-for-sale" at fair value, and unrealized gains and losses on such securities, net of any deferred taxes, are reported as a separate component of accumulated other comprehensive income. Equity securities (except those accounted for under the equity method of accounting or those that result in consolidation of the investee) are measured at fair value with changes in fair value recognized in net income. Fixed maturity securities purchased for short-term resale are classified as "trading" and are carried at fair value with unrealized gains and losses included in earnings as a component of investment income. We do not have any securities classified as "held-to-maturity."

We evaluate our available-for-sale fixed maturity securities regularly to determine whether there have been declines in value that are other-than-temporary. Our outside investment managers assist us in this evaluation. When we determine that a security has experienced an other-than-temporary impairment, the impairment loss is recognized as a realized investment loss.

We consider a number of factors in assessing whether an impairment is other-than-temporary, including (1) the amount and percentage that current fair value is below amortized cost, (2) the length of time that the fair value has been below amortized cost and (3) recent corporate developments or other factors that may impact an issuer's near term prospects. In addition, we consider the credit quality ratings for the securities, with a special emphasis on securities downgraded to below investment grade. We also consider our intent to sell available-for-sale fixed maturity securities in an unrealized loss position, and if it is "more likely than not" that we will be required to sell these securities before a recovery in fair value to their amortized cost basis. As a starting point for our evaluation, we compare the fair value of each available-for-sale security to its amortized cost to identify any securities with a fair value less than amortized cost.

72

TABLE OF CONTENTS

### *Equity Price Risk*

A portion of our portfolio is invested in equity securities, which have historically produced higher long-term returns relative to fixed maturities. We own preferred stocks, generally in the financial services industry, and common stocks. The changes in the estimated fair value of the equity securities portfolio are recognized in net income.

At December 31, 2018, our equity securities portfolio was concentrated in terms of the number of issuers and industries. Such concentrations can lead to higher levels of price volatility.

The following table summarizes our equity price risk and shows the effect of a hypothetical 35% increase or decrease in the fair value of our equity securities portfolio as of December 31, 2018. We believe that this range represents a reasonably likely scenario, as the largest annual increases and decreases in the S&P 500 Index in the past twenty-five years were 34.1% (1995) and (38.5%) (2008), respectively. The selected hypothetical changes do not indicate what could be the potential best or worst case scenarios.

| | | As of December 31, 2018 | | |
|---|---|---|---|---|
| | | Estimated Fair Value | Hypothetical Price Change | Estimated Fair Value after Hypothetical Change in Prices |
| | | ($ in thousands) | | |
| Equity securities | $ | 78,385 | 35% increase | $ 105,820 |
| | | | 35% decrease | 50,950 |

### Item 8.    FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

The report of our independent registered public accounting firm and our Consolidated Financial Statements and required Financial Statement Schedules are filed pursuant to this Item 8 and are included later in this report. See Index to Financial Statements and Schedules on page F-1.

### Item 9.    CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE

Not applicable.

### Item 9A.    CONTROLS AND PROCEDURES

#### Evaluation of Disclosure Controls and Procedures

We maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), as appropriate, to allow timely decisions regarding required disclosure. In connection with the preparation of this Annual Report on Form 10-K, our management carried out an evaluation, under the supervision and with the participation of our CEO and CFO, as of December 31, 2018, of the effectiveness of the design and operation of our disclosure controls and procedures, as such term is defined under Rule 13a-15(e) and 15d-15(e) under the Exchange Act. Based upon this evaluation, our CEO and CFO concluded that our disclosure controls and procedures were effective as of December 31, 2018.

#### Management's Annual Report on Internal Control over Financial Reporting

Management is responsible for establishing and maintaining adequate internal control over financial reporting for the Company, as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act. Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. Internal control over financial reporting includes those policies and procedures that: pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of our assets; provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that our receipts and expenditures are being made only in accordance with authorizations of our management and directors; and provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of our assets that could have a material effect on our financial statements. Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

110

TABLE OF CONTENTS

Management has conducted an assessment, including testing, of the effectiveness of our internal control over financial reporting as of December 31, 2018. In making its assessment of internal control over financial reporting, management used the criteria in *Internal Control — Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this assessment, the Company's management has concluded that, as of December 31, 2018, the Company's internal control over financial reporting was effective.

Ernst & Young LLP, the independent registered public accounting firm that audited the Consolidated Financial Statements of the Company included in this Annual Report, has audited the effectiveness of internal control over financial reporting as of December 31, 2018. Their attestation report, which expresses an unqualified opinion on the effectiveness of the Company's internal control over financial reporting as of December 31, 2018, is included with our financial statements.

**Changes in Internal Control over Financial Reporting**

There were no changes in our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that occurred during our quarter ended December 31, 2018 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

The effectiveness of any system of controls and procedures is subject to certain limitations, and, as a result, there can be no assurance that our controls and procedures will detect all errors or fraud. A control system, no matter how well conceived and operated, can provide only reasonable, not absolute, assurance that the objectives of the control system will be attained.

**Item 9B.    OTHER INFORMATION**

None.

111

TABLE OF CONTENTS

**JAMES RIVER GROUP HOLDINGS, LTD. AND SUBSIDIARIES**

**Report of Independent Registered Public Accounting Firm**

The Shareholders and the Board of Directors
James River Group Holdings, Ltd.

### Opinion on Internal Control over Financial Reporting

We have audited James River Group Holdings, Ltd. and subsidiaries' internal control over financial reporting as of December 31, 2018, based on criteria established in Internal Control - Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework), (the COSO criteria). In our opinion, James River Group Holdings, Ltd. and subsidiaries (the Company) maintained, in all material respects, effective internal control over financial reporting as of December 31, 2018, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the consolidated balance sheets of the Company as of December 31, 2018 and 2017, the related consolidated statements of income and comprehensive income, changes in shareholders' equity and cash flows for each of the three years in the period ended December 31, 2018, and related notes and financial statement schedules listed in the Index at Item 15(a) and our report dated February 27, 2019 expressed an unqualified opinion thereon.

### Basis for Opinion

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Annual Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects.

Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

### Definition and Limitations of Internal Control Over Financial Reporting

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ Ernst & Young LLP
Pittsburgh, Pennsylvania
February 27, 2019

TABLE OF CONTENTS

**JAMES RIVER GROUP HOLDINGS, LTD. AND SUBSIDIARIES**

**Consolidated Balance Sheets**

| | December 31, | |
|---|---|---|
| | **2018** | **2017** |
| | *(in thousands)* | |
| **Assets** | | |
| Invested assets: | | |
| Fixed maturity securities: | | |
| Available-for-sale, at fair value (amortized cost: 2018 – $1,199,409; 2017 – $1,008,662) | $ 1,184,202 | $ 1,016,098 |
| Trading, at fair value (amortized cost: 2018 – $0; 2017 – $3,801) | — | 3,808 |
| Equity securities, at fair value (cost: 2018 – $77,152; 2017 – $75,318) | 78,385 | 82,522 |
| Bank loan participations held-for-investment, at amortized cost, net of allowance | 260,972 | 238,214 |
| Short-term investments | 81,966 | 36,804 |
| Other invested assets | 72,321 | 70,208 |
| Total invested assets | 1,677,846 | 1,447,654 |
| Cash and cash equivalents | 172,457 | 163,495 |
| Accrued investment income | 11,110 | 8,381 |
| Premiums receivable and agents' balances, net | 307,899 | 352,436 |
| Reinsurance recoverable on unpaid losses | 467,371 | 302,524 |
| Reinsurance recoverable on paid losses | 18,344 | 11,292 |
| Prepaid reinsurance premiums | 112,498 | 91,979 |
| Deferred policy acquisition costs | 54,450 | 72,365 |
| Intangible assets, net | 37,537 | 38,334 |
| Goodwill | 181,831 | 181,831 |
| Deferred tax assets, net | 1,054 | — |
| Income taxes receivable | — | 2,806 |
| Other assets | 94,379 | 83,598 |
| Total assets | $ 3,136,776 | $ 2,756,695 |

