**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

|  |  |
|---|---|
| *In re James River Group Holdings, Ltd.*<br>*Securities Litigation* | Case: 3:21-cv-00444-MHL<br><br>Hon. M. Hannah Lauck<br><br><u>CLASS ACTION</u><br><br><u>JURY TRIAL DEMANDED</u> |

<u>**LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION**</u>
<u>**TO DEFENDANTS' MOTION TO DISMISS**</u>

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... iii

I.  INTRODUCTION ........................................................................................................... 1

II. FACTUAL BACKGROUND............................................................................................ 4

    A.  James River Insures Uber and Touts Its Careful Reserving Process ..................... 4

    B.  Unbeknownst to Investors, James River Was Suppressing Reserves
        Through Systemic Policies Directed by Management........................................... 6

    C.  James River Unexpectedly Terminates the Uber Contract but Falsely
        Assures Investors Reserves Are Sufficient and the Runoff Is Going Well ........... 7

    D.  The Truth Emerges: James River Takes a Massive $170 Million Charge
        and Admits That for Years It Used the "Wrong" Reserve Methodology ............... 8

III. ARGUMENT.................................................................................................................. 10

    A.  The Complaint Alleges Actionable Misrepresentations ...................................... 10

        1.  Defendants Misrepresented James River's Reserving Process................. 10

            a.  Defendants' Attempted Distinction Between "Case" and
               "Loss" Reserves Defies the Company's Own Disclosures........... 12

            b.  Defendants' Attacks on Their Former Employees Fail ............... 13

            c.  The Complaint Does Not Allege Fraud by Hindsight ................. 15

        2.  Defendants' Misrepresented the Adequacy of Reserves ......................... 16

        3.  Defendants Misrepresented the Status of the Runoff .............................. 18

        4.  Defendants Misrepresented That James River Complied with
            GAAP and Had Effective Internal Controls ........................................... 19

        5.  The "Forward Looking" Safe Harbor Does Not Apply ........................... 20

    B.  Plaintiffs Have Adequately Pled Scienter........................................................... 22

        1.  The Complaint Alleges a Strong Inference of Scienter ........................... 22

        2.  The FE Allegations Reinforce a Strong Scienter Inference..................... 26

        3.  The Opposing Inference of Non-Fraudulent Intent Is Not
            Compelling............................................................................................. 28

      C.      The Complaint Adequately Alleges Loss Causation ............................................. 30

      D.      The Complaint Adequately Alleges Control Person Liability ............................. 30

IV.    CONCLUSION ..................................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re 2U, Inc., Sec. Class Action*,
2021 WL 3418841 (D. Md. Aug. 5, 2021) ...............................................................................27

*Abramson v. Newlink Genetics Corp.*,
965 F.3d 165 (2d Cir. 2020)....................................................................................................18

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
324 F. Supp. 2d 474 (S.D.N.Y. 2004)......................................................................................27

*Black v. Martek Biosciences Corp.*,
2006 WL 8435572 (D. Md. June 14, 2006)..............................................................................27

*Cambridge Ret. Sys. v. Jeld-Wen Holding, Inc.*,
496 F. Supp. 3d 952 (E.D. Va. 2020) ......................................................................................10

*Carlucci v. Han*,
907 F. Supp. 2d 709 (E.D. Va. 2012) ......................................................................................22

*Chapman v. Mueller Water Prods., Inc.*,
466 F. Supp. 3d 382 (S.D.N.Y. 2020)......................................................................................20

*City of Pontiac Gen. Empls. Ret. Sys. v. Lockheed Martin Corp.*,
875 F. Supp. 2d 359 (S.D.N.Y. 2012)......................................................................................22

*In re Commtouch Software Ltd. Sec. Litig.*,
2002 WL 31417998 (N.D. Cal. July 24, 2002).........................................................................23

*Cozzarelli v. Inspire Pharms., Inc.*,
549 F.3d 618 (4th Cir. 2008) ...................................................................................................26

*In re Dynex Cap., Inc. Sec. Litig.*,
2009 WL 3380621 (S.D.N.Y. Oct. 19, 2009)...........................................................................20

*Epstein v. World Acceptance Corp.*,
2015 WL 2365701 (D.S.C. May 18, 2015)...............................................................................27

*Epstein v. World Acceptance Corp.*,
203 F. Supp. 3d 665 (D.S.C. 2016)....................................................................................10, 19

*In re EQT Corp. Sec. Litig.*,
504 F. Supp. 3d 474 (W.D. Pa. 2020) ......................................................................................14

*Freedman v. Value Health, Inc.*,
  958 F. Supp. 745 (D. Conn. 1997)................................................................................25

*Freudenberg v. E\*Trade Financial Corp.*,
  712 F. Supp. 2d 171 (S.D.N.Y. 2010)....................................................................10, 13

*In re Genworth Fin. Inc. Sec. Litig.*,
  103 F. Supp. 3d 759 (E.D. Va. 2015) ................................................................. passim

*Katyle v. Penn Nat. Gaming, Inc.*,
  637 F.3d 462 (4th Cir. 2011) ......................................................................................30

*KBC Asset Mgmt.NV v. 3D Sys. Corp.*,
  2016 WL 3981236 (D.S.C. July 25, 2016) ...........................................................24, 26

*KBC Asset Mgmt. NV v. DXC Tech. Co.*,
  19 F. 4th 601 (4th Cir. 2021) ...............................................................................25, 26

*Kiken v. Lumber Liquidators Holdings, Inc.*,
  155 F. Supp. 3d 593 (E.D. Va. 2015) ...................................................................23, 24

*Klein v. Altria Grp., Inc.*,
  525 F. Supp. 3d 638 (E.D. Va. 2021) ........................................................................14

*Knurr v. Orbital ATK Inc.*,
  294 F. Supp. 3d 498 (E.D. Va. 2018) ...................................................................23, 30

*Lefkoe v. Jos. A. Bank Clothiers*,
  2007 WL 6890353 (D. Md. Sept. 10, 2007) ..............................................................14

*Loc. 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*,
  2011 WL 12855820 (N.D. Ala. June 7, 2011)............................................................18

*Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*,
  363 F. Supp. 3d 476 (D. Del. 2019)......................................................10, 13, 15, 17

*Marsh Group v. Prime Retail, Inc.*,
  46 F. App'x 140 (4th Cir. 2002) .................................................................................21

*Matrix Cap. Mgmt. Fund LP v. BearingPoint, Inc.*,
  576 F.3d 172 (4th Cir. 2009) ......................................................................................23

*MAZ Partners LP v. First Choice Healthcare Sols., Inc.*,
  2019 WL 5394011 (M.D. Fla. Oct. 16, 2019) ...........................................................20

*In re MicroStrategy, Inc. Sec. Litig.*,
  115 F. Supp. 2d 620 (E.D. Va. 2000) ................................................................. passim

iv

*In re New Century*,
  588 F. Supp. 2d 1206 (C.D. Cal. 2008) ................................................................................21

*In re New Oriental Educ. & Tech. Group Sec. Litig.*,
  988 F. Supp. 2d 406 (S.D.N.Y. 2013).................................................................................24

*Nolte v. Cap. One Fin. Corp.*,
  390 F.3d 311 (4th Cir. 2004) .......................................................................................16, 17

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000)..........................................................................................23, 27

*Ollila v. Babcock & Wilson Enters., Inc.*,
  2018 WL 792069 (W.D.N.C. Feb. 8, 2018) .................................................................. passim

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015)...............................................................................................3, 17, 18

*In re Orbital Scis. Corp. Sec. Litig.*,
  58 F. Supp. 2d 682 (E.D. Va. 1999) .....................................................................................26

*Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*,
  918 F.3d 312 (4th Cir. 2019) ...............................................................................................18

*In re PEC Solutions, Inc. Sec. Litig.*,
  418 F.3d 379 (4th Cir. 2005) ...............................................................................................20

*Pittston Co. v. United States*,
  2001 WL 34148374 (E.D. Va. Oct. 31, 2001).......................................................................30

*Plymouth Cnty. Ret. Sys. v. Evolent Health, Inc.*,
  2021 WL 1439680 (E.D. Va. Mar. 24, 2021).........................................................................26

*In re PMA Cap. Corp. Sec. Litig.*,
  2005 WL 1806503 (E.D. Pa. July 27, 2005)..........................................................................10

*In re Raytheon Sec. Litig.*,
  157 F. Supp. 2d 131 (D. Mass. Aug. 29, 2001) ....................................................................19

*In re Signet Jewelers Ltd. Sec. Litig.*,
  2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018)..........................................................14, 16, 18

*Singer v. Reali*,
  883 F.3d 425 (4th Cir. 2018) ...............................................................................12, 21, 30

*Sjunde AP-Fonden v. Goldman Sachs Group, Inc.*,
  2021 WL 2659797 (S.D.N.Y. June 28, 2021) .......................................................................30

v

*Teachers' Ret. Sys. of LA v. Hunter*,
    477 F.3d 162 (4th Cir. 2007) ....................................................................................14

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)...................................................................................................22

*Underland v. Alter*,
    2011 WL 4017908 (E.D. Pa. Sept. 9, 2011) ......................................................10, 17

*In re Wilmington Tr. Sec. Litig.*,
    29 F. Supp. 3d 432 (D. Del. 2014)............................................................................10

*Winslow v. BancorpSouth, Inc.*,
    2011 WL 7090820 (M.D. Tenn. Apr. 26, 2011).............................................10, 16, 29

*Yates v. Mun. Mortg. & Equity, LLC*,
    744 F.3d 874 Cir. 2014 ........................................................................................14, 26

**OTHER AUTHORITIES**

Fed. R. Civ. P. 15(a)(2)........................................................................................................30

## I.    INTRODUCTION

James River is an insurance company whose largest client was Uber. By the start of the Class Period, James River had collected hundreds of millions of dollars in premiums from Uber and gained deep familiarity handling Uber claims. James River touted its profitable relationship with Uber and assured investors that it was well-protected against claims under the Uber policy, repeatedly stating that its loss reserves were "adequate," "reasonable," and set pursuant to a careful methodology that relied on "past experience" and complied with GAAP.[1] These representations were vital to James River's financial health as any reserve increases directly reduced profits. Indeed, analysts stressed that the stability of auto reserves was "key to the stock's performance."

