# Appendix B

## Appendix B

**Summary of Scienter Allegations for Each Individual Defendant**

| Executive Defendant | Position During Class Period | Summary of Individual Scienter Allegations |
|---|---|---|
| Myron | CEO, then President and COO (¶24). | • Touted James River's "strong" "relationship" with its "largest client," Uber (¶¶43, 290), including mere months before the Uber contract was cancelled as not profitable.<br><br>• Assured investors, "When we look at the E&S segment, we are comfortable with our loss reserves." ¶43.<br><br>• Represented that James River had "leading-edge claims technology in handling [Uber] claims." ¶276.<br><br>• Member of the Reserve Committee. ¶¶95-96, 251-52.<br><br>• As the CEO, was "senior management," which "review[ed] each case above a specified amount at least quarterly to evaluate whether the key issues in the case are being considered and to monitor case reserve levels." ¶¶96, 253.<br><br>• Schmitzer, the CEO of the E&S segment who received Uber audit reports (¶98) and LLRs for Uber reserves (¶254), reported "exclusively and directly" to Myron (¶248(a)).<br><br>• Sold 21% of his holdings of James River stock, reaping nearly $3 million, during the runoff—not pursuant to a 10b5-1 plan. ¶280.<br><br>• Signed SOX certifications. ¶¶178-81. |

1

| Executive Defendant | Position During Class Period | Summary of Individual Scienter Allegations |
|---|---|---|
| Abram | Founder, CEO, and Executive Chairman (¶26). | • Admitted in connection with the $170 million charge that the Uber contract—which had been in place and unprofitable for years – was not profitable (¶46), that James River had "never reported a loss of this magnitude before" (¶48), and that under his watch, James River "mispriced the risk" (¶48).<br><br>• Assured, including in response to analyst questions, that the losses from the Uber contract were behind James River, promising, "we're comfortable with our pricing." ¶49.<br><br>• Touted personal involvement in reserves review, and depth and breadth of that review, stating, "We look at the actual case reserves and we look at our IBNR and measure the pace of claims and make a judgment that's a historically well-informed judgment." ¶¶192, 296.<br><br>• Continued to assure investors that the "run off of the [Uber] account is going well" and that James River was settling claims "consistent with our held reserves" (¶¶51, 203). *See also* ¶200 ("We feel confident about our reserves and the progress we are making in the run-off of the cancelled account.").<br><br>• Member of the Reserve Committee. ¶¶95-96, 251-52.<br><br>• As Founder, CEO, and Executive Chairman, was "senior management," which "review[ed] each case above a specified amount at least quarterly to evaluate whether the key issues in the case are being considered and to monitor case reserve levels." ¶¶96, 253.<br><br>• Signed SOX certifications. ¶¶178-81. |

| Executive Defendant | Position During Class Period | Summary of Individual Scienter Allegations |
|---|---|---|
| D'Orazio | CEO (¶28). | • Made it his "personal goal" to "eliminate the overhang" surrounding the Uber contract. ¶¶56, 263.<br><br>• Admitted that "we got it wrong" (¶¶56, 263) and that James River "meaningfully changed" its actuarial methodology to "use only our own loss experience" in reserve projections. ¶¶57, 263, 310.<br><br>• Definitively told investors that the $170 million charge "put the concerns with our commercial auto runoff portfolio behind us for good," when, in truth, losses continued to mount. ¶62.<br><br>• Denied that the Company was facing any problems with its reserves or the runoff in response to analyst questions, stating that James River was "comfortable with where we entered the quarter in particular with the overall group reserve position," and was "comfortable with the actions that we've taken" with respect to the Uber contract. ¶¶286, 299.<br><br>• Explained that he was "comfortable" with "our overall group reserve position" because James River had conducted a "claims audit by our senior claims leadership team" that resulted in "boost[ing] our case reserves." ¶286.<br><br>• Touted depth and breadth of reserves review, including "claims audit by our senior claims leadership team to review a healthy sampling of the open files." ¶97, 286.<br><br>• Member of the Reserve Committee. ¶¶95-96, 251-52.<br><br>• As CEO, was "senior management," which "review[ed] each case above a specified amount at least quarterly to evaluate whether the key issues in the case are being considered and to monitor case reserve levels." ¶¶96, 253. |

3

| Executive Defendant | Position During Class Period | Summary of Individual Scienter Allegations |
|---|---|---|
| Doran | CFO (¶30). | • Assured in response to analyst questions that James River had "standard practices and procedures" governing the reserve. ¶¶49, 285, 297.<br><br>• Touted personal involvement and depth and breadth of reserves review, stating "we are certainly watching it very carefully and very closely," and James River had done a "deep dive" into the reserves, just like the Company did "every quarter." ¶¶49, 285, 297.<br><br>• Further assured investors that the "run-off . . . is performing well within our expectations," and that the Company was "pleased with the pace" of the runoff. ¶51.<br><br>• Member of the Reserve Committee. ¶¶95-96, 251-52.<br><br>• Reported the favorable and adverse development amounts to investors. ¶¶115, 120, 143, 145.<br><br>• Told investors on calls that "[w]e did not experience any material reserve development in our Commercial Auto line." ¶¶125, 132.<br><br>• Sold 25% of her James River holdings during the runoff—not pursuant to a 10b5-1 plan. ¶282.<br><br>• Signed SOX certifications. ¶¶178-81. |

4