# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### RICHMOND DIVISION

| | |
|---|---|
| *In re James River Group Holdings, Ltd. Securities Litigation* | 3:21-cv-00444-MHL |

## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
## <u>DEFENDANTS' MOTION TO DISMISS</u>

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ................................................................................................... 1

I.      The Opposition Effectively Concedes That Plaintiffs Cannot Meet the Stringent
        Standard Imposed by Omnicare as to Statements About Reserve Estimates. ................... 3

II.     Plaintiffs Fail to Allege Any Facts to Suggest That the Purported Misstatements
        Concerning the Process for Estimating Reserves Were Actually False. ........................... 6

        A.      Plaintiffs Fail to Plead Any False Statement About the Process of
                Estimating Loss Reserves. ..................................................................................... 6

        B.      Defendant D'Orazio's Statement Is Not an "Admission." .................................... 8

        C.      Plaintiffs' Remaining Attempts to Manufacture a Misstatement Fail. ................ 10

III.    Defendants' Statements Regarding GAAP and Sarbanes-Oxley Are Not
        Actionable. ....................................................................................................................... 13

IV.     The Safe Harbor Applies to Defendants' Forward-Looking Statements.......................... 14

V.      The Amended Complaint Fails to Plead a Strong Inference of Scienter. ......................... 16

VI.     The Amended Complaint Fails to Plead Loss Causation.................................................. 20

VII.    The Amended Complaint Should Be Dismissed With Prejudice. .................................... 20

CONCLUSION.............................................................................................................................. 20

# TABLE OF AUTHORITIES

**CASES**

*Black v. Martek Biosciences Corp.*,
2006 WL 8435572 (D. Md. June 14, 2006) ................................................................17

*City of Dearborn Heights v. Align Tech.*,
856 F.3d 605 (9th Cir. 2017) ......................................................................................6

*Cozzarelli v. Inspire Pharms., Inc.*,
549 F.3d 618 (4th Cir. 2008) ...............................................................................14, 20

*Freudenberg v. E\*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010)........................................................................10

*In re 2U, Inc. Secs. Class Action*,
2021 WL 3418841 (D. Md. Aug. 5, 2021) ................................................................17

*In re AmTrust Fin. Servs., Inc. Secs. Litig.*,
2019 WL 4257110 (S.D.N.Y. Sept. 9, 2019)..............................................................13

*In re BioScrip, Inc. Secs. Litig.*,
95 F. Supp. 3d 711 (S.D.N.Y. 2015)............................................................................4

*In re Braskem S.A. Secs. Litig.*,
246 F. Supp. 3d 731 (S.D.N.Y. 2017)........................................................................14

*In re Gentiva Secs. Litig.*,
932 F. Supp. 2d 352 (E.D.N.Y. 2013) .......................................................................14

*In re Genworth Fin. Inc. Secs. Litig.*,
103 F. Supp. 3d 759 (E.D. Va. 2015) ......................................................9, 10, 13, 15

*In re PEC Sols., Inc. Secs. Litig.*,
418 F.3d 379 (4th Cir. 2005) .....................................................................................14

*In re PMA Cap. Corp. Sec. Litig.*,
2005 WL 1806503 (E.D. Pa. July 27, 2005)..............................................................10

*In re Triangle Cap. Corp. Secs. Litig.*,
988 F.3d 743 (4th Cir. 2021) ...............................................................................19, 20

*Katyle v. Penn Nat'l Gaming, Inc.*,
637 F.3d 462 (4th Cir. 2011) .....................................................................................20

*KBC Asset Mgmt. NV v. DXC Tech. Co.*,
19 F.4th 601 (4th Cir. 2021) .............................................................................17, 18, 19

*Marsh Grp. v. Prime Retail, Inc.*,
46 F. App'x 140 (4th Cir. 2002) ...........................................................................................15

*Matrix Cap. Mgmt. Fund, LP v. BearingPoint, Inc.*,
576 F.3d 172 (4th Cir. 2009) ................................................................................................18

*Nolte v. Cap. One Fin. Corp.*,
390 F.3d 311 (4th Cir. 2004) ..................................................................................................3

*Omnicare, Inc. v. Laborers Dist. Council*,
575 U.S. 175 (2015)...............................................................1, 2, 3, 4, 5, 6, 8, 10, 12, 13, 15

*Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*,
918 F.3d 312 (4th Cir. 2019) ....................................................................................11, 12, 16

*Proter v. Medifast, Inc.*,
2013 WL 1316034 (D. Md. Mar. 28, 2013).........................................................................19

*Smith v. Circuit City Stores, Inc.*,
286 F. Supp. 2d 707 (E.D. Va. 2003) ...................................................................................13

*Teachers' Ret. Sys. of LA v. Hunter*,
477 F.3d 162 (4th Cir. 2007) .................................................................................................7

*TransEnterix Investor Grp. v. TransEnterix, Inc.*,
272 F. Supp. 3d 740 (E.D.N.C. 2017)...................................................................................15

*Woolgar v. Kingstone Cos., Inc.*,
477 F. Supp. 3d 193 (S.D.N.Y. 2020)......................................................................................9

*Yates v. Municipal Mortg. & Equity, LLC*,
744 F.3d 874 (4th Cir. 2014) ..............................................................................16, 17, 18, 19, 20

STATUTES

15 U.S.C. § 78u–5................................................................................................................15, 16

OTHER AUTHORITIES

Local Rule 7(F) .......................................................................................................................3

**PRELIMINARY STATEMENT**

Plaintiffs' Opposition demonstrates the Amended Complaint's ("AC") utter failure to plead particularized facts sufficient to demonstrate an actionable misstatement, a strong inference of scienter, or loss causation. Nor could it, as nothing in the Opposition ("Opp.") can cure the AC's fundamental flaw: Plaintiffs fail to allege any facts regarding the Company's loss reserves or the process by which they were estimated, and likewise plead no facts connecting any of the purported problems observed by the former employees ("FEs")—who Plaintiffs concede are "frontline claims personnel"—to any Defendant. (Opp. 15.) The Opposition fails to identify any case that survived a motion to dismiss in these circumstances, and Plaintiffs' claims must be dismissed because they cannot meet the high bar imposed by *Omnicare* and the PSLRA.

