## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | |
|---|---|
| *In Re James River Group Holdings, Ltd. Securities Litigation* | Case: 3:21-cv-00444-MHL <br><br> Hon. M. Hannah Lauck <br><br> <u>CLASS ACTION</u> <br><br> <u>JURY TRIAL DEMANDED</u> |

## LEAD PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR LEAVE TO AMEND THE AMENDED CLASS ACTION COMPLAINT

**TABLE OF CONTENTS**

I.      INTRODUCTION ............................................................................................................1

II.     FACTUAL BACKGROUND ..........................................................................................5

        A.      Procedural History ..............................................................................................5

        B.      The Proposed SAC's New Allegations Corroborate And Bolster Plaintiffs'
                Claims ..................................................................................................................7

                1.      The New Evidence Corroborates And Reinforces Falsity ........................8

                2.      The New Evidence Corroborates And Reinforces Scienter .....................10

III.    ARGUMENT .................................................................................................................14

        A.      Leave To Amend Should Be "Freely Give[n]" ..................................................14

        B.      The Amendment Will Not Prejudice Defendants ................................................15

        C.      Plaintiffs Do Not Seek Leave to Amend in Bad Faith ........................................17

        D.      Filing the Proposed SAC Will Not Be Futile .....................................................18

IV.     CONCLUSION ..............................................................................................................20

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Bennett v. Berryhill*,
   2018 WL 10016165 (E.D. Va. Oct. 19, 2018)..........................................................................18

*Connelly v. Gen. Medical Corp.*,
   880 F. Supp. 1100 (E.D. Va. 1995)..................................................................................15, 16

*Davis v. Piper Aircraft Corp.*,
   615 F.2d 606 (4th Cir. 1980) .................................................................................................18

*Edwards v. City of Goldsboro*,
   178 F.3d 231 (4th Cir. 1999) .................................................................................................16

*Galustian v. Peter*,
   591 F.3d 724 (4th Cir. 2010) ............................................................................................4, 14

*Johnson v. Oroweat Foods Co.*,
   785 F.3d 503 (4th Cir. 1986) .................................................................................................18

*Laber v. Harvey*,
   438 F.3d 404 (4th Cir. 2006) ...........................................................................................15, 16

*Lickteig v. Cerberus Cap. Mgmt., L.P.*,
   2020 WL 7629876 (S.D.N.Y. Dec. 22, 2020) ........................................................................18

*Matrix Cap. Mgmt. Fund, LP v. BearingPoint, Inc.*,
   576 F.3d 172 (4th Cir. 2009) .....................................................................................15, 16, 18

*Midgett, Trustee of Hardcastle Charitable Remained Annuity Trust U/A Aug. 6, 2007 v.*
   *Hardcastle*,
   2018 WL 4781178 (E.D. Va. Oct. 3, 2018)............................................................................14

*Pinnacle Advisory Group, Inc. v. Krone*,
   2021 WL 3852338 (D. Md. Aug. 26, 2021)............................................................................14

*Plymouth County Ret. Sys. v. Evolent Health, Inc.*,
   2020 WL 6875183 (E.D. Va. June 5, 2020) .....................................................................*passim*

*Scott v. Family Dollar Stores*,
   733 F.3d 105 (4th Cir. 2013) .................................................................................................14

*Sec. Police & Fire Professionals of Am. Ret. Fund v. Pfizer, Inc.,*
   2012 WL 6771941 (D.N.J. Dec. 6, 2012) .............................................................................19

ii

*Takiguchi v. MRI Int'l, Inc.*,
  2014 WL 3105068 (D. Nev. July 7, 2014) ............................................................................18

*Tao of Systems Integration, Inc. v. Analytical Services & Materials, Inc.*,
  299 F. Supp. 2d 565 (E.D. Va. 2004)...................................................................................17

**RULES**

Fed. R. Civ. P. 15............................................................................................................*passim*

Pursuant to Rule 15(a) of the Federal Rules of Civil Procedure, Employees' Retirement Fund of the City of Fort Worth d/b/a Fort Worth Employees' Retirement Fund  ("Fort Worth") and The City of Miami General Employees' & Sanitation Employees' Retirement Trust ("Miami," and together with Forth Worth, "Lead Plaintiffs" or "Plaintiffs") respectfully submit this Memorandum of Law in Support of their Motion for Leave to Amend the Amended Class Action Complaint (the "Motion"), and further request that the Proposed Second Amended Class Action Complaint for Violations of the Federal Securities Laws, attached as Exhibit A to Plaintiffs' Motion (the "SAC"),[1] be deemed filed as of the date of the Order granting such Motion.

## I.    INTRODUCTION

This is a quintessential case where leave to amend the pleadings should be granted. After briefing on Defendants' motion to dismiss closed, important new evidence came to light in an unrelated bad faith action against Defendant James River's specialty insurance operating subsidiary, James River Insurance Company ("JRIC"). This new evidence, which includes internal JRIC documents and sworn testimony of multiple former employees, confirms and bolsters the allegations of the AC. Specifically, the documents produced and testimony offered in the bad faith action corroborate that James River not only lacked any established policies, procedures, or training for the setting, monitoring, or adjusting of reserves for claims involving Uber, the Company's largest client, but also that the Company's management took deliberate steps to suppress *all* reserves for Uber claims, as more fully explained in Section II.B below. The new evidence contradicts Defendants' representations to investors that James River maintained robust

---

[1] Plaintiffs' Amended Class Action Complaint for Violations of the Federal Securities Laws ("AC") was filed on November 19, 2021 (ECF No. 41). All "¶__" references are to the proposed SAC unless otherwise stated; all references to "MTD" are to Defendants' motion to dismiss the AC (ECF No. 54); all defined terms have the meanings assigned in the SAC; and all emphasis in quoted material is added and internal quotations and citations omitted unless otherwise noted.

