**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | |
|---|---|
| *In Re James River Group Holdings, Ltd. Securities Litigation* | Case: 3:21-cv-00444-MHL<br>Hon. M. Hannah Lauck<br>CLASS ACTION<br>JURY TRIAL DEMANDED |

# SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

# TABLE OF CONTENTS


Page

I. INTRODUCTION ........ 1

II. JURISDICTION AND VENUE ........ 13

III. THE PARTIES ........ 13

A. Lead Plaintiff ........ 13

B. Defendants ........ 14

IV. OVERVIEW OF THE FRAUD ........ 17

A. James River's Insurance Business ........ 17

B. James River Underwrites A New Type Of Insurance With Uber And Uber Becomes James River's Largest And Most Important Contract ........ 18

C. James River Cancels The Uber Contract But Assures The Market That Problems Are Contained And The Reserves Are Sufficient ........ 20

D. Eighteen Months After Cancelling The Uber Contract, And After Repeatedly Assuring Investors That Its Reserves Were Adequate, Defendants Announced A Massive $170 Million Increase In Uber Reserves And Revealed That The Reserve Methodology Used By The Company For Seven Years Was "Wrong" ........ 23

E. Former Employees Confirm That James River's Reserves Were Materially Understated And Not Calculated In Accordance With GAAP, And That The Uber Contract Was Not Profitable For James River ........ 28

1. Former James River Employees Confirm That James River Had No Reserve Methodology Except To Keep The Reserves Low ........ 28

2. James River Systematically Under-Reserved On Uber Claims ........ 30

3. James River "Bent Over Backwards" For Uber, Systematically Overpaying On Uber Claims To Avoid Embarrassing Uber ........ 34

4. James River Knowingly Hired Adjusters With No Claims Experience, Gave Them No Training, And Prevented Them From Using Software That Would Accurately Set Reserves, And Senior Management Knew It ........ 35

5. As A Direct Result Of These Systemic Reserving Failures, The Uber Contract Was Unprofitable And Was Cancelled ........ 39

6. The Company's Most Senior Officers Were Directly Responsible For Reviewing, Monitoring, And Approving The Reserves For The Uber Account ..... 40

F. Sworn Testimony And Internal Claim Documents Confirm That James River's Only Overriding "Policy" Was To Keep Reserves Artificially Low For As Long As Possible ..... 43

1. Sworn Deposition Testimony Confirms The Fraud ..... 43

a. Sworn Testimony Confirms That James River Had No Established Processes, Procedures, Or Formal Training For The Setting, Monitoring, Or Adjusting Of Uber Claim Reserves ..... 44

b. Sworn Testimony Confirms That, After Cancelling The Uber Contract, Management Implemented Systemic Practices To Further Suppress Uber Reserves And Limit And Conceal Any Requests For Increases ..... 51

c. Sworn Testimony Provides Additional Information Reinforcing Defendants' Motive ..... 55

2. Internal James River Documents Confirm The Fraud ..... 56

V. FALSE AND MISLEADING MISSTATEMENTS AND OMISSIONS ..... 60

A. Materially False Statements And Omissions Relating To Financial Measures And Reserve Developments ..... 60

1. Misstatement of Key Financial Measures for the Fourth Quarter of 2018 and Full Year 2018 ..... 60

2. Misstatement of Key Financial Measures for the First Quarter of 2019 ..... 62

3. Misstatement of Key Financial Measures for the Second Quarter of 2019 ..... 64

4. Misstatement Of Key Financial Measures for the Third Quarter of 2019 ..... 65

5. Misstatement of Key Financial Measures for the Fourth Quarter of 2019 and Full Year 2019 ..... 67

6. Misstatement of Key Financial Measures for the First Quarter of 2020 ..... 69

7. Misstatement of Key Financial Measures for the Second Quarter of 2020 ... 71

8. Misstatement of Key Financial Measures for the Third Quarter of 2020 ... 72

9. Misstatement of Reserve Development on February 17, 2021 ... 74

10. Misstatement of Key Financial Measures for the Fourth Quarter of 2020 and Full Year 2020 ... 75

11. Misstatement of Key Financial Measures for the First Quarter of 2021 ... 77

12. Misstatement of Key Financial Measures for the Second Quarter of 2021 ... 79

B. Impact Of Materially Understated Reserve On James River's Financial Statements ... 80

1. Misstatement of Key Financial Measures for the Full Year of 2018 ... 81

2. Misstatement of Key Financial Measures for the First Quarter of 2019 ... 81

3. Misstatement of Key Financial Measures for the Second Quarter of 2019 ... 82

4. Misstatement of Key Financial Measures for the Third Quarter of 2019 ... 82

5. Misstatement of Key Financial Measures for the Full Year of 2019 ... 82

6. Misstatement of Key Financial Measures for the First Quarter of 2020 ... 83

7. Misstatement of Key Financial Measures for the Second Quarter of 2020 ... 83

8. Misstatement of Key Financial Measures for the Third Quarter of 2020 ... 84

9. Misstatement of Key Financial Measures for the Full Year of 2020 ... 84

10. Misstatement of Key Financial Measures for the First Quarter of 2021 ... 84

11. Misstatement of Key Financial Measures for the Second Quarter of 2021 ... 85

C. Materially False And Misleading Statements That James River's Internal Controls and Financial Statements Were In Accordance With GAAP ................ 85

D. Materially False And Misleading Statements And Omissions Regarding The Reserving Process ................ 90

1. Materially False and Misleading Statements and Omissions Relating to Fourth Quarter 2018 and Fiscal Year 2018. ................ 90

2. Materially False and Misleading Statements and Omissions Relating to the Third Quarter of 2019 ................ 93

3. Materially False and Misleading Statements and Omissions Relating to Fourth Quarter 2019 and Fiscal Year 2019 ................ 94

4. Materially False and Misleading Statements and Omissions Relating to the First Quarter of 2020 ................ 97

5. Materially False and Misleading Statements and Omissions Relating to Fourth Quarter Fiscal 2020 and Fiscal Year 2020 ................ 98

VI. THE STANDARDS AND REGULATIONS GOVERNING THE CALCULATION AND REPORTING OF THE RESERVE FOR LOSSES AND LOSS ADJUSTMENT EXPENSES ................ 101

A. GAAP Governs The Calculation Of Reserve Losses And Loss Adjustment Expenses ................ 101

B. James River Admitted That Its Reserve Methodology Violated GAAP ................ 103

C. James River Violated GAAP By Calculating Reserves That Were Not Primarily Based On Past Experience With Similar Claims ................ 103

D. James River Violated GAAP By Recording Reserves For Losses That Were Not Reasonably Estimated ................ 106

VII. THE LAWS AND REGULATIONS GOVERNING INTERNAL CONTROLS OVER FINANCIAL REPORTING ................ 108

A. Public Companies Are Required To Implement Internal Controls Over Financial Reporting And Ensure They Are Effective ................ 108

B. James River Violated The Laws And Regulations Governing Internal Controls ................ 112

VIII. ADDITIONAL SCIENTER ALLEGATIONS ................ 113

A. Senior James River Management Reviewed And Approved The Company's Reserves For Losses And Loss Adjustment Expenses ................ 113

B. Senior James River Management Met Regularly To Discuss James River's Uber Reserves ..... 116

C. Senior James River Management Received Reserve Reports And Audited James River's Uber Reserves ..... 117

D. Defendants' Own Admissions And The Magnitude Of The $170 Million Charge Establish Scienter ..... 117

E. Senior James River Management Oversaw And Maintained A Company Policy Of Under-Reserving ..... 118

1. Senior James River Management Directed Claims Employees To Under-Reserve And To Stay Within Reserve Limits Regardless Of Actual Claim Exposure ..... 118

2. Senior James River Management Prevented Claims Employees From Increasing Reserves Based on Actual Loss Experience ..... 119

3. The Company Maintained No Formal Reserving Processes And Knowingly Failed To Train Employees On Proper Reserving ..... 119

4. The Company Hired Inexperienced Personnel To Handle The Influx Of Claims From The Uber Account ..... 121

5. The Company Maintained Outdated, Dysfunctional Technology For Setting Reserves ..... 122

F. Management Implemented Deliberate Steps To Further Suppress Reserves After Cancelling The Uber Contract ..... 122

G. Defendants Were Motivated To Keep The Reserves Artificially Low Because They Wanted To Sell The Company ..... 125

H. Defendants Myron And Doran's Suspicious Sales Of James River Stock ..... 126

I. Defendants Held Themselves Out As Knowledgeable About James River's Reserves ..... 127

J. The Uber Contract Constituted A "Core Operation" Of James River ..... 128

K. James River Took Adverse Charges In The Two Years Prior To The Class Period And In Each Year Of The Class Period ..... 130

L. In Response To Questions From Analysts, Defendants Denied Problems Existed With Its Reserves And, Later, With The Runoff Of The Uber Contract ..... 130

M. The Executive Defendants Signed Sarbanes-Oxley And Internal Controls Certifications ... 132

IX. LOSS CAUSATION ... 132

X. PRESUMPTION OF RELIANCE ... 136

XI. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ... 137

XII. CLASS ACTION ALLEGATIONS ... 138

XIII. CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT ... 140

XIV. PRAYER FOR RELIEF ... 143

XV. JURY DEMAND ... 144

Lead Plaintiffs Employees' Retirement Fund of the City of Fort Worth d/b/a Fort Worth Employees' Retirement Fund ("Fort Worth") and The City of Miami General Employees' & Sanitation Employees' Retirement Trust ("Miami"), by their undersigned attorneys, bring this action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Securities Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, on behalf of themselves and all other similarly situated persons and entities, except Defendants and their affiliates, who purchased or otherwise acquired James River Group Holdings, Ltd. ("James River" or the "Company") common stock between February 22, 2019 and October 25, 2021, inclusive (the "Class Period"), and were damaged thereby.

## I. INTRODUCTION

1. James River is an insurance company whose largest and most important client was the rideshare company Uber. In 2014, James River began providing a specialty insurance product designed to cover Uber drivers while they were logged into the Uber app but not actively transporting passengers. Due to the specialty nature of the insurance, it was provided through James River's Excess and Surplus Line ("E&S"). The E&S Line not only provided insurance products that standard insurance would not cover due to their unique characteristics or perceived risks, but it was also vital to James River's financial health—accounting for 70% of James River's net written premiums between 2018 and 2020.

2. Properly reserving for losses is critical for companies like James River that provide E&S insurance because, unlike standard insurance, there is no guaranty fund for E&S lines from which to pay out claims in the event that an insurer files for bankruptcy. For this reason, reserves are material information to investors and the insureds' themselves as a measure of a specialty insurance company's financial health. Accordingly, companies like James River must report their reserves in financial statements, and these insurance reserves must be calculated and presented in

accordance with Generally Accepted Accounting Principles ("GAAP"), which are accounting rules adopted by the SEC.

3. Uber comprised ***over 25%*** of James River's total consolidated gross written premiums for 2018 and 2019—totaling $294.3 million and $374.2 million, respectively—making it by far James River's most important customer. Accordingly, Defendants constantly assured investors that they closely monitored the account to make sure that the Company's loss reserves on claims arising from the Uber Contract—which was housed in the Company's Commercial Auto Division—were strong and stable. Supposedly, as a result of this close oversight, Defendants were entirely "comfortable with our loss reserves." Analysts credited these assurances and, in fact, directly linked reserves relating to the Uber Contract to the performance of James River's share price. For example, JMP reported that "***stability in the commercial auto reserves is key to the stock's performance in the near/intermediate term***."[1]

4. The market was shocked when, on October 8, 2019, James River announced that it was terminating the Uber Contract early because it "has not met our expectations for profitability." Simultaneously, James River announced that it was taking an adverse charge of between $55-$60 million that Defendants "primarily" attributed to Uber, and which resulted in a $25.2 million quarterly net loss—which until that point was James River's largest quarterly loss ever. James River put the Uber Account into "runoff," meaning that, while the contract had been cancelled, the Company would still be responsible for processing and paying claims that had accrued through the end of 2019. On this news, Uber's share price plummeted nearly 23% from $48.94 to close at $37.88 on October 8, 2019.

---

[1] Unless otherwise indicated, all emphasis in quotation marks is added.

5. During an investor conference call on November 7, 2019, Defendant J. Adam Abram, James River's former CEO, admitted that the Company terminated the Uber Contract because "the risk became too large in absolute terms" and that "***candidly, in some years we mispriced the risk***." Analysts immediately questioned James River's "future trajectory" given the "magnitude" of the losses. Accordingly, Defendants repeatedly assured the market that the risk from the runoff Uber Account was contained, reassuring investors that James River was "comfortable with our pricing for the 2018 and 2019 years," and later that James River was settling Uber-related claims "consistent with our held reserves." Indeed, in each of its annual reports filed with SEC during the Class Period, Defendants emphasized that the Company's reserves were set, monitored, and adjusted according to a comprehensive and established process that included, ***for each specific Uber claim***, "individual case-basis valuations" that utilized "historical information" and the Company's "past experience," adjusted for "current developments" and "anticipated trends." These statements were highly material, because they assured investors that the Company had specific, proven, and robust policies in place to set and monitor reserves.

6. Analysts credited these reassurances, noting that James River was "not seeing the type of loss emergence that had by this point already start[ed] plaguing" James River during prior accident years. Unbeknownst to the market, however, Defendants' assurances were utterly false. In truth, losses continued to rapidly mount on the Uber Contract after it was placed into runoff, and the Company lacked any established policies, procedures, or training for the setting, monitoring, and adjusting of reserves for the massive influx of Uber claims. Despite full knowledge of these rapidly mounting losses, Defendants knowingly failed to properly increase the reserves or implement a sound and reliable reserving process, resulting in James River's reserves being materially understated and insufficient to cover the multitude of Uber claims. In fact, the

Company did precisely the opposite. After eventually cancelling the enormously unprofitable Uber Contract, as explained more fully in ¶¶136-148 below, management deliberately instituted a variety of arbitrary and secretive practices to systematically suppress reserves across the entire Uber book and thus ensure that reserves were kept as low as possible, for as long as possible. Indeed, when James River knew that it had under-reserved for Uber, instead of admitting a mistake and outlining a correction program, Defendants took these measures to keep the truth from the market, particularly long enough to allow certain Executive Defendants to sell off massive blocks of stock at an inflated price and leaving the proposed class, and Fort Worth and Miami in particular, vulnerable to the effects of the inevitable revelation of the truth.

7. Ultimately, on May 5, 2021—a full eighteen months after the Uber Contract was terminated and placed into runoff, and despite Defendants' repeated assurances that the runoff from the Uber Contract was "going well" and proceeding "consistent with our held reserves"—James River stunned the market by announcing that it was taking a $170 million charge that was "primarily driven" by losses relating to Uber. The $170 million charge was massive, wiping out all of the Company's profit for the prior two years, and represented over 50% of the $337 million net reserves that James River maintained for its entire Commercial Auto Division. Analysts were shocked, noting that the $170 million charge meant that ***each and every claim on the Uber Account was, on average, under-reserved by an astonishing 40%***.

8. The $170 million charge further resulted in a net quarterly loss to James River of $103.5 million, which was nearly ***three times greater*** than James River's previous largest quarterly income loss of only $36.8 million. Accordingly, in order to cover this massive loss, James River announced that it was commencing a dilutive secondary offering valued at approximately $175 million—with a $31.00 offering price that was a massive 34% discount to the closing price just

one day prior. The announcement of the $170 million charge, the $103.5 million loss, and the discounted, dilutive offering had a devastating impact on James River, with the Company's share price plummeting over 26% in a single day in response to these stunning revelations.

9. Significantly, at the same time that James River announced the $170 million charge, the Company also admitted that the reserve methodology it used for claims on the Uber Account since its inception in 2014 was "wrong." Specifically, Defendant Frank D'Orazio, who was named James River's CEO less than a year prior, and whose self-professed goal was to "eliminate the overhang" of Uber, admitted that James River had "***meaningfully changed our actuarial methodology***" because "using only our own loss experience in our paid and incurred reserve projections rather than the array of inputs that we had used in prior quarters, and giving greater weight to incurred methods would give us a better and more conservative estimate of ultimate losses on this account." As D'Orazio bluntly acknowledged, "[W]e got it wrong."

10. Then, on October 26, 2021, James River again stunned investors by disclosing still more losses attributable to Uber—namely $29.6 million in "impacts" from the Uber Contract. In response, James River's share price again dropped more than 16%, to close at $32.75 on October 26, 2021. As Defendant D'Orazio later admitted, it was only after taking this charge—incurred two full years after cancelling the contract with Uber—that James River finally brought "economic finality to substantially all" of the Uber claims. Such "finality," however, resulted in substantial losses to the Company's investors, who experienced the elimination of ***over $450 million in shareholder market capitalization*** during the Class Period.

11. In connection with their independent investigation of Defendants' fraud, Lead Plaintiffs interviewed 15 former employees of James River, all of whom worked first-hand on the Uber Account in senior level positions in James River's offices across the country, and several of

whom reported directly to the Company's most senior executives. As these numerous former employees uniformly recount, James River was forced to take these massive charges to the Uber Account due to James River's fundamental and systematic failures, which Defendants knew contradicted their public statements during the Class Period. In addition, Lead Plaintiffs recently obtained internal Company documents and sworn testimony by three additional former employees in an unrelated bad faith litigation against James River Insurance, which further corroborate and provide additional explosive details concerning the operation of Defendants' fraud.

12. *First*, former employees recounted that, unbeknownst to investors, James River ***had no reserve methodology at all, except to keep the reserves low***. Specifically, former Claims Examiners recalled that "***there was no methodology for calculating reserves . . . it didn't exist; there was nothing***." Former employees confirmed that the process for setting reserves was "***willy nilly***" and typically based on nothing more than a "gut feeling . . . we would guess."

13. *Second*, multiple former employees of the Company gave detailed explanations as to how James River systematically under-reserved on Uber claims. For example, a former Bodily Injury Claims Examiner recalled that James River used minimal reserves as "placeholders" to open Uber claims, which were often ***as little as $1.00.*** In his first year, approximately ***65%*** of bodily injury reserves were set at this de minimis amount. Similarly, a former Litigation Claims Examiner recalled that in 2017, the Company's Director of Claims implemented an automatic 30% cut to reserve increases across the board. A former James River Manager corroborated this account and likewise described the corporate culture at James River as "***incredible***" because he had "***never worked in an environment where we bent the truth***. ***They put caps on reserves irrespective of the injuries***." In the words of yet another former Claims Manager, this "***put [James River] in a hole*** from the beginning with Uber."

14. *Third*, multiple former employees recounted how James River would overpay on Uber claims specifically to avoid embarrassing Uber during litigation or at trial. A former Litigation Claims Examiner described how James River "bent over backwards" for Uber to avoid embarrassing it. Indeed, multiple Claims Examiners described how James River would pay out over ***10 times*** the reasonable value of the claim—sometimes over a hundred thousand dollars, all while not increasing the reserve for the claim—to appease Uber and help it avoid any negative publicity.

15. *Fourth*, numerous former employees recalled how James River knowingly hired adjusters with no claims experience and provided them with no training to accurately set reserves. A former Senior Claims Examiner at James River explained that the Company hired inexperienced people into the claims department, including recent college graduates and baristas from Starbucks, and that assigning Uber claims to people with no experience in claims was a bad recipe. Indeed, multiple former employees described how this lack of experience and training directly resulted in under-reserved claims. Moreover, these woefully inexperienced claims examiners were immediately given crushing workloads of 150-250 files or more. Not surprisingly, the claims department was plagued by very high turnover, which only compounded the Company's inability to properly process, reserve for, and settle the massive influx of Uber claims. As one Claims Examiner stated bluntly, "***I could see that the place was a Titanic sinking***."

16. The accounts of these fifteen former employees are corroborated and amplified by sworn deposition testimony from three additional former James River claims personnel and internal James River claim documents created during the Class Period, which have been developed in an ongoing insurance bad faith litigation against James River styled *Mark St. Amand v. James River Insurance Company, et al.*, Case No. 2:20-cv-01666 (D. Nev.) ("*St. Amand*") (asserting

claims for breach of contract and contractual and tortious breach of the covenant of good faith and fair dealing). The claim at issue in the case involved a car accident where the Uber driver, a disabled U.S. veteran, was rear-ended on an interstate highway by another driver. The Uber driver was seriously injured in the accident. As a result, he had multiple surgeries and ongoing therapy to treat his resulting neck and spinal injuries, which resulted in over $1 million in medical bills and months of lost wages. Sworn eyewitness testimony and internal documents from this high-dollar value case confirm that James River artificially suppressed reserves on this and all other Uber-related claims. The same evidence confirms that James River (1) did not have any policies, procedures, or guidelines for the setting, monitoring, and adjusting of reserves for Uber-related claims; and (2) lacked any formal training programs for the setting, monitoring, and adjusting of reserves for Uber-related claims.

17. Specifically, James River's former Vice President of Claims, Anita Rogers ("Rogers") repeatedly testified in her deposition in the *St. Amand* case that she could not "recall" and did not "know" of any policies or procedures to set, monitor, or adjust the reserves for Uber-related claims during her entire eight-year tenure at the Company. As the designated individual at James River responsible for monitoring and resolving Uber claims that presented large exposure to the Company (and having served in James River's claims department for many years), if any such policies, procedures or guidelines existed, it is utterly implausible that Rogers would not have known about them.

18. In addition, Rogers testified that "[t]here was no training" for claims examiners that she could recall on how to set a reserve either formally or informally. Rogers further testified that she received no training at James River prior to being handed claims files—even though she was

charged with the responsibility of overseeing all Uber claims with large losses and reported directly to the c-suite.

19. Additional sworn testimony from former James River employees in the *St. Amand* case further corroborates that James River provided no formal training to claims employees on how to set, monitor, or adjust a reserve, and that the Company had no policies or procedures to guide reserve-setting. These employees also testified that high-level James River executives, including Rogers, Courtenay Warren ("Warren"), the former Senior Vice President and Chief Claims Officer at James River Insurance, and Richard Schmitzer ("Schmitzer"), the President and CEO of James River Insurance (i.e., the Company's E&S segment), were intimately involved in efforts to keep reserves artificially low, particularly after James River terminated the Uber Account.

20. Specifically, both Ingrid (Moses) Slaughter, who served as a Claims Manager and then Assistant Director of Litigated Claims at James River from September 2018 to May 2020, and Brianna Belcher, who served as Claims Manager and Litigation Claims Adjuster at James River between September 2015 and March 2021, testified that James River's reserving process was predicated entirely on keeping reserves artificially low, that employees received little to no training on reserving, and that the Company maintained no established policies or procedures for the setting, monitoring, or adjusting of reserves. Instead, the Company's reserving practices for the massive influx of Uber claims was predicated entirely on *ad hoc*, subjective, and on-the-fly decisions of a revolving door of woefully inexperienced and untrained claims department personnel.

21. The sworn testimony of Rogers, Slaughter, and Belcher confirms that Defendants lied to investors when describing "[t]he procedures we use to estimate loss reserves": there were

no such procedures. Moreover, without any policies, procedures, or training of claims personnel on how to properly reserve against Uber claims, Defendants could not know and had no factual basis on which to assert that "every known claim has a specific case reserve established against it which management believes is adequate to resolve the claim and pay attendant expenses based on information available at the time."

22. What is more, the Company's internal claim file from the *St. Amand* case demonstrates that, from the outset, it was crystal clear to James River's claims personnel who was at fault and that the Uber driver's injuries were serious and required a sizeable reserve. However, despite the known and obvious severity of this claim and consequential need for a large reserve, James River's internal documents show that the Company: (i) took nearly three months to set any reserve for the claim; (ii) set an initial reserve at the plainly insufficient level of $2,500; (iii) repeatedly acknowledged that the reserve required a "significant" increase "per [the] injury report," but waited more than one year after acknowledging that fact to increase the reserve at all; and (iv) never increased the reserve to a level that came even close to being "adequate to resolve the claim and pay attendant expenses based on information available at the time."

23. As detailed in Section IV(F)(2) below, the internal claims file shows years of *ad hoc* efforts by no fewer than ten claims department personnel to keep reserves on the claim as low as possible, notwithstanding their receipt of information which demonstrated that James River's actual exposure was far greater. Contrary to Defendants' representations to investors, there is no evidence that James River performed any analyses to estimate incurred and future losses on the claim, let alone analyses that utilized "historical information" and "past experience" adjusting for "current developments" and "anticipated trends." Instead, James River set reserves artificially low from the start and then did not appropriately increase those reserves based on the level of incurred

medical expenses, lost wages, and other costs, as well as known and anticipated future costs and expenses.

24. There is no question that James River's most senior officers knew of the pervasive and fundamental deficiencies in James River's reserves and reserve setting process. Indeed, the Executive Defendants repeatedly assured investors that the Company's most senior officers were directly responsible for reviewing and establishing the Company's loss reserves, representing that, as members of James River's Reserves Committee, they were specifically responsible for ***"reviewing" and "approving" the reserve for losses and loss adjustment expenses***. Defendant D'Orazio further described how James River's "leadership team" conducted "claims audits" to "review a healthy sampling of the open files." Moreover, former employees described how reports on reserves—titled "Rasier [Uber] Reserves Audit" that listed various claims on a spreadsheet that needed to be reviewed to determine if the reserve was properly charged—were regularly provided to Schmitzer, who sat on the Reserves Committee along with the Executive Defendants. Indeed, given that senior James River executives repeatedly represented that they closely monitored the Uber reserve, the systemic and fundamental deficiencies that directly led to the $170 million charge could not have gone unnoticed.

25. In addition, the new evidence adduced in the *St. Amand* litigation, together with the corroborating accounts of former employees interviewed during Lead Plaintiffs' investigation, confirm that after the highly unprofitable Uber Contract was terminated in 2019, management's systemic efforts to suppress reserves only accelerated. Indeed, management intentionally implemented draconian, arbitrary, and secretive practices to systematically suppress reserves across the entire Uber book—with the clear objective of ensuring that reserves stayed as low as possible.

26. First, to suppress reserves for large Uber claims, any request for a reserve increase to $250,000 or more was ***elevated all the way up to James River Insurance's CEO***, Schmitzer, who routinely refused to approve such requests. Second, to suppress reserves on all other claims, management ***drastically reduced the reserve authority across the board for all claims department personnel to absurdly low levels—e.g., 1/10th of an examiner's prior levels—or simply "stripped [reserve authority] away to nothing***." Third, management required that ***each and every request for a reserve increase be re-routed through a secret new "PLM" email portal***, which was surreptitiously operated by Rogers, Warren, and Schmitzer. Remarkably, frontline claims handlers were specifically instructed to ***not mention the PLM system in their notes*** so that the inevitable reserve increase denials were not officially documented and would not be discovered in litigation. Indeed, only if the reserve increase was *approved* would the need for the increase even appear in the claim file. If, however, the increase was *denied*—as nearly all large requests "***almost always***" were—there would be no record ever indicating that the claim examiner even solicited an increase in the first place.

27. Finally, sworn witness testimony from *St. Amand* provides an additional motive—along with suspiciously timed insider selling—for Defendants' deliberate suppression of reserves. Specifically, James River was actively seeking a sale of the Company both before and during the Class Period, but faced significant obstacles because of its enormous Uber-related liabilities—including sales that fell through precisely "***because of the Uber account***."

28. Defendants' knowledge of James River's pervasive and fundamental reserving deficiencies for the Uber policy, and their knowing failure to correct them, directly resulted in the Uber Account being materially under-reserved and James River incurring aggregate charges in excess of $200 million. As a result of these previously hidden facts being fully revealed to

investors, James River's share price fell precipitously, causing substantial harm to Lead Plaintiffs and the Class.

## II. JURISDICTION AND VENUE

29. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa. In addition, because this is a civil action arising under the laws of the United States, this Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337.

30. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), Section 27 of the Exchange Act, 15 U.S.C. § 78aa. Many of the acts and transactions that constitute violations of law complained of herein, including the dissemination to the public of untrue statements of material facts, occurred in this District as James River Insurance Company ("James River Insurance") is headquartered in Richmond, Virginia.

31. In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of a national securities exchange.

## III. THE PARTIES

### A. Lead Plaintiff

32. Lead Plaintiff Fort Worth provides retirement benefits to full-time City of Fort Worth employees, including general employees, police officers and firefighters and serves approximately 6,500 active members and 4,700 retirees and beneficiaries. As set forth in the certification previously filed with the Court (ECF No. 41), Fort Worth purchased James River common stock during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

33. Lead Plaintiff Miami is an independent body politic that was established in 1956 to provide benefits—including retirement, death, and disability benefits—to eligible employees of

the government of the City of Miami, Florida. As of year-end 2021, Miami managed $1 billion in assets for the benefit of over 4000 active and retired participants. As set forth in the certification previously filed with the Court (ECF No. 41), Miami purchased James River common stock during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

**B. Defendants**

34. Defendant James River is an insurance holding company that owns and operates a group of specialty insurance and reinsurance companies, including James River Insurance, which is based in Richmond, Virginia. James River is organized under the laws of Bermuda. James River became a public company in December 2014, and its common stock trades on the NASDAQ under the symbol "JRVR."

35. Defendant Robert ("Bob") P. Myron ("Myron") was the CEO of James River from January 2017 to August 5, 2019, and has served as the Company's President and Chief Operating Officer since August 5, 2019. Myron has also served on the Company's Board of Directors since 2010. Myron served as the Company's Chief Financial Officer from June 2010 until September 2012, as the Company's Chief Executive Officer from October 2012 to September 2014 and as the Company's President and Chief Operating Officer from September 2014 to December 2017.

36. During the Class Period, Myron made materially false and misleading statements and/or omissions in interviews, presentations, and during investor conferences with securities analysts, including on February 22, 2019, May 2, 2019, August 1, 2019, February 21, 2020, April 30, 2020, July 30, 2020, October 29, 2020, and February 26, 2021. Defendant Myron also reviewed, approved, and signed James River's filings with the SEC on Form 10-Q and Form10-K on February 27, 2019, May 3, 2019, August 2, 2019, and February 27, 2020, which contained additional materially false and misleading statements and/or material omissions.

