# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

*In Re James River Group Holdings, Ltd.*
*Securities Litigation*

3:21-cv-00444-MHL

## MEMORANDUM OF LAW IN SUPPORT OF
## <u>DEFENDANTS' MOTION TO DISMISS</u>

<table>
<tr>
<td>

Maeve O'Connor (*pro hac vice*)
Susan Reagan Gittes (*pro hac vice*)
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022
Telephone: (212) 909-6000
Facsimile: (212) 521-7715
mloconnor@debevoise.com
srgittes@debevoise.com

</td>
<td>

By: /s/ *Carter Burwell*
Carter Burwell (Va. Bar No. 88177)
DEBEVOISE & PLIMPTON LLP
801 Pennsylvania Ave. N.W., Suite 500
Washington, D.C. 20004
Telephone: (202) 383-8000
Facsimile: (212) 521-7715
cburwell@debevoise.com

*Counsel for Defendants*

</td>
</tr>
</table>

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................... 1

STATEMENT OF FACTS ................................................................................................. 4

I.      James River's Business ........................................................................................... 4

II.     James River Underwrites Novel Policies for Uber ................................................. 6

III.    Plaintiffs' Allegations Regarding the Reserves for the Uber Policies ............................... 9

        A.      Plaintiffs Rely on Duplicative Allegations from Former Claims
                Department Employees With No Insight Into the Actuarial Process. ................... 9

        B.      Plaintiffs Fail to Allege Facts Regarding Any Individual Defendant. .................. 11

IV.     The Alleged Misstatements ................................................................................... 12

ARGUMENT ................................................................................................................. 12

I.      Plaintiffs Fail to Plead That the Challenged Statements Were False or Misleading. ....... 13

        A.      Alleged Misstatements Regarding Loss Reserves Are Inactionable
                Statements of Opinion ................................................................................ 13

                1.      Plaintiffs Fail to Plead Facts Demonstrating That Any Alleged
                        Misstatement Was Not Genuinely Believed When Made ................... 14

                        a.      Plaintiffs' Failure to Plead Facts Regarding Loss Reserves
                                for the Uber Account Overall Is Fatal To Their Claims. .............. 14

                        b.      The FE Allegations Should Be Disregarded. ............................... 15

                        c.      Plaintiffs Fail to Plead Any Facts To Suggest That Any
                                Defendant Made Any Knowing Misstatement. ........................... 17

                2.      Plaintiffs Fail to Allege That Defendants Failed to Disclose Facts
                        Rendering Their Statements False or Misleading ........................... 18

        B.      Plaintiffs' Attempts to Plead Misrepresentations by Hindsight Also Fail. ........... 20

        C.      Defendants' Statements Regarding GAAP and Sarbanes-Oxley Were Not
                False or Misleading. .................................................................................... 21

        D.      Many Challenged Statements Are Inactionable Forward-Looking
                Statements .................................................................................................. 22

II.     The Section 10(b) Claim Should Be Dismissed for Failure to Plead Particularized
        Facts Giving Rise to a Strong Inference of Scienter. .................................................. 23

        A.      Plaintiffs Fail to Plead Facts Raising a Strong Inference of Scienter Based
                on the FE Allegations. ................................................................................. 24

        B.      Plaintiffs' Remaining Theories of Scienter Cannot Save Their Claims. ............... 26

        C.      Plaintiffs Fail to Allege That the Corporation Acted with Scienter ..................... 28

        D.      The Opposing Inference of Non-Fraudulent Intent Is More Compelling. ............. 29

III.   Plaintiffs Fail to Plead Control Person Liability as to the Individual Defendants............ 30

CONCLUSION.................................................................................................................. 30

# TABLE OF AUTHORITIES

**CASES**

*Atl. Mut. Ins. Co. v. Comm'r*,
  523 U.S. 382 (1998)...................................................................................................5

*Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*,
  394 F.3d 126 (3d Cir. 2004)..........................................................................16, 19, 28

*Chapman v. Mueller Water Prods., Inc.*,
  466 F. Supp. 3d 382 (S.D.N.Y. 2020).....................................................................21

*Cozzarelli v. Inspire Pharms., Inc.*,
  549 F.3d 618 (4th Cir. 2008) .............................................................................22, 28

*Gasner v. Bd. of Supervisors of Cnty. of Dinwiddie*,
  103 F.3d 351 (4th Cir. 1996) ...................................................................................23

*In re Acceptance Ins. Cos. Secs. Litig.*,
  423 F.3d 899 (8th Cir. 2005) ...................................................................................20

*In re AmTrust Fin. Servs., Inc. Sec. Litig.*,
  2019 WL 4257110 (S.D.N.Y. Sept. 9, 2019)...........................................................13

*In re PEC Sols., Inc. Secs. Litig.*,
  418 F.3d 379 (4th Cir. 2005) .............................................................................21, 27

*In re Triangle Cap. Corp. Secs. Litig.*,
  988 F.3d 743 (4th Cir. 2021) .............................................................................26, 27

*Katyle v. Penn Nat'l Gaming, Inc.*,
  637 F.3d 462 (4th Cir. 2011) ...................................................................................30

*KBC Asset Mgmt. NV v. DXC Tech. Co.*,
  19 F.4th 601 (4th Cir. 2021) ...............................................24, 25, 27, 28, 29, 30

*Maguire Fin., LP v. PowerSecure Int'l, Inc.*,
  876 F.3d 541 (4th Cir. 2017) .............................................................................12, 24

*Malone v. Microdyne Corp.*,
  26 F.3d 471 (4th Cir. 1994) .....................................................................................23

*Marsh Grp. v. Prime Retail, Inc.*,
  46 F. App'x 140 (4th Cir. 2002) .............................................................................23

*Matrix Cap. Mgmt. Fund, LP v. BearingPoint, Inc.*,
  576 F.3d 172 (4th Cir. 2009) .............................................................................25, 26, 29

iii

*Nolte v. Cap. One Fin. Corp.*,
   390 F.3d 311 (4th Cir. 2004) .................................................................................13, 17, 19

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   575 U.S. 175 (2015)......................................................................3, 13, 14, 17, 18, 19, 22, 24

*Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*,
   918 F.3d 312 (4th Cir. 2019) ....................................................................................19, 20

*Phillips v. LCI Int'l*,
   190 F.3d 609 (4th Cir. 1999) ............................................................................................28

*Proter v. Medifast, Inc.*,
   2013 WL 1316034 (D. Md. Mar. 28, 2013)......................................................................28

*Stephens v. Nat'l Distillers & Chem. Corp.*,
   6 F.3d 63 (2d Cir. 1993).....................................................................................................6

*Tchrs.' Ret. Sys. of LA v. Hunter*,
   477 F.3d 162 (4th Cir. 2007) ......................................................................................15, 20

*Woolgar v. Kingstone Cos.*,
   477 F. Supp. 3d 193 (S.D.N.Y. 2020)...............................................................................22

*Yates v. Mun. Mortg. & Equity, LLC*,
   744 F.3d 874 (4th Cir. 2014) .....................................................4, 15, 16, 23, 24, 25, 26, 28, 29

**STATUTES**

15 U.S.C. § 78t(a) .................................................................................................................30

15 U.S.C. § 78u–5.................................................................................................................22

iv

## PRELIMINARY STATEMENT

Plaintiffs' Second Amended Complaint (the "SAC"), like its predecessors, is a misguided attempt to manufacture a claim for securities fraud out of James River's good-faith efforts to estimate the insurance reserves backing an entirely new kind of insurance policy.  In early 2014, James River created a new type of insurance coverage for Uber, then an up-and-coming ride-sharing company.  Uber allowed passengers to book a ride using their cell phone through the Uber app, offering a popular alternative to traditional taxi service.  However, this new ride-sharing phenomenon had an insurance "gap": there was no existing insurance product that covered an Uber driver while waiting to connect with or en route to pick up a passenger.  James River crafted a new insurance policy to cover this "gap."

