# EXHIBIT 37

# Preface

## Audit & Accounting Guide

# Property and Liability Insurance Entities

## Prepared by the Insurance Companies Committee.

## (Updated As of August 1, 2021)

*All rights reserved. For information about the procedure for requesting permission to make copies of any part of this work, please call the AICPA Copyright Permissions Hotline at 201-938-3245. A Permissions Request Form for emailing requests is available at http://www.aicpa.org by clicking on the copyright notice on any page. Otherwise, requests should be written and mailed to the Permissions Department, AICPA, Harborside Financial Center, 201 Plaza Three, Jersey City, NJ 07311-3881.*

Preface

## About AICPA Audit and Accounting Guides

This AICPA Audit and Accounting Guide has been developed by the AICPA Property and Liability Insurance Guide Task Force to assist practitioners in performing and reporting on their audit engagements, and to assist management of property and liability insurance entities in preparing financial statements in conformity with U.S. generally accepted accounting principles (GAAP) and statutory accounting principles.

An AICPA Guide containing auditing guidance related to generally accepted auditing standards (GAAS) is recognized as an interpretive publication as defined in AU-C section 200, *Overall Objectives of the Independent Auditor and the Conduct of an Audit in Accordance With Generally Accepted Auditing Standards.*[1] Interpretive publications are recommendations on the application of GAAS in specific circumstances, including engagements for entities in specialized industries.

[1] All AU-C sections can be found in AICPA *Professional Standards.*

Interpretive publications are issued under the authority of the AICPA Auditing Standards Board (ASB) after all ASB members have been provided an opportunity to consider and comment on whether the proposed interpretive publication is consistent with GAAS. The members of the ASB have found the auditing guidance in this guide to be consistent with existing GAAS.

Although interpretive publications are not auditing standards, AU-C section 200 requires the auditor to consider applicable interpretive publications in planning and performing the audit because interpretive publications are relevant to the proper application of GAAS in specific circumstances. If the auditor does not apply the auditing guidance in an applicable interpretive publication, the auditor should document how the requirements of GAAS were complied with in the circumstances addressed by such auditing guidance.

The ASB is the designated senior committee of the AICPA authorized to speak for the AICPA on all matters related to auditing. Conforming changes made to the auditing guidance contained in this guide are approved by the ASB chair (or the ASB chair's designee) and the Director or Chief Auditor of the AICPA Audit and Attest Standards staff. Updates made to the auditing guidance in this guide exceeding that of conforming changes are issued after all ASB members have been provided an opportunity to consider and comment on whether the guide is consistent with existing GAAS.

Throughout this guide, when appropriate, reference is made to Technical Questions and Answers (Q&A), which are considered other auditing publications. AU-C section 200 indicates that in applying the auditing guidance included in an other auditing publication, the auditor should, exercising professional judgment, assess the relevance and appropriateness of such guidance to the circumstances of the audit. Other auditing publications have no authoritative status; however, they may help the auditor understand and apply GAAS. The auditor is not expected to be aware of the full body of other auditing publications. Although the auditor determines the relevance of these publications in accordance with paragraph .28 ⧉ of AU-C section 200, the auditor may presume that other auditing publications published by the AICPA that have been reviewed by the AICPA Audit and Attest Standards staff are appropriate. These other auditing publications are listed in AU-C appendix F, *Other Auditing Publications* ⧉.

Any auditing guidance in a guide appendix or exhibit (whether a chapter or back matter appendix or exhibit) is also considered an "other auditing publication." While other auditing publications have no authoritative status, when applying such guidance, the auditor should, exercising professional judgment, assess the relevance and appropriateness of such guidance to the circumstances of the audit. Although the auditor determines the relevance of other auditing guidance, auditing guidance in a guide appendix or exhibit has been reviewed by the AICPA Audit and Attest Standards staff and the auditor may presume that it is appropriate.

The Financial Reporting Executive Committee (FinREC) is the designated senior committee of the AICPA authorized to speak for the AICPA in the areas of financial accounting and reporting. Conforming changes made to the financial accounting and reporting guidance contained in this guide are approved by the FinREC chair (or his or her designee). Updates made to the financial accounting and reporting guidance in this guide exceeding that of conforming changes are approved by the affirmative vote of at least two-thirds of the members of FinREC.

This guide does the following:

- Identifies certain requirements set forth in the FASB *Accounting Standards Codification*® (ASC).

- Describes FinREC's understanding of prevalent or sole industry practice concerning certain issues. In addition, this guide may indicate that FinREC expresses a preference for the prevalent or sole industry practice, or it may indicate that FinREC expresses a preference for another practice that is not the prevalent or sole industry practice; alternatively, FinREC may express no view on the matter.

- Identifies certain other, but not necessarily all, industry practices concerning certain accounting issues without expressing FinREC's views on them.

- Provides guidance that has been supported by FinREC on the accounting, reporting, or disclosure treatment of transactions or events that are not set forth in FASB ASC.

Accounting guidance for nongovernmental entities included in an AICPA Guide is a source of nonauthoritative accounting guidance. As discussed later in this preface, FASB ASC is the authoritative source of U.S. accounting and reporting standards for nongovernmental entities, in addition to guidance issued by the SEC.

AICPA Audit and Accounting Guides also include guidance from *Technical Questions and Answers*. These questions and answers are not sources of established authoritative accounting principles as described in FASB ASC, the authoritative source of GAAP for nongovernmental entities. This material is based on selected practice matters identified by the staff of the AICPA's Technical Hotline and various other bodies within the AICPA and has not been approved, disapproved, or otherwise acted upon by any senior technical committee of the AICPA.

AICPA Guides may include certain content presented as "supplement," "appendix," or "exhibit." A supplement is a reproduction, in whole or in part, of authoritative guidance originally issued by a standard setting body (including regulatory bodies) and applicable to entities or engagements within the purview of that standard setter, independent of the authoritative status of the applicable AICPA Guide. Both appendixes and exhibits are included for informational purposes and have no authoritative status.

## Recognition

**2021 Guide Edition**

**AICPA Senior Committees**

**Auditing Standards Board**

Harry Cohen, ASB Member

Tracy Harding, *Chair*

**Financial Reporting Executive Committee**

Angela Newell, *Chair*

The AICPA gratefully acknowledges the following individuals who reviewed or otherwise contributed to the development of this edition of the guide: David Affeldt, Jennifer Austin, Dianne Batistoni, Carol Bolles, Jill Butler, Dan Buttke, Jean Connolly, Maureen Downie, Fred Fischer, Man Du, Ganesha Krishna Gandi, Darcie Garza, Mike Hanlon, John Laird, Allison Haug, Steven Kenney, Allison Lange, Jake Lehnowsky, Josh Leinum, Jeff Maffitt, Josh Martin, Sarah McConnell, Dave Osborn, Lorenzo Providence, Olga Roberts, Brian Rozek, Greg Schlaefer, Nate Seacrist, Jie Shen, Sam Sladky, David Spayde, J.D. Stadler, Anne Stevens, Danny Suttiratana, John Tittle, Lauren Tonetti, Jennifer Weiner, Tiffany Wyszkowski, and Isabella Yao.

**AICPA Staff**

Robert Booth

*Manager*

Product Management & Development

Jennifer Burns

*Chief Auditor*

Kim Kushmerick

*Director*

Accounting Standards and *Staff Liaison* to the AICPA Insurance Expert Panel

Daniel Noll

*Vice President*

Financial Reporting, Forensic and Valuation Services

**2013 Guide Edition**

**Property and Liability Insurance Entities Audit and Accounting Guide Overhaul Task Force (2005–2012)**

(members when this edition was completed)
Mark Parkin, *Chair*
Michelle Avery

Keith Bell

Alissa Choi

Maureen Downie

William Ferguson

Daniel Grady

Richard Lynch

Coleman Ross

E. Daniel Thomas

Magali Welch

(former members who contributed to the development of this edition)
Ken Croarkin

Martin John

Scott Lewis

William Lowry

Marc Smith

Ramin Taraz

**ICPA Senior Committees**

**Financial Reporting Executive Committee**

(members when this edition was completed)
Richard C. Paul, *Chair*
Aaron Anderson

Linda Bergen

Adam Brown

Terry Cooper

Lawrence Gray

Randolph Green

Mary E. Kane

Jack Markey

Joseph D. McGrath

Rebecca Mihalko

Steve Moehrle

Angela Newell

Mark Scoles

Brad Sparks

Dusty Stallings

(former members who contributed to the development of this edition)
Jay Hanson, *Former Chair*
Benjamin S. Neuhausen, *Former Chair*
David Alexander

Robert Axel

Rick Arpin

Kimber Bascom

Glenn Bradley

Neri Bukspan

Brett Cohen

Pascal Desroches

James A. Dolinar

L. Charles Evans

Faye Feger

Bruce Johnson

Richard Jones

Carl Kampel

Lisa Kelley

David Morris

Jonathon Nus

Richard Petersen

Roy Rendino

Terry Spidell

Randall Sogoloff

Richard K. Stuart

Enrique Tejerina

Robert Uhl

Dan Weaver

Dan Zwarn

**Auditing Standards Board**

(members when this edition was completed)
Darrel R. Schubert, *Chair*
Brian Bluhm

Robert E. Chevalier

Sam K. Cotterell

Jim Dalkin

David Duree

Jennifer Haskell

Ed G. Jolicoeur

Barbara Lewis

Carolyn H. McNerney

David Morris

Kenneth R. Odom

Don M. Pallais

Brian R. Richson

Mike Santay

Kay W. Tatum

Kim L. Tredinnick

H. Steven Vogel

Kurtis A. Wolff

The AICPA and the Property and Liability Insurance Entities Audit and Accounting Guide Overhaul Task Force gratefully acknowledges the contributions of Evan Cabat, Jean Connolly, Jennifer Englert, Robert Evans, Danielle Fandrey, Thomas Fekete, Julie Gould, Andy Gray, Linda Healy, Jay Muska, Mary Saslow, Lisa Slotznick, and Deborah Whitmore.

The AICPA and the Property and Liability Insurance Entities Audit and Accounting Guide Overhaul Task Force gratefully acknowledges those members of the AICPA Insurance Expert Panel who reviewed or otherwise contributed to the development of this guide: Jill Butler, Darryl Briley, Kathleen Enright, Matthew Farney, James Greisch, Kenneth N. Hugendubler, Margie M. Keeley, Joshua Keene, Rick Sojkowski, Robert Tarnok, Anthony Valoroso, and Jennifer Yaross. Additionally, the AICPA and the Property and Liability Insurance Entities Audit and Accounting Guide Overhaul Task Force thank those past members of the AICPA Insurance Expert Panel who reviewed or otherwise contributed to the development of this guide but rotated off the Insurance Expert Panel prior to the guide being completed: Amy Corbin, Elaine Lehnert, Sandra Peters, and Donald Schwegman.

**AICPA Staff**

Kim Kushmerick

*Senior Technical Manager*

Accounting Standards and *Staff Liaison* to the AICPA Insurance Expert Panel

Dan Noll

*Vice President*

Financial Reporting, Forensic and Valuation Services

## Guidance Considered in This Edition

This edition of the guide has been revised by AICPA staff to include certain changes necessary due to the issuance of authoritative guidance since the guide was originally issued, and other revisions as deemed appropriate. Relevant guidance issued through August 1, 2021, has been considered in the development of this edition of the guide. However, this guide does not include all audit, accounting, reporting, and other requirements applicable to an entity or a particular engagement. This guide is intended to be used in conjunction with all applicable sources of relevant guidance.

Relevant guidance that is issued and effective on or before August 1, 2021, is incorporated directly in the text of this guide. Relevant guidance issued but not yet effective as of August 1, 2021, but becoming effective on or before December 31, 2021, is also presented directly in the text of the guide, but shaded gray and accompanied by a footnote indicating the effective date of the new guidance. The distinct presentation of this content is intended to aid the reader in differentiating content that may not be effective for the reader's purposes (as part of the guide's dual guidance treatment of applicable new guidance).

Unless otherwise indicated, relevant guidance issued but not yet effective as of the date of the guide and not becoming effective until after December 31, 2021, is referenced in a guidance update box; that is, a box that contains summary information on the guidance issued but not yet effective.

In updating this guide, all guidance issued up to and including the following was considered, but not necessarily incorporated, as determined based on applicability:

- FASB Accounting Standards Update (ASU) No. 2021-05, *Leases (Topic 842): Lessors — Certain Leases with Variable Lease Payments* 🗋

- Statement on Auditing Standards (SAS) No. 144, *Amendments to AU-C Sections 501, 540, and 620 Related to the Use of Specialists and the Use of Pricing Information Obtained From External Information Sources*

- May 20, 2021, meeting of the National Association of Insurance Commissioners Statutory Accounting Principles Working Group

Users of this guide should consider guidance issued subsequent to those items listed previously to determine their effect on entities covered by this guide. In determining the applicability of recently issued guidance, its effective date should also be considered.

The changes made to this edition of the guide are identified in the Schedule of Changes appendix. The changes do not include all those that might be considered necessary if the guide were subjected to a comprehensive review and revision.

## FASB ASC Pending Content

### *Presentation of Pending Content in FASB ASC*

Amendments to FASB ASC (issued in the form of ASUs) are initially incorporated into FASB ASC in "pending content" boxes that follow the paragraphs being amended with links to the transition information. The pending content boxes are meant to provide users with information about how the guidance in a paragraph will change as a result of the new guidance.

Pending content applies to different entities at different times due to varying fiscal year-ends, and because certain guidance may be effective on different dates for public and nonpublic entities. As such, FASB maintains amended guidance in pending content boxes within FASB ASC until the roll-off date. Generally, the roll-off date is six months following the latest fiscal year-end for which the original guidance being amended could still be applied.

### *Presentation of FASB ASC Pending Content in AICPA Guides*

Amended FASB ASC guidance that is included in pending content boxes in FASB ASC on August 1, 2021, is referenced as "pending content" in this guide. Readers should be aware that pending content referenced in this guide will eventually be subjected to FASB's roll-off process and no longer be labeled as "pending content" in FASB ASC (as discussed in the previous paragraph).

## Terms Used to Define Professional Requirements in This AICPA Audit and Accounting Guide

Any requirements described in this guide are normally referenced to the applicable standards or regulations from which they are derived. Generally, the terms used in this guide describing the professional requirements of the referenced standard setter (for example, the ASB) are the same as those used in the applicable standards or regulations (for example, *must* or *should*). However, where the accounting requirements are derived from FASB ASC, this guide uses *should*, whereas FASB uses *shall*. In its resource document "About the Codification" that accompanies FASB ASC, FASB states that it considers the terms *should* and *shall* to be comparable terms and to represent the same concept — the requirement to apply a standard.

Readers should refer to the applicable standards and regulations for more information on the requirements imposed by the use of the various terms used to define professional requirements in the context of the standards and regulations in which they appear.

Certain exceptions apply to these general rules, particularly in those circumstances in which the guide describes prevailing or preferred industry practices for the application of a standard or regulation. In these circumstances, the applicable senior committee responsible for reviewing the guide's content believes the guidance contained herein is appropriate for the circumstances.

**Applicability of GAAS and PCAOB Standards**

Appendix A of the AICPA Code of Professional Conduct, "Council Resolution Designating Bodies to Promulgate Technical Standards," recognizes both the ASB and the PCAOB as standard-setting bodies designated to promulgate auditing, attestation, and quality control standards. Paragraph .01 of the "Compliance With Standards Rule" (ET sec. 1.310.001 and 2.310.001) [2] requires an AICPA member who performs an audit to comply with the applicable standards.

[2] All ET sections can be found in AICPA *Professional Standards*

Audits of the financial statements of those entities subject to the oversight authority of the PCAOB (that is, those audit reports within the PCAOB's jurisdiction as defined by the Sarbanes-Oxley Act of 2002, as amended) are to be conducted in accordance with standards established by the PCAOB, a private sector, not-for-profit corporation created by the Sarbanes-Oxley Act of 2002. The SEC has oversight authority over the PCAOB, including the approval of its rules, standards, and budget.

Audits of the financial statements of those entities not subject to the oversight authority of the PCAOB (that is, those audit reports not within the PCAOB's jurisdiction as defined by the Sarbanes-Oxley Act of 2002, as amended) — hereinafter referred to as *nonissuers* [3] are to be conducted in accordance with GAAS as issued by the ASB. The ASB develops and issues standards in the form of SASs through a due process that includes deliberation in meetings open to the public, public exposure of proposed SASs, and a formal vote. The SASs and their related interpretations are codified in AICPA *Professional Standards*. In citing GAAS and their related interpretations, references generally use section numbers within the codification of currently effective SASs and not the original statement number, as appropriate.

[3] See the definition of the term *nonissuer* in the AU-C Glossary.

The auditing content in this guide primarily discusses GAAS issued by the ASB and is applicable to audits of nonissuers. Users of this guide may find the tool developed by the PCAOB's Office of the Chief Auditor helpful in identifying comparable PCAOB standards. The tool is available at the following link:

Find an Analogous Standard | PCAOB (http://www.pcaobus.org).

# Applicability of Quality Control Standards

QC section 10, *A Firm's System of Quality Control*,[4] addresses a CPA firm's responsibilities for its system of quality control for its accounting and auditing practice. A system of quality control consists of policies that a firm establishes and maintains to provide it with reasonable assurance that the firm and its personnel comply with professional standards, as well as applicable legal and regulatory requirements. The policies also provide the firm with reasonable assurance that reports issued by the firm are appropriate in the circumstances.

[4] The QC section can be found in AICPA *Professional Standards*.

QC section 10 applies to all CPA firms with respect to engagements in their accounting and auditing practice. In paragraph .13 of QC section 10, an *accounting and auditing practice* is defined as "a practice that performs engagements covered by this section, which are audit, attestation, compilation, review, and any other services for which standards have been promulgated by the ASB or the Accounting and Review Services Committee under the "General Standards Rule" (ET sec. 1.300.001) or the "Compliance With Standards Rule" (ET sec. 1.310.001) of the AICPA Code of Professional Conduct. Although standards for other engagements may be promulgated by other AICPA technical committees, engagements performed in accordance with those standards are not encompassed in the definition of an *accounting and auditing practice*."

In addition to the provisions of QC section 10, readers should be aware of other sections within AICPA *Professional Standards* that address quality control considerations, including the following provisions that address engagement level quality control matters for various types of engagements that an accounting and auditing practice might perform:

- AU–C section 220, *Quality Control for an Engagement Conducted in Accordance With Generally Accepted Auditing Standards* 🗋

- AT–C section 105, *Concepts Common to All Attestation Engagements* 🗋[5]

   [5] All AT–C sections can be found in AICPA *Professional Standards*.

- AR–C section 60, *General Principles for Engagements Performed in Accordance With Statements on Standards for Accounting and Review Services* 🗋[6]

   [6] All AR–C sections can be found in AICPA *Professional Standards*.

Because of the importance of engagement quality, this guide includes an appendix C, "Overview of Statements on Quality Control Standards 🗋" which summarizes key aspects of the quality control standard. This summarization should be read in conjunction with QC section 10, AU–C section 220, AT–C section 105, AR–C section 60, and the quality control standards issued by the PCAOB, as applicable.

## Alternatives Within U.S. GAAP

The Private Company Council (PCC), established by the Financial Accounting Foundation's Board of Trustees in 2012, and FASB, working jointly, will mutually agree on a set of criteria to decide whether and when alternatives within U.S. GAAP are warranted for private companies. Based on those criteria, the PCC reviews and proposes alternatives within U.S. GAAP to address the needs of users of private company financial statements. These U.S. GAAP alternatives may be applied to those entities that are not public business entities, not-for-profits, or employee benefit plans.

The FASB ASC Master Glossary defines a *public business entity* as follows:

A public business entity is a business entity meeting any one of the criteria below. Neither a not-for-profit entity nor an employee benefit plan is a business entity.

a. It is required by the U.S. Securities and Exchange Commission (SEC) to file or furnish financial statements, or does file or furnish financial statements (including voluntary filers), with the SEC (including other entities whose financial statements or financial information are required to be or are included in a filing).

b. It is required by the Securities Exchange Act of 1934 (the Act), as amended, or rules or regulations promulgated under the Act, to file or furnish financial statements with a regulatory agency other than the SEC.

c. It is required to file or furnish financial statements with a foreign or domestic regulatory agency in preparation for the sale of or for purposes of issuing securities that are not subject to contractual restrictions on transfer.

d. It has issued, or is a conduit bond obligor for, securities that are traded, listed, or quoted on an exchange or an over-the-counter market.

e. It has one or more securities that are not subject to contractual restrictions on transfer, and it is required by law, contract, or regulation to prepare U.S. GAAP financial statements (including footnotes) and make them publicly available on a periodic basis (for example, interim or annual periods). An entity must meet both of these conditions to meet this criterion.

An entity may meet the definition of a public business entity solely because its financial statements or financial information is included in another entity's filing with the SEC. In that case, the entity is only a public business entity for purposes of financial statements that are filed or furnished with the SEC.

Readers should refer to Q&A section 7100.15, "Insurance Companies and the Definition of Public Business Entity,"[7] for additional information related to applying the definition of a public business entity to insurance entities.

   [7] All Q&A sections can be found in *Technical Questions and Answers*.

Considerations related to alternatives for private companies may be discussed within this guide's chapter text. When such discussion is provided, the related paragraphs are designated with the following title: *Considerations for Private Companies That Elect to Use Standards as Issued by the Private Company Council*.

## AICPA.org Website

The AICPA encourages you to visit the website at http://www.aicpa.org and the Financial Reporting Center at http://www.aicpa.org/frc. The Financial Reporting Center supports members in the execution of high-quality financial reporting. Whether you are a financial statement preparer or a member in public practice, this center provides exclusive member-only resources for the entire financial reporting process. The Financial Reporting Center also provides timely and relevant news, guidance, and examples supporting the financial reporting process, including accounting, preparing financial statements, and performing compilation, review, audit, attest or assurance, and advisory engagements. Certain content on the AICPA's website referenced in this guide may be restricted to AICPA members only.

## AICPA Enhancing Audit Quality Areas of Focus

Audits play a vital role in society, providing valuable information to business owners, investors, and the public. As today's business environment continues to evolve and become more complex, upholding audit quality becomes more crucial than ever.

The AICPA promotes this goal through its Enhancing Audit Quality initiative (EAQ). The initiative, which started in 2014, aligns all AICPA assurance-related activities to support auditors in their quality improvement.

EAQ takes a data-driven approach to audit quality. First, we gather data from the AICPA Peer Review Program and other sources. Then, we analyze that data, actions of standard setters, and other prevailing environmental trends to identify areas where quality challenges may arise. Each year, we use that analysis to determine areas of focus for EAQ. We then help auditors improve in those areas by revising standards and guides to improve clarity, developing free education and resources, and emphasizing the areas of focus in Peer Review. In 2021, those areas of focus were COVID-19 audit implications, auditing revenue recognition, risk assessment and response, engagement acceptance and continuance, and emerging attestation engagements.

Through EAQ, the AICPA has developed toolkits to help auditors avoid the most common quality issues. Those toolkits can be found at http://www.aicpa.org/eaq.

## Select Recent Developments Significant to This Guide

### *Insurance Contracts Project*

International Accounting Standards Board® Activities

In September 2016, the International Accounting Standards Board (IASB) issued amendments to International Financial Reporting Standards (IFRS) 4, *Insurance Contracts* 🗋, to address concerns arising from implementing the new financial instruments standard, IFRS 9, *Financial Instruments* 🗋, before implementing IFRS 17, *Insurance Contracts*, the replacement standard that the board was developing for IFRS 4. These concerns included temporary volatility in reported results. IFRS 9 is effective for annual periods beginning on or after January 1, 2018, with early application permitted.

The amendments introduce two approaches: an overlay approach and a deferral approach. The amended standard was intended to

- give all companies that issue insurance contracts the option to recognize in other comprehensive income, rather than profit or loss, the volatility that could arise when IFRS 9 is applied before the issuance of the new insurance contracts standard; and

- give companies whose activities are predominantly connected with insurance an optional temporary exemption from applying IFRS 9 until January 1, 2023. The entities that defer the application of IFRS 9 will continue to apply the existing financial instruments standard, International Accounting Standard No. 39, *Financial Instruments: Recognition and Measurement* 🗋.