*See accompanying notes.*

F-4

TABLE OF CONTENTS

**JAMES RIVER GROUP HOLDINGS, LTD. AND SUBSIDIARIES**

**Consolidated Balance Sheets**

|  | December 31, | |
|---|---|---|
|  | **2018** | **2017** |
|  | *(in thousands, except share amounts)* | |
| **Liabilities and shareholders' equity** | | |
| Liabilities: | | |
| Reserve for losses and loss adjustment expenses | $ 1,661,459 | $ 1,292,349 |
| Unearned premiums | 386,473 | 418,114 |
| Payables to reinsurers | 61,662 | 56,268 |
| Senior debt | 118,300 | 98,300 |
| Junior subordinated debt | 104,055 | 104,055 |
| Accrued expenses | 51,792 | 39,295 |
| Deferred tax liabilities, net | — | 5,247 |
| Income taxes payable | 1,915 | — |
| Other liabilities | 41,879 | 48,368 |
| Total liabilities | 2,427,535 | 2,061,996 |
| Commitments and contingent liabilities | — | — |
| Shareholders' equity: | | |
| Common Shares – $0.0002 par value; 200,000,000 shares authorized. 2018 and 2017: 29,988,460 and 29,696,682 shares issued and outstanding, respectively | 6 | 6 |
| Preferred Shares – 2018 and 2017: $0.00125 par value; 20,000,000 shares authorized; no shares issued and outstanding | — | — |
| Additional paid-in capital | 645,310 | 636,149 |
| Retained earnings | 79,753 | 48,198 |
| Accumulated other comprehensive (loss) income | (15,828) | 10,346 |
| Total shareholders' equity | 709,241 | 694,699 |
| Total liabilities and shareholders' equity | $ 3,136,776 | $ 2,756,695 |

*See accompanying notes.*

F-5

TABLE OF CONTENTS

**JAMES RIVER GROUP HOLDINGS, LTD. AND SUBSIDIARIES**

**Consolidated Statements of Income and Comprehensive Income**

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2018** | **2017** | **2016** |
| | *(in thousands, except share amounts)* | | |
| **Revenues:** | | | |
| Gross written premiums | $ 1,166,773 | $ 1,081,905 | $ 737,398 |
| Ceded written premiums | (404,101) | (315,279) | (179,690) |
| Net written premiums | 762,672 | 766,626 | 557,708 |
| Change in net unearned premiums | 52,726 | (25,517) | (42,045) |
| Net earned premiums | 815,398 | 741,109 | 515,663 |
| Net investment income | 61,256 | 61,119 | 52,638 |
| Net realized and unrealized (losses) gains on investments | (5,479) | (1,989) | 7,565 |
| Other income | 14,424 | 17,386 | 10,361 |
| Total revenues | 885,599 | 817,625 | 586,227 |
| **Expenses:** | | | |
| Losses and loss adjustment expenses | 600,276 | 555,377 | 325,421 |
| Other operating expenses | 201,035 | 196,993 | 170,828 |
| Other expenses | 1,300 | 539 | 1,590 |
| Interest expense | 11,553 | 8,974 | 8,448 |
| Amortization of intangible assets | 597 | 597 | 597 |
| Total expenses | 814,761 | 762,480 | 506,884 |
| Income before income taxes | 70,838 | 55,145 | 79,343 |
| Income tax expense (benefit): | | | |
| Current | 12,867 | 11,943 | (221) |
| Deferred | (5,859) | (364) | 5,093 |
| | 7,008 | 11,579 | 4,872 |
| **Net income** | $ 63,830 | $ 43,566 | $ 74,471 |
| Other comprehensive (losses) income: | | | |
| Net unrealized (losses) gains, net of taxes of $(444) in 2018, $2,707 in 2017, and $(1,723) in 2016 | (22,203) | 9,219 | (2,059) |
| **Total comprehensive income** | $ 41,627 | $ 52,785 | $ 72,412 |
| **Per share data:** | | | |
| Basic earnings per share | $ 2.14 | $ 1.48 | $ 2.56 |
| Diluted earnings per share | $ 2.11 | $ 1.44 | $ 2.49 |
| Dividend declared per share | $ 1.20 | $ 1.70 | $ 2.25 |
| **Weighted-average common shares outstanding:** | | | |
| Basic | 29,887,990 | 29,461,717 | 29,063,075 |
| Diluted | 30,307,101 | 30,273,149 | 29,894,378 |

*See accompanying notes.*

F-6

TABLE OF CONTENTS

**JAMES RIVER GROUP HOLDINGS, LTD. AND SUBSIDIARIES**

**Consolidated Statements of Changes in Shareholders' Equity**

| | Number of Common Shares Outstanding | Common Shares (Par) | Preferred Shares | Additional Paid-in Capital | Retained Earnings | Accumulated Other Comprehensive (Loss) Income | Total Shareholders' Equity |
|---|---|---|---|---|---|---|---|
| | | | | *(in thousands, except share amounts)* | | | |
| **Balances at December 31, 2015** | 28,941,547 | $ 6 | $ — | $ 630,820 | $ 47,026 | $ 3,186 | $ 681,038 |
| Net income | — | — | | — | 74,471 | — | 74,471 |
| Other comprehensive loss | — | — | | — | — | (2,059) | (2,059) |
| Dividends | — | — | | — | (66,265) | — | (66,265) |
| Exercise of stock options and related excess tax benefits | 260,672 | — | | 1,536 | — | — | 1,536 |
| Vesting of RSUs and related excess tax benefits | 55,347 | — | | (992) | — | — | (992) |
| Compensation expense under share incentive plans | — | — | | 5,492 | — | — | 5,492 |
| **Balances at December 31, 2016** | 29,257,566 | $ 6 | $ — | $ 636,856 | $ 55,232 | $ 1,127 | $ 693,221 |
| Net income | — | — | | — | 43,566 | — | 43,566 |
| Other comprehensive loss | — | — | | — | — | 9,219 | 9,219 |
| Dividends | — | — | | — | (50,600) | — | (50,600) |
| Exercise of stock options and related excess tax benefits | 358,967 | — | | (6,213) | — | — | (6,213) |
| Vesting of RSUs and related excess tax benefits | 80,149 | — | | (2,182) | — | — | (2,182) |
| Compensation expense under share incentive plans | — | — | | 7,688 | — | — | 7,688 |
| **Balances at December 31, 2017** | 29,696,682 | $ 6 | $ — | $ 636,149 | $ 48,198 | $ 10,346 | $ 694,699 |
| Net income | — | — | — | — | 63,830 | — | 63,830 |
| Other comprehensive loss | — | — | — | — | — | (22,203) | (22,203) |
| Dividends | — | — | — | — | (36,246) | — | (36,246) |
| Exercise of stock options | 237,319 | — | — | 4,045 | — | — | 4,045 |
| Vesting of RSUs | 54,459 | — | — | (1,112) | — | — | (1,112) |
| Compensation expense under share incentive plans | — | — | — | 6,228 | — | — | 6,228 |
| Cumulative effect of adoption of ASU No. 2016-01, net of taxes | — | — | — | $ — | $ 4,682 | $ (4,682) | $ — |
| Cumulative effect of adoption of ASU No. 2018-02 | — | — | — | $ — | $ (711) | $ 711 | $ — |
| **Balances at December 31, 2018** | 29,988,460 | $ 6 | $ — | $ 645,310 | $ 79,753 | $ (15,828) | $ 709,241 |