Eight months into the Class Period, James River stunned the market by cancelling the Uber contract and taking a $55-60 million adverse reserve charge, resulting in the Company's largest loss to date and tanking the Company's share price by over 20%. The Uber contract was put into "runoff," meaning that James River would still be responsible for paying claims that had accrued through 2019. To assuage investor concern, Defendants falsely told the market that the runoff was "going well" and that James River was settling Uber-related claims "consistent with our held reserves." However, these statements were false. In May 2021, a full 18 months after the Uber contract was terminated and put into runoff, the Company stunned investors by announcing that it needed to take a *$170 million* adverse reserve charge to cover its Uber exposure. The charge was massive, wiping out all of the profit the Company had reported over the previous *two years,* and represented over *50%* of the total net reserves that James River maintained for its *entire* Commercial Auto Division. In response to this disclosure, James River's stock price plummeted

---

[1] Capitalized terms not defined herein have the meanings ascribed in the Amended Complaint (ECF No. 41). "MTD" refers to Defendants' brief (ECF No. 54) and "Ex. __" refers to the exhibits thereto. All emphasis is added and internal quotations and citations omitted.

1

26%, and analysts reacted with astonishment, noting that the charge meant that, on average, each and every Uber claim was under-reserved by a staggering *40%*.

Significantly, the massive charge was not the product of a sudden increase in claims, or some unspecified development. To the contrary, Defendant D'Orazio, the Company's then-new CEO, who had been brought in specifically to address the "Uber overhang," admitted that the reserve methodology the Company had been using for *more than five years* was completely and utterly "*wrong*," and had to be "meaningfully changed" to give a "better and more conservative estimate of the ultimate losses" on the Uber account. Indeed, as the Company revealed, despite having more than a *half-decade* of experience handling Uber claims, and in clear violation of GAAP, the Company had for years largely ignored its own loss experience when setting Uber reserves in favor of "*an array*" of extraneous factors. This "wrong" methodology concealed staggering liabilities and falsely projected financial strength.

The Complaint contains allegations from fifteen former James River employees ("FEs"), all of whom had detailed, percipient knowledge of the Uber account and reserve process, and consistently describe a top-down, companywide effort to suppress Uber reserves and "ben[d] the truth." Among other things, James River (i) set "placeholder" reserves as low as $1 that bore no relation to the specifics of a claim; (ii) placed artificial "caps" on any reserve increases above $5,000—again, regardless of the damages sustained; and (iii) slashed all requests for reserve increases by 20-30%. Management also "bent over backwards for Uber" who sought to close claims at all costs to avoid negative publicity, resulting in insurer-funded settlements that were often *10 times* their reasonable value—*without corresponding* reserve increases.

In response to these well-pled allegations, Defendants contend that James River "estimated its loss reserves in good faith using its actuarial judgment." This is belied by the Company's

2

admission that for years it used an improper and "wrong" reserve methodology for Uber claims that essentially ignored its own loss experience on those claims, and by the widespread, systemic, and pervasive under-reserving policies implemented by management and described by the consistent accounts of fifteen FEs. The "night and day difference" between the $170 million charge under the new, proper methodology and Defendants' prior statements about the adequacy of Uber reserves and runoff compels a strong inference "that fraud or recklessness was afoot." *See In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 636-37 (E.D. Va. 2000). As D'Orazio admitted, the "wrong" methodology did not come ***close*** to accurately measuring Uber losses.

Next, Defendants attempt to manufacture a distinction between "case reserves" and "loss reserves," pretending that the former has nothing to do with the latter. But there can be no serious dispute that case reserves—the loss reserves for individual claims—were a key input into the overall loss reserve estimates that James River publicly reported to investors. Indeed, as James River explained in its Class Period Forms 10-K, it estimated the reserve for losses and loss adjustment expenses "***using individual case-basis valuations of reported claims***."

Defendants' claim that their statements are non-actionable opinions also fails. Defendants' statements regarding the Company's process for setting reserves concern objectively verifiable facts. To the extent certain statements or portions thereof are deemed "opinions," they contained "embedded statements of fact" that were highly misleading to investors (*e.g.*, a reserving process that ignored past experience) and omitted critical facts about how Defendants "formed the[ir] opinion" (*e.g.*, systemic policies to keep reserves low). *See In re Genworth Fin. Inc. Sec. Litig.*, 103 F. Supp. 3d 759, 778-79 (E.D. Va. 2015) (finding reserve statements actionable); *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 176 (2015).

As for scienter, Defendants claim that the Individual Defendants knew nothing about case

3

reserves. Again, this is directly contrary to Defendants' repeated representations that "senior management" specifically "reviewed" and "monitored" case reserves, at least quarterly, as part of a dedicated "Reserve Committee." The Complaint pleads a host of other strong scienter facts, including that Uber was James River's *largest client*, D'Orazio's *admission* that the Company used an improper reserve methodology, and the sheer magnitude of the *$170 million* charge. Courts in this District and across the nation credit such scienter facts in sustaining reserve-based claims. *See Genworth*, 103 F. Supp. 3d at 783-86 (finding that "Plaintiffs' allegations are sufficiently probative of scienter" under the "totality of circumstances alleged").

Finally, Defendants concede that loss causation is sufficiently alleged and offer only a half-hearted challenge to *one* alleged corrective disclosure. Their argument misunderstands the facts, ignores the applicable pleading standard, and is irrelevant to the disposition of this motion.

## II.    FACTUAL BACKGROUND

James River is an insurance company. ¶23. Its most important segment is Excess and Surplus Lines ("E&S"), which accounted for over 70% of its Class Period premiums, and within E&S, the most important division is Commercial Auto, which generated half of E&S's 2019 premiums. ¶¶35, 38-39. E&S carriers must set aside funds sufficient to cover the expected costs of settling claims. ¶¶36-37. Reserves are a key financial metric because every dollar added to reserves correspondingly reduces net income. ¶2. When reserves are insufficient, insurers must increase reserves through "adverse development charges" that negatively impact its bottom line.

### A.    James River Insures Uber and Touts Its Careful Reserving Process

In March 2014, James River began providing Uber with car insurance for when its drivers were between fares. ¶¶40-41. Like any other car insurance, the Uber policy insured against property damage and bodily injury from car accidents. ¶¶41, 69-70. With Uber as its star client, James River went public in December 2014. ¶¶23, 40. By 2019, Uber's annual premiums exceeded

4

$300 million, comprising 25% of James River's total premiums. ¶42. Analysts noted that James River's Uber-related reserves were "key to the stock's performance." ¶45. Accordingly, Defendants assured investors that the Commercial Auto Division's reserves were strong and stable, and that the Uber contract was profitable. ¶¶43-44, 187-88, 196-97, 200, 207-08.

The Class Period begins on February 22, 2019, when then-CEO Defendant Myron announced that Uber was renewing the contract for a sixth year and touted the companies' "long and collaborative relationship." ¶43. At the same time, James River recognized that setting "appropriate" loss reserves was fundamental to "balance sheet integrity" and "key to our-long term success." *Id*. To that end, the Company's 2018 Form 10-K described James River's purportedly careful process for establishing loss reserves: reserves for reported claims were set at the individual claim level, then added with the estimated costs for incurred but unreported claims, to arrive at a total loss reserve amount. ¶¶43, 186. Specifically, the Company disclosed that: (i) for reported claims, the Company used *"individual case-basis valuations" that evaluated each "specific claim" to establish a "specific case reserve… which management believes is adequate to resolve the claim"* (¶¶43, 186-87); and (ii) for unreported claims, the Company used "statistical analyses to estimate the cost of losses," based primarily on "historical information" and certain other factors. ¶186. Significantly, both types of reserves were purportedly based primarily on "historical information" and "past experience." *¶186*. Defendant Abram, who became CEO in August 2019, underscored that *all* reserves were based on a "historically well-informed judgment." ¶192.