None of Plaintiffs' efforts to avoid dismissal can salvage their claims. While Plaintiffs do not dispute that the reserve estimates that form the bulk of the Amended Complaint are statements of opinion under *Omnicare*, Plaintiffs barely even attempt to meet *Omnicare*'s exacting standard for such statements, offering mere conclusory assertions of omissions and purportedly "embedded" facts that fall far short of what the Supreme Court has instructed is required to render an opinion statement actionable. Instead, Plaintiffs try to save their claims by claiming their case is really about a handful of alleged misstatements regarding the *process* for estimating reserves and claiming that such statements are false. But Plaintiffs fail to plead the requisite facts to back up their assertions. For example, Plaintiffs claim that the Company's statements regarding the process for estimating reserves was necessarily false because the Company said it would take experience into account in estimating reserves but actually systemically "disregarded" such experience. (Opp. 11.) This argument falls apart under even the slightest scrutiny: the Opposition confirms that Plaintiffs plead no facts to connect the scattered accounts of claims staff who believed reserves for individual claims should be higher to the Company's overall "experience"

1

across thousands of claims at any particular point in time, let alone any facts to connect these purported issues to the Company's estimation of loss reserves for current and *future* claims in its actuarial judgment. Indeed, Plaintiffs' own allegations foreclose the Opposition's arguments, as Plaintiffs elsewhere concede that case reserves could be increased if properly requested by claims staff. Plaintiffs cannot credibly claim that the process for setting overall reserves about which they allege zero facts was somehow falsely described.

Plaintiffs' other attempts to plead that Defendants made any false descriptions of its process for estimating reserves fare no better. For example, Plaintiffs' strenuous attempts to mischaracterize Defendant D'Orazio's May 2021 statement regarding the Company's reserve increases and methodology as an "admission" that Defendants knew their prior estimates were false only highlights the weakness of their position. Far from "admitting" anything, D'Orazio's statement described the Company's decision to revise the methodology for estimating reserves in its actuarial judgment based on newly received information. Nothing suggested that the Company did not believe its earlier estimates when they were made or refused to take experience into account before May 2021, and Plaintiffs cannot transform a good-faith statement describing the Company's decision to take a different approach based on new data into a claim for securities fraud. The Opposition confirms that Plaintiffs cannot meet *Omnicare*'s standard and identify no false statement about the process for estimating reserves, failures that are fatal to Plaintiffs' claims.

Plaintiffs' Opposition likewise makes clear Plaintiffs' claims are subject to dismissal for the additional reason that Plaintiffs fail to plead facts coming close to meeting the requisite "strong inference" of scienter. While Plaintiffs repeatedly protest that they are not pleading fraud by hindsight, the Opposition makes clear that Plaintiffs do exactly that, relying heavily on arguments that because Defendants' projections did not turn out as expected, their earlier statements *must*

2

*have been* fraudulent. The Fourth Circuit has rejected this theory time and again, holding that Plaintiffs must plead that the opinions were knowingly false *when made*, which the AC fails to do. For these and other reasons described below, this Court should dismiss the AC with prejudice.[1]

## I.   The Opposition Effectively Concedes That Plaintiffs Cannot Meet the Stringent Standard Imposed by *Omnicare* as to Statements About Reserve Estimates.

The core of Plaintiffs' case is based on the theory that the Company's overall loss reserve estimates were false. The AC spends paragraph after paragraph claiming that the Company's "key financial measures" from the fourth quarter of 2018 through the first quarter of 2021 (¶¶ 103–75) were knowingly misstated and likewise identifies numerous purported misstatements about the Company's belief that its loss reserve estimates were "reasonable" and otherwise describing the Company's held reserves, including that "every known claim has a specific case reserve . . . which management believes is adequate . . . based on information available at the time" and that the Company seeks to "estimate the amount of future obligations, especially reserves for losses and loss adjustment expenses, in a consistent and appropriate fashion" (¶¶ 187–88, 196–97, 207–08). As Plaintiffs cannot dispute, Fourth Circuit precedent makes clear that reserve estimates are quintessential statements of opinion evaluated under *Omnicare*. *See Nolte v. Cap. One Fin. Corp.*, 390 F.3d 311, 314–15 (4th Cir. 2004); *see also Omnicare, Inc. v. Laborers Dist. Council*, 575 U.S. 175 (2015).[2]

Notwithstanding that loss reserves make up the vast bulk of their purported misstatements,

---

[1] The Court should also disregard the two "exhibits" filed by Plaintiffs, which merely summarize their allegations and appear to be an attempt to evade this Court's page limit for briefs. *See* Local Rule 7(F) (setting a 30-page limit for opening and responsive briefs).

[2] Contrary to Plaintiffs' suggestion (Opp. 16–17), *Nolte* did not rely on any concession that statements regarding the adequacy of reserves are opinions. Rather, the Fourth Circuit held that the challenged statements "about the adequacy of . . . loan loss reserves" were "statement[s] of opinion." 390 F.3d at 314–15. In particular, the opinions were not actionable because, as here, there was no allegation "that management was ever informed" of the FEs' concerns. *Id.* at 316.

the Opposition barely mentions *Omnicare* and largely tries to avoid its application, spending just two short paragraphs arguing that they have pled actionable statements of opinion, all but conceding they fail to meet *Omnicare*'s high bar.  (Opp. 17-18.)  Plaintiffs' meager attempt to argue that statements regarding (unspecified) misstatements regarding the "adequacy of reserves" are actionable boils down to conclusory arguments that (i) the Company's reserve estimates contained "embedded"—and unstated—alleged misstatements regarding the *process* for estimating loss reserves and (ii) purportedly material "facts" were omitted from statements about reserve estimates, including that the Company did not "primarily rely" on past experience in estimating overall loss reserves, implemented "systemic policies" to keep "reserves" low, and failed to use "current information" in estimating reserves.  These half-hearted efforts fail to meet *Omnicare's* high bar.