1

reserving processes and "adequate" reserves to resolve "every known claim."

Indeed, despite Defendants' repeated public statements affirming the adequacy of James River's reserves and robust reserve setting processes, JRIC's former Vice President of Claims, Anita Rogers, testified under oath that she could not "recall" and did not "know" whether any policies or procedures to set, monitor, or adjust the reserves for Uber-related claims existed during her eight-year tenure at the Company. She further testified that the Company provided Uber claims examiners "no training" on setting, monitoring, or adjusting reserves. ¶¶122-24. Ingrid Slaughter f/k/a Ingrid Moses, a former Assistant Director of Claims, who worked exclusively on the Uber Account and oversaw nearly 100 Uber claims managers, similarly confirmed under oath that James River provided no training to claims adjusters for setting and monitoring reserves. When asked whether the Company had "policies and procedures . . . in place regarding how to adjust the reserve," Ms. Slaughter responded with a resounding "No." ¶127. The proposed SAC includes similar sworn testimony by another former JRIC employee, Brianna Belcher, who also witnessed firsthand how reserves for the massive influx of Uber claims were set based purely on the *ad hoc*, subjective, and on-the-fly decisions of a revolving door of woefully inexperienced and largely untrained claims handlers.

The new allegations also provide additional details about management's systemic and pervasive efforts to suppress Uber reserves, which accelerated after James River terminated the unprofitable Uber Account in October 2019. First, to suppress reserves for large claims, any request for a reserve increase to $250,000 or more was elevated to JRIC's CEO, Richard Schmitzer, who routinely refused such requests. Second, to suppress reserves on all other claims, management drastically reduced all claims department personnel's reserve authority to levels as low as one-tenth of their prior authority or even "to nothing." ¶139. Third, management required

2

that all requests for reserve increases be routed through a secret new "PLM" email portal operated by Rogers and her boss, Courtenay Warren, the Chief Claims Officer. While the AC described the existence of the PLM portal, the new allegations provide additional alarming details about its operation, including how claims handlers were specifically instructed not to mention the PLM system in their notes so that the inevitable reserve increase denials were not officially documented. Indeed, only if the reserve increase was approved would the need for the increase appear in the claim file. If, however, the increase was denied—as nearly all large requests "almost always" were—there would be no record indicating that the claim examiner solicited an increase in the first place. ¶143.

Additionally, the proposed SAC contains sworn testimony describing James River's strong motive for keeping reserves artificially low. Specifically, both before and during the Class Period, Defendants were actively seeking to sell the Company but faced significant obstacles to completing a sale "because of the Uber account." ¶149. Moreover, as set forth in the AC, while such efforts were underway, Defendants Myron and Doran unloaded large amounts of their personal holdings of James River common stock in suspiciously timed sales that occurred only months before James River cancelled the Uber Contract and stunned the market by taking a $170 million adverse charge primarily due to the Uber Contract. Thus, Defendants were highly motivated to present to the market a façade of financial strength that concealed the Company's massive liabilities under the Uber policy.

Defendants' motion to dismiss the AC (ECF No. 54) was fully briefed and remained pending before the Court at the time Plaintiffs filed their Notice of Intent to Amend the Complaint (ECF No. 63). The SAC's new evidence directly refutes many of Defendants' arguments. For example, Rogers's, Slaughter's, and Belcher's sworn testimony dispenses with Defendants'

3

contention that the AC's allegations were based on "general criticisms" by "anonymous former employees." MTD at 14-16. Moreover, the additional evidence of motive negates Defendants' claim that James River was not "a company with something to hide." *Id.* at 29.

There is no scheduling order in place in this Action. Therefore, Plaintiffs' motion is governed by Rule 15(a), which the Fourth Circuit has stated "liberally allow[s] amendment." *Galustian v. Peter*, 591 F.3d 724, 729 (4th Cir. 2010). The proposed SAC easily meets the requirements for leave to amend under Rule 15(a).

*First*, the amendment will not prejudice Defendants. Granting Plaintiffs' Motion will not delay the proceedings because the Court has not yet ruled on Defendants' motion to dismiss, and no discovery has taken place pursuant to the PSLRA's discovery stay provision. Moreover, the proposed SAC adds factual allegations that supplement and corroborate the AC, but Plaintiffs do not seek to assert new claims, name additional defendants, redefine the Class or the Class Period, or allege new legal theories.

*Second*, Plaintiffs seek to amend the AC without undue delay and in good faith. The facts underlying Plaintiffs' new allegations were only recently adduced in an unrelated, pending litigation. Much of the evidence did not exist when the parties briefed Defendants' motion to dismiss; indeed, the three depositions had not been taken. The sworn testimony, and the internal JRIC documents produced in the bad faith litigation, provide compelling evidence that Defendants knowingly misled investors about the adequacy of James River's reserves and reserve-setting processes.