37. Defendant J. Adam Abram ("Abram") is James River's founder and was the Company's CEO and Executive Chairman from August 2019 through October 2020 and has served as the Company's Non-Executive Chairman since November 2020. Abram served as Chief Executive Officer and Executive Chairman of the Board from September 2014 through December 2017, Non-Executive Chairman of the Board from October 2012 through September 2014, Executive Chairman of the Board from December 2007 to September 2012, Chief Executive Officer from December 2007 through March 2008 and the Executive Chairman, President and Chief Executive Officer of James River Group, Inc. from its inception in 2002 through 2007 and from March 2008 until October 2012.

38. During the Class Period, Abram made materially false and misleading statements and/or omissions in interviews, presentations, and during investor conferences with securities analysts, including on August 1, 2019, November 7, 2019, February 21, 2020, April 30, 2020, July 30, 2020, and October 29, 2020. Defendant Abram also reviewed, approved, and signed James River's filings with the SEC on Form 10-Q and Form 10-K on February 27, 2019, November 7, 2019, February 27, 2020, April 30, 2020, July 31, 2020, October 29, 2020, and February 26, 2021, which contained additional materially false and misleading statements and/or omissions.

39. Defendant Frank N. D'Orazio ("D'Orazio") has served as the CEO of James River and been on its Board of Directors since November 2020.

40. During the Class Period, D'Orazio made materially false and misleading statements and/or omissions in interviews, presentations, and during investor conferences with securities analysts, including on February 26, 2021, May 5, 2021, and August 5, 2021. Defendant D'Orazio also reviewed, approved, and signed James River's filings with the SEC on Form 10-Q and Form

10-K on February 26, 2021, May 5, 2021, and August 5, 2021, which contained additional materially false and misleading statements and/or omissions.

41. Defendant Sarah C. Doran ("Doran") has been the Chief Financial Officer of James River since January 2017.

42. During the Class Period, Doran made materially false and misleading statements and/or omissions in interviews, presentations, and during investor conferences with securities analysts, including on February 22, 2019, May 2, 2019, August 1, 2019, November 7, 2019, February 21, 2020, April 30, 2020, July 30, 2020, October 29, 2020, February 26, 2021, May 5, 2021, and August 5, 2021. Defendant Doran also reviewed, approved, and signed James River's filings with the SEC on Form 10-Q, Form 10-K, and Form 8-K on February 21, 2019, February 27, 2019, May 1, 2019, May 3, 2019, July 31, 2019, August 2, 2019, November 6, 2019, November 7, 2019, February 20, 2020, February 27, 2020, April 29, 2020, April 30, 2020, July 30, 2020, July 31, 2020, October 28, 2020, October 29, 2020, February 17, 2021, February 25, 2021, February 26, 2021, March 1, 2021, May 5, 2021, August 4, 2021, and August 5, 2021, which contained additional materially false and misleading statements and/or omissions.

43. Defendants Myron, Abram, D'Orazio, and Doran are referred to herein as the "Executive Defendants."

44. Defendants Myron, Abram, D'Orazio, and Doran, because of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day business of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about James River, had the power and ability to control the actions of James River and its employees throughout the Class Period, as alleged herein.

45. James River and the Executive Defendants are referred to herein as "Defendants."

## IV. OVERVIEW OF THE FRAUD

### A. James River's Insurance Business

46. James River is a Bermuda-based holding company that operates a group of specialty insurance and reinsurance companies, including Virginia-based James River Insurance. James River principally operates through three main business segments: Excess and Surplus Lines, Specialty and Admitted Insurance, and Casualty Reinsurance. Relevant here, the Company's E&S Lines business is administered through James River Insurance and its wholly-owned subsidiary, James River Casualty Company ("James River Casualty").

47. E&S lines provide insurance for business lines that standard insurance carriers will not cover due to unique characteristics or risks. Unlike with standard insurance, the insured runs the risk of the E&S insurer being unable to pay because there is no guaranty fund from which to obtain payment on a claim if an insurer files for bankruptcy. As James River explained in its 2018 Form 10-K:

> Companies that underwrite on an E&S lines basis operate under a different regulatory structure than standard market carriers. E&S lines carriers are generally permitted to craft the terms of the insurance contract to suit the particular risk they are assuming. Also, E&S lines carriers are, for the most part, free of rate regulation. In contrast, standard market carriers are generally required to use approved insurance forms and to charge rates that have been authorized by or filed with state insurance departments. ***However, as E&S carriers, our insurance subsidiaries in the Excess and Surplus Lines segment are not backed by any state's guarantee fund***, . . .

48. For this reason, an E&S insurer's reserves—the money set aside to pay claims associated with a particular claim—are critically important to E&S insurers, insureds, and investors.

49. James River's E&S Lines was by far the Company's most important business, and its performance was critical to the Company's financial health. Indeed, the E&S Lines produced 68% of James River's net written premiums in 2018, 77% in 2019, and 70% in 2020.

50. Within James River's E&S Lines, the most important division by far was Commercial Auto, which accounted for nearly 50% of the E&S Lines' gross written premiums in 2018, and 44% in 2019. James River's Commercial Auto Division administered the Company's contract with Uber.

**B. James River Underwrites A New Type Of Insurance With Uber And Uber Becomes James River's Largest And Most Important Contract**

51. In March 2014, James River significantly ramped up its Commercial Auto Division by underwriting a new type of insurance policy that covered Rasier LLC ("Rasier"), a subsidiary of the rideshare company Uber Technologies, Inc. (together with Rasier, "Uber"). James River entered into a contract to provide E&S insurance to Uber, which came up annually for renewal in March (the "Uber Contract" or the "Uber Account").

52. Until this point, ride-sharing companies—still a relatively new phenomenon—carried automobile insurance that only covered claims incurred while the ride-sharing drivers were transporting passengers, not while they were driving their cars in search of a passenger. This left a gap in coverage for accidents that occurred while the ride-sharing drivers were logged into the Uber app and available to accept a passenger but not actively transporting anyone. On March 14, 2014, Uber announced new expanded coverage through the Uber Contract that would cover this gap. At the time, James River was the only insurance company providing this type of insurance.

53. Uber quickly grew to become James River's largest and most important insured. Indeed, the Uber Contract comprised over 25% of James River's consolidated gross written premiums for 2018 and 2019—totaling $294.3 million and $374.2 million in gross written

premiums, respectively. With the growth of the Commercial Auto Division, Defendants constantly assured investors that the Commercial Auto division reserves were strong and stable, and boasted that the Uber Contract was healthy and profitable for James River.

54. On the Company's earnings call on February 22, 2019—the first day of the Class Period—Defendant Myron celebrated the renewal of the Uber Contract, expressing that James River was "appreciative of continuing the long and collaborative relationship we have had with" the Company's "largest account." Defendants also focused on the reserves of the E&S Lines in particular. For example, in James River's 2018 Form 10-K, filed on February 27, 2019, the Company stated, "Balance sheet integrity is key to our long-term success. In order to maintain balance sheet integrity, we seek to estimate the amount of future obligations, especially reserves for losses and loss adjustment expenses, in a consistent and appropriate fashion." James River further emphasized that its senior officers set reserves only after they conduct extensive and detailed valuation of claims "on an individual case-basis." As James River explained:

> The reserve for losses and loss adjustment expenses represents our estimated ultimate cost of all reported and unreported losses and loss adjustment expenses incurred and unpaid at the balance sheet date. . . . ***We estimate the reserve using individual case-basis valuations of reported claims and statistical analysis***.
>
> * * *
>
> Based on the information provided, we establish case reserves [for the E&S Lines] by estimating the ultimate losses from the claim, including administrative costs associated with the ultimate settlement of the claim. ***Our claims department personnel use their knowledge of the specific claim along with internal and external experts, including underwriters and legal counsel, to estimate the expected ultimate losses.***

Later, on an August 2, 2019 earnings call, Defendant Myron assured investors, "When we look at the E&S segment, we are comfortable with our loss reserves."

55. Analysts credited Defendants' statements regarding James River's relationship with Uber and the health of its reserves. For example, SunTrust noted on February 22, 2019,

"***Uber premium should be relatively stable*** in the coming year following the renewal of the company's contract . . . ." A week later, on March 1, 2019, SunTrust wrote that James River's "***reserves appear to be healthy***" and that James River had "robust reserving practices" and "emphasize[d] adequacy" in setting its reserves.

56. Importantly, analysts directly linked the health of James River's Commercial Auto reserves in particular to the performance of the Company's share price. For example, on May 1, 2019, JMP reported that "commercial auto reserves were stable . . . . ***We continue to believe that stability in the commercial auto reserves is key to the stock's performance in the near/intermediate term***." On August 1, 2019, JMP reemphasized this direct link, reiterating that "Commercial auto reserves were stable in aggregate . . . . ***We continue to believe that stability in the aggregate commercial auto reserves is key to stock performance in the near/intermediate term*** . . . ." Accordingly, both James River and the market were well-aware that proper reserving for claims on the Uber Contract was critical to James River's financial performance.

### C. James River Cancels The Uber Contract But Assures The Market That Problems Are Contained And The Reserves Are Sufficient

57. On October 8, 2019, just two months after analysts reiterated the close connection between reserves on the Uber Contract and James River's share price, James River announced that it was cancelling the Uber Contract early because, in the words of Defendant Abram, the Uber "***account has not met our expectations for profitability***, and we think it ***best to terminate the underwriting relationship*** as of year end." James River additionally announced that it was taking an adverse development charge of $55-$60 million attributed "primarily" to the Commercial Auto Division—*i.e.*, the Uber Contract. This charge resulted in a quarterly net loss of $25.2 million. Consequently, James River put the Uber Account into "runoff," meaning that the Company would be responsible for processing and paying claims that had accrued through the end of 2019.

58. This news shocked the market, sending James River's share price plummeting nearly 23%, over $11 per share. Analysts were stunned; the next day, SunTrust downgraded James River and noted that "the magnitude of the volatility in losses—and, we would assume, ***concern about their future trajectory***—have contributed to management's decision to end the [Uber] relationship." JMP similarly noted on October 9, 2019, "Last night's announcement included ***a larger-than-anticipated charge***, as well as the ***unexpected news*** that James River had delivered notice of early cancellation to Uber . . . ."

59. During the subsequent 3Q 2019 quarterly earnings call on November 7, 2019, Defendant Abram spoke at length regarding the cancellation of the Uber Contract and the multiple ways that it was negatively impacting James River. Defendant Abram admitted that the $25 million quarterly loss was "driven by the lack of profitability on the Uber Account" and "is not acceptable." He also described how, in the 17 years since James River was founded, it "***never reported a loss of this magnitude before***." Abram further admitted that, under his watch, "Uber's business and the underlying risk evolved very quickly. ***Our underwriting assumptions and the related pricing did not keep pace with changes in Uber's business***. . . . [T]he risk became too large in absolute terms given the size of our company. And ***candidly, in some years, we mispriced the risk***." Abram described the Uber Contract as "a diversion" from "highly profitable underwriting of small- and middle-market risk," and he stated that James River "decided to reset [its] focus on the many positives in [its] core E&S business. . . ." In response, the Company's stock dropped more than 3%.

60. Nevertheless, to assuage investors that the risks relating to the Uber Contract were contained, Defendant Abram assured the market that the losses from the Uber Contract were behind James River. He promised investors on the November 7, 2019 analyst call that "we're

comfortable with our pricing for the 2018 and 2019 years" and that the reported reserves reflected "a judgment that's a historically well-informed judgment." In response to an analyst's request for "a little bit of color behind the scenes in terms of what changed with the reserve charge this quarter," Defendant Doran similarly assured that James River had "standard practices and procedure around this," was "watching it very carefully and very closely," and had done a "deep dive" into the reserves, just like the Company did "every quarter."

61. Analysts credited the Company's reassurances. For example, on November 7, 2019, SunTrust wrote that "Management expressed confidence in its commercial auto reserves. They point out that accident years 2018 and 2019 are benefiting from substantial rate hikes and that they are not seeing the type of loss emergence that had by this point already starting (*sic*) plaguing the 2016 and 2017 accident years." Over a year later, on March 3, 2021, Truist reported a "lower reserve risk" for James River, explaining that "the non-commercial auto E&S reserves look solidly redundant."

62. With James River's largest and most important customer in runoff due directly to the fact that Defendants admitted they "mispriced [Uber's] risk," Defendants continued to reassure the market that the risk associated with Uber was gone. For example, during the Company's April 30, 2020 earnings call, Defendant Abram explained that the "run off of the [Uber] account is going well. We're settling commercial auto claims at a rapid pace for amounts that are consistent with our held reserves." Defendant Doran reiterated that the "run-off . . . is performing well within our expectations," and that the Company was "pleased with the pace" of the runoff. The market credited these repeated reassurances, sending James River's share price to as high as $53 per share for the remainder of the Class Period.

**D. Eighteen Months After Cancelling The Uber Contract, And After Repeatedly Assuring Investors That Its Reserves Were Adequate, Defendants Announced A Massive $170 Million Increase In Uber Reserves And Revealed That The Reserve Methodology Used By The Company For Seven Years Was "Wrong"**

63. On May 5, 2021—a year-and-a-half after the Uber Contract was terminated and Defendant Abram reassured the market that James River was "comfortable" with the Uber reserve—James River again shocked the market by disclosing that ***the Uber Account was under-reserved by a stunning $170 million***. Specifically, James River announced that it was taking a $168.7 million adverse development charge, which included "***$170.0 million of unfavorable development in Commercial Auto***, primarily driven by" Uber.

64. The $170 million adverse reserve development was devastating to James River, and demonstrated how the Company had materially under-reserved for claims on the Uber Account ***for years***. Indeed, the massive charge represented ***over 50%*** of the entire Commercial Auto Division's $337 million net reserves reported less than three months earlier in James River's 2020 Form 10-K. Moreover, the $170 million charge exceeded all of James River's prior adverse reserve developments in the E&S Lines in the eight quarters since the Class Period began, ***combined***:

| Quarter | E&S Reserve Development (Adverse) |
|---|---|
| Q4 2020 | ($62,300,000) |
| Q3 2020 | ($27,000) |
| Q2 2020 | $2,800,000 |
| Q1 2020 | $3,000 |
| Q4 2019 | $46,000 |
| Q3 2019 | ($50,000,000) |
| Q2 2019 | ($1,200,000) |
| Q1 2019 | $10,000 |

65. As this chart reflects, for half the reporting periods in the Class Period—four out of eight quarters—James River announced favorable reserve developments which actually reduced its Uber-related reserves, thereby creating the materially false impression that the money set aside for the Uber claims was more than sufficient. Indeed, for three consecutive quarters beginning in Q4 2019, James River ***reduced*** its E&S reserves—and even when James River eventually increased the reserves in Q3 2020, it took only a *de minimis* $27,000 adverse development, even as the Uber claims were spiraling out of control. Further, as described in Section V below, all of the adverse charges that James River reported during the Class Period were also materially understated.

66. Analysts immediately noted the stunning size of the $170 million charge. JMP, for example, wrote that ***"headline figures impress upon outsiders just how significant the $170 mln reserve charge was—most notably that it increased the total reserve per open claim by 55%."*** JMP put the $170 million into further context, describing how it meant that, on average, each claim on the Uber Account was under-reserved by an astonishing 40%: "The average reserves/claim now sit at ***40% higher*** than the average paid claim severity observed during 1Q. In other words, with the $170 mln charge, ***management has provisioned for 40% further adverse development across the entire runoff book***."

67. Significantly, at the same time that James River announced the $170 million charge, the Company also admitted that the reserve methodology that James River had used for claims on the Uber Account was "wrong" and that the Company would immediately begin using a more conservative and correct methodology to calculate reserves. Specifically, Defendant D'Orazio—who was unexpectedly named James River CEO in November 2020, and admittedly made it his "***personal goal to be able to eliminate the overhang surrounding [the] Commercial Auto***

***runoff***"—conceded openly on the May 5, 2021 analyst call that "***we got it wrong.***" D'Orazio explained that the $170 million charge was not due to the sudden influx of new claims or some other unforeseen occurrence, but rather because for years, James River had been using an improper methodology that materially understated reserves. Indeed, after years of repeatedly reassuring investors that James River's reserve methodology was sound, Defendants announced the exact opposite: the methodology was deeply flawed, it ignored the Company's own loss experience on Uber claims, and the Company was forced to abandon it.

68. As D'Orazio stunningly conceded, James River "***meaningfully changed our actuarial methodology*** . . . ." Specifically, Defendant D'Orazio admitted that "using only our own loss experience in our paid and incurred reserve projections rather than the array of inputs that we had used in prior quarters, and giving greater weight to incurred methods would give us ***a better and more conservative estimate of ultimate losses on this account***." As Defendant D'Orazio further acknowledged, "The result in the changed methodology is significant . . . ."

69. Analysts immediately linked the $170 million charge to the new reserve methodology, and they understood the magnitude of the old methodology's fundamental and pervasive flaws. JMP flatly wrote that James River took the charge "***by effectively throwing out the prior reserving approach and starting fresh with a much more conservative process*** that, among other things, only used James River data (no longer taking into account industry commercial auto data) and more heavily focused on incurred data (a more conservative approach than focusing on paids)." JMP further made clear that the massive charge and new methodology had occurred because D'Orazio had been brought in to James River to clean house, writing that this "much more conservative approach" was "drive[n] by a new CEO that is determined to get the risk management error behind them."

70. The $170 million charge resulted in a net quarterly loss to James River of $103.5 million. This loss was nearly ***three times*** greater than the largest quarterly income loss the Company had ever reported—$36.8 million—and completely wiped out the $54.7 million in profit that the Company had reportedly earned over the nine prior quarters of the Class Period. Indeed, the charge was more than three times greater than the profit that the Company had reported for the prior 2-1/2 years:

| **Quarter** | **Net Income (Loss)** *(in millions)* |
|---|---|
| Q4 2020 | ($20.3) |
| Q3 2020 | $26.3 |
| Q2 2020 | $35.6 |
| Q1 2020 | ($36.8) |
| Q4 2019 | $20.5 |
| Q3 2019 | ($25.2) |
| Q2 2019 | $20.3 |
| Q1 2019 | $22.7 |
| Q4 2018 | $11.6 |

71. The announcement of the $170 million charge and $103.5 million loss had a devastating impact on James River. The Company's share price plummeted over 26% in response to these stunning revelations in a single day, from a close of $46.50 to $34.23, on unusually high trading volume.

72. In an obvious attempt to cover the massive loss, James River announced that it was commencing a secondary offering valued at approximately $175 million to raise badly needed capital. Announced simultaneously with—and clearly as a direct result of—the massive charge and quarterly loss, James River disclosed that it was issuing 5,650,000 shares at an offering price of $31.00 per share—an astonishing ***34% discount*** to the $46.49 closing price on May 4, 2021.

The extraordinary discount reflected the Company's own assessment of the impact of the change on its true financial condition—and made clear that the Company itself understood that its value had been dramatically impaired by the staggering charge. *Bloomberg* noted bluntly that the offering was priced at "***the sector's steepest discount ever***." Writing on May 6, 2021, UBS explained that the offering "will shore up" James River's balance sheet "after the charges and provide them with capital . . . ," but nevertheless "expect[ed] a negative reaction from investors given the reserve charge and dilutive equity capital raise."

73. Remarkably, notwithstanding D'Orazio's assurance on May 5, 2021 that the reserve charge would "put the concerns with our commercial auto runoff portfolio behind us for good," the losses on the Uber Contract continued to mount. On October 26, 2021, James River disclosed an additional $29.6 million in "impacts" from the Uber Contract, which directly resulted in James River's share price falling more than 16%, from a close of $39.08 per share on October 25, 2021 to a close of $32.75 per share on October 26, 2021. Analysts reacted negatively to the announcement. For instance, UBS lowered its earnings per share estimate for James River in an October 26, 2021 report due in part to the "29.6mm charge related to the previously announced" decision to enter into a transaction to reinsure the remaining Uber claims.

74. Then, on November 2, 2021, after the Class Period ended, James River confirmed the obvious: that the "impact" would be booked as an adverse loss and loss adjustment expense reserve development, and that this development was directly related to the Company's $23.9 million quarterly loss, explaining in its Form 8-K that "our third quarter results were impacted by the . . . legacy transaction." The Company's Form 10-Q filing made on November 3, 2021 clarified that of the $29.6 million development, $13.8 million was an adverse loss adjustment reserve—despite having recognized the $170 million charge just months prior.

### E. Former Employees Confirm That James River's Reserves Were Materially Understated And Not Calculated In Accordance With GAAP, And That The Uber Contract Was Not Profitable For James River

75. Contrary to Defendants' representations, and as Defendants later admitted, James River's reserves for the Uber Contract were materially understated. In their investigation of this Action, Lead Counsel interviewed 15 former employees of James River ("FE").[2] Their first-hand accounts unequivocally establish that, contrary to Defendants' assurances during the Class Period, James River: (i) had no reserve methodology at all, except to keep the reserves low; (ii) systematically under-reserved on Uber-related claims; (iii) "bent over backwards" for Uber by overpaying on claims to avoid embarrassing Uber; and (iv) knowingly hired adjusters with no claims experience, provided them with no training, and prevented them from using software that would accurately set reserves. These former employees described that the Uber Account was not profitable as a direct result of these fundamental and systemic failures, and that Defendants had first-hand knowledge of these facts.

#### 1. Former James River Employees Confirm That James River Had No Reserve Methodology Except To Keep The Reserves Low

76. Despite Defendants touting the strength and robustness of the reserve throughout the Class Period, multiple former employees confirmed that, in fact, ***James River had no reserve methodology at all—except to keep the reserves low***. FE1, a former Claims Examiner at James River Insurance's Richmond office from 2019 until 2020, stated bluntly that ***there was "no methodology" for calculating reserves***. According to FE1, "***It didn't exist; there was nothing***."

---

[2] The terms "Former Employees" and "FE" refer to the former employees of James River whose reports are discussed in this Complaint. In order to preserve the Former Employees' anonymity while maintaining readability, the Complaint uses the pronouns "he," "his," and "him" in connection with all of the Former Employees, regardless of their gender.

Rather than following a specific methodology, FE1 described the reserve-setting process as throwing a random number at the wall and hoping it would stick at what employees thought the claim was worth. Because of the absence of any methodology, FE1 explained that there was no standardization of setting reserves at an appropriate level. Thus, FE1 described, with nine out of ten claims, James River would find out that the claim was worth a lot more than what it had been priced.

77. FE2, a Bodily Injury Claims Examiner at James River Insurance from October 2017 until December 2019, confirmed this account. He described how new claims were valued to set a reserve, stating, "[W]e would guess" depending on the severity of the accident. A lot of it was "***gut feeling***," he explained. These accounts were confirmed by numerous former employees. For example, FE3, who worked at James River Insurance as a Litigation Specialist from May to December 2020 and as a Bodily Injury Claims Examiner at James River Insurance from February 2017 to May 2020, described the reserving process as "willy nilly." FE4, who worked as a Bodily Injury Claims Manager at James River Insurance from September 2017 until May 2020, described that, for his entire tenure at James River, the reserving process was a "firestorm," noting that claims were always coming back under-reserved.

78. Indeed, ***the only guiding principle in James River's reserving process was to keep the reserves low***. Former employees described how James River deliberately discounted the reserves set on Uber claims. FE5 served as a Litigation Claims Examiner at James River Insurance's Richmond, Virginia office from January 2017 through January 2021, in which role he was responsible for examining claims stemming from the Company's Uber Account. He explained that in 2017, when Donna Jefferson came onboard as a Director of Claims, which gave her high-level authority over the Uber claims, the Company implemented an automatic 30% cut to reserve

increases. According to FE5, this meant that if a claims manager asked to increase a reserve up to $100,000, that claim would be automatically cut to $70,000. FE6, who worked at James River Insurance from 2016 until December 2020, most recently as a Litigation Claims Examiner, and FE1 confirmed FE5's account, explaining that Jefferson automatically cut reserves by 20-30%. Importantly, according to FE6, Jefferson reported to the Vice President of Claims, Rogers. According to FE4, all of the Company's reserving directives came from Rogers, who received her marching orders from the c-suite.[3]

### 2. James River Systematically Under-Reserved On Uber Claims

79. Given a reserve methodology where the only guiding principle was to keep the reserves low, James River's loss reserves, which it repeatedly touted as "conservative"—and analysts repeatedly accepted as "stabl[e]" and "conservative"—were in fact anything but. From the moment a new claim was opened, reserves were kept artificially low. Then, rather than take actual losses or new information into account in adjusting the loss reserves on Uber claims—as required by GAAP—***James River instead directed its claims adjusters to stay within well-defined reserve limits, regardless of new facts impacting the expected claims exposure***.

80. When a claim was opened on the Uber Account, an initial reserve was supposed to be set. However, rather than take into account the facts and information available to them at the time, adjusters were directed to open claims with artificially low "placeholder" reserves—reserves that were often times ***as little as $1.00***. For example, FE7 served as a Bodily Injury Claims Examiner at James River Insurance from May 2017 to March 2020, in which role he serviced Uber claims. He explained that adjusters would open claims at $1.00 because all that was needed to

[3] In May 2022, Rogers testified in the *St. Amand* case (bad faith litigation against James River) that as Vice President of Claims, she "reported directly to Courtney Warren," James River Insurance's Chief Claims Officer and a "C suite employee."

open a claim was a dollar amount. FE7 pointed out the obvious—that this made no sense whatsoever because claims could never be settled for just a dollar. Nonetheless, FE7 estimated that in his first year in Bodily Injury, reserves were set at $1.00 for 65% of the claims that came in that year.

81. In addition to artificially low placeholder reserves being used to open bodily injury claims, these low placeholder reserves were similarly mandated for property damage claims. FE1 confirmed FE4's account, stating that in Property Damage, associates were allowed to reserve $1,000 to $1,500 for claims. FE4 also confirmed FE1's account, explaining that one of the clear reserving issues in 2018 and 2019 was the low factor reserve of $1,500 per claim that was set for Uber claims. As FE4 put it, using a smaller factor reserve "***put us in the hole from the beginning with Uber***. No case was ever going to settle for $1,500."

82. Once these placeholder reserves were set, former James River employees uniformly described how managers deliberately prevented adjusters from increasing claims reserves in light of new information. FE1 explained that, with respect to bodily injury claims, the claim reserve limit was set at $5,000-$10,000 right off the bat, and James River wanted the adjusters to stay within that amount. FE1 described how, with respect to certain bodily injury claims, for example a person with a face laceration, adjusters would state that they thought it was a six-figure claim and ask why they had to start it at $5,000 instead of an obviously more appropriate number, such as $70,000. FE1 recounted a particular time when he was reviewing high-value claims, and noticed a claim in which the initial information stated that the woman had facial lacerations because the car had flipped, and the initial reserve was set at $5,000. FE1 said that it should have started at $100,000 because the accident was clearly the Uber driver's fault. Yet, when employees asked why the reserves were set so low, they were told that was just how it is. FE1 further confirmed

that he frequently saw that James River's reserves were too low, but that the Company wanted employees to stay within reserves limits, regardless of the expected claim exposure.

83. FE8, who worked at James River Insurance as a Manager from July 2019 until July 2020, explained that, after the Uber Contract was terminated, claims managers were told that their reserve authority was lowered to $32,000, a number that was cumulative for the entire file, even if there was more than one injured party. FE8 explained that reserves that needed to be set above $32,000 had to go to the director level. FE8's director was Marti Shelton, who came from property damage and had no experience in bodily injury. According to FE8, Shelton just kept cutting the reserves. Anything above his authority had to get approved in Richmond and he could not get them to move on the numbers at all.

84. Indeed, FE8 described how the managers were forced to cut reserves when they knew that the files were worth much more. According to FE8, when managers complained about this, they were told that James River was not going to make any changes. According to FE8, Warren and Rogers (former VP of Claims at James River Insurance) stated that this was going to be the way James River reserved. FE8 added that he heard a rumor that Warren's and Roger's bonuses were dependent on keeping the reserves at a certain level. FE8 also stated that the adjusters were required to have a claim closure every day. FE8 explained, "It was incredible. ***I have never worked in an environment where we bent the truth***. ***They put caps on reserves irrespective of the injuries***."

85. FE9 was a Bodily Injury Claims Manager at James River Insurance from August 2017 until November 2019, handling Uber claims. FE9 similarly described how in 2019, while on the litigation team, he and his colleagues were constantly submitting reports to Rogers regarding recommended reserves but were constantly getting shut down by her. According to FE9, Rogers

reduced reserves 100% of the time. FE9 described how every day he had conference calls with Rogers regarding the reserves during which the reserves would get cut and slashed. According to FE9, if you attempted to push back, you would be "reduced to ashes."

86. FE6 confirmed the accounts of FE9 and FE8, explaining that there was not a time when reserves stopped being cut, and it never got easier to increase reserves. FE6 explained that after James River ended the contract with Uber, reserves were actually reduced. As FE6 put it, it was never easy to get more reserves on claims even when the Company knew that they should have more money on claims.

87. Multiple former employees have also described how James River required claims employees to draft time-consuming reports known as Large Loss Reports ("LLR") when they wanted to increase the reserves set on certain Uber claims, which contributed to under-reserving. FE10, who served as a Claims Quality Assurance ("QA") Manager at James River Insurance's Richmond, Virginia office from April 2017 to January 2020, flatly explained that the LLR process resulted in under-reserved claims. He described that in mid-2019, Rogers and Warren lowered all the claim examiners' settlement authority to $5,000—and FE10 noted that you can't do anything to settle claims with $5,000. As FE10 explained, in order to have higher settlement and reserve authority, the claim examiner had to put together LLRs, which were very lengthy and took a lot of time to complete. It was not uncommon for the average claim examiner to have 150 files, and that examiner would need to write 20 or more LLRs in order to increase a claim's reserve. FE10 explained that an LLR typically took half a day to complete, which resulted in examiners not being able to properly reserve their files because of the enormous delays involved in completing LLRs.