In connection with the issuance of these novel policies, James River estimated and set aside funds it believed were adequate, based on available information, to pay all *future* claims under the Uber policies—amounts known in the insurance industry as loss reserves, which were also reviewed by independent external auditors.  Because the total amount of future losses is not knowable until years later when all claims under a policy are made and resolved, insurers use actuarial judgment to estimate the amounts to be set aside as loss reserves to pay these future losses.  While James River estimated loss reserves in good faith using its actuarial judgment, the novelty of the Uber policies—which had never been written before and insured an entirely new kind of risk—presented unique challenges and significantly greater uncertainty in estimating loss reserves than would a more established insurance product, as the Company frequently warned its investors.  After several years of providing Uber this insurance coverage, in late 2019 James River announced that it would no longer issue new policies to Uber because the business had proven unprofitable.  In 2020 and 2021, James River determined that it needed to increase the

1

reserves backing the Uber policies because its prior estimates proved to be insufficient to cover the unexpectedly high losses that ultimately emerged.  The Company kept investors informed promptly as it determined that loss reserves needed to be increased based on its actuarial model.

With a hindsight view of those losses, Plaintiffs attempt to twist the Company's good-faith efforts into a claim for securities fraud, asserting that Defendants must have known that the loss reserves for the Uber policies would be insufficient and therefore that the Company's financials and statements about reserves were false or misleading.  But while the SAC contends that the Company's statements about its *loss reserves* for Uber policies overall were knowingly understated, Plaintiffs' factual allegations barely mention these loss reserves. Plaintiffs instead focus entirely on allegations regarding *case reserves* for individual claims reported to James River under the Uber policies, relying on the accounts of former employees ("FEs") who worked on case reserves—the vast majority of whom are anonymous—to suggest that the Company's processes for setting case reserves were deficient.  Evidently recognizing the weakness of their claims, Plaintiffs attempt to bolster their pleading by adding allegations derived from a different litigation regarding the handling of a single claim under the Uber policies, but these are just more of the same—allegations regarding the setting of cases reserves—and do nothing to demonstrate as required that Defendants *knowingly* understated reserves on the Uber block as a whole.

As a result, Plaintiffs' new allegations do nothing to cure the fundamental problems with their theory.  Plaintiffs' SAC still fails to plead any facts to connect these specific case reserves to the Company's loss reserves.  Plaintiffs say nothing at all about the Company's actuarial process for estimating loss reserves and allege no facts about the relationship between the case reserves on which they rely and the statements about overall loss reserves that they seek to challenge.  Instead, Plaintiffs ask this Court to assume that loss reserves estimates—which

2

predict the total losses for the Uber policies, including on claims that had not yet been reported—could have been derived from case reserves alone through simple arithmetic and that Defendants knew or recklessly disregarded known deficiencies.  Indeed, the new allegations in the SAC relate *solely* to the process for setting case reserves, effectively confirming that Plaintiffs lack any concrete facts regarding the process for setting overall loss reserves.

The Fourth Circuit has repeatedly rejected similar attempts to plead securities fraud by stacking inference upon inference, and Plaintiffs' failure to allege any facts whatsoever about how the Company exercised its actuarial judgment in estimating the loss reserves necessary to cover future claims is fatal to their claims.  At most, Plaintiffs' allegations paint the picture of a company struggling to manage a new and rapidly growing aspect of their business, but Fourth Circuit law is clear that allegations of mismanagement are not enough to state a claim for securities fraud.  Plaintiffs fall far short of the Private Securities Litigation Reform Act's ("PSLRA") high pleading bar and the SAC should be dismissed for several independent reasons.

*First*, Plaintiffs fail to plead any actionable misstatement, as required to state a claim. Plaintiffs' alleged misstatements concern the adequacy of the Company's reserve estimates and therefore are statements of opinion evaluated under the heightened pleading standard established by the Supreme Court in *Omnicare*.  575 U.S. 175 (2015).  The SAC does not meet that high bar, as it lacks any particularized factual allegation that the Defendants did not believe their statements when they made them or omitted known material facts regarding the basis for their opinions so as to render the statements misleading.  Plaintiffs instead assert that because loss reserves ultimately needed to be increased, Defendants must have known at the time of each alleged misstatement that reserves were insufficient.  This impermissible attempt to plead fraud by hindsight fails under Fourth Circuit law.

*Second*, Plaintiffs fall far short of the PSLRA's high bar for pleading scienter. Plaintiffs allege no facts at all regarding the process for estimating the loss reserves on which their claims are based, much less particularized facts supporting the required "strong inference" that Defendants knowingly or recklessly made any misstatement. Plaintiffs' effort to plead scienter based on the purported accounts of claims employees handling individual Uber claims fails because those allegations are not tied to the Company's actuarial process for estimating overall loss reserves and do not support any inference of fraud. On the contrary, these allegations show that case reserves were subject to multiple layers of review, that the Company had an approval process for increasing such reserves, and that the Company's Reserve Committee reviewed and monitored loss reserves and data from the Uber account. The far more compelling inference to be drawn is that Defendants engaged in a good-faith exercise of actuarial judgment to estimate overall losses for the entirely new kind of insurance provided under the Uber account and that over time those estimates turned out to be inadequate.

*Finally*, several of Plaintiffs' alleged misstatements are also inactionable under the PSLRA's Safe Harbor because they addressed whether reserves would be adequate to cover *future* losses and were accompanied by meaningful cautionary language. For these reasons, the motion to dismiss should be granted.

**STATEMENT OF FACTS**[1]

## I.     James River's Business

James River Group Holdings is a holding company that owns and operates a group of specialty insurance and reinsurance companies, including James River Insurance. SAC ¶ 46.

---

[1] Plaintiffs' factual allegations are taken as true solely for purposes of this motion except where contradicted by documents cited or relied upon in the SAC. This court may also take judicial notice "of the content of relevant SEC filings and other publicly available documents." *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 881 (4th Cir. 2014). Copies of such documents are attached as exhibits to the Declaration of Susan Gittes.

4

James River's products include property and casualty insurance policies that cover a particular risk for a given time period.  Claims under such policies may take many years to be reported, and it can take years for an insurer to determine the actual amount to be paid on a given claim.

Like other insurers, James River sets aside money—known as loss reserves—to estimate the total losses from insurance claims that have been and will be made under policies issued by the Company.  SAC ¶¶ 48, 54; *see Atl. Mut. Ins. Co. v. Comm'r*, 523 U.S. 382, 384 (1998) ("Loss reserves are estimates of amounts insurers will have to pay for losses that have been reported but not yet paid, for losses that have been incurred but not yet reported, and for administrative costs of resolving claims."); Ex. 2 at 18 ("[Reserve] estimates are by their nature subjective and imprecise, and ultimate losses and loss adjustment expenses may vary from established reserves.").  James River's overall loss reserves are estimated by the Company's internal actuaries and reviewed by its Reserve Committees, with review by independent actuarial consulting firms twice each year.  *See, e.g.*, Ex. 2 at 18, 70.  One component of the Company's loss reserves are case reserves, which are amounts set aside for each particular claim actually made under a given policy.  *See id.* at 18, 38–39.  Case reserves are initially set by the Company's claims department and are periodically revised as additional information is obtained regarding a particular claim of loss; case reserves often undergo multiple layers of review.  *Id.* at 13.  The Company discloses that both case reserves and overall loss reserves are estimates based on currently-available data and are subject to a number of uncertainties.  *See id.* at 70–71, F-24.

As described in its financial statements, James River, like other insurers, has traditionally used a range of factors and actuarial methods to estimate overall loss reserves, weighing data from the insurance industry as well as its own historical experience. SAC ¶ 245; *see also* Ex. 2 at 18.  In estimating overall loss reserves, the Company must estimate both reserves for reported

claims, which are derived from the Company's case reserves, and reserves for claims that have been "incurred but not yet reported" ("IBNR").  SAC ¶ 245; *see also* Ex. 2 at 18; Ex. 37 at ¶ 4.33 (cited in SAC ¶¶ 278–79).  The estimation of IBNR reserves—which the Company by definition does not yet have any information about—is especially uncertain, as the Company has to estimate the number, timing and severity of incurred but as-yet unreported claims.  *See* Ex. 18 at 19; Ex. 37 at ¶ 4.33; *see also Stephens v. Nat'l Distillers & Chem. Corp.*, 6 F.3d 63, 65 (2d Cir. 1993) ("IBNR reserves are extremely conjectural, and may need adjustment as time passes and their accuracy can be tested in retrospect").