The amendments to IFRS 4 supplement existing options in the standard that can already be used to address the temporary volatility.

In May 2017, the IASB issued IFRS 17 to replace IFRS 4. IFRS 17 had an original effective date of January 1, 2021, with early application permitted provided that IFRS 9 and IFRS 15, *Revenue from Contracts with Customers*, were also applied. Subsequently the effective date for IFRS 17 was deferred by two years (annual reporting periods beginning on or after January 1, 2023).

IFRS® guidance states,

The key principles in IFRS 17 are that an entity:

- Identifies as insurance contracts those contracts under which the entity accepts significant insurance risk from another party (the policyholder) by agreeing to compensate the policyholder if a specified uncertain future event (the insured event) adversely affects the policyholder.

- Separates specified embedded derivatives, distinct investment components and distinct performance obligations for goods and services other than insurance from the insurance contracts.

- Divides the contracts into groups that it will recognize and measure.

- Recognizes and measures groups of insurance contracts at:

  i. A risk-adjusted present value of the future cash flows (the fulfilment cash flows) that incorporates all of the available information about the fulfilment cash flows in a way that is consistent with observable market information; plus (if this value is a liability) or minus (if this value is an asset).

  ii. An amount representing the unearned profit in the group of contracts (the contractual service margin).

- Recognizes the profit from a group of insurance contracts over the period the entity provides insurance contract services, and as the entity is released from risk. If a group of contracts is or becomes loss-making, an entity recognizes the loss immediately.

- Presents separately insurance revenue (that excludes the receipt of any investment component), insurance service expenses (that excludes the repayment of any investment components) and insurance finance income or expenses.

- Discloses information to enable users of financial statements to assess the effect that contracts within the scope of IFRS 17 have on the financial position, financial performance and cash flows of an entity.

IFRS 17 includes an optional simplified measurement approach, or premium allocation approach, for insurance contracts that have certain attributes.

In June 2020, the IASB amended IFRS 17 with the objective of helping companies implement the standard and making it easier for them to explain their financial performance.

The amendments to IFRS 17 include the following:[8]

  [8] Amendment information is quoted or paraphrased from the IFRS® Standards Project Summary and Feedback Statement, "Amendments to IFRS 17," June 2020. www.ifrs.org/content/dam/ifrs/project/amendments-to-ifrs-17/project-summary-amends-to-ifrs17.pdf.

- Deferral of the original effective date of IFRS 17 by two years (annual reporting periods beginning on or after January 1, 2023).

- Acquisition costs — the amendment requires a company to: allocate part of the acquisition costs to related expected contract renewals and recognize assets in respect of those costs until the company recognizes the contract renewals; assess the recoverability of the assets at each reporting date, if facts and circumstances indicate the assets may be impaired; and disclose information about those assets.

- Reinsurance contracts held — the amendment requires that a company that recognizes losses on insurance contracts on initial recognition, also recognize at the same time, expected recoveries of those losses from reinsurance contracts held that the company entered into before or at the same time as the loss-making insurance contracts were recognized. A simplification is available at transition if a company does not know the date it entered into a reinsurance contract.

- Use of the risk mitigation option — the amendment enables a company to also apply the risk mitigation option when mitigating financial risks using reinsurance contracts held or non-derivative financial instruments measured at fair value through profit or loss.

- Profit recognition — the amendment requires a company that issues insurance contracts without direct participation features to recognize profit when the company provides insurance coverage or any service relating to investment activities (investment-return service).

- Temporary exemption from IFRS 9 — the exemption from applying IFRS 9 has been extended by two years. It will expire for annual reporting periods beginning on or after January 1, 2023.

- Scope exclusions for some credit card (or similar) contracts, and some loan contracts.

- Balance sheet presentation— the amendment requires a company to present insurance contract assets and liabilities on the balance sheet in portfolios instead of in groups.

- The effect of previous interim reports — the amendment provides: an option for a company to change the estimates made in previous interim financial statements when applying IFRS 17 subsequently; and a simplification at transition for companies that choose not to change such estimates.

**FASB Activities**

In August 2018, FASB issued ASU No. 2018-12, *Financial Services—Insurance (Topic 944): Targeted Improvements to the Accounting for Long-Duration Contracts* , which will result in the following improvements:

1. Requires updated assumptions for liability measurement. Assumptions used to measure the liability for traditional insurance contracts, which are typically determined at contract inception, will now be reviewed — and, if there is a change, updated — at least annually, with the effect recorded in net income.

2. Standardizes the liability discount rate. The liability discount rate will be an upper-medium grade (low-credit-risk) fixed-income instrument yield that maximizes the use of observable market inputs with the effect of rate changes recorded in other comprehensive income.

3. Provides greater consistency in measurement of market risk benefits. The two previous measurement models have been reduced to one measurement model (fair value), resulting in greater uniformity in accounting for similar capital market-based benefits and better alignment with the fair value measurement of derivatives used to hedge capital market risk.

4. Changes amortization of deferred acquisition costs. Previous earnings-based amortization methods have been replaced with a more level amortization basis.

5. Requires enhanced disclosures. They include roll forwards and information about significant assumptions and the effects of changes in those assumptions.

For calendar-year public business entities, the changes in FASB ASU No. 2018-12 were originally effective at the beginning of 2021. For all other calendar-year entities, the changes in FASB ASU No. 2018-12 were originally effective at the end of 2022.

In November 2019, FASB issued ASU No. 2019-09, *Financial Services — Insurance (Topic 944): Effective Date* , to amend the effective dates for FASB ASU No. 2018-12.

In November 2020, FASB issued ASU No. 2020-11, *Financial Services — Insurance (Topic 944): Effective Date and Early Application* , to further amend the effective dates for FASB ASU No. 2018-12. The ASU amends the effective date as follows:

- For public business entities that meet the definition of an SEC filer and are not smaller reporting companies (SRCs), ASU No. 2018-12 is effective for fiscal years beginning after December 15, 2022, and interim periods within those fiscal years.

- For all other entities, ASU No. 2018-12 is effective for fiscal years beginning after December 15, 2024, and interim periods within fiscal years beginning after December 15, 2025.

- To facilitate early application of ASU No. 2018-12, an entity that chooses early application may do so as of the beginning of the prior period presented or as of the beginning of the earliest period presented.

- For example, a large calendar-year public insurance entity could reflect ASU No. 2018-12 as of January 1, 2021 (and record a transition adjustment as of that date), (1) in its 2022 financial statements if the entity elects early application or (2) in its 2023 financial statements if the entity does not elect early application.

The Insurance Expert Panel is developing papers related to implementation of FASB ASU No. 2018-12 that will eventually be included in AICPA Audit and Accounting Guide *Life and Health Insurance Entities*. The list of identified implementation issues and status can be found on the Insurance Expert Panel web page at: https://www.aicpa.org/interestareas/frc/industryinsights/long-duration-insurance-accounting-issues.html.

## *The New Revenue Recognition Standard: FASB ASC 606*

FASB ASU No. 2014-09, *Revenue from Contracts with Customers (Topic 606* ), and subsequent amendments (FASB ASU No. 2016-08, *Revenue from Contracts with Customers (Topic 606): Principal versus Agent Considerations (Reporting Revenue Gross versus Net* ); ASU No. 2016-10, *Revenue from Contracts with Customers (Topic 606): Identifying Performance Obligations and Licensing* ; ASU No. 2016-12, *Revenue from Contracts with Customers (Topic 606): Narrow-Scope Improvements and Practical Expedients* ; and ASU No. 2016-20, *Technical Corrections and Improvements to Topic 606, Revenue from Contracts with Customers* , was originally effective for annual reporting periods of public business entities, certain not-for-profits and certain employee benefit plans, beginning after December 15, 2017, including interim periods within that reporting period.

FASB ASU No. 2015-14, *Revenue from Contracts with Customers (Topic 606* ): *Deferral of the Effective Date*, deferred the effective date of ASU No. 2014-09 for all entities by one year as follows:

Public business entities, certain not-for-profit entities, and certain employee benefit plans should apply the guidance in ASU No. 2014-09 to annual reporting periods beginning after December 15, 2017, including interim reporting periods within that reporting period. Earlier application is permitted only as of annual reporting periods beginning after December 15, 2016, including interim reporting periods within that reporting period.

All other entities should apply the guidance in ASU No. 2014-09 to annual reporting periods beginning after December 15, 2018, and interim reporting periods within annual reporting periods beginning after December 15, 2019. All other entities may apply the guidance in ASU No. 2014-09 earlier as of an annual reporting period beginning after December 15, 2016, including interim reporting periods within that reporting period. All other entities also may apply the guidance in ASU No. 2014-09 earlier as of an annual reporting period beginning after December 15, 2016, and interim reporting periods within annual reporting periods beginning one year after the annual reporting period in which the entity first applies the guidance in ASU No. 2014-09.

FASB ASU No. 2020-05, *Revenue from Contracts with Customers (Topic 606) and Leases (Topic 842): Effective Dates for Certain Entities* 🗋, deferred the effective date of both ASUs to certain entities that have not yet issued their financial statements (or made financial statements available for issuance). For FASB ASC 606 🗋

the amendments in [ASU No. 2020-05] defer, for one year, the required effective date of Topic 606 for certain entities that have not yet issued their financial statements (or made financial statements available for issuance) reflecting the adoption of Topic 606. Those entities may elect to adopt the guidance for annual reporting periods beginning after December 15, 2019, and for interim reporting periods within annual reporting periods beginning after December 15, 2020. Those entities may elect to follow the original effective date of annual reporting periods beginning after December 15, 2018, and interim reporting periods within annual reporting periods beginning after December 15, 2019.

In this guide, revenue recognition implementation issues developed by the Insurance Revenue Recognition Task Force are directly referenced from the "Insurance Entities 🗋" chapter of AICPA Audit and Accounting Guide *Revenue Recognition.*

## Statements on Auditing Standards Nos. 134–141

SAS No. 134, *Auditor Reporting and Amendments, Including Amendments Addressing Disclosures in the Audit of Financial Statements*, as amended, significantly changes the form and content of the auditor's report issued after auditing a set of financial statements. The SAS also addresses the auditor's responsibility to form an opinion on the financial statements and amends various AU-C sections to focus auditor attention on disclosures throughout the audit process. SAS No. 134 has been codified as a suite of new or revised AU-C sections that includes a new AU-C section 701, *Communicating Key Audit Matters in the Independent Auditor's Report* 🗋, and replaces the following AU-C sections in AICPA *Professional Standards*:

- AU-C section 700, *Forming an Opinion and Reporting on Financial Statements* 🗋

- AU-C section 705, *Modifications to the Opinion in the Independent Auditor's Report* 🗋

- AU-C section 706, *Emphasis-of-Matter Paragraphs and Other-Matter Paragraphs in the Independent Auditor's Report* 🗋

SAS No. 135, *Omnibus Statement on Auditing Standards — 2019*, is intended to more closely align ASB guidance with the PCAOB standards primarily by amending AU-C sections 260, *The Auditor's Communication With Those Charged With Governance* 🗋; 550, *Related Parties* 🗋; and 240, *Consideration of Fraud in a Financial Statement Audit* 🗋, in AICPA *Professional Standards*. By eliminating unnecessary differences between the ASB guidance and PCAOB standards, auditors who perform audits under both sets of auditing standards will experience more consistency between the guidance and standards, thereby enhancing audit quality.

SAS No. 136, *Forming an Opinion and Reporting on Financial Statements of Employee Benefit Plans Subject to ERISA* (AU-C sec. 703 🗋), as amended, prescribes certain new performance requirements for an audit of financial statements of employee benefit plans subject to the Employee Retirement Income Security Act of 1974 (ERISA) and changes the form and content of the related auditor's report. It should not be adapted for plans that are not subject to ERISA. Note that the requirements from SAS No. 136 have not been included in this guide because ERISA does not apply. See AICPA Audit and Accounting Guide *Employee Benefit Plans* for guidance related to auditing ERISA plans.

SAS No. 137, *The Auditor's Responsibilities Relating to Other Information Included in Annual Reports* (AU-C sec. 720 🗋), as amended, provides transparency related to the auditor's responsibility for other information included in an annual report when the auditor has obtained all the other information at the date of the auditor's report on the financial statements. SAS No. 137 supersedes SAS No. 118, *Other Information in Documents Containing Audited Financial Statements*, as amended and codified in AU-C section 720, *The Auditor's Responsibilities Relating to Other Information Included in Annual Reports.*

SAS No. 138, *Amendments to the Description of the Concept of Materiality*, amends various SASs, including SAS Nos. 134 and 136, and aligns the materiality concepts discussed in AICPA *Professional Standards* with the description of materiality used by the U.S. judicial system, the auditing standards of the PCAOB, the SEC, and FASB. The ASB's current description of the concept of materiality is consistent with the definition used by the International Accounting Standards Board and the International Auditing and Assurance Standards Board. The changes are not expected to significantly affect practice.

SAS No. 139, *Amendments to AU-C Sections 800, 805, and 810 to Incorporate Auditor Reporting Changes From SAS No. 134*, amends the following AU-C sections to reflect changes to the auditor's report included in SAS No. 134, as amended: section 800, *Special Considerations — Audits of Financial Statements Prepared in Accordance With Special Purpose Frameworks*; section 805, *Special Considerations — Audits of Single Financial Statements and Specific Elements, Accounts, or Items of a Financial Statement* ⃞; and section 810, *Engagements to Report on Summary Financial Statements* ⃞.

SAS No. 140, *Amendments to AU-C Sections 725, 730, 930, 935, and 940 to Incorporate Auditor Reporting Changes From SAS Nos. 134 and 137*, contains amendments to conform the following AU-C sections to SAS No. 134, as amended: section 930, *Interim Financial Information* ⃞; section 935, *Compliance Audits* ⃞; and section 940, *An Audit of Internal Control Over Financial Reporting That Is Integrated With an Audit of Financial Statements* ⃞. SAS No. 140 also contains amendments to conform the following AU-C sections to SAS No. 137: section 725, *Supplementary Information in Relation to the Financial Statements as a Whole* ⃞, and section 730, *Required Supplementary Information*.

SAS No. 141, *Amendment to the Effective Dates of SAS Nos. 134–140*, allows for a one-year delay of the effective dates of SAS Nos. 134–140 and their amendments to other SASs from December 15, 2020, to December 15, 2021, to provide more time for firms to implement these SASs in light of the effect of the coronavirus pandemic. SAS No. 141 also lifts the prohibition against early implementation. SAS No. 141 is effective upon issuance. Refer to each individual standard for specific effective date language. The ASB recommends that SAS Nos. 134–140 be implemented at the same time.

Readers are also encouraged to consult the full text of SAS Nos. 134–140 at http://www.aicpa.org/interestareas/frc/auditattest/auditing-standards-information-and-resources.html.

## Statement on Auditing Standards No. 142, Audit Evidence

SAS No. 142, *Audit Evidence* (AU-C sec. 500 ⃞), issued in July 2020, is effective for audits of financial statements for periods ending on or after December 15, 2022.

SAS No. 142 supersedes SAS No. 122, *Statements on Auditing Standards: Clarification and Recodification*, as amended, section 500, *Audit Evidence*, and amends various other AU-C sections. The SAS explains what constitutes audit evidence in an audit of financial statements and sets out attributes of information that are taken into account by the auditor when evaluating information to be used as audit evidence. Taking these attributes into account assists the auditor in maintaining professional skepticism. The SAS addresses such issues as the use of emerging technologies and techniques by both preparers and auditors, the application of professional skepticism, the expanding use of external information sources to provide audit evidence, and more broadly, the relevance and reliability of audit evidence.

Extant AU-C section 500 is designated with an "A" suffix (for example, "AU-C section 500A ⃞") to denote content that does not reflect the codification of SAS No. 142. Upon implementation of SAS No. 142, auditors and firms should no longer utilize content from AU-C section 500A and should follow the standard as codified. This edition of the guide has not been updated to reflect changes that result from this SAS; however affected sections will be updated in a future edition. Readers are encouraged to consult the full text of the SAS on the AICPA's website at aicpa.org.

## Statement on Auditing Standards No. 143, Auditing Accounting Estimates and Related Disclosures

SAS No. 143, *Auditing Accounting Estimates and Related Disclosures* (AU-C sec. 540 ⃞), issued in July 2020, is effective for audits of financial statements for periods ending on or after December 15, 2023.

SAS No. 143 supersedes SAS No. 122, as amended, section 540, *Auditing Accounting Estimates, Including Fair Value Accounting Estimates, and Related Disclosures*, and amends various other AU-C sections. The SAS addresses the auditor's responsibilities relating to accounting estimates, including fair value accounting estimates, and related disclosures in an audit of financial statements. This standard enables auditors to appropriately address the increasingly complex scenarios that arise from new accounting standards that include estimates and related disclosures, and to enhance the auditor's focus on factors driving estimation uncertainty and potential management bias.

Extant AU-C section 540 is designated with an "A" suffix (for example, "AU-C section 540A") to denote content that does not reflect the codification of SAS No. 143. Upon implementation of SAS No. 143, auditors and firms should no longer utilize content from AU-C section 540A and should follow the standard as codified. This edition of the guide has not been updated to reflect changes that result from this SAS; however affected sections will be updated in a future edition. Readers are encouraged to consult the full text of the SAS on the AICPA's website at aicpa.org.

# 4.01-4.204 Chapter 4: The Loss Reserving and Claims Cycle

# Chapter 4: The Loss Reserving and Claims Cycle

*Gray shaded text in this chapter reflects certain accounting guidance issued but not yet effective as of the date of this guide, August 1, 2021, but becoming effective on or prior to December 31, 2021, exclusive of any option to early adopt ahead of the mandatory effective date. Unless otherwise indicated, all unshaded text reflects guidance that was already effective as of the date of this guide.*

## Introduction

4.01 Property and liability insurance contracts are generally agreements that provide protection against damage or loss of property caused by various perils, such as fire and theft, as well as the legal liability resulting from injuries to persons or damage to property in exchange for premiums or other considerations. The liability for unpaid losses and loss and claim adjustment expenses (herein referred to as reserves) is accrued when insured events occur based on the estimated ultimate cost of settling the claims or losses associated with those contracts. *Reserves* are management's best estimate of those amounts incurred yet unpaid. Reserve estimates should include the effects of inflation and other social and economic factors, as well as estimated recoveries from salvage and subrogation, which are deducted from the reserve estimate. A reserve for loss adjustment expenses (LAE) expected to be incurred in the settlement of unpaid claims should be accrued when the related loss reserve is accrued. These concepts are further discussed in paragraph 4.74. Throughout this guide, the term *reserves* is used in discussions of generally accepted accounting principles (GAAP) and statutory accounting principles (SAP).

4.02 An insurance entity's claims department accepts, investigates, adjusts, and settles claims that are reported by or against policyholders. This process includes the notification of the claim, determining whether the loss is covered under an active insurance policy, gathering and investigating information about the loss, and paying or denying the claim. Insurance entities generally use claims adjusters, who may be employees of the insurance entities or agents, to investigate claims. Insurance entities may also use outside organizations to investigate and adjust claims.

### Types of Businesses and Their Effect on the Estimation Process

4.03 The reporting and payment characteristics of an entity's losses will differ depending on the types of policies written. Insurance policies may be categorized in several different ways:

- By policy duration (short duration or long duration)

- By the type of coverage provided (occurrence basis or claims-made basis)

- By the kind of insurance underwritten — in this chapter, the terms *line of business* and *type of risk* are used interchangeably to mean the kind of insurance underwritten (for example, property, liability, workers' compensation, and assumed reinsurance)

### *Policy Duration*

4.04 Insurance policies are considered to be either short duration or long duration. Policies are considered short duration when the contract provides insurance coverage for a fixed period of short duration, generally one year or less, and allows the insurer to either not renew the contract or to adjust future provisions of the contract at the end of the contract period. Certain policies are considered to be short duration policies, even though they have a duration of more than one year (for a discussion of these types of policies, see chapter 3, "Premiums 🗋," of this guide). Policies are considered long duration when the contract provides insurance coverage for an extended period and is not generally subject to unilateral changes in its provisions. Because most policies written by property and liability insurance entities are short duration policies, only short duration reserving considerations are discussed in this chapter.

### *Type of Coverage*

4.05 Property and liability insurance policies are issued on either an occurrence basis or a claims-made basis. Occurrence basis policies provide coverage for insured events occurring during the contract period, regardless of the length of time that passes between the loss event and when the insurance entity is notified of the claim. Under occurrence basis policies, claims may be filed months or years after the policy contract has expired, making it difficult to estimate the eventual number of claims that will be reported. A pure claims-made policy typically only covers claims reported to the insurer during the contract period, regardless of when the loss event occurred. In practice, claims-made policies generally cover claims reported to either the insurer or insured during the contract period. In some cases, the claims-made policy may exclude certain claims reported to the insurer during the contract period that occurred before a stated date. Even if claims have been reported to the insurer during the contract period, it may take several months for the insurer to investigate and establish a case-basis reserve for reported claims. In addition, some claims on

claims-made policies may be reported to the insurer after the contract expires. In practice, most claims-made insurance policies contain extended reporting clauses or endorsements that provide for coverage, in specified circumstances, of claims occurring during the contract period but reported after the expiration of the policy. In many states, a claims-made insurance policy is required to (*a*) contain an extended reporting clause; (*b*) provide for the purchase, at the policyholder's option, of tail coverage (that is, coverage for events occurring during the policy term but reported after the initial policy expires); or (*c*) provide for automatic tail coverage upon the death, disability, or retirement of the insured. Thus, in practice, certain claims-made policies may resemble occurrence basis policies.

## *Kind of Insurance Underwritten: Line of Business or Type of Risk*

4.06 The kind of insurance underwritten by property and liability insurance entities typically includes property, liability, workers' compensation, surety, and fidelity. Other examples of business written by property and liability entities include credit, accident, and health and guaranty insurance.

4.07 Lines of insurance can be further classified as primary coverage or reinsurance assumed. Primary coverage involves policies written between an insurer and a customer directly. Reinsurance coverage involves the transfer of the insurer's risk to a reinsurer (see chapter 6, "Reinsurance 🗋," of this guide). Retrocession (sometimes also called reinsurance of reinsurance) involves the further transfer of the reinsurer's risk to a retrocessionaire (sometimes called a reinsurer).

4.08 Excess claims are those in which another insurer or the insured pays a significant portion of the claim amount (called a retention) before the insurance protection responds. Retentions can be thousands of dollars or millions of dollars, depending on the situation. Policies with a large retention or deductible that is the responsibility of the insured are referred to as high deductible policies. For these types of policies, the policyholder is typically responsible for reimbursing the insurer for claim payments made up to the deductible level. The insurance entity provides coverage for the claims over the deductible level and may service the claims, although a third-party administrator is sometimes utilized in servicing claims. These types of policies have premiums that are less than traditional coverage because the insured shares in the risk. When the insurance entity is ultimately obligated to pay all claims and recover from the insured for claims paid below the retention level, the insurance entity is subject to credit risk until the deductible is reached. However, such credit risk is typically mitigated by various forms of collateral. High deductible policies are typically sold in commercial markets (workers' compensation and health insurance) and are sold in two forms: per occurrence and aggregate coverage. On a high deductible per occurrence policy, the deductible is applied to each loss event and the insured is generally responsible for reimbursing the insurance entity for losses on each claim up to a predefined level.

4.09 Property claims generally are reported and settled quickly, often within several months. Some exceptions to this general rule may include business interruption insurance and ocean marine insurance. Property claims are usually first-party claims (that is, they are direct obligations of the insurer to pay the insured, with the claimant being the policyholder). In addition, the occurrence and extent of property losses are often relatively easy to determine because the claims relate to tangible property. However, insurance entities may set up reserves in addition to case reserves in order to reflect projected deficiencies or adverse development on existing case reserves when case reserves are not easily determinable. See the discussion on components of loss reserves in paragraph 4.33.

4.10 Liability claims are reported more slowly than property claims and settlement is often delayed, especially if litigation is involved. *Liability claims* are third-party claims in which the insurer has agreed to pay, defend, or settle claims made by third parties against the insured. A single insured event may result in several claimants. In processing a liability claim, many insurance entities keep a single file for each insured event, with separate identification of each claimant.