*See accompanying notes.*

F-7

TABLE OF CONTENTS

**JAMES RIVER GROUP HOLDINGS, LTD. AND SUBSIDIARIES**

**Consolidated Statements of Cash Flows**

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2018** | **2017** | **2016** |
| | *(in thousands)* | | |
| **Operating activities** | | | |
| Net income | $ 63,830 | $ 43,566 | $ 74,471 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Deferred policy acquisition costs | (93,188) | (123,577) | (105,659) |
| Amortization of policy acquisition costs | 111,103 | 116,001 | 101,624 |
| Net realized investment losses (gains) | 5,479 | 1,989 | (7,565) |
| Impairment of intangible assets | 200 | — | — |
| Distributions from equity method investments | 7,499 | 7,333 | 3,467 |
| Income from equity method investments | (3,540) | (13,209) | (8,743) |
| Trading securities purchases, sales, and maturities, net | 3,804 | 1,250 | — |
| Deferred U.S. federal income tax (benefit) expense | (5,859) | (364) | 5,093 |
| Provision for depreciation and amortization | 4,215 | 2,123 | 2,414 |
| Share based compensation expense | 6,228 | 7,688 | 5,492 |
| Excess tax benefits from equity incentive plan transactions | (2,699) | (2,115) | 3,191 |
| Change in operating assets and liabilities: | | | |
| Reserve for losses and loss adjustment expenses | 369,110 | 348,484 | 158,543 |
| Unearned premiums | (31,641) | 27,551 | 89,459 |
| Premiums receivable and agents' balances | 44,537 | (87,121) | (88,630) |
| Reinsurance balances | (187,024) | (113,665) | (68,497) |
| Payable to insurance companies | (2,029) | 445 | (950) |
| Other | 3 | (8,563) | (9,361) |
| Net cash provided by operating activities | 290,028 | 207,816 | 154,349 |
| **Investing activities** | | | |
| Securities available-for-sale: | | | |
| Purchases – fixed maturity securities | (418,011) | (270,014) | (300,135) |
| Sales – fixed maturity securities | 95,793 | 77,781 | 110,124 |
| Maturities and calls – fixed maturity securities | 129,139 | 121,890 | 135,472 |
| Purchases – equity securities | (7,507) | (5,540) | (3,680) |
| Sales – equity securities | 5,578 | 3,522 | 14,850 |
| Bank loan participations: | | | |
| Purchases | (203,328) | (240,799) | (156,638) |
| Sales | 123,114 | 138,214 | 51,077 |
| Maturities | 58,742 | 69,740 | 97,097 |
| Other invested assets: | | | |
| Purchases | (6,993) | (8,913) | (2,365) |
| Return of capital | 921 | — | 226 |
| Maturities and repayments | — | — | 6,500 |
| Securities receivable or payable, net | 2,268 | (2,525) | 1,018 |
| Short-term investments, net | (45,162) | 14,040 | (31,574) |
| Other | (1,326) | (2,137) | (2,736) |
| Net cash used in investing activities | (266,772) | (104,741) | (80,764) |
| **Financing activities** | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| Senior debt issuances | | | 20,000 | | 10,000 | — |
| Dividends paid | | | (36,123) | | (50,832) | (65,988) |
| Issuances of common shares under equity incentive plans | | | 5,172 | | 1,708 | 2,260 |
| Common share repurchases | | | (2,239) | | (9,448) | (4,907) |
| Other financing activities | | | (1,104) | | (792) | (1,572) |
| Net cash used in financing activities | | | (14,294) | | (49,364) | (70,207) |
| Change in cash and cash equivalents | | | 8,962 | | 53,711 | 3,378 |
| Cash and cash equivalents at beginning of year | | | 163,495 | | 109,784 | 106,406 |
| Cash and cash equivalents at end of year | | $ | 172,457 | S | 163,495 | $ 109,784 |
| **Supplemental information** | | | | | | |
| Income taxes paid (refunded), net | | $ | 8,174 | S | 9,848 | $ (59) |
| Interest paid | | $ | 11,269 | S | 8,909 | $ 8,121 |

*See accompanying notes.*

F-8

TABLE OF CONTENTS

**James River Group Holdings, LTD. and Subsidiaries**

**Notes to Consolidated Financial Statements**
**Years ended December 2018, 2017, and 2016**

## 1.  Accounting Policies

### Organization

James River Group Holdings, Ltd. (referred to as "JRG Holdings" or, with its subsidiaries, the "Company") is an exempted holding company registered in Bermuda, organized for the purpose of acquiring and managing insurance and reinsurance entities.

The Company owns five insurance companies based in the United States ("U.S.") focused on specialty insurance niches and two Bermuda-based reinsurance companies as described below:

- James River Group Holdings UK Limited ("James River UK") is an insurance holding company formed in 2015 in the United Kingdom ("U.K."). The Company contributed James River Group, Inc. ("James River Group"), a U.S. insurance holding company, to James River UK in 2015.

- James River Group is a Delaware domiciled insurance holding company formed in 2002, which owns all of the Company's U.S.-based subsidiaries, either directly or indirectly through one of its wholly-owned U.S. subsidiaries. James River Group oversees the Company's U.S. insurance operations and maintains all of the outstanding debt in the U.S.

- James River Insurance Company ("James River Insurance") is an Ohio domiciled excess and surplus lines insurance company that, with its wholly-owned insurance subsidiary, James River Casualty Company, is authorized to write business in every state and the District of Columbia.

- Falls Lake National Insurance Company ("Falls Lake National") is an Ohio domiciled insurance company which wholly owns Stonewood Insurance Company ("Stonewood Insurance"), a North Carolina domiciled company, and Falls Lake Fire and Casualty Company, a California domiciled company. Falls Lake National began writing specialty admitted fronting and program business in late 2013. Falls Lake Fire and Casualty Company began operations in 2016.

- JRG Reinsurance Company, Ltd. ("JRG Re") was formed in 2007 and commenced operations in 2008. JRG Re, a Bermuda domiciled reinsurer, primarily provides non-catastrophe casualty reinsurance to U.S. third parties and to the Company's U.S.-based insurance subsidiaries.

- Carolina Re Ltd ("Carolina Re") was formed in 2018 and provides reinsurance to the Company's U.S.-based insurance subsidiaries. Carolina Re is also the cedent on a stop loss reinsurance treaty with JRG Re.

### Basis of Presentation and Principles of Consolidation

The consolidated financial statements are prepared in accordance with U.S. generally accepted accounting principles ("GAAP"), which vary in some respects from statutory accounting practices ("SAP") which are prescribed or permitted by the various state insurance departments in the U.S. or by insurance regulators in Bermuda. The accompanying consolidated financial statements include the accounts and operations of the Company and its subsidiaries. Intercompany transactions and balances have been eliminated.

### Estimates and Assumptions

Preparation of the consolidated financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the amounts reported in the consolidated financial statements and accompanying disclosures. Those estimates are inherently subject to change, and actual results may ultimately differ from those estimates.

### Fixed Maturity and Equity Securities

Fixed maturity securities classified as "available-for-sale" are carried at fair value, and unrealized gains and losses on such securities, net of any deferred taxes, are reported as a separate component of accumulated other comprehensive income. Fixed maturity securities purchased for short-term resale are classified as "trading" and are carried at fair value with unrealized gains and losses included in earnings as a component of net investment income. The Company does not have any securities classified as "held-to-maturity".

Fair value generally represents quoted market value prices for securities traded in the public marketplace or prices analytically determined using bid or closing prices for securities not traded in the public marketplace.

F-9

TABLE OF CONTENTS

**James River Group Holdings, LTD. and Subsidiaries**

**Notes to Consolidated Financial Statements**
**Years ended December 2018, 2017, and 2016**

ranging from 7.0 to 27.5 years represent relationships with brokers. These intangible assets are amortized on a straight-line basis over their estimated useful lives.

Intangible assets with indefinite useful lives are reviewed for impairment at least annually. In evaluating whether there has been impairment to the intangible asset, management determines the fair value of the intangible asset and compares the resulting fair value to the carrying value of the intangible asset. If the carrying value exceeds the fair value, the intangible asset is written down to fair value, and the impairment is reported through earnings. The Company evaluates intangible assets with definite lives for impairment when impairment indicators are noted.

**Impairment of Long-Lived Assets**

Long-lived assets with finite lives are tested for impairment whenever recognized events or changes in circumstances indicate the carrying value of these assets may not be recoverable. If indicators of impairment are present, fair value is calculated using estimated future cash flows expected to be generated from the use of those assets. An impairment loss is recognized only if the carrying amount of a long-lived asset or asset group is not recoverable and exceeds its fair value. The carrying amount of a long-lived asset or asset group is not recoverable if it exceeds the sum of the undiscounted cash flows expected to result from the use and eventual disposition of the asset or asset group. That assessment is based on the carrying amount of the asset or asset group at the date it is tested for recoverability. An impairment loss is measured as the amount by which the carrying amount of a long-lived asset or asset group exceeds its fair value.