James River's "Reserve Policy" purportedly included "continually monitor[ing] reserves using new information on reported claims" under the oversight of a dedicated Reserve Committee. ¶¶95-96, 186. "[A]t least quarterly," the Committee—which included the Individual Defendants and E&S CEO Schmitzer—reviewed, determined, monitored, and approved the reserves. ¶¶95-96.

5

Consistent with this purportedly meticulous process, James River repeatedly assured investors that its reserves were "reasonable," "adequate," and "appropriate," and set in accordance with GAAP. ¶¶176, 187-88, 196-97, 207-08. Analysts and the market credited Defendants' representations. For example, on March 1, 2019, shortly after the sixth Uber renewal, SunTrust noted James River's "robust reserving practices" and "healthy" reserves, and on May 1 and August 1, 2019, JMP highlighted that "commercial auto reserves were stable." ¶¶44-45.

### B.    Unbeknownst to Investors, James River Was Suppressing Reserves Through Systemic Policies Directed by Management

In truth, James River maintained systemic, top-down policies and procedures designed to artificially suppress loss reserves for Uber-related claims. Cross-corroborating accounts of no less than fifteen former James River employees, all of whom worked on the Uber account—and several of whom reported to the Company's senior officers—described undisclosed facts that were diametrically opposed to Defendants' public representations to investors. ¶¶64-94.

First, James River's management constrained the claims department to keep Uber reserves artificially low. ¶¶65, 67. As former claims examiners stated, there was a corporate policy to keep reserves low, but "*there was no methodology for calculating reserves . . . it didn't exist; there was nothing.*" ¶¶12, 65. Rather than reserving funds "adequate to resolve the claim," James River required adjusters to open Uber claims with placeholder reserves as low as $1 that bore no relation to the reported damages and were not updated to reflect new information. ¶¶69-70, 187. Thereafter, claims personnel were mandated to stay within pre-determined limits when seeking reserve increases, regardless of their actual case valuations. ¶¶69-73, 83. Any reserves exceeding these artificial "caps on reserves irrespective of the injuries" were cut by managers. ¶¶72-73. FEs confirmed that James River's senior officers were aware of, *and participated in*, the improper practices. For example, Jefferson, the Director of Claims—who had high-level authority over Uber

6

claims and reported to Rogers, Vice President of Claims tasked with issuing all reserving directives—implemented, at the direction of the c-suite, a 20-30% cut to Uber reserve increases. ¶67. FEs described an unethical culture where objectors were "*reduced to ashes*" and James River "*bent the truth*" which put it "*in the hole from the beginning with Uber*." ¶¶70, 73, 74.

FEs described other management initiatives to suppress reserves. For example, dysfunctional, outdated technology consistently under-reserved claims and adjusters were instructed to rely on the erroneous numbers. ¶¶91-92, 275. Management required adjusters to draft onerous Large Loss Reports ("LLRs") that typically exceeded *30 pages* and took a half day to complete to increase reserves above a mere *$5,000*; completion of as many as *20* LLRs were typically required *per claim* for even minimal increases. ¶¶76-77. This "crazy" amount of paperwork meant that well-intentioned adjusters were simply unable to increase reserves. *Id.*

Second, James River "bent over backwards" to appease Uber, who wanted to keep claims out of court. ¶¶78-79. At Uber's insistence, James River settled Uber claims above fair value, rendering the Company's already low reserves even more deficient. ¶¶78-81. Uber had access to James River's files throughout the Class Period and did its own claim audits, and its representatives would often instruct James River adjusters and managers to settle claims—even above their fair value and/or held reserves—including with James River executives in the same room. ¶¶80-81.

Third, James River knowingly staffed its claims department with inexperienced, untrained employees, many of whom formerly held jobs at stores like Starbucks or PetSmart. ¶87. After landing the Uber contract, it went into a "hypergrowth" stage, hiring 350-400 new adjusters and immediately assigning them extraordinary numbers of Uber claims to handle at once. ¶¶83-88.

    **C.**    **James River Unexpectedly Terminates the Uber Contract but Falsely Assures Investors Reserves Are Sufficient and the Runoff Is Going Well**

Problems with Uber began to surface when, on October 8, 2019, James River announced

7

that, after six years, it was cancelling the Uber contract and putting it into "runoff." ¶¶46-48. Despite former CEO Myron's assurance just two months prior that "we are comfortable with our loss reserves," James River also announced a $55-60 million adverse reserve charge attributed "primarily" to Uber, causing a net loss of over $25 million for Q2 2019—at the time, the largest quarterly loss in Company history. ¶¶46-48. News of the large adverse charge sent James River shares plummeting nearly 23%, yet then-CEO Abram reassured investors that the increased reserves reflected a "historically well-informed judgment" sufficient to cover the runoff. ¶¶47-49.

Defendants continued to portray James River as capably handling the runoff and settling Uber claims within reserves. Post-cancellation, management was "watching" the Uber reserves "very carefully and very closely" and "doing a deep dive every quarter." ¶285. On February 21, 2020, Abram declared, "We feel confident about our reserves and the progress we are making in the run-off." ¶200. On April 30, 2020, Abram reiterated that the "run off of the [Uber] account is going well" and James River was "settling commercial auto claims at a rapid pace for amounts that are consistent with our held reserves." ¶203. Defendant Doran assured investors that the "run-off . . . is performing well within our expectations" and the Company was "pleased with [its] pace." ¶51. Indeed, James River *reduced* its E&S reserves throughout the runoff. ¶¶124, 131, 136.

In reality, Company policies to suppress reserves *intensified* during the runoff. James River slashed the negligible pre-set reserve limits and required management to vet *all* reserve increases. ¶¶72, 75, 101-02. This caused additional under-reserving as management's automatic cuts applied to more claims and more LLRs went uncompleted. ¶¶75-77. Employees quit in droves, swamping remaining staff with crushing caseloads, leaving claims under-reserved or ignored. ¶¶89-90.

### D.    The Truth Emerges: James River Takes a Massive $170 Million Charge and Admits That For Years It Used the "Wrong" Reserve Methodology

On May 5, 2021, roughly 1.5 years after the cancellation, James River disclosed that the

8

Uber account was under-reserved by a staggering *$170 million*. ¶52. The charge represented over 50% of Commercial Auto's total existing reserves, exceeded all of James River's E&S adverse reserve charges during the prior eight quarters *combined*, and caused a net quarterly loss of $103.5 million—*three times larger* than any past loss. ¶¶53, 59. Significantly, the charge wiped out every penny of profit the Company had falsely reported over the prior *nine quarters* and made clear that Defendants' prior assurances that Uber reserves were "reasonable" and "adequate" were completely and utterly false. ¶¶148, 150, 207-08. In response, the Company's share price plummeted over 26%, falling from $46.50 to just $34.23 in a single day. ¶313. Analysts noted "just how significant the $170 mln reserve charge was," highlighting that the massive charge meant that, on average, each claim on the Uber account was under-reserved by an astonishing 40%. ¶55. The charge forced the Company to conduct a secondary offering to raise $175 million at a fire sale price that was 34% less than the prior day's close price—the sector's steepest discount ever. ¶61.

Moreover, the massive reserve increase was not due to a sudden influx of Uber claims or a modest adjustment to Company procedures. Rather, James River disclosed that it had used an improper model to set reserves that ignored its own historical Uber loss experiences. Indeed, as D'Orazio admitted, for years the Company used a completely "wrong" methodology for Uber reserves and would now implement a "more conservative" model. ¶56. This 180-degree reversal "would give us a better and more conservative estimate of ultimate losses on this account." *¶*57. As analysts reported, James River was "*effectively throwing out the prior reserving approach and starting fresh*." ¶58. Even then, however, the full truth regarding Defendants' under-reserving had not been fully disclosed. Despite D'Orazio's claim that the enormous charge would "put the concerns with our commercial auto runoff portfolio behind us for good" (¶62), less than six months later, on October 26, 2021, James River disclosed a further $29.6 million in "impacts" (*i.e.*, more

reserve charges) for Uber. This news sent James River shares tumbling an additional 16%. *Id*.

## III.    ARGUMENT

On this motion, "a court must accept all allegations in the complaint as true and must draw all reasonable inferences in favor of the plaintiff." *Cambridge Ret. Sys. v. Jeld-Wen Holding, Inc.*, 496 F. Supp. 3d 952, 961 n.6 (E.D. Va. 2020). "[A]ll that is necessary at this stage is whether Plaintiff has alleged sufficient facts that, if true, would form a basis for relief." *Epstein v. World Acceptance Corp.*, 203 F. Supp. 3d 665, 669 (D.S.C. 2016).