First, Plaintiffs' extraordinary argument that the Company's reserve estimates contain implied statements about the estimation process that take them outside of *Omnicare* would quickly swallow *Omnicare* entirely, and Plaintiffs cite no authority for such an expansive interpretation. (Opp. 17.)  In any event, Plaintiffs' arguments are premised on allegedly misstated or omitted "facts" about how the Company estimated **loss reserves**; however, as discussed further below, Plaintiffs offer no facts whatsoever about such reserves or the process of estimating them, including whether and to what extent the Company took its own historical experience into account. Plaintiffs cannot credibly claim to have identified purportedly "embedded" or "omitted" facts about the Company's loss reserves where they offer no facts whatsoever about such reserves or the process to estimate them.  *See In re BioScrip, Inc. Secs. Litig.*, 95 F. Supp. 3d 711, 739 (S.D.N.Y. 2015) ("Allegations premised on the testimony of confidential sources must show that individual defendants actually possessed the knowledge highlighting the falsity of public

4

statements").  The Opposition confirms this failure, as Plaintiffs do not contend that a single FE was an actuary or provided any facts about loss reserves or IBNR reserves for future claims (let alone indicated that they even knew IBNR reserves existed).  (*See* Opp. 14 (describing FEs as "frontline claims personnel")).  Plaintiffs cannot satisfy *Omnicare*'s demanding standard when they have failed to plead any particularized factual allegations regarding the process for estimating loss reserves, about which the Defendants spoke.

Plaintiffs' conclusory attempts to link FE statements about the claims handling process and case reserves to the process for estimating overall loss reserves—for example, by arguing that the FEs showed "direct management involvement in suppressing reserves" (Opp. 15 (citing AC ¶¶ 67, 72–73, 76, 98, 100 (collecting allegations about the director of claims, officers in the claims department, and low-level managers)))—cannot satisfy *Omnicare*'s exacting standard.  Plaintiffs allege no facts, much less "particular" facts as required by *Omnicare*, supporting any connection between the facts pled regarding case reserves and the actuarial process for estimating loss reserves.[3]  Plaintiffs' allegations suggest nothing more than that a few "frontline claims personnel" could not increase reserves on individual claims as high as the FEs thought appropriate and that members of the claims department—not the Individual Defendants—perceived what Plaintiffs claim was "systemic under-reserving."  But *Omnicare* explicitly rejected a similar attempt to render statements of opinion actionable without allegations that the *speaker* omitted material facts within her possession.  *See* 575 U.S. at 189 (speaker can be held liable for factual omissions only if that factual information is in the speaker's "possession at the time").  Plaintiffs have failed to meet their burden to identify allegedly omitted facts known to any speaker "with specificity," and

---

[3] Plaintiffs also fail to mention that their allegations involve "*a* Director of Claims," not alleged to have sole authority over Uber claims.  AC ¶ 67 (emphasis added).  Nor have Plaintiffs pleaded particularized facts to suggest that this director acted at the direction of the named Defendants.

the Opposition's reliance on lawyer's argumentation to obfuscate their failure to plead such facts falls far short of this high bar.[4] *See City of Dearborn Heights v. Align Tech.*, 856 F.3d 605, 617 (9th Cir. 2017) (allegations insufficient to plead falsity under *Omnicare* where sources did not "participate[]" in or have knowledge of the challenged accounting practice).

## II. Plaintiffs Fail to Allege Any Facts to Suggest That the Purported Misstatements Concerning the Process for Estimating Reserves Were Actually False.

Recognizing that the majority of the alleged misstatements are not actionable under *Omnicare*, Plaintiffs change their tack, focusing on a handful of misstatements that Plaintiffs contend fall outside of *Omnicare* because they concern the *process* for estimating reserves, including: that (i) Defendants said they relied on "past experience" in estimating reserves when in fact they "disregarded" such experience; (ii) Defendant D'Orazio's statements in May 2021 somehow conceded that the Company knew its prior methodology was wrong but used it anyway; and (iii) Defendants falsely described case reserves because they did not actually make an "individual case-basis valuation" for each known claim, and misrepresented the status of the "run off" of the Uber block. (Opp. 10-11)  But Plaintiffs fail to plead any facts demonstrating that any alleged statement about process was actually false, as required to plead an actionable misstatement.

### A. Plaintiffs Fail to Plead Any False Statement About the Process of Estimating Loss Reserves.

Plaintiffs' claim that the Company's process for estimating reserves was falsely described badly misstates the facts actually pled.  As described above, Plaintiffs' argument fails for the threshold reason that they allege no facts regarding the process for estimating loss reserves;

---

[4] Likewise, while the AC describes audit reports allegedly presented to unnamed executives regarding reserves on individual claims, Plaintiffs fail to allege that any Defendant received or reviewed any report at any time, let alone allege what any report said, how many claims they related to, or how the unspecified claims discussed in the alleged report would have affected the Company's overall loss reserves.  (Opp. 15 (citing AC ¶¶ 97–99).)

Plaintiffs cannot credibly argue that the Company made misstatements about a process they fail to plead a single fact about. *See Teachers' Ret. Sys. of LA v. Hunter*, 477 F.3d 162, 179 (4th Cir. 2007) (disregarding account of FE with no "access to information" about practice at issue).