*Finally*, the amendment is not futile. Courts routinely grant motions to amend where, as here, plaintiffs have uncovered new compelling facts further supporting their claims. *See Plymouth County Ret. Sys. v. Evolent Health, Inc.*, 2020 WL 6875183, at *3-4 (E.D. Va. June 5, 2020) (granting leave to amend where account from a new witness corroborated other witness statements

and could demonstrate "the crux of [Plaintiffs'] claims"). The proposed SAC's new evidence corroborates and bolsters the AC's accounts of fifteen former James River employees; will assist Plaintiffs in challenging Defendants' motion to dismiss; and demonstrates that "Defendants made false and/or misleading statements to investors with scienter." *Id.*

For these reasons, the Court should grant Plaintiffs' Motion.

## II.    FACTUAL BACKGROUND

### A.    Procedural History

On September 22, 2021, the Court appointed Fort Worth and Miami as Lead Plaintiffs pursuant to the PSLRA. ECF No. 20. On November 19, 2021, Plaintiffs filed the AC, the current operative complaint in this Action. ECF No. 41. The AC alleges violations of Section 10(b) and 20(a) of the Exchange Act against Defendants James River, Robert P. Myron, J. Adam Abram, Frank N. D'Orazio, and Sarah C. Doran (collectively, "Defendants"), on behalf of themselves and a Class of all persons or entities that purchased or otherwise acquired James River common stock between February 22, 2019 and October 25, 2021, inclusive (the "Class Period"), and were damaged thereby.

Specifically, the AC alleges that, throughout the Class Period, James River repeatedly assured investors that it was well-positioned to satisfy all claims arising under the Company's largest insurance policy issued to Uber. Defendants represented that their loss reserves were "adequate," "reasonable," and set pursuant to a careful and comprehensive methodology that used "individual case-basis valuations" for each "specific claim" to establish a "specific case reserve… which management believes is adequate to resolve the claim." *E.g.*, AC ¶¶186-88. In reality, James River had no policies and procedures to set reserves, provided no training to its claims staff on setting reserves, and implemented systems to artificially suppress reserves without regard to the merits of the claim, the actual losses incurred, and other adverse information available to the

5

Company. *E.g.*, AC ¶¶189-90.

When the truth regarding James River's deficient reserves and reserve-setting process began to emerge in May 2021—including the Company's startling disclosure that it needed to take a $170 million adverse reserve charge to cover its Uber exposure, meaning that each Uber claim was under-reserved by 40%—James River's stock price plummeted by 26%. AC ¶313. Less than six months later, on October 26, 2021, James River disclosed a further $29.6 million in "impacts" stemming from the Uber Account, sending shares down an additional 16%. AC ¶315. As Defendant D'Orazio later admitted, only after taking this charge—two full years after cancelling the contract with Uber—did James River bring "economic finality to substantially all" of the Uber claims. AC ¶158.

In accordance with the briefing schedule set by the Court, Defendants filed the MTD on January 18, 2022 (ECF No. 54); Plaintiffs filed their opposition to the MTD on March 4, 2022 (ECF No. 57); and Defendants filed a reply in further support of their MTD on April 4, 2022 (ECF No. 60).

On July 13, 2022, while the MTD was pending, Plaintiffs filed a Notice of Intent to Amend the Complaint. ECF No. 63. Defendants declined to consent to the amendment because they had not reviewed Plaintiffs' proposed amendment, and thus could not "take a position" at that time about whether they would agree to the amendment. Plaintiffs did not, and have not, provided Defendants with a copy of the proposed SAC because Plaintiffs have been incorporating into the SAC evidence from an unrelated bad faith litigation against JRIC that has only been disclosed in recent days. Indeed, certain deposition testimony did not become available until shortly before the August 25 filing date that Plaintiffs previously committed to in their correspondence with Defendants and the Court. *Id.*

6

In order to meet the August 25 deadline, Plaintiffs filed the proposed SAC along with this Motion. Plaintiffs will promptly confer with Defendants and ensure that they have sufficient time to review the filed SAC and determine whether they consent to the amendment. Plaintiffs will revert to the Court with a proposed stipulated briefing schedule after meeting and conferring with Defendants.

### B. The Proposed SAC's New Allegations Corroborate And Bolster Plaintiffs' Claims

After Defendants filed their Reply on April 4, 2022, counsel for a former Uber driver currently pursuing an insurance coverage and bad faith litigation against JRIC, captioned *Mark St. Amand v. James River Insurance Company, et al*, No. 2:30-cv-01666 (D. Nev.) ("*St. Amand*"), contacted Plaintiffs' counsel *sua sponte* and unsolicited. The plaintiff in *St. Amand* sued JRIC for breach of contract, and contractual and tortious breach of the implied covenant of good faith and fair dealing, in connection with an insurance claim involving more than $1 million in documented losses. Counsel to plaintiff in *St. Amand* explained that he read the AC and was able to provide non-confidential information from the *St. Amand* litigation that supported the AC's allegations. Counsel for the plaintiff in *St. Amand* provided Plaintiffs with the claims file and other internal documents produced by JRIC in that litigation, and, in the ensuing weeks, transcripts of newly taken depositions of three former JRIC employees. None of this evidence is subject to a protective order or has been designated as confidential or proprietary by any party in the *St. Amand*, or any other, litigation.