88. Even after the Uber Contract was terminated, James River continued to systematically under-reserve on Uber claims due to burdensome, mandatory LLRs. According to

FE5, who worked on litigation claims for the Uber Account until he left the Company in January 2021, James River under-reserved for the Uber Account the entire time he worked on the Uber Account. He stated that the claims examiners had to jump through a lot of hoops to increase their reserves, and that LLRs had to be generated in order to increase reserves for Uber claims. These reports were very detailed and often more than 30 pages long. He commented that employees had such a high claim load that they did not have time to increase their reserves, and that the standards to increase the reserves were "crazy."

#### 3. James River "Bent Over Backwards" For Uber, Systematically Overpaying On Uber Claims To Avoid Embarrassing Uber

89. Multiple former employees confirmed that James River consistently overpaid and lost money on Uber claims. This, in turn, contributed to the Uber Contract being not profitable and to James River being under-reserved, because the reserves were supposed to reflect what the claims were actually worth. FE11, who worked as a Litigation Claims Examiner at James River Insurance from November 2015 to April 2021, explained that James River's claims examiners "bent over backwards" for Uber, and as a result, the Company under-reserved on the Uber Account from the beginning.

90. FE12, who worked as a Litigation Claims Examiner at James River Insurance's Richmond office from May 2018 until July 2020, explained that many of the Uber claims were overpaid to appease Uber and avoid any negative publicity. He was told that Uber was James River's largest client, and the Company wanted to make them happy. He added that Uber's public image should not have been an insurance issue, and James River should not have been paying $100,000 to settle claims that should have settled for $30,000.

91. The pressure from Uber to overpay claims and avoid trial only increased after the contract was terminated. FE3 explained how James River still had a backlog of claims at the time,

and Uber was still included in the claims process even though they were not insuring new claims. FE3 described how Uber was eager to settle by any means necessary. According to FE3, James River would request a certain amount to settle the claims, but Uber was very eager to avoid trial and thus would increase the amount paid to settle the claim.

92. Uber dictated James River's compliance with its demands and the amount the Company paid out on claims because, incredibly, ***Uber had first-hand access to the files of claims pending against it—and because Uber representatives were often sitting in the room with James River executives while James River determined the reserve on a claim***. According to FE13, who served as a Claims Examiner, Assistant Claims Manager, and Claims Manager at James River Insurance between April 2015 and May 2020, Uber had access to James River's claims files, and Uber would go in and do its own audits on its claims. As a claims manager, FE13 was fielding questions about claims from both James River and Uber.

**4. James River Knowingly Hired Adjusters With No Claims Experience, Gave Them No Training, And Prevented Them From Using Software That Would Accurately Set Reserves, And Senior Management Knew It**

93. James River was particularly susceptible to pressure from Uber that resulted in materially understated reserves—not only because Uber was the Company's most important contract, but because the Company knowingly failed to train its claims employees in proper reserving practices and processes. Just as the only guiding reserve principle was to keep the reserves low; the only guiding principles for paying claims were to pay them off to appease Uber, or to stay within authority, regardless of what the claims were actually worth.

94. According to FE6, there was no reserve training when he was hired. There was not a formal process of saying for this type of injury, pay this amount; rather, employees were just supposed to pay the claim within their authority, and the focus was on staying inside of authority

rather than on properly paying the claim. FE1 confirmed that no one on his team received proper training. FE1 described how, with respect to pricing out claims depending on someone's injury, Sean Casey, the Assistant Director of Claims, went over a claim in which a car flipped, and the person had a concussion and a traumatic brain injury. Casey was upfront about the fact that they still had to set the reserves at their reserve limit regardless of what they knew the claim to actually be worth.

95. James River's failure to train adjusters in how to properly reserve a claim directly led to claims being under-reserved. FE3 described how with respect to reserving, there was no training; no one trained him how to reserve; and there was under-reserving. FE3 stated that no one told employees how to reserve correctly, and he was never formally advised on how to reserve files. Instead, he would be sent this spreadsheet and be told to figure it out.

96. FE1's team manager had zero bodily injury training, and he confirmed that the lack of training directly contributed to James River being under-reserved. FE12 agreed, confirming that James River's lack of training for staff members resulted in poor reserves. He explained that James River did not have a formalized training program for these new hires until 2020. FE12 stated that he also did not receive any training on the Uber Account. He explained that he was shown his desk and handed 75 bodily injury claims, many with severe liability. According to FE12, it was a free-for-all and like a startup that did not know anything.

97. The lack of training for new employees was magnified exponentially due to the influx of claims that James River received after signing on the Uber Account, which forced the Company into a "hypergrowth" stage. FE14, who worked at James River Insurance's Richmond office as a Claims Examiner from May 2019 until January 2021, explained that the claims department was understaffed and unable to process all the Uber claims. He added that the

Company had a high turnover rate within claims because people were leaving the Company, and those positions were not being filled. Most of the claim examiners quit because of the stress from their workloads. The remaining claims examiners were getting an increase in Uber claims and the claims from the examiners who quit.

98. As a result of the adjusters not being able to perform all of the work, the Company went on a hiring spree to make up for its personnel shortfall—hiring anyone and everyone regardless of their lack of expertise. FE12 explained that James River only had a few dozen claims examiners prior to the Uber Account. To address that avalanche of claims from Uber, James River hired 350 to 400 new claims examiners. Most of the new hires did not have insurance experience, and many had only retail experience, such as working at PetSmart and Starbucks. FE12 commented that the Company was just filling seats to fill seats. As FE12 stated, "Insurance is not a place where you put someone who does not know anything about coverage. You cannot hand them 100 claims and expect to prosper."

99. FE15, who worked as a Senior Claims Examiner at James River Insurance from November 2017 until March 2021, explained that the Company had 300 to 400 adjusters just for the Uber Account. Most of them were inexperienced and overworked; in fact, according to FE15, "That's an understatement." He also noted that the Company hired recent college graduates and baristas from Starbucks to meet the demand for claim examiners to work on the Uber claims.

100. The constant hiring and turnover of new, inexperienced staff led FE1 to bluntly state that, as of October or November 2019—*i.e.*, just as the early termination of the Uber Contract was announced—"I could see that the place was a Titanic sinking." FE15 added that, after James River announced that it was cutting ties with Uber in October 2019, many people started to leave the Company, and those positions were not filled. He stated that claims examiners that worked on

Uber and the core division had their workload increased. The claims examiners were overloaded and he was up to 160-170 claims in litigation. He added that there was no way a claims examiner could handle 160 claims in litigation and not have something blow up. FE15 stated that he still gets telephone calls from defense counsel across the country that complain to him that the claims examiners have no idea what they are doing.

101. FE11 confirmed that, once ties with Uber were cut in October 2019, there was a revolving door with claims examiners. Claims examiners were leaving in droves, and their files were transferred to other overworked claims examiners that were also looking to leave James River. He stated that every two (2) weeks, the claims examiners were getting 20-30 file transfers. FE11 stated that those transfers were then sent to someone else who was looking to leave, so they didn't touch those files.

102. Compounding the problems James River encountered by hiring inexperienced staff and not training them, former employees have described how the technology the Company used for estimating reserves was either dysfunctional or unsuitable for its purpose. For example, FE8 was responsible for managing the national transportation claim team dedicated to the Uber Account and had 28 years of claims-handling experience in the insurance industry. He explained that he was aware of James River's reserving issues, and in particular, noted that James River's systems consistently under-reserved claims. Specifically, FE8 stated that James River had templates for the adjusters for reserving and a software system, which evaluated the claims. It was a requirement that all the claim information had to be entered into this system. The system then generated a reserve amount for each claim. If the system generated a number above the adjuster's reserve authority, the adjusters needed to get management approval. FE8 was one of four or five managers that reviewed these claims. He commented that the numbers made absolutely no sense.

For instance, FE8 recounted that there were "claims with multiple compound fractures with internal fixation . . . which is a big claim, and the system is saying that the reserve should be $6,000," which was below the claim value. As described further in Section VIII below, Defendants touted James River's supposedly ground-breaking technology throughout the Class Period.

103. In stark contrast, FE13 explained that at James River, they were using a homegrown claims system. According to FE13, the data was poor and outdated. FE13 noted that James River used the Mitchell system for their bodily injury evaluations, but not until the last year or so that he was there, which was 2019. Prior to that, they did not have any tools for evaluating claims. Further, the Mitchell system did not solve James River's under-reserving problem. According to FE6, the Company would "nickel and dime" or insist the examiners just go with the Mitchell IQ number, which was not accurate. FE6 explained that the Mitchell system did not consider certain injuries, like a concussion, or a lot of basic injuries that examiners often saw, such as scarring and other things that put more money on claims. Despite this, the Company would push for employees to go with the inaccurate Mitchell number.

#### 5. As A Direct Result Of These Systemic Reserving Failures, The Uber Contract Was Unprofitable And Was Cancelled

104. James River's fundamental, systemic, and widespread failure to properly reserve for Uber claims directly caused steadily mounting losses and increasing quarterly loss adjustment expenses. Indeed, the Company's fundamental failure to properly reserve for Uber claims rendered the Uber Contract unprofitable—as Defendant Abram conceded—and led to its early termination.

105. In fact, the Uber Contract was unprofitable for James River long before the October 2019 announcement that it was being terminated early. For example, FE13 explained that in 2017 or 2018, a lot of rumors began circulating about how James River was not making any money on

the Uber Account and that they were all going to be laid off. In the early years of the Uber Account, James River lost a lot of money and under-reserved its files by a lot. Thus, by the start of the Class Period, the Uber Contract had been unprofitable for years.

### 6. The Company's Most Senior Officers Were Directly Responsible For Reviewing, Monitoring, And Approving The Reserves For The Uber Account

106. Defendants repeatedly assured investors that they closely monitored the reserves on Uber claims given the critical significance of Uber and the Uber reserves to James River's financial health. James River maintained a Reserve Committee, which included Defendant Myron (the Company's President and CEO from January 2018 through August 2019 and President and COO from August 2019 to August 2021), Defendant Abram (the Company's CEO from August 2019 through October 2020), Defendant D'Orazio (the Company's CEO from November 2020 to the present), and Defendant Doran (the Company's CFO from January 2017 to the present), as well as Schmitzer, the President and CEO of James River's E&S segment during the Class Period.

107. James River's Forms 10-K described the Reserve Committee's responsibilities as (a) reviewing, (b) determining, (c) monitoring, and (d) approving James River's reserves. Specifically, the Forms 10-K provide that the Reserve Committee (a) "meets quarterly to review the actuarial recommendations made by each chief actuary"; (b) uses its best judgment to determine the best estimate to be recorded for the reserve for losses and loss adjustment expenses on our quarterly balance sheet"; (c) "continually monitor reserves using new information on reported claims and a variety of statistical techniques and adjust our estimates as experience develops or new information becomes known"; and (d) "review[s]" and "approve[s]" the reserve for losses and loss adjustment expenses.

108. The Forms 10-K reiterated that senior management reviewed the reserves at least quarterly, and that the settlement authority of front-line adjusters was intentionally kept low:

> ***Senior management reviews each case above a specified amount at least quarterly to evaluate whether the key issues in the case are being considered and to monitor case reserve levels***. We keep the settlement authority of front-line adjusters low to ensure the practice of having two or more members of the department participate in the decision as to whether to settle or defend.

109. In addition to the responsibilities laid out in the Forms 10-K, the accounts of multiple former James River employees confirm that senior management was personally involved in setting and auditing reserves for claims made on the Uber Account. Indeed, on the February 26, 2021 earnings call, Defendant D'Orazio explained that senior James River leadership conducted audits of claims while reviewing the Company's reserves. He described, "We call for a claims ***audit by our senior claims leadership team to review a healthy sampling of the open files of time***."

110. FE3 described receiving "reserve reports" titled "Rasier [Uber] Reserves Audit," on an Excel spreadsheet that would have the employee's name, and list the employee's claims that needed to be reviewed to see if those claims were adequately reserved. FE3 stated that the Excel spreadsheets came from Anita Rogers, then to Donna Jefferson and then to Sean Casey. The spreadsheet would be sent via email, and all of their names were attached to it. Schmitzer's name was also on the report. The reports went all the way to the president of the Company.

111. FE10 described that in 2018 his QA team began conducting focus audits on Uber reserves. The first focus audit analyzed reserves set at under $100,000. He explained that the focus audits indicated that most of the files were being under-reserved based on the information in the files relating to bodily injuries. FE10 then stated that the audit results went to the c-suite because the results were shared with Uber.

112. FE10 also related that Rogers and Warren were involved in the QA audit process. Specifically, if a claim file received a low audit score for being under-reserved, claim managers

would often push back on the audit. According to FE10, Rogers and Warren always sided with the managers. In addition, Rogers and Warren wanted to make the QA audit questions more vague, which further allowed several of the QA team's findings to be challenged by claim managers and directors. FE10 explained that this "was very frustrating for me and my team" as they were being "told to give more leeway and look at it more subjectively." But, according to FE10, "audits are supposed to be black and white and not vague." FE10 stated that Rogers and Warren even started allowing exceptions to some of the QA questions which also caused the QA audit scores to improve. James River disbanded the QA audit team at the end of 2019. FE10 felt he was penalized for not getting the QA team to look at the audits in the way that Rogers and Warren wanted.

113. After the Uber Contract was terminated early, Defendants' scrutiny of the Company's reserves increased, as James River was paying out on Uber claims but not receiving additional premiums to support those payouts. According to FE11, in October 2019, James River cut back on their reserves for Uber and reduced adjusters' reserve authority down to $5,000. In addition, the Company created a new email portal referred to as PLM. All reserves had to be sent to PLM for review by VP Anita Rogers and SVP Courtenay Warren.

114. FE12 also noted that the Company began to scrutinize its Uber claims more after the contract cancellation. For instance, FE12 noted that litigation claims examiners and their managers' settlement authority limits were greatly reduced beginning in 2020, and his limit to settle claims went from $50,000 down to $5,000. FE12 added that middle managers had their limits decreased from $100,000 to $25,000. FE2 similarly stated that his settlement authority changed from $15,000 to $1,000 and from $100,000 to $5,000 for his supervisor after the announcement of the Uber cancellation. FE2 specifically recalled that authority levels were decreased a week after the press release about Uber, and everybody's authority got cut including

all of the supervisors. This made it harder for adjusters to do their jobs, because employees were required to make specific requests to set reserves above their settlement authority. FE6 similarly explained that once settlement authorities were slashed after the Uber Contract was cancelled, it became even more difficult to increase reserves.

### F. Sworn Testimony And Internal Claim Documents Confirm That James River's Only Overriding "Policy" Was To Keep Reserves Artificially Low For As Long As Possible

#### 1. Sworn Deposition Testimony Confirms The Fraud

115. Defendants' deficient, arbitrary, and fraudulent reserving practices are corroborated by sworn testimony from multiple former James River employees recently provided in depositions in the *St. Amand* insurance bad faith litigation. Remarkably, such testimony includes that of the Company's longtime former VP of Claims, Rogers, who was responsible for all Uber claims with "large losses" (including the claim at issue in *St. Amand*) and who reported to Warren, the Company's Chief Claims Officer. Deposition testimony from Ingrid (Moses) Slaughter ("Slaughter"), who served as a Claims Manager and an Assistant Director of Litigated Claims at James River from September 2018 to May 2020, and Brianna Belcher ("Belcher"), who served as Claims Manager and Litigation Claims Adjuster at James River between September 2015 and March 2021, further corroborates and adds additional details to Rogers' sworn testimony and the accounts of the fifteen former employees set forth above.

116. The testimony provided by these eyewitnesses exemplifies how James River's claims department set and maintained reserves at remarkably low levels for years, even while internally acknowledging that reserves should be adjusted to far higher levels based on available information about the severity of the exposure. Rather than setting specific case reserves for every known claim that were "adequate to resolve the claim and pay attendant expenses," in truth, the

evidentiary record in the *St. Amand* litigation confirms that the only guiding principle for James River's reserving "process" was to keep reserves as low as possible, for as long as possible.

117. Indeed, the sworn testimony adduced in the *St. Amand* litigation substantiates that after the calamitous Uber Contract was terminated in 2019, management's systemic and pervasive efforts to suppress reserves grew in scope and severity. Rogers, Slaughter, and Belcher each describe significant changes in corporate policy to keep reserves for all Uber claims at absurdly low levels and resist any increases, including through the implementation of draconian, arbitrary, and secretive Companywide practices that applied across the entire Uber book.

118. Finally, sworn witness testimony from *St. Amand* provides an additional motive for Defendants' deliberate suppression of Uber reserves. Specifically, in addition to reaping millions in insider sales before blindsiding investors with a $170 million charge, James River actively sought a sale of the Company but faced significant obstacles because of its enormous Uber-related liabilities—including sales that fell through precisely "because of the Uber account."

### a. Sworn Testimony Confirms That James River Had No Established Processes, Procedures, Or Formal Training For The Setting, Monitoring, Or Adjusting Of Uber Claim Reserves

119. Throughout the Class Period, Defendants made numerous assurances to investors in SEC filings and investor conference calls that James River maintained comprehensive and robust policies and procedures for setting, monitoring, and adjusting reserves. For example, under the heading "Reserve Policy," each of the Company's Forms 10-K assured investors, "We continually monitor reserves using new information on reported claims and a variety of statistical techniques and adjust our estimates as necessary as experience develops or new information becomes known"—including, specifically, "individual case-basis valuations" to set loss and expense reserves for reported claims, and sophisticated "statistical analyses" to "estimate the cost

of losses" for "incurred but not reported claims." The same Forms 10-K unequivocally assured investors that "every known claim ha[d] a specific case reserve established against it which management believes is adequate to resolve the claim and pay attendant expenses based on information available at the time." These statements, and others like them, were all designed to convince investors that James River had detailed policies for setting reserves and was constantly monitoring and adjusting them pursuant to hard analyses. James River also sought to convince investors that the reserves were accurate and sufficient to cover all losses and expenses resulting from the Uber Contract. However, as sworn testimony in the *St. Amand* litigation revealed, none of these statements were true. To the contrary, numerous senior James River claim personnel testified under oath that throughout the Class Period, James River lacked ***any*** established policies and procedures for the setting, monitoring, or adjusting reserves for Uber-related claims.

120. Indeed, Rogers, Slaughter, and Belcher—the Vice President of Claims, Assistant Director of Litigation Claims, and Senior Claims Manager—each confirmed under oath that throughout the Class Period, James River had ***no*** established policies or procedures, and ***no*** formal training, for setting, monitoring, or adjusting Uber reserves. To the contrary, ***all*** reserve decisions were left to *ad hoc*, subjective, and on-the-fly decisions of the revolving door of highly inexperienced claims handlers abruptly hired by James River to deal with the crushing influx of Uber claims.

121. Remarkably, despite serving as the VP of Claims during the Class Period who responsible for overseeing all Uber claims with large losses, and serving in various managerial capacities in James River's claim department during a tenure that spanned over eight years[4]—on May 27, 2022, Rogers repeatedly testified, under oath, that she could not "recall" and did not

[4] *See* www.linkedin.com/in/anita-rogers-11963758 (listing Roger's positions at James River from May 2013 to July 2021, including as a Claims Manager, Senior Claims Manager, Director of Claims, and Vice President of Claims).

"know" if the Company had policies or procedures for setting, adjusting, or monitoring reserves on Uber-related claims.

122. Rogers' testimony contradicts Defendants' assurances to investors about the Company's comprehensive reserve-setting procedures. For example, Rogers testified that she was ***not aware of any reserving policies at all—and tellingly, she was unable to cite or describe a single policy that purportedly applied to or governed the Company's reserves setting process***. Specifically, Rogers testified:

- Despite working at James River for over eight years and reporting directly to a c-level officer, she did not know of any "policies and procedures in place that were used on how to set a reserve";
- She did not know of any "policies and procedures that explain to the claims handlers what information they should consider" or "follow when setting a reserve";
- She did not know whether "there were policies and procedures in place that were used on whether to adjust the reserve when new information is made known";
- She did not know whether there were "policies and procedures that set a limit on how long it should take to make a decision on whether to increase a reserve";
- She could not "recall" "whether there were policies and procedures in place at James River regarding how to handle reserves";
- There was "no standard practice" that "James River followed to dictate to its claims examiners . . . when it needs to request an increase to the reserves when they reach an opinion that it should be [increased]";

- She was unaware of any policies and procedures for monitoring claim reserves during any time she was employed by James River; and
- In fact, Rogers admitted that she did not even monitor reserves for individual claims, but instead, only "monitor[ed] reserves … ***in gross level***."

123. Rogers further testified that she was ***not aware of any formal or informal training for claims handlers***. Specifically, Rogers testified that she did not know "whether or not there were policies in place that would require claims handlers hired in response to the Uber contract to undergo either formal or informal training." In addition, Rogers testified that the "claims handlers that were hired in response to the Uber contract" were not "sent to schooling or any type of . . . training academy" or "provided any . . . training manuals."

124. Rogers further testified that ***she personally received no training***. When Rogers began as a James River claim examiner in 2013, Rogers "received no training from James River on how to set a reserve"; "received no training on how to train, formally or informally, claims examiners on how to set a reserve"; and, upon her promotion in 2018 to Director and then VP of Claims, she received no training on how to handle Uber-specific claims such as uninsured motorist claims.

125. The lack of any training and instruction on how to set or adjust a reserve was particularly problematic because, as Rogers testified, ***James River "hired people to work as claims examiners with no insurance experience***." Indeed, prior to the Uber Account, Rogers testified that James River had only "between 10 and 50" claims examiners on staff—which, as discussed herein, quickly multiplied to between 300 and 400.

126. In short, Rogers testified that James River lacked policies or procedures for setting, monitoring, or adjusting reserves for Uber-related claims, and, at best, its reserving practices were

done on an *ad hoc* basis at the whim of inexperienced and untrained claims handlers. Accordingly, management had no basis to conclude that the Uber reserves were adequate or that the reserves were sufficient to cover expected losses.

127. Slaughter's deposition testimony in the *St. Amand* insurance litigation explicitly confirms that James River had ***no policies or procedures for setting and adjusting reserves***. Slaughter served as a Claims Manager and an Assistant Director of Litigated Claims at James River from September 2018 to May 2020.[5] Specifically, when asked, "Were there any policies and procedures that you recall in place regarding how to adjust the reserve while you worked at James River?," Slaughter unequivocally testified, "No."

128. Slaughter further testified that ***there was no formal reserving training***. Slaughter did not recall "any formal training on how to monitor a reserve." When asked, "Do you recall formal training in place regarding those three things of reserves, setting, monitoring, those type of things?" Slaughter answered, "I don't remember anything like that, no."

129. Significantly, Slaughter made clear that James River's lack of formal training was not a standard industry practice. Slaughter testified that ***James River's lack of training for claims examiners contrasted dramatically with other insurance companies***. Specifically, she described that, at her previous employer, Nationwide, she worked at a corporate training center training "everyone from folks who were newly hired . . . with no experience to experienced adjusters . . . ." When asked to describe the differences between James River and Nationwide, she testified,

[5] Prior to joining James River, Slaughter had extensive relevant experience in the insurance industry. Slaughter testified that her career in insurance began nearly thirty years ago, in 1995, when she was hired by Nationwide Insurance as an insurance adjuster. After being quickly promoted at Nationwide, she joined Penn National Insurance for a couple of years, before rejoining Nationwide Insurance as a corporate trainer. In that position, she trained new hires with no background in insurance, as well as experienced adjusters, teaching three levels of classes: "Class I, Class II, and Class III." She then received several promotions at Nationwide, working in its Harrisburg, Pennsylvania office, and its Raleigh, North Carolina office until 2018, where she held the title of commercial claims manager before leaving to join James River Insurance.

"There were a lot of differences. Nationwide was a very structured environment. . . . They had training centers. They had training curriculum. They had processes as to when you were hired in as far as what you had to do to become adept at a particular job."

130. The sworn testimony of Rogers and Slaughter was further confirmed by Brianna Belcher, another former claims employee assigned to Uber claims both before and during the Class Period.[6] Belcher served as Claims Manager and Litigation Claims Adjuster at James River between September 2015 and March 2021. Belcher testified that she underwent ***no formal training on how to set, monitor, or adjust a reserve***. This testimony corroborates the statements of FE1, FE3, FE6, and FE12, all of whom stated that the Company lacked any formal training for claims employees, which directly contributed to James River being under-reserved.

131. Like Slaughter, Belcher testified that ***James River's practices did not comport with the industry standard***. Belcher explained that her previous employer, Allstate, required her to go through rigorous training before she could begin to handle claims. Belcher testified that she was required to attend a week-long training known as "claims university" during which she attended classes every day from 8 a.m. until 5 p.m. She also took daily quizzes and a final test at the end of her training. Belcher was required to undergo this rigorous training even though her settlement authority was relatively low.

132. James River's lack of formal training for Uber claims personnel was in no way addressed by any on the job training. The claims department was overwhelmingly staffed by employees with little or no relevant insurance experience, and any informal "hands-on" training

---

[6] Like Slaughter, before joining James River, Belcher had significant relevant experience in the insurance industry. Belcher testified that she began her career in insurance at Capital One in or about August 2010, where she investigated fraudulent claims at its Richmond, Virginia office. After four years at Capital One, she joined Allstate as a liability determination adjuster, in its Richmond office. Belcher remained at Capital One for over a year before joining James River in September 2015. Belcher was employed by James River for over 5½ years until her departure in March 2021, where she held the title of litigation claims adjuster.

was ineffective because of the department's chaotic environment and exceptionally high turnover. Slaughter testified that given the extreme demands of working on the Uber Account, turnover was "***huge***" and "***unusual***." Slaughter further testified that she herself was hired in September 2018 and quickly promoted—after barely 12 months—from claims manager to assistant director of litigated claims.

133. Slaughter also testified that James River was "***hiring people so fast and losing people so fast*** that some of the folks I would hire would ***literally get crushed with 150 new files the first day they sat in a chair***. So in between picking their benefits, they were faced with 150 files that had not been handled since the last person had left the job." She testified that it is "very difficult to keep employees in a situation like that."

134. Indeed, Slaughter testified, "***people were quitting so frequently that the work environment was horrific***. And for somebody to handle that many files, even the best intentions will . . . eventually say, you know what, this is too much, it's not getting any better, and they would seek employment elsewhere." Further, Slaughter testified, "in Arizona, they had ***constant turnover***" and "Richmond had ***a ton of turnover***" as well.

135. Slaughter's description of James River's rapid hiring of individuals to cope with the enormous influx of Uber claims corroborates FE12's and FE15's accounts (described at ¶¶98-100) of a dramatic increase in hiring of claims personnel after James River signed the Uber Contract, who were promptly given crushing workloads. Slaughter, FE12, and FE15 all described how this "horrific" work environment led to high turnover and a revolving door of inexperienced and untrained claims personnel, who were left without any formal policies, procedures, or training to guide them in properly reserving for the large and ballooning number of Uber claims.

**b. Sworn Testimony Confirms That, After Cancelling The Uber Contract, Management Implemented Systemic Practices To Further Suppress Uber Reserves And Limit And Conceal Any Requests For Increases**

136. By October 2019, the Uber Contract had become so unprofitable and disruptive to James River's business that Defendants decided to cancel it. At that point, management's systemic efforts to keep reserves artificially low reached crisis proportions. Indeed, Slaughter's and Belcher's sworn testimony in the *St. Amand* litigation provides further detail (described at ¶¶83-84, 86, and 113-14 by FE2, FE6, FE8, FE11, and FE12) on how after the Uber Contract was terminated, management implemented extreme, arbitrary, and surreptitious practices designed to further suppress reserves—and all requests to increase reserves—across the entire Uber book.

137. Specifically, Slaughter and Belcher testified that James River's pointed efforts at under-reserving ***increased dramatically after the Company terminated the Uber Account***. Belcher explained that ***any*** request for a reserve increase to $250,000 or more now had to be approved by James River Insurance's CEO. Slaughter and Belcher both testified that these requests were routinely refused; that employees' reserve authority was dramatically slashed on all other claims; and that all requests to increase reserves above even these newly lowered levels (e.g., 1/10th of the authority that existed previously) were required to be routed through a new and secret PLM email portal (described at ¶113 by FE11) that was controlled by Rogers and Warren.

138. Remarkably, both Slaughter and Belcher testified that ***claims handlers were specifically instructed not to mention the PLM system in their notes*** so that requests for reserve increases—and the inevitable denials—were not officially documented in the claims file and, thus, were unlikely to be discovered in litigation.

139. In particular, Slaughter testified in the *St. Amand* litigation that in October 2019, ***reserve authority across the entire claims department was dramatically reduced by Schmitzer,***

***Warren, and Rogers***. Slaughter described how the three officers "stripped everyone's authority," "dump[ing] the claims managers down to [$]25,000, which is basically taking all of their authority away," and that both Slaughter's and her boss's (the Director of Claims) reserve authority was "stripped away to nothing." As she explained, in "a litigated file environment, you would never do that to someone that you wanted to resolve files."

140. What is more, Slaughter testified that Rogers's and Warren's reserve "authority was reduced as well because if they wanted, for instance, a million dollars in authority, they would have to elevate it to [Schmitzer]." In other words, and as explicitly stated by Belcher, ***any request for a reserve increase of $250,000 or more now had to be personally approved by James River Insurance's CEO, Schmitzer***.

141. In conjunction with lowering claims employees' reserve authority, in October 2019, James River opened a new email portal, colloquially known as the "PLM" account, and all requests to increase reserves were "funneled to this one email account where everyone had to go . . . if they wanted authority." According to Slaughter, this was an extreme departure from James River's existing procedure for requesting reserve increases, and documenting the reasons therefore, in the claims file.

142. The PLM portal was secretly operated by Rogers, Warren, and Schmitzer. Specifically, Slaughter testified that the PLM email account "went to Anita Rogers most of the time" or to "Courtenay Warren if Anita Rogers was not available or if it exceeded Anita Rogers' authority. And then it went even higher to Richard [Schmitzer] . . . . ." Once the PLM account was put into operation, Schmitzer weighed in more aggressively on reserve increase requests, often sending "a paragraph of things that you needed to do in order to have the reserve reviewed." Additionally, Schmitzer would often "disagree" with Rogers's determination to increase a reserve.