## II.      James River Underwrites Novel Policies for Uber

In March 2014, James River began underwriting a new type of insurance policy covering then up-and-coming rideshare company Uber through its Commercial Auto Division.  SAC ¶¶ 51–52.  James River's Commercial Auto business was part of the Company's excess and surplus ("E&S") lines segment, which insures "unique characteristics and risks" that standard insurance carriers will not cover.  *Id.* ¶¶ 47, 50.  As James River advises its investors, because of the "unique" risks insured, the E&S business necessarily involves a greater degree of risk than typical insurance reserves.  *Id.* ¶ 47 (citing Ex. 2 at 9).  For example, James River disclosed that for E&S lines, "we sometimes have to make estimates of future losses for risk classes with which we"—and the market as a whole—"do not have a great deal of experience."  Ex. 2 at 38.

In 2014, ridesharing companies such as Uber were a "relatively new phenomenon" (SAC ¶¶ 51–52), and Uber's fast-growing business had an insurance "gap":  There was no available insurance coverage for the periods when an Uber driver was driving around waiting for a fare or when a driver had been paired with a rider through the Uber app and was driving to pick up the customer.  James River contracted with Uber to fill this coverage gap through its E&S lines segment.  At the time, James River was the only company providing this type of insurance.  *Id.*

6

¶ 52. Annually from March 2015 to March 2019, James River renewed its contract with Uber, offering coverage across varying states. *See id.* ¶ 54; Ex. 25 at 3; Ex. 26 at 10; Ex. 27 at 2.

The market was aware of the uncertainties of the Uber business. In the words of a 2019 analyst report cited in the SAC, James River's "[n]ewer products bring less reserving certainty" because they "have less cost and claim data surrounding them, which increases the potential for adverse surprises down the road." Ex. 34 at 4 (cited in SAC ¶¶ 3, 56); *see also* Ex. 35 at 5 (analyst report listing as a "downside risk" the Company's "exposure to the rideshare market, which pressures margins") (cited in SAC ¶ 61). Unfortunately, this statement proved to be prescient: in October 2019, James River announced that it was terminating the Uber contract because it had not "met our expectations for profitability." SAC ¶ 57. Although the contract would be terminated at the end of 2019, the Company explained that it would still be responsible for claims that occurred during the periods covered by existing policies. *Id.* James River simultaneously announced that it was increasing its reserves by around $55 to $60 million, principally due to the Uber contract, resulting in a net loss of $25.2 million. *Id.*

Defendant Abram, then Chairman and CEO, told investors that "we wrote a new type of risk that initially seemed to be highly profitable based on the data available to us, but Uber's business and the underlying risk evolved very quickly." Ex. 27 at 2. As he explained:

> Our underwriting assumptions and the related pricing did not keep pace with changes in Uber's business. Uber created a new transportation model that altered the American transport system and presented new challenges and opportunities for the insurance industries. The risk associated with the model shifted as the company expanded into new regions, added tens of thousands of drivers and evolved beyond just ride hailing. All of these factors created a situation where the risk became too large in absolute terms given the size of our company. And candidly, in some years, we mispriced the risk.

*Id.* But he stated that, moving forward, he was "comfortable" that losses from the Uber account would be manageable. *Id.* On the same call, Defendant Doran stated that the Company believed loss reserves were sufficient based on then-current information but would be monitoring the

7

Uber block closely for new data that might affect these estimates: "And we're certainly watching it very carefully and very closely, especially around claims and further development and behavior of that, but we feel that we have put up a number that is in response . . . to the data that we saw that we were presented with, and that's where we got to this quarter." *Id.* at 5.

In February 2021, the Company informed investors of $85–$90 million in additional adverse reserve development. SAC ¶ 204 (citing Ex. 17). As Defendant D'Orazio explained on an investor call, the Company increased its loss reserves given "heightened reported losses this quarter" in the Uber block, which had previously appeared to be trending down. Ex. 30 at 3. D'Orazio believed that "this trend reflect[ed] COVID-driven delays" in submitting claims after the onset of the COVID pandemic, "possibly exacerbated by higher unemployment rates." *Id.*

In May 2021, James River announced it had increased loss reserve estimates by $170 million. SAC ¶¶ 215–16 (quoting Ex. 20 at 1). As D'Orazio explained, although the Company had expected losses to taper off, the "continued heavy reported loss[es]" observed in early 2021 suggested "more inherent severity" from the Uber account than previously anticipated. Ex. 31 at 2. Given these sustained losses, James River decided to begin estimating loss reserves for the Uber block "using only our own loss experience in our paid and incurred reserve projections rather than the array of inputs that we had used in prior quarters[.]" *Id.* As repeatedly disclosed to investors, the Company had previously estimated reserves by using both industry data and its own historical data from the Uber account. Ex. 2 at 71; Ex. 10 at 72; Ex. 18 at 75. In light of recent experience, the Company decided that focusing more on its own historical data in estimating loss reserves "would give us a better and more conservative estimate of ultimate losses on this account." Ex. 31 at 2. On September 30, 2021, James River announced its entry into a reinsurance agreement that would provide "economic finality" on the Uber account. Ex.

8

23 at 70. In connection with the transaction, the Company announced a post-tax charge of $23.5 million. *Id.* On October 26, 2021, James River announced third quarter results, reiterating that it had entered into the "previously announced" reinsurance transaction.  Ex. 24 at 5.

### III.     Plaintiffs' Allegations Regarding the Reserves for the Uber Policies
#### A.      Plaintiffs Rely on Duplicative Allegations from Former Claims Department Employees with No Insight into the Actuarial Process.

Although the SAC asserts that the 2019–2021 increases in loss reserve estimates were the direct result of purported "systemic failures" in the Company's estimation of "reserves," SAC ¶ 75, Plaintiffs do not plead any facts regarding the process they seek to challenge.  In fact, Plaintiffs omit any mention of disclosures regarding James River's process for estimating loss reserves, which were estimated by actuaries weighing a range of factors and inputs, *see, e.g.*, Ex. 2 at 18, and were also reviewed by external actuaries biannually to give the Company "additional comfort on the adequacy of our reserves." *Id.* at 70.  Instead, Plaintiffs rely entirely on the accounts of FEs from the claims department—most of them anonymous—who were involved in setting *case reserves* on specific claims made under the policies issued to Uber and had nothing to do with estimating overall loss reserves.  SAC ¶¶ 75–114.

For example, Plaintiffs rely on the account of a former claims examiner, FE1, to claim that the Company had "no methodology" for setting loss reserves (SAC ¶ 76), but this assertion mixes apples and oranges and is contradicted by Plaintiffs' own allegations elsewhere in the SAC.  An employee's process for setting case reserves on a single known claim says nothing about the Company's actuarial process for estimating loss reserves.  Moreover, other FEs relied on by Plaintiffs describe numerous aspects of the Company's process for setting case reserves. For example, Plaintiffs allege that (*i*) the Company used the "Mitchell" system to estimate case reserves, which recommended a case reserve amount based on certain inputs, *id.* ¶ 103; (*ii*) that some case reserves received multiple layers of review by more senior employees, *id.* ¶¶ 106 –

9

114; and (*iii*) that processes existed for requesting reserve increases, such as by submitting a large loss report, *id.* ¶¶ 87–88.