4.11 Workers' compensation claims are reported quickly but often take many years to settle. The amount of most claim payments is set by law and may change during the life of a claim. A claim settlement is characterized by numerous payments to the claimants or survivors for medical expenses and loss of earnings, possibly over extended periods of time.

4.12 In some instances, surety or fidelity claims may be reported and settled very slowly because the loss may be discovered months or years after it has occurred. Also, determining the extent of the loss often takes a long time. Financial guarantee insurance has become a significant insured risk to some commercial entities. Financial guarantees include the guaranteeing of interest and principal payments on corporate and municipal debt, the guaranteeing of limited partnership obligations, and a number of other products in which the insurance entity takes on an obligation to pay at some later date. The ultimate exposure to a large loss can be high with financial guarantees. FASB *Accounting Standards Codification* (ASC) 944, *Financial Services—Insurance* 🗋, provides the accounting for financial guarantee insurance contracts, including the recognition and measurement to be used to account for premium revenue and claim liabilities.

4.13 Some lines of insurance are commonly referred to as long tail lines because of the extended time required before claims are ultimately settled. Examples of long tail lines are automobile bodily injury liability, workers' compensation, professional liability, and other lines, such as products and umbrella liability coverages. Some lines are long tail because the claim may take a long time to be reported (for example, professional liability), and

others may take a long time to pay out (for example, workers' compensation). It is generally more difficult to estimate loss reserves for long tail lines because of the long period of time that elapses between the occurrence of a claim and its final disposition, as well as the difficulty of estimating the ultimate settlement value of the claim.

**4.14** Lines of insurance in which claims are settled relatively quickly are called short tail lines. Examples of short tail lines are automobile physical damage and property coverages.

## The Transaction Cycle

**4.15** Although specific procedures vary from entity to entity, a common pattern exists to the flow of transactions through the claims cycle, which consists of the following major functions: claim acceptance and processing, claim adjustment and estimation, and claim settlement. The insurance entity typically uses a computer application (herein referred to as the claim system) to store claim data, process claim information, and assist in the claim estimation process, as described subsequently. Also shown is a flowchart exhibiting a typical claims cycle transaction.

**Claim Process Flowchart**



## Claim Acceptance and Processing

**4.16** Notice of a loss or an accident is received at the home or branch office directly from the insured or through an agent. For certain lines of business, a service provider may provide claims in-take services in which case the service provider will transmit the notice of loss or input the claim directly into the insurance company claims in-take system. A file number for the claim, which forms the basis for all future references, is assigned to the case, usually in numerical sequence, and a loss file and abstract are prepared. Typically, information relating to the claim is retained electronically by the insurance entity in the claim system. Policy coverage is examined to determine whether the loss is covered by an insurance policy and whether the policy was in force at the time the loss occurred. Failure to raise questions promptly may be prejudicial to an entity's rights. If it is determined that the claim is covered, the case is assigned to an adjuster. Some insurance entities establish a diary file instead of a claim file when a notice of an incident is received and when the entity is not certain that the facts require it to establish a claim file and record an estimate. For example, an insured under a liability policy may report an injury, but the injury is not expected to result in a claim.

**4.17** Claim data is typically entered into the insurance entity's claim system for later use in the development of statistics used for reserve analysis or to comply with statistical reporting to the insurance regulators. Coding of claims data is important because errors in coding data directly affect the reliability of information used to monitor historical claims experience, which may be used by the entity and auditor to evaluate the adequacy of loss reserves. Among the most important dates that might affect loss reserve developments are the date of loss, policy effective date, claim report date (date reported to the entity), claim record date (date the claim is entered on the entity's claim system), claim payment date, and claim reopening date (a claim may be closed and later reopened for additional payments). Other key claim data must be properly coded, so that insurance entities can accurately meet the statutory reporting requirements of the annual statement, as well as GAAP disclosures, and provide statistical information to support rate filings, including the claim state, location of risk, date of loss, and policy year.

**4.18** Smaller claims or claims that are expected to be settled quickly are processed by less extensive adjudication methods. Usually, a claim file is not prepared, and a separate reserve estimate is not recorded. All statistical and accounting matters are processed on the date of payment and average reserve estimation methods are used between the report and settlement dates.

## Claim Adjustment and Estimation

**4.19** The process of adjusting claims involves (*a*) a field investigation; (*b*) an appraisal and a negotiation of the claim, subject to the appropriate supervision; and (*c*) approval by the entity's claims department. Through an investigation, the adjuster determines, among other things, whether the claimed loss actually occurred, his or her estimate of the amount of the loss, whether the loss may be excludable under the terms of the policy, and whether the entity has a right to recover part or all of the loss through either salvage or subrogation. *Salvage* is a contractual right of recovery that entitles the insurer to any proceeds from the disposal of damaged property for which the claim has been paid, such as the sale of a wrecked automobile to a junkyard. *Subrogation* is the legal right of the insurer to recover from a third-party who may be wholly or partly responsible for the loss paid under the terms of the policy, such as recovery from a product manufacturer for a loss resulting from the failure of a product.

**4.20** Insurance entities use several different processes to adjust claims. Companies may use home or branch office adjusters, who are salaried employees of the entity, or independent adjusters, who charge fees for their investigation and adjustment services. Most insurance entities use a combination of methods to adjust claims. They may have a claim branch office established for closer supervision and better control of the cost of adjustments in territories in which they have a larger concentration of risks.

**4.21** In accordance with an entity's claims settlement policy, an adjuster estimates the total expected amount that is payable on a claim as soon as it is practicable. Such an estimate may be determined by the average cost per case based on experience for the line of business or may be based on specific information on the individual case. The estimate is revised in response to changes in experience or as investigations progress and further information is received.

**4.22** Insurance entities have different approaches to establishing reserves on individual claim files. For some insurance entities, the case-basis reserve represents the amount that the entity would pay as a settlement based on the facts in the file at that time. Case-basis reserves based on that approach, in the aggregate, tend to be inadequate to pay the ultimate cost of the reported claims. For other insurance entities, the claim reserve represents a worst case view of the injury and the liability or coverage issues presented by the case. Reserves based on this approach, in the aggregate, tend to exceed the ultimate cost of the reported claims.

**4.23** For most insurance entities, the philosophy intended for individual claim reserving falls between the examples previously described. For purposes of establishing an appropriate financial statement reserve, the most important factors to consider are (*a*) the historical adequacy or inadequacy of total reserves, (*b*) the consistency in the reserving approach followed by the entity, and (*c*) the availability of an actuarial or a statistical analysis of reserves.

**4.24** Unpredictably high jury awards; malpractice claims; bad faith claims; and the proliferation of mass tort and latent injury claims, such as those for injuries caused by pollution and asbestos, have complicated the claim estimation process. Mass tort and latent injury claims have affected insurance entities indirectly through their participation in pools and associations (for example, the significant reserves that the industry had to provide for workers' compensation injury claims). The complexity of such claims requires a more focused claims review process that may include using complex actuarial models. Most insurance entities now use a variety of focused reviews that include those by claims committees and in-house counsel, to specifically review and set loss reserves for mass tort and latent injury claims. Due to the high level of sensitivity surrounding bad faith claim cases, these claims also are often subject to a higher level of internal review.

## Claim Settlement

**4.25** Once all documentation, such as proof of loss, medical bills, repair bills, or invoices for fees of independent adjusters or lawyers, has been received, this information is reviewed for accuracy, consistency, and coverage under the associated policy before payment is authorized. Once all proper claim documentation is obtained and reviewed, authorization is documented within the insurance entity's claim system by the proper level of claim adjuster.

**4.26** Methods of payment vary among insurance entities, generally either by check draft, or ACH transfer Once the claim has been approved for payment, the claim system may automatically generate the claim check or draft, or the approved documents may be electronically forwarded to the claim payment department for draft or check preparation. In many insurance entities, authority to issue drafts may be given to field offices, adjusters, and sometimes agents; in those cases, copies of the drafts and related supporting documents are forwarded to the claims department and these supporting documents are typically scanned and electronically filed in the insurance entity's claim system.

**4.27** Some insurance entities record claims paid when checks drafts or ACH transfer are issued, and other insurance entities record claims paid when the drafts clear the bank because that is when the claimant has accepted the settlement offer and the entity's obligation for the claim is extinguished. Source records are sent to the claim system, usually in electronic control total batches, and totals of paid losses are posted to the

general ledger. Changes in payment procedures or changes in the definition of payment date for coding purposes can affect loss reserve developments depending on when payments (checks or drafts) are recorded as a paid loss.

4.28 In the case of large claims, insurance entities sometimes enter into an agreement to pay the claimant in installments over an established period of time. This arrangement is referred to as a structured settlement. Often, these settlements are funded by the purchase of an annuity contract. Structured settlements funded by annuity contracts allow insurance entities to pay the present value of the ultimate claim amount immediately but, depending on who remains the primary obligor, may not allow the related reserve to be removed from the financial statements. Structured settlements are more commonly used in workers' compensation and commercial casualty lines of insurance.

## *Reinsurance Recoverable*

4.29 After the claim is entered into the claim system, the system will often automatically determine whether any right of recovery exists for that particular claim under a reinsurance agreement, based on predefined reinsurance levels coded into the claim system. When the reinsurance recovery details are not incorporated into the claim system, the determination may be performed by the claim adjuster or reinsurance department. If the entity purchases reinsurance coverage over a group of claims, any potential recovery generally has to be determined outside of the claim system, such as in the case of excess reinsurance contracts. Recoveries under quota-share reinsurance agreements are usually based on total claims figures period by period. Reinsurance arrangements on liability policies may include provisions such that if aggregate claims from a common occurrence exceed the retention, then the excess amounts are covered by the reinsurer. Recoveries under such aggregate excess reinsurance treaties are coded similarly to catastrophe claims (see chapter 6 🗎 for a further discussion about reinsurance contracts).

4.30 When it is determined that there will be a reinsurance recoverable on a claim, the estimated amount recoverable is usually recorded in the claim file and data processing records. Notices of losses are sent to the reinsurers in accordance with the terms of the reinsurance contracts. Although some reinsurance contracts contain provisions for immediate recovery for losses over a stated amount, recoveries are normally settled monthly or quarterly, sometimes by being deducted from the premiums due to the reinsurers.

## *Salvage and Subrogation*

4.31 Whenever an entity incurs a claim, the possibility of salvage or subrogation may exist. As noted in FASB ASC 944-40-30-2 🗎, estimated recoveries on unsettled claims, such as salvage, subrogation, or a potential ownership interest in real estate, shall be evaluated in terms of their estimated realizable value and deducted from the liability for unpaid claims. Generally, the simplest approach to determining the anticipated receivable is to estimate loss reserves using loss data that is net of salvage and subrogation recoveries. Many of the reserving methods for losses and loss-adjustment expenses, however, can also be used to estimate salvage and subrogation recoveries.

4.32 Under SAP, as discussed in paragraph 26 of Statement of Statutory Accounting Principles (SSAP) No. 65, *Property and Casualty Contracts*, "[t]he projected losses and expenses may be reduced for expected salvage and subrogation recoveries, but may not be reduced for anticipated deductible recoveries, unless the deductibles are secured by a letter of credit (LOC) or like security." Any reduction in the liability for unpaid claims and losses for estimated anticipated recoveries on salvage and subrogation should be disclosed, as noted in paragraph 17 of SSAP No. 55, *Unpaid Claims, Losses, and Loss Adjustment Expenses*, and would be considered an accounting policy decision, that is insurers are not required to estimate salvage and subrogation recoveries under SAP.

## Components of Loss Reserves

4.33 *Loss reserves* are an insurer's estimate of its liability for the unpaid costs of insured events that have occurred. All insurance entities develop reserves for known claims on a case basis and also for the estimated cost to settle claims on insured events that occurred but were not yet reported to the insurance entity. The basic components of loss reserves or liability for unpaid claims consist of the following:

- *Case-basis reserves*. The sum of the values assigned by claims adjusters at the insurance entity to specific claims that have been reported to, and were recorded by, the insurance entity but not yet paid at the financial statement date.

- *Incurred but not reported (IBNR)*. The estimated cost to settle claims arising from insured events that occurred but were not reported to the insurance entity as of the financial statement date.

Generally, loss reserves also include a component for case development reserves that is the difference between the case-basis reserves and estimated ultimate cost of such recorded claims. This component recognizes that case-basis reserves, which are estimates based on preliminary data, will probably differ from ultimate settlement amounts. Accordingly, a summation of case-basis reserve estimates may not produce the most reasonable estimate of their ultimate cost. Depending on the insurance entity's process, this additional reserve may be specifically identified as additional case reserves or incorporated into the IBNR component. Frequently, loss reserves are reduced for salvage and subrogation, as discussed in paragraphs 4.19 and 4.31–.32.

Some insurance entities may elect to pay claims by draft rather than by check and may not record the drafts as cash disbursed until the drafts are presented to the insurer by the bank. A liability for drafts outstanding is required only if cash disbursements and claim statistical information is not recorded concurrently, thereby creating a timing difference. Because the claim statistical information is updated to reflect the payment, no loss reserve is recorded for the claim; however, because the draft has not been presented, a draft's outstanding liability is required. In some cases, a liability for drafts outstanding is presented separately from loss reserves.

- *Reserves for LAE.* These represent expected payments for costs to be incurred in connection with the adjustment and recording of losses and commonly do not include allocated general overhead costs that will be incurred to run the business. Additional discussion on LAE can be found in paragraphs 4.54–.62.

## Estimating Methods

4.34 Various analytical techniques are typically used by management or consulting actuaries in estimating and evaluating the reasonableness of loss reserves. These techniques generally consist of statistical analyses of historical information and result in estimates that may be referred to as loss reserve estimates.

4.35 Loss reserve projections are used to develop loss reserve estimates. Understanding and assessing the variability of these estimates and the reliability of historical experience as an indicator of future loss payments require a careful analysis of the historical loss data and the use of projection methods that are sensitive to the particular circumstances.

4.36 Loss reserve estimates are developed on a gross and net of reinsurance basis to enable insurance entities to report on both a GAAP (reported gross of reinsurance) and SAP (reported net of reinsurance) basis. Generally the same projection methods are used to estimate both gross and net loss reserves; gross reserve estimates are developed using data gross of reinsurance and net reserve estimates are developed using data net of reinsurance. However, some insurance entities may initially develop loss reserve estimates on a net of reinsurance basis and then gross up these estimates using more simplified assumptions in order to approximate gross reserves. In general, it is more appropriate for insurance entities to estimate gross and net reserves separately because this will enhance their ability to more effectively monitor the impact of reinsurance programs on the reserves estimates for more complex reinsurance structures.

4.37 The data used for projections is generally grouped by line of business and may be further classified by attributes such as geographic location, underwriting class, or type of coverage to improve the homogeneity of the data within each group. The data is then arranged chronologically. The following are dates that are key to classifying the chronology of the data:

- *Policy date.* The date on which the contract becomes effective (sometimes referred to as the underwriting date).

- *Accident date.* The date on which the accident (or loss) occurs.

- *Report date.* The date on which the entity first receives notice of the claim.

- *Record date.* The date on which the entity records the claim in its claim system.

- *Closing date.* The date on which the claim is closed.

4.38 After the data has been grouped by line of business and chronology, it may then be arrayed to facilitate the analysis of the data, highlight trends, and permit ready extrapolation of the data. The following are examples of types of data that are commonly arrayed and analyzed:

- Losses paid

- Losses incurred

- Case-basis reserves

- Claim units reported

- Claim units paid

- Claim units closed

- Claim units outstanding

- Defense and cost containment (DCC) paid

- DCC outstanding

- Salvage and subrogation recovered

- Reinsurance recovered

- Reinsurance receivable

- Premiums earned

- Premiums in force

- Exposures earned

- Insured amounts

- Policy limits

- Policies in force

4.39 The loss data may be cumulative or incremental, gross or net of reinsurance, gross or net of salvage and subrogation, or sometimes combined with DCC data. The data may be stratified by size of loss or other criteria. Because claim data and characteristics such as dates, type of loss, and claim counts significantly affect reserve estimation, controls should be established over the recording, classification, and accumulation of historical data used in the determination of loss reserves.

4.40 Loss reserve projections can be performed using a variety of mathematical approaches ranging from simple arithmetic projections using loss development factors to complex statistical models. Projection methods usually fall into three categories:

- Extrapolation of historical loss dollars

- Projection of separate frequency and severity data (the number of claims that will be paid or closed and the average costs of these claims)

- Use of expected loss ratios

4.41 Within each of these methods, a variety of techniques and loss data may be used; some methods also combine features of these basic methods. No single projection method is inherently better than any other in all circumstances.

4.42 The following is a brief summary of some commonly used projection methods:

| *Method* | *Basis* |
|---|---|
| **Loss extrapolation** | |
| Paid loss | Uses only paid losses. Case-basis reserves are not considered. |
| Incurred loss | Uses paid losses plus case-basis reserves. |
| Frequency Severity | Uses various claim count and average cost per claim data on either a paid or an incurred basis. |
| Loss ratio | Uses various forms of expected losses in relation to premiums earned. |
| Bornhuetter-Ferguson | Uses a combination of the loss ratio method and paid or incurred loss development factors to estimate reserves. |

4.43 The decision to use a particular projection method and the results obtained from that method should be evaluated by considering the inherent assumptions underlying the method and the appropriateness of these assumptions to the circumstances. Stability and consistency of data are extremely important. Changes in variables, such as rates of claim payments, claims department practices, case-basis reserving adequacy, claim reporting rates, mix of business, reinsurance retention levels, and the legal environment may have a significant effect on the projection and may produce distortions or conflicting results. Reference should be made to paragraphs 4.64–.66 for a discussion of how changes in variables may affect the loss-reserving process. The results of any projection should be reviewed for reasonableness by analyzing the resultant loss ratios and losses per measure of exposure.

## Illustrative Projection Data

4.44 The following tables are simple illustrations of the use of the loss extrapolation method to estimate ultimate losses, as well as the effects of considering the results of more than one projection. In these illustrations, the result of extrapolating incurred-loss data is compared with the result of extrapolating paid-loss data. These tables are presented solely for the purpose of illustrating the mathematical mechanics of the two projections. They do not illustrate the required analysis of the data and consideration of internal and external environmental variables that may affect the claim payment and loss reserving process.

4.45 Table 4-1 presents an illustration of historical incurred-loss data. It reflects, as an example, that the sum of paid losses and case-basis reserves from all claims that occurred during 20X0 at the end of 20X0 was $2,054; that sum increased to $2,717 in the next year and increased to $3,270 five years later.

Table 4-1

Case–Basis Incurred–Loss Data as of December 31, 20X9

*Development Period*

*(in months)*

| 24 | 36 | 48 | 60 | 72 | 84 | 96 |
|---|---|---|---|---|---|---|
| $2,717 | $2,979 | $3,095 | $3,199 | $3,348 | $3,270 | $3,288 |
| 2,980 | 3,269 | 3,461 | 3,551 | 3,592 | 3,631 | 3,643 |
| 3,125 | 3,513 | 3,695 | 3,798 | 3,849 | 3,672 | 3,676 |
| 3,502 | 3,926 | 4,177 | 4,313 | 4,369 | 4,392 | |
| 4,246 | 4,659 | 5,179 | 5,315 | 5,376 | | |
| 4,929 | 5,605 | 5,957 | 6,131 | | | |
| 5,433 | 6,162 | 6,571 | | | | |
| 5,912 | 6,771 | | | | | |
| 8,382 | | | | | | |

4.46 This incurred-loss data is first used to calculate historical period-to-period incurred-loss development factors. These factors are used to compare the amount of incurred losses at successive development stages and are illustrated in part 1 of table 4-2.

4.47 The calculation of average historical period-to-period incurred-loss development factors may be based on the use of simple averages of various period-to-period factors or more complex weighting or trending techniques. These techniques can significantly affect the reserving process and require judgment, understanding, and experience in applying. In this example, a simple average of the latest three period-to-period factors has been calculated and is presented in part 2 of table 4-2.

4.48 Once historical period-to-period incurred-loss development factors are calculated, future period-to-period incurred-loss development factors must be selected. The future period-to-period factors must reflect anticipated differences between historical and future conditions that affect loss development, such as changes in the underlying business, different inflation rates, or case-basis reserving practices. In the example, no differences are anticipated, and the average historical factors have been chosen as the selected factors, as shown in part 2 of table 4-2. The selected future period-to-period factors are then used to produce ultimate incurred development factors. The ultimate factors are presented in part 3 of table 4-2.

**Table 4-2**

**Period-to-Period Incurred-Loss Development Factors as of December 31, 20X9**

*Development Period*

*(In months)*

| | 24–36 | 36–48 | 48–60 | 60–72 | 72–84 | 84–96 | 96–108 | | |
|---|---|---|---|---|---|---|---|---|---|

**Part 1: Period-to-Period Historical Loss Development Factors**

| | 24–36 | 36–48 | 48–60 | 60–72 | 72–84 | 84–96 | 96–108 | | |
|---|---|---|---|---|---|---|---|---|---|
| 20X0 | $1.323^2$ | 1.096 | 1.039 | 1.034 | 1.047 | 0.977 | 1.005 | 1.004 | 1.001 |
| 20X1 | 1.347 | 1.097 | 1.059 | 1.026 | 1.012 | 1.011 | 1.003 | 1.002 | |
| 20X2 | 1.335 | 1.124 | 1.052 | 1.026 | 1.013 | 1.006 | 1.001 | | |
| 20X3 | 1.405 | 1.122 | 1.063 | 1.033 | 1.013 | 1.005 | | | |
| 20X4 | 1.433 | 1.144 | 1.066 | 1.026 | 1.011 | | | | |
| 20X5 | 1.452 | 1.137 | 1.063 | 1.029 | | | | | |
| 20X6 | 1.462 | 1.134 | 1.066 | | | | | | |
| 20X7 | 1.422 | 1.145 | | | | | | | |
| 20X8 | 1.396 | | | | | | | | |

**Part 2: Period-to-Period Average Development Factors**

*Simple Average of Latest Three Years*

| | 1.427 | 1.139 | 1.065 | 1.029 | 1.012 | 1.007 | 1.003 | 1.003 | 1.001 | 1.000 |
|---|---|---|---|---|---|---|---|---|---|---|

*Selected Factors*

| 1.427 | 1.139 | 1.065 | 1.029 | 1.012 | 1.007 | 1.003 | 1.003 | 1.001 | 1.000 |

**Part 3: Ultimate Development Factors Selected for the Projection**

| 1.828[3] | 1.281 | 1.125 | 1.056 | 1.026 | 1.014 | 1.007 | 1.004 | 1.001 | 1.000 |

[1] Applies when the development period is determined to be longer than the period covered by the model (assumed to be 1.000 in this illustration).

[2] The 24-month developed losses are divided by the 12-month developed losses from table 4-1 ($2,717/$2,054 = 1.323).

[3] The product of the remaining factors (1.427 × 1.139 × 1.065 × 1.029 × 1.012 × 1.007 × 1.003 × 1.003 × 1.001 × 1.000 = 1.828) or the product of the 12–24 month selected factor multiplied by the 24–36 month ultimate factor (1.427 × 1.281 = 1.828).

4.49 The loss reserve analysis has now reached the point where an initial projection of ultimate losses, as well as an indicated provision for unreported losses for each accident year, can be made by using the historical incurred-loss data and ultimate incurred-loss development factors. This initial projection of ultimate losses is presented in table 4-3.

Table 4-3

Incurred-Loss Projection as of December 31, 20X9

| Accident Year | Case-Basis Incurred Loss as of 20X9[4] | Ultimate Incurred-Losses Development Factors [5] | Projected Ultimate Losses(2) x (3) | Projected Unreported Loss(4) – (2) |
|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) |
| 20X0 | $3,301 | 1.000 | $3,301 | $0 |
| 20X1 | 3,651 | 1.001 | 3,655 | 4 |
| 20X2 | 3,876 | 1.004 | 3,892 | 16 |
| 20X3 | 4,392 | 1.007 | 4,423 | 31 |
| 20X4 | 5,376 | 1.014 | 5,451 | 75 |
| 20X5 | 6,131 | 1.026 | 6,290 | 159 |
| 20X6 | 6,571 | 1.056 | 6,939 | 368 |
| 20X7 | 6,771 | 1.125 | 7,617 | 846 |
| 20X8 | 6,382 | 1.281 | 8,175 | 1,793 |
| 20X9 | 4,785 | 1.828 | 8,747 | 3,962 |
| Total | $51,236 | = | $58,490 | $7,254 |

[4] From table 4-1.