**Property and Equipment, Net**

Property and equipment, which is included in "other assets" in the accompanying consolidated balance sheets, is reported at cost less accumulated depreciation and is depreciated principally on a straight-line basis over the estimated useful lives of the depreciable assets, generally three to ten years.

In the event the Company has been deemed the owner for accounting purposes of construction projects in lease arrangements, the estimated construction costs incurred to date are recorded as assets in property and equipment, net and included in "other assets" in the accompanying consolidated balance sheets. Upon occupancy of facilities under lease, the Company assesses whether arrangements qualify for sales recognition under the sale-leaseback accounting guidance. If the Company continues to be the deemed owner for accounting purposes, the cost of the building is depreciated over its estimated useful life.

**Reserve for Losses and Loss Adjustment Expenses**

The reserve for losses and loss adjustment expenses represents the estimated ultimate cost of all reported and unreported losses and loss adjustment expenses incurred and unpaid at the balance sheet date. The Company does not discount this reserve. The process of estimating the reserve for losses and loss adjustment expenses requires a high degree of judgment and is subject to a number of variables. The reserve for losses and loss adjustment expenses is estimated using individual case-basis valuations and statistical analyses. Those estimates are subject to the effects of trends in loss severity and frequency.

The Company utilizes various actuarially-accepted reserving methodologies in determining the continuum of expected outcomes for its reserves. These methodologies utilize various inputs, including management's initial expected loss ratio (the ratio of losses and loss adjustment expenses incurred to net earned premiums), expected reporting patterns and payment patterns for losses and loss adjustment expenses (based on insurance industry data and the Company's own experience), and the Company's actual paid and reported losses and loss adjustment expenses. An internal actuary reviews these results and (after applying appropriate professional judgment and other actuarial techniques that are considered necessary) presents recommendations to the Company's management. Management uses this information and its judgment to make decisions on the final recorded reserve for losses and loss adjustment expenses. Management believes that the use of judgment is necessary to arrive at a best estimate for the reserve for losses and loss adjustment expenses given the long-tailed nature of the business generally written by the Company and the limited operating experience of the Casualty Reinsurance segment, the fronting and program business in the Specialty Admitted Insurance segment, and the commercial auto business in the Excess and Surplus Lines segment.

Catastrophes of significant magnitude, including hurricanes and earthquakes, involve complex coverage issues. In estimating the reserve for losses and loss adjustment expenses for these catastrophes, management uses case reserve estimates based on information obtained from site inspections by the Company's adjustors and the terms of coverage provided in the policies. Management estimates reserves for incurred but not reported claims for these catastrophes using judgment based on an assessment of the Company's property insurance exposures where the catastrophes occur and the Company's progress in settling claims.

TABLE OF CONTENTS

**James River Group Holdings, LTD. and Subsidiaries**

**Notes to Consolidated Financial Statements**
**Years ended December 2018, 2017, and 2016**

Although management believes that the reserve for losses and loss adjustment expenses is reasonable, it is possible that the Company's actual incurred losses and loss adjustment expenses will not develop in a manner consistent with the assumptions inherent in the determination of these reserves. Specifically, the Company's actual ultimate loss ratio could differ from management's initial expected loss ratio and/or the Company's actual reporting patterns for losses could differ from the expected reporting patterns. Accordingly, the ultimate settlement of losses and the related loss adjustment expenses may vary significantly from the estimates included in the Company's consolidated financial statements. These estimates are reviewed continually by management and are adjusted as necessary as experience develops or new information becomes known; such adjustments are included in current operations.

**Share Based Compensation**

The Company expenses the fair value of share equity awards over the vesting period of the award on a straight-line basis. The Black-Scholes-Merton option pricing model is used to value the options granted (see Note 11). Forfeitures of share-based awards are recognized as they occur. As the share based compensation expense is incurred, a corresponding increase to additional paid-in capital in shareholders' equity is recognized. Share based compensation expense is reflected in "other operating expenses" in the accompanying consolidated statements of income and comprehensive income.

**Financing Obligations**

In a lease arrangement where the Company made a minority investment in a partnership that was involved in the construction of a building, the Company was deemed the owner for accounting purposes during the construction period. The Company recorded an asset for the amount of the total project costs and the related financing obligation is included in "other liabilities" in the accompanying consolidated balance sheets. Once construction was completed, the Company determined the arrangement did not qualify for sale-lease back treatment. Accordingly, the Company continues to reduce the obligation over the lease term as payments are made and depreciates the asset over its useful life. The Company does not report rent expense for the portion of the rent payment determined to be related to the assets which are owned for accounting purposes. Rather, this portion of the rent payment under the lease is recognized as a reduction of the financing obligation and as interest expense.

Upon adoption of ASU 2016-02, *Leases (Topic 842)* on January 1, 2019, the Company will derecognize assets of $22.6 million and liabilities of $30.9 million associated with the above lease that was designated as build-to-suit under the previous guidance, and record a cumulative-effect adjustment to retained earnings of $8.3 million. The lease will be classified as an operating lease under the new standard. The Company will record a right-of-use asset and lease liability for the lease under the new standard.

**Variable Interest Entities**

Entities that do not have sufficient equity at risk to allow the entity to finance its activities without additional financial support or in which the equity investors, as a group, do not have the characteristic of a controlling financial interest are referred to as variable interest entities ("VIE"). A VIE is consolidated by the variable interest holder that is determined to have the controlling financial interest (primary beneficiary) as a result of having both the power to direct the activities of a VIE that most significantly impact the VIE's economic performance and the obligation to absorb losses or right to receive benefits from the VIE that could potentially be significant to the VIE. The Company determines whether it is the primary beneficiary of an entity subject to consolidation based on a qualitative assessment of the VIE's capital structure, contractual terms, nature of the VIE's operations and purpose, and the Company's relative exposure to the related risks of the VIE on the date it becomes initially involved in the VIE. The Company reassesses its VIE determination with respect to an entity on an ongoing basis.

The Company holds interests in VIEs through certain equity method investments included in "other invested assets" in the accompanying consolidated balance sheets. The Company has determined that it should not consolidate any of the VIEs as it is not the primary beneficiary in any of the relationships. Although the investments resulted in the Company holding variable interests in the entities, they did not empower the Company to direct the activities that most significantly impact the economic performance of the entities. The Company's investments related to these VIEs totaled $29.8 million and $32.1 million as of December 31, 2018 and 2017, respectively, representing the Company's maximum exposure to loss.

**Earnings Per Share**

Basic earnings per share excludes dilution and is computed by dividing net income by the weighted-average number of common shares outstanding for the period. Diluted earnings per share reflects the dilution that could occur if securities or other contracts to issue common shares or common share equivalents were exercised or converted into common shares as calculated using the treasury stock method. When inclusion of common share equivalents increases the earnings per share or reduces the

TABLE OF CONTENTS

**James River Group Holdings, LTD. and Subsidiaries**

**Notes to Consolidated Financial Statements**
**Years ended December 2018, 2017, and 2016**

Amortization of intangible assets was $362,000 for the Excess and Surplus Lines segment and $235,000 for the Specialty Admitted Insurance segment for the year ended December 31, 2016.