### A.    The Complaint Alleges Actionable Misrepresentations

#### 1.    Defendants Misrepresented James River's Reserving Process

Statements that "misrepresented the way [a company] set [its] loss reserves" are actionable. *See In re PMA Cap. Corp. Sec. Litig.*, 2005 WL 1806503, at *6 (E.D. Pa. July 27, 2005); *Underland v. Alter*, 2011 WL 4017908, at *9 (E.D. Pa. Sept. 9, 2011) ("Defendants departed from their claimed methodology to calculate the loan loss reserve").[2] The court's decision in *Genworth* is instructive. There, statements that the company conducted "a broad, intensive review" and used its "own credible data" when setting reserves were actionable where plaintiffs alleged the company used stale information that failed to incorporate past experiences. 103 F. Supp. 3d at 773-75. Similarly, in *Freudenberg v. E*Trade Financial Corp.*, 712 F. Supp. 2d 171, 188 (S.D.N.Y. 2010), statements that reserves were "based on careful monitoring of the quality of the portfolio and other relevant conditions" were actionable, when the complaint alleged the opposite was true.

---

[2]  *See also Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*, 363 F. Supp. 3d 476, 495 (D. Del. 2019) (allegations of systemic manipulation of lender's loan loss model sufficient to plead falsity of loan loss provisions); *In re Wilmington Tr. Sec. Litig.*, 29 F. Supp. 3d 432, 453 (D. Del. 2014) ("[company] was inconsistently and arbitrarily applying the standards it claimed to use to calculate its loan reserve"); *Winslow v. BancorpSouth, Inc.*, 2011 WL 7090820, at *16 (M.D. Tenn. Apr. 26, 2011) (company "did not calculate the reserves in the manner they claimed").

Here, too, Defendants misrepresented the Company's reserving process, falsely telling investors of the critical role that the Company's own historical loss experience played in setting Uber reserves. Indeed, Defendants assured investors that reserves were based on "historical information" and "past experience," and that the Company "continually monitor[ed]" and adjusted its reserves "as experience develop[ed]." Defendants also stated that their reserves were predicated on "historically well-informed judgment." ¶¶186, 195, 206. In fact, James River's reserve methodology minimized and disregarded the Company's "own loss experience" and relied on an "array" of extraneous inputs. As D'Orazio admitted, the reserve methodology the Company had been using for years had been "wrong," required a "meaningful[] change," and, now, James River would "us[e] *only* our own loss experience." ¶57. Adjusting for "past experiences" resulted in a charge so large it wiped out every penny of profit the Company reported for the prior two years.

Nor did each reported Uber claim have a "reserve established against it" based on an "individual case-basis valuation[]" that was "adequate to resolve the claim." ¶¶186-87. In reality, James River's systemic policies assured that the facts of a given claim were *not* considered in establishing reserves. ¶¶65-77. For example, adjusters were required to open claims with absurdly low placeholder reserves that were clearly inadequate to cover *any* legitimate claim. *See* ¶69 (65% of reported Uber claims were set with a $1 reserve). James River similarly implemented artificial, pre-set caps on individual claim reserves without regard to facts known about the specific claim. ¶¶67, 71-74, 101-02. Moreover, managers automatically "slashed" proposed reserve increases by 20-30%, "irrespective of the injuries." ¶¶73-74. These procedures guaranteed that, contrary to Defendants' public assurances, Uber reserves were not based primarily on the Company's "past

11

experiences" and "known" information, but were knowingly false. ¶186.[3]

None of these critical facts were disclosed to investors. *See Singer v. Reali*, 883 F.3d 425, 441-42 (4th Cir. 2018) (once a company speaks, it must provide "the whole, material truth").

### a.    Defendants' Attempted Distinction Between "Case" and "Loss" Reserves Defies the Company's Own Disclosures

Rather than directly challenge the falsity of reserve process statements, Defendants attempt to manufacture a distinction between "case reserves" and "loss reserves," and argue that the Complaint does not allege "which type of reserve(s) were ultimately increased." MTD 14-15. This fact-intensive argument flies in the face of James River's own SEC filings, which describe the reserve process as a straightforward sum-of-the-parts calculation of (1) individual case reserves for reported claims; and (2) estimated costs for unreported claims. Accordingly, deficiencies in case reserves ***necessarily*** resulted in understated reserves for the "overall Uber block." In fact, Defendants' brief acknowledges that case reserves are a "component[]" of loss reserves. MTD 15. Thus, when Defendants declared a $170 million adverse charge which increased the reported loss reserve, they necessarily "ultimately increased" the case reserves that comprised that metric.

Indeed, Defendants themselves repeatedly made clear that actual individual claim reserves played a critical role in setting reserves. James River's Forms 10-K explained that overall reserves were established using "individual case-basis valuations." ¶186. Under the header "Reserve for Losses and Loss Adjustment Expenses," which assessed the "ultimate costs of all *reported* and *unreported* losses," James River explained, "Our claims department personnel use their ***knowledge***

---

[3] Nor did James River's reserves account for "new information." ¶186. Multiple FEs described how filling out LLRs to increase even one claim was so burdensome that it simply was not done. ¶¶76, 77. Further, the lack of qualified adjusters, crushing workloads, and deficient software, meant that James River was incapable of timely incorporating new information into its reserving process and did not reasonably "estimate the amount of future obligations." ¶¶83-88, 188, 275.

12

*of the specific claim* … to estimate the expected ultimate losses." ¶43. Further, in November 2019, Doran described how senior management's quarterly "deep dive" into reserves revolved "especially around claims," and Abram added that booking reserves began by "***look[ing] at the actual case reserves***." ¶285. Defendants' counterfactual argument not only defies the Company's disclosures, it is contrary to the market's understanding that the $170 million charge was "significant" because "it increased the total reserve ***per open claim*** by 55%."[4] ¶55.

Defendants' argument that Plaintiffs do not criticize James River's purported use of "actuarial judgment" in the "estimation of loss reserves" (MTD 14) ignores that Defendants claimed to "adjust" ***all*** reserves for ***both*** reported and unreported claims based on the Company's own "experience" and "historically well-informed judgment." ¶¶186, 192, 195, 206. D'Orazio admitted that assertion was false. ¶¶56-57. The actuarial inputs disregarding the Company's experience were so manifestly "wrong" that "[t]he result in the changed methodology is significant," *i.e.*, to the tune of $170 million. *Id.*[5]

#### b.      Defendants' Attacks on Their Former Employees Fail

Far from conclusory (MTD 15-16), the FEs provide firsthand and cross-corroborating accounts of how Defendants fostered a corporate culture and implemented a host of systemic procedures to keep Uber reserves artificially low. *See Ollila v. Babcock & Wilson Enters., Inc.*, 2018 WL 792069, at *4 (W.D.N.C. Feb. 8, 2018) (crediting "confidential witnesses responsible for Renewable segment projects who detailed the substantial and reoccurring nature of problems with the projects"); *E\*Trade*, 712 F. Supp. 2d at 197 ("confidential witnesses support a strong

---

[4] Defendants' attempt to wall-off case reserves from loss reserves is particularly inappropriate at this stage. *See Genworth*, 103 F. Supp. 3d at 776 ("[T]he Court cannot engage in a factual dispute at this stage of litigation regarding how [a company] calculated its reserves").

[5] There is no requirement to allege that ***every*** aspect of the process was mispresented. *See Navient*, 363 F. Supp. 3d at 494-95 (certain practices sufficient to create "artificially depressed" reserves).

inference of a Company-wide culture that, at every level, emphasized increased loan origination volume in derogation of underwriting standards"). Consistent with established Fourth Circuit law, and summarized in **Appendix A**, the Complaint pleads information about the former employees that "allows the Court to assess what information the confidential witnesses had available to them and properly weigh the inferences derived from [their] allegations." *Klein v. Altria Grp., Inc.*, 525 F. Supp. 3d 638, 667 (E.D. Va. 2021). Nothing more is required.[6]

Defendants criticize the FEs as "low level" (MTD 15-16) but provide no basis whatsoever to question their reliability.[7] Nor is there any. *See Lefkoe v. Jos. A. Bank Clothiers*, 2007 WL 6890353, at *5 (D. Md. Sept. 10, 2007) ("factual issues concerning the credibility and weight of the employee statements will be construed in favor of Plaintiffs"). The fifteen FEs were frontline claims personnel responsible for handling Uber claims, their reports include the exact information claims personnel would be expected to possess, and their accounts align with Defendants' own admissions and conduct. *See In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at *13 (S.D.N.Y. Nov. 26, 2018) ("store-level employees[] possessed first-hand knowledge of [company's] lending practices" and "corporate policy").

Defendants quibble that "there were hundreds of junior claims employees working on the Uber account" (MTD 15), but do not explain why this means the Complaint's fifteen FEs should be ignored or discredited. Similarly, Defendants' contention that the FEs merely reflect the "subjective belief" that they deserved higher personal reserve authorizations (MTD 16) ignores

---

[6] Notably, the FE accounts are not necessary to establish falsity given D'Orazio's admission. *See In re EQT Corp. Sec. Litig.*, 504 F. Supp. 3d 474, 494 n.14 (W.D. Pa. 2020) (confidential sources believable but not necessary to establish falsity given company's acknowledgment of problems).