While Plaintiffs do not dispute that they pled facts only about case reserves for individual claims (Opp. 15), Plaintiffs nonetheless claim based on FE allegations that the Court can conclude that the Company failed to account for "experience" in estimating loss reserves. (*See, e.g.*, Opp. 11–13.)  But Plaintiffs offer no factual basis for this leap, nor could they: case reserves estimated by "frontline claims staff" are not the same thing as the Company's historical experience across thousands of open and closed claims, and Plaintiffs' attempt to conflate the two concepts without any well-pleaded facts to support such a connection only underscores the weakness of their claims.

And even accepting Plaintiffs' theory that case reserves have some (unspecified) relation to the Company's experience as that term is used in the Company's disclosures, Plaintiffs' own allegations demonstrate that experience *was* taken into account and not "uniformly" disregarded under "systemic" "policies" and "procedures" applied to all case reserves, as Plaintiffs claim. (Opp. 11–12, 15.)  For example, Plaintiffs claim that the "facts of a given claim were ***not*** considered in establishing reserves" because FEs claimed that at times the Company automatically reduced "proposed reserve increases" and that the Company had a "policy" that case reserves for newly reported claims were initially set with a "placeholder" amount of one dollar.  (Opp. 11.) But Plaintiffs' own allegations defeat their claims: Plaintiffs' criticism that the Company reduced **proposed increases to case reserves** admits that such increases *were* permitted and setting a "placeholder" reserve when a claim was first reported does not mean that amount was maintained over time.

Indeed, not one FE claims that case reserves were actually set to zero or could not be

increased; at most, the FE allegations show that "frontline claims staff" were purportedly dissatisfied that reserves were not increased to the amounts they wanted and that staff believed that the paperwork necessary to increase reserves was too difficult to complete. *Omnicare* requires the pleading of specific facts, not conclusory (and contradictory) assertions, and the facts pled do not plausibly indicate that the process for estimating loss reserves disregarded the Company's aggregated experience as of any particular time period. *See Omnicare*, 575 U.S. at 194. Lawyers' argumentation aside, Plaintiffs cannot manufacture a misstatement based on conclusory arguments when they pled no facts about how experience, or any specific case reserve or even case reserves for open claims at any point in time, factored into the estimation of loss reserves.

**B.**      **Defendant D'Orazio's Statement Is Not an "Admission."**

Recognizing the weakness of the allegations of their FEs, Plaintiffs resort to distorting the May 2021 statement of Defendant D'Orazio announcing an increase in reserves and a modification of its methodology for calculating reserves to "us[e] only our own loss experience" to estimate loss reserves. Plaintiffs contend that D'Orazio's comment that the Company's earlier estimates "got it wrong" amounted to an "admission" that the Company had not used historical data in its earlier reserve estimates and thus knowingly misled investors when telling them that it had incorporated historical data into its calculations. (Opp. 13; *see* Ex. 31 at 2–3.)[5] But any reading of D'Orazio's statement makes clear that he made no such "admission"; rather, he explained that the Company had previously used a mix of its own data along with data from others in the industry (Ex. 31 at 2), which was entirely consistent with what the Company had disclosed to investors all along, that it used *both* "our own data and industry data" to estimate loss reserves. *See* Ex. 2 at 71; Ex. 10 at 72; Ex. 18 at 75. D'Orazio's statement announced, based on new information

---

[5] "Ex. __" refers to the exhibits attached to the Declaration of Susan Gittes, ECF No. 55.

received in the first quarter of 2021, that the Company would begin to use "only our own loss experience . . . rather than the array of inputs that we had used in prior quarters" and that they believed this new methodology "would give us a better and more conservative estimate of ultimate losses on this account." *Id.* This comment only reinforces the judgment-based nature of estimating reserves for *future* losses: the Company weighs different factors and inputs in its actuarial judgment and adjusts that approach if necessary based on newly received data.

Most importantly, D'Orazio's statement says nothing to suggest that Defendants did not *believe* their prior reserve estimates when made. *See* Ex. 31 at 3. "That defendants later decided to revise the amount of loss reserves that [they] deemed adequate provides absolutely no reasonable basis for concluding that defendants did not think reserves were adequate at the time of the challenged statements." *Woolgar v. Kingstone Cos., Inc.*, 477 F. Supp. 3d 193, 225 (S.D.N.Y. 2020); *see id.* at 225 n.13 (collecting cases reaching the same conclusion). "Plaintiffs['] assertions about the Company's loss reserves mimic the typical type of 'fraud by hindsight' theory that courts have been unwilling to entertain." *Id.* at 225–26.

Once D'Orazio's comments are placed in proper context, it is clear why Plaintiffs' reliance on *Genworth* is inappropriate. (Opp. 10, 19.) In *Genworth*, the court denied a motion to dismiss based on particularized factual allegations that the defendants made false factual statements about their review of the company's insurance reserves—including that they had conducted a "thorough review" of reserves in 2013 and were using current claims data to estimate reserves. *In re Genworth Fin. Inc. Secs. Litig.*, 103 F. Supp. 3d 759, 772–75 (E.D. Va. 2015). But the *Genworth* defendants expressly acknowledged the falsity of those statements in a subsequent investor conference where they stated they had not done a "deep review" since 2012 and had not in fact used current claims data. *Id.* at 773. Unsurprisingly, such allegations were sufficient to show that

9

the defendants' factual statements were false when made given that defendants admitted that they knew no such review had occurred. *Id.* at 773–74. In sharp contrast to *Genworth*, Plaintiffs point to *no* similar factual allegation—much less any "admission"—here.[6]