The internal James River documents and deposition testimony corroborate and bolster Plaintiffs' allegations, including that: (1) Defendants made false and misleading statements concerning the adequacy of James River's reserves and reserve-setting process (*see* ¶¶162-269); and (2) Defendants acted with scienter in deceiving investors regarding these statements (*see*

¶¶307-70). Significantly, the new information further substantiates the accounts of the fifteen former employees cited in the AC, and describes with particularity how, in stark contrast to its public statements to investors throughout the Class Period, James River lacked any established training programs, practices, or procedures for setting, monitoring, or adjusting reserves for Uber-related claims. To the contrary, the Company struggled to cope with the flood of Uber claims, instructed claims personnel to set reserves based on *ad hoc* and subjective determinations, and then dramatically slashed all reserve authority across the entire claims department. Moreover, Company management routinely denied requests for reserve increases without regard to the merits of the claims, actual losses incurred, or other information available to and known by the Company. A toxic workplace and crushing workloads—including the assignment of upwards of 250 files to claims examiners on their first day of employment—caused chronic attrition in James River's claims department and resulted in reserves that bore no relation to the Company's actual liabilities under the Uber Contract.

### 1.    The New Evidence Corroborates And Reinforces Falsity

The SAC's new evidence further demonstrates the falsity of Defendants' statements and omissions regarding James River's reserving process and the adequacy of its held reserves, undercutting many of Defendants' MTD arguments. For example, Defendants contended that "[t]he former employees offer little to corroborate their accounts beyond general criticisms, which boil down to the claim that their personal authorization to set case reserves should have been higher." MTD at 16. The new evidence in the SAC provides specific corroboration that James River's statements about its reserving process were false based on first-hand experience:

- Rogers, James River's former Vice President of Claims, testified that she did not know of any policies or procedures in place that were used to set reserves or to explain to claims examiners how to set reserves. *See* ¶122.

8

- Rogers testified there was "no standard practice" that "James River followed to dictate to its claims examiners . . . when it needs to request an increase to the reserves when they reach an opinion that it should be [increased]." *See* ¶122.

- Rogers testified that James River hired claims examiners "with no insurance experience" who were not given "any type of . . . training" by James River or "provided any . . . training manuals." *See* ¶¶123, 125.

- Slaughter, a former James River Claims Manager and Assistant Director of Litigated Claims, testified that she did not recall "any formal training on how to monitor a reserve"; and that she could not recall "formal training in place regarding those three things of reserves, setting, monitoring, those type of things." *See* ¶128.

- When asked, "Were there any policies and procedures that you recall in place regarding how to adjust the reserve when you worked at James River," Slaughter answered, "No." *See* ¶127.

- Belcher, a former Claims Manager and Litigation Claims Adjuster, testified that she underwent no formal training on how to set, monitor, or adjust a reserve. *See* ¶130.

- Slaughter and Belcher each testified that, in contrast to the lack of any established policies, procedures, or formal at training at James River regarding how to set, monitor, and adjust reserves, they received extensive training at the prior employers, Allstate and Nationwide, including "training centers," "training curriculum," and a "training university" that featured daily quizzes and a final exam.  ¶129, 131.

- Slaughter and Belcher each testified that after the Uber Account was terminated, James River Management implemented drastic and arbitrary cuts in reserve authority levels across the claims department – often $1/10^{th}$ or less than the authority that existed previously – and Belcher described a specific "managers meeting" at which the Assistant Director of Claims, Donna Jefferson, announced the dramatic reductions. *See* ¶¶137, 139, 144.

Defendants further argued that "Plaintiffs have also failed to allege that Defendants made false or misleading statements by telling investors that the Company monitored reserves, estimated losses for each individual claim, and based those estimates in part on historical information…. Plaintiffs lack any particularized factual allegation that these statements were false, and thus rely on nothing more than 'fraud by hindsight.'" MTD at 19. The new evidence in the SAC further

9

refutes this argument and provides additional facts that reinforce the falsity of Defendants' statements:

- Rogers testified that she did not know of any policies or procedures in place that were used to monitor reserves. *See* ¶122.

- Slaughter testified that she did not recall "any formal training on how to monitor a reserve"; and could not recall any "formal training in place regarding . . . reserves, setting [reserves], [or] monitoring [reserves]." *See* ¶128.

- Belcher, a former Claims Manager and Litigation Claims Adjuster, testified that she underwent no formal training on how to monitor or adjust a reserve. *See* ¶130.

- The internal JRIC claims file produced in the *St. Amand* litigation shows that the claims department was aware of the severity of the accident and injuries at issue, and yet (i) set "placeholder" reserves of just $2,500; (ii) for two and a half years no fewer than ten James River claims personnel made *ad hoc* efforts to keep the reserves on the claim artificially low, even though James River knew that the Uber driver's medical bills alone exceeded the reserves, often by several hundred thousand dollars; and (iii) senior claims managers repeatedly recognized that the reserve "[w]ill need to be increased" due to the severity of the injury, and that the increase would need to be "significant." However, the reserve was not increased for over a year, and even then, was set at a 25% discount to the $1 million policy limits. *See* ¶¶152-59.

- Rogers testified that prior to the eight-fold increase, "the reserves were inappropriate based on the information" that James River had in its possession—in her own words, the reserves for this large claim were "grossly undervalued at the time." *See* ¶159.