143. Further, Slaughter testified, requests for reserve increases sent to the PLM portal were frequently denied for vague reasons, such as "we didn't present it well enough. We needed more information. It's not ready to resolve yet." These requests were "almost always denied," and "if it was a larger increase . . . most of the time it's denied."

144. Belcher confirmed Slaughter's testimony, and the accounts of FE2, FE11, and FE12, regarding employees' ***reserve authority being dramatically slashed after James River terminated the Uber Account***, noting that prior to the loss of the Uber Account her authority to set a reserve was $250,000, and after the termination it was decreased ***tenfold*** to $25,000. Belcher further testified that a "manager's meeting" was held at which claims managers were told by Donna Jefferson, the then-Assistant Director of Claims (and current Director of Claims), that their reserve-setting authority was decreased "to streamline the process." Belcher also confirmed that, after the termination of the Uber Account, one of the processes instituted was that Rogers, Warren, and Schmitzer had more involvement regarding the Company's handling of reserves. Specifically, after the termination of the Uber Account, Schmitzer made all decisions to accept or reject an increase to the reserve over $250,000. FE2 and FE12 (discussed at ¶114 above) similarly described the process by which James River systematically decreased claims employees' and their managers' reserve and settlement authority in the aftermath of the Uber termination.

145. Rogers similarly testified that claims examiners' reserve authority was "lowered" after the Uber Contract was cancelled.

146. Significantly, Schmitzer, Warren, and Rogers took ***deliberate steps to conceal the PLM portal***, conceal its circumvention of standard operating procedures (at both James River and other insurance companies), and conceal that they (Schmitzer, Warren, and Rogers) had injected themselves into any request for a reserve increase—all the way down to the lowest level claims

adjuster—in a deliberate effort to ensure that reserves for Uber claims remained as low as possible. Moreover, these new reserves procedures were designed to keep requests for reserve increases out of the claims files, *i.e.*, unless the request was accepted. If, however, a request for increased reserves was denied, neither the request nor the denial would ever appear in the claims file. Instead, such requests and denials would stay hidden in the PLM portal, and thus unlikely to be discovered in any eventual litigation, or as part of due diligence by a potential buyer of the Company.

147. For example, Slaughter testified that James River employees were instructed not to mention emails that were routed through the PLM account. She explained, "***We were told not to talk about it***, that we were to submit it in email form and then it would be considered and then they would look at it to see if it was justified or not. And then if they justified it, the manager had to go in and write a note about why they were changing the reserve." Slaughter explained that this practice was "***very unusual***" compared to the practices of other insurance companies such as Nationwide, where "you have to justify what you're doing first and then it goes into a claim log to say, okay, I've looked at all these things and this is why I think we need to make a change." Conversely, at James River, "***everything was after the fact. So you had to basically apply for your reserve change and if it was granted, then you would document the notes"—meaning that if the request was not granted, there would be no record in the claims file of either the request for a reserve increase or that it was denied***. Belcher also testified that it was "accurate" that claims managers were told not to mention the PLM account in their claims notes after the termination of the Uber Account in October 2019. Thus, if the claim was denied, there was no record in the claim file indicating that the adjuster believed the reserves were inadequate.

148. The testimony of Rogers, Slaughter, and Belcher in the *St. Amand* case directly contradicts Defendants' representation to investors regarding both the adequacy of James River's held reserves, as well as its purportedly robust reserving process. Indeed, their testimony eviscerates Defendants' representation that "every known claim has a specific case reserve established against it which management believes is adequate to resolve the claim and pay attendant expenses based on information available at the time." Defendants could not know whether reserves for any Uber claim were adequate based on available information in light of the facts that: (1) James River had no established policies or procedures for claims handlers or their supervisors to follow in setting, monitoring, or adjusting reserves for Uber related claims; (2) James River did not provide its large team of inexperienced claim handlers with any training on how to set reserves; and (3) after the Uber Contract was terminated, James River's management implemented systemic, pervasive, and draconian practices to ensure that Uber-related reserves remained at absurdly low-levels and that any efforts to increase reserves were met with resistance or denied outright, all while being kept secret. In short, rather than setting reserves in a "consistent and appropriate fashion" using "historical information," "continually monitor[ing] reserves using new information," and adjusting reserves "as experience develops or new information becomes known," the deposition testimony and the underlying sample claim file (discussed below) from the *St. Amand* litigation confirm that, in truth, the only guiding principle for James River's reserving "process" was to keep reserves artificially low.

**c. Sworn Testimony Provides Additional Information Reinforcing Defendants' Motive**

149. Finally, deposition testimony in the *St Amand* litigation provides additional information reinforcing Defendants' motive to mispresent and conceal the Company's enormous liabilities under the Uber Contract. As internally known within the Company but undisclosed to

investors, a key part of the reason that James River refused to increase reserves appropriately—even after the Uber Account was terminated—was because ***James River was trying to sell the Company.*** Specifically, Slaughter testified that James River was for years looking for a potential acquiror, and she mentioned two specific instances in which a potential sale fell apart. First, Slaughter understood that James River attempted to sell the Company in 2018 but "they weren't able to because of the Uber account." She further testified that after she left the Company in May 2020, she heard that James River tried to "sell it again and the folks who were trying to look into buying it were doing due diligence, but I . . . don't think they were liking the answers they were getting,"—undoubtedly referring, again, to the massive Uber related liabilities.

### 2. Internal James River Documents Confirm The Fraud

150. Corroborating the sworn testimony of Rogers, Slaughter, and Belcher, and the accounts of the former James River employees described above, the claims file from the *St. Amand* insurance bad faith litigation shows that James River's claims department was immediately aware of the severity of the accident and injuries at issue, yet ***for two and a half years*** no fewer than ten James River claims personnel made *ad hoc* efforts to keep the reserves on the claim artificially low, notwithstanding their receipt of information showing that the Company's actual exposure was far greater.

151. The claim at issue in the *St. Amand* bad faith litigation concerns an Uber-driver who was rear-ended and severely injured in an accident on September 26, 2017. The details of the accident are straightforward. The Uber driver, a disabled U.S. veteran, was rear-ended while driving on an interstate highway by a driver who admitted she was "looking down at her phone" at the time of impact. The other vehicle's driver, who undisputedly was 100% at fault, had $15,000 of liability coverage from a different auto insurer and James River provided the Uber driver uninsured motorist ("UM") coverage with a policy limit of $1 million. Thus, James River was

responsible for medical bills and other damages sustained by the Uber driver exceeding the other driver's $15,000 limits, ***up to a maximum of $1 million***—excluding liability for bad faith claims handling.

152. The claim file shows that James River's claims department was immediately aware of the severity of the accident and injuries, yet kept reserves artificially low. When originally reporting the claim to James River in September 2017, the Uber driver informed James River that he was taken to the hospital to treat back and neck injuries stemming from the accident. Despite the seriousness of the injuries, James River set no reserves for the Uber driver's claims for three months. Then, in January 2018, ***James River set "placeholder" reserves of just $2,500***, a plainly insufficient amount given the seriousness of the reported injuries—consistent with the Company's practice as reported by FE1, FE4, and FE7 (*see* ¶¶80-82).

153. Over the ensuing two-year period, James River's claims department received increasing amounts of information confirming the severity of the insured's injuries and the insufficient nature of the reserves. Indeed, throughout this time, the Uber driver's medical bills ***alone*** exceeded the reserves, at times by several hundred thousand dollars. Notably, the incurred medical bills constituted only one aspect of James River's exposure for the accident; for example, the insured was unable to work and lost income for months, required ongoing physical therapy, and would likely require additional major surgeries as a result of the accident—information that was also known to the Company's claims handlers. Yet, reserves for the claim were never materially increased to an amount even approaching James River's true exposure.

154. As set forth in James River's internal claim file, by November 2018, the Uber driver reported to James River that: (i) he had already received medical bills exceeding $84,000 with additional bills impending; (ii) he was transferred from the Veterans Affairs hospital "because they

could not manage his injuries"; (iii) he was in ongoing treatment, including receiving physical therapy "a couple of times per week"; (iv) he was missing work because of the pain; (v) he had undergone a back surgery to address pain from the accident; and (vi) specialists recommended an additional back surgery. In response to this information, James River increased reserves to just $79,000. But this figure was manifestly insufficient to cover even the known medical bills, let alone the additional bills that were rapidly mounting and the driver's lost income. *See* ¶¶79-88 (describing pre-set caps on reserve increases).

155. Over the next 1½ years, James River continued to knowingly maintain a grossly insufficient reserve. Evidence continued to mount demonstrating the need to increase reserves, and the claims personnel responsible for handling the claim repeatedly recognized the need for a significant increase. For example, on March 29, 2019, (during the Class Period) a note in the claims file expressly recognized that the reserve "[w]ill need to be increased due to the severity of the injury," and, moreover, the increase would need to be "significant." Yet, no action was taken. On April 29, 2019, a notation in the claim file explicitly stated that the reserves "need[] to be increased." Again, no increase was made. Further, there is no indication in the claims file that James River supervisors were reviewing these notes and compelling claims handlers to act on increasing the reserve. On May 16, 2019, the Uber driver's attorney made a demand for the $1 million policy limits and provided documentation of the extensive medical records and bills; still, James River did not increase its reserves. On July 1, 2019, Slaughter instructed a subordinate that the claim will require an "LLR" (Large Loss Report) because the Uber driver was claiming "over $1M in specials."

156. Slaughter's July 1, 2019 email confirms that multiple claims department personnel, including managers, were involved in monitoring reserves for this claim, and internally recognized

that James River's exposure vastly exceeded its established reserves. Remarkably, the LLR was not completed for an additional nine months. Consistent with the accounts of FE5 and FE10 (¶¶87-88), the personnel responsible for this claim delayed filling out the onerous LLR despite internally recognizing that the reserves required a "significant" increase based on information the Company had known about for years.

157. On August 2, 2019 the Uber driver provided James River with yet additional medical records, but James River still made no change to the reserves. In fact, on September 10, 2019, James River's claims handlers internally acknowledged for the ***third time in six months*** that the reserve on the claim "***needs to be increased per injury report***." Still, no increases were made or LLRs completed. On December 6, 2019, the Uber driver renewed its policy limit demand of $1 million; still no changes were made to the reserves.

158. In March 2020—approximately 2½ years after James River received notice of the loss, 17 months after any prior reserve adjustment on the claim, and over 1 year after James River internally admitted that its reserves were insufficient—James River finally increased its reserves. On March 16, 2020, a claim examiner requested a reserve increase, but only to $95,000, and only in response to a formal demand for $1 million in policy limits which was supported by ***medical bills totaling more than $1.1 million***. Consistent with the accounts of FE1, FE8 and FE6 (¶¶81-82, 84, 103), the claims examiners and managers were forced to keep the reserves materially lower than the Company's known exposure. On March 25, 2020, the same day the reserve was changed to $95,000, a claim examiner finally submitted a 23-page Large Loss Report.

159. On April 15, 2020, with the Uber driver threatening litigation, Rogers reviewed the belatedly prepared LLR and approved a staggering eight-fold reserve increase, from $95,000 to $750,000. Notably, even this amount represented a ***25% discount*** to the $1 million policy limits.

Significantly, she made clear that the massive increase was not in response to new information that James River had not known about. To the contrary, Rogers testified that, prior to the increase, "the reserves were ***inappropriate*** based on the information" that James River had in its possession and agreed that the reserves for this enormous claim were "***grossly undervalued at the time***."

160. Thus, in the one claim file obtained through Lead Plaintiffs' ongoing investigation (and without any discovery), James River knowingly under-reserved a material claim for years. Indeed, for much of the Class Period, James River admittedly under-reserved on this one claim at times by nearly 90%, if not more, despite acknowledging on at least three separate occasions that the reserves "need to be increased per the injury report." The dramatic under-reserving of this sample claim was not an aberration, but rather the result of James Rivers' complete lack of any policies, procedures, or formal training regarding the setting, monitoring, or adjusting of claim reserves, as confirmed by Rogers' testimony and the accounts of FE1, FE3, and FE6 (*see* ¶¶76-78, 94-96).

161. Indeed, since September 1, 2016, James River has been sued in connection with its Uber insurance in over 70 cases alleging coverage disputes and/or bad faith claims handling, approximately ***one-quarter*** of which assert that James River's misconduct in the given case was part of a larger pattern and practice of bad faith claims handling concerning the Uber Account.

## V. FALSE AND MISLEADING MISSTATEMENTS AND OMISSIONS

### A. Materially False Statements And Omissions Relating To Financial Measures And Reserve Developments

#### 1. Misstatement of Key Financial Measures for the Fourth Quarter of 2018 and Full Year 2018

162. On February 21, 2019, James River filed with the SEC a press release announcing its financial results for the fourth quarter and fiscal year ended December 31, 2018 on Form 8-K ("4Q 2018 Press Release") signed by Defendant Doran. The Company held an earnings call on

February 22, 2019 to discuss its results for the fourth quarter and fiscal year 2018. On February 27, 2019, James River filed with the SEC its Annual Report on Form 10-K ("2018 Form 10-K") signed by Defendants Myron, Abram, and Doran.

163. In the 4Q 2018 Press Release, James River reported its "Reserve for losses and loss adjustment expenses" as ***$1.661 billion*** as of December 31, 2018. In the 2018 Form 10-K, the Company clarified that "the Company's *net reserve* for losses and loss adjustment expenses at December 31, 2018 was ***$1,194.1 million***." The 2018 Form 10-K further provided that the specific amount of the "*net reserve*" attributed to the "*E&S – commercial auto*" segment was ***$355 million***.

164. In the 4Q 2018 Press Release, James River further reported an adverse reserve development of $5.8 million dollars. James River explained, "The unfavorable reserve development in the quarter was largely a result of ***$5.8 million*** of adverse development in the Excess and Surplus Lines segment, driven by the 2016 accident year in our commercial auto division." During the earnings call, Defendant Doran confirmed, "We just had the ***$5.8 million*** of adverse development from the 2016 accident year in Commercial Auto."

165. The 2018 Form 10-K disclosed the following reserves developments for the full fiscal year 2018:

> $17.7 million of adverse development was experienced in 2018 on the reserve for losses and loss adjustment expenses held at December 31, 2017. ***This adverse reserve development included $15.0 million of adverse development in the Excess and Surplus Lines segment, including $20.7 million of adverse development in the commercial auto line of business that was primarily related to the 2016 contract year with one insured***.

166. The reported reserves and reserve developments set forth in ¶¶163-165 above were materially false and misleading because they were materially understated. For example:

a. As described in ¶¶63-68 above, on May 5, 2021, Defendant D'Orazio admitted that, despite insuring Uber claims since 2014 and recognizing adverse reserve developments year after year, James River did not primarily rely on its prior "own loss experience," but that doing so "would give us a better and more conservative

estimate of ultimate losses on [the Uber] account" as required under GAAP. Using this improper methodology caused James River's reserve for losses and loss adjustment expenses to be materially understated, requiring an adverse reserve development of $170 million.

b. James River had no reserve methodology except to keep reserves low, as described in ¶¶76-78 above. Indeed, James River had no established policies or procedures for claims handlers or their supervisors to follow in setting, monitoring, and adjusting reserves for Uber related claims, as described in ¶¶119-135 above.

c. James River systematically under-reserved on Uber claims by putting caps on reserves and then refusing to increase them based on new information, as described in ¶¶79-88 above.

d. James River "bent over backwards" for Uber, systematically overpaying on Uber claims to avoid embarrassing Uber, thereby causing the claims to be under-reserved, as described in ¶¶89-92 above.

e. James River knowingly hired adjusters with no claims experience, gave them no training, and prevented them from using software that would accurately set reserves, as described in ¶¶93-103, 123-135 above.

f. In addition, as described in ¶¶275-291 below, James River's reported reserves for losses and loss adjustment expenses were (a) not primarily based on James River's past loss experience with similar claims; and (b) not reasonably estimated, in violation of GAAP.

**2. Misstatement of Key Financial Measures for the First Quarter of 2019**

167. On May 1, 2019, James River filed with the SEC a press release announcing its financial results for the first quarter of 2019 on Form 8-K ("1Q 2019 Press Release") signed by Defendant Doran. On May 2, 2019, the Company held an earnings call to discuss its results for the first quarter of 2019. On May 3, 2019, the Company filed its Quarterly Report on Form 10-Q, signed by Defendants Myron and Doran ("1Q 2019 Form 10-Q").

168. In the 1Q 2019 Press Release, James River reported its "Reserve for losses and loss adjustment expenses" as ***$1.730 billion*** as of March 31, 2019. In the 1Q 2019 Form 10-Q, the Company clarified that, as of March 31, 2019, the Company's "*net reserves*" were ***$1.222 billion***.

The 1Q 2019 Form 10-Q broke down the "*net reserve*" by segment. Specifically, the reported net reserve for the E&S line—which included the commercial auto segment—was ***$864 million***.

169. In its 1Q 2019 Form 10-Q, James River further disclosed the following reserve developments:

> The Company experienced $1.0 million of adverse reserve development in the three months ended March 31, 2019 on the reserve for losses and loss adjustment expenses held at December 31, 2018. ***This reserve development included $10,000 of favorable development in the Excess and Surplus Lines segment*** . . . .

170. The reported reserves and reserve developments set forth in ¶¶168-169 above were materially false and misleading because they were materially understated:

a. As described in ¶¶63-68 above, on May 5, 2021, Defendant D'Orazio admitted that, despite insuring Uber claims since 2014 and recognizing adverse reserve developments year after year, James River did not primarily rely on its prior "own loss experience," but that doing so "would give us a better and more conservative estimate of ultimate losses on [the Uber] account" as required under GAAP. Using this improper methodology caused James River's reserve for losses and loss adjustment expenses to be materially understated, requiring an adverse reserve development of $170 million.

b. James River had no reserve methodology except to keep reserves low, as described in ¶¶76-78 above. Indeed, James River had no established policies or procedures for claims handlers or their supervisors to follow in setting, monitoring, and adjusting reserves for Uber related claims, as described in ¶¶119-135 above.

c. James River systematically under-reserved on Uber claims by putting caps on reserves and then refusing to increase them based on new information as described in ¶¶79-88 above.

d. James River "bent over backwards" for Uber, systematically overpaying on Uber claims to avoid embarrassing Uber, thereby causing the claims to be under-reserved, as described in ¶¶89-92 above.

e. James River knowingly hired adjusters with no claims experience, gave them no training, and prevented them from using software that would accurately set reserves, as described in ¶¶93-103, 122-135 above.

f. In addition, as described in ¶¶275-291 below, James River's reported reserves for losses and loss adjustment expenses were (a) not primarily based on James River's past loss experience with similar claims; and (b) not reasonably estimated, in violation of GAAP.

### 3. Misstatement of Key Financial Measures for the Second Quarter of 2019

171. On July 31, 2019, James River filed with the SEC a press release announcing its financial results for the second quarter of 2019 on Form 8-K ("2Q 2019 Press Release") signed by Defendant Doran. On August 1, 2019, the Company held an earnings call to discuss its results for the second quarter of 2019. On August 2, 2019, the Company filed its Quarterly Report on Form 10-Q, signed by Defendants Myron and Doran ("2Q 2019 Form 10-Q").

172. In the 2Q 2019 Press Release, James River reported its "Reserve for losses and loss adjustment expenses" as ***$1.783 billion*** as of June 30, 2019. In the 2Q 2019 Form 10-Q, the Company clarified that, as of June 30, 2019, the Company's "*net reserves*" were ***$1.238 billion***. The 2Q 2019 Form 10-Q broke down the "*net reserve*" by segment. Specifically, the reported net reserve for the E&S line—which included the commercial auto segment—was ***$879 million***.

173. In its 2Q 2019 Form 10-Q, James River further disclosed the following reserve developments:

> The Company experienced $2.3 million of adverse reserve development in the three months ended June 30, 2019 on the reserve for losses and loss adjustment expenses held at December 31, 2018. ***This reserve development included $1.2 million of adverse development in the Excess and Surplus Lines segment***, as adverse development in the 2016 and 2017 accident years for commercial auto business were largely offset ***by favorable development in the 2018 accident year for commercial auto business . . . .***

174. The 2Q 2019 Press Release similarly stated: "The reserve development in the quarter included ***$1.2 million*** of adverse development in the Excess and Surplus Lines segment. During the quarter, the Company had adverse development in the 2016 and 2017 accident years of its commercial auto line, which was largely offset by favorable development in this line from the 2018 accident year." During the earnings call, Defendant Doran explained, "This quarter, we had

***$25 million*** of favorable development from the 2018 accident year, which was largely offset by adverse development in the 2016 and 2017 years."

175. The reported reserves and reserve developments set forth in ¶¶172-174 above were materially false and misleading because they were materially understated:

a. As described in ¶¶63-68 above, on May 5, 2021, Defendant D'Orazio admitted that, despite insuring Uber claims since 2014 and recognizing adverse reserve developments year after year, James River did not primarily rely on its prior "own loss experience," but that doing so "would give us a better and more conservative estimate of ultimate losses on [the Uber] account" as required under GAAP. Using this improper methodology caused James River's reserve for losses and loss adjustment expenses to be materially understated, requiring an adverse reserve development of $170 million.

b. James River had no reserve methodology except to keep reserves low, as described in ¶¶76-78 above. Indeed, James River had no established policies or procedures for claims handlers or their supervisors to follow in setting, monitoring, and adjusting reserves for Uber related claims, as described in ¶¶119-135 above.

c. James River systematically under-reserved on Uber claims by putting caps on reserves and then refusing to increase them based on new information, as described in ¶¶79-88 above.

d. James River "bent over backwards" for Uber, systematically overpaying on Uber claims to avoid embarrassing Uber, thereby causing the claims to be under-reserved, as described in ¶¶89-92 above.

e. James River knowingly hired adjusters with no claims experience, gave them no training, and prevented them from using software that would accurately set reserves, as described in ¶¶93-103, 122-135above.

f. In addition, as described in ¶¶275-291 below, James River's reported reserves for losses and loss adjustment expenses were (a) not primarily based on James River's past loss experience with similar claims; and (b) not reasonably estimated, in violation of GAAP.

#### 4. Misstatement Of Key Financial Measures for the Third Quarter of 2019

176. On November 6, 2019, James River filed with the SEC a press release announcing its financial results for the third quarter of 2019 on Form 8-K ("3Q 2019 Press Release") signed by Defendant Doran. On November 7, 2019, the Company filed its Quarterly Report on Form 10-

Q, signed by Defendants Abram and Doran ("3Q 2019 Form 10-Q"), and held an earnings call to discuss its results for the third quarter of 2019.

177. In the 3Q 2019 Press Release, James River reported its "Reserve for losses and loss adjustment expenses" as ***$1.941 billion*** as of September 30, 2019. In the 3Q 2019 Form 10-Q, the Company clarified that, as of September 30, 2019, the Company's "*net reserves*" were ***$1.326 billion***. The 3Q 2019 Form 10-Q broke down the "net reserve" by segment. Specifically, the reported net reserve for the E&S line—which included the commercial auto segment—was ***$958 million***.

178. In its 3Q 2019 Form 10-Q, James River disclosed the following reserve developments:

> The Company experienced ***$57.0 million of adverse reserve development*** in the three months ended September 30, 2019 on the reserve for losses and loss adjustment expenses held at December 31, 2018. ***This reserve development included $50.0 million of adverse development in the Excess and Surplus Lines segment primarily related to the 2016 and 2017 accident years for the commercial auto business***.

179. The 3Q 2019 Press Release similarly stated: "during the quarter, there was ***$50 million*** of unfavorable development in the Excess and Surplus Lines segment, driven by one large account (Rasier LLC) in two prior underwriting years." The 3Q 2019 Press Release further explained, "The reserve development in the quarter included ***$50.0 million*** of adverse development in the Excess and Surplus Lines segment, driven by the 2016 and 2017 accident years of its commercial auto line." During the earnings call, Defendant Doran confirmed that "[w]e had adverse development of ***$57 million*** overall. We had ***$50 million*** of adverse development in the Uber book, most of which was focused on the 2017 underwriting year with the balance in the 2016 underwriting year."

180. The reported reserves and reserve developments set forth in ¶¶177-179 above were materially false and misleading because they were materially understated:

a. As described in ¶¶63-68 above, on May 5, 2021, Defendant D'Orazio admitted that, despite insuring Uber claims since 2014 and recognizing adverse reserve developments year after year, James River did not primarily rely on its prior "own loss experience," but that doing so "would give us a better and more conservative estimate of ultimate losses on [the Uber] account" as required under GAAP. Using this improper methodology caused James River's reserve for losses and loss adjustment expenses to be materially understated, requiring an adverse reserve development of $170 million.

b. James River had no reserve methodology except to keep reserves low, as described in ¶¶76-78 above. Indeed, James River had no established policies or procedures for claims handlers or their supervisors to follow in setting, monitoring, and adjusting reserves for Uber related claims, as described in ¶¶119-135 above.

c. James River systematically under-reserved on Uber claims by putting caps on reserves and then refusing to increase them based on new information, as described in ¶¶79-88 above.

d. James River "bent over backwards" for Uber, systematically overpaying on Uber claims to avoid embarrassing Uber, thereby causing the claims to be under-reserved, as described in ¶¶89-92 above.

e. James River knowingly hired adjusters with no claims experience, gave them no training, and prevented them from using software that would accurately set reserves, as described in ¶¶93-103, 122-135 above.

f. In addition, as described in ¶¶275-291 below, James River's reported reserves for losses and loss adjustment expenses were (a) not primarily based on James River's past loss experience with similar claims; and (b) not reasonably estimated, in violation of GAAP.

**5. Misstatement of Key Financial Measures for the Fourth Quarter of 2019 and Full Year 2019**

181. On February 20, 2020, James River filed with the SEC a press release announcing its financial results for the fourth quarter and fiscal year ended December 31, 2019, on Form 8-K ("4Q 2019 Press Release") signed by Defendant Doran. The Company held an earnings call on February 21, 2020, to discuss its results for the fourth quarter and fiscal year 2019. On February

27, 2020, James River filed with the SEC its Annual Report on Form 10-K ("2019 Form 10-K") signed by Defendants Abram, Myron, and Doran.

182. In the 4Q 2019 Press Release, James River reported its "Reserve for losses and loss adjustment expenses" as ***$2.046 billion*** as of December 31, 2019. In the 2019 Form 10-K, the Company clarified that "the Company's *net reserve* for losses and loss adjustment expenses as of December 31, 2019 was ***$1,377.5 million***." The 2019 Form 10-K further provided that the specific amount of "net reserves" attributed to the Company's "E&S – commercial auto" business was ***$433 million***.

183. In the 4Q 2019 Press Release, James River further reported a "favorable reserve development" of ***$46,000*** in the Excess and Surplus Lines for the fourth quarter of 2019.

184. During the earnings call, Defendant Doran confirmed, "We did not experience ***any material reserve development in our Commercial Auto line***."

185. The 2019 Form 10-K, however, disclosed the following regarding the Company's reserve developments for the full fiscal year 2019:

> $69.0 million of adverse development was experienced in 2019 on the reserve for losses and loss adjustment expenses held at December 31, 2018. ***This adverse reserve development included $51.2 million of adverse development in the Excess and Surplus Lines segment, including $57.4 million of adverse development in the commercial auto line of business that was primarily related to the 2016 and 2017 accident years with Rasier.***

186. The reported reserves and reserve developments set forth in ¶¶182-185 above were materially false and misleading because they were materially understated:

a. As described in ¶¶63-68 above, on May 5, 2021, Defendant D'Orazio admitted that, despite insuring Uber claims since 2014 and recognizing adverse reserve developments year after year, James River did not primarily rely on its prior "own loss experience," but that doing so "would give us a better and more conservative estimate of ultimate losses on [the Uber] account" as required under GAAP. Using this improper methodology caused James River's reserve for losses and loss adjustment expenses to be materially understated, requiring an adverse reserve development of $170 million.

b. James River had no reserve methodology except to keep reserves low, as described in ¶¶76-78 above. Indeed, James River had no established policies or procedures for claims handlers or their supervisors to follow in setting, monitoring, and adjusting reserves for Uber related claims, as described in ¶¶119-135 above.

c. James River systematically under-reserved on Uber claims by putting caps on reserves and then refusing to increase them based on new information, as described in ¶¶79-88 above.

d. James River "bent over backwards" for Uber, systematically overpaying on Uber claims to avoid embarrassing Uber, thereby causing the claims to be under-reserved, as described in ¶¶89-92 above.

e. James River knowingly hired adjusters with no claims experience, gave them no training, and prevented them from using software that would accurately set reserves, as described in ¶¶93-103, 122-135 above.

f. In addition, as described in ¶¶275-291 below, James River's reported reserves for losses and loss adjustment expenses were (a) not primarily based on James River's past loss experience with similar claims; and (b) not reasonably estimated, in violation of GAAP.

**6. Misstatement of Key Financial Measures for the First Quarter of 2020**

187. On April 29, 2020, James River filed with the SEC a press release announcing its financial results for the first quarter of 2020 on Form 8-K ("1Q 2020 Press Release") signed by Defendant Doran. On April 30, 2020, the Company filed its Quarterly Report on Form 10-Q, signed by Defendants Abram and Doran ("1Q 2020 Form 10-Q"), and held an earnings call to discuss its results for the first quarter of 2020.

188. In the 1Q 2020 Press Release, James River reported its "Reserve for losses and loss adjustment expenses" as ***$2.043 billion*** as of March 31, 2020. In the 1Q 2020 Form 10-Q, the Company clarified that, as of March 31, 2020, the Company's "*net reserves*" were ***$1.352 billion***. The 1Q 2020 Form 10-Q broke down the "net reserve" by segment. Specifically, the reported net reserve for the E&S line—which included the commercial auto segment—was ***$979 million***.