Similarly, while Plaintiffs contend that claims examiners lacked adequate training and had a high turnover rate—for instance, asserting that the Company hired "300 to 400 adjusters just for the Uber Account," including "recent college graduates" and former Starbucks baristas, SAC ¶¶ 93–101—Plaintiffs fail to allege any facts that new hires were assigned complex claims (versus administrative work), much less facts supporting their assertion that this purported practice was designed to keep Uber reserves low.  Instead, Plaintiffs resort to mixing together the accounts of different anonymous witnesses with little context or supporting detail.  *See, e.g.*, *id.* ¶¶ 76–77, 80, 90.  Similarly, Plaintiffs rely on the deposition of a former vice president in the claims department—taken in an unrelated case involving a single Uber claim (the "*St. Amand*" litigation)—to assert that the Company had no appropriate training or procedures for handling Uber claims, but she testified only that she did not "recall" or "know" whether such training or procedures existed.  *Id.* ¶¶ 121–23.  Plaintiffs likewise rely on the depositions of two low-level claims employees in *St. Amand* to suggest that those employees did not receive adequate training, but Plaintiffs simultaneously acknowledge that they came to the job with extensive experience in claims adjustment and thus required less training.  *Id.* ¶¶ 129–31.

Despite Plaintiffs' argumentation about the St. Amand depositions, Plaintiffs offer no facts in support of their assertion that the Company knowingly and improperly suppressed loss reserves.  Plaintiffs complain that junior claims employees were required to seek permission from supervisors to increase reserves above a certain level but ignore that the Company's practice of limiting the authority of low-level claims employees to establish case reserves was prudent and repeatedly disclosed. *See* SAC ¶¶ 108, 312 (quoting Ex. 10 at 13).  Plaintiffs also

10

quibble over whether Mr. St. Amand's case reserve was increased swiftly enough, *id.* ¶¶ 151–59, but they acknowledge that his case reserve was increased by a "staggering" amount a mere three weeks after the claims adjuster submitted a Large Loss Report as required. *Id.* ¶¶ 158–59. At most, Plaintiffs allege that individual claims examiners were dissatisfied that they needed supervisory approval to raise case reserves and that junior employees' authority to modify reserves fluctuated over time. *Id.* ¶¶ 87–88, 113–14. But the SAC conspicuously lacks any facts—as opposed to innuendo—that these changes were made with the goal of keeping Uber claim reserves artificially low or that the junior claims employees were in fact correct that any individual case reserve should have been increased. Plaintiffs instead rely on unsourced "rumors," such as that some employees thought that case reserves were kept low because the Company was seeking to sell itself—a statement made by a low-level employee who is not alleged to have been in a position to know whether it was true. *Id.* ¶¶ 105, 149, 344.

**B.      Plaintiffs Fail to Allege Facts Regarding Any Individual Defendant.**

Plaintiffs do not plead any facts connecting any Individual Defendant to these purported managerial issues in the claims department, nor do they claim that any of their FEs had direct contact with any Individual Defendant or Company actuary. Plaintiffs nonetheless attempt to connect the Individual Defendants to the purported issues with Uber claims by asserting that: (*i*) the Individual Defendants served on the Reserve Committee that was ultimately responsible for determining the Company's *loss reserve* estimates based on recommendations from the Company's internal and external actuaries, and (*ii*) certain non-defendant employees (specifically Courtenay Warren and Anita Rogers (who oversaw E&S claims) and Richard Schmitzer (the President of the Company's E&S division)) attended meetings regarding certain case reserves, reviewed a sampling of Uber claims above "a certain threshold," and used a centralized email portal to manage requests to increase reserves. *See* SAC ¶¶ 109, 141–43, 313.

11

The SAC lacks any allegation about the content of these sampling reports, except that they related to *case* reserves. At most, Plaintiffs allege that non-Defendants Rogers and Warren received information about Uber claims that were potentially under- or over-reserved. *See id.* ¶¶ 110–12. Plaintiffs do not explain how the sampling of case reserves or use of a portal for review of case reserves support their theory at all, much less tie these allegations to the Reserve Committee, which assessed the adequacy of the Company's reserves *overall*. *See* Ex. 2 at 18.

## IV.    The Alleged Misstatements

Plaintiffs claim that James River's financial statements from February 2019 through October 2021 were false or misleading in light of the allegations described above, which in their view show that Defendants knew the Uber account was under-reserved and unprofitable. SAC ¶¶ 162–234. They allege that the Company made misrepresentations concerning the adequacy of the Company's reserve estimates in calls with investors and in public filings where they explained the Company's process for resolving Uber claims. *Id.* ¶¶ 244–69. Finally, Plaintiffs allege that Defendants misrepresented their compliance with Generally Accepted Accounting Principles ("GAAP") and Sarbanes-Oxley. *See id.* ¶¶ 235–43; 275–92; 305–06.

## ARGUMENT

To state a claim under Section 10(b), a plaintiff must adequately allege, among other things, that the defendant made a material misrepresentation or omission and that the defendant acted with scienter. *Maguire Fin., LP v. PowerSecure Int'l, Inc.*, 876 F.3d 541, 546 (4th Cir. 2017). Additionally, Rule 9(b) and the PSLRA impose a "heightened pleading standard" that a securities fraud plaintiff must meet to survive a motion to dismiss, which is designed "to protect defendants' reputations from baseless accusations, eliminate meritless suits brought only to extract a settlement [and] discourage fishing expeditions." *Id.*[2] Plaintiffs have failed to allege

---

[2] Internal quotation marks, brackets, and citations are omitted unless otherwise noted.

with the requisite particularity that Defendants made false statements of material fact, much less set forth particularized facts sufficient to raise a strong inference that they did so with an intent to deceive investors. And because control-person liability requires a successful § 10(b) claim, Plaintiffs' failure to adequately plead a §10(b) claim dooms their § 20(a) claim as well.

I.      **Plaintiffs Fail to Plead That the Challenged Statements Were False or Misleading.**

Plaintiffs' claims fail for the threshold reason that Plaintiffs cannot allege any actionable misstatement. Plaintiffs plead three categories of alleged misstatements: (*i*) statements derivative of Plaintiffs' core theory that the Company fraudulently understated its reserves; (*ii*) related opinion statements based on compliance with GAAP and Sarbanes-Oxley; and (*iii*) protected forward-looking statements. None of them are actionable.

A.      **Alleged Misstatements Regarding Loss Reserves Are Inactionable Statements of Opinion.**

Plaintiffs' purported misrepresentations are premised on the contention that the Company's reserves were understated. The Fourth Circuit has made clear that reserve estimates must be evaluated as statements of opinion, not fact. *Nolte v. Cap. One Fin. Corp.*, 390 F.3d 311, 315–16 (4th Cir. 2004). This means that they are not actionable unless they meet the strict standard set forth by the Supreme Court in *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175 (2015). Under *Omnicare*, statements of opinion like those regarding reserve estimates are not actionable unless the plaintiff pleads particularized facts indicating that the speaker (*i*) "did not hold the belief she professed" or (*ii*) omitted "particular (and material) facts" known to the speaker "going to the basis" of the opinion such that the statements are rendered misleading. *Id.* at 185–86, 194. This heightened standard to plead an actionable misstatement of opinion is akin to the stringent standard for pleading scienter. *See In re AmTrust Fin. Servs., Inc. Sec. Litig.*, 2019 WL 4257110, at *17 (S.D.N.Y. Sept. 9, 2019). Plaintiffs have failed to state a claim under either prong of *Omnicare*.