[5] From part 3 of table 4-2.

4.50 Tables 4-4 and 4-5 present paid-loss data for the same entity whose incurred-loss data was presented in table 4-1. The array of paid-loss period-to-period development factors presented in table 4-5 is derived from table 4-4 using the same calculation methods used for incurred losses in table 4-2. The importance of the use of a tail factor in this calculation is apparent from the period-to-period historical loss development factors calculated in table 4-5. The tail factor represents an estimate of the development of losses beyond the period covered by the data array. In this instance, a tail factor of 1.01 was selected to project an additional 1% of losses to be paid from the 10th development year to ultimate. Selection of a tail factor requires careful judgment based on consideration of entity and industry experience for the line of business, actuarial studies, case-basis reserves, and any other relevant information. The initial projection of ultimate losses, using the historical paid losses and paid-loss ultimate development factors, is presented in table 4-6.

Table 4-4

Paid-Loss Data as of December 31, 20X9

*Development Period*

*(In months)*

| 24 | 36 | 48 | 60 | 72 | 84 | 96 |
|---|---|---|---|---|---|---|
| $1,716 | $2,291 | $2,696 | $3,041 | $3,096 | $3,185 | $3,235 |
| 1,840 | 2,503 | 2,973 | 3,261 | 3,429 | 3,538 | 3,589 |
| 1,975 | 2,683 | 3,185 | 3,494 | 3,670 | 3,763 | 3,819 |
| 2,130 | 2,968 | 3,571 | 3,942 | 4,147 | 4,274 | |
| 2,580 | 3,673 | 4,421 | 4,860 | 5,114 | | |
| 2,996 | 4,207 | 5,115 | 5,632 | | | |
| 3,148 | 4,520 | 5,496 | | | | |
| 3,428 | 4,960 | | | | | |
| 3,696 | | | | | | |

Table 4-5

Period-to-Period Paid-Loss Development Factors as of December 31, 20X9

*Development Period*

*(In months)*

| 24-36 | 36-48 | 48-60 | 60-72 | 72-84 | 84-96 | 96-108 |
|---|---|---|---|---|---|---|

**Part 1: Period-to-Period Historical Loss Development Factors[7]**

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 20X0 | 1.915 | 1.335 | 1.177 | 1.128 | 1.016 | 1.029 | 1.016 | 1.008 | 1.004 |
| 20X1 | 2.110 | 1.360 | 1.188 | 1.097 | 1.052 | 1.032 | 1.014 | 1.010 | |
| 20X2 | 2.040 | 1.358 | 1.187 | 1.097 | 1.050 | 1.025 | 1.015 | | |
| 20X3 | 2.200 | 1.393 | 1.203 | 1.104 | 1.052 | 1.031 | | | |
| 20X4 | 2.148 | 1.424 | 1.204 | 1.099 | 1.052 | | | | |
| 20X5 | 2.223 | 1.404 | 1.216 | 1.101 | | | | | |
| 20X6 | 2.348 | 1.437 | 1.216 | | | | | | |
| 20X7 | 2.477 | 1.447 | | | | | | | |
| 20X8 | 2.357 | | | | | | | | |

**Part 2: Period-to-Period Average Development Factors**

*Simple Average of Latest Three Years*

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 2.394 | 1.429 | 1.212 | 1.101 | 1.051 | 1.029 | 1.015 | 1.009 | 1.004 | 1.010 |

*Selected Factors*

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 2.394 | 1.429 | 1.212 | 1.101 | 1.051 | 1.029 | 1.015 | 1.009 | 1.004 | 1.010 |

**Part 3: Ultimate Development Factors Selected for the Projection[8]**

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 5.127 | 2.142 | 1.499 | 1.237 | 1.123 | 1.069 | 1.039 | 1.023 | 1.014 | 1.010 |

[6] Applies when the development period is determined to be longer than the period covered by the model (assumed to be 1.010 in this illustration).

[7] Computations are the same as those explained in table 4-2.

[8] See footnote 7.

Table 4-6

Paid-Loss Projection as of December 31, 20X9

| Accident Year (1) | Paid Losses as of 20X9 (2) | Ultimate Loss Development Factors (3) | Projected Ultimate Losses (2) x (3) (4) | Projected Unreported Losses[9] (5) |
|---|---|---|---|---|
| 20X0 | $3,276 | 1.010 | $3,309 | $8 |
| 20X1 | $3,624 | 1.014 | $3,675 | 24 |
| 20X2 | 3,819 | 1.023 | 3,907 | 31 |
| 20X3 | 4,274 | 1.039 | 4,439 | 47 |
| 20X4 | 5,114 | 1.069 | 5,465 | 89 |
| 20X5 | 5,832 | 1.123 | 6,325 | 194 |
| 20X6 | 5,496 | 1.237 | 6,796 | 225 |
| 20X7 | 4,960 | 1.499 | 7,434 | 663 |
| 20X8 | 3,696 | 2.142 | 7,916 | 1,534 |
| 20X9 | 2,243 | 5.127 | 11,500 | 6,715 |
| Total | $42,134 | = | $60,766 | $9,530 |

[9] Represents the projected losses from column 4 of table 4-6 less the recorded case-basis incurred losses from column 2 of table 4-3.

4.51 Table 4-7 compares the results of extrapolating paid-loss data (table 4-6) with the results of extrapolating incurred-loss data (table 4-3). Because of the variance in the results of the two methods for accident year 20X9, additional analysis of accident year 20X9 losses is needed, as well as possible review of the results of the two techniques for all accident periods. The differences between methods will be considered in making the determination of the selected reserve estimate for this projection.

**Table 4-7**

**Alternative Projections of Ultimate Losses and Unreported Losses as of December 31, 20X9**

| Accident Year | Ultimate Losses Incurred | Ultimate Losses Paid | Unreported Losses Incurred | Unreported Losses Paid |
|---|---|---|---|---|
| 20X0 | $3,301 | $3,309 | $0 | $6 |
| 20X1 | 3,655 | 3,675 | 4 | 24 |
| 20X2 | 3,692 | 3,907 | 16 | 31 |
| 20X3 | 4,423 | 4,439 | 31 | 47 |
| 20X4 | 5,451 | 5,465 | 75 | 69 |
| 20X5 | 6,290 | 6,325 | 159 | 194 |
| 20X6 | 6,939 | 6,796 | 368 | 225 |
| 20X7 | 7,617 | 7,434 | 848 | 663 |
| 20X8 | 8,175 | 7,916 | 1,793 | 1,534 |

| | | | | |
|---|---|---|---|---|
| 20X9 | 8.747 | 11.500 | 3.962 | 6.715 |
| Total | $58.490 | $60.766 | $7.254 | $9.530 |

4.52 Another projection methodology that is commonly used for more recent (that is, less mature) accident periods, such as 20X8 and 20X9, is a Bornhuetter-Ferguson approach (named for the two American actuaries who developed the methodology). Tables 4-8 and 4-9 contain examples of the Bornhuetter-Ferguson methodology using earned premiums applied for accident years 20X8 and 20X9 on an incurred-loss and a paid-loss basis, respectively. As previously indicated, the Bornhuetter-Ferguson approach uses earned premiums and is a combination of the incurred-loss or paid-loss development method and a loss ratio method. A loss ratio method assumes that loss varies directly with earned premiums; for any given accident year, a simple ultimate loss projection can be obtained by multiplying estimated ultimate earned premium by a selected ultimate loss ratio. The selected loss ratio for 20X8 and 20X9 is selected by the actuary based on expectations resulting from loss ratio trends. The Bornhuetter-Ferguson method assumes, however, that only future losses will develop based on this estimated loss ratio. For each accident year, the amount of loss yet to be developed is determined as the product of (a) the ratio of incurred loss or paid loss to ultimate loss implied by the maturity of the accident year and the incurred-loss or paid-loss development factor and (b) the ultimate loss estimate based on the loss ratio approach. Cumulative incurred loss or paid loss to date is then added to the loss-yet-to-be-developed estimate, yielding an ultimate loss estimate for each accident year.

### Table 4-8

### Bornhuetter-Ferguson Incurred-Loss Projection as of December 31, 20X9

| Ultimate Earned Premiums | Selected Loss Ratio | Expected Ultimate Loss (2) × (3) | Ultimate Incurred-Loss Development Factors |
|---|---|---|---|
| (2) | (3) | (4) | (5) |
| $4,128 | | | 1.000 |
| 4,729 | | | 1.001 |
| 5,255 | | | 1.004 |
| 8,043 | | | 1.007 |
| 7,305 | | | 1.014 |
| 8,329 | | | 1.026 |
| 8,929 | | | 1.056 |
| 9,832 | | | 1.125 |
| 10,222 | 80.0% | $8,178 | 1.281 |
| 11.090 | 80.0% | 8.872 | 1.826 |
| $75.660 | | | |

Cont...

| Undeveloped Incurred-Loss to Ultimate Loss [1 - (6)] | Undeveloped Incurred-Loss (4) × (7) | Case-Basis Incurred-Loss as of 20X9 |
|---|---|---|

| (7) | (8) | (9) |
|---|---|---|
| 000 | | $3,301 |
| 001 | | 3,651 |
| 004 | | 3,676 |
| 007 | | 4,392 |
| 014 | | 5,376 |
| 025 | | 6,131 |
| 053 | | 6,571 |
| 112 | | 6,771 |
| 219 | $1,794 | 6,382 |
| 453 | 4,019 | 4,785 |
| | | $51,236 |

### Table 4-9

### Bornhuetter-Ferguson Paid-Loss Projection as of December 31, 20X9

| Selected Loss Ratio | Expected Ultimate Loss (2) × (3) | Ultimate Paid-Loss Development Factors |
|---|---|---|
| (3) | (4) | (5) |
| | | 1.010 |
| | | 1.014 |
| | | 1.023 |
| | | 1.039 |
| | | 1.069 |
| | | 1.123 |
| | | 1.237 |
| | | 1.499 |
| 60.0% | $8,176 | 2.192 |
| 80.0% | 8,872 | 5.127 |

Cont...

| eloped Paid-Loss to Ultimate Loss [1 - (6)] (7) | Undeveloped Paid-Loss (4) × (7) (8) | Paid-Loss as of 20X9 (9) | Projected Ultimate Losses (8) + (9) (10) | Case-Bas as |
|---|---|---|---|---|
| 0.010 | | $3,276 | | $ |
| 0.014 | | 3,624 | | |
| 0.022 | | 3,819 | | |
| 0.038 | | 4,274 | | |
| 0.065 | | 5,114 | | |
| 0.110 | | 5,632 | | |
| 0.192 | | 5,496 | | |
| 0.333 | | 4,960 | | |
| 0.533 | $4,360 | 3,696 | $8,056 | |
| 0.805 | 7,142 | 2,243 | 9,385 | |
| | | $42,134 | | $ |

4.53 Table 4-10 contains a comparison of the results of all 4 actuarial techniques used in this example: incurred-loss development, paid-loss development, and the 2 Bornhuetter–Ferguson techniques based on earned premiums and incurred loss and paid loss. Based on the results of this comparison, ultimate loss amounts by accident year are selected in column 7, and indicated unreported (broad IBNR in this example) amounts and loss ratios are calculated in columns 9 and 10 based on the selected ultimate loss amounts. For accident years 20X8 and 20X9, ultimate loss amounts are selected based on the results of the Bornhuetter–Ferguson methods. A further examination of the difference in the incurred-loss and paid-loss development methods for accident year 20X9 finds that the high level of losses paid in 20X9 for accident year 20X9 relative to case-basis incurred losses for the same period causes the paid-loss development method indication to significantly exceed the incurred-loss method indication. The actuary must then examine more closely whether the high level of loss payments represents an acceleration of payment activity or an increase in the overall level of losses incurred in 20X9. The Bornhuetter–Ferguson methods are less responsive to unusual levels of incurred-loss or paid-loss activity in immature accident years, and they also avoid the distortion that could result from the application of a large development factor to a small base of incurred loss or paid loss, which may occur for long tail lines in more recent accident years. As a result, these methods are frequently used to determine loss indications for more recent accident years. This example demonstrates the benefit of using multiple actuarial methodologies in the evaluation of loss reserves because of the analysis and comparison of the ultimate loss indications from the various methodologies.

**Table 4-10**

**Comparison of Ultimate Loss Projections and Selected Ultimate Loss as of December 31, 20X9**

Ultimate Loss

Projections

| Incurred | Paid | Bornhuetter- Ferguson Incurred | Bornhuetter- Ferguson Paid | Selected Ultimate Loss | Case-Basis Incurred-Loss as of 20X9 | |
|---|---|---|---|---|---|---|

| (3) | (4) | (5) | (6) | (7) | (8) |
|---|---|---|---|---|---|
| $3,301 | $3,309 | | | $3,301 | $3,301 |
| 3,655 | 3,675 | | | 3,665 | 3,651 |
| 3,892 | 3,907 | | | 3,900 | 3,876 |
| 4,423 | 4,439 | | | 4,431 | 4,392 |
| 5,451 | 5,465 | | | 5,458 | 5,376 |
| 6,290 | 8,325 | | | 6,308 | 6,131 |
| 6,939 | 6,796 | | | 6,868 | 6,571 |
| 7,617 | 7,434 | | | 7,526 | 6,771 |
| 8,175 | 7,916 | $8,176 | $6,056 | 8,116 | 6,382 |
| 8,747 | 11,500 | 8,804 | 9,385 | 9,094 | 4,785 |
| $58,490 | $60,766 | $16,979 | $17,440 | $58,855 | $51,236 |

## LAE Reserves

4.54 *LAE reserves* are the costs that will be required to settle claims that have been incurred as of the valuation date. Under GAAP, LAE are separated as (*a*) allocated LAE, which are expenses that are assignable or allocable to specific claims, such as fees paid to outside attorneys, experts, and investigators, and used to defend claims, and (*b*) unallocated LAE, which are expenses that consist of all external, internal, and administrative claims-handling expenses, including determination of coverage, that are not included in allocated LAE. For GAAP reporting purposes, total LAE expense is reported as one line or combined with incurred losses.

4.55 Under SAP, total LAE (allocated LAE plus unallocated LAE) can be classified into two broad categories: Defense and Cost Containment (DCC) and Adjusting and Other (AO). Paragraph 6 of SSAP No. 55 states:

DCC includes defense,[1] litigation, and medical cost containment expenses, whether internal or external. DCC include, but are not limited to, the following items:

[1] Legal defense costs incurred under the definition of covered damages or losses as the only insured peril would be accounted for as losses, while legal defense costs incurred under a duty to defend would be accounted for as Defense and Cost Containment (DCC). For policies where legal costs are the only insured peril, the insurer would record the legal costs that reimburse the policyholder as loss and, to the extent the insurer participated in the defense, would record its legal costs as DCC. This is not intended to change the classifications of legal expenses for existing long tailed lines of liability coverage, such as medical malpractice and workers' compensation insurance.

(a) Surveillance expenses;

(b) Fixed amounts for medical cost containment expenses;

(c) Litigation management expenses;

(d) Loss adjustment expenses for participation in voluntary and involuntary market pools if reported by accident year;

(e) Fees or salaries for appraisers, private investigators, hearing representatives, reinspectors and fraud investigators, if working in defense of a claim, and fees or salaries for rehabilitation nurses, if such cost is not included in losses;

(f) Attorney fees incurred owing to a duty to defend, even when other coverage does not exist; and

(g) The cost of engaging experts

AO are those expenses other than DCC as defined in (i) above assigned to the expense group "Loss Adjustment Expense." AO include, but are not limited to, the following items:

(a) Fees and expenses of adjusters and settling agents,

(b) LAEs for participation in voluntary and involuntary market pools if reported by calendar year,

(c) Attorney fees incurred in the determination of coverage, including litigation between the reporting entity and the policyholder,

(d) Fees and salaries for appraisers, private investigators, hearing representatives, reinspectors and fraud investigators, if working in the capacity of an adjuster, and

(e) Adjustment expenses arising from claims related lawsuits such as extra contractual obligations and bad faith lawsuits.

## DCC Reserve Calculation Approaches

4.56 DCC is generally analyzed by line of business, utilizing methods similar to the loss methods previously described. A shift in the composition of the costs in relation to the total might affect the statistical data used in the related loss projections. This shift would need to be considered in future loss reserve projections.

4.57 Many companies calculate DCC reserves based on the relationship of DCC to losses. Underlying this approach is a basic assumption that DCC will increase or decrease in proportion to losses. The setting of reserves for DCC based on the relationship of paid DCC to paid losses is referred to as the paid-to-paid ratio approach. Separate ratios are normally developed for each accident year. Inflation in DCC is not typically evaluated separately; rather, it is estimated to occur at the same rate as the rate of inflation in the losses. The validity of this assumption can be tested by reviewing historical relationships between DCC and losses over time. The effects of a pattern of increasing or decreasing the ratio of DCC to losses should be considered in establishing DCC reserves. An understanding of the claims department's operations and philosophy over time is essential to a proper interpretation of the data.

4.58 Other approaches to DCC reserve calculation and analysis include (a) analyzing DCC entirely apart from the related loss costs using methods that compare the development of DCC payments at various stages and (b) using combined loss and DCC data in situations when it appears likely that this would produce more accurate estimates (for example, when the entity has changed its claim defense posture so that defense costs increase and loss costs decrease). In this latter approach, statistical tests and projections are based on the combined data for losses and DCC.

4.59 Some companies establish case-basis reserves for certain types of DCC or increase case-basis reserves by a stated percentage to provide for DCC. In either case, additional DCC reserves should be provided for the development of case-basis reserves and IBNR.

## AO Reserve Calculation Approaches

4.60 AO reserves are often estimated using the calendar year paid-to-paid method rather than the accident year paid-to-paid method used for DCC reserves. Although the paid-to-paid ratios establish the relationship of the AO payments to the loss payments, the timing of the AO payments is also critical to estimation of the AO reserves. For example, some companies assume that a portion of AO costs is incurred when a claim is placed on the books and the remaining portion is incurred when the claim is settled. For reported claims, the cost of placing the claim on the books has been incurred, so it is only necessary to provide a reserve for the remaining portion at settlement. For IBNR claims, it is necessary to provide for all of the AO. Some companies perform internal studies to establish the methods and ratios to be used in their calculations. Other AO reserving methods may apply the estimated average cost per open claim to the number of open and unreported claims.

4.61 The AO reserves should provide for inflation. The assumption that AO will inflate at a rate equal to the rate at which losses inflate should be periodically reviewed. The rate should also be adjusted for expected technological or operational changes that might cause economies or inefficiencies in the claim settlement process.

4.62 If paid-to-paid AO ratios will be calculated in the aggregate for each line of business, a reasonable basis for allocating paid AO by line of business should be established.

## Changes in the Environment

4.63 Loss reserve projections are used to estimate loss reporting patterns, loss payment patterns, and ultimate claim costs. An inherent assumption in such projections is that historical loss patterns can be used to predict future patterns with reasonable accuracy. Because many variables can affect past and future loss patterns, the effect of changes in such variables on the results of loss projections should be carefully considered.

4.64 Identification of changes in variables and consideration of their effect on loss reserve projections are critical steps in the loss reserving process. The evaluation of these factors requires the involvement of a loss reserve specialist as well as input from various operating departments within the entity, such as the marketing, underwriting, claims, actuarial, reinsurance, finance, and legal departments. Management's use of a specialist in determining loss reserves is discussed in paragraphs 4.69-.71.

4.65 If changes in variables have occurred, the mechanical application of loss projection methods may result in unreasonable estimates of ultimate claim costs. Changes in variables can be considered in the loss reserving process in a variety of ways, including the following:

- *Selection of the loss projection method(s)*. Loss projection methods vary in their sensitivity to changes in the underlying variables and the length of the claim emergence pattern. When selecting a loss projection method, consideration should be given to how a change in the underlying data will affect that method. For example, if management has adopted a policy to defer or accelerate the settlement of claims, a paid-loss extrapolation method will probably produce unreliable results. In that case, an incurred-loss extrapolation or other methods may produce better estimates of ultimate losses.

- *Adjustment of underlying historical loss data*. In certain cases, the effect of changed variables can be isolated and appropriately reflected in the historical loss data used in the loss projection. For example, if policy limits are relatively consistent for all policies in a block of business and if these limits have recently been reduced by a constant amount, historical loss data can be adjusted to exclude amounts in excess of the revised policy limits.

- *Further segregation of historical loss data*. Certain changes in variables can be addressed by further differentiating and segregating historical loss data. For example, if an entity begins to issue claims-made policies for a line of business for which it traditionally issued occurrence basis policies, segregation of data between the two types of policies should minimize the effect of the different reporting patterns. Such segregation should produce more accurate loss reserve projections for the occurrence basis policies. However, loss development data relating to the claims-made policies will be limited in the initial years.

- *Separate calculation of the effect of variables*. The effect of certain changes in variables can be isolated and separately computed as an adjustment to the results of other loss projection methods. For example, if claim cost severity has increased (an increase in auto repair costs) or is expected to increase beyond historic trends, an additional reserve can be separately computed to reflect the effect of such actual or anticipated increases.

- *Qualitative assessments*. In many instances, the magnitude or effect of a change in a variable will be uncertain. The establishment of loss reserves in such situations requires considerable judgment and knowledge of the entity's business.

4.66 The development of pollution, asbestos, and similar mass tort claims may not follow the usual development pattern of the general liability claims with which they are usually grouped. When the activity of these claims is sufficient to distort the recorded development of the entity, the distorting activity should be isolated from the development history, so that an accurate projection of the remaining general liability claims can be made. Management's process of assessing its pollution, asbestos, and other similar exposures should include procedures to

- ensure that all data elements are recorded on each incoming claim or precautionary notice.

- assess the entity's exposure to these types of liability claims by considering such factors as the types of risks historically written, the layers of coverage provided, the policy language employed, and recent decisions rendered by courts.

- determine whether any portion of potential liability costs is probable and reasonably estimable.

## Critical Accounting Policies and Estimates Disclosure

4.67 SEC registrants should consider that the "Management's Discussion and Analysis" section of Form 10-K 🗋 adequately discuss the following information:

*a.* The actuarial methodologies used to calculate the loss reserve projections and the differences in these methods for different lines of businesses. The discussion on the method used to develop reserve estimates might include information on the loss reserve projection methods used (for example, loss-ratio method, paid-loss development method, incurred-loss development method, and so on); the basis for selecting a certain method for different lines of business; and the reasons for any changes in the loss reserve methodology.

*b.* The significant assumptions, judgment, and uncertainty used in the estimation process and the potential impact of variability in this estimate to the financial statements. Uncertainties to be discussed may include any products with higher volatility or uncertainty that may affect the overall estimate (for example, asbestos reserves) and any particular assumptions that are more difficult than others to measure (for example, the length of time to reach claim settlement).

*c.* If available, a company should disclose the range of reasonable estimates for the loss reserves.

*d.* The significant changes in these assumptions during the reporting period and the effect of that change on the estimates produced. Examples of changes in assumptions that may be discussed more qualitatively include changes in the claims-handling process, policy and exposure forms, inflation, legal trends, environmental factors, mix of claimants, or timeliness of claim reporting by claimants.

*e.* Any development in the estimates that was identified subsequent to the initial estimation.

*f.* Readers may also refer to minutes from the December 19, 2019, December 20, 2018, and December 7, 2017, meetings between the AICPA Insurance Expert Panel and SEC Staff, that includes discussion on disclosures required by FASB Accounting Standards Update (ASU) No. 2015-09, *Financial Services — Insurance (Topic 944): Disclosures about Short-Duration Contracts* 🗋. The minutes can be found on the Insurance Expert Panel webpage at

- https://www.aicpa.org/content/dam/aicpa/interestareas/frc/industryinsights/downloadabledocuments/ins/ins-ep-meeting-highlights-201912.pdf,

- https://www.aicpa.org/content/dam/aicpa/interestareas/frc/industryinsights/downloadabledocuments/ins/ins-ep-meeting-highlights-201812.pdf, and

- https://www.aicpa.org/content/dam/aicpa/interestareas/frc/industryinsights/downloadabledocuments/ins/ins-ep-meeting-highlights-archive.pdf.