## 5. Property and Equipment, Net

Property and equipment, net of accumulated depreciation, is included in "other assets" on the consolidated balance sheets and consists of the following:

|  | December 31, | |
|---|---|---|
|  | 2018 | 2017 |
|  | (in thousands) | |
| Building, leased for which the Company has been deemed the owner for accounting purposes (Note 21) | $ 30,971 | $ 30,902 |
| Electronic data processing hardware and software | 7,423 | 6,156 |
| Furniture and equipment | 2,662 | 2,659 |
| Property and equipment, cost basis | 41,056 | 39,717 |
| Accumulated depreciation | (17,745) | (14,716) |
| Property and equipment, net | $ 23,311 | $ 25,001 |

## 6. Reserve for Losses and Loss Adjustment Expenses

In establishing the reserve for losses and loss adjustment expenses, the Company's internal actuaries estimate an initial expected ultimate loss ratio for each of our lines of business by accident year (or for our Casualty Reinsurance segment, on a contract by contract basis). Input from the Company's underwriting and claims departments, including premium pricing assumptions and historical experience, are considered by the Company's internal actuaries in estimating the initial expected loss ratios. The Company's internal actuaries generally utilize five actuarial methods in their estimation process for the reserve for losses and loss adjustment expenses. These five methods utilize, to varying degrees, the initial expected loss ratio, detailed statistical analysis of past claims reporting and payment patterns, claims frequency and severity, paid loss experience, industry loss experience, and changes in market conditions, policy forms, exclusions, and exposures.

In applying these methods to develop an estimate of the reserve for losses and loss adjustment expenses, our internal actuaries use judgment to determine three key parameters for each accident year and line of business: the initial expected loss ratios, the incurred and paid loss development factors and the weighting of the five actuarial methods to be used for each accident year and line of business. For the Excess and Surplus Lines and Specialty Admitted Insurance segments, the internal actuaries perform a study on each of these parameters annually and make recommendations for the initial expected loss ratios, the incurred and paid loss development factors and the weighting of the five actuarial methods by accident year and line of business. Members of management's Reserve Committee review and approve the parameter review actuarial recommendations, and these approved parameters are used in the reserve estimation process for the next four quarters at which time a new parameter study is performed. For the Casualty Reinsurance segment, periodic assessments are made on a contract by contract basis with the goal of keeping the initial expected loss ratios and the incurred and paid loss development factors as constant as possible until sufficient evidence presents itself to support adjustments. Method weights are generally less rigid for the Casualty Reinsurance segment given the heterogeneous nature of the various contracts, and the potential for significant changes in mix of business within individual treaties.

Different reserving methods are appropriate in different situations, and the Company's internal actuaries use their judgment and experience to determine the weighting of the methods to use for each accident year and each line of business and, for our Casualty Reinsurance segment, on a contract by contract basis. For example, the current accident year has very little incurred and paid loss development data on which to base reserve projections. As a result, the Company relies heavily on the initial expected loss ratio in estimating reserves for the current accident year. The Company generally sets the initial expected loss ratio for the current accident year consistent with the internal actuaries' pricing assumptions. We believe that this is a reasonable and appropriate reserving assumption for the current accident year since our pricing assumptions are actuarially driven and since the Company expects to make an acceptable return on the new business written. If actual loss emergence is better than our initial expected loss ratio assumptions, we will experience favorable development and if it is worse than our initial expected loss ratio assumptions, we will experience adverse development. Conversely, sufficient incurred and paid loss

F-24

TABLE OF CONTENTS

**James River Group Holdings, LTD. and Subsidiaries**

**Notes to Consolidated Financial Statements**
**Years ended December 2018, 2017, and 2016**

development data is available for the oldest accident years, so more weight is given to this development data and less weight is given to the initial expected loss ratio.

The following table provides a reconciliation of the beginning and ending reserve balances for losses and loss adjustment expenses, net of reinsurance, to the gross amounts reported in the consolidated balance sheets:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2018 | 2017 | 2016 |
| | *(in thousands)* | | |
| Reserve for losses and loss adjustment expenses net of reinsurance recoverables at beginning of period | $ 989,825 | $ 761,128 | $ 653,534 |
| Add: Incurred losses and loss adjustment expenses net of reinsurance: | | | |
| Current year | 582,604 | 533,905 | 349,137 |
| Prior years | 17,672 | 21,472 | (23,716) |
| Total incurred losses and loss and adjustment expenses | 600,276 | 555,377 | 325,421 |
| Deduct: Loss and loss adjustment expense payments net of reinsurance: | | | |
| Current year | 86,355 | 103,205 | 39,473 |
| Prior years | 309,658 | 223,475 | 178,354 |
| Total loss and loss adjustment expense payments | 396,013 | 326,680 | 217,827 |
| Reserve for losses and loss adjustment expenses net of reinsurance recoverables at end of period | 1,194,088 | 989,825 | 761,128 |
| Add: Reinsurance recoverables on unpaid losses and loss adjustment expenses at end of period | 467,371 | 302,524 | 182,737 |
| Reserve for losses and loss adjustment expenses gross of reinsurance recoverables on unpaid losses and loss adjustment expenses at end of period | $ 1,661,459 | $ 1,292,349 | $ 943,865 |

The foregoing reconciliation shows that $17.7 million of adverse development was experienced in 2018 on the reserve for losses and loss adjustment expenses held at December 31, 2017. This adverse reserve development included $15.0 million of adverse development in the Excess and Surplus Lines segment, including $20.7 million of adverse development in the commercial auto line of business that was primarily related to the 2016 contract year with one insured. The adverse development for commercial auto was partially offset by $5.7 million of favorable development in other Excess and Surplus Lines underwriting divisions primarily from favorable development in the Excess Property underwriting division related to the 2017 hurricanes. Favorable reserve development in the Specialty Admitted Insurance segment was $5.6 million and primarily came from accident years 2014 through 2016, as loss emergence on our workers' compensation business written prior to 2016 continued to develop more favorably than we had anticipated. In addition, $8.2 million of adverse development occurred in the Casualty Reinsurance segment, with a majority of this adverse development coming from accident years at least four years old and treaties the Company has since non-renewed.

The foregoing reconciliation shows that $21.5 million of adverse development was experienced in 2017 on the reserve for losses and loss adjustment expenses held at December 31, 2016. This adverse reserve development included $20.0 million of adverse development in the Excess and Surplus Lines segment, including $38.7 million of adverse development in the commercial auto line of business that was primarily related to the 2016 contract year with one insured. The adverse development for commercial auto was partially offset by favorable development of $18.6 million in other Excess and Surplus Lines underwriting divisions primarily from the 2014 through 2016 accident years. This favorable development occurred because our actuarial studies at December 31, 2017 for the Excess and Surplus Lines segment indicated that our loss experience on our casualty business excluding commercial auto continued to be below our initial expected ultimate loss ratios. The Company also experienced $2.7 million of favorable development on prior accident years in the Specialty Admitted Insurance segment primarily from accident years 2010 through 2015, as losses on our workers' compensation business written prior to 2016 continued to develop more favorably than we had anticipated. The Casualty Reinsurance segment experienced $4.2 million of adverse development on prior accident years primarily from two contracts from 2010 through 2013 that had higher than expected reported losses in 2017.

The foregoing reconciliation shows that a $23.7 million redundancy developed in 2016 on the reserve for losses and loss adjustment expenses held at December 31, 2015. This favorable reserve development included $24.1 million of favorable

F-25

TABLE OF CONTENTS

**James River Group Holdings, LTD. and Subsidiaries**

**Notes to Consolidated Financial Statements**
**Years ended December 2018, 2017, and 2016**

development in the Excess and Surplus Lines segment primarily from the 2013, 2014 and 2015 accident years with favorable development of $4.5 million, $10.7 million and $10.0 million, respectively. This favorable development occurred because our actuarial studies at December 31, 2016 for the Excess and Surplus Lines segment indicated that our loss experience on our casualty business continued to be below our initial expected ultimate loss ratios. The Company also experienced $3.8 million of favorable development on prior accident years in the Specialty Admitted Insurance segment primarily from accident years 2010 through 2014, as losses on our workers' compensation business written prior to 2015 continued to develop more favorably than we had anticipated. The Casualty Reinsurance segment experienced $4.2 million of adverse development on prior accident years primarily from two contracts from 2012 and 2013 that had higher than expected reported losses in 2016.