[7] Defendants' authorities are readily distinguishable. In *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 887 4th Cir. 2014), the Court credited the FE statements. In *Teachers' Ret. Sys. of LA v. Hunter*, 477 F.3d 162, 177 (4th Cir. 2007) public documents contradicted the FE accounts.

14

the FEs' uniform accounts of systemic procedures obstructing *all* claims personnel from increasing reserves to even minimal levels. And, while senior-level positions are not necessary to show falsity (particularly for operational matters), the accounts of FEs #1, 3, 4, 5, 6, 8, 9 and 10 show direct management involvement in suppressing reserves, which strongly supports systemic and pervasive practices directed from above. ¶¶67, 72-73, 76, 98, 100; *see Navient*, 363 F. Supp. 3d at 493 (accounts of low-level FEs reveal actions "approved by employees who are not low-level").[8]

### c.      The Complaint Does Not Allege Fraud by Hindsight

The reserving process statements concern concrete assertions of purported fact that are not "fraud by hindsight." MTD 19-20. Further, there is no fraud by hindsight where the Complaint includes allegations "supported by a host of confidential witnesses" that members of "senior management … were aware of significant problems … within the business," or "had access to information" contradicting public statements. *See Ollila*, 2018 WL 792069, at *2-3; *Genworth*, 103 F. Supp. 3d at 777 (no "fraud by hindsight" where allegations set forth "information available to [defendant] and why, given its possession of this information, [defendant's] statements about the adequacy of its reserves were misleading"). Eight different FEs have confirmed how senior management not only knew of systemic under-reserving but were instrumental in enforcing the policies. ¶¶67, 72-76, 83, 98, 100. The Complaint further describes audit reports presented to c-suite executives showing that Uber claims were under-reserved. ¶¶97-99.

Moreover, D'Orazio explicitly admitted that James River had *for years* used a completely inappropriate and improper method to set reserves on Uber claims. Although Defendants attempt to whitewash D'Orazio's admission that the past methodology was "*wrong*" (MTD 19), the new

---

[8] The suggestion that placeholders were appropriately increased (MTD 16) ignores that adjusters were unable to raise reserves above preset "caps" and increases were automatically slashed by 20-30%. Per FE9, senior managers cut increases 100% of the time. ¶¶67, 73-74, 102, 254.

methodology did not merely put "more weight on its own loss data (and less weight on other actuarial methodologies)," but rather "meaningfully changed" the methodology to now "us[e] *only* our own loss experience." ¶263. Analysts confirmed that this approach was entirely new, stating that James River was "effectively *throwing out* the prior reserving approach and *starting fresh*." ¶58. D'Orazio's admission thus fully supports the falsity of Defendants' prior reserve process descriptions, particularly assertions that the Company relied on its "experience" and "historically well-informed judgment."[9] And, again, Defendants' own words connect the Company's reserve processes for individual claims with "estimating reserves for the Uber block overall." MTD 20.

### 2. Defendants Misrepresented the Adequacy of Reserves

In total, James River's Uber reserves were understated by more than $183 million—a staggering sum representing more than 50% of the $337 million total runoff reserves in place. ¶53. Defendants do not, and cannot, dispute that the reported reserve balances and repeated assurances that they were "reasonable" and "adequate" were materially false. ¶¶103-63, 188, 200, 207-08. These misstatements are unquestionably actionable. *See Genworth*, 103 F. Supp. 3d at 775 ("adequate" reserves statements actionable where Company took $531 million charge).[10]

Defendants rely on *Nolte v. Cap. One Fin. Corp.*, 390 F.3d 311, 315-16 (4th Cir. 2004) to argue that all their "reserve estimates and related statements" are non-actionable opinions. MTD 13. But in *Nolte*, the Court addressed only reserve estimates themselves, which plaintiffs conceded

---

[9] The prior methodology also failed to incorporate James River's own loss data as evidenced by the annual need to adjust the reserves from 2017 through 2020. ¶224; *see Signet*, 2018 WL 6167889, at *13 (alleging misstated reserves "based upon Signet's loss history").

[10] Defendants' argument (MTD 21, n.6) that statements of reserve adequacy were "puffery" is baseless because it ignores the context of the statements. The reserves concerned James River's most important business, were key to the Company's financial performance, and were a major focus of analysts. *See Signet*, 2018 WL 6167889, at *12 (responding to investor concern by claiming portfolio was "strong" was "not puffery at all"). Moreover, the statements "ignored" data and "*facts* which affected those reserves." *Winslow,* 2011 WL 7090820, at *19.

were opinions, and not whether the company followed its own reserve setting process. *See Nolte*, 390 F.3d at 315 (management "lied to investors when it opined" that reserves were sufficient). Importantly, courts reject "the broad proposition that *all* statements pertaining to …reserves are opinions." *Underland*, 2011 WL 4017908, at \*9. Here, James River's reported reserves constituted misstatements of fact, and not opinions, for two reasons. First, the reserves were purportedly the result of a process that was not followed. *See id.* ("Unlike a subjective evaluation that a loan reserve is adequate or not, nonconformance to a stated methodology to arrive at a loan loss reserve amount is a measurable objective fact" and, if factors are omitted, "*the sum of that calculation is necessarily misstated*"). Second, Defendants knew that the reserves setting process, even if followed, was based on erroneous inputs. *See Navient*, 363 F. Supp. 3d at 496-97 (reserve balances were not opinions because the "dollar amounts disclosed" for reserves were "artificially understated" due to "[d]efendants' systemic" policies keeping reserves low).

Moreover, even if taken as statements of "opinion," liability attaches where "*the supporting fact[s] … supplied were untrue*." *Omnicare*, 575 U.S. at 186. As the Supreme Court explained, "embedded statements of fact" are "perfectly capable of misleading investors." *Id.* at 185, 193. Here, Defendants falsely grounded their reserve statements in James River's "past experience" and "historically well-informed judgment" even though James River's methodology ignored past loss experience and disregarded known facts on claims. ¶¶186-87, 192.

Defendants' "opinions" are actionable for the additional reason that they omitted material information. *Omnicare*, 575 U.S. at 189; *Genworth*, 103 F. Supp. 3d at 779 (opinions convey facts about "how the speaker has formed the opinion," and if the "real facts" are "not provided, the opinion statement will mislead its audience"). Here, Defendants omitted critical facts, including that the Company: (i) did not primarily rely on past Uber loss experience; (ii) implemented

17

systemic policies to keep Uber reserves low; and (iii) did not use current or reliable information.[11]

These facts conflicted with what a reasonable investor would understand the "opinion" to mean. [12]

### 3. Defendants Misrepresented the Status of the Runoff

CEO Abram assured investors, "The run off of the large commercial account is going well" and James River was "settling commercial auto claims at a rapid pace for amounts that are ***consistent with our held reserves***." ¶¶51, 203. In truth, the runoff was a disaster, requiring Defendants to further suppress Uber reserves. ¶¶68-77. Examiners' authority was slashed, and others left "in droves," overloading the remaining examiners with impossible workloads. ¶¶89-90. Common sense and simple logic dictates that, had the runoff been "going well," or had Uber claims been settled "at a rapid pace for amounts … consistent with … held reserves," the $170 million charge would have been unnecessary. *See Signet*, 2018 WL 6167889, at *16 ("$170 million loss that was equal to an entire quarter's worth of pretax income [] speaks for itself."); *Loc. 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*, 2011 WL 12855820, at *8 (N.D. Ala. June 7, 2011) (crediting "significant and sudden increase in loan loss reserves along with [] write-down"). Notably, Defendants can point to no cataclysmic event, such as an influx of claims, during the one-year gap between Abram's statement and the $170 million charge. ¶56.

---

[11] In *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312 (4th Cir. 2019) (MTD 18), the proxy warned that it "would not be updated," yet, the plaintiffs complained the proxy omitted *current* information. *Id.* at 322-23. Here, Defendants never warned of their systemic procedures to keep reserves low. Warning that "lack of experience" may affect reserves is unhelpful given the deliberate under-reserving efforts; it also rings hollow in light of a 5+ year history with Uber.

[12] "*Omnicare* rejected the proposition that there can be no liability based on a statement of opinion unless the speaker disbelieved the opinion at the time it was made." *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 175 (2d Cir. 2020). Here, however, to the extent Uber data ***was*** considered in estimating reserves, Defendants ***knew*** the information was wrong due to the systemic policies to keep reserves low. *See Genworth*, 103 F. Supp. 3d at 776 (opinion statements actionably false where defendants "lacked any reasonable basis for believing their statements when made").

18

### 4.    Defendants Misrepresented That James River Complied with GAAP and Had Effective Internal Controls

James River consistently represented that its "financial statements and notes" complied with GAAP. ¶¶176, 214. To reasonably estimate loss reserves, GAAP and ASC 944-40-30-1 required James River to use the Company's past experience settling similar claims as its primary data point. ¶¶217-20. However, Uber reserves were *not* primarily based on the Company's past experience but rather, as D'Orazio admitted, an "array of inputs" *other* than the Company's "own loss experience." ¶¶9, 57, 216, 221; *see Genworth*, 103 F. Supp. 3d at 781 (ASC 944-40-30-1 violation alleged where company relied on "old data not reflective of current reality").