### C. Plaintiffs' Remaining Attempts to Manufacture a Misstatement Fail.

Plaintiffs likewise fail to plead facts suggesting that any statements regarding case reserves or the status of the run-off of the Uber block were actually false or misleading. First, Plaintiffs try to manufacture a factual misstatement by cutting and pasting different statements about the Company's process for estimating case reserves, claiming that Defendants falsely stated that the Company used "'individual case-basis evaluations' that evaluated 'each specific claim' to establish a 'specific case reserve . . . which management believes is adequate to resolve the claim.'" (Opp. 5.) However, Plaintiffs omit the surrounding context in which the Company explained that case reserves "[a]s a general rule" are estimated based on "**information [then] available**," which "**management believes**" is adequate to resolve the claim." Ex. 2 at 19, Ex. 10 at 19, Ex. 18 at 19. As that context makes clear, the Company was expressing its *opinion* that case reserves would be adequate to pay claims based on the information it had available, while explaining some of the factors that could cause losses to vary from those estimates. That is a classic statement of opinion that must be evaluated under *Omnicare*, a standard Plaintiffs barely attempt to meet. *See also, e.g.*, AC ¶¶ 186, 195, 200 (expressing the Company's *opinion* that its process for estimating overall loss reserves provided "an appropriate basis for predicting future events"); *see id.* ¶¶ 188, 197

---

[6] Plaintiffs' out-of-circuit cases involved particularized factual allegations of knowing misrepresentations regarding reserves, allegations which are not present here. *See, e.g.*, *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 177 (S.D.N.Y. 2010) (defendants admitted internally "that the Company was experiencing losses and expected more losses . . ., but Defendants made the opposite representations to the public"); *In re PMA Cap. Corp. Sec. Litig.*, 2005 WL 1806503, at \*3, 6 (E.D. Pa. July 27, 2005) (defendants represented reserves were adequate despite outside auditors' advice that reserves were insufficient, and auditors were fired).

(expressing Company's *opinion* that "reserve estimates are reasonable" and that its goal was to estimate future losses "in a consistent and appropriate fashion")).

Moreover, while Plaintiffs' selective quotations attempt to reduce the Company's process for estimating loss reserves to a mechanical one such that allegedly deficient case reserves necessarily mean overall reserves were understated and that descriptions of how the Company estimated case reserves and loss reserves were necessarily false, in fact the Company's disclosures make clear that the process is anything but simple addition and that the Company made no false statement describing the process for estimating loss reserves.  For instance, the Company stated that "individual case-basis valuations"—which Plaintiffs assume without any support are "case reserves"—for all claims reported as of a given date *and* statistical analysis are used to estimate loss reserves in the Company's "judgment."  Ex. 2 at 18, Ex. 10 at 18, Ex. 18 at 18. Plaintiffs ask this Court to ignore the full context of these statements and adopt their incorrect view that because the FEs contended that case reserves should have been set higher, the Company misled the market as to how such reserves were estimated.  But Plaintiffs fail to point to any statement made about the estimation of case reserves that was false: as Plaintiffs' own allegations emphasize, the Company *did* undertake a case-by-case evaluation of claims reported to the Company (AC ¶¶ 76, 96). While the FEs may disagree with the Company's handling of such evaluations, nowhere in the Company's disclosures did it say that case reserve estimates from "frontline claims" staff would be accepted without applying the Company's judgment based on a global view of the Company's overall experience and expectations of future claims.  To the contrary, the Company expressly advised that "[w]e keep the settlement authority of front-line adjusters low to ensure the practice of having two or more members of the department participate in the decision as to whether to settle or defend."  Ex. 2 at 13, Ex. 10 at 13, Ex. 18 at 14; *see Paradise Wire & Cable Defined*

11

*Benefit Pension Plan v. Weil*, 918 F.3d 312, 322 (4th Cir. 2019) ("A reasonable investor is expected to understand a statement of opinion in its full context and there will only be liability for the omission of material facts that cannot be squared with such a fair reading.").

Second, Plaintiffs' claim that the Company's statements about the status of the run-off of the Uber block were false suffers from the same core defects. As above, Plaintiffs' efforts to cast these statements as factual to avoid *Omnicare*'s standard fails: statements about the Company's *belief* that the run-off was going well—for example, statements in February 2020 that we are "comfortable with our loss reserves" and that the Company was "pleased" with the run-off (Opp. 8)—are classic opinion statements. To the extent there are components of such statements that are plausibly factual, Plaintiffs fail to demonstrate how such statements are false. In particular, Plaintiffs claim that statements that the Company was "watching [the run-off] closely," that the run-off was progressing consistent with the Company's expectations, and settling claims at a "rapid pace" that is "consistent with held reserves" (*id.*) were false based on the conclusory claim the run-off was a "disaster," citing to approximately 10 paragraphs of the AC. (AC ¶¶ 68–77.) But again, Plaintiffs' allegations do not support the Opposition's description: only a small number of FEs said anything about the Company's handling of claims in 2020, when the purportedly false statements were made. (AC ¶¶ 72, 77.) And far from describing a "disaster," the FE accounts from this time period are consistent with the Company's statement that it was closely monitoring the development of claims during this period and sought to close claims quickly. (*See, e.g.*, AC ¶¶ 89–90 (reporting that claims staff was required to close a claim every day)). As above, that "frontline" claims staff believed they should have greater authority to increase case reserves does not say anything about Defendants' opinions on the progress of the Company's run-off at the time of the challenged statement, let alone how the Company viewed its reserving as a whole.