- Slaughter testified that Rogers, the VP of Claims, Courtenay Warren, the Chief Claims Officer, and Richard Schmitzer, the President and CEO of James River Insurance, "almost always denied" any "larger increase[s]" to reserves. *See* ¶143.

### 2.     The New Evidence Corroborates And Reinforces Scienter

In addition, the SAC's new evidence further supports the inference that Defendants acted with scienter when making materially false and misleading statements and omissions. For example, Defendants argued in the MTD that "Plaintiffs attempt to solve their scienter problem by asserting that scienter can be inferred because the Company purportedly had a policy to keep claim

10

reserves low. First…. Plaintiffs fail to plead sufficient facts to infer than any such 'policy' existed."

MTD at 25. The new evidence in the SAC confirms both the existence of James River's policy to

keep the reserves low and Defendants' knowledge of it. As noted in Section II.B above, Rogers's

and Slaughter's deposition testimony confirms that there was, in fact, a policy to keep the reserves

low, that it was orchestrated and overseen by high-level officers, and the testimony provides

additional details regarding the circumstances of the policy's implementation and operation.

In addition, internal Company documents—specifically, the claims file produced by JRIC

in the *St. Amand* litigation—provide further compelling evidence establishing that the Company

was dramatically and materially under-reserved during the Class Period. Significantly, the claim

at issue in *St. Amand* concerned an extremely high-dollar claim where the insured suffered very

serious injuries (requiring multiple surgeries), and there was no dispute as to the Company's

liability or responsibility. As detailed in the proposed SAC, notwithstanding the fact that numerous

James River employees repeatedly noted that the reserve for the claim needed to be increased

dramatically to account for the severity of the insured's injuries, James River utterly ignored those

assertions and knowingly maintained a grossly insufficient reserve for that claim for a full one and

a half years.

Thus, for example, the documents show that on March 29, 2019, claims personnel

explicitly recognized that the reserve "[w]ill need to be increased due to the severity of the

injury"—and that the increase would need to be "significant." Yet, no action was taken. On April

29, 2019, claims personnel again noted that the reserves "need to be increased" and, again, no

increase was made. Then, on July 1, 2019, Slaughter, a litigation claims manager, instructed a

subordinate that the claim would require an "LLR" (Large Loss Report) because the Uber driver

was claiming "over $1M in specials"—thus triggering review by JRIC's Vice President of Claims

11

(Rogers) and approval by the CEO (Schmitzer). Yet, remarkably, notwithstanding these facts, the claims file reveals that James River did not increase its reserves for the *St. Amand* claim until March 2020—approximately 2½ years after James River received notice of the loss, 17 months after any prior reserve adjustment on the claim, and more than one full year after James River internally admitted that its reserves were insufficient and required a "significant" increase. And even then, Rogers only increased the reserve to $750,000, notwithstanding known medical bills totaling more than $1 million and threatened litigation. Rogers herself made clear in sworn deposition testimony that James River deliberately failed to increase the reserves in a timely manner, stating that, at the time she approved the increase, "***the reserves were inappropriate*** based on the information" that James River had, and the reserves were "***grossly undervalued at the time***." In sum, such detailed, highly specific facts, set forth in the Defendants' own documents, provide further compelling evidence that Defendants' deliberately understated reserves throughout the Class Period. *See* ¶¶150-61.

The new evidence in the SAC further confirms James River's senior executives' knowledge and/or reckless disregard of the policy, and active efforts among James River management to keep that policy a secret:

- Slaughter testified that, after the Company terminated the Uber Account, all requests to increase reserves were routed through a new "PLM" email account, and that the Company's high-level executives, including Rogers, Warren, and Schmitzer, were involved in efforts to maintain artificially low reserves after the termination of the Uber Account. *See* ¶142.

- Slaughter testified that James River employees were instructed not to mention emails that were submitted to the PLM email account, which Belcher confirmed. *See* ¶147.

- Slaughter testified that requests sent to the PLM account, which went to Rogers, Warren, or Schmitzer, were "almost always denied," frequently for vague reasons. *See* ¶143.

12

- Rogers, Slaughter, and Belcher testified that claims examiners' reserve authority was drastically lowered after the termination of the Uber Contract, often to only 1/10th of an examiner's prior levels, or simply "stripped away to nothing." *See* ¶¶139, 144, 145.

- Belcher testified that any request for a reserve increase of $250,000 or more had to be personally approved by Schmitzer. *See* ¶¶137, 140.

Defendants argued in the MTD that "the FE allegations support a more plausible, non-fraudulent inference that the Company had a system in place to ensure case reserves were appropriately set, consistent with its disclosures" (MTD at 25-26), but the new evidence in the proposed SAC shows the exact opposite:

- Rogers testified that she did not know of any policies or procedures in place that were used to set or monitor reserves. *See* ¶¶121-22.

- Rogers testified that she "received no training from James River on how to set a reserve" and "received no training on how to train, formally or informally, claims examiners on how to set a reserve." *See* ¶124.

- Slaughter testified that she did not recall "any formal training on how to monitor a reserve"; and could not recall any "formal training in place regarding . . . reserves, setting [reserves], [or] monitoring [reserves]." *See* ¶128.