189. Furthermore, in its 1Q 2020 Form 10-Q, James River disclosed the following reserve developments:

> The Company experienced $874,000 of adverse reserve development in the three months ended March 31, 2020 on the reserve for losses and loss adjustment expenses held at December 31, 2019. ***This reserve development included $3,000 of favorable development in the Excess and Surplus Lines segment***.

190. In the 1Q 2020 Press Release, James River similarly reported a "favorable reserve development" of ***$3,000*** in the Excess and Surplus Lines for the first quarter of 2020.

191. During the earnings call, Defendant Doran confirmed, "We did not experience ***any material reserve development in our commercial auto line***."

192. The reported reserves and reserve developments set forth in ¶¶188-191 above were materially false and misleading because they were materially understated:

a. As described in ¶¶63-68 above, on May 5, 2021, Defendant D'Orazio admitted that, despite insuring Uber claims since 2014 and recognizing adverse reserve developments year after year, James River did not primarily rely on its prior "own loss experience," but that doing so "would give us a better and more conservative estimate of ultimate losses on [the Uber] account" as required under GAAP. Using this improper methodology caused James River's reserve for losses and loss adjustment expenses to be materially understated, requiring an adverse reserve development of $170 million.

b. James River had no reserve methodology except to keep reserves low, as described in ¶¶76-78 above. Indeed, James River had no established policies or procedures for claims handlers or their supervisors to follow in setting, monitoring, and adjusting reserves for Uber related claims, as described in ¶¶119-135 above.

c. James River systematically under-reserved on Uber claims by putting caps on reserves and then refusing to increase them based on new information, as described in ¶¶79-88 above.

d. James River "bent over backwards" for Uber, systematically overpaying on Uber claims to avoid embarrassing Uber, thereby causing the claims to be under-reserved, as described in ¶¶89-92 above.

e. James River knowingly hired adjusters with no claims experience, gave them no training, and prevented them from using software that would accurately set reserves as described in ¶¶93-103, 122-135 above.

f. In addition, as described in ¶¶275-291 below, James River's reported reserves for losses and loss adjustment expenses were (a) not primarily based on James River's past loss experience with similar claims; and (b) not reasonably estimated, in violation of GAAP.

### 7. Misstatement of Key Financial Measures for the Second Quarter of 2020

193. On July 30, 2020, James River filed with the SEC a press release announcing its financial results for the second quarter of 2020 on Form 8-K ("2Q 2020 Press Release") signed by Defendant Doran and held an earnings call to discuss its results for the second quarter of 2020. On July 31, 2020, the Company filed its Quarterly Report on Form 10-Q, signed by Defendants Abram and Doran ("2Q 2020 Form 10-Q").

194. In the 2Q 2020 Press Release, James River reported its "Reserve for losses and loss adjustment expenses" as ***$2.067 billion*** as of June 30, 2020. In the 2Q 2020 Form 10-Q, the Company clarified that, as of June 30, 2020, the Company's "*net reserves*" were ***$1.340 billion***. The 2Q 2020 Form 10-Q broke down the "net reserve" by segment. Specifically, the reported net reserve for the E&S line—which included the commercial auto segment—was ***$968 million***.

195. Furthermore, in its 2Q 2020 Form 10-Q, James River disclosed the following reserve developments:

> The Company experienced ***$1.1 million*** of adverse reserve development in the three months ended June 30, 2020 on the reserve for losses and loss adjustment expenses held at December 31, 2019. ***This reserve development included $2.8 million of favorable development in the Excess and Surplus Lines segment***.

196. In the 2Q 2020 Press Release, James River similarly reported, "The Excess and Surplus Lines segment experienced ***$2.8 million*** of favorable development due to reserve releases in its Core divisions."

197. The reported reserves and reserve developments set forth in ¶¶194-196 above were materially false and misleading because they were materially understated:

a. As described in ¶¶63-68 above, on May 5, 2021, Defendant D'Orazio admitted that, despite insuring Uber claims since 2014 and recognizing adverse reserve developments year after year, James River did not primarily rely on its prior "own loss experience," but that doing so "would give us a better and more conservative estimate of ultimate losses on [the Uber] account" as required under GAAP. Using

this improper methodology caused James River's reserve for losses and loss adjustment expenses to be materially understated, requiring an adverse reserve development of $170 million.

b. James River had no reserve methodology except to keep reserves low, as described in ¶¶76-78 above. Indeed, James River had no established policies or procedures for claims handlers or their supervisors to follow in setting, monitoring, and adjusting reserves for Uber related claims, as described in ¶¶119-135 above.

c. James River systematically under-reserved on Uber claims by putting caps on reserves and then refusing to increase them based on new information as described in ¶¶79-88 above.

d. James River "bent over backwards" for Uber, systematically overpaying on Uber claims to avoid embarrassing Uber, thereby causing the claims to be under-reserved, as described in ¶¶89-92 above.

e. James River knowingly hired adjusters with no claims experience, gave them no training, and prevented them from using software that would accurately set reserves as described in ¶¶93-103, 122-135 above.

f. In addition, as described in ¶¶275-291 below, James River's reported reserves for losses and loss adjustment expenses were (a) not primarily based on James River's past loss experience with similar claims; and (b) not reasonably estimated, in violation of GAAP.

### 8. Misstatement of Key Financial Measures for the Third Quarter of 2020

198. On October 28, 2020, James River filed with the SEC a press release announcing its financial results for the third quarter of 2020 on Form 8-K ("3Q 2020 Press Release") signed by Defendant Doran. On October 29, 2020, the Company filed its Quarterly Report on Form 10-Q, signed by Defendants Abram and Doran ("3Q 2020 Form 10-Q"), and held an earnings call to discuss its results for the third quarter of 2020.

199. In the 3Q 2020 Press Release, James River reported its "Reserve for losses and loss adjustment expenses" as ***$2.107 billion*** as of September 30, 2020. In the 3Q 2020 Form 10-Q, the Company clarified that, as of September 30, 2020, the Company's "*net reserves*" were ***$1.337 billion***. The 3Q 2020 Form 10-Q broke down the "*net reserve*" by segment. Specifically, the

reported net reserve for the E&S line—which included the commercial auto segment—was ***$959 million***.

200. In its 3Q 2020 Form 10-Q, James River further disclosed the following reserve developments:

> The Company experienced ***$4.2 million*** of net adverse reserve development in the three months ended September 30, 2020 on the reserve for losses and loss adjustment expenses held at December 31, 2019. ***This reserve development included $27,000 of net adverse development in the Excess and Surplus Lines segment*** . . . .

201. In the 3Q 2020 Press Release, James River similarly reported an "adverse reserve development" of ***$27,000*** in the Excess and Surplus Lines for the third quarter of 2020.

202. During the earnings call, Defendant Abram represented that the Company "add[ed] approximately $10 million to reserves for the run-off of the large commercial account canceled at the end of last year," (i.e., the Uber Contract). Defendant Doran represented on the same call that "we added $***10 million*** of reserves to our large commercial auto account in run-off this quarter but had a similar level of reserve takedowns from our core E&S book, which continues to run very well. The reserve increase relates to the 2017 and 2018 years."

203. The reported reserves and reserve developments set forth in ¶¶199-202 above were materially false and misleading because they were materially understated:

a. As described in ¶¶63-68 above, on May 5, 2021, Defendant D'Orazio admitted that, despite insuring Uber claims since 2014 and recognizing adverse reserve developments year after year, James River did not primarily rely on its prior "own loss experience," but that doing so "would give us a better and more conservative estimate of ultimate losses on [the Uber] account" as required under GAAP. Using this improper methodology caused James River's reserve for losses and loss adjustment expenses to be materially understated, requiring an adverse reserve development of $170 million.

b. James River had no reserve methodology except to keep reserves low, as described in ¶¶76-78 above. Indeed, James River had no established policies or procedures for claims handlers or their supervisors to follow in setting, monitoring, and adjusting reserves for Uber related claims, as described in ¶¶119-135 above.

c. James River systematically under-reserved on Uber claims by putting caps on reserves and then refusing to increase them based on new information, as described in ¶¶79-88 above.

d. James River "bent over backwards" for Uber, systematically overpaying on Uber claims to avoid embarrassing Uber, thereby causing the claims to be under-reserved, as described in ¶¶89-92 above.

e. James River knowingly hired adjusters with no claims experience, gave them no training, and prevented them from using software that would accurately set reserves as described in ¶¶93-103, 122-135 above.

f. In addition, as described in ¶¶275-291 below, James River's reported reserves for losses and loss adjustment expenses were (a) not primarily based on James River's past loss experience with similar claims; and (b) not reasonably estimated, in violation of GAAP.

### 9. Misstatement of Reserve Development on February 17, 2021

204. On February 17, 2021, the Company issued a press release that was filed with the SEC on Form 8-K, signed by Defendant Doran, preliminarily announcing the Company's financial results for the fourth quarter of 2020. The press release revealed that the Company suffered an "***unfavorable development of prior year loss reserves of between $85 million and $90 million during the fourth quarter***. The unfavorable development is concentrated in the Company's Commercial Auto division within its E&S segment and its Casualty Re segment."

205. The reported development set forth in ¶204 above was materially false and misleading because it was materially understated:

a. As described in ¶¶63-68 above, on May 5, 2021, Defendant D'Orazio admitted that, despite insuring Uber claims since 2014 and recognizing adverse reserve developments year after year, James River did not primarily rely on its prior "own loss experience," but that doing so "would give us a better and more conservative estimate of ultimate losses on [the Uber] account" as required under GAAP. Using this improper methodology caused James River's reserve for losses and loss adjustment expenses to be materially understated, requiring an adverse reserve development of $170 million.

b. James River had no reserve methodology except to keep reserves low, as described in ¶¶76-78 above. Indeed, James River had no established policies or procedures

for claims handlers or their supervisors to follow in setting, monitoring, and adjusting reserves for Uber related claims, as described in ¶¶119-135 above.

c. James River systematically under-reserved on Uber claims by putting caps on reserves and then refusing to increase them based on new information, as described in ¶¶79-88 above.

d. James River "bent over backwards" for Uber, systematically overpaying on Uber claims to avoid embarrassing Uber, thereby causing the claims to be under-reserved, as described in ¶¶89-92 above.

e. James River knowingly hired adjusters with no claims experience, gave them no training, and prevented them from using software that would accurately set reserves, as described in ¶¶93-103, 122-135 above.

f. In addition, as described in ¶¶275-291 below, James River's reported reserves for losses and loss adjustment expenses were (a) not primarily based on James River's past loss experience with similar claims; and (b) not reasonably estimated, in violation of GAAP.

### 10. Misstatement of Key Financial Measures for the Fourth Quarter of 2020 and Full Year 2020

206. On February 25, 2021, James River filed with the SEC a press release announcing its financial results for the fourth quarter and fiscal year ended December 31, 2020 on Form 8-K ("4Q 2020 Press Release") signed by Defendant Doran. On February 26, 2021, James River filed with the SEC its Annual Report on Form 10-K, signed by Defendants D'Orazio, Doran, and Abram ("2020 Form 10-K"), and held an earnings call to discuss its results for the fourth quarter and full year of fiscal 2020.

207. In the 4Q 2020 Press Release, James River reported its "Reserve for losses and loss adjustment expenses" as ***$2.192 billion*** as of December 31, 2020. In the 2020 Form 10-K, the Company clarified that "*the Company's net reserve for losses and loss adjustment expenses . . . at December 31, 2020 was **$1,386.1 million***." The 2020 Form 10-K further provided that the specific amount of "*net reserves*" attributed to the Company's "*E&S – commercial auto*" business was ***$337 million***.

208. Furthermore, in the 4Q 2020 Press Release, James River revealed an "overall unfavorable reserve development of ***$86.0 million***." The Company further explained, "The prior year reserve development in the quarter included ***$62.3 million*** of adverse development in the E&S segment, driven by ***$75.8 million*** of unfavorable development in the commercial auto division, principally from one large account [Uber]."

209. During the earnings call, Defendant D'Orazio confirmed that "during our fourth quarter, we strengthened our reserves by ***$75.8 million*** in our commercial auto runoff portfolio."

210. The 2020 Form 10-K disclosed the following reserves developments for the full year 2020:

> $92.2 million of adverse development was experienced in 2020 on the reserve for losses and loss adjustment expenses held at December 31, 2019. ***This adverse reserve development included $59.4 million of adverse development in the Excess and Surplus Lines segment***, ***including $91.4 million of adverse development in the commercial auto line of business that was primarily related to the 2018 and prior accident years with Rasier***.

211. On March 1, 2021, James River filed a Fourth Quarter 2020 Investor Presentation ("4Q 2020 Investor Presentation") with the SEC on Form 8-K, signed by Defendant Doran. The 4Q 2020 Investor Presentation provided a "Fourth Quarter and Year End 2020 Review," which stated, "We recorded ***$86.0 million*** of adverse development on prior accident year loss reserves, driven by commercial auto (***$75.8 million***, primarily from one large runoff account)."

212. The reported reserves and reserve developments set forth in ¶¶207-211 above were materially false and misleading because they were materially understated:

a. As described in ¶¶63-68 above, on May 5, 2021, Defendant D'Orazio admitted that, despite insuring Uber claims since 2014 and recognizing adverse reserve developments year after year, James River did not primarily rely on its prior "own loss experience," but that doing so "would give us a better and more conservative estimate of ultimate losses on [the Uber] account" as required under GAAP. Using this improper methodology caused James River's reserve for losses and loss

adjustment expenses to be materially understated, requiring an adverse reserve development of $170 million.

b. James River had no reserve methodology except to keep reserves low, as described in ¶¶76-78 above. Indeed, James River had no established policies or procedures for claims handlers or their supervisors to follow in setting, monitoring, and adjusting reserves for Uber related claims, as described in ¶¶119-135 above.

c. James River systematically under-reserved on Uber claims by putting caps on reserves and then refusing to increase them based on new information, as described in ¶¶79-88 above.

d. James River "bent over backwards" for Uber, systematically overpaying on Uber claims to avoid embarrassing Uber, thereby causing the claims to be under-reserved, as described in ¶¶89-92 above.

e. James River knowingly hired adjusters with no claims experience, gave them no training, and prevented them from using software that would accurately set reserves, as described in ¶¶93-103, 122-135 above.

f. In addition, as described in ¶¶275-291 below, James River's reported reserves for losses and loss adjustment expenses were (a) not primarily based on James River's past loss experience with similar claims; and (b) not reasonably estimated, in violation of GAAP.

**11. Misstatement of Key Financial Measures for the First Quarter of 2021**

213. On May 5, 2021, James River filed with the SEC a press release announcing its financial results for the first quarter of 2021 on Form 8-K ("1Q 2021 Press Release") signed by Defendant Doran. That day, James River also filed its Quarterly Report on Form 10-Q, signed by Defendants D'Orazio and Doran ("1Q 2021 Form 10-Q"), and released a pre-recorded earnings call discussing its results for the first quarter of 2021.

214. In the 1Q 2021 Press Release, James River reported its "Reserve for losses and loss adjustment expenses" as ***$2.414 billion*** as of March 31, 2021. In the 1Q 2021 Form 10-Q, the Company clarified that, as of March 31, 2021, its "*net reserves*" were ***$1.535 billion***. The 1Q 2021 Form 10-Q broke down the "*net reserve*" by segment. Specifically, the reported net reserve for the E&S line—which included the commercial auto segment—was ***$1.134 billion***.

215. In its 1Q 2021 Form 10-Q, James River further disclosed the following reserve developments:

> The Company experienced ***$170.1 million*** of net adverse reserve development in the three months ended March 31, 2021 on the reserve for losses and loss adjustment expenses held at December 31, 2020. ***This reserve development included $168.7 million of net adverse development in the Excess and Surplus Lines segment including $ 170.0 million on commercial auto business, almost entirely related to a previously canceled account that has been in runoff since 2019***.

216. In the pre-recorded earnings call, Defendant D'Orazio similarly explained, "During the first quarter, we strengthened our prior year reserves by ***$170 million*** in our commercial auto runoff portfolio." The 1Q 2021 Press Release likewise disclosed "***$168.7 million*** of unfavorable development in the E&S segment, ***inclusive of $170.0 million of unfavorable development in Commercial Auto, primarily driven by a previously canceled account that has been in runoff since 2019***."

217. The reported reserves and reserve developments set forth in ¶¶214-216 above were materially false and misleading because they were materially understated:

a. As described in ¶¶63-68 above, on October 26, 2021, James River announced $29.6 million in "impacts" relating to Uber, which Defendant D'Orazio described as bringing "economic finality to substantially all of" the Uber Account that was in run-off, and $13.8 million of which James River confirmed was recorded as an adverse loss and loss adjustment expense reserve development because the Uber Account was still under-reserved.

b. James River had no reserve methodology except to keep reserves low, as described in ¶¶76-78 above. Indeed, James River had no established policies or procedures for claims handlers or their supervisors to follow in setting, monitoring, and adjusting reserves for Uber related claims, as described in ¶¶119-135 above.

c. James River systematically under-reserved on Uber claims due to pressure from Uber, as described in ¶¶79-88 above.

d. James River "bent over backwards" for Uber, systematically overpaying on Uber claims to avoid embarrassing Uber, thereby causing the claims to be under-reserved, as described in ¶¶89-92 above.

e. James River knowingly hired adjusters with no claims experience, gave them no training, and prevented them from using software that would accurately set reserves, as described in ¶¶93-103, 122-135 above.

f. In addition, as described in ¶¶275-291 below, James River's reported reserves for losses and loss adjustment expenses were (a) not primarily based on James River's past loss experience with similar claims; and (b) not reasonably estimated, in violation of GAAP

**12. Misstatement of Key Financial Measures for the Second Quarter of 2021**

218. On August 4, 2021, James River filed with the SEC a press release announcing its financial results for the second quarter of 2021 on Form 8-K ("2Q 2021 Press Release") signed by Defendant Doran. On August 5, 2021, the Company held an earnings call to discuss its results for the second quarter of 2021 and filed its Quarterly Report on Form 10-Q, signed by Defendants D'Orazio and Doran ("2Q 2021 Form 10-Q").

219. In the 2Q 2021 Press Release, James River reported its "Reserve for losses and loss adjustment expenses" as ***$2.447 billion*** as of June 30, 2021. In the 2Q 2021 Form 10-Q, the Company clarified that, as of June 30, 2021, the Company's "*net reserves*" were ***$1.511 billion***. The 2Q 2021 Form 10-Q broke down the "net reserve" by segment. Specifically, the reported net reserve for the E&S line—which included the commercial auto segment—was ***$1.106 billion***.

220. Furthermore, in its 2Q 2021 Form 10-Q, James River disclosed the following reserve developments:

> The Company experienced ***$3.5 million*** of net favorable reserve development in the three months ended June 30, 2021 on the reserve for losses and loss adjustment expenses held at December 31, 2020. This reserve development included ***$7.5 million of net favorable development in the Excess and Surplus Lines segment*** . . . .

221. In the 2Q 2021 Press Release, James River similarly reported that "The prior year reserve development in the quarter included ***$7.5 million*** of favorable development in Core E&S lines."

222. The reported reserves and reserve developments set forth in ¶¶219-221 above were materially false and misleading because they were materially understated:

a. As described in ¶¶63-68 above, on October 26, 2021, James River announced $29.6 million in "impacts" relating to Uber, which Defendant D'Orazio described as bringing "economic finality to substantially all of" the Uber Account that was in run-off, and $13.8 million of which James River confirmed was recorded as an adverse loss and loss adjustment expense reserve development because the Uber Account was still under-reserved.

b. James River had no reserve methodology except to keep reserves low, as described in ¶¶76-78 above. Indeed, James River had no established policies or procedures for claims handlers or their supervisors to follow in setting, monitoring, and adjusting reserves for Uber related claims, as described in ¶¶119-135 above.

c. James River systematically under-reserved on Uber claims due to pressure from Uber, as described in ¶¶79-88 above.

d. James River "bent over backwards" for Uber, systematically overpaying on Uber claims to avoid embarrassing Uber, thereby causing the claims to be under-reserved, as described in ¶¶89-92 above.

e. James River knowingly hired adjusters with no claims experience, gave them no training, and prevented them from using software that would accurately set reserves, as described in ¶¶93-103, 122-135 above.

f. In addition, as described in ¶¶275-291 below, James River's reported reserves for losses and loss adjustment expenses were (a) not primarily based on James River's past loss experience with similar claims; and (b) not reasonably estimated, in violation of GAAP.

## B. Impact Of Materially Understated Reserve On James River's Financial Statements

223. The false and misleading reserves set forth in Section V.A. above impact other material financial measures in James River's financial statements, and rendered those financial statements materially inflated. The tables below reflect the impact of the $170 million, and later $13.8 million, adverse charge in the particular prior quarter or year on James River's financial statements.

### 1. Misstatement of Key Financial Measures for the Full Year of 2018[7]

224. The following financial measures for fiscal year 2018 were materially false and misleading due to the impact of the $170 million adverse charge:

| | Reported Amount | Adjusted Amount | Percent Misstatement |
|---|---|---|---|
| Losses and loss adjustment expenses | $600 | $770 | 22% |
| Income (loss) before taxes | $71 | $(99) | 171% |
| Net income (loss) | $64 | $(76) | 184% |
| Basic earnings (loss) per share | $2.14 | $(2.56) | 184% |
| Reserve for losses and loss adjustment expenses net of reinsurance recoverables at end of period | $1,194 | $1,364 | 12% |
| Reserve for losses and loss adjustment expenses net of reinsurance recoverables at end of period - E&S - commercial auto | $355 | $525 | 32% |

### 2. Misstatement of Key Financial Measures for the First Quarter of 2019

225. The following reported financial measures for 1Q 2019 were materially false and misleading due to the impact of the $170 million adverse charge:

| | Reported Amount | Adjusted Amount | Percent Misstatement |
|---|---|---|---|
| Losses and loss adjustment expenses | $140 | $310 | 55% |
| Income (loss) before taxes | $25 | $(145) | 118% |
| Net income (loss) | $23 | $(118) | 119% |
| Basic earnings (loss) per share | $0.76 | $(3.91) | 119% |
| Reserve for losses and loss adjustment expenses net of reinsurance recoverables at end of period | $1,222 | $1,392 | 12% |

[7] All data presented in these tables, except for EPS data, is presented in millions of dollars. These calculations are based on information presented in James River's Class Period Forms 10-Q and 10-K, with each table reflecting a column showing the impact of the reserve charge in the particular period or year, from the fourth quarter of 2018 to the fourth quarter of 2020. The "Adjusted" amounts for net income (loss) and earnings per share were calculated using a tax-effected rate of approximately 17.5%, the average effective tax rate reflected in the Company's reported results for the eleven quarters comprising the Class Period (fourth quarter / full year 2018 through second quarter 2021). Amounts may not precisely compute because of rounding.

### 3. Misstatement of Key Financial Measures for the Second Quarter of 2019

226. The following reported financial measures for 2Q 2019 were materially false and misleading due to the impact of the $170 million adverse charge:

| | Reported Amount | Adjusted Amount | Percent Misstatement |
|---|---|---|---|
| Losses and loss adjustment expenses | $147 | $317 | 54% |
| Income (loss) before taxes | $25 | $(145) | 117% |
| Net income (loss) | $20 | $(120) | 117% |
| Basic earnings (loss) per share | $0.67 | $(3.97) | 117% |
| Reserve for losses and loss adjustment expenses net of reinsurance recoverables at end of period | $1,238 | $1,408 | 12% |

### 4. Misstatement of Key Financial Measures for the Third Quarter of 2019

227. The following reported financial measures for 3Q 2019 were materially false and misleading due to the impact of the $170 million adverse charge:

| | Reported Amount | Adjusted Amount | Percent Misstatement |
|---|---|---|---|
| Losses and loss adjustment expenses | $214 | $384 | 44% |
| Income (loss) before taxes | $(27) | $(198) | 86% |
| Net income (loss) | $(25) | $(165) | 85% |
| Basic earnings (loss) per share | $(0.83) | $(5.45) | 85% |
| Reserve for losses and loss adjustment expenses net of reinsurance recoverables at end of period | $1,326 | $1,497 | 11% |

### 5. Misstatement of Key Financial Measures for the Full Year of 2019

228. The following reported financial measures for fiscal year 2019 were materially false and misleading due to the impact of the $170 million adverse charge:

| | Reported Amount | Adjusted Amount | Percent Misstatement |
|---|---|---|---|
| Losses and loss adjustment expenses | $672 | $842 | 20% |
| Income (loss) before taxes | $52 | $(118) | 144% |
| Net income (loss) | $38 | $(102) | 138% |
| Basic earnings (loss) per share | $1.27 | $(3.37) | 138% |
| Reserve for losses and loss adjustment expenses net of reinsurance recoverables at end of period | $1,377 | $1,548 | 11% |
| Reserve for losses and loss adjustment expenses net of reinsurance recoverables at end of period - E&S - commercial auto | $433 | $603 | 28% |

### 6. Misstatement of Key Financial Measures for the First Quarter of 2020

229. The following reported financial measures for 1Q 2020 were materially false and misleading due to the impact of the $170 million adverse charge:

| | Reported Amount | Adjusted Amount | Percent Misstatement |
|---|---|---|---|
| Losses and loss adjustment expenses | $97 | $267 | 64% |
| Income (loss) before taxes | $(41) | $(211) | 80% |
| Net income (loss) | $(37) | $(177) | 79% |
| Basic earnings (loss) per share | $(1.21) | $(5.81) | 79% |
| Reserve for losses and loss adjustment expenses net of reinsurance recoverables at end of period | $1,352 | $1,522 | 11% |

### 7. Misstatement of Key Financial Measures for the Second Quarter of 2020

230. The following reported financial measures for 2Q 2020 were materially false and misleading due to the impact of the $170 million adverse charge:

| | Reported Amount | Adjusted Amount | Percent Misstatement |
|---|---|---|---|
| Losses and loss adjustment expenses | $99 | $269 | 63% |
| Income (loss) before taxes | $40 | $(130) | 131% |
| Net income (loss) | $36 | $ (105) | 134% |
| Basic earnings (loss) per share | $1.17 | $(3.43) | 134% |
| Reserve for losses and loss adjustment expenses net of reinsurance recoverables at end of period | $1,340 | $1,510 | 11% |

**8. Misstatement of Key Financial Measures for the Third Quarter of 2020**

231. The following reported financial measures for 3Q 2020 were materially false and misleading due to the impact of the $170 million adverse charge:

| | Reported Amount | Adjusted Amount | Percent Misstatement |
|---|---|---|---|
| Losses and loss adjustment expenses | $106 | $276 | 62% |
| Income (loss) before taxes | $31 | $(139) | 122% |
| Net income (loss) | $26 | $ (114) | 123% |
| Basic earnings (loss) per share | $0.86 | $(3.73) | 123% |
| Reserve for losses and loss adjustment expenses net of reinsurance recoverables at end of period | $1,337 | $1,507 | 11% |

**9. Misstatement of Key Financial Measures for the Full Year of 2020**

232. The following reported financial measures for fiscal year 2020 were materially false and misleading due to the impact of the $170 million adverse charge:

| | Reported Amount | Adjusted Amount | Percent Misstatement |
|---|---|---|---|
| Losses and loss adjustment expenses | $479 | $649 | 26% |
| Income (loss) before taxes | $12 | $(158) | 108% |
| Net income (loss) | $5 | $(135) | 104% |
| Basic earnings (loss) per share | $0.16 | $(4.43) | 104% |
| Reserve for losses and loss adjustment expenses net of reinsurance recoverables at end of period | $1,386 | $1,556 | 11% |
| Reserve for losses and loss adjustment expenses net of reinsurance recoverables at end of period - E&S - commercial auto | $337 | $507 | 34% |

**10. Misstatement of Key Financial Measures for the First Quarter of 2021**

233. The following reported financial measures for 1Q 2021 were materially false and misleading due to the impact of the $13.8 million adverse charge announced on October 26, 2021 and confirmed on November 3, 2021:

| | Reported Amount | Adjusted Amount | Percent Misstatement |
|---|---|---|---|
| Losses and loss adjustment expenses | $274 | $287 | 5% |
| Income (loss) before taxes | $(141) | $(155) | 9% |
| Net income (loss) | $(103) | $(115) | 10% |
| Basic earnings (loss) per share | $(3.37) | $(3.74) | 10% |

### 11. Misstatement of Key Financial Measures for the Second Quarter of 2021

234. The following reported financial measures for 2Q 2021 were materially false and misleading due to the impact of the $13.8 million adverse charge announced on October 26, 2021 and confirmed on November 3, 2021:

| | Reported Amount | Adjusted Amount | Percent Misstatement |
|---|---|---|---|
| Losses and loss adjustment expenses | $110 | $124 | 11% |
| Income (loss) before taxes | $32 | $19 | 74% |
| Net income (loss) | $21 | $9 | 120% |
| Basic earnings (loss) per share | $0.61 | $0.27 | 122% |

## C. Materially False And Misleading Statements That James River's Internal Controls and Financial Statements Were In Accordance With GAAP

235. During the Class Period, each of James River's Forms 10-Q set forth in ¶¶167 to 218 asserted that the Company's "financial statements and notes . . . have been prepared in accordance with . . . U.S. GAAP."[8] The James River Form 10-Ks set forth in ¶¶162, 181 and 206, similarly stated that they were "prepared in accordance" with U.S. GAAP.[9]

[8] ¶167 (1Q 2019 Form 10-Q at pp.10, 28); ¶171 (2Q 2019 Form 10-Q at pp.11, 31); ¶176 (3Q 2019 Form 10-Q at pp.11, 31); ¶187 (1Q 2020 Form 10-Q at pp.10, 29); ¶193 (2Q 2020 Form 10-Q at pp.11, 31); ¶198 (3Q 2020 Form 10-Q at pp.11, 31); ¶213 (1Q 2021 Form 10-Q at pp.10, 28); ¶218 (2Q 2021 Form 10-Q at pp.11, 30).

[9] ¶162 (2018 Form 10-K at p.F-9); ¶181 (2019 Form 10-K at p.F-10); ¶206 (2020 Form 10-K at p.F-10).