13

1.      **Plaintiffs Fail to Plead Facts Demonstrating That Any Alleged Misstatement Was Not Genuinely Believed When Made.**

The SAC lacks any factual allegations that Defendants did not genuinely believe in their reserve estimates and related statements at the time they were made, much less particularized factual allegations as required to state a claim. As *Omnicare* explained, a "sincere statement" of opinion, "however irrational[]," is not actionable even if it later turns out to be incorrect or subject to revision. 575 U.S. at 186, 189. Plaintiffs' attempts to allege that Defendants did not genuinely believe the Company's reserve estimates rest entirely on an assumption that Defendants knew that a material reserve charge would be required. To support this claim, Plaintiffs rely on the irrelevant accounts of FEs in the claims department who were not involved in the estimation of reserves for the Uber block overall. But none of these allegations come close to demonstrating as required that Defendants did not believe the Company's reserve estimates were sufficient at the time of any alleged misstatement. *Id.* at 186.

a.      **Plaintiffs' Failure to Plead Facts Regarding Loss Reserves for the Uber Account Overall Is Fatal to Their Claims.**

While the SAC contends that Defendants' statements regarding the loss reserves backing the Uber account and related statements were false, Plaintiffs fail to plead any facts regarding loss reserves. Instead, Plaintiffs use the term "reserves" interchangeably to refer to both case reserves set by claims staff on individual Uber claims and the Company's actuarial estimates of loss reserves overall. *See, e.g.*, SAC ¶¶ 76, 311. Under Plaintiffs' theory, because certain FEs working in the claims department believed case reserves were set too low on the individual claims that they personally oversaw—which they acknowledge were often "placeholders" and were subject to additional review, *id.* ¶ 13—the Company's loss reserve estimates must have been knowingly false. But Plaintiffs allege no facts whatsoever supporting this assumption. Indeed, Plaintiffs selectively quote the Company's disclosures to omit the Company's

14

description of its actuarial process, which discloses that a variety of different factors and inputs were weighed in the Company's actuarial judgment, including trends in claim frequency and severity; emerging economic and social trends; changes in the regulatory and litigation environment; and discussions with third-party actuarial consultants. *See* Ex. 2 at 18.

Plaintiffs' efforts to muddle the distinction between the case reserves set by claims adjusters and the Company's loss reserves fall apart the moment those quotations are put in context. For example, Plaintiffs selectively quote from the Company's disclosures to focus on purported misstatements regarding case reserves, *see, e.g.*, SAC ¶¶ 79, 245, 254, but omit key language from the same sections making clear that there are other components to the Company's loss reserves, including reserve estimates for IBNR, *see, e.g.*, Ex. 2 at 7. Plaintiffs plead no facts in support of their apparent assumption that overall loss reserves can be estimated using simple arithmetic based on the anecdotal experiences of a small number of claims staff.

### b.    The FE Allegations Should Be Disregarded.

In addition to these fundamental flaws, Plaintiffs' allegations are based on FEs who worked on individual claims and have no insight into how the Company set overall loss reserves. As a threshold matter, the anonymous accounts of 15 FEs are not sufficiently particularized and should be disregarded. The Fourth Circuit has underscored that "[w]hen the complaint chooses to rely on facts provided by confidential sources, it must describe the sources with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged or in the alternative provide other evidence to support their allegations." *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 885 (4th Cir. 2014); *see also Tchrs.' Ret. Sys. of LA v. Hunter*, 477 F.3d 162, 174–75 (4th Cir. 2007) (affirming dismissal under PSLRA for failure to plead why each statement was misleading and instead relying on FEs with insufficient knowledge of the facts). Plaintiffs fail to meet that standard.

15

The SAC provides remarkably few details about these anonymous FEs, describing them as low-level claims examiners and their immediate supervisors. *See, e.g.*, SAC ¶¶ 76–77, 90. By Plaintiffs' own allegations, there were hundreds of junior claims employees working on the Uber account alone, often for brief periods of time, and they allege no contact between these employees and the senior management who made the challenged statements. *See* SAC ¶¶ 98–101. The Court should "steeply discount" these reports from claims examiners who lacked any insight into the process of setting actuarial reserves as "lack[ing] sufficient indicia of reliability." *Yates*, 744 F.3d at 886. The allegations of former low-level employees are "wholly insufficient to demonstrate" that an insurer's "reserves were manipulated downward." *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 153 (3d Cir. 2004). "The sheer volume of confidential sources cited cannot compensate for these inadequacies." *Id.* at 155.

The FEs offer little to corroborate their accounts beyond general criticisms, which boil down to the claim that their personal authorization to set case reserves should have been higher. FE 7, for example, was a claims examiner whose sole complaint is that some claim reserves were opened at $1 because that was "all that was needed to open a claim," but he concedes that these were simply "placeholder" reserves pending a fuller assessment. SAC ¶ 80. Indeed, while Plaintiffs' FEs report their subjective belief that case reserves on unspecified claims they oversaw should have been higher, Plaintiffs elsewhere concede that Defendants disclosed that "[w]e keep the settlement authority of front-line adjusters low to ensure the practice of having two or more members of the department participate in the decision as to whether to settle or defend." Ex. 10 at 13 (quoted in SAC ¶ 108). As is evident from Plaintiffs' allegations, junior claims staff, as the first of several layers of review, had a limited perspective on any particular claim and no insight into overall loss reserves.

16

Plaintiffs' new allegations derived from the *St. Amand* litigation suffer from the same defect: they all relate to whether low-level employees believed that the process for setting *case reserves* was adequate.  Plaintiffs do not allege that the three named FEs played any role in the actuarial process of setting overall loss reserves.  Two of these FEs were front-line claims adjusters who (according to Plaintiffs) received inadequate training on adjusting case reserves.  SAC ¶¶ 128, 130.  The third FE, Anita Rogers, testified only that she could not "recall" or did not "know" whether there were appropriate policies in place to train new employees or adjust case reserves.  *Id.* ¶¶ 121–23.  Plaintiffs fail to allege that these FEs conveyed any of their concerns to Defendants, and in any event they do not bear on the truth or falsity of Defendants' statements of opinion regarding loss reserves.  *See Nolte*, 390 F.3d at 315–16 (affirming dismissal where plaintiffs failed to allege that employee informed defendants of his belief that reserves were inadequate).

### c.   Plaintiffs Fail to Plead Any Facts to Suggest That Any Defendant Made Any Knowing Misstatement.

Plaintiffs allege no particularized facts that any Defendant knew that the Company's loss reserves were inadequate, falling far short of the stringent pleading standard imposed by *Omnicare*.  Plaintiffs fail to plead any facts to even suggest that any Defendant was aware of alleged reserve deficiencies, and none of Plaintiffs' attempts to make up for this failure of pleading can salvage their claims.  Plaintiffs rely on the scattered accounts of FEs to claim that Defendants must have known reserves were understated, but as described above, not one of those accounts even mentions any Individual Defendant.  Similarly, Plaintiffs' assertion that "senior executives"—not including any Individual Defendant—at times reviewed specific *case reserves* does not suggest that any Defendant knew that *loss reserves* were insufficient, and in fact supports the opposite conclusion, that the Company had appropriate safeguards in place to ensure

17

reserves were appropriately set.  *See* SAC ¶¶ 11, 107–09. Finally, Plaintiffs allege that the Reserve Committee—which included (at various points) the Individual Defendants—met quarterly to review actuarial recommendations for the Company's loss reserves and that the Individual Defendants therefore must have known reserves were not sufficient.  *Id.* ¶ 311. Plaintiffs selectively quote from the Company's disclosures in support of this argument, *see id.* ¶ 107, but the Company's disclosures make clear that the role of the Reserve Committee was overseeing the Company's actuarial process, not micromanaging thousands of Uber claims, and Plaintiffs fail to plead any facts suggesting otherwise. *See, e.g.*, Ex. 2 at 69–70.

### 2.      Plaintiffs Fail to Allege That Defendants Failed to Disclose Facts Rendering Their Statements False or Misleading.