**4.68** In conjunction with Section 401 🗋 of the Sarbanes-Oxley Act of 2002, registrants, other than small business issuers, are required to provide an overview of certain known contractual obligations in a tabular format (referred to as a contractual obligations table). Readers should be aware that the SEC has requested that loss reserves be included as part of the contractual obligations table.

## Use of Specialists by Management in Determining Loss Reserves

**4.69** Management is responsible for making the accounting estimates included in the financial statements. As explained in the previous sections of this chapter, the process of estimating loss reserves is complex and involves many subjective judgments. Accordingly, the determination of loss reserves should involve an individual with a sufficient level of competence and experience in loss reserving, including knowledge about the kind(s) of insurance for which a reserve is being established and an understanding of appropriate methods available for calculating loss reserve estimates. These individuals are referred to in this chapter as *loss reserve specialists*. The specialist's level of competence and experience should be commensurate with the complexity of the entity's business, which is affected by such factors as the kind(s) of insurance underwritten and environmental and risk considerations. Criteria that may be considered in determining whether an individual qualifies as a loss reserve specialist include the aforementioned, as well as the following:

- Knowledge of various projection techniques, including their strengths and weaknesses and applicability to various lines of insurance

- Knowledge of changes in the environment in which the entity operates, including regulatory developments, social and legal trends, court decisions, and other factors described in more detail in the auditing section of this chapter, and the effect that these factors will have on the emergence and ultimate cost of these claims

**4.70** The Casualty Actuarial Society offers a course of study and examinations that are designed to train individuals to be, among other things, loss reserve specialists. In addition, the American Academy of Actuaries, Society of Actuaries and Casualty Actuarial Society establish qualification standards for its members who practice in this area. Although many casualty actuaries may therefore be qualified to be loss reserve specialists, other individuals, through their experience and training, may also be qualified. Training and experience should provide individuals with knowledge about different policy forms and coverages, current developments in insurance, and environmental factors that might affect the loss reserving process. Training and experience should also provide individuals with knowledge that will enable them to apply appropriate methods of estimating loss reserves. The extent of this knowledge and ability should be commensurate with the complexity and kinds of business written.

**4.71** Many insurance entities use internal loss reserve specialists who are employees or officers of the entity. In addition, many companies engage consulting casualty actuaries to either assist in the determination of the loss reserve estimate or perform a separate review of the entity's loss reserve estimate. The scope of work to be performed by the consulting actuary is a matter of judgment by entity management. Usually, the consulting actuary will issue a report summarizing the nature of the work performed and the results. Since 1990, the National Association of Insurance Commissioners (NAIC) *Annual Statement Instructions* has required a statement of actuarial opinion relating to loss and LAE reserves.

## Guaranty Fund and Other Assessments[10]

[10] Discussion of the Patient Protection and Affordable Care Act is included in paragraphs 8.32–.42 🗋 and 8.69–.71 🗋 of this guide.

4.72 State guaranty funds assess entities licensed to sell insurance in the state; provide for the payment of covered claims; or meet other insurance obligations, subject to prescribed limits, of insolvent insurance enterprises. The assessments are generally based on premium volume for certain covered lines of business. Most state guaranty funds assess entities for costs related to a particular insolvency after the insolvency occurs. Many states and a number of local governmental units have established other funds supported by assessments. The most prevalent uses for such assessments are to fund operating expenses of state insurance regulatory bodies and second-injury funds. FASB ASC 405-30 ⃞ provides guidance on accounting for guaranty-fund and other assessments related to insurance activities. SSAP No. 35R, *Guaranty Fund and Other Assessments*, provides statutory accounting guidance on guaranty funds and other types of assessments. For further information, see <u>chapter 8</u>, "Insurance-Related Expenses, Taxes, and Assessments ⃞," of this guide.

## Accounting Principles

### *GAAP Accounting*

4.73 Sources for specialized industry accounting principles for insurance enterprises include FASB ASC 944 ⃞, *Financial Services — Insurance*, 405-30 *Liabilities — Insurance-Related Assessments*, and 340-30, *Other Assets and Deferred Costs — Insurance Contracts That Do Not Transfer Insurance Risk* ⃞.

4.74 Under GAAP, as discussed in paragraphs 1–2 ⃞ of FASB ASC 944-40-25, liabilities for the cost of unpaid claims, including estimates of the cost of IBNR claims, are accrued when insured events occur. As discussed in FASB ASC 944-40-30-1 ⃞, the liability for unpaid claims should be based on the estimated ultimate cost of settling the claims (that is, the total payments expected to be made) and should include the effects of inflation and other social and economic factors. Some companies select their estimate of the ultimate cost of settling claims from a selection of several different reserve methods.[11] As discussed in FASB ASC 944-40-30-2, estimated recoveries on unpaid claims, such as salvage, subrogation, or a potential ownership interest in real estate, should be evaluated in terms of their estimated realizable value and deducted from the liability for unpaid claims. As discussed in FASB ASC 944-40-25-1, a liability for those adjustment expenses expected to be incurred in the settlement of unpaid claims should be accrued when the related liability for unpaid claims is accrued. FASB ASC 944-40-35-1 ⃞ notes that changes in estimates of the liabilities resulting from the continuous review process and differences between estimates and payments for claims should be recognized in income in the period in which the estimates are changed or payments are made.

[11] In practice, this amount is often referred to as management's best estimate.

### *Discounting Loss Reserves*

4.75 The objective of discounting loss reserves is to account for the time value of money in a way that accurately reflects the anticipated future cash flows based on the characteristics of the insurance obligation. Certain liabilities for unpaid claims and claim-adjustment expenses are normally discounted (that is, the liabilities are presented at present value in the financial statements).

4.76 FASB ASC 944 provides no accounting guidance for determining if it is appropriate to discount reserves; however, it requires disclosure if reserves are discounted. In making the determination whether it is appropriate to discount liabilities for unpaid claims and claim-adjustment expenses, many insurance entities consider the following guidance to establish their policy:

- Per FASB ASC 410-30-35-12 ⃞, the measurement of the liability or a component of the liability may be discounted to reflect the time value of money if the aggregate amount of the liability or component and the amount and timing of cash payments for the liability or component are fixed or reliably determinable.

- The interpretive response to question 1 in FASB ASC 944-20-S99-1 ⃞ allows the following:

  - Discounting liabilities for unpaid claims and claim adjustment expenses at the same rates that it uses for reporting to state regulatory authorities with respect to the same claims liabilities

  - Discounting liabilities with respect to settled claims under the following circumstances:

    - The payment pattern and ultimate cost are fixed and determinable on an individual basis claim basis

    - The discount rate used is reasonable based on the facts and circumstances applicable to the registrant at the time the claims are settled

For SEC reporting, the payment pattern and ultimate costs need to be both fixed and determinable and the claim already settled versus the guidance in FASB ASC 410-30-35-12 that requires the components to be either fixed or reliably determinable and is silent with regard to whether the liability is settled.

**4.77** Examples of reserves that might be discounted include workers' compensation indemnity reserves, long-term disability reserves, and short duration contract claim liabilities that meet the criteria in FASB ASC 410-30-35-12 or 944-20-S99-1, as applicable, and have payment streams that are expected to occur over a longer period of time.

**4.78** Reasonable diversity exists regarding what rates should be used for discounting liabilities for unpaid claims and claim-adjustment expenses and how they are applied. If an entity decides to discount, many analogize to the following guidance in determining an appropriate discount rate:

- The interpretive response to question 1 of Topic 5(N), "Discounting by Property-Casualty Insurance Companies ☐," of the SEC's *Codification of Staff Accounting Bulletins* notes that

[p]ending authoritative guidance resulting from those efforts however, the staff will raise no objection if a registrant follows a policy for GAAP reporting purposes of:

- Discounting liabilities for unpaid claims and claim adjustment expenses at the same rates that it uses for reporting to state regulatory authorities with respect to the same claims liabilities.

- Paragraph .132 ☐ of Statement of Position (SOP) 96-1, *Environmental Remediation Liabilities*, states that for entities that file with the SEC, the guidance in Staff Accounting Bulletin No. 92 ☐ with respect to the discount rate to be used — a rate that will produce an amount at which the environmental liability theoretically could be settled in an arm's-length transaction with a third-party and that should not exceed the interest rate on monetary assets that are essentially risk free and have maturities comparable to that of the environmental liability — should be followed.

- FASB ASC 340-30-35-6 ☐ concludes that for the insurer or assuming enterprise, the discount rate used to determine the deposit liability should be the current rate on a U.S. government obligation with similar cash flow characteristics.

**4.79** Careful consideration of the facts and circumstances surrounding a change in the discount rate for the liabilities for unpaid claims is needed to determine the proper accounting for the change (change in accounting principle or change in accounting estimate). A change from not discounting loss reserves to discounting loss reserves would generally be a change in accounting principle.

**4.80** FASB ASC 944-40-50-5 ☐ requires the following:

For liabilities for unpaid claims and claim adjustment expenses that are presented at present value in the financial statements, an insurance entity shall disclose all of the following in its annual financial statements:

a. For each period presented in the statement of financial position, the carrying amount of liabilities for unpaid claims and claim adjustment expenses relating to short-duration contracts that are presented at present value

b. The range of interest rates used to discount the liabilities disclosed in (a).

c. The aggregate amount of discount related to the time value of money deducted to derive the liabilities disclosed in (a)

d. For each period presented in the statement of income, the amount of interest accretion recognized

e. The line item(s) in the statement of income in which the interest accretion is classified.

**4.81** Topic 5(W), "Contingency Disclosures Regarding Property/Casualty Insurance Reserves for Unpaid Claim Costs ☐," of the SEC's *Codification of Staff Accounting Bulletins* provides guidance concerning those uncertainties surrounding property and casualty loss reserves that may be required to follow the guidance in FASB ASC 450, *Contingencies* ☐. In addition, Topic 5(Y), "Accounting and Disclosures Relating to Loss Contingencies ☐," and Topic 10(F), "Presentation of Liabilities for Environmental Costs ☐," of the SEC's *Codification of Staff Accounting Bulletins* provide the SEC staff's interpretation of current accounting literature relating to the following:

- Recognition of liabilities for costs apportioned to other potential responsible parties

- Uncertainties in estimation of the extent of environmental or product liability

- The appropriate discount rate for environmental or product liability, if discounting is appropriate

- Accounting for exit costs

- Financial statement disclosures and disclosure of certain information outside the basic financial statements

4.82 FASB ASC 450 provides guidance for the accounting and disclosure of loss contingencies.

## Structured Settlements

4.83 The treatment of structured settlements can be different between SAP and GAAP. Paragraph 18 of SSAP No. 65, states that

Statutory accounting and GAAP are consistent for the accounting of structured settlement annuities where the reporting entity is the owner and payee, and where the claimant is the owner and payee and the reporting entity has been released from its obligation. GAAP distinguishes structured settlement annuities where the owner is the claimant and a legally enforceable release from the reporting entity's liability is obtained from those where the claimant is the owner and payee but the reporting entity had not been released from its obligation. GAAP requires the deferral of any gain resulting from the purchase of a structured settlement annuity where the claimant is the owner and payee yet the reporting entity has not been released from its obligation. Statutory accounting treats these settlements as completed transactions and considers the earnings process complete, thereby allowing for immediate gain recognition.

4.84 Also see paragraph 19 of SSAP No. 65 for disclosure items for structured settlements.

4.85 As stated in FASB ASC 944-40-25-33 ⃞, "reinsurance contracts do not result in immediate recognition of gains unless the reinsurance contract is a legal replacement of one insurer by another and thereby extinguishes the ceding entity's liability to the policyholder." Therefore, the gain would be deferred when the structured settlement annuity is purchased and the claimant is the owner and payee, but the reporting entity has not been released from its obligation.

## Reinsurance Recoverables

4.86 *Reinsurance recoverables*, as discussed in paragraphs 4.29−.30, are amounts that will be recovered from reinsurers for losses and LAE accrued, including IBNR losses accrued. As stated in FASB ASC 944-310-45-5 ⃞, "a ceding entity shall report an estimated reinsurance recoverable arising from those contracts described in paragraph 944-310-25-2 ⃞ separately as an asset." (See chapter 6 ⃞ for a further discussion about reinsurance contracts including reinsurance recoverables.)

s — *Credit Losses* ⃞, provides guidance on how an entity should measure credit losses on financial instruments. FASB ASC 326 includes the following subtopics:

sses — *Overall*

sses — *Measured at Amortized Cost* ⃞

sses — *Available-for-Sale Debt Securities* ⃞

of this guide for further discussion of FASB's Accounting for Financial Instruments project. Also see AICPA Guide *Credit Losses*, which addresses accounting implementation issues uide *Credit Losses* are incorporated into chapter 6 of this guide and provide considerations for implementation of FASB ASC 326 to reinsurance recoverables.

## Liability for Unpaid Claims and Claim Adjustment Expenses

4.87 As discussed in FASB ASC 944-40-25-1 ⃞, both of the following should be accrued when insured events occur:

*a.* A liability for unpaid claims (including estimates of costs for claims relating to insured events that have occurred but have not been reported to the insurer)

*b.* A liability for claim adjustment expenses; that is, a liability for all costs expected to be incurred in connection with the settlement of unpaid claims

4.88 As discussed in FASB ASC 944-40-25-2, the estimated liability includes the amount of money that will be used for future payments of (*a*) claims that have been reported to the insurer and (*b*) claims related to insured events that have occurred but that have not been reported to the insurer as of the date the liability is estimated. As discussed in FASB ASC 944-40-25-3, claim adjustment expenses include costs incurred in the claim settlement process such as legal fees; outside adjuster fees; and costs to record, process, and adjust claims.

## Statutory Accounting

4.89 Paragraph 4 of SSAP No. 55 states:

[c]laims, losses, and loss/claim adjustment expenses shall be recognized as expense when a covered or insured event occurs. . . . Until claim payments and related expense payments are made subsequent to the occurrence of a covered or insured event and, in order to recognize the expense of a covered or insured event that has occurred, it is necessary to establish a liability. Liabilities shall be established for any unpaid claims and unpaid losses (loss reserves), unpaid loss/claim adjustment expenses (loss/claim adjustment expense reserve) and incurred costs, with a corresponding charge to income. Claims related to extra contractual obligations losses and bad-faith losses shall be included in losses. See individual business types for the accounting treatment for adjustment expenses related to extra contractual obligations and bad-faith lawsuits.

4.90 Paragraph 11 of SSAP No. 55 also states:

[t]he liability for claim reserves and claim liabilities, unpaid losses and loss/claim adjustment expenses shall be based upon the estimated ultimate cost of settling claims (including the effects of inflation and other societal and economic factors), using past experience adjusted for current trends, and any other factors that would modify past experience. These liabilities shall not be discounted unless authorized for specific types of claims by specific SSAPs, including SSAP No. 54R and SSAP No. 65 — *Property and Casualty Contracts.*

4.91 As stated in paragraphs 13–16 of SSAP No. 55:

[f]or each line of business and for all lines of business in the aggregate, management shall record its best estimate of its liabilities for unpaid claims, unpaid losses, and loss/claim adjustment expenses. Because the ultimate settlement of claims (including IBNR for death claims and accident and health claims) is subject to future events, no single claim estimate can be considered accurate with certainty. Management's analysis of the reasonableness of claim or loss and loss/claim adjustment expense reserve estimates shall include an analysis of the amount of variability in the estimate. If, for a particular line of business, management develops its estimate considering a range of claim or loss and loss/claim adjustment expense reserve estimates bounded by a high and a low estimate, management's best estimate of the liability within the range shall be recorded. The high and low ends of the range shall not correspond to an absolute best-and-worst case scenario of ultimate settlements because such estimates maybe the result of unlikely assumptions. Management's range shall be realistic and, therefore; shall not include the set of all possible outcomes but only those outcomes that are considered reasonable. Management shall also follow the concept of conservatism included in the Preamble when determining estimates for claim reserves. However, there is not a specific requirement to include a provision for adverse deviation in claims.

In the rare instances when, for a particular line of business, after considering the relative probability of the points within management's estimated range, it is determined that no point within management's estimate of the range is a better estimate that any other point, the midpoint within management's estimate of the range shall be accrued. It is anticipated that using the midpoint in a range will be applicable only when there is a continuous range of possible values, and no amount within that range is any more probable than any other. For purposes of this statement, it is assumed that management can quantify the high end of the range. If management determines that the high end of the range cannot be quantified, then a range does not exist, and management's best estimate shall be accrued. This guidance is not applicable when there are several point estimates which have been determined as equally possible values, but those point estimates do not constitute a range. If there are several point estimates with equal probabilities, management should determine its best estimate of the liability.

If a reporting entity chooses to anticipate salvage and subrogation recoverables (including amounts recoverable from second injury funds, other governmental agencies, or quasi-governmental agencies, where applicable), the recoverables shall be estimated in a manner consistent with paragraphs 11–13 of this statement. Estimated salvage and subrogation recoveries (net of associated expenses) shall be deducted from the liability for unpaid claims or losses. . . .

Changes in estimates of the liabilities for unpaid claims or losses and loss/claim adjustment expenses resulting from the continuous review process, including the consideration of differences between estimated and actual payments, shall be considered a change in estimate and shall be recorded in accordance with SSAP No. 3 – *Accounting Changes and Corrections of Errors* (SSAP No. 3). SSAP No. 3 requires changes in estimates to be included in the statement of operations in the period the change becomes known. This guidance also applies to the period subsequent to the March 1 filing deadline for annual financial statements through the filing deadline of June 1 for audited annual financial statements.

4.92 Additional SAP guidance can be found in SSAP No. 62R, *Property and Casualty Reinsurance*, and SSAP No. 65.

4.93 As stated in paragraph 10 of SSAP No. 65:

With the exception of fixed and reasonably determinable payments such as those emanating from workers' compensation tabular indemnity reserves and long-term disability claims, property and casualty loss reserves shall not be discounted. No loss adjustment expense reserves shall be discounted.

Exhibit A of SSAP No. 65 provides guidelines for states that prescribe or permit discounting on a nontabular basis. As required under paragraph 14 of SSAP No. 65, "[t]he financial statements shall disclose whether or not any of the liabilities for unpaid losses or unpaid loss adjustment expenses are discounted, including liabilities for workers' compensation."

4.94 As discussed in paragraph 31 of SSAP No. 62R, "[r]einsurance recoverables on unpaid case-basis and incurred but not reported losses and loss adjustment expenses shall be netted against the liability for gross losses and loss adjustment expense." Therefore, reserves in statutory financial statements for unpaid losses are presented net of reinsurance. However, under paragraph 24 of SSAP No. 62R, "reinsurance recoverables on paid losses shall be reported as an asset without any available offset." For SAP and the purpose of determining the provision for reinsurance (the statutory reserve for uncollectible reinsurance), reinsurance recoverable balances are segregated between those recoverable from companies authorized by the state to transact reinsurance and those recoverable from other companies (referred to as unauthorized reinsurers). When reinsurance is placed with an unauthorized entity, the ceding entity must maintain and report a liability account(s) for reserve credits taken and the losses recoverable that have been recorded, to the extent that it has not retained funds or obtained letters of credit or other collateral.

4.95 Paragraphs 34–39 of SSAP No. 65 provide guidance on accounting for high-deductible policies. Paragraph 35 of SSAP No. 65 states:

[t]he liability for loss reserves shall be determined in accordance with SSAP No. 55. Because the risk of loss if present from the inception date, the reporting entity shall reserve losses throughout the policy period, not over the period after the deductible has been reached. Reserves for claims arising under high deductible plans shall be established net of the deductible, however, no reserve credit shall be permitted for any claim where any amount due from the insured has been determined to be uncollectible.

# Disclosures[12] of Certain Matters in the Financial Statements of Insurance Enterprises

[12] See chapter 1, "Nature, Conduct, and Regulation of the Business 🗋," and the preface 🗋 of this guide for additional information on rules and regulations.

## *Applicability to Statutory Financial Statements*

4.96 As discussed in paragraphs 1.99–.101:

Paragraph .A8 🗋 of AU-C section 800[13] notes that the applicable financial reporting framework may encompass the financial reporting standards established by an organization that is authorized or recognized to promulgate standards for special purpose financial statements. In that case, those standards will be presumed acceptable for that purpose if the organization follows an established and transparent process involving deliberation and consideration of the views of relevant stakeholders. For the insurance statutory basis of accounting, the NAIC establishes financial reporting provisions to meet the requirements of insurance regulators, industry and users of financial statements, and states adopt these provisions as their regulatory basis of accounting. The NAIC follows a deliberative and comprehensive process for considering new disclosures, including those required by GAAP.

[13] All AU-C sections can be found in AICPA *Professional Standards*.

Accordingly, GAAP disclosure requirements that have been rejected by the NAIC in whole or in part would not need to be evaluated by the auditor in order to determine whether the annual audited statutory financial statements achieve fair presentation in accordance with the insurance statutory basis of accounting. However, if the NAIC has not finalized action on GAAP disclosure requirements, an auditor would need to assess whether informative disclosure in the annual audited statement financial statements would be needed to achieve fair presentation in accordance with paragraph .18 🗋 of AU-C section 800. This assessment would occur when the entity is required to adopt the new standard for GAAP.

In accordance with AU-C section 730, *Required Supplementary Information* 🗋, required supplementary information (RSI) is not part of the basic financial statements and the auditor's opinion on the basic financial statements does not cover RSI. The auditor does not need to apply AU-C section 800 to RSI, because AU-C section 800 addresses the need for disclosure of financial information in order for the basic financial statements to achieve fair presentation and RSI by definition is not part of the basic financial statements.

## *Relationship to Other Pronouncements*

4.97 In some circumstances, the disclosure requirements in FASB ASC 944 🗋 may be similar to, or overlap, the disclosure requirements in certain other authoritative accounting pronouncements issued by FASB or the SEC. For example,

- FASB ASC 450 🗋 requires certain disclosures related to loss contingencies, including catastrophe losses of property and casualty insurance entities.

- FASB ASC 275, *Risks and Uncertainties* 🗋, requires certain disclosures about reinsurance transactions.

- the SEC Securities Act Guide 6, *Disclosures Concerning Unpaid Claims and Claim Adjustment Expenses of Property-Casualty Insurance Underwriters* ⬜, requires disclosures of information about liabilities for unpaid claims and claim adjustment expenses.[14]

  [14] For additional information, see paragraph 1.53.

**4.98** In addition to the disclosures required by FASB ASC 450, paragraphs 1 ⬜ and 4 of FASB ASC 944-40-50 note that insurance enterprises should disclose management's policies and methodologies for estimating the liability for unpaid claims and claim adjustment expenses for difficult-to-estimate liabilities, such as for claims for toxic waste cleanup, asbestos-related illnesses, or other environmental exposures.

**4.99** FASB ASC 944-40-50-3[15] requires that, for annual and interim reporting periods, insurance entities should disclose all of the following information about the liability for unpaid claims and claim adjustment expenses presented in a tabular rollforward:

  [15] FASB Accounting Standards Update No. 2015-09, *Financial Services — Insurance (Topic 944): Disclosures about Short-Duration Contracts*, issued in May 2015, was effective for public business entities for annual periods beginning after December 15, 2015, and interim periods within annual periods beginning after December 15, 2016. For all other entities, the amendments are effective for annual periods beginning after December 15, 2016, and interim periods within annual periods beginning after December 15, 2017. In the year of initial application, an insurance entity need not disclose information about claims development for a particular category that occurred earlier than 5 years before the end of the first financial reporting year in which the amendments are first applied if it is impracticable to obtain the information required to satisfy the disclosure requirement. For each subsequent year following the year of initial application, the minimum required number of years will increase by at least 1 but need not exceed 10 years, including the most recent period presented in the statement of financial position. Early application is permitted.