The following tables present incurred and paid losses and loss adjustment expenses, net of reinsurance as of December 31, 2018 for: (1) the Excess and Surplus Lines segment split between all excess and surplus lines business excluding commercial auto and commercial auto, (2) the Specialty Admitted Insurance segment split between individual risk workers' compensation and fronting and programs, and (3) the Casualty Reinsurance segment. The information provided herein about incurred and paid accident year claims development for the years ended December 31, 2017 and prior is presented as unaudited supplementary information.

**Excess and Surplus Lines — Excluding Commercial Auto**

**Incurred losses and loss adjustment expenses, net of reinsurance (in thousands)**

| Accident Year | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|---|---|---|---|---|
| 2009 | $ 114,834 | $ 110,783 | $ 106,480 | $ 98,502 | $ 86,691 | $ 81,764 | $ 83,431 | $ 83,846 | $ 85,470 | $ 85,807 |
| 2010 | | 78,424 | 80,569 | 78,117 | 73,035 | 69,080 | 69,964 | 70,294 | 70,913 | 71,312 |
| 2011 | | | 111,190 | 119,927 | 114,473 | 106,564 | 106,381 | 106,130 | 106,643 | 106,536 |
| 2012 | | | | 97,908 | 98,672 | 97,829 | 96,497 | 97,306 | 99,619 | 101,271 |
| 2013 | | | | | 96,729 | 96,064 | 85,433 | 81,009 | 82,830 | 83,855 |
| 2014 | | | | | | 114,942 | 104,092 | 90,267 | 82,232 | 84,074 |
| 2015 | | | | | | | 126,443 | 113,417 | 104,847 | 102,434 |
| 2016 | | | | | | | | 138,507 | 125,093 | 126,050 |
| 2017 | | | | | | | | | 144,349 | 131,897 |
| 2018 | | | | | | | | | | 167,004 |
| Total | | | | | | | | | | $ 1,060,240 |

**Cumulative paid losses and loss adjustment expenses, net of reinsurance (in thousands)**

| Accident Year | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|---|---|---|---|---|
| 2009 | $ 29,860 | $ 41,687 | $ 51,731 | $ 61,548 | $ 67,293 | $ 71,245 | $ 76,091 | $ 79,014 | $ 81,496 | $ 82,560 |
| 2010 | | 13,673 | 26,418 | 35,812 | 45,641 | 52,071 | 57,371 | 61,307 | 64,214 | 65,246 |
| 2011 | | | 27,684 | 53,109 | 72,732 | 81,696 | 90,884 | 94,998 | 98,684 | 99,798 |
| 2012 | | | | 6,944 | 33,757 | 49,604 | 63,216 | 74,869 | 82,545 | 88,812 |
| 2013 | | | | | 3,867 | 14,509 | 30,382 | 44,421 | 59,641 | 66,553 |
| 2014 | | | | | | 3,412 | 16,969 | 28,212 | 43,891 | 58,774 |
| 2015 | | | | | | | 4,048 | 17,164 | 34,801 | 55,911 |
| 2016 | | | | | | | | 5,180 | 22,852 | 46,045 |
| 2017 | | | | | | | | | 5,290 | 22,956 |
| 2018 | | | | | | | | | | 6,000 |
| Total | | | | | | | | | | $ 592,655 |

All outstanding losses and loss adjustment expenses prior to 2009, net of reinsurance (33 claims outstanding)   $ 12,187

| | |
|---|---|
| Total outstanding losses and loss adjustment expenses, net of reinsurance | $ 479,772 |

F-26

TABLE OF CONTENTS

**James River Group Holdings, LTD. and Subsidiaries**

**Notes to Consolidated Financial Statements**
**Years ended December 2018, 2017, and 2016**

**Excess and Surplus Lines — Commercial Auto**

**Incurred losses and adjustment expenses, net of reinsurance (in thousands)**

| Accident Year | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|---|
| 2013 | $ 1,255 | $ 1,300 | $ 1,451 | $ 1,351 | $ 1,301 | $ 1,277 |
| 2014 | | 20,487 | 14,071 | 17,233 | 18,953 | 19,779 |
| 2015 | | | 30,109 | 33,113 | 35,149 | 36,139 |
| 2016 | | | | 74,340 | 109,286 | 126,791 |
| 2017 | | | | | 207,355 | 208,743 |
| 2018 | | | | | | 255,881 |
| Total | | | | | | $ 648,610 |

**Cumulative paid losses and loss adjustment expenses, net of reinsurance (in thousands)**

| Accident Year | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|---|
| 2013 | $ 60 | $ 1,182 | $ 1,285 | $ 1,291 | $ 1,275 | $ 1,275 |
| 2014 | | 6,166 | 8,645 | 12,679 | 16,359 | 18,678 |
| 2015 | | | 8,356 | 15,234 | 24,282 | 31,592 |
| 2016 | | | | 18,295 | 54,054 | 89,381 |
| 2017 | | | | | 41,467 | 107,377 |
| 2018 | | | | | | 45,136 |
| Total | | | | | | $ 293,439 |
| Total outstanding losses and loss adjustment expenses, net of reinsurance | | | | | | $ 355,171 |

**Specialty Admitted — Individual Risk Workers' Compensation**

**Incurred losses and loss adjustment expenses, net of reinsurance (in thousands)**

| Accident Year | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|---|---|---|---|---|
| 2009 | $ 28,691 | $ 28,526 | $ 27,535 | $ 28,116 | $ 27,795 | $ 26,171 | $ 26,169 | $ 26,232 | $ 26,194 | $ 25,660 |
| 2010 | | 27,209 | 28,736 | 30,464 | 30,373 | 28,963 | 28,938 | 27,590 | 27,098 | 27,099 |
| 2011 | | | 37,834 | 41,421 | 40,154 | 38,999 | 38,311 | 37,455 | 36,594 | 36,593 |
| 2012 | | | | 32,116 | 32,420 | 31,490 | 29,689 | 28,255 | 28,174 | 28,186 |
| 2013 | | | | | 12,525 | 13,668 | 12,786 | 11,578 | 10,907 | 10,909 |
| 2014 | | | | | | 16,638 | 16,652 | 14,620 | 13,890 | 12,704 |
| 2015 | | | | | | | 20,938 | 21,274 | 19,741 | 18,376 |
| 2016 | | | | | | | | 21,678 | 20,299 | 18,050 |
| 2017 | | | | | | | | | 24,869 | 22,071 |
| 2018 | | | | | | | | | | 16,432 |
| Total | | | | | | | | | | $ 216,080 |

TABLE OF CONTENTS

**James River Group Holdings, LTD. and Subsidiaries**

**Notes to Consolidated Financial Statements**
**Years ended December 2018, 2017, and 2016**

**Cumulative paid losses and loss adjustment expenses, net of reinsurance (in thousands)**

| Accident Year | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|---|---|---|---|---|
| 2009 | $ 7,277 | $ 16,945 | $ 21,095 | $ 22,646 | $ 24,231 | $ 24,192 | $ 24,350 | $ 24,418 | $ 25,660 | $ 25,660 |
| 2010 | | 7,157 | 16,245 | 21,805 | 23,898 | 25,210 | 25,477 | 26,345 | 26,352 | 26,358 |
| 2011 | | | 10,123 | 23,127 | 29,021 | 33,204 | 34,240 | 34,287 | 34,334 | 34,614 |
| 2012 | | | | 9,222 | 20,308 | 24,755 | 26,435 | 26,897 | 26,932 | 26,963 |
| 2013 | | | | | 4,487 | 8,723 | 9,846 | 10,246 | 10,263 | 10,309 |
| 2014 | | | | | | 4,633 | 10,648 | 12,041 | 12,236 | 12,282 |
| 2015 | | | | | | | 6,604 | 13,285 | 15,118 | 15,889 |
| 2016 | | | | | | | | 4,664 | 10,227 | 12,135 |
| 2017 | | | | | | | | | 6,546 | 12,782 |
| 2018 | | | | | | | | | | 4,497 |
| Total | | | | | | | | | | $ 181,489 |

| | |
|---|---|
| All outstanding losses and loss adjustment expenses prior to 2009, net of reinsurance (4 claims outstanding) | $ 1,056 |
| Outstanding losses and loss adjustment expenses assumed from involuntary workers' compensation pools | $ 4,966 |
| Total outstanding losses and loss adjustment expenses, net of reinsurance | $ 40,613 |