 "Plaintiffs' theory" is <u>not</u> that GAAP required "the Company to rely *solely* on its own historical data to estimate reserves." MTD 20. GAAP requires that a company "*primarily*" consider past loss experience. ¶¶217, 220-21, 223, 226. This commonsense principle (¶¶218-20) eviscerates Defendants' claim that the prior methodology was adopted in good faith. MTD 1-2, 4, 23. "Good faith" is also belied by the "night and day difference" between the held reserves and the massive charges. *See MicroStrategy*, 115 F. Supp. 2d at 635-37 (fraud alleged based on "simplicity of the accounting principles violated," "importance of the contract involved," and "great magnitude" of the error); *Genworth*, 103 F. Supp. 3d at 786 (considering "magnitude of the [loss reserve] discrepancy" in sustaining GAAP violations); *Epstein*, 203 F. Supp. 3d at 671 (violation of "single GAAP rule" sufficient where it resulted in "significant" and "material [] impact").

The Complaint also plausibly alleges that James River violated GAAP by failing to reasonably estimate reserves for Uber losses, as required by ASC 450-20-25-2. ¶¶227-33. *See, e.g.*, *In re Raytheon Sec. Litig.*, 157 F. Supp. 2d 131, 147-49 (D. Mass. Aug. 29, 2001) (sustaining claim based on losses that were allegedly not reasonably estimated). In response, Defendants repeat their arguments about former employees, fraud-by-hindsight, and loss reserves constituting opinions

19

(MTD 20 & n.5), which fail for the reasons set forth above.[13]

Defendants do not challenge the falsity of their internal control certifications. ¶¶133-37, 179-81, 246-47; *see MAZ Partners LP v. First Choice Healthcare Sols., Inc.*, 2019 WL 5394011, at *11 (M.D. Fla. Oct. 16, 2019) (collecting cases finding SOX certifications actionable). Nor could they. James River systemically under-reserved, belatedly took a $170 million charge, and only then "thr[e]w out the prior reserving approach" in favor of a GAAP-compliant method that provided a "better and more conservative estimate of ultimate losses." ¶¶52-58, 182; *see In re Dynex Cap., Inc. Sec. Litig.*, 2009 WL 3380621, at *15 (S.D.N.Y. Oct. 19, 2009) ("[Defendants] must have known or refused to acknowledge that their loss reserves and internal controls were insufficient, as ultimately became manifest when Merit restated its loan loss reserves").

### 5.    The "Forward Looking" Safe Harbor Does Not Apply

Defendants argue that four of their challenged statements are protected by the PSLRA's safe harbor for certain "forward-looking" statements. *See* MTD 21 (citing ¶¶188, 197, 200, 207). To qualify, the challenged statement must be "forward-looking" *and* accompanied by "meaningful cautionary statements identifying important factors that could cause actual results to differ materially" from those in the forward-looking statement. *Ollila*, 2018 WL 792069, at *4–5.

First, Defendants' statements that James River's then-existing reserves "*are* reasonable" and affirming "the progress we *are* making in the run-off" are not forward-looking. "[S]tatements regarding loss reserves are not projections [if] they are directed to the then-present state of the Company's financial condition." *Genworth*, 103 F. Supp. 3d at 788-89. Where, as here, a defendant

---

[13] Defendants' authority is inapposite. In *Chapman v. Mueller Water Prods., Inc.*, 466 F. Supp. 3d 382, 403 (S.D.N.Y. 2020), "Plaintiffs offer[ed] no basis to believe that Mueller did not take the [relevant] information available [] into account in setting its reserve." Here, D'Orazio admitted the relevant information was largely ignored, and any data included was warped by Defendants' systemic policies. Unlike in *In re PEC Solutions, Inc. Sec. Litig.*, 418 F.3d 379 (4th Cir. 2005), the Complaint does not rely on GAAP for scienter; it pleads a host of scienter facts, as set forth below.

"disregarded [adverse factors that had already occurred] in setting the reserve," the misrepresentations "[do] not turn on the outcome of future events." *In re New Century*, 588 F. Supp. 2d 1206, 1227 (C.D. Cal. 2008). Further, the present-tense portions of these statements are "taken out of the safe harbor." *Ollila*, 2018 WL 792069 at *5; *Genworth*, 103 F. Supp. 3d at 789.[14]

Second, cautionary language is not "meaningful" if a defendant "knew that the specific risks and uncertainties stated to be 'potential' in their cautionary language had already been realized." *See Genworth*, 103 F. Supp. at 790. Here, nothing in James River's boilerplate disclosures cautioned investors that the ***primary*** factor the Company used in setting reserves was anything other than its past loss experience. In fact, Defendants' cautionary language reinforced that reserve procedures were based on "past experience" and underscored that the Company "continually monitor[s] reserves using new information on reported claims." ¶186; *see Singer*, 883 F.3d at 442 ("generic warning of a risk will not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability"). And, while Defendants "warned" that reserves relied on "other factors" and "a variety of statistical techniques," they never disclosed that these extraneous factors ***overrode*** the Company's own loss experience.

Moreover, although Defendants "warned" of the "inherent uncertainty in estimating reserves" and the possibility that "inaccurate estimates and judgment" may result in "incurred losses exceeding the reserves," Defendants omitted that management instituted systemic and pervasive procedures to keep Uber reserves artificially low and refused to increase reserves based on known facts. Thus, Defendants' boilerplate "risk factors" are not "meaningful."[15]

---

[14] In *Marsh Group v. Prime Retail, Inc.*, 46 F. App'x 140, 146-47 (4th Cir. 2002) (MTD 22) "projections of *future* dividends" were "forward-looking because they relate to '*future* economic performance.'"

[15] *See* ¶¶178-80. At the very least, Defendants' arguments about the supposed "adequacy of [their] cautionary language" raise premature questions of fact. *See Ollila*, 2018 WL 792069, at *5.

21

B.      **Plaintiffs Have Adequately Pled Scienter**

      1.      **The Complaint Alleges a Strong Inference of Scienter**

Scienter is alleged through intentional misconduct *or* recklessness. *Carlucci v. Han*, 907 F. Supp. 2d 709, 728 (E.D. Va. 2012). A court must scrutinize scienter allegations holistically. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 326 (2007). Scienter allegations "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id*. at 323-24. Rather, the inference must be as compelling as any nonculpable explanation, and "a tie on scienter goes to the plaintiff." *City of Pontiac Gen. Empls. Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012). Plaintiffs meet these standards.

First, the Company repeatedly assured investors that the Individual Defendants were personally and intimately involved in the reserving process—facts which strongly support scienter. ¶¶249-61, 277-78. Indeed, management stressed their personal involvement: Abram explained how "***We*** *look at the actual case reserves*," and Doran explained how, for Uber reserves, she was "*watching it very carefully and closely, especially around claims*." ¶285. D'Orazio similarly described how he was "comfortable" with the "reserve position" because of a "*claims audit by our senior claims leadership team*" that resulted in "boost[ing] our case reserves." ¶286.

Further, the Individual Defendants were all members of the Reserve Committee, which reviewed, determined, monitored and approved reserves. ¶¶251-52. The claims department heads, including Schmitzer, Warren, and Rogers, also reviewed reserve reports and audited Uber reserves. ¶¶254, 259-61, 286. "Rasier [Uber] Reserves Audit" reports were provided to Schmitzer, who also sat on the Reserve Committee (¶¶98-100, 251), and management scrutiny of Uber reserves, including by Rogers and Warren, increased post-cancellation. ¶¶277-78.

This "personal involvement" in the reserves process supports a strong inference that the

Individual Defendants "possessed knowledge of the true state of affairs." *Genworth*, 103 F. Supp. 3d at 785; *see also Kiken v. Lumber Liquidators Holdings, Inc.*, 155 F. Supp. 3d 593, 607 (E.D. Va. 2015) (personal involvement in operations supports scienter). Further, given their access to information about the materially understated reserves, they were at least reckless in not knowing of the deficient reserving methodology, massively inadequate reserves, disastrous runoff, systemic policies suppressing reserves, and deficient internal controls and key GAAP violations.[16] *See Ollila*, 2018 WL 792069, at *3 ("access to information" on relevant issues supports scienter); *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000) (recklessness alleged where plaintiffs allege "defendants' knowledge of facts or access to information contradicting their public statements"); *In re Commtouch Software Ltd. Sec. Litig.*, 2002 WL 31417998, at *10 (N.D. Cal. July 24, 2002) ("confidential witnesses['] [allegations of] pattern and practice of improper revenue recognition" sufficient to plead "a strong inference of, at a minimum, deliberate recklessness").