12

### III.     Defendants' Statements Regarding GAAP and Sarbanes-Oxley Are Not Actionable.

Plaintiffs' arguments regarding Defendants' compliance with GAAP and statements regarding internal controls fare no better.  Plaintiffs claim that, while GAAP did not require the Company to rely *solely* on its historical data, it did require the Company to rely "primarily" on such data to estimate loss reserves.  (Opp. 19.)  But the GAAP provision they cite, ASC 944-40-30-1, requires only that a company estimate losses "using past experience adjusted for current trends, **and any other factors that would modify past experience**."  *See* AC ¶ 218 (emphasis added).  As discussed above, the AC does not plead facts to plausibly suggest—nor could it—that Defendants *ignored* past experience when setting loss reserves; rather, Plaintiffs' real dispute is whether the Company placed sufficient weight on its historical experience as compared to other factors in exercising its actuarial judgment, which GAAP leaves to the judgment of the Company and its auditors.  *See Smith v. Circuit City Stores, Inc.*, 286 F. Supp. 2d 707, 719 (E.D. Va. 2003) ("GAAP is a term of art encompassing a wide range of acceptable procedures").[7]  Contrary to Plaintiffs' claims, the GAAP provisions at issue are anything but "simple" (Opp. 19); they require the application of reasoned judgment after considering multiple factors and are thus opinions subject to challenge only under *Omnicare*.  *See In re AmTrust Fin. Servs., Inc. Secs. Litig.*, 2019 WL 4257110, at *14 (S.D.N.Y. Sept. 9, 2019) (holding that when "the relevant accounting guidance called for the exercise of judgment, then the resulting data would be a statement of opinion").  The Opposition likewise confirms Plaintiffs' failure to plead any facts to suggest that Defendants knowingly violated GAAP by failing to reasonably estimate loss reserves in the

---

[7] Plaintiffs cite only one case (*Genworth*) sustaining a claim under ASC 944-40-30-1, and it did so for reasons not present here.  Given the unique facts of that case, the court found defendants may have violated GAAP by knowingly failing to adjust the company's reserves "for current trends" because the defendants were aware that the claims duration data used by the company was out of date and thus that reserves were understated.  103 F. Supp. 3d at 781, 776–77.  Plaintiffs cite *no* case for the proposition that the "primary" input must be a Company's historical data.

13

exercise of the Company's actuarial judgment pursuant to ASC 450-20-25-2, as Plaintiffs fail to identify any allegation to suggest that the Defendants disbelieved their own reserve estimates or failed to disclose particularized facts within their possession rendering any opinion misleading. *See* Mot. at 20–21; *see also In re PEC Sols., Inc. Secs. Litig.*, 418 F.3d 379, 389–90 (4th Cir. 2005).

Nor have Plaintiffs offered any basis to conclude that Defendants falsely certified that they had established internal controls to ensure the reliability of the Company's financial statements in accordance with Sarbanes-Oxley and that, in Defendants' opinion, those internal controls were effective.[8]  *See* AC ¶¶ 179–82.  The Opposition makes clear that Plaintiffs have "not alleged any facts pertaining to the Company's internal structure for financial reporting, much less that [it] lacked adequate internal controls."  *In re Gentiva Secs. Litig.*, 932 F. Supp. 2d 352, 371 (E.D.N.Y. 2013).  As described above, they simply rely upon the fact that the Company later adjusted its reserve methodology and irrelevant FE accounts, *see* AC ¶ 182, which are insufficient to show that the certifications were false when made as discussed above.  *See In re Braskem S.A. Secs. Litig.*, 246 F. Supp. 3d 731, 757–58 (S.D.N.Y. 2017) (collecting cases rejecting theory that internal controls certifications were false where plaintiffs' allegations regarding "the company's deficient financial controls and accounting were wholly conclusory").  As the Fourth Circuit has explained, the signing of statements regarding internal controls does not provide any "independent support" for the inference that Defendants knowingly engaged in wrongdoing, even when a company later suffers losses.  *Cozzarelli v. Inspire Pharms., Inc.*, 549 F.3d 618, 628 n.2 (4th Cir. 2008).

## IV.    The Safe Harbor Applies to Defendants' Forward-Looking Statements.

Plaintiffs likewise cannot avoid the application of the Safe Harbor for forward-looking statements by mischaracterizing the Defendants' statements or claiming that the cautionary

---

[8] The Company's filings stated that its independent auditors confirmed internal controls were "effective" under applicable standards.  *See* Ex. 2 at F-3, Ex. 10 at F-4, Ex. 18 at F-4.

language accompanying them was insufficient: these arguments are squarely foreclosed by Fourth Circuit precedent. *Marsh Grp. v. Prime Retail, Inc.*, 46 F. App'x 140, 146 (4th Cir. 2002); *see* Opp. 20–21. Statements that management is "confident" about loss reserves and believes those reserves to be "reasonable" are necessarily forward-looking because they are projections that the reserves will be adequate to cover *future* losses. *See* Mot. at 21; *see also, e.g.*, AC ¶¶ 188, 197, 200, 207–08 (collecting similar statements).[9] Plaintiffs' argument that these remarks are statements of the Company's "present" condition—and thus not subject to the Safe Harbor—fails under the Fourth Circuit's holding that "statements of present belief regarding future events" retain their forward-looking character. *Marsh Grp.*, 46 F. App'x at 147; *see also TransEnterix Investor Grp. v. TransEnterix, Inc.*, 272 F. Supp. 3d 740, 758 (E.D.N.C. 2017) ("The Fourth Circuit has rejected attempts to color forward-looking statements as 'present intentions' in a bid to alter their forward-looking nature."). Contrary to Plaintiffs' assertion that *Marsh* involved projections of future dividends whereas this case involves estimates of future losses, that is a distinction without a difference (Opp. 21 n.14); both are "statement[s] of future economic performance" protected by the Safe Harbor. *See* 15 U.S.C. § 78u–5(i)(1)(C).[10]

Moreover, while Plaintiffs claim that Defendants' risk disclosures were not "meaningful" because Defendants allegedly knew that the risk that reserves could be underestimated "had already been realized" (Opp. 21), they point to no concrete allegation that any such risk *had*

---

[9] Even if these were not forward-looking statements, they would be actionable only under *Omnicare*, a standard that Plaintiffs have failed to satisfy as explained above.