- When Slaughter was asked "Were there any policies and procedures that you recall in place regarding how to adjust the reserve while you worked at James River?," she unequivocally testified, "No." *See* ¶127.

- Belcher testified that she underwent no formal training on how to set, monitor, or adjust a reserve. *See* ¶130.

- The claim file from JRIC shows that reserve was not increased despite repeated internal acknowledgments that it "[w]ill need to be increased" due to the severity of the injury. *See* ¶¶152-59.

Further, Defendants argued in the MTD that there was no scienter because Defendants had "nothing to hide," but the new evidence in the proposed SAC shows that not only were Defendants actively hiding their policy of low-reserving through the secret PLM account, they were doing so because they were trying to sell the Company:

13

- Slaughter testified that James River employees were instructed not to mention, in the claim file or claim notes, emails that were submitted to the PLM email account, which Belcher confirmed. *See* ¶147.

- Slaughter testified that James River tried to sell the Company twice—first in 2018, which failed "because of the Uber account" and next in May 2020, when she heard that James River tried to sell the Company again when the prospective purchasers were "doing due diligence, but I . . . don't think they were liking the answers they were getting." *See* ¶149.

Thus, there can be no serious question that the new evidence in the proposed SAC bolsters and corroborates Plaintiffs' fraud claims.

## III.    ARGUMENT

### A.    Leave To Amend Should Be "Freely Give[n]"

Because Plaintiffs are moving for leave to amend before the Court has entered a scheduling order setting a deadline for amendment, Rule 15(a)(2) of the Federal Rules of Civil Procedure governs Plaintiffs' motion. *See Pinnacle Advisory Group, Inc. v. Krone*, 2021 WL 3852338, at *3 (D. Md. Aug. 26, 2021) (Rule 15(a)(2) standard applies until a party moves to amend after the deadline established in the scheduling order). "Crucially, [Rule 15(a)(2)] states: 'The court should freely give leave [to amend] when justice so requires,'" and "[t]he Fourth Circuit's 'policy is to liberally allow amendment in keeping with the spirit of [Rule 15(a)].'" *Evolent*, 2020 WL 6875183, at *2 (quoting *Galustian v. Peter*, 591 F.3d 724, 729 (4th Cir. 2010)); *see also Midgett, Trustee of Hardcastle Charitable Remained Annuity Trust U/A Aug. 6, 2007 v. Hardcastle*, 2018 WL 4781178, at *5 (E.D. Va. Oct. 3, 2018) (citing *Scott v. Family Dollar Stores*, 733 F.3d 105, 117-19 (4th Cir. 2013)). A Court's discretion to decide Rule 15 motions "is limited by the dictate of Federal Rule of Civil Procedure 15(a) that 'leave shall be freely given when justice so requires,' and by the general policy, embraced by the Federal Rules, favoring resolution of cases on their merits." *Connelly v. Gen. Medical Corp.*, 880 F. Supp. 1100, 1109-10 (E.D. Va. 1995) (granting leave to amend federal

14

securities fraud complaint).

The Fourth Circuit has therefore "instructed district courts to deny amendment *only* when (1) it would prejudice the opposing party, (2) the moving party has acted in bad faith, or (3) amendment would be futile." *Evolent*, 2020 WL 6875183, at *2 (emphasis in original) (citing *Matrix Cap. Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 193 (4th Cir. 2009)). Because none of the three grounds for denial apply here, Plaintiffs' Motion should be granted.

### B.    The Amendment Will Not Prejudice Defendants

The Fourth Circuit has instructed that: "Whether an amendment is prejudicial will often be determined by the nature of the amendment and its timing. A common example of a prejudicial amendment is one that 'raises a new legal theory that would require the gathering and analysis of facts not already considered by the [defendant, and] is offered shortly before or during trial.'" *Laber v. Harvey*, 438 F.3d 404, 427 (4th Cir. 2006). Similarly, courts in this District have explained that "[a]mendment can be prejudicial if, for example, the moving party inserts new legal theories, counts, or claims, and if it is offered shortly before or during trial without giving the opposing party enough time to properly defend itself." *Evolent*, 2020 WL 6875183, at *3. In contrast, amendment is not prejudicial where "Plaintiffs merely seek to allege new facts—stemming from the same events outlined in the amended complaint—that may help them prove their existing claims" because such "facts add specificity to the complaint and put Defendants on better notice as to Plaintiffs' allegations." *Id.* at *3.

Here, in keeping with Fourth Circuit law, the proposed SAC does not raise new legal theories or add new counts, claims, or defendants, nor does it change the Class definition, modify the Class Period, or request any new form of relief. Rather, the new allegations in the proposed SAC (i) corroborate and bolster the falsity of Defendants' alleged misstatements and material omissions regarding the adequacy of James River's reserves and reserve-setting process; (ii)

15

reinforce the inference of scienter by showing that Defendants had motive and opportunity to mislead the investing public about these critical topics; and (iii) detail Defendants' systemic and pervasive efforts to suppress Uber-related reserves, as exemplified by a serious, high-dollar claim where there was no dispute as to liability, yet the claim was intentionally under-reserved by almost $1 million for nearly eighteen months.