236. The statements set forth in ¶235 above were materially false and misleading because each of those financial statements and related earnings releases failed to comply with GAAP. In particular, James River's reported reserves for losses and loss adjustment expenses were (a) not primarily based on James River's past loss experience with similar claims; and (b) not reasonably estimated, in violation of GAAP. For example:

a. As described in ¶¶63-68 above, on May 5, 2021, Defendant D'Orazio admitted that, despite insuring Uber claims since 2014 and recognizing adverse reserve developments year after year, James River did not primarily rely on its prior "own loss experience," but that doing so "would give us a better and more conservative estimate of ultimate losses on [the Uber] account" as required under GAAP. Using this improper methodology caused James River's reserve for losses and loss adjustment expenses to be materially understated, requiring adverse reserve developments of $170 million, and, later, an additional $13.8 million.

b. James River had no reserve methodology except to keep reserves low, as described in ¶¶76-78 above. Indeed, James River had no established policies or procedures for claims handlers or their supervisors to follow in setting, monitoring, and adjusting reserves for Uber related claims, as described in ¶¶119-135 above.

c. James River systematically under-reserved on Uber claims by putting caps on reserves and then refusing to increase them based on new information, as described in ¶¶79-88 above.

d. James River "bent over backwards" for Uber, systematically overpaying on Uber claims to avoid embarrassing Uber, thereby causing the claims to be under-reserved, as described in ¶¶89-92 above.

e. James River knowingly hired adjusters with no claims experience, gave them no training, and prevented them from using software that would accurately set reserves, as described in ¶¶93-103, 122-135 above.

237. During the Class Period, each of James River's Form 10-Ks and 10-Qs set forth in ¶¶162-218, contained certifications pursuant to Section 302 of the Sarbanes-Oxley Act of 2002

("SOX Certifications") made by Defendants Myron, Abram, or D'Orazio, and by Defendant Doran.[10]

238. The SOX Certifications represented that the Company's financial statements were accurate and in accordance with GAAP, and that Defendants had designed and implemented internal controls that provided reasonable assurance that James River's financial reporting was reliable and complied with GAAP. Specifically, the SOX Certifications provided, in relevant part:

> 1. I have reviewed this annual report on [Form 10-K or Form 10-Q] of James River Group Holdings, Ltd.;
>
> 2. Based on my knowledge, ***this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report***;
>
> 3. Based on my knowledge, ***the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant*** as of, and for, the periods presented in this report;
>
> 4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
> a) ***Designed such disclosure controls and procedures***, or caused such disclosure controls and procedures to be designed under our supervision, ***to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to***

---

[10] ¶162 (2018 Form 10-K at Exhs. 31.1, 31.2 (Myron and Doran)); ¶167 (1Q 2019 Form 10-Q at Exhs. 31.1, 31.2 (Myron and Doran)); ¶171 (2Q 2019 Form 10-Q at Exhs. 31.1, 31.2 (Myron and Doran)); ¶176 (3Q 2019 Form 10-Q at Exhs. 31.1, 31.2 (Abram and Doran)); ¶181 (2019 Form 10-K at Exhs. 31.1, 31.2 (Abram and Doran)); ¶187 (1Q 2020 Form 10-Q at Exhs. 31.1, 31.2 (Abram and Doran)); ¶193 (2Q 2020 Form 10-Q at Exhs. 31.1, 31.2 (Abram and Doran)); ¶198 (3Q 2020 Form 10-Q at Exhs. 31.1, 31.2 (Abram and Doran)); ¶206 (2020 Form 10-K at Exhs. 31.1, 31.2 (D'Orazio and Doran); ¶213 (1Q 2021 Form 10-Q at Exhs. 31.1, 31.2 (D'Orazio and Doran)); ¶218 (2Q 2021 Form 10-Q at Exhs. 31.1, 31.2 (D'Orazio and Doran)).

> ***us by others within those entities, particularly during the period in which this report is being prepared***;
>
> b) ***Designed such internal control over financial reporting***, or caused such internal control over financial reporting to be designed under our supervision, ***to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles***;
>
> c) ***Evaluated the effectiveness of the registrant's disclosure controls and procedures*** and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation.

239. The filings also contained SOX Certifications claiming that "The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."[11]

240. In addition, the Form 10-Ks acknowledged that "Management is responsible for establishing and maintaining adequate internal control over financial reporting for the Company, as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act." The Form 10-Ks therefore all included a statement as follows:

> Management has conducted an assessment, including testing, of the effectiveness of our internal control over financial reporting as of December 31, [of the relevant year]. . . . ***Based on this assessment, the Company's management has concluded that, as of December 31, [of the relevant year], the Company's internal control over financial reporting was effective***.[12]

---

[11] ¶162 (2018 Form 10-K at Exh. 32.1 (Myron and Doran)); ¶167 (1Q 2019 Form 10-Q at Exh. 32 (Myron and Doran)); ¶171 (2Q 2019 Form 10-Q at Exh. 32 (Myron and Doran)); ¶176 (3Q 2019 Form 10-Q at Exh. 32 (Abram and Doran)); ¶181 (2019 Form 10-K at Exh. 32.1 (Abram and Doran)); ¶187 (1Q 2020 Form 10-Q at Exh. 32 (Abram and Doran)); ¶193 (2Q 2020 Form 10-Q at Exh. 32 Abram and Doran)); ¶198 (3Q 2020 Form 10-Q at Exh. 32 (Abram and Doran)); ¶206 (2020 Form 10-K at Exh. 32.1 (D'Orazio and Doran)); ¶213 (1Q 2021 Form 10-Q at Exh. 32 (D'Orazio and Doran)); ¶218 (2Q 2021 Form 10-Q at Exh. 32 (D'Orazio and Doran)).

[12] 2018 Form 10-K at 110-111; 2019 Form 10-K at 98-99; 2020 Form 10-K at 101-102.

241. The statements in ¶¶237-240 were materially false and misleading and omitted to state material facts. As described in ¶¶63-68 above, on May 5, 2021, Defendant D'Orazio admitted that, despite insuring Uber claims since 2014 and recognizing adverse reserve developments year after year, James River did not primarily rely on its prior "own loss experience," but that doing so "would give us a better and more conservative estimate of ultimate losses on [the Uber] account" as required under GAAP. Using this improper methodology caused James River's reserve for losses and loss adjustment expenses to be materially understated, requiring adverse reserve developments of $170 million, and, later, an additional $13.8 million. Moreover, as described in ¶¶76-103 above, James River: (a) had no reserve methodology except to keep reserves low; (b) had no established policies or procedures for claims handlers or their supervisors to follow in setting, monitoring, and adjusting reserves for Uber related claims; (c) systematically under-reserved on Uber claims by putting caps on reserves and then refusing to increase them based on new information; (d) "bent over backwards" for Uber, systematically overpaying on Uber claims to avoid embarrassing Uber, thereby causing the claims to be under-reserved; and (e) James River knowingly hired adjusters with no claims experience, gave them no training, and prevented them from using software that would accurately set reserves. As a result of these issues, James River's disclosure controls and procedures were not effective and its ICFR contained material weaknesses.

242. In addition, as described in ¶¶275-291 below, James River's reported reserves for losses and loss adjustment expenses were (a) not primarily based on James River's past loss experience with similar claims; and (b) not reasonably estimated, in violation of GAAP. These GAAP violations constitute an ICFR violation.

243. Further, the statements set forth in ¶¶237-240 above omitted to disclose the material facts that James River (a) had no reserve methodology except to keep reserves low; (b) had no

established policies or procedures for claims handlers or their supervisors to follow in setting, monitoring, and adjusting reserves for Uber related claims; (c) systematically under-reserved on Uber claims by putting caps on reserves and then refusing to increase them based on new information; (d) "bent over backwards" for Uber, systematically overpaying on Uber claims to avoid embarrassing Uber, thereby causing the claims to be under-reserved; and (e) knowingly hired adjusters with no claims experience, gave them no training, and prevented them from using software that would accurately set reserves.

### D. Materially False And Misleading Statements And Omissions Regarding The Reserving Process

#### 1. Materially False and Misleading Statements and Omissions Relating to Fourth Quarter 2018 and Fiscal Year 2018.

244. As noted above, James River filed its 2018 Form 10-K, signed by Defendants Myron, Abram, and Doran, on February 27, 2019.

245. In the 2018 Form 10-K, James River described the Company's policy for setting reserves. Specifically, under the heading "Reserve Policy," James River stated:

> ***We continually monitor reserves using new information on reported claims and a variety of statistical techniques and adjust our estimates as necessary as experience develops or new information becomes known.*** Such adjustments (referred to as reserve development) are included in current operations. Anticipated inflation is reflected implicitly in the reserving process through analysis of cost trends and the review of historical development.
>
> * * *
>
> In many cases, several years may elapse between the occurrence of an insured loss, the reporting of the loss and our eventual payment of the loss. We establish loss and loss adjustment expense reserves for the ultimate payment of all losses and loss adjustment expenses incurred. ***We estimate the reserve for losses and loss adjustment expenses using individual case-basis valuations of reported claims. We also use statistical analyses to estimate the cost of losses that have been incurred but not reported to us. These estimates are based on historical information*** and on estimates of future trends that may affect the frequency of claims and changes in the average cost of claims that may arise in the future. We also consider various factors such as:

* * *

***The procedures we use to estimate loss reserves assume that past experience, adjusted for the effects of current developments and anticipated trends, is an appropriate basis for predicting future events*.**

246. James River further claimed in the 2018 Form 10-K that "every known claim has a specific case reserve established against it which ***management believes is adequate to resolve the claim and pay attendant expenses based on information available at the time***."

247. The 2018 Form 10-K concluded that James River's "***reserve estimates are reasonable***" and that, "In order to maintain balance sheet integrity, we seek to estimate the amount of future obligations, especially reserves for losses and loss adjustment expenses, ***in a consistent and appropriate fashion***."

248. The statements set forth in ¶¶245-247 above were materially false and misleading because (a) the reserve for losses and loss adjustment expenses reported in the 2018 Form 10-K was materially understated in violation of GAAP; (b) the reserves were not "based on historical information" and James River's reserving procedures did not "assume that past experience . . . is an appropriate basis for predicting future events"; and (c) the reserve estimates were not "reasonable" or estimated "in a consistent and appropriate fashion." For example:

a. As described in ¶¶63-68 above, on May 5, 2021, Defendant D'Orazio admitted that, despite insuring Uber claims since 2014 and recognizing adverse reserve developments year after year, James River did not primarily rely on its prior "own loss experience," but that doing so "would give us a better and more conservative estimate of ultimate losses on [the Uber] account" as required under GAAP. Using this improper methodology caused James River's reserve for losses and loss adjustment expenses to be materially understated, requiring an adverse reserve development of $170 million.

b. James River had no reserve methodology except to keep reserves low, as described in ¶¶76-78 above. Indeed, James River had no established policies or procedures for claims handlers or their supervisors to follow in setting, monitoring, and adjusting reserves for Uber related claims, as described in ¶¶119-135 above.

c. James River systematically under-reserved on Uber claims by putting caps on reserves and then refusing to increase them based on new information, as described in ¶¶79-88 above.

d. James River "bent over backwards" for Uber, systematically overpaying on Uber claims to avoid embarrassing Uber, thereby causing the claims to be under-reserved, as described in ¶¶89-92 above.

e. James River knowingly hired adjusters with no claims experience, gave them no training, and prevented them from using software that would accurately set reserves, as described in ¶¶93-103, 122-135 above.

f. In addition, as described in ¶¶275-291 below, James River's reported reserves for losses and loss adjustment expenses were (a) not primarily based on James River's past loss experience with similar claims; and (b) not reasonably estimated, in violation of GAAP.

249. Further, the statements set forth in ¶¶244-247 above omitted to disclose the material facts that James River (a) had no reserve methodology except to keep reserves low; (b) had no established policies or procedures for claims handlers or their supervisors to follow in setting, monitoring, and adjusting reserves for Uber related claims; (c) systematically under-reserved on Uber claims by putting caps on reserves and then refusing to increase them based on new information; (d) "bent over backwards" for Uber, systematically overpaying on Uber claims to avoid embarrassing Uber, thereby causing the claims to be under-reserved; and (e) knowingly hired adjusters with no claims experience, gave them no training, and prevented them from using software that would accurately set reserves, as described in ¶¶76-103 above. In addition, Defendants had no reasonable basis to believe that the reserves were "reasonable" or "adequate" because Defendants knew that the reserving process was defective and that James River had historically under-reserved for claims arising from the Uber Contract, as described in ¶¶76-103, 106-114, and 119-148 above, and ¶¶275-291 below. Defendants thus knew, or were reckless in not knowing, that the reserve for losses and loss adjustment expenses was materially understated.

### 2. Materially False and Misleading Statements and Omissions Relating to the Third Quarter of 2019

250. As noted above, James River filed its 3Q 2019 Form 10-Q, signed by Defendants Abram and Doran on November 7, 2019, and held its third quarter 2019 earnings call on November 7, 2019.

251. During the November 7, 2019 earnings call, in response to a question from a SunTrust analyst, Defendant Abram stated, "We look at the actual case reserves and we look at our IBNR and measure the pace of claims and ***make a judgment that's a historically well-informed judgment***."

252. The statements set forth in ¶¶250-251 above were materially false and misleading and omitted to state material facts because James River's reserve for losses and loss adjustment expenses reported in the 3Q 2019 Form 10-Q was not primarily based on past loss experience with similar claims. For example:

a. As described in ¶¶63-68 above, on May 5, 2021, Defendant D'Orazio admitted that, despite insuring Uber claims since 2014 and recognizing adverse reserve developments year after year, James River did not primarily rely on its prior "own loss experience," but that doing so "would give us a better and more conservative estimate of ultimate losses on [the Uber] account" as required under GAAP. Using this improper methodology caused James River's reserve for losses and loss adjustment expenses to be materially understated, requiring an adverse reserve development of $170 million.

b. James River had no reserve methodology except to keep reserves low, as described in ¶¶76-78 above. Indeed, James River had no established policies or procedures for claims handlers or their supervisors to follow in setting, monitoring, and adjusting reserves for Uber related claims, as described in ¶¶119-135 above.

c. James River systematically under-reserved on Uber claims by putting caps on reserves and then refusing to increase them based on new information, as described in ¶¶89-92 above.

d. James River "bent over backwards" for Uber, systematically overpaying on Uber claims to avoid embarrassing Uber, thereby causing the claims to be under-reserved, as described in ¶¶89-92 above.

e. James River knowingly hired adjusters with no claims experience, gave them no training, and prevented them from using software that would accurately set reserves, as described in ¶¶93-103, 122-135 above.

f. In addition, as described in ¶¶275-291 below, James River's reported reserves for losses and loss adjustment expenses were (a) not primarily based on James River's past loss experience with similar claims; and (b) not reasonably estimated, in violation of GAAP.

### 3. Materially False and Misleading Statements and Omissions Relating to Fourth Quarter 2019 and Fiscal Year 2019

253. As noted above, James River filed its 2019 Form 10-K, signed by Defendants Abram, Doran, and Myron, on February 27, 2020.

254. In the 2019 Form 10-K, James River described the Company's policy for setting reserves. Specifically, under the heading "Reserve Policy," James River stated:

> ***We continually monitor reserves using new information on reported claims and a variety of statistical techniques and adjust our estimates as experience develops or new information becomes known.*** Such adjustments (referred to as reserve development) are included in current operations. Anticipated inflation is reflected implicitly in the reserving process through analysis of cost trends and the review of historical development.
>
> * * *
>
> In many cases, several years may elapse between the occurrence of an insured loss, the reporting of the loss and our eventual payment of the loss. We establish loss and loss adjustment expense reserves for the ultimate payment of all losses and loss adjustment expenses incurred. ***We estimate the reserve for losses and loss adjustment expenses using individual case-basis valuations of reported claims. We also use statistical analyses to estimate the cost of losses that have been incurred but not reported to us. These estimates are based on historical information*** and on estimates of future trends that may affect the frequency of claims and changes in the average cost of claims that may arise in the future. We also consider various factors such as:
>
> * * *
>
> ***The procedures we use to estimate loss reserves assume that past experience, adjusted for the effects of current developments and anticipated trends, is an appropriate basis for predicting future events***. . . .

255. James River further claimed in the 2019 Form 10-K that "every known claim has a specific case reserve established against it which ***management believes is adequate to resolve the claim and pay attendant expenses based on information available at the time***."

256. The 2019 Form 10-K concluded that James River's "***reserve estimates are reasonable***" and that, "In order to maintain balance sheet integrity, we seek to estimate the amount of future obligations, especially reserves for losses and loss adjustment expenses, ***in a consistent and appropriate fashion***."

257. The statements set forth in ¶¶253-256 above were materially false and misleading because (a) the reserve for losses and loss adjustment expenses reported in the 2019 Form 10-K was materially understated in violation of GAAP; (b) the reserves were not "based on historical information" and James River's reserving procedures did not "assume that past experience . . . is an appropriate basis for predicting future events"; and (c) the reserve estimates were not "reasonable" or estimated "in a consistent and appropriate fashion." For example:

a. As described in ¶¶63-68 above, on May 5, 2021, Defendant D'Orazio admitted that, despite insuring Uber claims since 2014 and recognizing adverse reserve developments year after year, James River did not primarily rely on its prior "own loss experience," but that doing so "would give us a better and more conservative estimate of ultimate losses on [the Uber] account" as required under GAAP. Using this improper methodology caused James River's reserve for losses and loss adjustment expenses to be materially understated, requiring an adverse reserve development of $170 million.

b. James River had no reserve methodology except to keep reserves low, as described in ¶¶76-78 above. Indeed, James River had no established policies or procedures for claims handlers or their supervisors to follow in setting, monitoring, and adjusting reserves for Uber related claims, as described in ¶¶119-135 above.

c. James River systematically under-reserved on Uber claims by putting caps on reserves and then refusing to increase them based on new information, as described in ¶¶79-88 above.

d. James River "bent over backwards" for Uber, systematically overpaying on Uber claims to avoid embarrassing Uber, thereby causing the claims to be under-reserved, as described in ¶¶89-92 above.

e. James River knowingly hired adjusters with no claims experience, gave them no training, and prevented them from using software that would accurately set reserves, as described in ¶¶93-103, 122-135 above.

f. In addition, as described in ¶¶275-291 below, James River's reported reserves for losses and loss adjustment expenses were (a) not primarily based on James River's past loss experience with similar claims; and (b) not reasonably estimated, in violation of GAAP.

258. Further, the statements set forth in ¶¶253-256 above omitted to disclose the material facts that James River (a) had no reserve methodology except to keep reserves low; (b) had no established policies or procedures for claims handlers or their supervisors to follow in setting, monitoring, and adjusting reserves for Uber related claims; (c) systematically under-reserved on Uber claims by putting caps on reserves and then refusing to increase them based on new information; (d) "bent over backwards" for Uber, systematically overpaying on Uber claims to avoid embarrassing Uber, thereby causing the claims to be under-reserved; and (e) knowingly hired adjusters with no claims experience, gave them no training, and prevented them from using software that would accurately set reserves, as described in ¶¶76-103, 119-135 above. In addition, Defendants had no reasonable basis to believe that the reserves were "reasonable" or "adequate" because Defendants knew that the reserving process was defective and that James River had historically under-reserved for claims arising from the Uber Contract, as described in ¶¶76-103, 106-114, and 119-148 above, and ¶¶275-291 below. Defendants thus knew, or were reckless in not knowing, that the reserve for losses and loss adjustment expenses was materially understated.

259. During his prepared remarks on the earnings call held on February 21, 2020, Defendant Abram talked specifically about the reserves relating to run-off of the Uber Account. He stated: "We had two external reserve studies performed at year-end and we did, of course, our own internal work. ***We feel confident about our reserves and the progress we are making in the run-off of the cancelled account***."

260. The statements set forth in ¶259 above were materially false and misleading and omitted to state material facts because the reserves established to handle the run-off were grossly understated. As described in ¶¶63-68 above, on May 5, 2021, Defendant D'Orazio admitted that, despite insuring Uber claims since 2014 and recognizing adverse reserve developments year after year, James River did not primarily rely on its prior "own loss experience," but that doing so "would give us a better and more conservative estimate of ultimate losses on [the Uber] account" as required under GAAP. Using this improper methodology caused James River's reserve for losses and loss adjustment expenses to be materially understated, requiring an adverse reserve development of $170 million. Further, Defendants had no reasonable basis to "feel confident about our reserves and the progress we are making in the run-off of the canceled account" because Defendants knew that the reserving process was defective and that James River had historically under-reserved for claims arising from the Uber Contract, as described in ¶¶76-103, 106-114, and 119-148 above, and ¶¶275-291 below. Defendants thus knew, or were reckless in not knowing, that the reserve for losses and loss adjustment expenses was materially understated. Indeed, the Company's processes for setting reserves was flawed throughout the run-off period, as described in ¶¶76-114 and 136-148 above.

**4. Materially False and Misleading Statements and Omissions Relating to the First Quarter of 2020**

261. As noted above, James River filed its 1Q 2020 Form 10-Q, signed by Defendants Abram and Doran, on April 30, 2020, and held is first quarter of 2020 earnings call also on April 30, 2020.

262. During the earnings call, Defendant Abram told investors that the problems with the reserves for James River's Uber Account were now in the past and that the runoff of the Uber Account was going well. Specifically, Defendant Abram stated, without qualification, "The run

off of the large commercial account is going well. ***We're settling commercial auto claims at a rapid pace for amounts that are consistent with our held reserves***."

263. The statements set forth in ¶262 above were materially false and misleading and omitted to state material facts because the reserves established to handle the run-off were grossly understated. As described in ¶¶63-68 above, on May 5, 2021, Defendant D'Orazio admitted that, despite insuring Uber claims since 2014 and recognizing adverse reserve developments year after year, James River did not primarily rely on its prior "own loss experience," but that doing so "would give us a better and more conservative estimate of ultimate losses on [the Uber] account" as required under GAAP. Using this improper methodology caused James River's reserve for losses and loss adjustment expenses to be materially understated, requiring an adverse reserve development of $170 million. Further, Defendants had no reasonable basis to believe that James River was "settling commercial auto claims at a rapid pace for amounts that are consistent with our held reserves" because Defendants knew that the reserving process was defective and that James River had historically under-reserved for claims arising from the Uber Contract, as described in ¶¶76-103, 106-114, and 119-148 above, and ¶¶275-291 below. Defendants thus knew, or were reckless in not knowing, that the reserve for losses and loss adjustment expenses was materially understated. Indeed, the Company's processes for setting reserves was flawed throughout the run-off period, as described in ¶¶76-114 and 136-148 above.

### 5. Materially False and Misleading Statements and Omissions Relating to Fourth Quarter Fiscal 2020 and Fiscal Year 2020

264. As noted in ¶206, James River filed its 2020 Form 10-K, signed by Defendants D'Orazio, Abram, and Doran, on February 26, 2021.

265. In the 2020 Form 10-K, James River described the Company's policy for setting reserves. Specifically, under the heading "Reserve Policy," James River stated:

> ***We continually monitor reserves using new information on reported claims and a variety of statistical techniques and adjust our estimates as experience develops or new information becomes known.*** Such adjustments (referred to as reserve development) are included in current operations. Anticipated inflation is reflected implicitly in the reserving process through analysis of cost trends and the review of historical development.
>
> * * *
>
> In many cases, several years may elapse between the occurrence of an insured loss, the reporting of the loss and our eventual payment of the loss. We establish loss and loss adjustment expense reserves for the ultimate payment of all losses and loss adjustment expenses incurred. ***We estimate the reserve for losses and loss adjustment expenses using individual case-basis valuations of reported claims. We also use statistical analyses to estimate the cost of losses that have been incurred but not reported to us. These estimates are based on historical information*** and on estimates of future trends that may affect the frequency of claims and changes in the average cost of claims that may arise in the future. We also consider various factors such as:
>
> * * *
>
> ***The procedures we use to estimate loss reserves assume that past experience, adjusted for the effects of current developments and anticipated trends, is an appropriate basis for predicting future events*** . . . .

266. James River further claimed in the 2020 Form 10-K that "every known claim has a specific case reserve established against it which ***management believes is adequate to resolve the claim and pay attendant expenses based on information available at the time***."

267. The 2020 Form 10-K stated that James River's "***reserve estimates are reasonable***" and that, "In order to maintain balance sheet integrity, we seek to estimate the amount of future obligations, especially reserves for losses and loss adjustment expenses, ***in a consistent and appropriate fashion***."

268. The statements set forth in ¶¶265-267 above were materially false and misleading because (a) the reserve for losses and loss adjustment expenses reported in the 2020 Form 10-K was materially understated in violation of GAAP; (b) the reserves were not "based on historical information" and James River's reserving procedures did not "assume that past experience . . . is

an appropriate basis for predicting future events"; and (c) the reserve estimates were not "reasonable" or estimated "in a consistent and appropriate fashion." For example:

a. As described in ¶¶63-68 above, on May 5, 2021, Defendant D'Orazio admitted that, despite insuring Uber claims since 2014 and recognizing adverse reserve developments year after year, James River did not primarily rely on its prior "own loss experience," but that doing so "would give us a better and more conservative estimate of ultimate losses on [the Uber] account" as required under GAAP. Using this improper methodology caused James River's reserve for losses and loss adjustment expenses to be materially understated, requiring an adverse reserve development of $170 million.

b. James River had no reserve methodology except to keep reserves low, as described in ¶¶76-78 above. Indeed, James River had no established policies or procedures for claims handlers or their supervisors to follow in setting, monitoring, and adjusting reserves for Uber related claims, as described in ¶¶119-135 above.

c. James River systematically under-reserved on Uber claims by putting caps on reserves and then refusing to increase them based on new information, as described in ¶¶79-88 above.

d. James River "bent over backwards" for Uber, systematically overpaying on Uber claims to avoid embarrassing Uber, thereby causing the claims to be under-reserved, as described in ¶¶89-92 above.

e. James River knowingly hired adjusters with no claims experience, gave them no training, and prevented them from using software that would accurately set reserves, as described in ¶¶93-103, 122-135 above.

f. In addition, as described in ¶¶275-291 below, James River's reported reserves for losses and loss adjustment expenses were (a) not primarily based on James River's past loss experience with similar claims; and (b) not reasonably estimated, in violation of GAAP.

269. Further, the statements set forth in ¶¶265-267 above omitted to disclose the material facts that James River (a) had no reserve methodology except to keep reserves low; (b) had no established policies or procedures for claims handlers or their supervisors to follow in setting, monitoring, and adjusting reserves for Uber related claims; (c) systematically under-reserved on Uber claims by putting caps on reserves and then refusing to increase them based on new information; (d) "bent over backwards" for Uber, systematically overpaying on Uber claims to

avoid embarrassing Uber, thereby causing the claims to be under-reserved; and (e) knowingly hired adjusters with no claims experience, gave them no training, and prevented them from using software that would accurately set reserves, as described in ¶¶76-103 and 119-135 above. In addition, Defendants had no reasonable basis to believe that the reserves were "reasonable" or "adequate" because Defendants knew that the reserving process was defective and that James River had historically under-reserved for claims arising from the Uber Contract, as described in ¶¶76-103, 106-114, and 119-148 above, and ¶¶275-291 below. Defendants thus knew, or were reckless in not knowing, that the reserve for losses and loss adjustment expenses was materially understated.

## VI. THE STANDARDS AND REGULATIONS GOVERNING THE CALCULATION AND REPORTING OF THE RESERVE FOR LOSSES AND LOSS ADJUSTMENT EXPENSES

### A. GAAP Governs The Calculation Of Reserve Losses And Loss Adjustment Expenses

270. Financial statements (including footnote disclosures) are a central feature of financial reporting and are a principal means of communicating financial information to external parties, such as investors. For companies such as James River, the accounting profession (and the SEC) recognize Generally Accepted Accounting Principles ("GAAP") as the uniform rules, conventions, and procedures necessary to define and reflect accepted accounting practices at a particular time. SEC Regulation S-X states that financial statements filed with the SEC that are not prepared and presented in accordance with GAAP "will be presumed to be misleading or inaccurate, despite footnotes or other disclosures." 17 C.F.R. § 210.4-01(a)(1). Violations of GAAP, therefore, bear on whether SEC regulations for publicly-traded companies, such as James River, have been properly followed and satisfied.

271. GAAP are primarily promulgated by the Financial Accounting Standards Board ("FASB") and are codified into a system that has been accepted by the SEC as the framework by which public companies must report their financial position and the results of their operations (among other things)—i.e., SEC regulations require that public company financial statements be prepared in conformity with GAAP. Beginning with the year 2009, the FASB codified its accounting standards into a system whereby pertinent sections are organized and referenced by the acronym ASC ("Accounting Standards Codification"). These ASCs represent the source of authoritative GAAP for nongovernmental entities, including James River. (ASC 105, *Generally Accepted Accounting Principles*, section 10-05-1).

272. The framework for the accounting standards that make up the ASCs within GAAP is set out in, among other places, Statements of Financial Accounting Concepts ("FASCON"). To that end, FASCON 8, *Conceptual Framework for Financial Reporting* ("FASCON 8"), states:

> Financial reports represent economic phenomena in words and numbers. To be useful, financial information not only must represent relevant phenomena, but it also must faithfully represent the phenomena it purports to represent. To be a perfectly faithful representation, a depiction would have three characteristics. It would be complete, neutral, and free from error.

FASCON 8, ¶QC12.

273. In each of its quarterly and annual financial statements during the Class Period, James River reported a reserve for losses and loss adjustment expenses. That reserve for losses and loss adjustment expenses purported to reflect the costs that James River estimated it would incur to ultimately settle unpaid claims. As the Company stated in its 2018, 2019, and 2020 Forms 10-K, "We establish loss and loss adjustment expense reserves for the ultimate payment of all losses and loss adjustment expenses incurred."

274. The accounting for the reserve for losses and loss adjustment expenses is governed by specific, applicable standards within GAAP, and because James River reported this reserve as part of its financial statements, those figures must comply with GAAP.