Nor have Plaintiffs plausibly "identif[ied] particular (and material) facts going to the basis for the issuer's opinion . . . whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context" as required to make an opinion actionable as an omission under *Omnicare*'s second prong.  575 U.S. at 194. As the Supreme Court made clear, meeting this standard "is no small task for an investor."  *Id*. Relevant context includes the statement's "surrounding text, . . . hedges, disclaimers, and apparently conflicting information," and "the customs and practices of the relevant industry."  *Id.* at 190.  A speaker need not disclose *all* facts cutting against an opinion; for example, a speaker need not disclose that a junior employee "expressed doubts" when "more senior colleagues gave a stamp of approval."  *Id.*

Plaintiffs cannot meet this high bar, as they plead no concrete or particularized allegations that, at the time of the challenged statements, Defendants possessed information relevant to the opinion statements at issue that they were required to disclose.  Plaintiffs' allegations by FEs regarding the process for setting case reserves on particular claims by a

18

handful of claims examiners are inadequate for multiple reasons, including that Plaintiffs have not alleged facts indicating that those alleged issues would have materially affected overall loss reserves, let alone that Defendants were aware of those alleged issues or their purported effect at the time the challenged statements were made. *See Nolte*, 390 F.3d at 315–16 (affirming dismissal for failure to allege that employee informed defendants of his belief that reserves were inadequate). And as the Supreme Court recognized in *Omnicare*, that junior employees may have disagreed with their managers on the adequacy of case reserves does not mean that the Individual Defendants were required to disclose those purported concerns, even if Plaintiffs had alleged that Defendants were aware of their views. *Omnicare*, 575 U.S. at 190. Plaintiffs' effort to draw a link between their allegations about case reserves and the Company's overall loss reserves by asserting that Rogers "received her marching orders from the c-suite," SAC ¶ 78, likewise fails because that assertion is not supported by any well-pleaded facts and appears to be "based on nothing more than speculation." *Chubb Corp.*, 394 F.3d at 155.

The inadequacy of Plaintiffs' pleading comes into sharp relief when considering the context of the challenged statements, as *Omnicare* instructs is required. *See Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 322 (4th Cir. 2019) (citing *Omnicare*, 575 U.S. at 191) ("[a] reasonable investor is expected to understand a statement of opinion in its full context and there will only be liability for 'the omission of material facts that cannot be squared with such a fair reading.'"). James River repeatedly reminded investors that reserves "represent an estimate of what we expect the ultimate settlement and administration of claims will cost us, and our ultimate liability may be greater or less than current reserves." Ex. 2 at 38; Ex. 10 at 38; Ex. 18 at 42. It explained that "there is always the risk that reserves may prove inadequate, and actual results *always* differ from our reserve estimates" and that, as was the case

with Uber, "we sometimes have to make estimates of future losses for risk classes with which we do not have a great deal of experience," which "may contribute to making errors of judgment when establishing reserves." *Id.* Indeed, Plaintiffs acknowledge that the Company disclosed that its E&S lines had "unique" risks. SAC ¶ 47. The Company's disclosures therefore "address[ed] the very claims asserted" by Plaintiffs, further undercutting Plaintiffs' claim. *Paradise Wire*, 918 F.3d at 323.

**B.      Plaintiffs' Attempts to Plead Misrepresentations by Hindsight Also Fail.**

Plaintiffs have also failed to plead falsity with respect to the Company's statements that it monitored reserves, estimated losses for each individual claim, and based those estimates in part on historical information. *See, e.g.*, SAC ¶¶ 244–48 (quoting 2018 10-K); *see also* SAC ¶¶ 253–56, 264–67 (quoting identical statements from 2019 and 2020 10-Ks). The SAC contains no particularized factual allegation that these statements were false, and boils down to an improper attempt to plead "fraud by hindsight"—*i.e.*, that Defendants' statements *must have been* false simply because the Company's results were ultimately worse than expected. *Tchrs.' Ret. Sys.*, 477 F.3d at 183 (rejecting such a theory and affirming dismissal for failure to allege falsity). Plaintiffs' reliance on the Company's May 2021 announcement of an adjustment in approach to estimating loss reserves on the Uber account is baseless: the Company never represented that it *only* used its own historical data to set reserves but rather repeatedly explained that its reserves "are based on our own data and industry data." Ex. 2 at 71; Ex. 10 at 72; Ex. 18 at 75. The Company's May 2021 statement that it would place more weight on its own loss data (and less weight on other actuarial methodologies) when estimating loss reserves on the Uber account does not concede earlier descriptions of its reserving methodology were knowingly false. *See* SAC ¶¶ 248(a), 252(a), 257(a), 268(a) (citing Ex. 31 at 2); *see also In re Acceptance Ins. Cos. Secs. Litig.*, 423 F.3d 899, 903 (8th Cir. 2005) (rejecting argument that defendants *must* have

20

known reserves would need to be increased as impermissible "retrospective analysis" which

"cannot be the basis for a claim").

### C. Defendants' Statements Regarding GAAP and Sarbanes-Oxley Were Not False or Misleading.

Plaintiffs further allege that the Company violated two provisions of GAAP and

Sarbanes-Oxley, but those allegations are entirely derivative of Plaintiffs' other theories and fail

to state a claim. *See In re PEC Sols., Inc. Secs. Litig.*, 418 F.3d 379, 390 (4th Cir. 2005)

(rejecting alleged GAAP violations that "add[] nothing new" but instead "simply ride[] around in

circles on the inadequate coattails" of Plaintiffs' other allegations). First, Plaintiffs have not

plausibly alleged that the Company failed to estimate its reserves "using past experience adjusted

for current trends, and any other factors that would modify past experience." *See* SAC ¶ 277

(quoting ASC 944-40-30-1). Plaintiffs' theory that ASC 944 required the Company to rely

*solely* on its own historical data to estimate reserves is contrary to the plain language of the

provision; experience is one of many permissible factors a company can weigh in its actuarial

judgment under ASC 944. Second, Plaintiffs have not plausibly alleged that the Company failed

to reserve for loss contingencies that are both "probable" and can be "reasonably estimated." *See*

SAC ¶ 287 (quoting ASC 450-20-25-2). As explained above, the scattered accounts of the FEs

who worked in the Company's claims department do not provide any insight into the Company's

overall loss reserves, let alone support an inference that any loss reserve increases were

"probable" and "reasonably estimable" before they were announced. Plaintiffs' theory is again

"one of underestimation in hindsight, which relies on conclusory allegations to mask the legally

insufficient contention at its core, which is that defendants could not possibly have believed their

own estimates, since plaintiffs interpret those estimates to have proven inadequate." *Chapman v.*

*Mueller Water Prods., Inc.*, 466 F. Supp. 3d 382, 404 & n.5 (S.D.N.Y. 2020) (rejecting

21

allegation based on ASC 450-20-25-2 for failure to allege that Defendants "knew that a loss contingency" was probable and reasonably estimable).

Nor have Plaintiffs offered any basis to conclude that Defendants falsely certified that they had established internal controls to ensure the reliability of the Company's financial statements in accordance with Sarbanes-Oxley and that, in Defendants' opinion, those internal controls were effective. *See* SAC ¶¶ 238–41.[3] Plaintiffs simply rely upon the fact that the Company later adjusted its reserve methodology and irrelevant FE accounts, *see id.* ¶ 241, which is insufficient to show that the certifications were false when made. *See Woolgar v. Kingstone Cos.*, 477 F. Supp. 3d 193, 230 (S.D.N.Y. 2020) (increase in loss reserve provided no support for concluding that earlier statements about internal controls were false). As the Fourth Circuit has explained, the signing of statements regarding internal controls does not provide any "independent support" for the inference that Defendants knowingly engaged in wrongdoing. *Cozzarelli v. Inspire Pharms., Inc.*, 549 F.3d 618, 628 n.2 (4th Cir. 2008).

**D.      Many Challenged Statements Are Inactionable Forward-Looking Statements**

Many of the challenged statements are inactionable for the additional reason that they are forward-looking statements protected under the PSLRA's "Safe Harbor" provision. 15 U.S.C. § 78u–5(c)(1).[4] The Safe Harbor immunizes forward-looking statements if they are "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." *Id.* § 78u–5(c)(1)(A)(i). Many of the challenged statements in the SAC relate to the adequacy of the Company's reserves and therefore are forward-looking because they necessarily forecast whether

---

[3] The Company's filings stated that its independent auditors confirmed internal controls were "effective" under applicable standards. *See* Ex. 2 at F-3, Ex. 10 at F-4, Ex. 18 at F-4.

[4] Even if these were not forward-looking statements, they would be actionable only under *Omnicare*, a standard that Plaintiffs have failed to satisfy as explained above.