  *a.* The balance in the liability for unpaid claims and claim adjustment expenses at the beginning of each fiscal year presented in the statement of income, and the related amount of reinsurance recoverable

  *b.* Year-to-date incurred claims and claim adjustment expenses with separate disclosure of the provision for insured events of the current fiscal year and of increases or decreases in the provision for insured events of prior fiscal years

  *c.* Year-to-date payments of claims and claim adjustment expenses with separate disclosure of payments of claims and claim adjustment expenses attributable to insured events of the current fiscal year and to insured events of prior fiscal years

  *cc.* The ending balance in the liability for unpaid claims and claim adjustment expenses and the related amount of reinsurance recoverable

In addition, an insurance entity shall disclose the reasons for the change in incurred claims and claim adjustment expenses recognized in the income statement attributable to insured events of prior fiscal years and indicate whether additional premiums or return premiums have been accrued as a result of the prior-year effects.

**4.100** FASB ASC 944-40-50-4B ⬜[16, 17] states the following:

  [16] Auditors should be aware of Technical Questions and Answers (Q&A) section 9180, *Required Supplementary Information*, when evaluating auditor independence. Q&A section 9180 is discussed in paragraph 2.137 of this guide.

  All Q&A sections can be found in *Technical Questions and Answers.*

  [17] FASB *Accounting Standards Codification* 944-40-65-1(E) allows that in the year of initial application, an insurance entity need not disclose information about claims development for a particular category that occurred earlier than five years before the end of the first period in which the guidance is first applied if it is impracticable to obtain the information required for disclosure. For each subsequent year following the year of initial application, the minimum required number of years will increase by at least 1 year but need not exceed 10 years, including the most recent period presented in the statement of financial position.

For annual reporting periods, an insurance entity shall disclose in a tabular format, as of the date of the latest statement of financial position presented, undiscounted information about claims development by accident year, including separate information about both of the following on a net basis after risk mitigation through reinsurance:

  *a.* Incurred claims and allocated claim adjustment expenses

  *b.* Paid claims and allocated claim adjustment expenses.

The disclosure about claims development by accident year should present information for the number of years for which claims incurred typically remain outstanding, but need not exceed 10 years including the most recent reporting period presented. All periods presented in the disclosure about claims development that precede the most recent reporting period shall be considered supplementary information. For the most recent reporting period presented, the disclosure about claims development shall include the total net outstanding claims for accident years not separately presented as part of the claims development (see paragraph 944-40-55-9E).

**4.101** FASB ASC 944-40-50-4C ⬚ requires that "For annual reporting periods, an insurance entity shall reconcile the disclosure about incurred and paid claims development information to the aggregate carrying amount of the liability for unpaid claims and claim adjustment expenses for the most recent reporting period presented, with separate disclosure of reinsurance recoverable on unpaid claims (see paragraph 944-40-55-9E ⬚)."

**4.102** FASB ASC 944-40-50-4D requires the following:

For annual reporting periods, an insurance entity shall quantitatively disclose the following for each accident year presented in the disclosures about incurred claims development (see paragraph 944-40-55-9E) for the most recent reporting period presented:

*a.* The total of incurred-but-not-reported liabilities plus expected development on reported claims included in the liability for unpaid claims and claim adjustment expenses

*b.* Cumulative claim frequency information, unless it is impracticable to do so. If it is impracticable to disclose claim frequency information, where the term impracticable has the same meaning as impracticability in paragraph 250-10-45-9 ⬚, an insurance entity shall disclose that fact and explain why the disclosure is impracticable."

**4.103** FASB ASC 944-40-50-4F ⬚ requires that "an insurance entity shall describe both of the following:

*a.* Its methodologies for:

i. Determining the presented amounts of both incurred-but-not-reported liabilities and expected development on reported claims required by paragraphs 944-40-50-4D ⬚ through 50-4E

ii. Calculating cumulative claim frequency information required by paragraph 944-40-50-4D

*b.* Significant changes to those methodologies. When describing (ii) above the insurance entity also shall include whether frequency is measured by claim event or individual claimant and how the insurance entity considers claims that do not result in a liability (see paragraph 944-40-55-9D).

**4.104** FASB ASC 944-40-50-4G states the following:

For annual reporting periods, for all claims except health insurance claims, an insurance entity shall disclose as supplementary information the historical average annual percentage payout of incurred claims by age, net of reinsurance (that is, history of claims duration by age), as of the most recent reporting period. This information shall be disclosed for the same number of accident years presented in the disclosures required by paragraph 944-40-50-4B (see paragraphs 944-40-55-9F through 55-9G).

**4.105** FASB ASC 944-40-50-4H states the following:

An insurance entity shall disclose the information required by paragraphs 944-40-50-4B through 50-4G and 944-40-50-5 in a manner that allows users to understand the amount, timing, and uncertainty of cash flows arising from the liabilities. An insurance entity shall aggregate or disaggregate the disclosures in paragraphs 944-40-50-4B through 50-4G and 944-40-50-5 so that useful information is not obscured by either the inclusion of a large amount of insignificant detail or the aggregation of items that have significantly different characteristics (see paragraphs 944-40-55-9A through 55-9C ⬚). An insurance entity need not provide disclosures about claims development for insignificant categories; however, balances for insignificant categories shall be included in the reconciliation required by paragraph 944-40-50-4C.

**4.106** FASB ASC 944-40-50-4I requires that for annual reporting periods, an insurance entity shall disclose information about significant changes in methodologies and assumptions used in calculating the liability for unpaid claims and claim adjustment expenses, including reasons for the change and the effects on the financial statements for the most recent reporting period presented.

**4.107** FASB ASC 944-40-50-5 states the following:

For liabilities for unpaid claims and claim adjustment expenses that are presented at present value in the financial statements, an insurance entity shall disclose all of the following in its annual financial statements:

a. For each period presented in the statement of financial position, the carrying amount of liabilities for unpaid claims and claim adjustment expenses relating to short-duration contracts that are presented at present value in the financial statements

b. The range of interest rates used to discount the liabilities disclosed in (a).

c. The aggregate amount of discount related to the time value of money deducted to derive the liabilities disclosed in (a)

d. For each period presented in the statement of income, the amount of interest accretion recognized

e. The line item(s) in the statement of income in which the interest accretion is classified.

4.108 FASB ASC 944-40-55-9A states the following:

Paragraphs 944-40-50-4A and 944-40-50-4H require an insurance entity to aggregate or disaggregate certain disclosures so that useful information is not obscured by either the inclusion of a large amount of insignificant detail or the aggregation of items that have significantly different characteristics to allow users to understand the amount, timing, and uncertainty of cash flows arising from contracts issued by insurance entities. Consequently, the extent to which an insurance entity's information is aggregated or disaggregated for the purposes of those disclosures depends on the facts and circumstances that pertain to the characteristics of the liability for unpaid claims and claim adjustment expenses.

4.109 FASB ASC 944-40-55-9B ⃞ states the following:

When selecting the type of category to use to aggregate or disaggregate disclosures, an insurance entity should consider how information about the insurance entity's liability for unpaid claims and claim adjustment expenses has been presented for other purposes, including all of the following:

a. Disclosures presented outside the financial statements (for example, in earnings releases, annual reports, statutory filings, or investor presentations)

b. Information regularly viewed by the chief operating decision maker for evaluating financial performance

c. Other information that is similar to the types of information identified in (a) and (b) and that is used by the insurance entity or users of the insurance entity's financial statements to evaluate the insurance entity's financial performance or make resource allocation decisions.

4.110 FASB ASC 944-40-55-9C ⃞ provides examples of categories that might be appropriate, including any of the following:

a. Type of coverage (for example, major product line)

b. Geography (for example, country or region)

c. Reportable segment as defined in Topic 280 on segment reporting

d. Market or type of customer (for example, personal or commercial lines of business)

e. Claim duration (for example, claims that have short settlement periods or claims that have long settlement periods)

When applying the guidance in FASB ASC 944-40-50-4A ⃞ and 944-40-50-4H, an insurance entity should not aggregate amounts from different reportable segments according to FASB ASC 280, Segment Reporting ⃞.

4.111 FASB ASC 944-40-55-9D states the following:

Claim frequency information may be tracked and analyzed by an insurance entity in a variety of ways. For example, an insurance entity may track claim frequency by claim event (such as a car accident), while another entity may track claim frequency by individual claimant (such as the number of individual claimants in a car accident). Also, certain types of insurance coverage, such as excess-of-loss insurance or supplemental insurance, can experience claim activity that does not result in a liability to the insurance entity. This Subtopic does not require a particular methodology. Therefore, to allow users to understand the context of the information presented, an insurance entity should describe qualitatively the methodologies used to determine the quantitative claim frequency information presented. In certain circumstances, such as providing reinsurance on short-duration contracts or participating in residual market pools, an insurance entity may not have access to claim frequency information, in which case it may be impracticable to disclose this information. The insurance entity should disclose that fact and explain why the disclosure is impracticable.

4.112 Paragraph 17 of SSAP No. 55 requires the following disclosures:

The financial statements shall include the following disclosures for each year full financial statements are presented. The disclosure requirements in paragraphs 17d is also applicable to the interim financial statements if there is a material change from the amounts reported in the annual filing. Life and annuity contracts are not subject to this disclosure requirement:

*a.* The balance in the liabilities for unpaid claims and unpaid losses and loss/claim adjustment expense reserves at the beginning and end of each year presented;

*b.* Incurred claims, losses, and loss/claim adjustment expenses with separate disclosures of the provision for incurred or covered events of the current year and increases or decreases in the provision for insured or covered events of prior years;

*c.* Payments of claims, losses, loss/claim adjustment expenses with separate disclosures of payments of losses and loss/claim adjustment expenses attributable to insured or covered events of the current year and insured or covered events of prior years;

*d.* The reasons for the change in the provision for incurred claims, losses, and loss/claim adjustment expenses attributable to insured or covered events of prior years. The disclosure should indicate whether additional premiums or return premiums have been accrued as a result of the prior-year effects. (For Title reporting entities, "provision" refers to the known claim reserve included in Line 1 of the Liabilities page, and "prior years" refers to prior report years);

*e.* Information about significant changes in methodologies and assumptions used in calculating the liability for unpaid claims and claim adjustment expenses, including reasons for the change and the effects on the financial statements for the most recent reporting period presented;

*f.* A summary of management's policies and methodologies for estimating the liabilities for losses and loss/claim adjustment expenses, including discussion of claims for toxic waste cleanup, asbestos-related illnesses, or other environmental remediation exposures;

*g.* Disclosure of the amount paid and reserved for losses and loss/claim adjustment expenses for asbestos and/or environmental claims, on a direct, assumed and net of reinsurance basis (the reserves required to be disclosed in this section shall exclude amounts relating to policies specifically written to cover asbestos and environmental exposures). Each company should report only its share of a group amount (after applying its respective pooling percentage) if the company is a member of an intercompany pooling agreement; and

*h.* Estimates of anticipated salvage and subrogation (including amounts recoverable from second injury funds, other governmental agencies, or quasi-governmental agencies, where applicable), deducted from the liability for unpaid claims or losses.

## Auditing Loss Reserves[18]

[18] The auditing content in this guide focuses on generally accepted auditing standards issued by the Auditing Standards Board and is applicable to audits of nonissuers. See the "Applicability of GAAS and PCAOB Standards" section of the preface to this guide for a discussion of the definitions of issuers and nonissuers as used throughout this guide.

ting Standards — SAS Nos. 142–144

hanges as a result of the issuance of the following Statements on Auditing Standards (SASs):

ated Disclosures (AU-C sec. 540 ⬜)

!0, and 620 Related to the Use of Specialists and the Use of Pricing Information Obtained From External Information Sources

for periods ending on or after December 15, 2022. SAS Nos. 143 and 144 are effective for audits of financial statements for periods ending on or after December 15, 2023. Early in · further details regarding these SASs.

## Planning Considerations — Overview

4.113 The auditor should plan the audit so that it is responsive to the assessment of the risks of material misstatement based on the auditor's understanding of the entity and its environment, including its internal control. As discussed in paragraph .A1 ▢ of AU-C section 300, *Planning an Audit*, the nature and extent of planning activities will vary according to the size and complexity of the entity, the key engagement team member's previous experience with the entity and changes in circumstances that occur during the audit engagement. Refer to chapter 2, "Audit Considerations ▢," for a detailed discussion of audit planning.

4.114 Given the significance loss reserves typically have on the financial statements and required disclosures of a property and liability insurance entity, and the inherent judgments necessary to estimate loss reserves, they generally give rise to significant risks that require special audit consideration in designing audit procedures to obtain sufficient appropriate audit evidence about the reasonableness of the reserve estimates. To appropriately design such procedures, the auditor should perform risk assessment procedures related to the loss reserve estimation as a part of overall engagement planning.

4.115 Considerations relevant to the auditor's design of loss reserve auditing procedures include the effects of relevant activities of the entity and changes in factors such as

- changes in the entity (mergers, acquisitions, dispositions);

- underwriting and claim trends;

- the reinsurance program of the entity (including any significant transactions);

- management turnover;

- IT system changes; and

- process changes (that is, the entity's claim handling strategies).

4.116 As part of the auditor's risk assessment procedures, the auditor may consider meeting with members of an entity's management responsible for underwriting, claims, reinsurance, IT systems, internal audit, and the accounting department and actuaries (internal or external). It is helpful for the audit team members who attend these meetings to have sufficient knowledge of the entity to understand how the changes identified could impact the estimation of the loss reserves. It is recommended that the loss reserve specialist used by the auditor (including when audit firms have internal loss reserving specialists) also attend these meetings.

4.117 Paragraph .12 of AU-C section 300 requires that the auditor consider whether specialized skills are needed in performing the audit. Due to the varying lines of business that may be underwritten by a property and liability insurance entity, the auditor will typically determine that when utilizing the work of a specialist (the auditor's internal or external loss reserve specialists or management's external loss reserve specialist)[19] that specialist has the requisite experience with the lines of business underwritten by the entity in order to satisfy the requirements of AU-C section 620, *Using the Work of an Auditor's Specialist*, and AU-C section 500A, *Audit Evidence*.[20] Refer to paragraph 4.06 for a discussion on the varying types of policies and underwriting risk generally maintained by a property and liability insurance entity.

[19] AU-C section 620, *Using the Work of an Auditor's Specialist* ▢, defines specialists used by management and the auditor. The guidance defines *management specialists* as "an individual or organization possessing expertise in a field other than accounting or auditing, whose work in that field is used by the entity to assist the entity in preparing the financial statements." *Auditor's specialists* are defined as

an individual or organization possessing expertise in a field other than accounting or auditing, whose work in that field is used by the auditor to assist the auditor in obtaining sufficient appropriate audit evidence. An auditor's specialist may be either an auditor's internal specialist (who is a partner or staff, including temporary staff, of the auditor's firm or a network firm) or an auditor's external specialist.

[20] AU-C section 500 ▢ designated with an "A" suffix (for example, "AU-C section 500A ▢") denotes content that does not reflect the codification of Statement on Auditing Standards (SAS) No. 142, *Audit Evidence*. Upon implementation of SAS No. 142, auditors and firms should no longer utilize content from AU-C sections designated with an "A" suffix and should follow the standards as codified.

4.118 The auditor should evaluate the effects of the reporting framework of the financial statements and the associated financial statement disclosures. For example, GAAP require the gross presentation of loss reserves on the financial statements whereas SAP require reporting net of reinsurance in the financial statements supplemented by gross and ceded amounts in the disclosures. These differences may influence the nature, timing, and extent of procedures depending on local auditing requirements. Refer to appendix E, "Examples of Development Data ▢," for an example disclosure of permitted and prescribed accounting practices. Auditors should also evaluate the impacts of the requirements to audit the

data within Schedule P–Part 1 of the Annual Statement under the requirements of the NAIC and in accordance with SOP 92–8, *Auditing Property/Casualty Insurance Entities' Statutory Financial Statements — Applying Certain Requirements of the NAIC Annual Statement Instructions* (AUD sec. 10).[21]

[21] All AUD sections can be found in AICPA *Professional Standards.*

## Consideration of Fraud in a Financial Statement Audit

4.119 Risks are inherent in all audit engagements, including the possibility that fraudulent acts may cause a material misstatement of financial statements. AU–C section 240, *Consideration of Fraud in a Financial Statement Audit* ⃞, addresses the auditor's responsibilities relating to fraud in an audit of financial statements. Because of the characteristics of fraud, maintaining professional skepticism is important for the auditor when considering the risk of material misstatement due to fraud. Readers should refer to additional discussion of AU–C section 240 in chapter 2 ⃞ of this guide.

4.120 As discussed in paragraph .28 ⃞ of AU–C section 315A, *Understanding the Entity and Its Environment and Assessing the Risks of Material Misstatement,* as part of the risk assessment described in paragraph .26, the auditor should determine whether any of the risks identified are, in the auditor's professional judgment, a significant risk. In exercising this judgment, the auditor should exclude the effects of identified controls related to the risk. Paragraph .29*a* of AU–C section 315A states that in exercising professional judgment about which risks are significant risks, the auditor should consider at least whether the risk is a risk of fraud. That assessment would include the auditor's understanding of the lines of business underwritten by the entity to determine which lines may be more volatile in nature and, therefore, more susceptible to misstatement via fraud.

4.121 As explained in AU–C section 240 ⃞, a fraud risk factor to consider in the auditor's fraud risk assessment is the risk of management overriding controls. This may include evaluating whether such an override might have allowed adjustments outside of the normal period-end financial reporting process to have been made to the financial statements. Such adjustments might have resulted in changes to the financial statement relationships being analyzed, causing the auditor to draw erroneous conclusions. For this reason, analytical procedures alone are not well suited to detecting fraud. Paragraph .31 of AU–C section 240 states that management is in a unique position to perpetrate fraud because of management's ability to manipulate accounting records and prepare fraudulent financial statements by overriding controls that otherwise appear to be operating effectively. Although the level of risk of management override of controls will vary from entity to entity, the risk is, nevertheless, present in all entities. Due to the unpredictable way in which such override could occur, it is a risk of material misstatement due to fraud and, thus, a significant risk.

## Risk of Material Misstatement — Inherent Risk

4.122 As discussed in AU–C section 200, *Overall Objectives of the Independent Auditor and the Conduct of an Audit in Accordance With Generally Accepted Auditing Standards* ⃞, inherent risk is the susceptibility of an assertion about a class of transaction, account balance, or disclosure to a misstatement that could be material, either individually or when aggregated with other misstatements, before consideration of any related controls. Paragraph .07*a*(i) ⃞ of AU–C section 330, *Performing Audit Procedures in Response to Assessed Risks and Evaluating the Audit Evidence Obtained,* requires the auditor to consider the reasons for the assessed risk of material misstatements, including inherent risk. Inherent risk factors relevant to the auditor's obtaining an understanding of loss reserves to assess the risks of material misstatement include factors relating to management, actuarial assumptions, product characteristics, underwriting approach, and the competitive, economic, and regulatory environment. Appendix C, "Conditions and Events That May Indicate Risks of Material Misstatement ⃞," of AU–C section 315A provides examples of conditions and events that may indicate the existence of risks of material misstatement in the financial statements. Such factors related to loss reserves for a property and liability insurance entity might encompass the following:

*a.* Management's selection of actuarial assumptions for pricing and loss reserve calculations are unduly influenced by considerations other than realistic expectations of future performance

*b.* Management's concerns with earnings and selection of its best estimate without proper support

*c.* The entity has a history of entering new lines of business and actual performance is less favorable than initial projections

*d.* Changes in regulations or application of accounting principles (SAP or GAAP) alter loss reserve requirements, assumptions, or calculation methodologies

*e.* Changes in the entity's underwriting standards or marketing strategy result in the acceptance of higher risks or a change in business practices

*f.* The entity's surplus position is weak in comparison to industry standards or close to minimum statutory requirements

*g.* Unqualified specialists are involved in the calculation and review of the loss reserves

### Internal Control

**4.123** Paragraph .04 of AU-C section 315A defines *internal control* as

[a] process effected by those charged with governance, management, and other personnel that is designed to provide reasonable assurance about the achievement of the entity's objectives with regard to the reliability of financial reporting, effectiveness and efficiency of operations, and compliance with applicable laws and regulations. Internal control over safeguarding of assets against unauthorized acquisition, use, or disposition may include controls relating to financial reporting and operations objectives.

**4.124** Internal control consists of the following five interrelated components:

    *a.* Control environment

    *b.* The entity's risk assessment process

    *c.* The information system, including the related business processes relevant to financial reporting and communication

    *d.* Control activities relevant to the audit

    *e.* Monitoring of controls

**4.125** AU-C section 315A requires the auditor to obtain an understanding of these components of the entity's internal control. Paragraphs 2.25–.35 of chapter 2 discuss in detail the components of internal control. This section will discuss certain components of a property and liability insurance entity's internal control as they relate to loss reserves.

### Control Environment

**4.126** The control environment comprises the collective effect of various factors on establishing, enhancing, or mitigating the effectiveness of specific control policies or procedures of the entity. Control environment factors related to the estimation process of loss reserves of a property and liability insurance entity may include the following:

    *a.* Whether operations are highly decentralized, have significant reliance on third parties to provide necessary data to calculate loss reserves, or are very centralized

    *b.* Adequacy of existing systems to provide data for the loss reserve estimation process and adequacy of interfaces with other key processing systems

    *c.* The extent of the use of manual processes or reliance on one individual for loss reserve calculations versus the use of systemic processes

    *d.* The experience of the staff in relation to the complexity involved in the estimation of loss reserves

### The Entity's Risk Assessment Process

**4.127** As discussed in paragraphs .16–.18 of AU-C section 315A, the auditor should obtain an understanding of whether the entity has a process for

    *a.* identifying business risks relevant to financial reporting objectives;

    *b.* estimating the significance of the risks;

    *c.* assessing the likelihood of their occurrence; and

    *d.* deciding about actions to address those risks.

**4.128** In accordance with paragraph .16 of AU-C section 315A, the auditor should obtain an understanding of the entity's risk assessment process related to loss reserves and the results thereof. As noted in paragraph .18 of AU-C section 315A, if the entity has not established such a process or has an ad hoc process, the auditor should discuss with management whether business risks relevant to financial reporting objectives have been identified and how they have been addressed. The auditor should evaluate whether the absence of a documented risk assessment process is appropriate in the circumstances or determine whether it represents a significant deficiency or material weakness in the entity's internal control.

### Information Systems

**4.129** As required by paragraph .19 of AU-C section 315A, the auditor should obtain an understanding of the information system, including the related business processes relevant to financial reporting. This would include obtaining an understanding of the loss reserve process and assessing the information systems used as part of that process. Reinsurance arrangements are contingent on many other functional areas of the entity and may involve information from multiple IT systems including premiums and claims.

## Control Activities

**4.130** *Control activities* are the policies and procedures that help ensure that management's directives are carried out. As discussed in paragraph .21 of AU-C section 315A, the auditor should obtain an understanding of those control activities the auditor judges it necessary to understand in order to assess the risks of material misstatement at the assertion level and design further audit procedures responsive to assessed risks. The following are examples of typical internal control procedures and policies relating to the estimation process of loss reserves:

  a. *Proper authorization of transactions and activities.* Written guidelines are in place that assign appropriate individuals the responsibility for initial approval and subsequent changes of actuarial assumptions and calculation methodologies.

  b. *Segregation of duties.* Product pricing and development, loss reserve processing, premium billing and collection, key information systems functions, and general accounting activities are appropriately segregated and independent reviews of the work performed are conducted.

  c. *Design of adequate controls over documents and records.* There are procedures to ensure that fictitious or duplicate claim records are not included in the actuarial data.

  d. *Independent checks on performance and proper valuation of recorded amounts.* Qualified specialists are used in actuarial calculations of loss reserve amounts and policies and procedures are in place for the appropriate personnel to evaluate those calculations and the resulting liability amounts.

Chapter 3 🗎 of this guide contains examples of internal control procedures and policies relating to premiums.

**4.131** After identifying the relevant data related to the estimation of loss reserves as part of obtaining an understanding of the information system, as discussed in paragraph .21 🗎 of AU-C section 315A, the auditor should obtain an understanding of the controls related to the completeness, accuracy, and classification of that data.

## Identifying and Assessing the Risks of Material Misstatement

**4.132** The auditor should identify and assess the risks of material misstatement for relevant assertions about loss reserves. The auditor should use the assessment of the risks of material misstatement at the relevant assertion level as a basis for designing and performing further audit procedures.