**Specialty Admitted — Fronting and Programs**

**Incurred losses and loss adjustment expenses, net of reinsurance (in thousands)**

| Accident Year | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|---|
| 2013 | $ 104 | $ 80 | $ 52 | $ 52 | $ 52 | $ 52 |
| 2014 | | 3,460 | 3,468 | 3,818 | 3,425 | 3,228 |
| 2015 | | | 7,136 | 9,632 | 9,358 | 8,974 |
| 2016 | | | | 11,542 | 15,670 | 14,682 |
| 2017 | | | | | 21,229 | 24,271 |
| 2018 | | | | | | 21,758 |
| Total | | | | | | $ 72,965 |

**Cumulative paid losses and loss adjustment expenses, net of reinsurance (in thousands)**

| Accident Year | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|---|
| 2013 | $ 28 | $ 52 | $ 52 | $ 52 | $ 52 | $ 52 |
| 2014 | | 883 | 1,687 | 2,369 | 2,728 | 2,854 |
| 2015 | | | 2,058 | 4,666 | 6,165 | 6,919 |
| 2016 | | | | 1,894 | 5,123 | 6,888 |
| 2017 | | | | | 1,223 | 6,682 |
| 2018 | | | | | | $ 885 |
| Total | | | | | | $ 24,280 |
| Total outstanding losses and loss adjustment expenses, net of reinsurance | | | | | | $ 48,685 |

F-28

TABLE OF CONTENTS

**James River Group Holdings, LTD. and Subsidiaries**

**Notes to Consolidated Financial Statements**
**Years ended December 2018, 2017, and 2016**

**Casualty Reinsurance**

**Incurred losses and loss adjustment expenses, net of reinsurance (in thousands)**

| Accident Year | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|---|---|---|---|---|
| 2009 | $ 34,587 | $ 28,244 | $ 24,125 | $ 26,458 | $ 27,078 | $ 27,116 | $ 26,989 | $ 26,931 | $ 26,980 | $ 27,168 |
| 2010 | | 64,413 | 60,476 | 61,068 | 62,714 | 61,344 | 60,949 | 60,978 | 61,619 | 62,605 |
| 2011 | | | 114,908 | 103,123 | 97,366 | 97,812 | 98,993 | 99,282 | 101,276 | 103,196 |
| 2012 | | | | 148,251 | 132,388 | 131,281 | 135,594 | 136,813 | 139,978 | 143,305 |
| 2013 | | | | | 133,230 | 130,361 | 131,352 | 134,446 | 137,801 | 143,124 |
| 2014 | | | | | | 118,881 | 115,927 | 114,636 | 116,981 | 121,200 |
| 2015 | | | | | | | 119,157 | 108,870 | 108,699 | 109,117 |
| 2016 | | | | | | | | 112,759 | 105,533 | 103,544 |
| 2017 | | | | | | | | | 134,628 | 128,472 |
| 2018 | | | | | | | | | | 121,529 |
| Total | | | | | | | | | | $ 1,063,260 |

**Cumulative paid losses and loss adjustment expenses, net of reinsurance (in thousands)**

| Accident Year | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|---|---|---|---|---|
| 2009 | $ 6,487 | $ 9,926 | $ 12,956 | $ 16,466 | $ 19,672 | $ 21,646 | $ 23,024 | $ 23,796 | $ 24,649 | $ 25,209 |
| 2010 | | 21,918 | 31,500 | 38,430 | 44,921 | 49,263 | 52,761 | 54,659 | 57,013 | 58,707 |
| 2011 | | | 48,688 | 61,922 | 68,616 | 78,164 | 87,267 | 90,287 | 94,627 | 97,715 |
| 2012 | | | | 73,124 | 81,859 | 97,215 | 113,943 | 121,026 | 128,567 | 133,606 |
| 2013 | | | | | 59,756 | 75,094 | 93,902 | 108,396 | 119,256 | 127,732 |
| 2014 | | | | | | 41,421 | 58,601 | 76,302 | 89,899 | 101,366 |
| 2015 | | | | | | | 40,021 | 53,986 | 68,002 | 80,208 |
| 2016 | | | | | | | | 36,268 | 50,905 | 65,409 |
| 2017 | | | | | | | | | 47,739 | 72,891 |
| 2018 | | | | | | | | | | 30,903 |
| Total | | | | | | | | | | $ 793,746 |
| All outstanding losses and loss adjustment expenses prior to 2009, net of reinsurance | | | | | | | | | | $ 333 |
| Total outstanding losses and loss adjustment expenses, net of reinsurance | | | | | | | | | | $ 269,847 |

The reconciliation of the net incurred and paid claims development tables to the reserve for losses and loss adjustment expenses in the consolidated balance sheet at December 31, 2018 is as follows (in thousands):

| | | |
|---|---|---|
| E&S – excluding commercial auto | $ | 479,772 |
| E&S – commercial auto | | 355,171 |
| Specialty Admitted – individual risk workers' compensation | | 40,613 |
| Specialty Admitted – fronting and programs | | 48,685 |
| Casualty Reinsurance | | 269,847 |
| Net reserve for losses and loss adjustment expenses | | 1,194,088 |
| Reinsurance recoverables on unpaid losses | | 467,371 |
| Gross reserve for losses and loss adjustment expenses | $ | 1,661,459 |

The following is unaudited supplementary information about average annual percentage payouts of incurred claims by age, net of reinsurance, for the Excess and Surplus Lines segment and the Specialty Admitted Insurance segments as of December 31, 2018. The Specialty Admitted Insurance segment's first full year of writing fronting and programs business was 2014, so the average annual percentage payouts for fronting and programs only shows five years of payout information.

F-29

**James River Group Holdings, LTD. and Subsidiaries**

**Notes to Consolidated Financial Statements**
**Years ended December 2018, 2017, and 2016**

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| E&S – excluding commercial auto | 10.0% | 16.0% | 17.4% | 18.0% | 14.5% | 7.9% | 5.6% | 3.4% | 1.1% | 2.3% |
| E&S – commercial auto | 21.0% | 38.9% | 15.6% | 14.3% | 6.5% | 3.7% | | | | |
| Specialty Admitted – individual risk workers' compensation | 28.7% | 33.8% | 13.8% | 6.2% | 3.3% | 1.3% | 1.0% | 0.2% | 0.5% | 0.0% |
| Specialty Admitted – fronting and programs | 7.7% | 16.7% | 7.2% | 1.5% | 0.2% | | | | | |
| Casualty Reinsurance | 27.5% | 17.7% | 12.5% | 8.7% | 6.1% | 4.5% | 3.4% | 2.7% | 2.2% | 1.9% |

In determining the cumulative number of reported claims, the Company measures claim counts by individual claimant for individual risk workers' compensation policies in the Specialty Admitted Insurance segment. In the Excess and Surplus Lines insurance segment and for fronting and programs in the Specialty Admitted Insurance segment, the Company measures claim counts by claim event. The claim counts include all claims reported, even if the Company does not establish a liability for the claim (i.e. reserve for loss and loss adjustment expenses).

The Casualty Reinsurance segment typically assumes written premium under quota share arrangements. The Company typically does not have direct access to claim frequency information underlying its assumed quota arrangements given the nature of that business. In addition, multiple claims are often aggregated by the ceding company before being reported to the Company. We do not use claim frequency information in the Casualty Reinsurance segment in the determination of loss reserves or for other internal purposes. Based on these considerations, the Company does not believe providing claims frequency information is practicable as it relates to the Casualty Reinsurance segment.