Defendants suggest that the Reserve Committee only oversaw the "actuarial process," and that the Individual Defendants were unaware of "case reserve" issues or their effects on "loss reserves." MTD 17. But this factual argument is gutted by Defendants' own statements. The "actuarial process" included "input" from the "claims department." Ex. 2 at 69. Further, the Reserve Committee admittedly "us[ed its] judgment to supplement the actuarial recommendations." *Id*.; ¶252. Moreover, according to James River's SEC filings, case reserves

---

[16] Because the Individual Defendants acted with scienter, the Complaint adequately alleges James River's corporate scienter. *See Genworth*, 103 F. Supp. 3d at 783. Further, the scienter of lower-level management "can be imputed to the corporation … where, as here, that lower-level employee fraudulently furnishes information for a public statement." *Knurr v. Orbital ATK Inc.*, 294 F. Supp. 3d 498, 515 (E.D. Va. 2018). Here, Schmitzer, Warren, and Rogers personally oversaw and participated in the systemic policies, and reviewed and approved the reported reserves; their scienter therefore flows to James River. ¶¶65-81, 101, 248, 254-55. *Matrix Cap. Mgmt. Fund LP v. BearingPoint, Inc.*, 576 F.3d 172, 189 (4th Cir. 2009) (MTD 27) is distinguishable because the agents had resigned prior to the relevant time and the company clarified any misstatements.

23

directly affected loss reserves and were reviewed by "senior management." ¶196 ("every known claim has a *specific case reserve* established against it *which management believes is adequate*"); ¶43 ("We estimate the reserve using individual case-basis valuations of reported claims"); ¶253 ("*Senior management* reviews each case above a specified amount at least quarterly … *to monitor case reserve levels*"). And, Defendants told investors that their knowledge of the "actual case reserves" informed their view of the "overall" loss reserves. ¶¶285-86. While Defendants argue that references to "senior management" excluded the CEO and CFO (MTD 17), they are not entitled to this strained reading at this early stage, which contradicts Defendants' own statements touting their personal knowledge of the "actual case reserves." Any potential affirmative defense of "good faith reliance" on actuaries would similarly be premature. *See In re New Oriental Educ. & Tech. Group Sec. Litig.*, 988 F. Supp. 2d 406, 426 (S.D.N.Y. 2013).

Second, Uber comprised over 25% of the Company's total premiums and was its "largest account" and "largest client." ¶¶38-39, 42, 288-92; *see MicroStrategy*, 115 F. Supp. 2d at 639 ("significance of the [] contracts" supports scienter). Further, Defendants specifically touted the importance of Uber, James River's reserves, and the runoff, often in direct response to analysts' questions. ¶¶43, 290, 296-97, 299; *see Kiken*, 155 F. Supp. 3d at 606 ("repeated public discussion" of operations "relevant to [defendants'] state of mind"); *Genworth*, 103 F. Supp. at 785 (that defendants "spoke repeatedly about the purported breadth and depth of the Company's review" of its reserves supports scienter); *KBC Asset Mgmt.NV v. 3D Sys. Corp.*, 2016 WL 3981236, *9 (D.S.C. July 25, 2016) (scienter with respect to "core operations" was "bolstered" by allegations that executives were "'specifically asked, directly and repeatedly' about these core operations").

Defendants claim the core operations doctrine "has been rejected by the Fourth Circuit" MTD 26, but their cited authority expressly recognized that "core-operations allegations are

24

relevant to the court's holistic analysis of scienter." *See KBC Asset Mgmt. NV v. DXC Tech. Co.*, 19 F. 4th 601, 612 (4th Cir. 2021); *see also Genworth*, 103 F. Supp. 3d at 784 (core operations "relevant to the Court's holistic analysis"). Indeed, Defendants rely heavily on *DXC* throughout their brief, but that case concerned "broad corporate strategies;" not reserves, which are inherently a core component of an insurance company. *DXC*, 19 F. 4th at 612. Further, *DXC* contained no allegations that the defendants were "aware of the problems alleged," and a "plausible—and largely uncontested—innocent narrative" existed that "DXC unexpectedly stumbled." *Id.* at 613. Here, the Complaint contains particularized allegations concerning the Individual Defendants' direct personal involvement in the Uber relationship and reserve monitoring processes (reinforced by their own statements), and Defendants' proffered non-culpable narrative is wildly implausible, as discussed below. The allegations here go far beyond a generic core operations theory.

Third, the magnitude of the $170 million adverse reserve charge reinforces scienter. *See Genworth*, 103 F. Supp. 3d at 786 ("magnitude of the discrepancy" supports scienter); *MicroStrategy*, 115 F. Supp. 2d at 636 ("magnitude of the . . . accounting violations [may] constitute strong circumstantial evidence of recklessness") (collecting cases). In James River's 17-year history it "***never reported a loss of this magnitude before***." ¶48. The charge represented over 50% of the entire Commercial Auto Division's net reserves, exceeded all reserve developments in E&S in the prior two years combined, and completely wiped out every penny of profit reported over the entire Class Period. ¶¶53, 262. Each Uber claim was under-reserved by 40%. ¶55.

Fourth, Defendants' own admissions create a strong inference of scienter. D'Orazio admitted the $170 million charge was needed because ***for years*** Defendants used the "***wrong***" methodology that did not primarily consider James River's **"*own loss experience*"** in setting reserves. ¶263; *see Freedman v. Value Health, Inc.*, 958 F. Supp. 745, 757 (D. Conn. 1997)

25

(pairing "admission" that company "blew it" in conducting due diligence together with "magnitude of the problems" to show scienter). Further, James River's past Uber experiences, including adverse reserve developments in 2017-20—and the need to cancel the prominent and purportedly highly profitable Uber contract in the first place—raised "red flags" that bolster scienter. ¶¶293-94; *see Plymouth Cnty. Ret. Sys. v. Evolent Health, Inc.*, 2021 WL 1439680, at \*36 (E.D. Va. Mar. 24, 2021) ("red flags" that are "coupled with" "significant problems" support scienter).

Finally, during the runoff, Myron and Doran each sold over 20% of their James River shares, collectively reaping over $3.5 million. ¶¶280-82; *see 3D Sys. Corp.*, 2016 WL 3981236, at \*10 (insider trading supports scienter). Defendants argue that "the sale of 25% or less of a Defendant's holdings standing alone" does not support scienter and the "lengthy" class period diminishes any inference. MTD 27. But courts have credited similar percentages and, in any event, the stock sales here do not "stand alone," rather, they must be read holistically in conjunction with the other well-pled scienter facts. *See, e.g.*, *In re Orbital Scis. Corp. Sec. Litig.*, 58 F. Supp. 2d 682, 686 (E.D. Va. 1999) (crediting 15%). Further, the sales were suspiciously timed, not made pursuant to Rule 10b5-1 plans (¶¶279-83),[17] and a 15-month class period is not "unusually long." MTD 27. Indeed, the *Yates* class period was a full year longer. 744 F.3d at 891.[18]

### 2.    The FE Allegations Reinforce a Strong Scienter Inference

Defendants contend that the scienter allegations fail because the FEs were not involved "in estimating the Company's loss reserves" and did not have "direct contact" with the Individual Defendants. MTD 24. But the FEs *were* involved in estimating loss reserves because, in James

---

[17] *Compare with DXC*, 19 F.4th at 610-12 (10b5-1 plan "weakens any inference of fraudulent purpose"); *Yates*, 744 F.3d at 890-91 (involving 10b5-1 plans).

[18] SOX certifications also contribute to scienter. *Cozzarelli v. Inspire Pharms., Inc.*, 549 F.3d 618, 628 n.2 (4th Cir. 2008), merely rejected a "bare allegation" as independently supporting scienter.

River's own words, "We estimate the [loss] reserve using *individual case-basis valuations* of reported claims," plus the Reserve Committee received "[i]nput" from the "*claims department.*" ¶43; Ex. 2 at 69. In any event, "direct contact" with the Individual Defendants is not required. *See In re 2U, Inc., Sec. Class Action*, 2021 WL 3418841, at *13 (D. Md. Aug. 5, 2021) (crediting FEs "who did not necessarily have direct interactions with the Executive Defendants").[19]

Defendants assert that the Complaint "fail[s] to specify precisely when or how each Individual Defendant" knew the reserves were deficient. MTD 24. As to "when," Plaintiffs allege that the reserves were deficient throughout the Class Period. The contract was unprofitable for years; the Individual Defendants knew of the materially understated reserves prior to the cancellation, were focused on Uber, and intensified scrutiny of the reserves post-cancellation. ¶¶53, 94-95, 102, 277, 290; *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 488 (S.D.N.Y. 2004) ("absolute precision" not required; plaintiffs can show defendants "knew or should have known that the statements were false at some point during the time period alleged"). As for "how," Plaintiffs allege scienter for each Defendant, as set forth in **Appendix B.**

Defendants contend that the reserve process allegations describe a "conservative process" and "a system in place to ensure case reserves were appropriately set." MTD 25-26. But this is a wildly implausible inference when the system's overriding methodology was to artificially keep reserves low. ¶¶65-92. The reserves were unquestionably not "appropriate" or "conservative" as confirmed by the $170 million in adverse charges and Defendants' own admission that they were "wrong" and anything but conservative. The contention that pressure from Uber was just another "data point" (MTD 25) ignores that it resulted in consistent overpayment on Uber claims (¶¶78-

---

[19] *See Epstein v. World Acceptance Corp.*, 2015 WL 2365701, at *3 (D.S.C. May 18, 2015) (crediting FEs without direct contact); *Black v. Martek Biosciences Corp.*, 2006 WL 8435572, at *5 (D. Md. June 14, 2006) (same); *see also Novak*, 216 F.3d at 314.