[10] Plaintiffs cite *Genworth* for the proposition that statements regarding loss reserves are not projections if "they are directed to the then-present state of the Company's financial condition." (Opp. 20 (citing 103 F. Supp. 3d at 789)). But *Genworth* characterized the view of *other* cases and recognized that the "plain meaning" of the Safe Harbor covers statements that include a company's present characterization of future financial results. 103 F. Supp. 3d at 788. *Genworth* recognized that statements about the "adequacy" of reserves can "encompass[] a representation of future events" and thus "may be deemed forward-looking." *Id.* at 789.

materialized or that Defendants were aware of it when they made the cautionary statements, as described above.  Defendants' disclosures regarding its reserve estimates were significantly more detailed than what the Fourth Circuit has required (Mot. 22), and this Court should therefore reject Plaintiffs' attempt to evade the application of the Safe Harbor.[11]  These warnings were more than sufficient to place investors on notice of the risk of "more inherent severity" from the Uber account that ultimately materialized.  Ex. 31 at 3; *see also Paradise Wire*, 918 F.3d at 319 (disclosure that "there can be no assurance that the [projections] will be realized or that [the company's] future financial results will not materially vary from the [projections]" was sufficiently cautionary).

## V.   The Amended Complaint Fails to Plead a Strong Inference of Scienter.

Plaintiffs' Opposition likewise demonstrates that they have failed to plead particular facts demonstrating the "strong inference" of scienter required by the Fourth Circuit.  Lacking such facts, Plaintiffs resort to the conclusory claim that their allegations show that the Individual Defendants "were personally and intimately involved in the reserving process." (Opp. 22; *see also* Opp. 22–24.)  But as discussed in Defendants' Motion (at 11 & 17), Plaintiffs mix apples and oranges: general allegations that Defendants oversaw *overall* loss reserves provide no basis to conclude that any Defendant was aware of the scattered complaints of a small group of "frontline claims personnel" regarding *individual* case reserves.  Plaintiffs fail to allege any fact to suggest that Defendants believed case *or* overall reserves were inadequate, much less that any intended to deceive investors; Plaintiffs lack even "vague and conclusory" allegations about the Defendants' "state of mind," *Yates v. Municipal Mortg. & Equity, LLC*, 744 F.3d 874, 886 (4th Cir. 2014).

Plaintiffs' failure to plead any facts connecting any of their purported criticisms of the

---

[11] Defendants' oral forward-looking statements incorporated these written disclosures by reference, as the Safe Harbor permits.  15 U.S.C. § 78u–5(c)(2)(B); *see, e.g.*, Ex. 28 at 2.

process for handling individual claims to any Defendant likewise forecloses any argument that Defendants recklessly failed to anticipate that reserves would need to be increased on account of the concerns of the FEs.  As the Fourth Circuit recently reaffirmed, the FE allegations "do not raise a strong inference of scienter because the former employees . . . do not allege that they passed their concerns on to [defendants] or that the individual Defendants were otherwise aware of the problems alleged."  *See KBC Asset Mgmt. NV v. DXC Tech. Co.*, 19 F.4th 601, 609 (4th Cir. 2021). "This general lack of direct contact with Defendants weakens the inference of scienter, as [Defendants] may have been unaware of the problems, the causes of the problems, or the extent of the problems."  *Id.*  Plaintiffs' cited cases involved allegations that FEs had direct contact with the individual defendants.  Opp. 27.[12]  If Plaintiffs had such specific facts here, they would not have been shy about pleading them, and Plaintiffs' failure to do so is fatal to their claims.

Plaintiffs' remaining efforts to plead scienter are largely premised on an impermissible theory of fraud by hindsight, claiming that scienter is demonstrated based on the size of the Uber account and the magnitude of the eventual reserve charge.  (Opp. 24–25.)  Yet as the Fourth Circuit has repeatedly explained, allegations that senior executives were aware "that their statements were false" simply "because of their positions or because such knowledge relates to the business's core operations are not enough, standing alone, 'to support a strong inference of scienter.'"  *KBC Asset Mgmt.*, 19 F.4th at 612 (quoting *Yates*, 744 F.3d at 890).  While Plaintiffs seek to distinguish *KBC* by arguing that it involved "broad corporate strategies"—which in their view might not have commanded the attention of executives (Opp. 25)—the facts of *KBC* support no such distinction,

---

[12] *See In re 2U, Inc. Secs. Class Action*, 2021 WL 3418841, at *12 (D. Md. Aug. 5, 2021) (crediting FEs with "specific knowledge that [defendants] were aware of the declining [] projections and had concerns about them"); *Black v. Martek Biosciences Corp.*, 2006 WL 8435572, at *5 (D. Md. June 14, 2006) (FE alleged management "knew" statements were false).

17

as that case concerned the company's implementation of a corporate strategy that ultimately required revision of financial projections "downward by an estimated $800 million[.]" 19 F.4th at 606; *see also Yates*, 744 F.3d at 890 ("reject[ing] plaintiffs' contention that the individual defendants must have acted intentionally or recklessly . . . merely because (1) they were senior executives, and (2) the [investment] represented a core business of the Company").

Nor can Plaintiffs establish scienter based on D'Orazio's statement, taken out of context as described above, announcing that the Company was revising its method for estimating reserves. (*See* Opp. 25; Ex. 31 at 3.) The Company's decision to increase its reserve estimates and change the actuarial methodology utilized to estimate reserves, which sought to predict *future* losses, does not "compel an inference of wrongful intent" with respect to its *prior* estimation of reserves. *Yates*, 744 F.3d at 887; *see also Matrix Cap. Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 183 (4th Cir. 2009) (statement that inaccurate financial statements were a result of an improper "tone at the top" failed "to suggest that defendants acted with scienter when they issued [the company's] 2003 and 2004 financial statements"). Rather, the candor of D'Orazio's statement "lend[s] weight to an inference that contemporaneous financial statements were made in good faith," especially where, as here, the estimates involved a new business that was particularly challenging to estimate. *See id.* at 187–88 (declining to infer scienter in analogous circumstances).