Accordingly, all of the allegations sought to be added to the SAC "arise from the same controversy as the balance of the [AC]," concern "matters already contained in the [AC] in some form and, . . . merely [seek] to add specificity to those matters." *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999) (holding district court abused its discretion by denying leave to amend under these circumstances, finding "[p]rejudice to the Defendants could hardly flow from such an addition"). Indeed, where, as here, "Plaintiffs simply seek to add specificity to scienter [and falsity] allegations in a situation where defendants are aware of the circumstances giving rise to the action," there is "no basis for a finding of prejudice." *Matrix Cap.*, 576 F.3d at 195; *see also Connelly*, 880 F. Supp. at 1110-1111 (allowing amendment that "ballooned" alleged false statements from 8 to 17 because "plaintiff has simply raised new factual contentions" to which the court could "still apply the same controlling legal principles").

Furthermore, the "timing of Plaintiffs' motion favors amendment because, "While the parties have briefed the pending motion to dismiss, the Court has not decided the motion, discovery is stayed, and this case remains in its early stages." *Evolent*, 2020 WL 6875183, at *3. Thus, under controlling Fourth Circuit precedent, granting Plaintiffs' Motion will not prejudicially delay these proceedings. *See, e.g.*, *Laber*, 438 F.3d at 426-27 ("An amendment is not prejudicial . . . if it merely adds . . . to the facts already pled and is offered before any discovery has occurred."); *Tao of Systems Integration, Inc. v. Analytical Services & Materials, Inc.*, 299 F. Supp. 2d 565, 571 (E.D.

16

Va. 2004) (granting motion for leave to amend made after defendants' motion to dismiss had been fully briefed).

Accordingly, Defendants will suffer no prejudice if the Court grants Plaintiffs' Motion.

### C.      Plaintiffs Do Not Seek Leave to Amend in Bad Faith

Leave to amend is also warranted because Plaintiffs' request is not made in bad faith. There is no bad faith where, as here, "the facts giving rise to this motion came to light after the briefing on the motion to dismiss occurred," and "Plaintiffs are merely trying to insert new facts that help bolster their claims with information that they did not previously have." *Evolent*, 2020 WL 6875183, at *3. Unquestionably, Plaintiffs' Motion is being filed in good faith without any improper motive.

*First*, Plaintiffs are not dilatory in bringing this Motion. The plaintiff's counsel in *St. Amand* contacted the undersigned counsel only after Defendants' MTD was fully briefed. Likewise, the deposition testimony from *St. Amand* referenced in the SAC was provided after briefing closed on Defendants' motion—and some of it only shortly before the SAC was filed. Further, promptly after being contacted by the plaintiff's counsel in *St. Amand* and having the opportunity to review the claims file and a single deposition from that case, Plaintiffs notified Defendants and the Court of their intention to seek leave to amend the AC (*see* ECF No. 63), and then filed this Motion in short order. Moreover, as explained above, the new documentary and testimonial evidence from *St. Amand* undercuts many of the grounds Defendants raise to dismiss the AC and confirms the information provided by James River's former employees. Thus, Plaintiffs' desire to amend "stem[s] from a good faith belief in legitimate claims" against Defendants, "rather than a bad faith attempt to . . . cause undue delay." *Tao of Systems Integration*, 299 F. Supp. 2d at 571 (granting leave to amend "in order to clarify certain allegations stated in the original complaint").

*Second*, the Motion comports with the PSLRA. Indeed, as the Fourth Circuit has explicitly held, "Nothing in the PSLRA affects the standards governing either the pre- or post-judgment

17

amendment of pleadings" made pursuant to Rule 15. *Matrix Cap.*, 576 F.3d at 193 (holding district court abused its discretion by denying leave to file second amended class action complaint on the ground that the new allegations could "affect the analysis of whether plaintiffs can satisfy the heightened pleading requirements for scienter under the PSLRA"). Furthermore, the PSLRA "encourages plaintiffs to do more investigation before filing a complaint, not less." *Takiguchi v. MRI Int'l, Inc.*, 2014 WL 3105068, at \*7 (D. Nev. July 7, 2014). Obtaining relevant information from unrelated litigation is a proper means of investigation as "[n]either the PSLRA nor this court's orders prohibit Plaintiffs from investigating matters related to the lawsuit . . . ." *Id.* (proper investigation included documents obtained from third parties); *see also Lickteig v. Cerberus Cap. Mgmt., L.P.*, 2020 WL 7629876, at \*\*5-6 (S.D.N.Y. Dec. 22, 2020) (granting leave to amend in PSLRA action where "discovery produced in" a different litigation "supplied the information that formed the basis of the substantive amendments included in the Proposed Amended Complaint").

Accordingly, the record affirmatively demonstrates that Plaintiffs are seeking to amend the AC in good faith.

### D.      Filing the Proposed SAC Will Not Be Futile

"Under this circuit's caselaw, Plaintiffs to do not face a heavy burden" on the issue of futility, "as futility encompasses only 'insufficient or frivolous' amendments." *Evolent*, 2020 WL 6875183, at \*3 (citing *Johnson v. Oroweat Foods Co.*, 785 F.3d 503, 510 (4th Cir. 1986)). Indeed, the Fourth Circuit has held that "[u]nless a proposed amendment may clearly be seen to be futile . . . conjecture about the merits of the litigation should not enter into the decision whether to allow amendment." *Davis v. Piper Aircraft Corp.*, 615 F.2d 606, 613 (4th Cir. 1980); *see also Bennett v. Berryhill*, 2018 WL 10016165, at \*1 (E.D. Va. Oct. 19, 2018) ("Leave to amend . . . should only be denied on the ground of futility when the proposed amendment is clearly insufficient or frivolous on its face.").