**B. James River Admitted That Its Reserve Methodology Violated GAAP**

275. As Defendant Abram admitted on James River's November 7, 2019 earnings call, James River "mispriced the risk" of the Uber Contract because "[o]ur underwriting assumptions and the related pricing did not keep pace with changes in Uber's business." Eighteen months later, Defendant D'Orazio stunningly added additional detail acknowledging that James River utterly failed to comply with GAAP, conceding that the Company changed its methodology for determining and reporting its reserve for losses and loss adjustment expenses, primarily as a result of the Uber Contract. Defendant D'Orazio ***admitted*** that the new methodology used "only our own loss experience in our paid and incurred reserve projections rather than the array of inputs that we had used in prior quarters," which gave James River "a better and more conservative estimate of ultimate losses."

**C. James River Violated GAAP By Calculating Reserves That Were Not Primarily Based On Past Experience With Similar Claims**

276. GAAP requires that the primary information that a company should use to determine the ultimate expected cost to settle its unpaid claims (i.e., what James River reports as the "reserve for losses and loss adjustment expenses") is the company's past experience with similar claims.

277. Specifically, ASC 944-40-30-1 provides that an insurance company's estimates of the costs it will incur to settle unpaid claims should be determined "using past experience adjusted for current trends, and any other factors that would modify past experience."

278. Similarly, paragraph 4.34 of the *Audit and Accounting Guide for Property and Liability Insurance Entities* issued by the American Institute of Certified Public Accountants ("AICPA") states that the various techniques insurance companies use to determine their reserves for losses and loss adjustment expenses "generally consist of statistical analyses of historical information." According to paragraph 4.35 of the AICPA guide, "Understanding and assessing . . . the reliability of historical experience as an indicator of future loss payments require[s] a careful analysis of the historical loss data and the use of projection methods that are sensitive to the particular circumstances."

279. Paragraph 4.23 of the AICPA guide further provides that one of the three "most important factors" an insurance company should consider for "purposes of establishing an appropriate financial statement reserve" is "the historical adequacy or inadequacy of total reserves." Thus, GAAP required James River to calculate reserves for losses and loss adjustment expenses that were primarily based on the Company's past experience with similar claims, including whether its reserves had historically been adequate or inadequate. Indeed, in its 2018, 2019, and 2020 Forms 10-K, James River told investors that its estimates for its reserve for losses and loss adjustment expenses "are based on historical information" and that "[t]he procedures we use to estimate loss reserves assume that past experience . . . is an appropriate basis for predicting future events."

280. James River violated GAAP by calculating and reporting reserves for losses and loss adjustment expenses that were not primarily based on the Company's past experience with similar claims. Indeed, on May 5, 2021, Defendants admitted that James River had historically failed to primarily use its "own loss experience" in calculating its reserve for losses and loss

adjustment expenses on the Uber Account and that this failure resulted in a $170 million adverse reserve development—an expense and charge to income.

281. As set forth in Section IV, James River's past experience with the Uber Contract revealed that James River's losses on the claims arising from the Uber Contract were consistently significantly higher than the reserve for losses and loss adjustment expenses that it had previously established. Rather than take actual losses and then-recent loss experience into account in adjusting the loss reserves on Uber-related claims—as required by GAAP—James River, incredibly, kept its reserves artificially low from the moment a claim was filed and then refused to increase those reserves based on its past loss experience with similar claims, as required by GAAP.

282. As set forth in ¶¶76-78 and 119-135 above, James River had no reserve methodology except to keep reserves low. Further, James River systematically under-reserved on Uber-related claims, as described in ¶¶79-88 above. For example, James River directed its claims adjusters to stay within well-defined reserve limits, regardless of new facts impacting the expected claims exposure. In addition, adjusters were routinely forced to cut and reduce their estimates of reserves on claims they processed. Claims employees were also required to draft time-consuming reports known as LLRs to increase the reserves set on certain Uber-related claims, which they did not do and thus, contributed to under-reserving. James River "bent over backwards" for Uber, systematically overpaying on Uber claims to avoid embarrassing Uber, as described in ¶¶89-92 above. James River also knowingly hired adjusters with no claims experience, gave them no training, and prevented them from using software that would accurately set reserves, as described in ¶¶93-103 and 122-135 above. As a result of these issues, James River's reserves for losses and loss adjustment expenses were not primarily based on its past loss experience with similar claims.

283. Indeed, the Company's past loss experience included the fact that James River recognized adverse reserve developments (i.e., expenses recorded to increase previously-determined loss estimates) for its E&S segment in each calendar year from 2017 through 2020, which it attributed to claims from the Uber Contract. Specifically, in its 2020 10-K, James River disclosed the favorable/(adverse) reserve developments for each of its business segments for the calendar years 2011 through 2020, including the following adverse reserve developments for E&S:

| **Calendar Year** | **Excess & Surplus Lines Adverse Reserve Development** |
|---|---|
| 2020 | (59,437) |
| 2019 | (51,173) |
| 2018 | (15,012) |
| 2017 | (20,023) |

284. These adverse reserve developments demonstrate that James River was continuously underestimating its reserve for losses and loss adjustment expenses for the Uber Contract. However, James River continued to report materially understated reserves for losses and loss adjustment expenses that violated GAAP.

285. Accordingly, Defendants' failure to report reserves for losses and loss adjustment expenses for claims on the Uber Contract that were primarily based on James River's past loss experience with similar claims on the Uber Contract violated GAAP.

**D. James River Violated GAAP By Recording Reserves For Losses That Were Not Reasonably Estimated**

286. GAAP further requires that loss contingencies, including a company's reported reserve for losses and loss adjustment expenses, reflect losses that are reasonably estimated.

287. Specifically, ASC 450-20-25-2, *Loss Contingencies*, provides that an "estimated loss from a loss contingency shall be accrued by a charge to income" if (a) "information available before the financial statements are issued or are available to be issued . . . indicates that it is

probable that . . . a liability had been incurred at the date of the financial statements," and (b) "***the amount of loss can be reasonably estimated***."

288. Thus, GAAP requires that the expected loss on claims reported by James River in its reserves for losses and loss adjustment expenses be reasonably estimated. Indeed, James River represented in its Forms 10-K for 2018, 2019, and 2020 that its "reserve estimates are reasonable" and that, "[i]n order to maintain balance sheet integrity, we seek to estimate the amount of future obligations, especially reserves for losses and loss adjustment expenses, in a consistent and appropriate fashion."

289. James River violated GAAP by not reasonably estimating expected losses on claims when reporting its reserve for losses and loss adjustment expenses.

290. As set forth in Section IV above, James River failed to reasonably estimate its reserves for losses on claims from the Uber Contract during the Class Period.

291. As set forth in ¶¶76-78 and 119-135 above, James River had no reserve methodology except to keep reserves low. Further, James River systematically under-reserved on Uber-related claims, as described in ¶¶79-88 above. For example, James River directed its claims adjusters to stay within well-defined reserve limits, regardless of new facts impacting the expected claims exposure. In addition, adjusters were routinely forced to cut and reduce their estimates of reserves on claims they processed. Claims employees were also required to draft time-consuming reports known as LLRs to increase the reserves set on certain Uber-related claims, which they did not do and thus, contributed to under-reserving. James River "bent over backwards" for Uber, systematically overpaying on Uber claims to avoid embarrassing Uber, as described in ¶¶89-92 above. James River also knowingly hired adjusters with no claims experience, gave them no training, and prevented them from using software that would accurately set reserves, as described

in ¶¶93-103 and 122-135 above. As a result of these issues, James River did not reasonably estimate expected losses on claims when reporting its reserves for losses and loss adjustment expenses.

292. Accordingly, Defendants' failure to reasonably estimate expected losses on claims when reporting James River's reserve for losses and loss adjustment expenses violated GAAP.

## VII. THE LAWS AND REGULATIONS GOVERNING INTERNAL CONTROLS OVER FINANCIAL REPORTING

### A. Public Companies Are Required To Implement Internal Controls Over Financial Reporting And Ensure They Are Effective

293. Public companies that file reports with the SEC, like James River, are required to design and implement two separate, but related, systems of internal controls to ensure that their representations to investors—both financial and non-financial—are complete and accurate: "disclosure controls and procedures" and "internal controls over financial reporting" (otherwise referred to as ICFR).

294. Under the Exchange Act of 1934, SEC filers must maintain "disclosure controls and procedures" such that information required to be disclosed by a company is addressed within the organization and communicated to company management, including its CEO and CFO, sufficiently in advance of the company's filing dates, to allow senior management ample time to consider the information and to develop proper disclosures in its filings. Disclosure controls and procedures pertain to, generally, the common set of accounting principles, standards, and procedures that United States companies use to compile their financial statements, and which may include, as an example, components meant to provide reasonable assurances that allowances are recorded properly by the Company, and to ensure that the Company's financial statements (including the footnotes thereto) are prepared in accordance with GAAP.

295. Likewise, ICFR are designed by or under the supervision of a company's CEO and CFO to provide reasonable assurances that a company's financial statements are accurate, reliable, and prepared in accordance with GAAP before they are shared with investors in, for example, Forms 10-Q and 10-K. Management is required to review and evaluate these controls on a quarterly basis to determine whether they are designed and operating effectively to prevent or detect, in a timely manner, material misstatements in the company's financial statements.

296. The foregoing obligations are outlined in several established laws and regulations, generally emanating from the Sarbanes-Oxley Act of 2002. Section 302 of the Sarbanes-Oxley Act of 2002, 15 U.S.C. § 7241 ("SOX 302") intends to ensure that a public company's CEO and CFO take a proactive role in their company's public disclosure and to give investors confidence in the accuracy, quality, and reliability of a company's periodic SEC reports. More specifically, the CEO and CFO of public companies are required to certify both that a company's quarterly and annual reports filed with the SEC have been prepared in accordance with GAAP and that the disclosure controls and procedures are designed and were operating effectively during the periods for which financial information is being reported on Forms 10-Q and 10-K.

297. Under SOX 302, the CEO and CFO must certify that: (1) they have reviewed the periodic quarterly or annual report that contains the company's financial statements; (2) that report does not contain any untrue statement of material fact or omit to state a material fact necessary to make any statements made not misleading; (3) based on their knowledge, the financial statements and other financial information fairly present the financial condition and results of operations of the company; (4) the company has maintained disclosure controls and procedures and has designed such controls to ensure that all material information is made known to them and to provide reasonable assurance regarding the reliability of financial information; and (5) they have disclosed

to the audit committee and auditors all significant deficiencies and material weaknesses in the design or operation of internal controls. These certifications communicate to investors that all material information required to be disclosed is contained in the report.

298. Item 307 of SEC Regulation S-K, 17 CFR § 229.307, also requires that a company disclose the conclusions of its CEO and CFO regarding the effectiveness of the company's disclosure controls and procedures as of the end of the period covered by the periodic report, in view of the established framework and the company's periodic assessment thereof.

299. Section 404 of SOX, 15 U.S.C. § 7262 ("SOX 404"), requires that management of a public company and its outside auditor annually evaluate the effectiveness of the company's internal controls over financial reporting and disclose the conclusion of that evaluation, including, specifically, any material weaknesses found in ICFR, to investors. Under the Public Company Accounting Oversight Board's ("PCAOB") standards established for the conduct of quarterly reviews and annual audits by independent accountants, a "material weakness" in internal controls over financial reporting is a control deficiency that gives rise to a reasonable possibility that a material misstatement of a company's annual or interim financial statements will not be prevented or detected on a timely basis. A "significant deficiency," by contrast, is a deficiency in internal control over financial reporting that is less severe than a material weakness, but important enough to merit attention by those responsible for oversight of a company's financial reporting.

300. SOX 404 reiterates the need for public company management to establish and maintain a system of internal controls relating to, among other things, financial reporting, and to document, test, and maintain those controls and procedures to ensure their effectiveness, as well as to assess and report on the design and operating effectiveness of internal controls over financial

reporting on an annual basis. SOX 404 was "intended to bring information about material weaknesses [in internal controls] into public view." SEC Release 33-8810.

301. In developing and reporting on the required framework for internal controls, most companies, including James River, adopt a framework established by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). The COSO Framework states: "Internal control is a process, effected by an entity's board of directors, management, and other personnel, designed to provide reasonable assurance regarding the achievement of objectives in the following categories: (i) effectiveness and efficiency of operations; (ii) reliability of financial reporting; and (iii) compliance with applicable laws and regulations."

302. COSO identifies interrelated components of internal control: control environment, risk assessment, control activities, information and communication, and monitoring. Most relevant to this litigation, the "information and communication" component of the COSO Framework requires that an "organization obtains or generates and uses relevant, quality information to support the functioning of internal control; internally communicates information, including objectives and responsibilities for internal control, necessary to support the functioning of internal control; and communicates with external parties regarding matters affecting the functioning of internal control."

303. Item 308 of Regulation S-K, 17 CFR § 229.308(a)(3) ("Item 308") then requires that a company provide annual reports on the state of its internal controls over financial reporting containing a statement of management's responsibility for maintaining adequate internal controls, identifying the framework used by management to evaluate the effectiveness of the internal controls, and the assessment of the effectiveness of the internal controls. Under Item 308, "Management is not permitted to conclude that the registrant's internal control over financial

reporting is effective if there are one or more material weaknesses in the registrant's internal control over financial reporting." A statement that internal controls over financial reporting are effective is, therefore, an assertion by management that there are no material weaknesses in such internal controls.

304. In addition to management's annual report on internal controls over financial reporting, SEC Regulation § 240.13a-15(d) requires that companies such as James River evaluate any change in its internal controls over financial reporting that occur during each of its fiscal quarters. After such evaluation, Item 308 requires that a company disclose any change to its internal controls over financial reporting during its last fiscal quarter.

**B. James River Violated The Laws And Regulations Governing Internal Controls**

305. James River violated the laws and regulations governing internal controls because during the Class Period, James River's disclosure controls and procedures were not effective and its ICFR contained material weaknesses, rendering them inadequate and ineffective throughout the Class Period.

306. As set forth in ¶¶76-78 and 119-135 above, James River had no reserve methodology except to keep reserves low. Further, James River systematically under-reserved on Uber-related claims, as described in ¶¶79-88 above. For example, James River directed its claims adjusters to stay within well-defined reserve limits, regardless of new facts impacting the expected claims exposure. In addition, adjusters were routinely forced to cut and reduce their estimates of reserves on claims they processed. Claims employees were also required to draft time-consuming reports known as LLRs to increase the reserves set on certain Uber-related claims, which they did not do and thus, contributed to under-reserving. James River "bent over backwards" for Uber, systematically overpaying on Uber claims to avoid embarrassing Uber, as described in ¶¶89-92 above. James River also knowingly hired adjusters with no claims experience, gave them no

training, and prevented them from using software that would accurately set reserves, as described in ¶¶93-103 and 122-135 above. As a result of these issues, James River's disclosure controls and procedures were not effective and its ICFR contained material weaknesses.

## VIII. ADDITIONAL SCIENTER ALLEGATIONS

### A. Senior James River Management Reviewed And Approved The Company's Reserves For Losses And Loss Adjustment Expenses

307. As set forth above and further below, numerous facts demonstrate that the Executive Defendants and James River knew or were, at a minimum, reckless in not knowing that Defendants' statements identified in Section V were materially false and misleading when made. The scienter of James River as a corporate entity is derived from the scienter of its executives, including the Executive Defendants and senior James River executives Richard Schmitzer, Courtenay Warren, and Anita Rogers.

a. As CEO of James River's E&S segment, Schmitzer is an agent of James River Group Holdings, and his scienter should be imputed to Defendant James River. Specifically, Schmitzer's employment contract—which was filed as an exhibit to James River's 2018 Form 10-K—provides that he is directly employed by James River Group, Inc. (i.e., "The Parent Company"). The contract also provides that Schmitzer "shall report exclusively and directly to the Chief Executive Officer of the Parent Company." The contract is signed by Defendants Myron and Doran, and Schmitzer's employment can only be terminated by James River Group, Inc. Moreover, the Company listed Schmitzer as an Executive Officer in its SEC filings throughout the Class Period, including its Proxy Statements dated April 2, 2019, March 31, 2020, and September 21, 2021.

b. As a former high-ranking executive of James River Insurance, Anita Rogers is an agent of James River Group Holdings, and her scienter should be imputed to Defendant James River. Rogers served as Vice President of Claims at James River Insurance from 2018 to 2021 and Director of Claims at James River Insurance from 2016 to 2018.

c. As a former high-ranking executive of James River Insurance, Courtenay Warren is an agent of James River Group Holdings, and her scienter should be imputed to Defendant James River. Warren served as James River Insurance's Senior Vice President and Chief Claims Officer from 2018 to 2021, Vice President of Claims from 2016 to 2021; Assistant Vice President of Claims from 2015 to 2016; and Director of Claims from 2013 to 2015.

308. The Company's own disclosures confirm that senior James River management—including Defendants Abram, Myron, D'Orazio, Doran, and Executive Officer Schmitzer—reviewed and approved the Company's reserves for losses and loss adjustment expenses.

309. James River described how senior management reviewed and approved the Company's reserves for losses and loss adjustment expenses in each Form 10-K that the Company issued during the Class Period, including the 2018 Form 10-K signed by Defendants Myron, Abram and Doran, the 2019 Form 10-K signed by Defendants Myron, Abram and Doran, and the 2020 Form 10-K signed by Defendants D'Orazio, Doran, and Abram.

310. Each Class Period Form 10-K described James River's Reserve Committee's membership and responsibilities to review the reserve. First, the Reserve Committee was comprised of the Company's Chief Actuary, Chief Executive Officer, President and Chief Operating Officer, Chief Financial Officer, and Chief Accounting Officer. As such, the Reserve Committee included Defendant Myron (the Company's CEO from January 2017 through August 2019 and President and Chief Operating Officer from August 2019 to the present), Defendant Abram (the Company's CEO from August 2019 through October 2020), Defendant D'Orazio (the Company's CEO from November 2020 to the present), and Defendant Doran (the Company's CFO from January 2017 to the present). In addition, each of the Forms 10-K provided that the "presidents, chief financial officers and chief actuaries of each of [the Company's] three insurance segments assist in the evaluation of reserves in their respective segments." The Reserve Committee thus includes Schmitzer, the President and CEO of James River's E&S segment during the Class Period.

311. Each of the Forms 10-K further describes the Reserve Committee's responsibilities as (a) reviewing, (b) determining, (c) monitoring, and (d) approving James River's reserves.

Specifically, the Forms 10-K provide that the Reserve Committee (a) "meets quarterly to review the actuarial recommendations made by each chief actuary"; (b) uses its best judgment to determine the best estimate to be recorded for the reserve for losses and loss adjustment expenses on our quarterly balance sheet"; (c) "continually monitor reserves using new information on reported claims and a variety of statistical techniques and adjust our estimates as experience develops or new information becomes known"; and (d) "review[s]" and "approve[s]" the reserve for losses and loss adjustment expenses.

312. The Forms 10-K reiterated that senior management reviewed the reserves at least quarterly, and that the settlement authority of front-line adjusters was intentionally kept low:

> Senior management reviews each case above a specified amount at least quarterly to evaluate whether the key issues in the case are being considered and to monitor case reserve levels. We keep the settlement authority of front-line adjusters low to ensure the practice of having two or more members of the department participate in the decision as to whether to settle or defend.

313. Lead Counsel's investigation corroborates the Company's statements. As described in more detail in ¶¶78, 84-85, 110-114, and 142-146 above and ¶¶340-341 below, former employees of James River, including FE11, Rogers, Belcher, and Slaughter, have confirmed that senior James River management, including Schmitzer, Rogers, and Warren, were intimately involved in reviewing and approving the Company's reserves for Uber claims. For example, Rogers testified that in her role as VP of Claims, she "monitored reserves in the department as a whole' and conducted "informal file audits" and reviewed files. She further testified that part of that review included the determination of "whether or not the reserves were accurately set." Further, as described in more detail in ¶¶87-88, 106-114 above, FE3, FE10, and FE11 explained that the Company's LLRs for Uber claims over a certain threshold and reserve reports were sent to Warren, Rogers, and sometimes Schmitzer for their review and approval. Further, as described in more detail in ¶¶113-114 and 136-148 above and Section VIII(F) below, FE11, FE12, Belcher,

and Slaughter described how, after James River cancelled the Uber Contract, the Company created a "PLM" inbox, to which reserves exceeding a certain dollar amount were sent for review by Warren, Rogers, and Schmitzer. Belcher and Slaughter further described that James River employees were instructed not to discuss the PLM account.

314. The fact that senior James River executives, including the Executive Defendants, reviewed, determined, monitored, and approved James River's reserves for losses and loss adjustment expenses during the Class Period supports a strong inference of scienter with respect to the materially understated reserves for losses and loss adjustment expenses and related metrics that the Company reported in its financial statements during the Class Period, as well as the unprofitability of the Uber Contract, and the Company's flawed reserves processes.

### B. Senior James River Management Met Regularly To Discuss James River's Uber Reserves

315. In addition to the Reserve Committee's quarterly meetings discussed in ¶107 above, Lead Counsel's investigation confirms that senior James River executives also participated in regular meetings specifically regarding reserves for Uber claims.

316. For instance, as described in more detail in ¶¶92 and 110-113 above, FE13, FE10 and FE3 noted that the Company's top executives reviewed audit reports regarding the Uber claims and Uber was often in the room to conduct their own audits.

317. The fact that senior James River executives personally attended and participated in meetings concerning reserves for claims on the Company's Uber Account supports a strong inference of Defendants' scienter with respect to the materially understated reserves for losses and loss adjustment expenses and related metrics that the Company reported in its financial statements during the Class Period, as well as the unprofitability of the Uber Contract, and the Company's flawed reserves processes.

### C. Senior James River Management Received Reserve Reports And Audited James River's Uber Reserves

318. Lead Counsel's investigation confirms that senior James River management was personally involved in auditing reserves for claims under the Uber Account.

319. As described in more detail in ¶¶110-113 above, FE3 explained that the Company's "reserve reports"—which were titled "Rasier [Uber] Reserves Audit"—came from Anita Rogers and Donna Jefferson, and Schmitzer's name was included on them. FE10 also related that Rogers and Warren were involved in the QA audit process.

320. The fact that senior James River executives personally received reserve reports and participated in audits of claims on the Company's Uber Account supports a strong inference of Defendants' scienter with respect to the materially understated reserves for losses and loss adjustment expenses and related metrics that the Company reported in its financial statements during the Class Period, as well as the unprofitability of the Uber Contract and the Company's flawed reserves processes.

### D. Defendants' Own Admissions And The Magnitude Of The $170 Million Charge Establish Scienter

321. Given that senior James River executives repeatedly represented that they closely monitored the Uber reserve, the stunning $170 million shortfall could not have gone unnoticed. Indeed, as set forth in ¶¶63-70 above, the $170 million charge represented ***over 50%*** of the entire Commercial Auto Division's $337 million net reserves reported in James River's 2020 Form 10-K. Moreover, the $170 million charge exceeded all of James River's prior adverse reserve developments in the E&S Lines in the eight quarters since the Class Period began, ***combined***. Indeed, the $170 million charge resulted in a net quarterly loss to James River of $103.5 million. This loss was nearly ***three times*** greater than the largest quarterly income loss the Company had ever reported—$36.8 million—and completely wiped out the $54.7 million in profit that the

Company had reportedly earned over the nine prior quarters of the Class Period. Moreover, the charge was more than three times greater than the profit that the Company had reported for the prior two and a half years.

322. Additionally, Defendants' close monitoring of the Uber Account would have revealed that James River was employing a completely incorrect and worthless methodology to calculate reserves. Indeed, on May 5, 2021, Defendant D'Orazio—who admittedly made it his "***personal goal to be able to eliminate the overhang surrounding [the] Commercial Auto runoff***"—conceded openly on May 5, 2021 that "***we got it wrong***." Specifically, D'Orazio explained that James River "***meaningfully changed our actuarial methodology***," admitting that "using only our own loss experience in our paid and incurred reserve projections rather than the array of inputs that we had used in prior quarters, and giving greater weight to incurred methods would give us ***a better and more conservative estimate of ultimate losses on this account***." As Defendant D'Orazio further acknowledged, "The result in the changed methodology is significant . . . ."

**E. Senior James River Management Oversaw And Maintained A Company Policy Of Under-Reserving**

323. Lead Counsel's investigation confirms that James River's policy required claims employees to under-reserve and that the Company maintained procedures and practices that resulted in under-reserving. Senior James River executives, who received their instructions from the Company's c-suite, oversaw and maintained this policy.

**1. Senior James River Management Directed Claims Employees To Under-Reserve And To Stay Within Reserve Limits Regardless Of Actual Claim Exposure**

324. As described in ¶¶76-78, 84, 94, and 136-148 above, former employees of the Company have explained that James River policy required the Company's claims employees to set reserves too low and to stay within reserve limits, regardless of potential claim exposure.

325. The existence of a policy at James River that required the Company's claims employees to set reserves too low and to stay within reserve limits, regardless of potential claim exposure supports an inference of Defendants' scienter with respect to the materially understated reserves for losses and loss adjustment expenses and related metrics that the Company reported in its financial statements during the Class Period, as well as the unprofitability of the Uber Contract and the Company's flawed reserves processes.

**2. Senior James River Management Prevented Claims Employees From Increasing Reserves Based on Actual Loss Experience**

326. As described in ¶¶79-88 and 136-148 above, former employees of the Company have explained that James River policy, directed by senior James River management, prevented claims employees from appropriately increasing reserves based on actual loss experience.

327. The existence of internal James River policies, directed by senior James River management, that prevented claims employees from appropriately increasing reserves based on actual loss experience supports an inference of Defendants' scienter with respect to the materially understated reserves for losses and loss adjustment expenses and related metrics that the Company reported in its financial statements during the Class Period, as well as the unprofitability of the Uber Contract and the Company's flawed reserves processes.

**3. The Company Maintained No Formal Reserving Processes And Knowingly Failed To Train Employees On Proper Reserving**

328. Defendants repeatedly assured investors throughout the Class Period that James River maintained a comprehensive and robust "Reserve Policy" for the setting, monitoring, and adjusting of reserves for reported and unreported Uber claims. The Company specifically assured

investors that it "continually monitor[ed] reserves using new information on reported claims and a variety of statistical techniques and adjust our estimates as necessary as experience develops or new information becomes known"—including, specifically, "individual case-basis valuations" to reserves for reported claims, and sophisticated "statistical analyses" to set reserves for incurred but unreported claims." Indeed, each of the Company's Forms 10-K unequivocally assured investors that "every known claim ha[d] a specific case reserve established against it which management believes is adequate to resolve the claim and pay attendant expenses based on information available at the time." However, more than a half dozen former employees, including multiple senior claims personnel, have described how these statements were lies.

329. As described in more detail in ¶¶93-103 and 119-136 above, former employees of the Company, including FE6, FE3, FE1, FE12, Rogers, Slaughter, and Belcher have explained that the Company maintained no formal processes for setting reserves, and knowingly failed to train its new employees on reserving practices. This process persisted even after the Company placed the Uber Account into runoff. As FE12 confirmed, James River did not have a formalized training program for new hires until 2020. Rogers repeatedly testified that she could not "recall" and did not "know" if the Company had policies or procedures for setting, adjusting, or monitoring reserves on Uber-related claims. When asked, "Were there any policies and procedures that you recall in place regarding how to adjust the reserve when you were at James River?" Slaughter similarly testified, "No." Belcher and Slaughter confirmed that no formal training program existed, and that they received no formal training, when they began their tenures at James River.

330. The Company's Reserve Committee—on which Defendants and other high-ranking James River executives sat—oversaw the Company's reserving process and thus knew or were

reckless in not knowing that the Company lacked formal processes for reserving and provided no training on reserving for new employees.

331. Defendants' failure to maintain formal processes for setting reserves and/or to train Company employees in proper reserving processes supports an inference of their scienter with respect to the materially understated reserves for losses and loss adjustment expenses and related metrics that the Company reported in its financial statements during the Class Period, as well as the unprofitability of the Uber Contract and the Company's flawed reserves processes.

### 4. The Company Hired Inexperienced Personnel To Handle The Influx Of Claims From The Uber Account

332. As described in more detail in ¶¶97-99, 125, and 133 above, former employees of James River described that the Company experienced "hypergrowth" after signing the Uber Contract. As a result, the Company began aggressively hiring claims personnel to manage the influx of claims it was processing from Uber. As described in more detail in ¶¶100-101 above, the Company's problems with inexperienced staff, personnel shortages, and an influx of claims continued and worsened after the Company placed the Uber Account into runoff.

333. Senior James River management knew or were reckless in not knowing about the Company's hiring spree, as well as the Company's practice of hiring inexperienced personnel in critical claims roles, particularly given the importance of the Uber Contract to the Company and the Company's small size prior to the commencement of the Uber Contract.

334. Defendants' awareness of the "hypergrowth" of James River's claims department in order to service the Uber Contract, the Company's hiring of inexperienced claims employees, and the Company's failure to fill positions for employees who quit in the claims department after the cancellation of the Uber Contract supports an inference of Defendants' scienter with respect to the materially understated reserves for losses and loss adjustment expenses and related metrics that

the Company reported in its financial statements during the Class Period, as well as the unprofitability of the Uber Contract and the Company's flawed reserves processes.

#### 5. The Company Maintained Outdated, Dysfunctional Technology For Setting Reserves

335. As described in more detail in ¶¶102-103 above, former employees of James River, including FE8, have described that the Company maintained dysfunctional, outdated systems and technology for setting reserves, which resulted in under-reserved claims. The Company continued to use outdated, ineffective technology to set reserves after the cancellation of the Uber Contract. FE13 explained that the Company did not start using the Mitchell system for their bodily injury evaluations until the last year he was at the Company—2019. Prior to that, they did not have any tools for evaluating claims.