22

the reserves will be adequate to cover *future* losses. *Compare, e.g.*, SAC ¶ 259 (defendant Abram's statement that "[w]e feel confident about our reserves and the progress we are making in the run-off of the cancelled account") *with Malone v. Microdyne Corp.*, 26 F.3d 471, 479 (4th Cir. 1994) (expressing "comfort" with an earnings projection was a statement about "future performance"). *See also, e.g.*, SAC ¶¶ 247, 256, 266–67 (challenging similar statements). While Plaintiffs claim statements about reserves are "historical statements or statements of purportedly current facts and conditions at the time the statements were made" (SAC ¶ 386), the Fourth Circuit has rejected that cramped reading of the Safe Harbor, which would render it a nullity because "[a]ll projections can be characterized as presently held beliefs." *Marsh Grp. v. Prime Retail, Inc.*, 46 F. App'x 140, 146 (4th Cir. 2002). Moreover, these statements were accompanied by warnings that described "in specific detail the risks which a purchaser would assume by purchasing" the Company's stock, which constitutes "meaningful cautionary language." *Gasner v. Bd. of Supervisors of Cnty. of Dinwiddie*, 103 F.3d 351, 359 (4th Cir. 1996) (affirming dismissal where cautionary statements "were tailored precisely to address the uncertainty" inherent in purchasing the securities). *See, e.g.*, Ex. 2 at 2 (statements denoted as forward-looking and identifying risk factors such as "the inherent uncertainty of estimating reserves and the possibility that incurred losses may be greater than our loss and loss adjustment expense reserves"); *id.* at 38 (collecting warnings about reserve calculations).

## II.   The Section 10(b) Claim Should Be Dismissed for Failure to Plead Particularized Facts Giving Rise to a Strong Inference of Scienter.

Plaintiffs' claims must be dismissed for the additional reason that they do not plead particularized facts giving rise to a "strong inference" of scienter as required by the PSLRA. *Yates*, 744 F.3d at 885. The inference of scienter "must be more than merely reasonable or permissible—it must be ***cogent*** and compelling, thus strong in light of other explanations."

23

*Maguire*, 876 F.3d at 547. Plaintiffs must allege that Defendants engaged in either intentional or "severely reckless" misconduct, requiring "an act so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff." *KBC Asset Mgmt. NV v. DXC Tech. Co.*, 19 F.4th 601, 608 (4th Cir. 2021).

Plaintiffs plead no facts supporting an inference, much less a cogent or compelling one, that any Defendant disregarded a purported reserve deficiency and intentionally or recklessly deceived investors. Instead, Plaintiffs rely on allegations from FEs—who do not claim to have had any contact with the Individual Defendants—to contend that the process for setting case reserves was mismanaged. Even if those FEs were correct, the Fourth Circuit has held time and again that FEs' disagreement with managerial decisions is insufficient to support a strong inference of scienter. *See id.* at 610; *see also Yates*, 744 F.3d at 894 (allegations that company was "chronically understaffed . . . strengthens the inference" that it made innocent mistakes). Instead, the far more compelling inference is that the Defendants entered into a novel contract with Uber, the Company estimated reserves based on available information, and Defendants disclosed to investors as their good-faith judgment about the adequacy of reserves evolved.

A.      **Plaintiffs Fail to Plead Facts Raising a Strong Inference of Scienter Based on the FE Allegations.**

For many of the same reasons that Plaintiffs' claims fail under *Omnicare*, Plaintiffs fail to plead particularized facts sufficient to raise a "strong inference" of scienter as to any Individual Defendant, as required to state a claim. The PSLRA "mandates that, 'with respect to *each act or omission alleged*' to constitute securities fraud, any prospective plaintiff must 'state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind.'" *KBC Asset Mgmt.*, 19 F.4th at 607. The SAC fails to plead with particularity that Defendants acted with the requisite state of mind for each alleged misstatement.

24

First, Plaintiffs cannot raise a strong inference of scienter based on their generalized allegations that James River's case reserves process was deficient. *See* SAC ¶¶ 323–45. None of the FE witnesses assert that they had any involvement with estimating the Company's loss reserves, much less "direct contact" with the Individual Defendants, which is fatal to Plaintiffs' claims. *KBC Asset Mgmt.*, 19 F.4th at 609. Plaintiffs also fail to specify precisely when or how each Individual Defendant was supposed to have realized that the Company's loss reserves were materially deficient. *See Matrix Cap. Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 184 (4th Cir. 2009) (plaintiffs failed to plead scienter because they "do not include a timeline for their allegations or otherwise allege facts that imply defendants were aware of OneGlobe problems prior to making or approving financial statements"). As discussed above, Plaintiffs fail to allege any connection between the allegedly inadequate process for setting case reserves and the challenged statements that Defendants made about overall loss reserves. No strong inference of fraudulent intent with respect to loss reserves can be drawn from allegations merely criticizing the Company's process for setting case reserves, especially absent factual allegations that any Defendant knew of the purported issues. *See Yates*, 744 F.3d at 893 (concluding that allegations of financial misstatements "at most" suggested that management "mistakenly" had "failed to have sufficient accounting controls and processes" but not a strong inference of scienter).

Plaintiffs' conclusory assertion that scienter can be inferred because the Company purportedly had a "policy" to keep claim reserves low does not come close to satisfying the stringent pleading standards of the PSLRA. First, as discussed more fully in section I.A.1 above, Plaintiffs fail to plead sufficient facts to infer that any such "policy" existed, much less that any Defendant was aware of such a policy. To the contrary, many of the details provided by the FEs describe a prudent process for setting case reserves consistent with the Company's disclosures,

25

further cutting against any inference that any Individual Defendant knew or should have known that overall loss reserves were understated.  And while certain FEs complain that higher-level employees placed limits on their ability to raise reserves above a certain level without supervisor approval, *see, e.g.*, SAC ¶¶ 79, 82–87, they acknowledge that there were procedures to increase reserves, including by submitting a "Large Loss Report." *Id.* ¶ 87.  These allegations could be read to suggest that the claims department could have been better managed, but they do nothing to demonstrate that Defendants acted with scienter.  *See Yates*, 744 F.3d at 887 ("Although the allegations in this case are legion, the facts alleged point towards the conclusion that the defendant was simply overwhelmed with integrating a large new division into its existing business."); *Matrix Cap. Mgmt. Fund*, 576 F.3d at 188 (inference of scienter was not compelling since defendants may not have been aware of accounting problems in growing business line).

Viewed holistically, the FE allegations support the more plausible, non-fraudulent inference that the Company had a system in place to ensure case reserves were appropriately set, consistent with its disclosures. SAC ¶ 108 (quoting Ex. 10 at 13) ("[w]e keep the settlement authority of front-line adjusters low to ensure the practice of having two or more members of the department participate in the decision as to whether to settle or defend").  Plaintiffs cannot allege a strong inference of fraud based on a practice repeatedly disclosed to investors.  *See In re Triangle Cap. Corp. Secs. Litig.*, 988 F.3d 743, 755 (4th Cir. 2021) ("The breadth of Defendants' risk disclosures to investors further strengthens the competing inference of innocence.").

**B.      Plaintiffs' Remaining Theories of Scienter Cannot Save Their Claims.**

Plaintiffs' hodgepodge of other attempts to plead scienter—via the core operations theory, alleged violations of Sarbanes-Oxley and GAAP, stock sales by Individual Defendants, or rumors that Defendants wished to sell the Company—fall equally flat.  First, Plaintiffs' attempt to save their claims by alleging that the Uber relationship constituted a "core business

26

operation" for James River fails because that theory has been rejected by the Fourth Circuit. *See* SAC ¶¶ 355–59. "[B]are allegations that officers have knowledge of key facts because of their positions or because such knowledge relates to the business's core operations are not enough, standing alone, to support a strong inference of scienter." *KBC Asset Mgmt.*, 19 F.4th at 612. Plaintiffs here also lack any "particularized allegations regarding Defendants' knowledge of shortcomings" for Uber-related reserves. *Id.* Nor can Plaintiffs rely on the inference that Defendants must have known of deficiencies with case reserves because Anita Rogers, Courtenay Warren, and Richard Schmitzer had contact with both claims adjusters and the "c-suite," or because Plaintiffs deem it "implausible" that Schmitzer would not have told the Reserve Committee that he denied certain requests to increase case reserves. SAC ¶¶ 18, 78, 307, 313, 342. Asking this Court to infer that Defendants acted with scienter based on such conjecture "flies in the face of the PSLRA's mandate that the strong inference of scienter be supported by facts, not other inferences." *In re Triangle Cap. Corp.*, 988 F.3d at 756. Plaintiffs' allegations regarding a supposed "secret email portal" to which "requests for reserve increases were funneled" fare no better (SAC ¶ 343): Plaintiffs allege no facts to suggest the portal had anything to do with loss reserves, much less that it was intended to artificially suppress loss reserves or that the Individual Defendants were aware of it. *KBC Asset Mgmt.*, 19 F.4th at 609 (rejecting inference of scienter due to lack of particularized factual allegations that Individual Defendants were "aware of the problems alleged").