## Audit Procedures Responsive to the Assessed Risks of Material Misstatement

**4.133** Paragraph .05 of AU-C section 315A states that the auditor should perform risk assessment procedures to provide a basis for the identification and assessment of risks of material misstatement at the financial statement and relevant assertion levels. Risk assessment procedures by themselves, however, do not provide sufficient appropriate audit evidence on which to base the audit opinion. As required by AU-C section 330, the auditor should design and perform further audit procedures whose nature, timing, and extent are based on, and are responsive to, the assessed risks of material misstatement at the relevant assertion level. The auditor should determine the planned reliance on controls and the nature, timing, and extent of substantive testing, including whether the substantive evidence is planned from tests of details or substantive analytics.

**4.134** If the auditor identifies a significant risk and is only performing substantive procedures, those procedures should include a test of details, as discussed in paragraph .22 🗎 of AU-C section 330. If procedures to respond to the significant risk include both a test of controls and substantive procedures, the auditor may select substantive analytical procedures if the controls are operating effectively.

**4.135** A sample of other factors that the auditor may consider when determining the substantive testing approach to be utilized include the volume of transactions to be tested, reliability of data, conditions that cause variations in relationships among data, such as specific unusual transactions or events, accounting changes, business changes, or misstatements. The auditor may also consider the use of substantive analytical procedures when tests of details are performed for the same assertion.

**4.136** It is the auditor's responsibility to evaluate the reasonableness of the loss reserve established by management. AU-C section 540A, *Auditing Accounting Estimates, Including Fair Value Accounting Estimates, and Related Disclosures,*[22] provides guidance for use by an auditor when considering the reasonableness of the loss reserve. Paragraph .08c 🗎 of AU-C section 540A states that the auditor should obtain an understanding of how

management makes the accounting estimates and the data on which they are based. The loss reserve estimate is typically a significant estimate on the financial statements of an insurance entity. Accordingly, regardless of the approach used to audit the loss reserve estimate, the auditor should gain an understanding of how management made the estimate.

[22] AU-C section 540 designated with an "A" suffix (for example, "AU-C section 540A") denotes content that does not reflect the codification of SAS No. 143, *Auditing Accounting Estimates and Related Disclosures*. Upon implementation of SAS No. 143, auditors and firms should no longer utilize content from AU-C sections designated with an "A" suffix and should follow the standards as codified.

**4.137** As required by paragraph .12 of AU-C section 540A, based on the assessed risks of material misstatement, the auditor should determine

*a.* whether management has appropriately applied the requirements of the applicable financial reporting framework relevant to the accounting estimate; and

*b.* whether the methods for making the accounting estimates are appropriate and have been applied consistently and whether changes from the prior period, if any, in accounting estimates or the method for making them are appropriate in the circumstances.

**4.138** As discussed in paragraph .13 of AU-C section 540A, in responding to the assessed risks of material misstatement, the auditor should undertake one or more of the following, taking into account the nature of the accounting estimate:

*a.* Determine whether events occurring up to the date of the auditor's report provide audit evidence regarding the accounting estimate.

*b.* Test how management made the accounting estimate and the data on which it is based. In doing so, the auditor should evaluate whether

i. the method of measurement used is appropriate in the circumstances;

ii. the assumptions used by management are reasonable in light of the measurement objectives of the applicable financial reporting framework; and

iii. the data on which the estimate is based is sufficiently reliable for the auditor's purposes.

*c.* Test the operating effectiveness of the controls over how management made the accounting estimate together with appropriate substantive procedures.

*d.* Develop a point estimate or range to evaluate management's point estimate. For this purpose

i. if the auditor uses assumptions or methods that differ from management's, the auditor should obtain an understanding of management's assumptions or methods sufficient to establish that the auditor's point estimate or range takes into account relevant variables and to evaluate any significant differences from management's point estimate.

ii. if the auditor concludes that it is appropriate to use a range, the auditor should narrow the range, based on audit evidence available, until all outcomes within the range are considered reasonable.

**4.139** When auditing loss reserve estimates, usually approach (b), (c), (d), or a combination of the three is used. Normally, approach (a) alone is insufficient to provide sufficient appropriate evidence because claims are usually reported to insurance entities and settled over a period of time extending well beyond the typical auditor's report date. However, approach (a) may provide additional information concerning the reasonableness of loss reserve estimates, particularly for short tail lines of business, when used in combination with one or more of the other approaches.

**4.140** When reviewing events occurring up to the date of the auditor's report for possible audit evidence regarding the estimation of loss reserves (as discussed in paragraph 4.139a), for statutory basis financial statements, changes in the reserve amounts as of year-end subsequent to the filing of the annual statement and prior to the issuance of audited financial statements due to the "continuous review process" should be considered a change in estimate and recorded in accordance with SSAP No. 3, *Accounting Changes and Corrections of Errors*.[23]

[23] Paragraph 15 of Statement of Statutory Accounting Principles (SSAP) No. 55, *Unpaid Claims, Losses and Loss Adjustment Expenses*, clarifies that liabilities for unpaid claims, losses, and loss adjustment expenses within the scope of SSAP No. 55 are not expected to be reestimated. Rather, additional information that is obtained after the submission of the annual statement that is not indicative of an error in the estimation process is considered part of the continuous review process and should be reflected in the statement of operations in the period the change becomes known.

**4.141** When planning the audit, whether the auditor chooses to use approach (b), (c), or (d), or a combination of the approaches will depend on his or her expectation of what approach will result in sufficient appropriate audit evidence in the most cost-effective manner. Each approach can be used, and, depending on client circumstances, each approach may be effective. However, when management has not used the services of a loss

reserve specialist (either internal or external) in developing its loss reserve estimate, testing how management made the accounting estimate would generally not be appropriate. In this circumstance, it would be appropriate to develop a point estimate or range to evaluate management's point estimate.

4.142 In accordance with paragraph .09 of AU-C section 500A, when using information produced by the entity, the auditor should evaluate whether the information (for example, data used by all involved parties, such as management and, as applicable, management's internal or external loss reserve specialist and the auditor's internal or external loss reserve specialist) is sufficiently reliable, including determining whether the data is complete, accurate and consistent. If the different parties will analyze the data in different groupings (that is, workers' compensation by state) the evaluation includes understanding the effect that may have on the ultimate loss reserve projections.

## Use of Loss Reserve Specialists

4.143 Although AU-C section 500A ⬚ does not preclude the auditor from using the work of a specialist who is employed by the insurance entity, because of the significance of loss reserves to the financial statements of insurance entities and the complexity and subjectivity involved in making loss reserve estimates, an auditor should consider using the work of either

   *a.* an auditor's external or internal loss reserve specialist; or

   *b.* management's external loss reserve specialist who is not an employee of the entity, (under the requirements of AU-C section 500A as discussed in paragraphs 4.148–.149).

## Loss Reserve Specialists Engaged by the Auditor

4.144 If the auditor is developing a point estimate or range to evaluate management's point estimate, they may use loss reserve specialists within the audit firm (auditor's internal specialist) or separately engage external loss reserve specialists (auditor's external specialist). In either situation the auditor should follow all relevant requirements of AU-C section 620 ⬚, including, among other things, assessing the competency, capabilities, and objectivity of the specialist as well as the determination of the level of interaction between the parties, evaluation of the relevance, completeness and accuracy of the significant source data used, and evaluation of the relevance and reasonableness of significant assumptions in the circumstances and in relation to the auditor's other findings and conclusions.

4.145 If the auditor is using an internal loss reserving specialist, the working papers of the auditor's specialist form part of the audit documentation.

4.146 When using an external loss reserve specialist, the auditor should agree with the auditor's external specialist about the nature, timing and extent of communication between the auditor and the auditor's specialist, including the form of any report to be provided by the auditor's specialist, as required by AU-C section 620. Generally the working papers of the external specialist are its own and do not form part of the audit documentation. This is a factor for consideration in determining that the auditor's documentation satisfies the requirements of AU-C section 230, *Audit Documentation* ⬚. This may include obtaining and reviewing a copy of the auditor's external specialist's report.

## Use of Management Specialists by Auditors in Evaluating Loss Reserves

4.147 One of the procedures the auditor may consider in evaluating the reasonableness of the loss reserve is using the work of management's external specialist. AU-C section 500A addresses the auditor's responsibilities when information to be used as audit evidence has been prepared using the work of a management's external specialist in performing an audit of financial statements, and the relevance and reliability of the information to be used as audit evidence. The auditor is not expected to have the expertise of a person trained for or qualified to engage in the practice of another profession or occupation.

4.148 As discussed in paragraph .08 ⬚ of AU-C section 500A, if information to be used as audit evidence has been prepared using the work of a management's specialist, the auditor should, to the extent necessary, taking into account the significance of that specialist's work for the auditor's purposes,

   *a.* evaluate the competence, capabilities, and objectivity of that specialist;

   *b.* obtain an understanding of the work of that specialist; and

   *c.* evaluate the appropriateness of that specialist's work as audit evidence for the relevant assertion.

4.149 As discussed in paragraph .09 of AU-C section 500A, when using information produced by the entity, the auditor should evaluate whether the information is sufficiently reliable for the auditor's purposes, including, as necessary, in the following circumstances:

   *a.* Obtaining audit evidence about the accuracy and completeness of the information

*b.* Evaluating whether the information is sufficiently precise and detailed for the auditor's purposes

## Auditor's Response to Management's Use or Non-Use of a Loss Reserve Specialist

4.150 The following are descriptions of situations involving the presence or absence of a loss reserve specialist in management's determination of loss reserves and the recommended response by the auditor in each situation.

*Situation 1* — The entity does not have a management loss reserve specialist involved in the determination of loss reserves.

*Auditor response to situation 1* — This situation may constitute a significant deficiency and possibly a material weakness in internal control. It is recommended that the auditor use an external or internal loss reserve specialist to develop a point estimate or range to evaluate management's point estimate.

*Situation 2* — The entity has a management internal loss reserve specialist who is involved in the determination of loss reserves and the entity does not use an outside loss reserve specialist.

*Auditor response to situation 2* — It is recommended that the auditor involve an auditor's external or internal loss reserve specialist to audit the reasonableness of the entity's loss reserve estimate by using an appropriate approach selected from paragraph 4.139.

*Situation 3* — The entity has no management internal loss reserve specialist but involves an external loss reserve specialist hired by management (that is, management's external loss reserve specialist) in the determination of loss reserves.

*Auditor response to situation 3* — If the auditor plans to use the work of management's external loss reserve specialist in evaluating the reasonableness of the loss reserve, the auditor should evaluate the competence, capabilities, and objectivity of a management's specialist, obtain an understanding of the work of that specialist, and evaluate the appropriateness of that specialist's work as audit evidence as required in AU-C section 500A 🗋.

*Situation 4* — The entity involves management's internal loss reserve specialist in the determination of loss reserves and involves an external loss reserve specialist to separately review the loss reserves.

*Auditor response to situation 4* — In evaluating the reasonableness of the loss reserves, the auditor may wish to consider the work of management's internal and external loss reserve specialists in determining the appropriate audit approach as discussed in paragraph 4.139.

As discussed in situation 3, if the auditor plans to use the work of management's external loss reserve specialist in evaluating the reasonableness of the loss reserve, the auditor should evaluate the competence, capabilities, and objectivity of a management's specialist, obtain an understanding of the work of that specialist, and evaluate the appropriateness of that specialist's work as audit evidence as required in AU-C section 500A.

## Evaluating the Reasonableness of the Estimates

4.151 As required by paragraphs .18–.20 🗋 of AU-C section 540A, the auditor should evaluate, based on the audit evidence, whether the accounting estimates in the financial statements are either reasonable in the context of the applicable financial reporting framework or are misstated. The auditor should obtain sufficient appropriate audit evidence about whether the disclosures in the financial statements related to accounting estimates are in accordance with the applicable financial reporting framework. For accounting estimates that give rise to significant risks, the auditor should evaluate the adequacy of the disclosure of estimation uncertainty in the financial statements in the context of the applicable financial reporting framework. The requirements in AU-C section 540A apply when an auditor is evaluating the reasonableness of the loss reserve. This evaluation may include analytical procedures to assist the auditor in understanding changes as well as substantive procedures to obtain evidence regarding the completeness and accuracy of the amounts.

## Analytical Procedures[24]

[24] AICPA Audit Guide *Analytical Procedures* provides practical guidance to auditors on the effective use of analytical procedures. The Audit Guide includes a discussion of AU-C section 520, *Analytical Procedures* 🗋, concepts and definitions, a series of questions and answers, and a case study illustrating trend analysis, ratio analysis, reasonableness testing, and regression analysis.

4.152 Analytical procedures are an important part of the audit process and consist of evaluations of financial information made by a study of plausible relationships among both financial and nonfinancial data. The use of analytical procedures should be considered throughout the audit cycle as a part of planning, substantive, or conclusion procedures. A basic premise underlying the application of analytical procedures is that it is reasonable to assume that plausible relationships among data exist and continue in the absence of known conditions to the contrary. Variations in these relationships may be caused by particular conditions such as unusual transactions or events, accounting changes, material business changes, random fluctuations, or misstatements.

4.153 AU-C section 520, *Analytical Procedures*, provides guidance on the use and documentation of analytical procedures and requires the use of analytical procedures in the overall review stage of all audits. Also, in accordance with paragraphs .05–.06 of AU-C section 315A the auditor should perform risk assessment procedures, including analytical procedures, to provide a basis for the identification and assessment of risks of material misstatement at the financial statement and relevant assertion levels.

4.154 The results of analytical procedures performed during the planning phase of the audit may affect the nature, timing, and extent of audit procedures. If there were numerous unexpected variances on a particular line of business, for example, the auditor may determine that it is more appropriate to develop a point estimate or range to evaluate management's point estimate rather than only test how management made the accounting estimate and the data on which it is based.

4.155 Various analytical procedures may be used in the evaluation of the reasonableness of loss reserve estimates, such as the analysis of the following:

- Loss and loss adjustment expense ratios

- Reserve development

- Loss frequency and severity statistics

- Claim cost by exposure units

- Average case reserves

- Claim closure rates

- Paid to incurred ratios

4.156 Examples of sources of information for developing analytical expectations include prior period financial information, Insurance Regulatory Information System ratio analysis, and rating agency reports.

4.157 Such analyses include comparison of significant assumptions or estimates with industry averages or other expectations. One type of evaluation would be to disaggregate by line of business and accident or report year. When the auditor is able to validate the completeness and accuracy of the data used in management analytics, the auditor may elect to include these as a part of their audit evidence. It may be appropriate for the auditor to meet with management to discuss the results of analytics performed by both parties in order to understand any unexpected or unusual trends or changes.

### *Testing the Data, Assumptions, and Selection of the Estimate*

4.158 As discussed in paragraph 4.139, an auditor may respond to the assessed risks of material misstatement for loss reserves by testing how management determined the accounting estimate and the data on which it is based. This approach may be appropriate for evaluating the reasonableness of the accounting estimates involved with loss reserves when loss reserve estimates are recommended by management's external loss reserve specialist, management has a process to evaluate the recommended reserve, and management accepts those recommendations.

4.159 An entity that uses an external loss reserve specialist to develop loss reserve recommendations may engage the external specialist to evaluate only the entity's major lines of business or only certain components of the loss reserves. In either circumstance, the auditor may determine that a different approach is needed for auditing the items not reported on by management's external loss-reserve specialist.

4.160 In addition to the requirements in paragraph .13 of AU-C section 540A, the following are procedures the auditor may consider performing. Some of the procedures subsequently listed apply to the process management uses to supply data to its external or internal loss reserve specialist, some apply to the process used by management's external or internal specialist to develop recommendations, some apply to the process used by management to review and evaluate those recommendations, and some apply to the process management uses to translate management's external or internal specialist's recommendations into the loss reserve estimates recorded in the financial statements:

- *Identify whether there are controls over the preparation of accounting estimates and supporting data that may be useful in the evaluation.* Controls over the preparation of accounting estimates may include

    - procedures for selecting independent external loss reserve specialists or hiring internal specialists, including procedures for determining that the specialist has the requisite competence in loss reserving, knowledge of the entity's types of business, and understanding of the different methods available for calculating loss reserve estimates.

- procedures for reviewing and evaluating the recommendations of the external or internal loss reserve specialist.

- procedures to ensure that the methods used to calculate the loss reserve estimate are appropriate and sufficient in the circumstances.

- procedures to verify the clerical accuracy of the calculations in the determination of key factors, assumptions and the ultimate loss estimate, especially with regard to the use of spreadsheets, which are susceptible to data transposition errors whether intentional or not.

Controls over the preparation of supporting data, in addition to those discussed later in this chapter, may include

- procedures for verifying that data used by the external or internal loss reserve specialist is appropriately summarized and classified from the entity's claims database.

- procedures for ensuring that data used by the external or internal loss reserve specialist is complete and accurate.

- procedures to substantiate and determine the appropriateness of industry or other external data sources used in developing assumptions (for example, data received from involuntary risk pools).

  - *Identify the sources of data and factors that management used in forming the assumptions, and consider whether such data and factors are relevant, reliable, and sufficient for the purpose, based on information gathered in other audit tests.* Sources of data and factors used may include

- entity historical claims data, including changes and trends in the data.

- entity information on reinsurance levels and changes from prior years' reinsurance programs.

- data received from involuntary risk pools such as those administered by the National Council on Compensation Insurance.

- industry loss data from published sources.

- internal entity experience or information from published sources concerning recent trends in socioeconomic factors affecting claim payments, such as (*a*) general inflation rates and specific inflation rates for medical costs, wages, automobile repair costs, and the like; (*b*) judicial decisions assessing liability; (*c*) judicial decisions regarding noneconomic damages; and (*d*) changes in legislation affecting payment levels and settlement practices.

Consider whether the entity's data is sufficient to have adequate statistical credibility (for example, to allow the "law of large numbers" to work for the entity's estimates). Consider whether the types of industry data used in developing assumptions are relevant to the entity's book of business, considering policy limits, reinsurance retention, geographic and industry concentrations, and other appropriate factors.

- *Consider whether there are additional key factors or alternative assumptions about the factors.* Key factors and potential alternative assumptions that might be considered include

  - changes in the entity's experience or trends in loss reporting and settlements. Increases in the speed of the settlement of claims may lead to assumptions that paid development levels will be lower in the future, or may indicate changes in the entity's procedures for processing claims that could lead to increased development in the future.

  - divergence in entity experience relative to industry experience. Such divergence might later result in entity development experience that reduces the divergence or might be indicative of a change in an entity's experience with a book of business.

  - changes in an entity's practices and procedures relating to recording and settling claims.

  - an entity's reinsurance programs and changes therein.

  - changes in an entity's underwriting practices such as new or increased use of managing general agents.

  - new or changed policy forms or coverages.

  - recent catastrophic occurrences.

- *Evaluate whether the assumptions are consistent with each other, the supporting data, relevant historical data, and industry data.* In accordance with AU–C section 540A, the auditor should evaluate whether the significant assumptions used by management are reasonable, which may include

  - paid loss projection methods, which assume that an entity's historical experience relating to the timeliness of settlement will be predictive of future results.

  - reported (incurred) loss development projection methods, which assume that an entity's experience in estimating case-basis reserves will be repeated in the future.

- *Analyze historical data used in developing the assumptions to assess whether it is comparable and consistent with data of the period under audit and consider whether the data is sufficiently reliable for the purpose.* Consider whether the entity's past methods of estimating loss reserves have resulted in appropriate estimates and whether current data (for example, current year development factors) indicate changes from prior experience. Consider the information within the loss reserve rollforward table and development commentary in the related footnotes to the financial statements. Consider how known changes in the entity's loss reporting procedures and settlement practices have been factored into the estimate. Consider how changes in reinsurance programs, in the current period and during historical periods, have been factored into management's estimates.

The auditor should review the current year development of prior reserve estimates to assess the loss reserving process under the requirements of paragraph .09 ⧉ of AU–C section 540A. To understand the change in prior year reserves, the auditor should consider additional information that led to the re-estimation of prior reserve estimates.

The evaluation should also take into account the nature of accounting estimates and whether the information obtained from the review would be relevant to identifying and assessing risks of material misstatement made in the current period. However, the review is not intended to call into question the auditor's professional judgments made in the prior periods that were based on information available at the time.

- *Consider whether changes in the business or industry may cause other factors to become significant to the assumptions.* The auditor may need the assistance of the auditor's external or internal specialist to understand the reasonableness of the drivers in the change in the loss estimate such as unexpected claim severity, frequency, regulatory changes, or process changes. Additionally, the understanding of the factors causing development in the current period will aid in the review of the loss rollforward disclosures required under FASB ASC 944 ⧉ as well as the associated discussion of the factors causing the change in the estimate disclosed as required under FASB ASC 944, FASB ASC 275 ⧉, and the SEC. Examples of these disclosures are included in appendix E ⧉. Consider such changes as

  - new lines of business and classes of business within lines.

  - changes in reinsurance programs.

  - changes in the regulatory environment such as premium rate rollbacks and regulation.

  - changes in the method of establishing rates and changes in methods of underwriting business.

  - changes in processing such as the timing of claim payments.

- *Review available documentation of the assumptions used in developing the accounting estimates, inquire about any other plans, goals, and objectives of the entity, and consider their relationship to the assumptions.* An entity's practices concerning settling claims, such as a practice of vigorously defending suits or of quickly settling suits, can have a significant effect on an entity's loss experience.

- *Consider using the work of a specialist regarding certain assumptions.* Using the work of a specialist is discussed in AU–C section 620 ⧉.

- *Test the calculations used by management to translate the assumptions and key factors into the accounting estimate.* Consider whether all lines of business and accident years are included in the loss reserve estimate. Consider how reinsurance receivable, salvage, and subrogation have been included.

4.161 If the auditor tests how management determines the accounting estimate and the data on which it is based, and management's estimate differs significantly from the recommendations developed by management's external or internal specialists, the auditor should consider the guidance in paragraph .10a ⧉ of AU–C section 500A that addresses what modifications or additions to audit procedures are necessary when audit evidence obtained from one source is inconsistent with that obtained from another. The auditor should also consider the guidance in paragraph .12 ⧉ of AU–C section 230 regarding documentation of how the auditor addressed information that is inconsistent with the auditor's final conclusion.

4.162 Because the process of estimating loss reserves is complex and involves many subjective judgments, the absence of involvement by a loss reserve specialist in the determination of management's estimate may constitute a significant deficiency and possibly a material weakness in the entity's internal control. AU-C section 265, *Communicating Internal Control Related Matters Identified in an Audit* 🗋, addresses the auditor's responsibility to appropriately communicate to those charged with governance and management deficiencies in internal control that the auditor has identified in an audit of financial statements. AU-C section 265 is not applicable if the auditor is engaged to perform an audit of internal control over financial reporting that is integrated with an audit of financial statements; in such circumstances, AU-C section 940, *An Audit of Internal Control Over Financial Reporting That Is Integrated With an Audit of Its Financial Statements* 🗋, applies. Under SAP, Section 11, "Communication of Internal Control Related Matters Noted in an Audit," of the NAIC revised Model Audit rule requires that each insurer furnish the commissioner with a written communication about any unremediated material weaknesses in its internal control over financial reporting noted during the audit.

## *Auditing the Underlying Data Used in the Loss Reserving Process*

4.163 The *NAIC Property and Casualty Annual Statement Instructions* require the auditor to determine what historical data and methods have been used by management in developing the loss reserve estimate and whether the auditor will rely on the same data or other statistical data in evaluating the reasonableness of the loss reserve estimate.

4.164 When the historical experience is the basis for significant assumptions used by management for loss reserve estimates, testing the historical data is necessary and may include

- premiums written or earned;

- losses paid or incurred;

- exposure;

- policy limits;

- claim counts; and

- third-party information.

4.165 Regardless of the audit approach selected, the auditor should perform substantive procedures for all relevant assertions related to each material class of transactions, account balance, and disclosure. The auditor's substantive procedures should include agreeing on the financial statements, including their accompanying notes, to the underlying accounting records and examining material journal entries and other adjustments. Because claim data and characteristics such as dates and type of loss can significantly influence reserve estimation, the auditor should test the completeness, accuracy, and classification of the claim loss data.