The table below provides information on IBNR liabilities and claims frequency for: (1) the Excess and Surplus Lines segment split between commercial auto and all non commercial auto, and (2) the Specialty Admitted Insurance segment split between individual risk workers' compensation and fronting and programs:

**Excess and Surplus Lines — Excluding Commercial Auto**

| Accident Year | Incurred Losses and Loss Adj Expenses | | IBNR | Cumulative # of Reported Claims |
|---|---|---|---|---|
| | | ($ in thousands) | | |
| 2009 | $ | 85,807 | $ 2,188 | 1,698 |
| 2010 | | 71,312 | 2,890 | 1,380 |
| 2011 | | 106,536 | 3,919 | 1,465 |
| 2012 | | 101,271 | 4,339 | 1,765 |
| 2013 | | 83,855 | 10,248 | 2,298 |
| 2014 | | 84,074 | 12,440 | 2,106 |
| 2015 | | 102,434 | 21,215 | 2,434 |
| 2016 | | 126,050 | 44,649 | 2,754 |
| 2017 | | 131,897 | 79,836 | 2,630 |
| 2018 | | 167,004 | 135,018 | 3,242 |

F-30

TABLE OF CONTENTS

**James River Group Holdings, LTD. and Subsidiaries**

**Notes to Consolidated Financial Statements**
**Years ended December 2018, 2017, and 2016**

**Excess and Surplus Lines — Commercial Auto**

| Accident Year | Incurred Losses and Loss Adj Expenses | IBNR | Cumulative # of Reported Claims |
|---|---|---|---|
| | *($ in thousands)* | | |
| 2013 | $ 1,277 | $ 1 | 54 |
| 2014 | 19,779 | 653 | 7,761 |
| 2015 | 36,139 | 1,761 | 41,723 |
| 2016 | 126,791 | 9,206 | 88,746 |
| 2017 | 208,743 | 23,777 | 132,191 |
| 2018 | 255,881 | 155,760 | 91,798 |

**Specialty Admitted - Individual Risk Workers' Compensation**

| Accident Year | Incurred Losses and Loss Adj Expenses | IBNR | Cumulative # of Reported Claims |
|---|---|---|---|
| | *($ in thousands)* | | |
| 2009 | $ 25,660 | $ — | $ 1,490 |
| 2010 | 27,099 | 699 | 1,604 |
| 2011 | 36,593 | 1,786 | 1,814 |
| 2012 | 28,186 | 1,020 | 1,323 |
| 2013 | 10,909 | 510 | 540 |
| 2014 | 12,704 | 422 | 850 |
| 2015 | 18,376 | 2,177 | 975 |
| 2016 | 18,050 | 5,010 | 833 |
| 2017 | 22,071 | 6,434 | 1,087 |
| 2018 | 16,432 | 5,422 | 1,170 |

**James River Group Holdings, LTD. and Subsidiaries**

**Notes to Consolidated Financial Statements**
**Years ended December 2018, 2017, and 2016**

**Specialty Admitted — Fronting and Programs**

| Accident Year | Incurred Losses and Loss Adj Expenses | IBNR | Cumulative # of Reported Claims |
|---|---|---|---|
| | ($ in thousands) | | |
| 2013 | $ 52 | $ — | 22 |
| 2014 | 3,228 | 238 | 856 |
| 2015 | 8,974 | 1,076 | 1,355 |
| 2016 | 14,682 | 3,203 | 2,792 |
| 2017 | 24,271 | 10,083 | 6,572 |
| 2018 | 21,758 | 16,058 | 5,874 |

**Casualty Reinsurance**

| Accident Year | Incurred Losses and Loss Adj Expenses | IBNR |
|---|---|---|
| | ($ in thousands) | |
| 2009 | $ 27,168 | $ 431 |
| 2010 | 62,605 | 937 |
| 2011 | 103,196 | 1,427 |
| 2012 | 143,305 | 2,397 |
| 2013 | 143,124 | 3,330 |
| 2014 | 121,200 | 5,450 |
| 2015 | 109,117 | 14,595 |
| 2016 | 103,544 | 26,675 |
| 2017 | 128,472 | 52,785 |
| 2018 | 121,529 | 55,052 |

The Company has not provided insurance coverage that could reasonably be expected to produce material levels of asbestos claims activity. In addition, management does not believe that the Company is exposed to environmental liability claims other than those which it has specifically underwritten and priced as an environmental exposure.

## 7.  Reinsurance

The Company remains liable to policyholders if its reinsurers are unable to meet their contractual obligations under applicable reinsurance agreements. To minimize exposure to significant losses from reinsurance insolvencies, the Company evaluates the financial condition of its reinsurers and monitors concentrations of credit risk. The Company's reinsurance contracts generally require reinsurers that are not authorized as reinsurers under U.S. state insurance regulations or that experience rating downgrades from rating agencies below specified levels to fund their share of the Company's ceded outstanding losses and loss adjustment expense reserves, typically through the use of irrevocable and unconditional letters of credit. In fronting arrangements, which the Company conducts through its Specialty Admitted Insurance segment, the Company is subject to credit risk with regard to insurance companies who act as reinsurers for the Company in such arrangements. The Company customarily requires a collateral trust arrangement to secure the obligations of the insurance entity for whom it is fronting.

At December 31, 2018, the Company had reinsurance recoverables on unpaid losses of $467.4 million and reinsurance recoverables on paid losses of $18.3 million. All material reinsurance recoverables are from companies with A.M. Best Company ratings of "A-" (Excellent) or better, or are collateralized with letters of credit or by a trust agreement.

At December 31, 2018, reinsurance recoverables on unpaid losses from the Company's three largest reinsurers were $151.6 million, $47.9 million, and $44.1 million, representing 52.1% of the total balance.

SCHEDULE II

## JAMES RIVER GROUP HOLDINGS, LTD. AND SUBSIDIARIES

### Condensed Financial Information of Registrant

### Notes to Condensed Financial Statements

## 1.  Accounting Policies

### Organization

James River Group Holdings, Ltd. (the "Company") is an exempted holding company registered in Bermuda, organized for the purpose of acquiring and managing insurance and reinsurance entities.

### Basis of Presentation

The accompanying condensed financial statements have been prepared using the equity method. Under the equity method, the investment in consolidated subsidiaries is stated at cost plus equity in undistributed earnings of consolidated subsidiaries since the date of acquisition. These condensed financial statements should be read in conjunction with the Company's consolidated financial statements.

### Estimates and Assumptions

Preparation of the financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the amounts reported in the financial statements and accompanying disclosures. Those estimates are inherently subject to change, and actual results may ultimately differ from those estimates.

### Adopted Accounting Standards

Effective January 1, 2018, the Company adopted ASU 2016-01, *Financial Instruments - Overall (Subtopic 825-10): Recognition and Measurement of Financial Assets and Financial Liabilities*. Among other things, this ASU requires equity investments (except those accounted for under the equity method of accounting or those that result in consolidation of the investee) to be measured at fair value with changes in fair value recognized in net income. Upon adoption on January 1, 2018, the Company made a $4.7 million cumulative-effect adjustment to increase retained earnings and reduce accumulated other comprehensive income. The adoption of ASU 2016-01 did not materially impact the Company's financial position, cash flows, or total comprehensive income. The Company's results of operations were impacted as changes in fair value of equity instruments are now presented in net income rather than other comprehensive (loss) income. For the year ended December 31, 2018, the respective impact on net income was a reduction of $4.7 million.

Effective January 1, 2018, the Company adopted ASU 2018-02, *Income Statement - Reporting Comprehensive Income (Topic 220): Reclassification of Certain Tax Effects from Accumulated Other Comprehensive Income*. This update was issued as a result of the enactment of Public Law No. 115-97, informally titled the Tax Cuts and Jobs Act (the "Tax Act"), on December 22, 2017. The ASU allows for the option to reclassify the stranded tax effects resulting from the implementation of the Tax Act out of accumulated other comprehensive income and into retained earnings. As the adoption of ASU 2016-01 in 2018 resulted in the reclassification of the entire unrealized balance on equity securities from accumulated other comprehensive income into retained earnings, only the stranded tax effects on the unrealized balances of fixed income securities were impacted by the adoption of ASU 2018-02. The reclassification resulted in a $711,000 decrease to the Company's retained earnings with a corresponding increase to accumulated other comprehensive income in the first quarter of 2018.

F-57