81). The claim that LLRs did not cause under-reserving (MTD 25) ignores how the associated delays and burdens caused adjusters to forego necessary reserve increases (¶¶76-77).

### 3.    The Opposing Inference of Non-Fraudulent Intent Is Not Compelling

Defendants urge the Court to adopt an implausible narrative that "James River wrote a novel insurance policy for the rideshare industry, was taken aback when it proved more costly than expected, tried to put the matter behind it, and yet still had difficulty containing the losses." MTD 28. This not what happened, nor what Plaintiffs have alleged. To the contrary, as analysts specifically noted, a new CEO came in and quickly determined that prior management had materially and dramatically understated reserves, and for years had been using a completely "wrong" reserve methodology that ignored the company's own experiences and losses. That is the exact opposite of what Defendants had repeatedly told investors throughout the Class Period.

The notion that Defendants were somehow ignorant of massive liability implicating the Company's most important client defies "common sense and logic." *MicroStrategy,* 115 F. Supp. 2d at 636-37, 639 (significance of contracts to company "certainly makes less credible the inference that the Defendants were not aware of or did not recklessly disregard the accounting irregularities relating to these contracts"). First, James River executives celebrated the companies' "long and collaborative relationship" over *five years*. Second, while ridesharing was perhaps a "novel" industry, the types of claims insured under the policy—car accidents—were not. Third, the Uber contract "had been unprofitable for years" before being cancelled. ¶94. Thereafter, the reserving problems only intensified. Fourth, the sheer magnitude of the $170 million charge, which erased two years of profits and exposed a "night and day difference" for Uber reserves, eviscerates any "innocent" explanation. *See MicroStrategy*, 115 F. Supp. 2d at 636-37 ("the greater the magnitude of a restatement or violation of GAAP, the more likely it is that such a restatement or

violation was made consciously or recklessly").

Here, even more than in *MicroStrategy*, the facts "compel an inference that fraud or recklessness was afoot." *Id.* The notion that an insurance company could somehow "mistakenly" ignore a half-decade of claims experience involving its single largest client and get its fundamental business operations "wrong" strains credulity. *See* MTD 29 (arguing that the massively understated reserves were a "mistake" or unwise business decision).[20] Unquestionably, the more plausible inference is that, after incurring enormous losses under the Uber policy for years, implementing systemic policies to downplay the exposure, and bringing in a new CEO whose self-professed goal was to "eliminate the overhang of Uber" (¶56), the Company was forced to take a belated charge and concede that it had knowingly or recklessly used the incorrect reserve methodology. Defendants cannot hide behind boilerplate disclosures such as "there is always the risk that reserves may prove inadequate." MTD at 28. Fundamentally, nothing had changed in the underlying insurance, claims experience, or liabilities that would necessitate such a massive and sudden increase. *See Winslow*, 2011 WL 7090820, at *16 (rejecting warnings about loss reserves "because such warnings portended the future, but did not alert investors about the conditions that then existed"). The Complaint details a systemic and intentional effort to convince investors that James River was healthy and profitable, and that the runoff and losses were under control, when none of this was remotely true—facts analysts explicitly recognized.[21]

---

[20] Defendants claim they tried to "keep investors updated about the Uber contract's weaknesses" (MTD 28), but Uber-related reserves were repeatedly *reduced* during the runoff. ¶¶53-54.

[21] Analysts were shocked at the "unexpected news" of the termination and warned of "a negative reaction" on the announcement of the $170 million charge. ¶¶47, 61. As for whether the Uber policy simply "did not work out" (MTD 28), for years Defendants falsely reassured that the contract was profitable, they were "confident" about the reserves, the runoff was "going well," and they were settling claims "consistent with our held reserves." ¶¶200-03. Far from "hope that the problem would improve" (MTD 28), this portrayed a misleading impression of the truth.

### C.      The Complaint Adequately Alleges Loss Causation

For loss causation, allegations that the "misrepresentation or omission was one substantial cause of the investment's decline in value," not the only cause, are sufficient. *Singer*, 883 F.3d at 445. Significantly, Defendants ***concede*** loss causation is adequately alleged based on the October 2019, November 2019, and May 2021 disclosures. Their sole argument (MTD 29) concerns the October 2021 disclosure. However, that disclosure revealed the Uber contract was ***still*** negatively impacting the Company's bottom line nearly ***six months*** after the $170 million charge. The disclosure of an additional $29.6 million in losses—which the Company specified only days later included $13.8 million in reserve charges relating to the "legacy [Uber] transaction"—was new information conveyed to the market. ¶¶63, 314. Defendants' focus on the fact of transfer of the legacy portfolio (MTD 29), rather than its impact on reserves and net losses, misses the mark.[22]

### D.      The Complaint Adequately Alleges Control Person Liability

Plaintiffs have pled a Section 10(b) primary violation, and they therefore overcome Defendants' only challenge to Section 20(a) liability. MTD 30; *Genworth*, 103 F. Supp. 3d at 790.

## IV.      CONCLUSION

For the foregoing reasons, Defendants' motion should be denied. Should the Court grant the motion in part or in full, Plaintiffs request leave to amend. *See* Fed. R. Civ. P. 15(a)(2).[23]

---

[22] The cited analyst report (MTD 29) does not say that the $29.6 million or the reserve impact were "previously announced." Whether the "contents of [a] disclosure had already been revealed" is a premature "fact-based inquiry." *See Sjunde AP-Fonden v. Goldman Sachs Group, Inc.,* 2021 WL 2659797, at *17 (S.D.N.Y. June 28, 2021). *Katyle v. Penn Nat. Gaming, Inc.*, 637 F.3d 462, 478 (4th Cir. 2011) (MTD 29) did not "even purport to reveal some then-undisclosed fact."

[23] *Pittston Co. v. United States*, 2001 WL 34148374, at *2 (E.D. Va. Oct. 31, 2001) ("In the Fourth Circuit, courts generally grant parties leave to amend"); *Knurr*, 272 F. Supp. 3d at 813 (granting leave to amend).

Dated: March 4, 2022

Respectfully submitted,

By: /s/ *Steven J. Toll*
Steven J. Toll (Va. Bar No. 15300)
Daniel S. Sommers
S. Douglas Bunch
**COHEN MILSTEIN SELLERS
& TOLL PLLC**
1100 New York Avenue, Suite 500
Washington, D.C. 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
stoll@cohenmilstein.com
dsommers@cohenmilstein.com
dbunch@cohenmilstein.com

*Liaison Counsel for the Class*

**BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP**
John C. Browne (*pro hac vice*)
Rebecca E. Boon (*pro hac vice*)
Kate W. Aufses (*pro hac vice*)
Benjamin W. Horowitz (*pro hac vice*)
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
johnb@blbglaw.com
rebecca.boon@blbglaw.com
kate.aufses@blbglaw.com
will.horowitz@blbglaw.com

*Attorneys for Lead Plaintiff City of Miami General
Employees' and Sanitation Employees' Retirement
Trust and Lead Counsel for the Class*

**SAXENA WHITE P.A.**

Steven B. Singer (*pro hac vice*)
10 Bank Street, 8th Floor
White Plains, NY 10606
Telephone: (914) 437-8551

31

Facsimile: (888) 631-3611
ssinger@saxenawhite.com

Maya Saxena
Joseph E. White, III (*pro hac vice*)
Jonathan Lamet (*pro hac vice*)
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Telephone: (561) 394-3399
Facsimile: (561) 394-3382
msaxena@saxenawhite.com
jwhite@saxenawhite.com
jlamet@saxenawhite.com

David R. Kaplan (*pro hac vice*)
Hani Y. Farah (*pro hac vice* forthcoming)
12750 High Bluff Drive, Suite 475
San Diego, CA 92130
Telephone: (858) 997-0860
Facsimile: (858) 369-0096
dkaplan@saxenawhite.com
hfarah@saxenawhite.com

*Attorneys for Lead Plaintiff Employees' Retirement Fund of the City of Fort Worth dba Fort Worth Employees' Retirement Fund and Lead Counsel for the Class*

**KLAUSNER KAUFMAN JENSEN & LEVINSON LLP**
Robert D. Klausner
Stuart A. Kaufman
7080 Northwest 4th Street
Plantation, Florida 33317
Telephone: (954) 916-1202
Facsimile: (954) 916-1232
bob@robertdklausner.com
stu@robertdklausner.com

*Additional Counsel for Lead Plaintiff the City of Miami General Employees' and Sanitation Employees' Retirement Trust*

32

**CERTIFICATE OF SERVICE**

I hereby certify that on March 4, 2022, I caused the foregoing to be electronically filed with the Clerk of Court via CM/ECF, which will send a notice of electronic filing to all registered users.

/s/ Steven J. Toll
Steven J. Toll

33