Nor does the size of the eventual reserve charge demonstrate that Defendants' earlier estimates were false or misleading when made. While Plaintiffs try to bolster their "magnitude" allegations by pointing to analyst commentary stating that the reserve increases purportedly indicated that Uber claims were under-reserved by 40% (Opp. 25), this allegation is yet another improper attempt to plead fraud by hindsight and does nothing to suggest that Defendants did not believe their prior estimates to be accurate when made. In any event, this purported calculation

18

does not account for the unknown number of claims not yet reported to the Company, underscoring the inherent uncertainty in estimating IBNR reserves for *future* claims.

Finally, Myron and Doran's sales of stock during the "unusually long" 32-month class period do not make up for Plaintiffs' failure to plead scienter. *Yates*, 744 F.3d at 891. Contrary to Plaintiffs claims that the sale of 25% or less of stock demonstrates scienter (Opp. 26), the Fourth Circuit has held that the sale of 17% of stock was insufficient to demonstrate scienter and favorably cited to a decision "collecting cases from this and other courts discussing similar or greater sales percentages that did not give rise to a strong inference of scienter." *KBC Asset Mgmt.*, 19 F.4th at 611 (citing *Proter v. Medifast, Inc.*, 2013 WL 1316034, at \*21 n.20 (D. Md. Mar. 28, 2013)).

Considering Plaintiffs' scienter allegations holistically does not change the conclusion. At most, they suggest that the FEs believe that Defendants "made unwise business decisions," which the Fourth Circuit has made clear is insufficient to "support a strong inference of scienter." *KBC Asset Mgmt.*, 19 F.4th at 610. The far more plausible inference is that the Company wrote a novel insurance policy, faced unexpectedly high claims, and had difficulty estimating the liability for future claims. *See Yates*, 744 F.3d at 887. And Plaintiffs have no response to the Fourth Circuit's holding that when, as here, "defendants disclose risks and newly discovered weaknesses to investors this counts against an inference of scienter." *KBC Asset Mgmt.*, 19 F.4th at 613; *see* Mot. at 28–29. Defendants repeatedly advised the public that the Uber claims were proving costlier than anticipated—which prompted the Company to terminate the contract—and repeatedly disclosed that it was increasing its reserves as a result. *See* Mot. at 7–8. "While Defendants shared with investors their optimism" that the Uber claims would stabilize, there was no "guarantee[]" that would occur, which is "precisely what Defendants disclosed." *In re Triangle Cap. Corp. Secs. Litig.*, 988 F.3d 743, 756 (4th Cir. 2021). Plaintiffs may not "use the benefit of 20-20 hindsight to

19

turn management's business judgment into securities fraud." *Id.* at 755.[13]

## VI.   The Amended Complaint Fails to Plead Loss Causation.

The Opposition likewise confirms that Plaintiffs have failed to plead loss causation based on the Company's October 26, 2021 press release.  While Plaintiffs claim the press release was "new information conveyed to the market" (Opp. 30), Plaintiffs misunderstand the nature of the transaction that the Company announced in September 2021, which transferred the liability for all remaining Uber claims to a reinsurer in exchange for a fixed payment.  *See* Ex. 23 at 8, 10; Ex. 24. Nothing had changed in October 2021; the Company merely reiterated that it had entered into the "previously announced" transaction.  Ex. 24.  The October 2021 statement was therefore not a "corrective disclosure" providing "new facts" that could demonstrate loss causation.  *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 473 (4th Cir. 2011).

## VII.   The Amended Complaint Should Be Dismissed With Prejudice.

Plaintiffs request leave to amend in a single sentence in the event that this Court grants the motion to dismiss.  (Opp. 30.)  Plaintiffs have already amended once, and in light of their failure to explain how they would remedy the "fundamental deficiencies in plaintiffs' theory of liability," the Court should dismiss the AC with prejudice.  *Cozzarelli*, 549 F.3d at 630.

## CONCLUSION

For the reasons stated above and in Defendants' motion to dismiss, the AC should be dismissed with prejudice.

---

[13] Plaintiffs also fail to allege that the Company acted with scienter.  Their arguments that the Individual Defendants had the requisite scienter (*see* Opp. 23 n.16) fail for the reasons stated above, and Plaintiffs fail to plead that any non-Defendant authorized any challenged statements (or even furnished information for those statements) as required to plead corporate scienter.

Dated: Washington, D.C.
      April 4, 2022

<table>
<tr><td></td><td>/s/ <em>Carter Burwell</em></td></tr>
<tr><td>Maeve O'Connor (<em>pro hac vice</em>)</td><td>Carter Burwell</td></tr>
<tr><td>Susan Reagan Gittes (<em>pro hac vice</em>)</td><td>Debevoise & Plimpton LLP</td></tr>
<tr><td>Debevoise & Plimpton LLP</td><td>801 Pennsylvania Ave. N.W.</td></tr>
<tr><td>919 Third Avenue</td><td>Suite 500</td></tr>
<tr><td>New York, NY 10022</td><td>Washington, D.C. 20004</td></tr>
<tr><td>(212) 909-6000</td><td>(202) 383-8000</td></tr>
<tr><td>mloconnor@debevoise.com</td><td>cburwell@debevoise.com</td></tr>
<tr><td>srgittes@debevoise.com</td><td></td></tr>
<tr><td></td><td><em>Counsel for Defendants</em></td></tr>
</table>

21