18

The new allegations in the SAC are clearly not futile. As described above, these allegations are supported by recently uncovered or newly provided evidence showing that Defendants made materially false and misleading statements about the adequacy of James River's reserves and reserving process. This evidence consists of sworn testimony from three former JRIC employees and internal James River documents demonstrating that the Company lacked any established policies or procedures to set, monitor, or adjust Uber reserves, did not train its claims adjusters on properly reserving claims, and took extraordinary steps to suppress reserves across the entire Uber book. *See* ¶¶119-48. The new allegations also shed light on Defendants' clear motive to keep reserves artificially low: in addition to unloading their personally held shares at fraudulently inflated prices, Defendants engaged in a years-long effort to sell the Company that was repeatedly thwarted "because of the Uber account." *See* ¶149.

Under these circumstances, federal courts routinely grant plaintiffs leave to amend their federal securities claims. *See Evolent*, 2020 WL 6875183, at \*4 (granting leave to amend where information from a new witness could "corroborate other confidential witnesses' statements" and could "demonstrate that Defendants made false and/or misleading statements to investors with scienter—*i.e.*, the crux of [Plaintiffs'] claims"); *Sec. Police & Fire Professionals of Am. Ret. Fund v. Pfizer, Inc.*, 2012 WL 6771941, at \*4 (D.N.J. Dec. 6, 2012), *report and rec. adopted*, 2012 WL 6765711 (D.N.J. Dec. 21, 2012) (granting leave to amend complaint asserting federal securities fraud claims because the new information "provide[s] several reasons why the challenged statements are affirmatively false and misleading when made").

Finally, Defendants will be provided the opportunity to file renewed motions to dismiss regarding the SAC if they choose to do so. Any question of "futility" is more efficiently resolved in that context instead of opposing the amendment itself.

19

## IV.    CONCLUSION

For all of these reasons, Lead Plaintiffs' Motion should be granted.

Dated: August 25, 2022

Respectfully submitted,

By: /s/ *Steven J. Toll*
Steven J. Toll
Va. Bar No. 15300
stoll@cohenmilstein.com
Daniel S. Sommers
dsommers@cohenmilstein.com
S. Douglas Bunch
dbunch@cohenmilstein.com
**COHEN MILSTEIN SELLERS
& TOLL PLLC**
1100 New York Avenue, Suite 500
Washington, D.C. 20005
Tel: (202) 408-4600
Fax: (202) 408-4699

*Liaison Counsel for the Class*

**BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP**
John C. Browne (*pro hac vice*)
Rebecca E. Boon (*pro hac vice*)
Kate W. Aufses (*pro hac vice*)
Benjamin W. Horowitz (*pro hac vice*)
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
johnb@blbglaw.com
rebecca.boon@blbglaw.com
kate.aufses@blbglaw.com
will.horowitz@blbglaw.com

*Attorneys for Lead Plaintiff City of Miami General
Employees' and Sanitation Employees' Retirement
Trust and Lead Counsel for the Class*

**SAXENA WHITE P.A.**
Steven B. Singer (*pro hac vice*)
10 Bank Street, 8th Floor

20

White Plains, NY 10606
Telephone: (914) 437-8551
Facsimile: (888) 631-3611
ssinger@saxenawhite.com

Maya Saxena
Joseph E. White, III (*pro hac vice*)
Jonathan Lamet (*pro hac vice*)
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Telephone: (561) 394-3399
Facsimile: (561) 394-3382
msaxena@saxenawhite.com
jwhite@saxenawhite.com
jlamet@saxenawhite.com

David R. Kaplan (*pro hac vice*)
Hani Y. Farah (*pro hac vice*)
12750 High Bluff Drive, Suite 475
San Diego, CA 92130
Telephone: (858) 997-0860
Facsimile: (858) 369-0096
dkaplan@saxenawhite.com
hfarah@saxenawhite.com

*Attorneys for Lead Plaintiff Employees' Retirement Fund of the City of Fort Worth dba Fort Worth Employees' Retirement Fund and Lead Counsel for the Class*

**KLAUSNER KAUFMAN JENSEN & LEVINSON LLP**
Robert D. Klausner
bob@robertdklausner.com
Stuart A. Kaufman
stu@robertdklausner.com
7080 Northwest 4th Street
Plantation, Florida 33317
Tel: (954) 916-1202
Fax: (954) 916-1232

*Additional Counsel for Lead Plaintiff the City of Miami General Employees' and Sanitation Employees' Retirement Trust*

21

## CERTIFICATE OF SERVICE

I hereby certify that on August 25, 2022, I caused the foregoing to be electronically filed with the Clerk of Court via CM/ECF, which will send a notice of electronic filing to all registered users.

/s/ Steven J. Toll
Steven J. Toll
Va. Bar No. 15300
stoll@cohenmilstein.com
**COHEN MILSTEIN SELLERS**
   **& TOLL PLLC**
1100 New York Avenue, Suite 500
Washington, D.C. 20005
Tel: (202) 408-4600
Fax: (202) 408-4699

*Liaison Counsel for Lead Plaintiffs*

22