336. Despite having deficient technology, Defendant Myron specifically told investors during the May 2, 2019 earnings call that the Company was "making appropriate use of a ***leading-edge claims technology*** in handling [Uber] claims." The Company's use of outdated, ineffective technology to evaluate claims and to set reserves, as well as Defendants' touting the Company's use of technology for servicing the Uber Account on conference calls with investors, supports an inference of their scienter with respect to the materially understated reserves for losses and loss adjustment expenses and related metrics that the Company reported in its financial statements during the Class Period, as well as the unprofitability of the Uber Contract and the Company's flawed reserves processes.

### F. Management Implemented Deliberate Steps To Further Suppress Reserves After Cancelling The Uber Contract

337. As described in ¶¶113-161 and 136-148 above, former James River employees, including Slaughter and Belcher, have explained that Defendants' efforts to suppress reserves across the entire Uber book increased dramatically after James River cancelled the Uber Contract.

Specifically, by October 2019, management implemented draconian, arbitrary, and surreptitious practices designed to further suppress reserves—and all requests to increase reserves—across the entire Uber book.

338. ***First***, as Belcher testified, ***all requests for a reserve increase to $250,000 or more now had to be approved by James River Insurance's CEO, Schmitzer, who routinely refused to approve them***. Belcher similarly testified that after the termination of the Uber Account, Schmitzer, Rogers, and Warren had more involvement regarding the Company's handling of reserves—and that Schmitzer made all decisions to accept or reject an increase to the reserve over $250,000.

339. ***Second***, as Slaughter and Belcher testified, post termination, the Company ***dramatically slashed reserve authority levels*** throughout the entire claims department. Slaughter described how Schmitzer, Warren, and Rogers "stripped everyone's authority," "dump[ing] the claims managers down to [$]25,000"—a ***tenfold decrease***—"which is basically taking all of their authority away," and that both Slaughter's and her boss's (the Director of Claims) reserve authority was "***stripped away to nothing***." Belcher similarly confirmed that employees' reserve authority was dramatically slashed after James River terminated the Uber Account, noting that her personal authority was reduced from $250,000 to just $25,000. Similarly, Rogers testified that claims examiners' reserve authority was "lowered" after the Uber contract was cancelled. FE2, FE8, FE11, and FE12 (discussed at ¶¶83 and 113-114 above) similarly described the process by which James River systematically decreased claims employees' and their managers' reserve and settlement authority in the aftermath of the Uber termination and noted that requests over a certain dollar threshold were reviewed by Rogers and Warren.

340. ***Third***, Slaughter and Belcher testified that James River opened the secret PLM portal (described by FEs 11 and 12) in October 2019, and that all requests to increase reserves were "funneled to this one email account where everyone had to go . . . if they wanted authority." Slaughter and Belcher both testified that ***claims handlers were specifically instructed not to mention the PLM system in their notes*** so that the adjuster's belief that reserves were inadequate and management's denial of the requested increases were not documented in the claims file. If the request was approved, the adjuster "had to go in and write a note about why they were changing the reserve." This practice was "very unusual" because instead of justifying the need for the reserve in the claim file at the outset, after the implementation of the PLM, "everything was after the fact. So you had to basically apply for your reserve change and if it was granted, then you would document the notes."

341. Rogers, Warren, and Schmitzer knew of, and managed, the PLM portal. Slaughter testified that the PLM email account "went to Anita Rogers most of the time" or to "Courtenay Warren if Anita Rogers was not available or if it exceeded Anita Rogers' authority. And then it went even higher to [Schmitzer] . . . . ." These requests were "***almost always denied***," and Schmitzer would often "disagree" with Rogers's determination to increase a reserve. According to Slaughter, reserve increase requests were frequently denied for vague reasons, such as "we didn't present it well enough. We needed more information. It's not ready to resolve yet." After October 2019, Schmitzer weighed in more aggressively on reserve increase requests, often sending "a paragraph of things that you needed to do in order to have the reserve reviewed."

342. Schmitzer, James River Insurance's CEO during the Class Period, sat on the Company's Reserve Committee with the Executive Defendants and reported directly to James River's CEO. It is implausible that he would have imposed such draconian measures, and been so

intimately involved in their execution, without the knowledge of the Reserve Committee, which was tasked with (a) reviewing, (b) determining, (c) monitoring, and (d) approving James River's reserves, and the knowledge of the Executive Defendants, who sat on the Reserve Committee.

343. The fact that the Company's scrutiny of reserves increased after the cancellation of the Uber Contract—and that senior James River management was responsible for reviewing and approving authority requests over a certain dollar threshold and implemented a secret email portal through which requests for reserve increases were funneled—supports an inference of Defendants' scienter with respect to the materially understated reserves for losses and loss adjustment expenses and related metrics that the Company reported in its financial statements during the Class Period, as well as the unprofitability of the Uber Contract and the Company's flawed reserves processes.

### G. Defendants Were Motivated To Keep The Reserves Artificially Low Because They Wanted To Sell The Company

344. Defendants were motivated to keep reserves inappropriately low even after the Uber Account was terminated because, in addition to unloading their personally held shares at fraudulently inflated prices (discussed below), James River was trying to sell the Company. Indeed, Slaughter testified that Defendants attempted to sell the Company in 2018 but were unable to "because of the Uber account." *See supra* at ¶149. Slaughter further testified that, after she left the Company in May 2020, she heard that Defendants attempted to sell the Company again, but the prospective buyers "were doing due diligence" and "were [not] liking the answers they were getting"—undoubtedly referring, again, to the Company's massive Uber-related liabilities. *See id*.

345. The fact that Defendants had a motive to keep reserves artificially low supports an inference of Defendants' scienter with respect to the materially understated reserves for losses and

loss adjustment expenses and related metrics that the Company reported in its financial statements during the Class Period as well as the Company's flawed reserves processes.

### H. Defendants Myron And Doran's Suspicious Sales Of James River Stock

346. Defendants Myron and Doran engaged in suspicious insider stock sales during the Class Period. Defendants' insider sales were suspiciously timed: they each sold shares in the months between James River's cancellation of the Uber Contract and the Company's announcement of a $170 million adverse charge, primarily due to the Uber Contract. Defendants Myron and Doran's insider sales were not comparable to their prior trading: neither Defendant sold shares of James River common stock in the three years prior to the Class Period. Neither Myron nor Doran's sales were made pursuant to Rule 10b5-1 plans. And Defendants' insider sales were suspicious in amount: the Defendants sold between 21% and 25% of their holdings of James River common stock for collective profits of over ***$3.6 million***.

347. Defendant Myron sold nearly $3 million worth of shares of James River common stock during the Class Period. In particular, Defendant Myron sold 65,000 shares of James River stock on August 4, 2020, in the months between James River's cancellation of the Uber Contract and the Company's announcement of a $170 million adverse charge, primarily due to the Uber Contract. Defendant Myron's sale during the Class Period comprised 21% of his total holdings of James River stock and garnered $2,905,183.69 in proceeds.

348. Lead Counsel calculated the percentage of Defendant Myron's total holdings of James River stock sold during the Class Period using Defendant Myron's Form 4 filed with the SEC on August 5, 2020, which reflects that Myron held 251,183 shares of James River common stock, of which he sold 65,000—or 21%—on that date. Significantly, Defendant Myron's August 4, 2020 sale comprised 21% of his James River holdings, which according to Myron's Form 4 filed with the SEC on August 5, 2020, was 251,183 shares after the transaction. The sale of James

River common stock garnered Myron $2,905,183.69 in proceeds and was not made pursuant to a Rule 10b5-1 trading plan.

349. Defendant Doran sold a quarter of her James River holdings during the Class Period, procuring over $700,000 worth of shares of James River common stock during the Class Period in proceeds. In particular, Defendant Doran sold 14,012 shares of James River stock on November 17, 2020, in the months between James River's cancellation of the Uber Contract and the Company's announcement of a $170 million adverse charge, primarily due to the Uber Contract. Significantly, Defendant Doran's November 17, 2020 sale during the Class Period comprised 25% of her total James River holdings, which according to Doran's Form 4 filed with the SEC on November 17, 2020, was 14,012 shares after the transaction. The sale garnered Doran $702,423.29 in proceeds and was not made pursuant to a Rule 10b5-1 trading plan.

350. The fact that Defendants Myron and Doran sold significant percentages of their personally held shares of James River common stock in the months prior to James River's disclosure of the truth concerning the profitability of the Uber Contract and the materially understated reserve for losses and loss adjustment expenses, while they were in possession of material non-public information, supports a strong inference that their sales were suspiciously timed, which further supports a strong inference of their scienter.

### I. Defendants Held Themselves Out As Knowledgeable About James River's Reserves

351. The Executive Defendants regularly spoke to investors and securities analysts regarding James River's reserving practices, professing to know details of the process.

352. For example, on the Company's November 7, 2019 earnings call, in response to an analyst's question about the Company's recent adverse reserve charge on Commercial Auto losses, Defendant Doran stated, "We have fairly standard practices and procedures around this. And we

follow the same that we do every quarter, and that we're looking at this book with monthly actuarial data and then ***we're doing a deep dive every single quarter***. . . . And ***we are certainly watching it very carefully and very closely***, especially around claims and further development and behavior of that." On this same call, Defendant Abram described the Company's process for booking reserves, stating, "***We look at the actual case reserves and . . . make a judgment that's a historically well-informed judgment***."

353. Similarly, on the Company's February 26, 2021 earnings call, Defendant D'Orazio explained to analysts the state of the Company's reserves. He described, "We call for a claims ***audit by our senior claims leadership team to review a healthy sampling of the open files of time*** and we boosted our case reserves on a portion of those files. . . . ***I'm comfortable with where we entered the quarter*** in particular with the overall group reserve position, given the indications of our external reserve study."

354. The fact that the Executive Defendants held themselves out as knowledgeable about James River's reserves and reserving practices, and discussed these subjects in detail with investors and securities analysts, supports a strong inference of their scienter with respect to the materially understated reserves for losses and loss adjustment expenses and related metrics that the Company reported in its financial statements during the Class Period, as well as the unprofitability of the Uber Contract, and the Company's flawed reserves processes.

**J. The Uber Contract Constituted A "Core Operation" Of James River**

355. The fraud concerned James River's core business operation during the Class Period—the Uber Contract.

356. As described in more detail in ¶¶49-50 above, the E&S segment was James River's largest and most profitable business segment. Within the E&S segment, the Commercial Auto

Division was the largest division, and within Commercial Auto, the Uber Contract generated the majority of the premiums the Company garnered.

357. Moreover, Defendants touted the importance of the Uber Contract on calls with investors and analysts. For example, on the Company's earnings call on February 22, 2019, Defendants touted James River's strong relationship with Uber and celebrated its contract renewal. Defendant Myron stated: "For Commercial Auto, we renewed our largest account [Uber] with an effective date of March 1, 2019, and we are appreciative of continuing the long and collaborative relationship we have had with this insured." And on James River's May 2, 2019 earnings call for the first quarter of 2019, Defendant Myron stated: "In the quarter, Commercial Auto grew 19%. This was principally from growth in written premiums in January and February of 2019 over the previous year's contract with our largest client . . . . ***Our relationship with this largest client continues to be strong***."

358. Further, given the relatively small size of James River compared to its peers and competitors in the insurance industry, its most profitable account and most important client would have been particularly visible to the Executive Defendants.

359. The fact that the Uber Contract was a core operation of James River's—and the Executive Defendants touted its importance and the Company's focus on it—supports a strong inference of the Executive Defendants' scienter with respect to the materially understated reserves for losses and loss adjustment expenses and related metrics that the Company reported in its financial statements during the Class Period, as well as the unprofitability of the Uber Contract, and the Company's flawed reserves processes.

### K. James River Took Adverse Charges In The Two Years Prior To The Class Period And In Each Year Of The Class Period

360. As described in ¶¶283-284 above, the Company recognized adverse reserve developments in its Excess and Surplus segment in each calendar year from 2017 through 2020. These developments indicate that Defendants had, at each prior period's end, underestimated the reserve for losses and loss adjustment expenses.

361. The fact that the Company was forced to recognize adverse reserve developments for each year of the Class Period and the two years prior to the Class Period supports a strong inference of scienter with respect to the flawed reserve methodology that contributed to the reserve for losses and loss adjustments being materially understated during the Class Period.

### L. In Response To Questions From Analysts, Defendants Denied Problems Existed With Its Reserves And, Later, With The Runoff Of The Uber Contract

362. In response to questions from analysts, Defendants assured investors that the Company was comfortable with its reserves and that the Company was making strong progress in the runoff of the Uber Contract.

363. For example, during James River's November 7, 2019 earnings call, in response to a question from a SunTrust analyst, Defendant Abram reiterated the strength of James River's reserving process and that its reserve calculations were based on past historical loss experience, stating: "We look at the actual case reserves and we look at our IBNR and measure the pace of claims and make a judgment that's a historically well-informed judgment."

364. On this same earnings call, in response to an analyst's question about the Company's recent adverse reserve charge on Commercial Auto losses, Defendant Doran stated, "We have fairly standard practices and procedures around this. And we follow the same that we do every quarter, and that we're looking at this book with monthly actuarial data and then we're

doing a deep dive every single quarter. . . . And we are certainly watching it very carefully and very closely, especially around claims and further development and behavior of that."

365. Following the Company's cancellation of the Uber Account, in response to questions by analysts and investors, Defendants specifically denied to the market that the Company was facing any problems putting the Uber Account into runoff.

366. For example, during the Company's February 26, 2021 earnings call for year-end 2020, an analyst from JMP pointedly asked Defendant D'Orazio a question that was "on a lot of investors' minds." The analyst asked: "What can you say . . . [about] your confidence level with getting [the runoff contract] behind you," that the Company's actions with respect to the contract thus far were not "just a reaction to the data that you know . . . [b]ut that there was also a very large dose of increased conservatism put into the process such that hopefully [the Company's assumptions] won't have to be revisited?" In response, Defendant D'Orazio assured the analyst that the Company had conducted an external reserve study, was "comfortable with where we entered the quarter in particular with the overall group reserve position," and was "comfortable with the actions that we've taken" with respect to the Uber Contract.

367. The Executive Defendants' reassurances in response to analysts' questions and concerns about the Company's reserves and with the progress of putting the Uber Contract into runoff support a strong inference of their scienter with respect to the materially understated reserves for losses and loss adjustment expenses and related metrics that the Company reported in its financial statements during the Class Period, as well as the unprofitability of the Uber Contract and the Company's flawed reserve process.

### M. The Executive Defendants Signed Sarbanes-Oxley And Internal Controls Certifications

368. The Executive Defendants signed Sarbanes-Oxley Certifications attesting to the fact that, "to [their] knowledge," the SEC filing at issue "fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company." Specifically, Defendants Myron and Doran signed the Sarbanes-Oxley Certification included in James River's 2018 Form 10-K filed on February 27, 2019. Defendants Abram and Doran signed the Sarbanes-Oxley Certification included in James River's 2019 Form 10-K filed on February 27, 2020. And Defendants D'Orazio and Doran signed the Sarbanes-Oxley Certification included in James River's 2020 Form 10-K filed on February 26, 2021.

369. However, the stated reserve figures included in the 2018, 2019, and 2020 Forms 10-K were materially understated in violation of Defendants' obligations under the Securities Exchange Act of 1934.

370. The Executive Defendants' signing Sarbanes-Oxley Certifications in the 2018, 2019, and 2020 Forms 10-K supports a strong inference of their scienter with respect to their statements in those SEC filings, including the materially understated reserves for losses and loss adjustment expenses and related metrics that the Company reported in its financial statements during the Class Period, as well as the unprofitability of the Uber Contract and the Company's flawed reserves processes.

## IX. LOSS CAUSATION

371. Throughout the Class Period, the price of James River's common stock was artificially inflated as a result of Defendants' materially false and misleading statements and omissions identified above. Defendants engaged in a scheme to deceive the market, and a course

of conduct that operated as a fraud or deceit on Class Period purchasers of James River common stock, by failing to disclose and misrepresenting the adverse facts detailed herein. These material misstatements and omissions were the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's stock price to be overvalued and artificially inflated and/or maintained at artificially inflated levels at all relevant times during the Class Period. Defendants' materially false and misleading statements and omissions made during the Class Period resulted in Lead Plaintiffs and other members of the Class purchasing the Company's stock at artificially inflated prices.

372. When Defendants' prior misrepresentations became apparent to the market through four disclosures that revealed to the market, on a piecemeal basis, the false and misleading nature of Defendants' statements and omissions, the price of James River common stock fell precipitously as the prior artificial inflation dissipated. As a result of their purchases of James River common stock during the Class Period, Lead Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

373. First, on October 8, 2019, after market close, James River revealed new facts to the market in a press release filed with the SEC on Form 8-K, signed by Defendant Doran, that it had delivered a notice of "early cancellation" of all insurance policies to Uber, "effective December 31, 2019." In the same press release, James River disclosed an adverse development charge of between $55 and $60 million, which the Company attributed "primarily" to its commercial auto business line for 2016 and 2017. Defendant Abram acknowledged that the Uber Account "has not met our expectations for profitability, and we think it best to terminate the underwriting relationship as of year end."

374. The next day, James River's stock dropped almost 23%, from a close of $48.94 on October 8, 2019 to a close of $37.88 per share on October 9, 2019, on high trading volume.

375. Second, on November 6, 2019, after market close, the Company revealed new facts to the market that the Uber Contract had been mispriced for years and disclosed an unfavorable reserve development of $50 million attributable to the Uber Contract. In connection with the announcement, Defendant Abram stated that "[t]he results from [the Uber Contract] were not consistent with our focus on underwriting profit." In the Company's November 7, 2019 earnings call discussing the Company's third quarter 2019 results, Defendant Abram disclosed that the "underlying risk evolved very quickly" after the Uber Contract commenced and admitted that "candidly, in some years [James River] mispriced the risk." Thus, the November 6 and 7, 2019 disclosures further revealed to the market that the Uber Contract was not profitable and that the Company had mispriced the risk associated with the contract for years.

376. In direct response to this disclosure, the Company's stock dropped more than 3%, from an open of $36.09 per share of November 7, 2019 to a close of $34.95 on November 7, 2019 on high trading volume.

377. Third, on May 5, 2021, after market close, in announcing its results for the first quarter of 2021, the Company revealed new facts to the market, reporting a net loss of $103.5 million, driven by $170.0 million of unfavorable development in the Commercial Auto Division primarily due to the cancelled Uber Contract that had been in runoff since 2019. In connection with the announcement, James River further disclosed that the Company had been using the wrong reserve methodology in violation of GAAP. Defendant D'Orazio stated that James River had "meaningfully changed our actuarial methodology, resulting in a material strengthening of reserves," and that James River had concluded that "using only our own loss experience in our

paid and incurred reserve projections rather than the array of inputs that we had used in prior quarters, and giving greater weight to incurred methods would give us a better and more conservative estimate of ultimate losses on this account."

378. Thus, the May 5, 2021 disclosures revealed that James River's prior reported reserves for losses and loss adjustment expenses and its reserve developments were materially understated in violation of GAAP; the reserving process that caused the reserves to be materially understated was defective because James River had not primarily used its "own loss experience" to calculate the reserves, as required by GAAP; and that the Company's internal controls were ineffective as a result of these GAAP violations.

379. Also on May 5, 2021, as a direct result of the losses attributable to the Uber Contract, James River announced that it had commenced an underwritten secondary public offering of approximately $175 million of its common shares, priced at $31.00 per share, with proceeds from the offering to be used for general corporate purposes.

380. In direct response to these revelations, the Company's stock dropped more than 26%, from a close of $46.50 on May 5, 2021 to a close of $34.23 on May 6, 2021, on high trading volume.

381. Fourth, on October 26, 2021, before the start of the trading day, James River announced new facts to the market in a press release filed with the SEC on Form 8-K that the Company that it "expect[ed] to report a Net Loss for the third quarter of 2021 of between $23 million and $26 million," which included "$29.6 million associated with the" loss portfolio transfer of the Uber claims. This announcement revealed that the Uber Contract was still negatively affecting the Company's bottom line more than six months after the large adverse reserve development in the first quarter of 2021.

382. In response to this news, the Company's stock price dropped more than 16%, from a close of $39.08 per share on October 25, 2021 to a close of $32.75 per share on October 26, 2021.

383. In total, James River's market capitalization fell from a Class Period high of nearly $1.7 billion on October 23, 2020, to a low of $1.22 billion at the end of the Class Period, a decline of over $466 million. The drastic and continuing decline in James River's stock price that occurred after each of the corrective disclosure events described above was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the decline in the Company's share price negates any inference that the loss suffered by Lead Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

## X. PRESUMPTION OF RELIANCE

384. At all relevant times, the market for James River common stock was an efficient market for the following reasons, among others:

a. James River was listed and actively traded on the NASDAQ, a highly efficient and automated market;

b. As a regulated issuer, James River filed periodic public reports with the SEC and/or the NASDAQ;

c. James River regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

d. James River was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered

the public marketplace.

385. As a result of the foregoing, the market for James River common stock promptly digested current information regarding James River from all publicly available sources and reflected such information in James River's stock price. Under these circumstances, all purchasers of James River stock during the Class Period suffered similar injury through their purchase of James River stock at artificially inflated prices and a presumption of reliance applies.

## XI. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

386. The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the false and misleading statements pleaded in this Complaint. None of the statements complained of herein was a forward-looking statement. Rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about James River's reserves, the data and processes used for the reserves, James River's financial condition and the financial condition of James River's E&S business, among others. Further, the statutory safe harbor does not apply to statements included in financial statements that were made purportedly in accordance with GAAP, including James River's quarterly reports on Form 10-Q and annual reports on Form 10-K issued during the Class Period.

387. To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. As set forth above in detail, then-existing facts contradicted Defendants' statements regarding James River's reserves and the financial condition of James River's E&S business, among others. Given the then-existing facts contradicting Defendants' statements, any

generalized risk disclosures made by James River were not sufficient to insulate Defendants from liability for their materially false and misleading statements.

388. To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those statements was made, the particular speaker knew that the particular forward-looking statement was false, and the false forward-looking statement was authorized and approved by an executive officer of James River who knew that the statement was false when made.

## XII. CLASS ACTION ALLEGATIONS

389. Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) on behalf of a Class consisting of all those who purchased or otherwise acquired the common stock of James River between February 22, 2019, and October 25, 2021, inclusive (the "Class"), and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of James River at all relevant times, members of their immediate families and their legal representatives, heirs, agents, affiliates, successors or assigns, Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof, and any entity in which Defendants or their immediate families have or had a controlling interest.

390. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, James River shares were actively traded on the NASDAQ. As of November 3, 2021, James River had approximately 37.29 million shares of common stock issued and outstanding. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are at least thousands of members of the proposed Class. Class members who purchased James River common stock may be identified from records maintained

by James River or its transfer agent(s), and may be notified of this class action using a form of notice similar to that customarily used in securities class actions.

391. Lead Plaintiffs' claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal laws as complained of herein.

392. Lead Plaintiffs will fairly and adequately protect Class members' interests and have retained competent counsel experienced in class actions and securities litigation.

393. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of fact and law common to the Class are:

a. whether the federal securities laws were violated by Defendants' acts as alleged herein;

b. whether the Defendants made statements to the investing public during the Class Period that were false, misleading or omitted material facts;

c. whether Defendants acted with scienter; and

d. the proper way to measure damages.

394. A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Class members is impracticable. Additionally, the damage suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation make it impossible for such members to individually redress the wrong done to them. There will be no difficulty in the management of this action as a class action.

## XIII. CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT I
### FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND SEC RULE 10b-5 PROMULGATED THEREUNDER
### (Against Defendants James River, Myron, Abram, D'Orazio, and Doran)

395. Lead Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

396. This Count is asserted on behalf of all members of the Class against Defendants James River, Myron, Abram, D'Orazio, and Doran for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

397. During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew were, or they deliberately disregarded as, misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

398. Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiffs and others similarly situated in connection with their purchases of James River common stock during the Class Period.

399. Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiffs and the Class; made various untrue and/or misleading statements of material facts and omitted to state

material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of James River common stock, which were intended to, and did: (a) deceive the investing public, including Lead Plaintiffs and the Class, regarding, among other things, James River's reserves, the data used for the review, the Company's internal controls and the Company's financial statements; (b) artificially inflate and/or maintain the market price of James River common stock; and (c) cause Lead Plaintiffs and other members of the Class to purchase James River common stock at artificially inflated prices and suffer losses when the true facts became known.

400. Defendants James River, Myron, Abram, D'Orazio, and Doran are liable for all materially false and misleading statements made during the Class Period, as alleged above.

401. As described above, Defendants acted with scienter throughout the Class Period, in that they acted either with intent to deceive, manipulate, or defraud, or with recklessness. The misrepresentations and omissions of material facts set forth herein, which presented a danger of misleading buyers or sellers of James River stock, were either known to the Defendants or were so obvious that the Defendants should have been aware of them.

402. Lead Plaintiffs and the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for James River common stock, which inflation was removed from their price when the true facts became known. Lead Plaintiffs and the Class would not have purchased James River common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by these Defendants' misleading statements.

403. As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages attributable to the material misstatements and omissions alleged herein in connection with their purchases of James River common stock during the Class Period.

**COUNT II**
**FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT**
**(Against Defendants Myron, Abram, D'Orazio, and Doran)**

404. Lead Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

405. This Count is asserted on behalf of all members of the Class against each of the Executive Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

406. During their tenures as officers and/or directors of James River, each of these Defendants was a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act. By reason of their positions of control and authority as officers and/or directors of James River, these Defendants had the power and authority to direct the management and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein. These Defendants were able to and did control, directly and indirectly, the content of the public statements made by James River during the Class Period, including its materially misleading financial statements, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

407. In their capacities as senior corporate officers of the Company, and as more fully described above, Defendants Myron, Abram, D'Orazio, and Doran had direct involvement in the day-to-day operations of the Company, in reviewing and managing its regulatory and legal compliance, and in its accounting and reporting functions. Defendants Myron, Abram, D'Orazio, and Doran signed the Company's SEC filings during the Class Period, and were directly involved

in providing false information and certifying and approving the false statements disseminated by James River during the Class Period. Defendants Myron, Abram, D'Orazio, and Doran were also directly responsible for controlling, and did control, the Company's violations of GAAP and other relevant accounting rules, and were directly involved in providing false information and certifying and approving the false statements disseminated by James River during the Class Period. As a result of the foregoing, Defendants Myron, Abram, D'Orazio, and Doran, as a group and individually, were controlling persons of James River within the meaning of Section 20(a) of the Exchange Act.

408. As set forth above, James River violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons of James River and as a result of their own aforementioned conduct, Defendants Myron, Abram, D'Orazio, and Doran are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiffs and the other members of the Class who purchased or otherwise acquired James River common stock. Moreover, as detailed above, during the respective times these Defendants served as officers and/or directors of James River, each of these Defendants was culpable for the material misstatements and omissions made by James River.

409. As a direct and proximate result of these Defendants' conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchase or acquisition of James River common stock.

## XIV. PRAYER FOR RELIEF

410. WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

a. Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3)

of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b. Awarding Plaintiffs and the other members of the Class damages in an amount that may be proven at trial, together with interest thereon;

c. Awarding Plaintiffs and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

d. Such other relief as this Court deems just and proper.

## XV. JURY DEMAND

411. Plaintiffs hereby demand a trial by jury.

Dated: August 25, 2022

Respectfully submitted,

By: /s/ *Steven J. Toll*
Steven J. Toll
Va. Bar No. 15300
stoll@cohenmilstein.com
Daniel S. Sommers
dsommers@cohenmilstein.com
S. Douglas Bunch
dbunch@cohenmilstein.com
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Avenue, Suite 500
Washington, D.C. 20005
Tel: (202) 408-4600
Fax: (202) 408-4699

*Liaison Counsel for the Class*

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
John C. Browne (*pro hac vice*)
Rebecca E. Boon (*pro hac vice*)
Kate W. Aufses (*pro hac vice*)
Benjamin W. Horowitz (*pro hac vice*)
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
johnb@blbglaw.com

rebecca.boon@blbglaw.com
kate.aufses@blbglaw.com
benjamin.horowitz@blbglaw.com

*Attorneys for Lead Plaintiff City of Miami General Employees' and Sanitation Employees' Retirement Trust and Lead Counsel for the Class*

**SAXENA WHITE P.A.**
Steven B. Singer (*pro hac vice*)
10 Bank Street, 8th Floor
White Plains, NY 10606
Telephone: (914) 437-8551
Facsimile: (888) 631-3611
ssinger@saxenawhite.com

Maya Saxena
Joseph E. White, III (*pro hac vice*)
Jonathan Lamet (*pro hac vice*)
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Telephone: (561) 394-3399
Facsimile: (561) 394-3382
msaxena@saxenawhite.com
jwhite@saxenawhite.com
jlamet@saxenawhite.com

David R. Kaplan (*pro hac vice*)
12750 High Bluff Drive, Suite 475
San Diego, CA 92130
Telephone: (858) 997-0860
Facsimile: (858) 369-0096
dkaplan@saxenawhite.com

*Attorneys for Lead Plaintiff Employees' Retirement Fund of the City of Fort Worth dba Fort Worth Employees' Retirement Fund and Lead Counsel for the Class*

**KLAUSNER KAUFMAN JENSEN & LEVINSON LLP**
Robert D. Klausner
bob@robertdklausner.com
Stuart A. Kaufman
stu@robertdklausner.com
7080 Northwest 4th Street
Plantation, Florida 33317

Tel: (954) 916-1202
Fax: (954) 916-1232

*Additional Counsel for Lead Plaintiff the City of Miami General Employees' and Sanitation Employees' Retirement Trust*

# CERTIFICATE OF SERVICE

I hereby certify that on August 25, 2022, I caused the foregoing to be electronically filed with the Clerk of Court via CM/ECF, which will send a notice of electronic filing to all registered users.

*/s/ Steven J. Toll*
Steven J. Toll
Va. Bar No. 15300
stoll@cohenmilstein.com
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Avenue, Suite 500
Washington, D.C. 20005
Tel: (202) 408-4600
Fax: (202) 408-4699

*Liaison Counsel for Lead Plaintiffs*