Second, the Individual Defendants' certification of the Company's compliance with Sarbanes-Oxley and GAAP adds nothing to Plaintiffs' scienter allegations, as these alleged violations are derivative of Plaintiffs' other meritless theories. *See In re PEC Sols., Inc. Secs. Litig.*, 418 F.3d at 389–90 (rejecting inference of scienter based on alleged noncompliance with

GAAP requirement that losses be reported when "reasonably estima[ble]"); *Cozzarelli*, 549 F.3d at 628 n.2 ("bare allegation" of a false certification under Sarbanes-Oxley "does not provide independent support for an inference of scienter").

Finally, Plaintiffs cannot demonstrate scienter based on stock sales during the course of the 32-month class period by two Individual Defendants—Myron, who sold about $2.9 million of James River shares in August 2020 (approximately 20.6% of his holdings), and Doran, who sold about $700,000 of her shares in November 2020 (approximately 25% of her holdings). SAC ¶¶ 346–50. There is no basis to conclude that the sale of 25% or less of a Defendant's holdings standing alone supports a strong inference of scienter. *See KBC Asset Mgmt.*, 19 F.4th at 611 (citing *Proter v. Medifast, Inc.*, 2013 WL 1316034, at *21 n.20 (D. Md. Mar. 28, 2013) (collecting cases concluding larger percentages of stock sales did not warrant suspicion)). Moreover, the Fourth Circuit has held that any inference of scienter is severely diminished when, as here, there is a particularly lengthy class period. *Yates*, 744 F.3d at 891 (noting that 15-month class period is "unusually long," as "it is not unusual for insiders to trade at some point during their tenure with a company"). Nor do vague rumors of plans to sell the Company help establish scienter. SAC ¶¶ 149, 344; *see Phillips v. LCI Int'l*, 190 F.3d 609, 622–23 (4th Cir. 1999) (rejecting inference of scienter based on generalized allegations that defendants misled shareholders out of a desire to sell the company); *Chubb Corp.*, 394 F.3d at 155 ("Generic and conclusory allegations based upon rumor or conjecture are undisputedly insufficient to satisfy the heightened pleading standard of [the PSLRA].").

**C.    Plaintiffs Fail to Allege That the Corporation Acted with Scienter.**

Having failed to allege a strong inference of scienter with respect to any corporate agent, Plaintiffs have likewise failed to do so for the Company as whole. Plaintiffs cannot hang their scienter allegations on allegations regarding Richard Schmitzer (the President of the E&S

division) or Courtenay Warren and Anita Rogers (who oversaw E&S claims), who allegedly reviewed some requests to increase Uber case reserves and circulated spreadsheets reporting on those reserves. *See* SAC ¶¶ 87, 110, 112–13, 141–43.  Plaintiffs do not allege that those employees made or authorized any alleged misstatement, as required to plead corporate scienter. *See Matrix Cap. Mgmt. Fund*, 576 F.3d at 189–90 (corporate scienter assessed based on the state of mind of individual who authorized challenged statement).

> ### D.      The Opposing Inference of Non-Fraudulent Intent Is More Compelling.

The inadequacy of Plaintiffs' allegations of scienter stands in sharp contrast to the competing inference in this case: that James River wrote a novel insurance policy for the rideshare industry, was taken aback when it proved costlier than expected, tried to put the matter behind it, and yet still had difficulty containing the losses.  *See KBC Asset Mgmt.*, 19 F.4th at 608 ("Courts must compare the malicious and innocent inferences from the facts pled and only allow the complaint to survive a motion to dismiss if the malicious inference is at least as compelling as any opposing innocent inference.").  James River repeatedly disclosed adverse results from the Uber contract, "successive disclosures [that] suggest that its officers attempted to keep investors updated about [the Uber contract's] weaknesses." *Yates*, 744 F.3d at 894.  While Plaintiffs attempt to cast the Company's statements regarding problems with the Uber block— such as Defendant Abram's comments upon the October 2019 announcement of the cancellation of the Uber policies that the "underlying risk evolved very quickly" and that "candidly, in some years, we mispriced the risk"—as admissions of wrongdoing (*see* SAC ¶¶ 5, 375), in fact they are the opposite: a good-faith acknowledgment that the Uber policies did not work out as anticipated.  As time went on, James River expressed hope that the problem would improve, *see id.* ¶ 60; informed investors that further sustained losses were possible, which ultimately occurred in 2020 and 2021, *see, e.g.*, Ex. 10 at 38; Ex. 18 at 42 ("there is always the risk that

29

reserves may prove inadequate, and actual results always differ from our reserve estimates"); and disclosed, over the course of many months, a continued need to increase reserve estimates related to the Uber policies.

These repeated disclosures are not the actions of a company with something to hide, but rather demonstrate that Defendants were seeking to inform investors in real time as additional claims were submitted and the full extent of the Company's losses became apparent. *See KBC Asset Mgmt.*, 19 F.4th at 613 ("when defendants disclose risks and newly discovered weaknesses to investors this counts against an inference of scienter"). Plaintiffs' allegations at most suggest that FEs believe that the Company made mistakes in how it dealt with the Uber contract, falling far short of the PSLRA's high bar. *Id.* at 610 ("Even if those employees were ultimately correct that Defendants made unwise business decisions . . . , that mistake does not support a strong inference of scienter.").

### III.    Plaintiffs Fail to Plead Control Person Liability as to the Individual Defendants.

Section 20(a) of the Exchange Act imposes liability on each person who "controls any person liable under any provision of this chapter or of any rule or regulation thereunder."  15 U.S.C. § 78t(a).  "Because § 20(a) liability is derivative of § 10(b) liability, Plaintiffs' failure to adequately plead a § 10(b) claim dooms their § 20(a) claim." *KBC Asset Mgmt.*, 19 F.4th at 614 n.4.[5]

### CONCLUSION

For the reasons stated above, the SAC fails and should be dismissed in its entirety.

---

[5] Plaintiffs have also failed to allege loss causation given their failure to allege any material misstatement or omission.  Nor can they claim that the October 26, 2021 press release, which reiterated that the Company would transfer Uber claims to a reinsurer, was a corrective disclosure sufficient to establish loss causation.  To constitute a corrective disclosure, the statement must have "present[ed] facts to the market that are new," and the Company had disclosed that Uber claims would be transferred in September 2021. *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 473 (4th Cir. 2011); *see* Exs. 23, 24.

Dated: Washington, D.C.
October 24, 2022

| | |
|---|---|
| Maeve O'Connor (*pro hac vice*)<br>Susan Reagan Gittes (*pro hac vice*)<br>DEBEVOISE & PLIMPTON LLP<br>919 Third Avenue<br>New York, NY 10022<br>Telephone: (212) 909-6000<br>Facsimile: (212) 521-7715<br>mloconnor@debevoise.com<br>srgittes@debevoise.com | By: /s/ *Carter Burwell*<br>Carter Burwell (Va. Bar No. 88177)<br>DEBEVOISE & PLIMPTON LLP<br>801 Pennsylvania Ave. N.W., Suite 500<br>Washington, D.C. 20004<br>Telephone: (202) 383-8000<br>Facsimile: (212) 521-7715<br>cburwell@debevoise.com<br><br>*Counsel for Defendants* |

31