4.166 The *NAIC Property and Casualty Annual Statement Instructions* require coordination among the auditor, an appointed actuary, and management and potentially require additional procedures for the auditor related to claim loss and LAE data. Section 9 of the instructions, "Scope of Examination and Report of Independent Certified Public Accountant," states

[t]he insurer shall also require that the independent certified public accountant subject the data used by the appointed actuary to testing procedures. The auditor is required to determine what historical data and methods have been used by management in developing the loss reserve estimate and whether he or she will rely on the same data or other statistical data in evaluating the reasonableness of the loss reserve estimate. After identifying the relevant data, the auditor should obtain an understanding of the controls related to the completeness, accuracy, and classification of loss data and perform testing as to the understanding of the controls related to the completeness, accuracy, and classification of loss data, and perform other testing as the auditor deems appropriate. Through inquiry of the appointed actuary, the auditor should obtain an understanding of the data identified by the appointed actuary as significant. It is recognized that there will be instances when data identified by the appointed actuary as significant to his or her reserve projections would not otherwise have been tested as part of the audit, and separate testing would be required. Unless otherwise agreed among the appointed actuary, management, and the auditor, the scope of the work performed by the auditor in testing the claims data in the course of the audit would be sufficient to determine whether the data tested is fairly stated in all material respects in relation to the statutory financial statements taken as a whole. The auditing procedures should be applied to the claims loss and defense and cost containment expense data used by the appointed actuary and would be applied to activity that occurred in the current calendar year (for example, tests of payments on claims paid during the current calendar year).

4.167 This does not replace the requirements to audit reconciliations of the data provided in Schedule P of the annual statement to the underlying accounting records as described in SOP 92-8 🗋. The auditor should inform management if the auditor has not planned to include in the audit all of the data identified as significant by the appointed actuary, that there may be a need for additional testing outside the scope of the statutory audit.

The conclusion regarding the need for the auditor to perform additional procedures should be agreed upon by the management and the loss reserving specialist and requested of the auditor directly by management. If procedures are performed beyond those included in the statutory audit, the auditor should report on such work under the AICPA's professional standards.

**4.168** As previously noted, the auditor should test the information in the underwriting and claims systems as well any other information considered critical including quantitative (that is, premiums written or earned, case reserves, deductible information) and qualitative information (that is, line of business, insured location, loss accident year). If any attributes deemed critical by the appointed actuary are not tested by the auditor the auditor should document their rationale for excluding those attributes.

## *Develop a Point Estimate or Range to Evaluate Management's Estimate*

**4.169** Based on the auditor's understanding of the facts and circumstances, the auditor may independently develop an expectation of the estimate by using other key factors or alternative assumptions about those factors. This approach is recommended whenever management has not used the services of an external or internal loss reserve specialist in developing its loss reserve estimate and may be appropriate to assist the auditor in assessing the range of reasonable possible outcomes of the entity's loss reserves and related income statement amounts, even when management does use an external or internal loss reserve specialist. The auditor may develop independent projections because this method may result in a more cost-effective method of obtaining sufficient appropriate audit evidence.

**4.170** When this approach is used, the auditor may use either an auditor's external or internal loss reserve specialist to develop the independent expectation of the loss reserve estimate.

## *Loss Reserve Ranges*

**4.171** Estimates are based on subjective as well as objective factors and, as a result, judgment is required to estimate an amount at the date of the financial statements. Management's judgment is normally based on its knowledge and experience about past and current events and its assumptions about conditions it expects to exist and courses of action it expects to take. Accordingly, loss reserves may develop in a number of ways and a reserve for a particular line of business or accident year may prove to be redundant or deficient when analyzed in a following period. Loss reserves considered to be adequate in prior periods may need to be adjusted at a later date as a result of events outside the control of the insurance entity that create the need for a change in estimate. Such events include future court decisions and periods of inflation, in which rates may change significantly from period to period and affect the payout of claims. As a result of the circumstances described previously, the need to adjust loss reserve estimates in future periods because of future events that are not predictable at the balance sheet date should not necessarily be interpreted as evidence of an error or poor loss reserving practices in the past.

**4.172** Because the ultimate settlement of claims is subject to future events, no single loss reserve estimate can be considered accurate with certainty. Auditors should refer to AU-C section 540A when considering the estimation uncertainty inherent in loss reserve estimates. The development of a single loss reserve projection, by itself, does not address estimation uncertainty (as discussed in paragraph .15 of AU-C section 540A) and may not provide sufficient evidence to evaluate the reasonableness of the loss reserve provision in the financial statements. As discussed in paragraph 4.74, it is management's responsibility to record its best estimate of loss reserves in the financial statements. The auditor is responsible for evaluating the reasonableness of accounting estimates made by management in the context of the financial statements taken as a whole. As discussed in paragraph .15 of AU-C section 540A, for accounting estimates that give rise to significant risks, in addition to other substantive procedures performed to meet the requirements of AU-C section 330, the auditor should evaluate the following:

*a.* How management has considered alternative assumptions or outcomes and why it has rejected them or how management has otherwise addressed estimation uncertainty in making the accounting estimate

*b.* Whether the significant assumptions used by management are reasonable

*c.* When relevant to the reasonableness of the significant assumptions used by management or the appropriate application of the applicable financial reporting framework, management's intent to carry out specific courses of action and its ability to do so

**4.173** As discussed in paragraph .16 of AU-C section 540A, if, in the auditor's professional judgment, management has not adequately addressed the effects of estimation uncertainty on the accounting estimates that give rise to significant risks, the auditor should, if considered necessary, develop a range with which to evaluate the reasonableness of the accounting estimate.

**4.174** In evaluating reasonableness, the auditor should obtain an understanding of how management developed the estimate. This understanding provides the auditor with information that may be relevant to the auditor's development of an appropriate point estimate or range. As discussed in paragraph .A99 of AU-C section 540A, when the auditor concludes that it is appropriate to use a range to evaluate the reasonableness of management's point estimate (the auditor's range), it is required that the range encompass all reasonable outcomes, rather than all possible outcomes. The auditor's range is useful and effective when it is sufficiently narrow to enable the auditor to conclude whether the accounting estimate is not materially misstated.

4.175 Another way to address the range of reasonable possible outcomes of the entity's loss reserves is for the auditor to develop a best estimate and to supplement it with qualitative analysis that addresses the variability of the estimate. Qualitative analysis involves consideration of the factors affecting the variability of loss reserves and integrating such factors into a determination of the range of reasonable estimates around a best estimate. Such factors, among others, include the mix of products underwritten, losses incurred by the insurance industry for similar coverages and underwriting years, and the correlation between past and current business written. Accordingly, when planning and performing procedures to evaluate accounting estimates, the auditor should consider, with an attitude of professional skepticism, both the subjective and objective factors. The audit procedures performed for this purpose will vary based on the characteristics of the business, the controls the entity uses to monitor such variability, and other audit procedures used.

4.176 The size of the loss reserve range will vary by line of business. For example, automobile physical damage claims may be estimated with greater precision than product liability claims. In extreme cases, the top-to-bottom range could extend to 50% and upward of the amount provided. An example of an extreme case might be a newly formed entity that writes primarily volatile types of business. The results of operations in such a situation are sensitive to future fluctuations because the loss reserve estimate is based primarily on assumptions that will undoubtedly change over time. More important, however, is the strain that any extremely adverse loss development would place on such an entity's surplus. In an opposite extreme case, the top-to-bottom range might only be 5% of the amount provided for an entity that only writes automobile physical damage coverages.

4.177 In evaluating whether management has identified all accounting estimates that could be material to the financial statements, the auditor considers the circumstances of the industry or industries in which the entity operates, its methods of conducting business, new accounting pronouncements, and other external factors. In other words, it is unlikely that ultimate claim settlements for each line of business will fall at the same end of the range.

## *Factors That Could Affect a Range of Reasonably Possible Outcomes*

4.178 Because loss reserves represent both reported and unreported claims that have occurred as of the valuation date, the auditor needs to gain an understanding of the entity's exposure to risk through the business it writes as well as an understanding of environmental factors that may affect the entity's loss development at the valuation date.

4.179 The following are some factors that may affect the range of reasonable possible outcomes of the entity's loss reserves:

- *The frequency and severity of claims associated with a line of business.* Medical malpractice, directors' and officers' liability, and other lines of business that typically produce few claims with large settlement amounts tend to have a high degree of variability.

- *Policy characteristics.* Individual lines of business can be written on different policy forms. For example, loss reserving and its related variability for medical malpractice written on an occurrence basis will differ markedly when the policy is written on a claims-made basis, especially during the early years of conversion from an occurrence to a claims-made basis. Additionally lines such as workers' compensation may include varying deductible amounts and significant changes that will have an impact on variability.

- *Retention levels.* The greater an entity's retention level, the more variable the results are likely to be. This increased variability is due to the effect that one or several large losses can have on the overall book of business. For reinsurance assumed, the concepts analogous to retention levels are referred to as attachment points and limits.

- *The mix of an entity's business with respect to long tail liability lines and short tail property lines.* Typically, loss reserves on business with longer tails exhibit greater variability than on business with shorter tails because events affecting ultimate claim settlements may occur at a later date.

4.180 Some external factors that may affect the range of reasonable possible outcomes of the entity's loss reserves are as follows:

- Changes in the regulatory environment

- Lack of readily available information related to catastrophes or major civil disorders

- Jury awards and social inflation arising from the legal environment in principal states in which an entity's risks are underwritten

- The effect of inflation

- Foreign exchange fluctuations

- Tort reform and the uncertainty of the appeals process may have on certain lines of business such as medical malpractice and workers' compensation

4.181 As required by AU-C section 315A ⬚, the auditor should obtain an understanding of internal control relevant to the audit and relevant industry, regulatory, and other external factors. This may be accomplished by a review of contracts, inquiries of underwriters, a review of pertinent trade publications, and any other procedures deemed necessary under the circumstances. The auditor should consider these factors in evaluating a range of reasonable possible outcomes of the entity's loss reserves. The best estimate may not necessarily be midway between in the range of reasonable possible outcomes of the entity's loss reserves, because certain factors (for example, risk retention limits and retrospectively rated contracts) may reduce the variability at one end of the range but not at the other.

4.182 The auditor needs to know about, be familiar with, and consider the workings of all significant reinsurance ceded contracts and the effect that these contracts have on best estimates and the range of reasonable possible outcomes of the entity's loss reserves. The effect of reinsurance ceded agreements on loss reserves and ceded reinsurance premiums are also important considerations.

4.183 When analyzing the range of reasonable possible outcomes of the entity's loss reserves, the auditor may wish to consider potential offsets that may serve to reduce the financial statement effects of misstatements in the recorded loss reserves. Two common examples are ceded reinsurance and retrospectively rated contracts (primary or reinsurance). It is recommended that such offsets, if material, be included in an analysis of the range of reasonable possible outcomes of the entity's loss reserves to quantify the true income statement or balance sheet effect that results from an increase or decrease in loss reserves.

4.184 A retrospectively rated feature in an insurance contract means that increases or decreases in incurred losses may be wholly or partially offset by changes to earned but unbilled premiums. As a result of such a clause, an increase in loss reserves may lead to a receivable for additional premiums, and a decrease in loss reserves may be offset by a reduction in premiums.

## *Evaluating the Financial Effect of a Reserve Range*

4.185 To determine the amount of variability that is significant to the financial statements, an auditor may wish to consider the financial leverage of an entity. Financial leverage refers to items such as reserve-to-surplus ratios. The financial position of an entity with a 1.5-to-1 reserve-to-surplus ratio is less affected by variability in its loss reserves than is an entity operating at a 3-to-1 ratio with a similar book of business.

4.186 Additionally, an analysis comparing the difference between the net recorded loss reserves and the high and low ends of a range of reasonable outcomes with key financial statement balances, such as surplus or recorded loss reserves, might be performed. Combining financial leverage with other materiality factors pertinent to the entity (for example, loan covenant agreements) may provide insights into the amount of variability that is acceptable to the auditor. Because of the imprecise nature of estimating loss reserves, the acceptable range of loss reserve estimates will generally be higher than that of a more tangible balance such as accounts receivable or payable.

4.187 As discussed in paragraph .A122 ⬚ of AU-C section 540A,

[b]ased on the audit evidence obtained, the auditor may conclude that the evidence points to an accounting estimate that differs from management's point estimate. When the audit evidence supports a point estimate, the difference between the auditor's point estimate and management's point estimate constitutes a misstatement. When the auditor has concluded that using the auditor's range provides sufficient appropriate audit evidence, a management point estimate that lies outside the auditor's range would not be supported by audit evidence. In such cases, the misstatement is no less than the difference between management's point estimate and the nearest point of the auditor's range.

4.188 As stated in paragraph .07 ⬚ of AU-C section 450, *Evaluation of Misstatements Identified During the Audit*, the auditor should communicate on a timely basis with the appropriate level of management all misstatements accumulated during the audit, and request management to correct those misstatements.

4.189 Where the auditor has identified a judgmental misstatement involving differences in estimates, the auditor may request management to review the assumption and methods used in developing the estimate. After management has challenged the assumptions and methods used in developing an estimate for which the auditor has identified a misstatement, the auditor should reevaluate the amount of the misstatement. This includes performing additional further audit procedures, if necessary. As discussed in paragraph .09 of AU-C section 450, if management refuses to correct some or all of the misstatements communicated by the auditor, the auditor should obtain an understanding of management's reasons for not making the corrections and should take that understanding into account when evaluating whether the financial statements as a whole are free from material misstatement.

4.190 Materiality judgments involve both qualitative and quantitative considerations. As a result of the interaction of quantitative and qualitative considerations in materiality judgments, misstatements of relatively small amounts that come to the auditor's attention could have a material effect on the financial statements. Refer to paragraph .12 of AU-C section 450 for documentation requirements related to misstatements.

4.191 Management generally should select a single loss reserve estimate (management's best estimate)[25] that represents its judgment about the most likely circumstances and events. If management develops a reasonable range, the amount recorded could be the best estimate within that range. If the difference between the entity's recorded reserve and the farther end of the reserve range is deemed significant, the auditor may extend

audit procedures to obtain additional audit evidence (such as, to understand the difference between the farther end of the range and management's estimate.

[25] See footnote 11.

4.192 In determining the reasonableness of loss reserves, the auditor also may consider the consistency of reserve estimates and any changes in the degree of conservatism of recorded reserves. A change in the degree of conservatism of management's estimate may be indicative of a change in management's reserve process.

## Auditor Uncertainty About the Reasonableness of Management's Estimate and Reporting Implications

4.193 Ordinarily, the auditor would look to historical data to obtain audit evidence that will provide reasonable assurance that management's estimate of loss reserves is reasonable in the circumstances. Such historical data may not currently exist for certain new entities, for entities writing significant amounts of new lines of business, or for entities with a low volume of claims. In situations where historical data is not available, the auditor should obtain other audit evidence to assist in making a determination whether management has adequately disclosed the uncertainty about management's estimate of loss reserves in the notes to the financial statements as required by FASB ASC 450 ⃞ and 275 ⃞.

4.194 A matter involving an uncertainty is one that is expected to be resolved at a future date at which time conclusive audit evidence concerning its outcome would be expected to become available. In accordance with paragraph .A14 of AU-C section 705, *Modifications to the Opinion in the Independent Auditor's Report,* absence of the existence of information related to the outcome of an uncertainty does not necessarily lead to a conclusion that the audit evidence supporting management's assertion is not sufficient. Rather, the auditor's professional judgment regarding the sufficiency of the audit evidence is based on the audit evidence that is, or should be, available. If, after considering the existing conditions and available evidence, the auditor concludes that sufficient appropriate audit evidence supports management's assertion about the nature of a matter involving an uncertainty and its presentation or disclosure in the financial statements, an unmodified opinion ordinarily is appropriate. If the auditor is unable to obtain sufficient appropriate audit evidence to conclude that the financial statements, as a whole, are free from material misstatement, the auditor should modify the opinion in the auditor's report, either as a qualified opinion or a disclaimer of opinion because of a scope limitation. A qualified opinion or disclaimer of opinion because of a scope limitation is appropriate if sufficient audit evidence related to an uncertainty does or did exist but was not available to the auditor for reasons such as management's record retention policies or a restriction imposed by management.

## Evaluating the Reasonableness of Loss Adjustment Expense Reserves

4.195 Evaluation of the reasonableness of LAE reserves involves many of the same skills that are needed to evaluate the reasonableness of loss reserves; therefore, such an evaluation ordinarily requires the use of an outside loss reserve specialist. Frequently, both DCC reserves and AO reserves are calculated based on formulas related to paid losses; therefore, in conjunction with the audit of LAE, the auditor should perform sufficient procedures to obtain assurance about the reliability of the paid-loss data. Although DCC and AO frequently are calculated using formulas based on paid losses, they can be calculated differently; accordingly, different procedures may be needed to evaluate those types of reserves.

4.196 The reasonableness of the AO reserve is primarily dependent on the application of sound techniques of cost accounting and expense allocation. It is recommended that the auditor review the basis of this allocation because the way that the entity allocates its expenses will have an effect on the AO reserve calculation. It is helpful for this review to focus on the allocation of costs to the loss adjustment classification as well as the allocation within that classification to the individual lines of business.

## Ceded Reinsurance Recoverable

4.197 This section discusses certain concepts and procedures that are fundamental to the auditor's evaluation of the reasonableness of the reinsurance recoverable. This section does not address the following items, which are discussed in chapter 6 ⃞. Refer to chapter 6 of this guide for information about the following:

- The purpose and nature of reinsurance

- Forms and types of reinsurance

- Accounting for reinsurance transactions

- Internal control considerations relating to ceded and assumed reinsurance and a description of audit procedures to verify the integrity of recorded transaction data pursuant to such agreements

**Understanding an Insurance Entity's Reinsurance Program**

4.198 Chapter 6 of this guide recommends that the auditor obtain an understanding of an insurance entity's reinsurance program to properly perform audit procedures to verify the accuracy and completeness of recorded cessions and assess the ability of reinsurers to meet their financial obligations under such agreements. This understanding is also essential to properly evaluate the reasonableness of reinsurance recoverable balances. Because the use of historical information from reinsurance arrangements may be necessary to estimate current amounts, it is recommended that the auditor obtain an understanding of both reinsurance arrangements currently in effect and those in effect during historical periods from which loss experience will be used to project current year ultimate losses and reinsurance recoveries.

4.199 Net loss development patterns will vary from gross development to the extent that current reinsurance arrangements (coverages, levels of retention, and type and form of reinsurance) differ from arrangements in effect during the claim experience period used to project losses. Accordingly, the effect of such differences on estimates of reinsurance recoverables will need to be assessed by the auditor and the loss reserve specialist. The level of complexity involved in making this assessment is dependent on the types of reinsurance used and the amount of experience available under the program. In order to obtain audit evidence about the reasonableness of certain reinsurance accounts, the auditor may need to perform procedures to test the "gross-up" or "net-down" of balances in the financial statements and related disclosures.

4.200 Special difficulties arise in estimating reinsurance receivables on excess of loss reinsurance arrangements in which claim frequency is sporadic, retention levels have changed, or aggregate excess of loss arrangements are used. Estimates of reinsurance receivables are generally easiest for primary first dollar coverages (first dollar coverage of either property or casualty business). Additionally, relying on expected loss ratios as a guide for estimating recoveries on excess reinsurance arrangements will not be very helpful if the pricing of such arrangements has varied from year to year with little correlation to the underlying economics of these agreements. Some entities separately project reinsurance recoverable on IBNR losses by stratifying the data base by size of loss.

4.201 Several other factors that are relevant when reviewing the effects of the insurer's reinsurance program on the loss reserves include the effects of the solvency of the reinsurer as well as the effects of intercompany reinsurance agreements. Companies can effectively manage risk through their reinsurance program but they must also consider the ability of the reinsurance counterparties to settle claims. The solvency of the reinsurer is relevant to the evaluation of ceded loss reserves both paid and unpaid as the losses are ultimately the responsibility of the direct insurer and any inability to recover amounts from the reinsurers could affect the solvency, risk based capital levels and potentially the direct insurer's ability to continue as a going concern.

4.202 It is recommended that the auditor evaluate the effects of intercompany reinsurance agreements within a group of insurers to determine that they are being reported appropriately on a legal entity basis within the requirements of the reporting framework. Suggested audit procedures, include testing of the intercompany elimination entries as well as an evaluation of the intercompany agreements.

## Understanding the Impacts of Foreign Exchange

4.203 Auditors of insurers with significant international operations should design procedures to determine that the entity is properly accounting for loss reserves developed in local currencies under the reporting framework (FASB ASC 830, *Foreign Currency Matters*, for GAAP financial statements and SSAP No. 23, *Foreign Currency Transactions and Translations*, for statutory financial statements). The auditors should understand the currency in which losses may be settled as well as the currency of any potential reinsurance recoveries and evaluate the potential effects of foreign exchange fluctuations.

## Audit Consideration Chart

4.204 The auditor may consider the following specific audit objectives, examples of selected control activities, and auditing procedures in auditing the claims and loss estimation processes of property and liability insurance entities. These are illustrative, however, auditors should develop tests that are appropriate to the risk of material misstatement in the circumstances of the engagement.

**Claims Cycle and Estimation of Loss Reserves**

| Audit Objectives | Examples of Selected Control Activities |
|---|---|

Paid claims relate to transactions during the period, and unpaid claims are recorded as of the balance sheet date.

Initial entry of claims data is appropriately controlled.

Claim system validates coverage exists.

Claim system validates date of loss was within coverage period.

Edits are in place to put potential duplicate claims into suspense.

Proper documentation and proof of loss are obtained before payment.

Salvage and subrogation are noted in claims files and are followed up.

Supporting data for claims and compliance with entity policies are reviewed before approval of claim payments.

Records include all claims paid during the period and all reported claims unpaid as of the balance sheet date.

Claim processing backlogs are continually monitored.

Claim records are automatically created upon input of claim information and assigned a unique claim number.

Appropriate controls of input, output, and other data are maintained to ensure that all claims are processed.

Claim system interfaces directly with the general ledger.

Detailed control records are maintained for all reported claims.

Statistical data are periodically reconciled to detail records.

Inventory of unpaid claims files is periodically reconciled to the master file for errors or omissions.

Reports are generated by IT which detail any transactions not correctly interfaced between systems.

Reserves and related balances under reinsurance assumed are properly recorded.

Current information is maintained on the status of assumed and ceded reinsurance contracts

For facultative reinsurance, reported claims are reviewed for notification of the reinsurer.

For treaty reinsurance, reinsurance recoverable estimates are recorded on a reinsurance bordereau, which is forwarded to the reinsurer in accordance with contract terms.

Reinsurance recoverable on paid and unpaid losses is properly recorded.

Reinsurance recoverable is regularly reconciled to detailed records.

Claims are reviewed for applicability of reinsurance and the reinsurers are promptly notified.

Reinsurers are promptly billed as claims are paid.

Paid claims are accumulated for recoveries under excess contracts.

Liability for outstanding drafts is properly recorded.

Paid losses and related accounts are recorded in the proper amounts.

Related disclosures have been appropriately measured and described.

Estimates of loss reserves are reasonable.

Outstanding loss reserves are balanced to monthly claims activity.

Changes in outstanding loss reserves are promptly reviewed and recorded.

System automatically updates reserves upon payment of claim.

For case-basis reserves, open claim files, including previous estimates of unpaid claims, are regularly reviewed and analyzed for adequacy of reserves in light of current information.

Appropriate management loss reserve specialists regularly develop and analyze reserves for each line of business by accident year or by other appropriate basis. Development and analysis includes IBNR claims, claims adjustment expenses, and reserves on reinsurance assumed.

Source data used in reserve valuations are reconciled to reserve model.

Statistical or other data used to estimate liabilities reviewed for unusual items or relationships.

Reserving methodology reviewed and approved by management.

Prior period estimates of select ultimates are retrospectively reviewed.

Loss reserve modeling techniques and validation tests are reviewed.

Independent reserve projections performed by outside actuaries.

Factors and assumptions used in estimating loss reserves, including difference between management's best estimate and actuarial calculations, are documented and periodically reviewed for reasonableness.