**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | |
|---|---|
| *In re James River Group Holdings, Ltd. Securities Litigation* | Case: 3:21-cv-00444-MHL |
| | Hon. M. Hannah Lauck |
| | <u>CLASS ACTION</u> |
| | <u>JURY TRIAL DEMANDED</u> |

<u>**LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION**</u>
<u>**TO DEFENDANTS' MOTION TO DISMISS**</u>

**TABLE OF CONTENTS**

**Page**

Table of Authorities ..................................................................................................................... iii

I.      INTRODUCTION ............................................................................................................... 1

II.     FACTUAL BACKGROUND ............................................................................................... 5

        A.      James River Insures Uber And Touts Its Careful Reserving Process .................... 5

        B.      Unknown To Investors, James River Was Suppressing Reserves Through
                Systemic Policies Directed By Management ............................................................ 6

        C.      James River Unexpectedly Terminates The Uber Contract But Falsely
                Assures Investors Reserves Are Sufficient And The Runoff Is Going Well,
                While Senior Management Takes Additional Deliberate Efforts To
                Suppress Reserves .................................................................................................... 8

        D.      The Truth Emerges: James River Takes A Massive $170 Million Charge
                And Admits That For Years It Used The "Wrong" Reserve Methodology .......... 10

III.    ARGUMENT ..................................................................................................................... 11

        A.      The Complaint Alleges Actionable Misrepresentations ....................................... 11

                1.      Defendants Misrepresented James River's Reserving Process ................. 11

                        a.      Defendants' Attempted Distinction Between "Case" And
                                "Loss" Reserves Defies The Company's Own Disclosures ......... 13

                        b.      Defendants' Attacks On Their Former Employees Fail .............. 14

                        c.      The Complaint Does Not Allege Fraud By Hindsight ................. 16

                2.      Defendants Misrepresented The Adequacy Of Reserves ......................... 17

                3.      Defendants Misrepresented The Status Of The Runoff ........................... 18

                4.      Defendants Misrepresented That James River Complied With
                        GAAP And Had Effective Internal Controls ........................................... 19

                5.      The "Forward Looking" Safe Harbor Does Not Apply ........................... 20

        B.      Plaintiffs Have Adequately Pled Scienter ........................................................... 22

                1.      The Complaint Alleges A Strong Inference Of Scienter ......................... 22

2.     The FE Allegations Reinforce A Strong Scienter Inference.....................27

3.     The Complaint Adequately Alleges James River's Corporate
       Scienter ................................................................................................ 28

4.     The Opposing Inference Of Non-Fraudulent Intent Is Not
       Compelling............................................................................................ 29

    C.    The Complaint Adequately Alleges Control Person Liability............................. 30

IV.    CONCLUSION...........................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*In re 2U, Inc., Sec. Class Action*,
2021 WL 3418841 (D. Md. Aug. 5, 2021) ...............................................................................27

*Abramson v. Newlink Genetics Corp.*,
965 F.3d 165 (2d Cir. 2020)...................................................................................................18

*In re Acceptance Ins. Cos. Sec. Litig.*,
423 F.3d 899 (8th Cir. 2005) .................................................................................................16

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
324 F. Supp. 2d 474 (S.D.N.Y. 2004).....................................................................................27

*Black v. Martek Biosciences Corp.*,
2006 WL 8435572 (D. Md. June 14, 2006)............................................................................27

*Brown v. China Integrated Energy, Inc.*,
875 F. Supp. 2d 1096 (C.D. Cal. 2012) ..................................................................................24

*California Pub. Employees' Ret. Sys. v. Chubb Corp.*,
394 F.3d 126 (3d Cir. 2004).............................................................................................14, 27

*Cambridge Ret. Sys. v. Jeld-Wen Holding, Inc.*,
496 F. Supp. 3d 952 (E.D. Va. 2020) .....................................................................................11

*Carlucci v. Han*,
907 F. Supp. 2d 709 (E.D. Va. 2012) .....................................................................................22

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
56 F. Supp 3d 549 (S.D.N.Y. 2014).......................................................................................15

*Chapman v. Mueller Water Prods., Inc.*,
466 F. Supp. 3d 382 (S.D.N.Y. 2020).....................................................................................20

*City of Pontiac Gen. Empls. Ret. Sys. v. Lockheed Martin Corp.*,
875 F. Supp. 2d 359 (S.D.N.Y. 2012).....................................................................................22

*In re Commtouch Software Ltd. Sec. Litig.*,
2002 WL 31417998 (N.D. Cal. July 24, 2002).......................................................................23

*In re Connetics Corp. Sec. Litig.*,
542 F. Supp. 2d 996 (N.D. Cal. 2008) ...................................................................................26

*Cozzarelli v. Inspire Pharms. Inc.*,
549 F.3d 618 (4th Cir. 2008) .................................................................................................20

iii

*Epstein v. World Acceptance Corp.*,
   203 F. Supp. 3d 655 (D.S.C. 2016)............................................................................11, 19, 27

*In re EQT Corp. Sec. Litig.*,
   504 F. Supp. 3d 474 (W.D. Pa. 2020)...................................................................................14

*Freedman v. Value Health, Inc.*,
   958 F. Supp. 745 (D. Conn. 1997)........................................................................................26

*Freudenberg v. E\*Trade Financial Corp.*,
   712 F. Supp. 2d 171 (S.D.N.Y. 2010)..............................................................................11, 14

*Gasner v. Bd. of Supervisors of Cnty. of Dinwiddie*,
   103 F.3d 351 (4th Cir. 1996) ...............................................................................................21

*In re Genworth Fin. Inc. Sec. Litig.*,
   103 F. Supp. 3d 759 (E.D. Va. 2015) .......................................................................... passim

*Katyle v. Penn Nat. Gaming, Inc.*,
   637 F.3d 462 (4th Cir. 2011) ...............................................................................................30

*KBC Asset Mgmt NV v. 3D Sys. Corp.*,
   2016 WL 3981236 (D.S.C. July 25, 2016) .............................................................................25

*KBC Asset Mgmt. NV v. DXC Tech. Co.*,
   19 F.4th 601 (4th Cir. 2021) .....................................................................................24, 25, 26

*Kiken v. Lumber Liquidators Holdings, Inc.*,
   155 F. Supp. 3d 593 (2015) .................................................................................................24

*Klein v. Altria Grp., Inc.*,
   525 F. Supp. 3d 638 (E.D. Va. 2021) ...................................................................................14

*Knurr v. Orbital ATK Inc.*,
   294 F. Supp. 3d 498 (E.D. Va. 2018) ...................................................................................28

*Lefkoe v. Jos. A. Bank Clothiers*,
   2007 WL 6890353 (D. Md. Sept. 10, 2007) .........................................................................14

*Loc. 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*,
   2011 WL 12855820 (N.D. Ala. June 7, 2011)........................................................................19

*Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*,
   363 F. Supp. 3d 476 (D. Del. 2019)............................................................................. passim

*Malone v. Microdyne Corp.*,
   26 F.3d 471 (4th Cir. 1994) .................................................................................................21

*Marsh Group v. Prime Retail, Inc.*,

46 F. App'x 140 (4th Cir. 2002) ............................................................................21

*Matrix Cap. Mgmt. Fund, LP v. BearingPoint, Inc.*,
   576 F.3d 172 (4th Cir. 2009) ............................................................................28

*MAZ Partners LP v. First Choice Healthcare Sols., Inc.*,
   2019 WL 5394011 (M.D. Fla. Oct. 16, 2019) ....................................................20

*In re MicroStrategy, Inc. Sec. Litig.*,
   115 F. Supp. 2d 620 (E.D. Va. 2000) ........................................................ passim

*In re New Century*,
   588 F. Supp. 2d 1206 (C.D. Cal. 2008) ..............................................................21

*In re New Oriental Educ. & Tech. Grp. Sec. Litig.*,
   988 F. Supp. 2d at 426 .................................................................................20, 23

*Nolte v. Cap. One Fin. Corp.*,
   390 F.3d 311 (4th Cir. 2004) .............................................................................17

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000)..........................................................................22, 27

*Ollila v. Babcock & Wilson Enters., Inc.*,
   2018 WL 792069 (W.D.N.C. Feb. 8, 2018) .................................................. passim

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   575 U.S. 175 (2015)....................................................................................17, 18

*In re Orbital Scis. Corp. Sec. Litig.*,
   58 F. Supp. 2d 682 (E.D. Va. 1999) ...................................................................26

*Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*,
   918 F.3d 312 (4th Cir. 2019) .............................................................................18

*In re PEC Solutions, Inc. Sec. Litig.*,
   418 F.3d 379 (4th Cir. 2005) .............................................................................20

*Phillips v. LCI Intern., Inc.*,
   190 F.3d 609 (4th Cir, 1999) .............................................................................26

*Pittston Co. v. U.S.*,
   2001 WL 34148374 (E.D. Va. Oct. 31, 2001)....................................................30

*Plymouth Cnty. Ret. Sys. v. Evolent Health, Inc.*,
   2021 WL 1439680 (E.D. Va. Mar. 24, 2021)......................................................26

*In re PMA Cap. Corp. Sec. Litig.*,
   2005 WL 1806503 (E.D. Pa. July 27, 2005)........................................................11

v

*In re Raytheon Sec. Litig.*,
    157 F. Supp. 2d 131 (D. Mass. Aug. 29, 2001) ......................................................19

*In re Signet Jewelers Ltd. Sec. Litig.*,
    2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018)......................................................14, 16, 17, 19

*Singer v. Reali*,
    883 F.3d 425 (4th Cir. 2018) ...............................................................................12, 21

*Sjunde AP-Fonden v. Goldman Sachs Group, Inc.*,
    2021 WL 2659797 (S.D.N.Y. June 28, 2021) .........................................................30

*Stephens v. Nat'l Distillers & Chem. Corp.*,
    6 F.3d 63 (2d Cir. 1993)........................................................................................13

*Tchrs' Ret. Sys. of LA v. Hunter*,
    477 F.3d 162 (4th Cir. 2007) ................................................................................14

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)...............................................................................................21, 22

*In re Triangle Cap. Corp. Sec. Litig.*,
    988 F.3d 743 (4th Cir. 2021) ................................................................................24

*Underland v. Alter*,
    2011 WL 4017908 (E.D. Pa. Sept. 9, 2011) .........................................................11, 17

*Vanderhoef v. China Auto Logistics Inc.*,
    2020 WL 5105243 (D.N.J. Aug. 31, 2020) ...........................................................24

*In re Vivendi Universal, S.A. Sec. Litig.*,
    765 F. Supp. 39 2d 512, 548 (S.D.N.Y. 2011).......................................................24

*In re Wilmington Tr. Sec. Litig.*,
    29 F. Supp. 3d 432 (D. Del. 2019).........................................................................11

*Winslow v. BancorpSouth, Inc.*,
    2011 WL 7090820 (M.D. Tenn. Apr. 26, 2011)......................................................11, 17, 30

*Woolgar v. Kingstone Companies, Inc.*,
    477 F. Supp. 3d 193 (S.D.N.Y. 2020)...................................................................20

*Yates v. Mun. Mortg. & Equity, LLC*,
    744 F.3d 874 (4th Cir. 2014) ................................................................................14, 26, 28

## I.    INTRODUCTION

James River is a specialty insurance company whose largest and most important client was Uber. James River regularly touted this profitable relationship, which comprised over 25% of its total gross written premiums during the Class Period. Defendants assured investors that James River was protected against Uber claims because it held "adequate" and "reasonable" loss reserves set pursuant to a specific, GAAP-compliant process based largely on its "past experience."[1]

Eight months into the Class Period, James River stunned the market by cancelling the Uber contract and taking a $55-60 million adverse reserve charge, resulting in the largest loss in its history and a stock price decline of over 20%. The Uber contract was put into "runoff," meaning that James River would still be responsible for paying claims that had accrued through termination. To assuage investors, Defendants falsely proclaimed that the runoff was "going well" and James River was settling Uber-related claims "consistent with our held reserves." These statements were utterly false. In May 2021, a year and a half after the runoff, James River shocked investors by announcing a massive charge of *$170 million* to cover its Uber exposure. This charge wiped out all profit James River had reported over the previous *two years*, and represented over *50%* of the total net reserves that James River maintained for its entire Commercial Auto Division. The Company's stock price dropped 26% and analysts rang alarm bells, noting the charge meant that, on average, *every Uber claim was under-reserved by a staggering 40%.*

This massive charge was not the product of a good faith error in judgment or unexpected development, such as a sudden influx of claims. Rather, directly contrary to Defendants' public statements, James River had been using a blatantly improper reserving methodology that steeply

---

[1] All capitalized but undefined terms have the meanings ascribed in the Second Amended Class Action Complaint ("Complaint" or "SAC") (ECF No. 69). "¶_" refers to paragraphs in the Complaint, "MTD" refers to Defendants' Memorandum of Law in Support of their Motion to Dismiss (ECF No. 72), and all emphasis is added, unless otherwise noted.

discounted its own historical experience of Uber losses that routinely outstripped its reserves. Defendant D'Orazio, the new CEO brought in to address the "Uber overhang," admitted the reserve methodology James River had been using for over five years was completely "*wrong*." He explained that James River's reserve methodology was not primarily based on its "own loss experience," and would have to be "meaningfully changed" to give a "better and more conservative estimate of the ultimate losses." Thus, despite a *half-decade* of experience handling Uber claims, James River had set reserves predominately based on "an array" of extraneous "industry factors" even though its past experience made clear that its Uber reserves were completely inadequate.

Defendants' use of a "wrong" methodology was no accident, as confirmed by the accounts of fifteen FEs and *sworn testimony and internal company documents* in a recent insurance bad faith litigation. First, the detailed FE accounts set forth in the SAC and corroborating evidence adduced in *St. Amand* demonstrate that, contrary to Defendants' reassuring statements, James River completely lacked any policies or procedures for setting reserves on Uber claims. For instance, Ingrid Slaughter, James River's former Assistant Director of Litigated Claims, who worked exclusively on the Uber Account and oversaw nearly 100 Uber claims managers, confirmed under oath that James River provided no training to claims adjusters for setting and monitoring reserves, and had *no "policies and procedures . . . in place regarding how to adjust the reserve."* Anita Rogers, James River's former VP of Claims, who was the designated executive responsible for overseeing the handling of all large Uber claims, also testified that she could not "recall" and did not "know" whether any policies or procedures to set, monitor, or adjust the reserves for Uber claims existed during her eight-year tenure.

Second, the sworn *St. Amand* testimony confirms that, far from taking careful steps to set "adequate" and "reasonable" reserves, senior management in fact *took deliberate and systematic*

2

*steps to suppress Uber claim reserves*. This effort accelerated after James River terminated the Uber account in October 2019. For example, Brianna Belcher, Claims Manager and Litigation Claims Adjuster, testified that to suppress reserves for large claims, any request for a reserve increase to $250,000 or more was elevated to—and then routinely denied by—James River Insurance's CEO, Schmitzer, who sat shoulder-to-shoulder with the Executive Defendants on James River's Reserve Committee. Next, to suppress reserves on all other claims, management slashed employees' reserve authority "to nothing." Even more remarkable, Slaughter and Belcher testified how management implemented a new, surreptitious process requiring that all requests for reserve increases be routed through a secret "PLM" email portal managed by Schmitzer—which claims personnel were expressly instructed to *"not [] talk about"* so that, unless approved, which almost never happened, *"there would be no record" of the request for an increase.*

The *St. Amand* evidence and the eyewitness accounts of 15 FEs expose a top-down, companywide effort to suppress Uber reserves and "ben[d] the truth." In addition to the facts above, the SAC details, for example, how James River (i) set "placeholder" reserves as low as $1; (ii) placed artificial "caps" on reserve increases; and (iii) slashed all requests for reserve increases by 20-30%. James River also routinely capitulated to Uber, which sought to close claims at any cost to avoid negative publicity, resulting in large insurer-funded settlements *without corresponding reserve increases*.

In response, Defendants contend that James River "estimated its loss reserves in good faith using its actuarial judgment." But this is belied by Defendants' admissions that, for years, James River used the "wrong" reserve methodology for Uber claims that largely ignored the Company's own loss experience, in violation of GAAP. The "night and day difference" between the $170 million charge under the new, proper methodology and Defendants' prior statements about the

3

adequacy of Uber reserves and runoff compels a strong inference "that fraud or recklessness was afoot." *See In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 636-37 (E.D. Va. 2000). Defendants' attempt to manufacture a distinction between "case reserves" and "loss reserves" ignores that loss reserves for individual claims were an integral part of the aggregate loss reserve that James River publicly reported. As James River explained in its Forms 10-K, the Company estimated the reserve for losses "***using individual case-basis valuations of reported claims***." Indeed, Defendants admit (MTD 5-6) that "case reserves" are one of only two components comprising James River's overall reserves.

Defendants' contentions are also belied by detailed accounts of the 15 FEs and the evidentiary record in *St. Amand*. Defendants wrongly contend (MTD 2) that the *St. Amand* witnesses "do nothing to demonstrate . . . that Defendants knowingly understated reserves on the Uber block." But those sworn accounts, corroborated by the 15 FEs, demonstrate that at management's direction, James River deliberately suppressed reserves and instituted secret measures to avoid documentation of serial denials of requests to increase reserves. Defendants contend that *St. Amand* (which settled shortly after the SAC was filed) pertains to only a single claim. However, it is extraordinary at this stage for plaintiffs to have internal documents and sworn testimony that directly support and corroborate their fraud allegations, including an intentional, years-long effort to understate reserves on a high-dollar value claim, undertaken as part of a larger pattern and practice of bad faith claims handling at a company bereft of any reserve setting policies.

Defendants' claim that their statements are non-actionable "opinions" also fails. Their statements about James River's reserve setting process concern objectively verifiable facts. Even if certain statements are deemed "opinions," they are still actionable because they contain "embedded statements of fact" that were highly misleading to investors (*e.g.*, a reserving process

4

that ignored James River's own loss experience) and omitted critical facts about how Defendants "formed the[ir] opinion" (*e.g.*, systemic policies to keep reserves low). *See In re Genworth Fin. Inc. Sec. Litig.*, 103 F. Supp. 3d 759, 778-79 (E.D. Va. 2015) (reserve statements actionable).

As for scienter, Defendants' assertion that they knew nothing about case reserves, including those for high dollar claims, directly contradicts their representations that "senior management" specifically "reviewed" and "monitored" case reserves, at least quarterly, as part of the "Reserve Committee." Those same representations confirm that case reserves were, unquestionably, a critical component of loss reserves. The SAC pleads a host of other strong scienter facts, including (i) that Uber was James River's largest client; (ii) management's deliberate and systemic efforts to suppress reserves and hide requests for increases using a secret system managed by Schmitzer; (iii) D'Orazio's admission that James River used a deficient reserve methodology that disregarded James River's actual loss experience; and (iv) the sheer magnitude of the $170 million charge. The SAC also alleges motive: Defendants were trying and failing to sell James River "because of the Uber account," all while the Executive Defendants unloaded large amounts of their shares.

## II.     FACTUAL BACKGROUND

### A.     James River Insures Uber And Touts Its Careful Reserving Process

In March 2014, James River started insuring Uber when its drivers were between fares, including for property damage and bodily injury. ¶¶51-52. With Uber as its star client, James River went public in December 2014. ¶34. By 2019, Uber's annual premiums exceeded $300 million, comprising over 25% of James River's total premiums. ¶53. Analysts noted that its Uber-related reserves were "key to the stock's performance." ¶56. Defendants assured investors that the reserves were stable and the Contract was profitable. ¶¶54-55, 246-47, 259, 266-67, 328.

The Class Period begins on February 22, 2019, when then-CEO Defendant Myron

5

announced that Uber was renewing the contract for a sixth year and touted the companies' "long and collaborative relationship." ¶54. At the same time, James River recognized that setting "appropriate" loss reserves was fundamental to "balance sheet integrity" and "key to our-long term success." *Id*. Indeed, the Company's 2018 Form 10-K described its purportedly careful process for establishing loss reserves: reserves for reported claims were set at the individual claim level, then added with the estimated costs for incurred but unreported claims. ¶¶54, 245. James River represented that its reserves were set, monitored, and adjusted according to a meticulous process that included, *for each specific Uber claim*, "individual case-basis valuations" that utilized "historical information" and "past experience," and adjusted for "current developments" and "anticipated trends." ¶¶119, 245. Defendant Abram, who became CEO in August 2019, underscored that *all* reserves were based on "historically well-informed judgment." ¶60. James River also stated that it "continually monitor[ed] reserves using new information on reported claims" under the oversight of a dedicated Reserve Committee, which included the Executive Defendants and Schmitzer. ¶¶106-07, 310-11. James River also assured that its reserves were "reasonable," "adequate," and "appropriate," and set in accordance with GAAP. ¶¶235, 255-56, 266-67. Analysts and the market credited Defendants' representations. ¶¶55-56.

**B.    Unknown To Investors, James River Was Suppressing Reserves Through Systemic Policies Directed By Management**

In truth, James River lacked any reliable reserves setting procedures for Uber claims. For instance, Rogers (former VP of Claims), testified in *St. Amand* that (i) she could not "recall" and did not "know" whether any policies or procedures to set, monitor, or adjust the reserves for Uber-related claims existed during her eight-year tenure; and (ii) James River provided Uber claims examiners "no training" on setting, monitoring, or adjusting reserves. ¶¶121-25, 329. Slaughter similarly testified that James River had no "policies and procedures . . . in place regarding how to

adjust the reserve," and provided no reserves training. ¶¶127-28. Belcher testified that Uber reserves were set based on *ad hoc*, subjective decisions of untrained claims handlers. ¶130.

The *St. Amand* litigation—which involved a $1 million claim by an Uber driver, and was handled by no fewer than ten claims personnel, including high-ranking officers—is emblematic not only of James River's complete lack of reliable reserve setting procedures, but also its concerted efforts to keep reserves artificially low despite its receipt of information demonstrating its exposure was far, far greater. Internal documents unearthed in the case show that, despite the fact that James River was responsible for significant medical bills and other damages totaling up to $1 million, the claims department set no reserves for three months—and then set "placeholder" reserves of just $2,500. ¶¶151-52. Over the next two years, James River continued to receive information confirming the severity of the injuries and the insufficient nature of the reserves, with medical bills alone exceeding the reserves at times by several hundred thousand dollars. ¶¶153-54. Even after a note in the claims file expressly recognized that the reserve "[w]ill need to be increased due to the severity of the injury" and the increase would need to be "significant," no action was taken and no increase was made. ¶155. As Rogers testified, *"the reserves were inappropriate based on the information" and "grossly undervalued at the time."* ¶159.

Numerous other facts confirm these blatantly inadequate reserving practices. <u>First</u>, cross-corroborating accounts of 15 FEs who worked on the Uber account—several of whom reported to James River executives—described a host of undisclosed facts that were diametrically opposed to Defendants' statements. ¶¶75-105. James River's management constrained the claims department to keep Uber reserves artificially low. ¶¶76, 78. There was a corporate policy to keep reserves low, but "*there was no methodology for calculating [Uber claim] reserves . . . it didn't exist; there was nothing*." ¶¶12, 76. Rather than reserving funds "adequate to resolve the claim," adjusters

7

were required to open Uber claims with placeholder reserves that bore no relation to the reported damages and were not updated to reflect new information. ¶¶80-81, 246. Then, they were mandated to stay within pre-determined limits when seeking reserve increases, regardless of their actual case valuations. ¶¶80-84, 94. Management knew about *and participated in* these blatantly improper practices. For example, the Director of Claims, who had high-level authority over Uber claims and reported to Rogers, implemented a 20-30% cut to reserve increases at the c-suite's direction. ¶78. James River "*bent the truth*" and objectors were "*reduced to ashes*."¶¶84-85.

Second, James River capitulated to Uber who wanted to keep claims out of court. ¶¶89-90. At Uber's insistence, it settled Uber claims above fair value, rendering its already low reserves even more inadequate. ¶¶89-92. Uber had access to James River's files throughout the Class Period and did its own claim audits, and its representatives often instructed James River personnel to settle claims—well above reserves—including with James River executives in the same room. ¶¶91-92.

Third, James River knowingly staffed its claims department with woefully inexperienced people and provided them with no reserves training. ¶98. After landing the Uber contract, James River went into a "hypergrowth" stage, hiring 350-400 new adjusters and immediately assigning them extraordinary numbers of Uber claims to handle—as many as 150-250 files or more at once. ¶¶94-99. Not surprisingly, the claims department was plagued by very high turnover, which only compounded the Company's inability to properly process, reserve for, and settle the massive influx of Uber claims.[2]  As one Claims Examiner stated bluntly, "*the place was a Titanic sinking*." ¶100.

**C.      James River Unexpectedly Terminates The Uber Contract But Falsely Assures Investors Reserves Are Sufficient And The Runoff Is Going Well, While Senior Management Takes Additional Deliberate Efforts To Suppress Reserves**

Problems with Uber began to surface on October 8, 2019, when James River announced

---

[2] Contrary to Defendants' assertion (MTD 10), the SAC plainly alleges that these employees were assigned "claims" and not "administrative work," as their job titles make clear. ¶¶83-88.

that, after six years, it was suddenly cancelling the Uber contract and putting it into runoff. ¶¶57-59. Despite now former CEO Myron's assurance just two months prior that "we are comfortable with our loss reserves," James River also announced a $55-60 million reserve charge attributed "primarily" to Uber, causing a net loss of over $25 million for Q2 2019—at the time, the largest quarterly loss in Company history. *Id.* News of the large charge sent James River shares plummeting nearly 23%, yet then-CEO Abram reassured investors that the increased reserves reflected a "historically well-informed judgment" sufficient to cover the runoff. ¶¶58-60.

Thereafter, Defendants assured they were "watching" Uber reserves "very carefully and very closely" and "doing a deep dive every single quarter." ¶¶60, 352. On February 21, 2020, Abram declared, "We feel confident about our reserves and the progress we are making in the run-off." ¶259. On April 30, 2020, Abram stated, the "run off of the [Uber] account is going well" and James River was "settling commercial auto claims … for amounts that are consistent with our held reserves." ¶262. Indeed, James River reduced its reserves throughout the runoff. ¶283.

In reality, as corroborated by FEs and sworn *St. Amand* testimony, James River's deliberate and systemic efforts to suppress Uber reserves accelerated after it cancelled the Contract. ¶¶83-84, 86, 113-14, 136-48. First, to suppress reserves for large claims, any request for a reserve increase to $250,000 or more had to be elevated to James River Insurance's CEO, Schmitzer, who routinely refused them. ¶¶137, 140. Second, to suppress reserves on all other claims, management slashed reserve authority across-the-board to levels as low as ***one-tenth*** of what they were before, or even "***stripped [reserve authority] away to nothing***." ¶139. Third, management required that all requests for reserve increases be routed through a secret PLM email portal operated by Schmitzer, Rogers, and Warren. ¶¶113, 137, 141-42. Claims handlers were instructed ***not to mention the PLM system in their notes*** so that the reserve increase denials—which "almost always" occurred—went

9

undocumented. ¶¶138, 143, 147. Defendants took these extreme steps because they were seeking to sell James River, but were thwarted "*because of the Uber account*." ¶149.

> **D.    The Truth Emerges: James River Takes A Massive $170 Million Charge And Admits That For Years It Used The "Wrong" Reserve Methodology**

On May 5, 2021, a year and a half after the Contract had been put into runoff, James River disclosed that it was still under-reserved by a staggering $170 million. ¶63. The charge represented over 50% of Commercial Auto's total existing reserves, exceeded all James River's E&S adverse reserve charges during the prior eight quarters combined, and caused a net quarterly loss of over $103 million—*three times larger* than any past loss. ¶¶64, 70. The charge wiped out every penny of profit the Company had falsely reported over the prior *nine quarters* and made clear that Defendants' prior assurances that Uber reserves were "reasonable" and "adequate" were patently false. ¶¶70, 266-67, 321. In response, the Company's share price plummeted over *26%* in a single day. ¶380. Analysts noted "just how significant the $170 mln reserve charge was," highlighting that, on average, each Uber claim was under-reserved by an astonishing 40%. ¶66. The charge forced the Company to conduct a secondary offering to raise $175 million at a fire sale price. ¶72.

The massive reserve increase was not due to any unexpected development. Rather, as D'Orazio admitted, for years the Company used a completely "wrong" methodology for Uber reserves. ¶67. Analysts reported that James River was "*effectively throwing out the prior reserving approach and starting fresh*." ¶69. Even then, the full truth regarding Defendants' under-reserving had not been fully disclosed. Despite D'Orazio's claim that the enormous charge would "put the concerns with our commercial auto runoff portfolio behind us for good" (¶73), less than six months later, on October 26, 2021, James River disclosed $29.6 million in "impacts"— *i.e.*, more reserve charges—for Uber, and shares tumbled another 16%. *Id.*

## III.    ARGUMENT

On this motion, "a court must accept all allegations in the complaint as true and must draw all reasonable inferences in favor of the plaintiff." *Cambridge Ret. Sys. v. Jeld-Wen Holding, Inc.*, 496 F. Supp. 3d 952, 961 n.6 (E.D. Va. 2020). "[A]ll that is necessary at this stage is whether Plaintiff has alleged sufficient facts that, if true, would form a basis for relief." *Epstein v. World Acceptance Corp.*, 203 F. Supp. 3d 655, 669 (D.S.C. 2016).

### A.    The Complaint Alleges Actionable Misrepresentations

#### 1.    Defendants Misrepresented James River's Reserving Process

Statements that "misrepresented the way [a company] set [its] loss reserves" are actionable. *In re PMA Cap. Corp. Sec. Litig.*, 2005 WL 1806503, at *6 (E.D. Pa. July 27, 2005). The *Genworth* decision is instructive. There, Judge Spencer found statements that the company conducted "a broad, intensive review" and used its "own credible data" when setting reserves were actionable where plaintiffs alleged the company used stale information that failed to incorporate past experiences. 103 F. Supp. 3d at 773-75. Similarly, in *Freudenberg v. E*Trade Financial Corp.*, 712 F. Supp. 2d 171, 188 (S.D.N.Y. 2010), statements that reserves were "based on careful monitoring of the quality of the portfolio and other relevant conditions" were actionable, when plaintiffs alleged facts showing the opposite was true. Numerous other cases are in accord.[3]

Here, too, Defendants misrepresented the reserving process. They assured that reserves were based on "historical information" and "past experience," and that James River "continually

---

[3] *See, e.g.*, *Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*, 363 F. Supp. 3d 476, 495 (D. Del. 2019) (systemic manipulation of  loan loss model pleads falsity of loss provisions); *In re Wilmington Tr. Sec. Litig.*, 29 F. Supp. 3d 432, 452-53 (D. Del. 2019) (company "inconsistently and arbitrarily appl[ied] the standards it claimed to use to calculate its loan reserve"); *Winslow v. BancorpSouth, Inc.*, 2011 WL 7090820, at *16 (M.D. Tenn. Apr. 26, 2011) (company "did not calculate the reserves in the manner they claimed"); *Underland v. Alter*, 2011 WL 4017908, at *9 (E.D. Pa. Sept. 9, 2011) ("Defendants departed from their claimed [reserve] methodology").

monitor[ed]" and adjusted its reserves "as experience develop[ed]." ¶¶119, 279. Defendants also stated that the reserves were predicated on "historically well-informed judgment." ¶¶60, 352, 363. This was utterly false. The reserve methodology James River had been using for years had been "wrong"; going forward, James River would "us[e] *only* our own loss experience." ¶322.

Even worse, Defendants knew that James River's "own loss experience" on the Uber contract was still characterized by woefully inadequate reserves, as ultimately confirmed by the massive $170 million charge. Indeed, Rogers testified that she did *not* know of any policies or procedure in place during the Class Period that were used to set reserves (¶122), which Slaughter corroborated (¶127). Reserves were also not "adjusted" for "current developments." Rogers testified that there was "*no standard practice*" concerning how to increase the reserves. ¶122; *see also* ¶127. Nor did each reported Uber claim have a "reserve established against it" based on an "individual case-basis valuation[]" that was "adequate to resolve the claim." ¶¶119, 148, 246, 248. The systemic policies assured that the facts of a given claim were *not* considered in establishing reserves. ¶¶76-88. Adjusters were required to open claims with absurdly low placeholder reserves. *See* ¶80 (65% of reported Uber claims were set with a $1 reserve).[4] James River also implemented artificial, pre-set caps on individual claim reserves without regard to the known facts. ¶¶79, 82-85, 113-14. Managers "slashed" proposed reserve increases by 20-30%, "irrespective of the injuries." ¶¶84-85. These procedures confirm that, contrary to Defendants' assurances, Uber reserves were not based primarily on James River's "past experience," but rather were knowingly understated. ¶245. None of these critical facts were disclosed. *See Singer v. Reali*, 883 F.3d 425, 441-42 (4th Cir. 2018) (when a company speaks it must provide "the whole, material truth").

---

[4] Thus, for example, notwithstanding severe injuries resulting in damages of up to $1 million, a "placeholder" reserve of *$2,500* was set for Mr. St. Amand's claim, which remained significantly under-reserved for *over a year*. ¶¶152, 155.

###### a.    Defendants' Attempted Distinction Between "Case" And "Loss" Reserves Defies The Company's Own Disclosures

Defendants manufacture a distinction between "case reserves" and "loss reserves," and argue that Plaintiffs "muddle" it by using the terms "interchangeably." MTD 14-15. Their argument flies in the face of James River's own SEC filings, which describe the reserve process as a straightforward sum-of-the-parts calculation of (i) individual case reserves for reported claims; and (ii) estimated costs for unreported claims. Accordingly, deficiencies in case reserves *necessarily* resulted in understated reserves for the "overall Uber block."[5] Defendants' own brief acknowledges that case reserves are one of only two key "components" of James River's loss reserves, and thus critical to whether those reserves are adequate. *See* MTD 5-6, 15.

Indeed, Defendants repeatedly made clear that individual claim reserves played a critical role in setting reserves. James River's Forms 10-K explained that loss reserves were established using "individual case-basis valuations" and "[o]ur claims department personnel use their *knowledge of the specific claim* … to estimate the expected ultimate losses." ¶¶54, 245. Further, in November 2019, Doran described how senior management's quarterly "deep dive" into reserves revolved "especially around claims," and Abram added that booking reserves began by "*look[ing] at the actual case reserves*." ¶352. Defendants' counterfactual argument defies James River's disclosures and is contrary to the market's understanding that the $170 million charge was "significant" because "it increased the total reserve *per open claim* by 55%." ¶66.[6]

---

[5] As such, *Stephens v. Nat'l Distillers & Chem. Corp.*, 6 F.3d 63, 65 (2d Cir. 1993) (cited at MTD 6) is of no relevance here. Even if "IBNR reserves are . . . conjectural," that James River misstated reserves for known claims made its reserves statements materially false and misleading.

[6] The argument is also premature at this stage. *See Genworth*, 103 F. Supp. 3d at 776 ("[T]he Court cannot engage in a factual dispute at this stage of litigation regarding how [a company] calculated its reserves"). There is also no requirement to allege that *every* aspect of the process was mispresented. *See Navient*, 363 F. Supp. 3d at 494-95.

### b.   Defendants' Attacks On Their Former Employees Fail

Far from failing to allege "particularized facts" (MTD 15-16), the FEs provide firsthand and cross-corroborating accounts of how Defendants implemented a host of procedures to keep Uber reserves artificially low. *See Ollila v. Babcock & Wilson Enters., Inc.*, 2018 WL 792069, at *4 (W.D.N.C. Feb. 8, 2018) (crediting FEs "who detailed the substantial and reoccurring nature of problems"); *E\*Trade*, 712 F. Supp. 2d at 197 (FEs "support a strong inference of a Company-wide culture that, at every level, emphasized increased loan origination volume in derogation of underwriting standards"). Consistent with established Fourth Circuit law, the SAC pleads information about the FEs that "allows the Court to assess what information [they] had available to them and properly weigh the inferences derived from [their] allegations." *Klein v. Altria Grp., Inc.*, 525 F. Supp. 3d 638, 667 (E.D. Va. 2021). [7] Further, the FE accounts are corroborated by sworn testimony from named witnesses and internal documents. *See Navient*, 363 F. Supp. 3d at 476 (facts from government complaints corroborated FE allegations).

Defendants criticize the FEs as "low-level" (MTD 16) but provide no basis to question their reliability.[8] Nor is there any. The fifteen FEs were frontline claims personnel responsible for handling Uber claims, their reports include the exact information claims personnel would be expected to possess, and their accounts align with Defendants' own admissions and conduct. *See In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at *13 (S.D.N.Y. Nov. 26, 2018)

---

[7] Notably, the FE accounts are not necessary to establish falsity given D'Orazio's admission. *See In re EQT Corp. Sec. Litig.*, 504 F. Supp. 3d 474, 494 n.14 (W.D. Pa. 2020).

[8] *See Lefkoe v. Jos. A. Bank Clothiers*, 2007 WL 6890353, at *5 (D. Md. Sept. 10, 2007) ("factual issues" concerning FE statements "construed in favor of Plaintiffs"). Defendants' authorities are inapt. In *Yates v. Mun. Mortg. & Equity, LLC*, the Court credited the FE statements. 744 F.3d 874, 887 (4th Cir. 2014). In *California Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 153 (3d Cir. 2004), the FE's only basis for knowledge was that he worked at the company. In *Tchrs' Ret. Sys. of LA v. Hunter*, 477 F.3d 162, 174-75 (4th Cir. 2007), an FE's statements about a contract were contradicted by the contract itself, showing his "lack of familiarity" with it.

(crediting "store-level employees" with "first-hand knowledge" of policy and practices at issue).

Defendants quibble that "there were hundreds of junior claims employees working on the Uber account" (MTD 16), but do not explain why this means any of the FEs should be discredited. Similarly, Defendants' contention that the FEs merely reflect the "subjective belief" of "low-level employees" that they deserved higher reserve authorizations or thought the process was inadequate (MTD 16-17) ignores the FEs' uniform accounts of systemic procedures obstructing *all* claims personnel from increasing reserves, even minimally. And, while senior-level positions are not necessary to show falsity (particularly for operational matters), the accounts of FEs #1, 3, 4, 5, 6, 8, 9 and 10 show direct management involvement in suppressing reserves, not a mere requirement to "seek permission[s]." MTD 10; ¶¶78, 83-87, 110, 112; *see Navient*, 363 F. Supp. 3d at 493 (accounts of low-level FEs reveal actions "approved by employees who are not low-level").[9]

Further, Belcher and Slaughter testified how high-level executives, including Rogers, Warren, and Schmitzer implemented unusual, surreptitious steps to systemically suppress reserves and avoid documentation of reserve increase denials, which is reflected in the claims file itself. ¶¶137, 140, 142, 146-47.[10] This evidence shows that reserves were *in fact* not adequate. ¶159. *See Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 56 F. Supp. 3d 549, 554 (S.D.N.Y. 2014) (examples "based on internal company documents" support scienter). Finally, Rogers,

---

[9] The suggestion that placeholders were appropriately increased (MTD 16) ignores the evidence from *St. Amand* confirming that increases were "*almost always*" denied and that the *St. Amand* claim was *not* appropriately increased. ¶¶143, 152-61. FEs confirmed that the adjusters were unable to raise reserves above preset "caps" and increases were automatically slashed by 20-30%. Per FE9, senior managers cut increases *100%* of the time. ¶¶78, 85-86, 114.

[10] Defendants ignore (MTD 10) that the *St. Amand* witnesses testified that they were not aware of *any* training at James River—regardless of the experience level of the claims manager. *See* ¶¶123-24, 128, 130. Their contention that the FEs did not "convey[] any of their concerns to Defendants" (MTD 17) ignores that Schmitzer, whose scienter is imputed to James River, was specifically made aware of their concerns and was himself actively involved in the reserve suppression policies.

15

James River's former VP of Claims is not a "low-level" employee; indeed, she testified that she "reported directly to . . . [a] C suite employee." ¶78 n.3.

### c.    The Complaint Does Not Allege Fraud By Hindsight

The reserving process statements concern concrete assertions of fact that are not "fraud by hindsight." MTD 20-21. Further, there is no fraud by hindsight where the allegations are "supported by a host of confidential witnesses"—and here, sworn eyewitness testimony and internal James River documents—showing that members of "senior management … were aware of significant problems" or "had access to information" contradicting public statements. *See Ollila*, 2018 WL 792069, at *2-3; *Genworth*, 103 F. Supp. 3d at 777 (no "fraud by hindsight" where allegations detail "information available to [defendant]" contradicting "[defendant's] statements about the adequacy of its reserves"). Slaughter, Belcher, and eight FEs confirmed how senior management knew of systemic under-reserving and enforced the policies. ¶¶78, 83-84, 87, 110, 112, 137-40. The VP of Claims did not know of any established reserving policies. ¶¶121-22. Audit reports presented to the c-suite showed that Uber claims were under-reserved. ¶¶109-11.

Further, D'Orazio admitted that James River had for years used a "wrong" method to set reserves on Uber claims. Although Defendants attempt to whitewash that the past methodology was an "*adjustment in approach*" (MTD 20), the new methodology did not merely put "more weight on its own loss data (and less weight on other actuarial methodologies)," but rather "meaningfully changed" the methodology to now "us[e] *only* our own loss experience."[11] ¶322. Analysts took note that James River was "effectively *throwing out* the prior reserving approach and *starting fresh*." ¶69. And, again, Defendants' own words connect the Company's reserve

---

[11] That the prior methodology failed to incorporate James River's own loss data is also evidenced by the annual need to adjust the reserves from 2018 through 2021. ¶224; *see Signet*, 2018 WL 6167889, at *13 (alleging misstated reserves "based upon Signet's loss history").

processes for individual claims with "estimating loss reserves on the Uber account." MTD 20.[12]

### 2.      Defendants Misrepresented The Adequacy Of Reserves

In total, James River's Uber reserves were understated by more than $183 million—a staggering sum representing more than 50% of the total runoff reserves in place. ¶64. Defendants do not dispute that the reported reserves and repeated assurances that they were "reasonable" and "adequate" were materially false. ¶¶162-222, 247, 259, 266-67; *see Genworth*, 103 F. Supp. 3d at 775 ("adequate" reserves statements actionable where Company took $531 million charge).[13]

Instead, Defendants cite *Nolte v. Cap. One Fin. Corp.*, 390 F.3d 311, 315-16 (4th Cir. 2004) in erroneously arguing (MTD 13) that their "loss reserves" statements are non-actionable opinions. But in *Nolte*, the court addressed only reserve estimates themselves, which plaintiffs conceded were opinions, and not whether the company truthfully described and followed its own reserve setting process. *See* 390 F.3d at 315. Importantly, courts reject "the broad proposition that *all* statements pertaining to … reserves are opinions." *Underland*, 2011 WL 4017908, at *9. Here, James River's reported reserves constituted misstatements of fact, not opinions, for two reasons. First, the reserves were the result of a ***process*** that was not followed. *See id.* ("Unlike a subjective evaluation that a loan reserve is adequate or not, nonconformance to a stated methodology to arrive at a loan loss reserve amount is a measurable objective fact" and, if factors are omitted, "***the sum of that calculation is necessarily misstated***"). Second, Defendants knew

---

[12] In *In re Acceptance Ins. Cos. Sec. Litig.*, 423 F.3d 899, 903 (8th Cir. 2005), scienter could not be "assume[d]" based on "knowledge at a later date." *Id.* Here, D'Orazio's admission that James River had used a deficient reserves methodology for years sufficiently alleges falsity.

[13] Defendants' argument (MTD 21, n.6) that statements of reserve adequacy were "puffery" is baseless because it ignores the context of the statements. The reserves concerned James River's most important business, were key to the Company's financial performance, and were a major focus of analysts. *See Signet*, 2018 WL 6167889, at *12 (responding to investor concern by claiming portfolio was "strong" was "not puffery at all"). Moreover, the statements "ignored" data and "***facts*** which affected those reserves." *Winslow,* 2011 WL 7090820, at *19.

that, even if followed, the reserves process was based on ***erroneous inputs***. *See Navient*, 363 F. Supp. 3d at 496-97 (reserves not opinions because "dollar amounts disclosed" were "artificially understated" due to "systemic" reserve policies).

Even if "opinions," liability attaches where "the supporting fact[s]…supplied were untrue." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 185-86 (2015). As the Supreme Court explained, "embedded statements of fact" are "perfectly capable of misleading investors." *Id.* at 185, 193. Here, Defendants falsely grounded their reserve statements in "past experience" and "historically well-informed judgment" when in truth, their methodology minimized past loss experience and disregarded known facts on claims. ¶¶186-87, 192.

Last, Defendants' "opinions" are actionable because they omitted material information. *See Omnicare*, 575 U.S. at 189; *Genworth*, 103 F. Supp. 3d at 779 ("if the real facts are …"not provided, the opinion statement will mislead its audience").[14] Defendants omitted the critical facts that James River: (i) did not primarily rely on past Uber loss experience; (ii) did not use current or reliable information; (iii) lacked any formal training, policies, or procedures for the setting and adjusting of Uber claims; and (iv) implemented systemic policies to suppress Uber reserves.[15]

### 3.    Defendants Misrepresented The Status Of The Runoff

CEO Abram assured investors, "The run off of the large commercial account is going well"

---

[14] By contrast, in *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312 (4th Cir. 2019) (MTD 19), the proxy warned that it "would not be updated," yet, plaintiffs alleged it later omitted *current* information. *Id.* at 322-23. Warning that "lack of experience" may affect reserves is inapt given the deliberate under-reserving efforts and  a 5+ year history with Uber.

[15] "*Omnicare* rejected the proposition that there can be no liability based on a statement of opinion unless the speaker disbelieved the opinion at the time it was made." *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 175 (2d Cir. 2020). Here, however, to the extent Uber data ***was*** considered in estimating reserves, Defendants ***knew*** the information was wrong due to the systemic policies to keep reserves low and deliberate efforts to suppress reserves and hide it. *See Genworth*, 103 F. Supp. 3d at 776 (opinion statements actionably false where defendants "lacked any reasonable basis for believing their statements when made").

18

and James River was "settling commercial auto claims at a rapid pace for amounts that are *consistent with our held reserves*." ¶262. In truth, the runoff was a disaster, requiring Defendants to further suppress Uber reserves. ¶¶77-88. Sworn testimony and FEs confirmed that a secret PLM portal was set up to hide requests for reserve increases, which were almost always denied; examiners' authority was slashed; and others left "in droves," overloading those who remained. ¶¶99-100, 113, 137. Had the runoff been "going well," or had Uber claims been settled "at a rapid pace for amounts … consistent with … held reserves," the massive $170 million charge would have been unnecessary. *See Signet*, 2018 WL 6167889, at *16 ("$170 million loss that was equal to an entire quarter's worth of pretax income [] speaks for itself."); *Loc. 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*, 2011 WL 12855820, at *8 (N.D. Ala. June 7, 2011) (crediting "significant and sudden increase in loan loss reserves along with [] write-down"). And significantly, Defendants can point to no cataclysmic event, such as an influx of claims, during the one-year gap between Abram's statement and the $170 million charge. ¶67.

### 4. Defendants Misrepresented That James River Complied With GAAP And Had Effective Internal Controls

James River consistently represented that its "financial statements and notes" complied with GAAP. ¶¶235, 273. To reasonably estimate loss reserves, GAAP and ASC 944-40-30-1 required James River to use the Company's past experience settling similar claims as its *primary* data point. ¶¶276-79. The Company admitted it did not do this when it took a massive $170 million charge. *See supra* at p. 10; *Genworth*, 103 F. Supp. 3d at 781, 786 (ASC 944-40-30-1 violation alleged where company relied on "old data not reflective of current reality" and considering "magnitude of the [loss reserve] discrepancy"); *MicroStrategy*, 115 F. Supp. 2d at 635-37 (fraud alleged based on "simplicity of the accounting principles violated," "importance of the contracts involved," and "great magnitude" of the error); *Epstein*, 203 F. Supp. 3d at 671 (violation of

19

"single GAAP rule" sufficient where it resulted in "significant" and "material [] impact").

The SAC also "plausibly allege[s]" (MTD 21) that Defendants violated GAAP by failing to reasonably estimate reserves for Uber losses. ¶¶286-92. *See In re Raytheon Sec. Litig.*, 157 F. Supp. 2d 131, 147-49 (D. Mass. Aug. 29, 2001) (sustaining same GAAP claim).

Defendants simply repeat their arguments about FEs, fraud-by-hindsight, and reserves constituting opinions (MTD 20 & n.5), which fail for the reasons set forth above.

Finally, Defendants' internal control certifications were false. ¶¶133-37, 179-81, 246-47; *see MAZ Partners LP v. First Choice Healthcare Sols., Inc.*, 2019 WL 5394011, at *11 (M.D. Fla. Oct. 16, 2019) (collecting cases finding SOX certifications actionable). Indeed, James River systemically under-reserved, belatedly took a $170 million charge, and only then "thr[e]w out the prior reserving approach" in favor of a GAAP-compliant method that provided a "better and more conservative estimate of ultimate losses." ¶¶9, 68-69, 166.[16] Defendants' authority is inapposite.[17]

### 5. The "Forward Looking" Safe Harbor Does Not Apply

Defendants argue that "many" of their challenged statements are protected by the PSLRA's safe harbor—specifically citing four statements. *See* MTD 22-23 (citing ¶¶247, 256, 259, 266-67). To qualify, the challenged statement must be "forward-looking" *and* accompanied by "meaningful cautionary statements identifying important factors that could cause actual results to differ

---

[16] The assertion that the SAC fails to "offer any basis to conclude" that Defendants falsely certified the reliability of their internal controls (MTD 22) ignores that, contrary to the certifications, James River's reported reserves were calculated in violation of GAAP. ¶¶275-91. Auditor signoff (MTD 22) is irrelevant at this stage. *See In re New Oriental*, 988 F. Supp. 2d at 426.

[17] In *Chapman v. Mueller Water Prods., Inc.*, 466 F. Supp. 3d 382, 403 (S.D.N.Y. 2020), "Plaintiffs offer[ed] no basis to believe that [the company] did not take the [relevant] information available [] into account in setting its reserve." Here, D'Orazio admitted the relevant information was largely ignored, and any data included was warped by Defendants' systemic policies. Unlike in *In re PEC Solutions, Inc. Sec. Litig.*, 418 F.3d 379 (4th Cir. 2005) and *Woolgar v. Kingstone Companies, Inc.*, 477 F. Supp. 3d 193, 230 (S.D.N.Y. 2020), the SAC does not rely on GAAP or SOX for scienter. Nor does the SAC rely, as in *Cozzarelli v. Inspire Pharms. Inc.*, 549 F.3d 618, 628 (4th Cir. 2008) on the bare allegation "that [the defendant] lied" in the certification.

20

materially" from those in the forward-looking statement. *Ollila*, 2018 WL 792069, at *4–5.

First, Defendants' statements that James River's then-existing reserves "*are* reasonable" and affirming "the progress we *are* making in the run-off" are not forward-looking. "[S]tatements regarding loss reserves are not projections [if] they are directed to the then-present state of the Company's financial condition." *Genworth*, 103 F. Supp. 3d at 788-89. Where, as here, a defendant "disregarded [adverse factors that had already occurred] in setting the reserve," the misrepresentations "[do] not turn on the outcome of future events." *In re New Century*, 588 F. Supp. 2d 1206, 1227 (C.D. Cal. 2008). Further, the present-tense portions of these statements are "taken out of the safe harbor." *Ollila*, 2018 WL 792069 at *5; *Genworth*, 103 F. Supp. 3d at 789.[18]

Second, cautionary language is not "meaningful" if a defendant "knew that the specific risks and uncertainties stated to be 'potential' in their cautionary language had already been realized." *See Genworth*, 103 F. Supp.3d at 790. Here, nothing in James River's boilerplate disclosures cautioned investors that the *primary* factor James River used in setting reserves was anything other than its past loss experience. In fact, Defendants' cautionary language reinforced that reserve procedures were based on "past experience" and underscored that James River "continually monitor[s] reserves using new information on reported claims." ¶¶119, 245; *see Singer*, 883 F.3d at 442 ("generic warning of a risk will not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability"). And, while Defendants "warned" that reserves relied on "a variety of statistical techniques," they never disclosed these extraneous "factors" *overrode* the Company's own loss experience. [19]

---

[18] *Compare with Marsh Group v. Prime Retail, Inc.*, 46 F. App'x 140, 146-47 (4th Cir. 2002) (MTD 23) ("projections of *future* dividends"); *Malone v. Microdyne Corp.*, 26 F.3d 471, 479 (4th Cir. 1994) (MTD 23) ("comfort" with "pure[] . . . projection").

[19] *Compare with Gasner v. Bd. of Supervisors of Cnty. of Dinwiddie*, 103 F.3d 351, 359 (4th Cir.

### B.   Plaintiffs Have Adequately Pled Scienter

#### 1.   The Complaint Alleges A Strong Inference Of Scienter

Courts must scrutinize scienter allegations holistically. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 326 (2007). Scienter allegations "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* at 323-24. Rather, the inference must be as compelling as any nonculpable explanation, and "a tie on scienter goes to the plaintiff." *City of Pontiac Gen. Empls. Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012). Scienter is alleged through intentional misconduct *or* recklessness. *Carlucci v. Han*, 907 F. Supp. 2d 709, 728 (E.D. Va. 2012). Plaintiffs meet these standards.

First, the Company repeatedly assured investors that the Executive Defendants were personally involved in the reserving process. ¶¶308-20, 337-43. Indeed, the Executive Defendants were all members of the Reserve Committee, which monitored and approved reserves. ¶¶310-11. In that context, Abram specifically assured that, "***We look at the actual case reserves***," and for Uber reserves, Doran was "***watching it very carefully and closely, especially around claims***." ¶¶363-64. D'Orazio was "comfortable" with the "reserve position" because of a "***claims audit by our senior claims leadership team***" that resulted in "boost[ing] our case reserves." ¶353.[20] This "personal involvement" in the reserves process supports a strong inference that the Executive Defendants "possessed knowledge of the true state of affairs." *Genworth*, 103 F. Supp. 3d at 785.

Moreover, given their access to information about the materially understated reserves, Defendants were at least reckless in not knowing of the deficient reserving methodology,

---

1996) (MTD 23) ("The venture failed because of the occurrence of the very same events outlined as risks"). At best, these arguments raise premature fact questions. *Ollila*, 2018 WL 792069, at *5.
[20] Claims executives, including Schmitzer (who sat on the Reserve Committee), Warren, and Rogers, also reviewed reserve reports and audited Uber reserves. ¶¶313, 318-20, 353. Rogers testified that she "monitored reserves in the department as a whole," conducted "informal file audits," and reviewed files to determine "whether or not the reserves were accurately set." ¶313.

massively inadequate reserves, disastrous runoff, complete lack of policies or procedures for setting reserves on Uber claims, systemic policies suppressing reserves, and deficient internal controls and key GAAP violations. *See Ollila*, 2018 WL 792069, at *3 ("access to information" on relevant issues supports scienter); *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000) (same); *In re Commtouch Software Ltd. Sec. Litig.*, 2002 WL 31417998, at *10 (N.D. Cal. July 24, 2002) (allegations of "pattern and practice of improper revenue recognition" sufficient).

Defendants suggest that the Reserve Committee oversaw the "actuarial process," and the Executive Defendants were unaware of "case reserve" issues or their effects on "loss reserves." MTD 17-18. But this factual argument is gutted by Defendants' own statements. The "actuarial process" included "input" from the "claims department," (Ex. 2 at 69), and the Reserve Committee "us[ed its] judgment to supplement the actuarial recommendations." *Id*. Further, "individual case-basis valuations" of "specific case reserve[s]," "which management believes is adequate," directly affected loss reserves and were reviewed by "senior management" "at least quarterly." ¶¶54, 255, 312. Defendants told investors that their knowledge of the "actual case reserves" informed their view of the "overall" loss reserves. ¶¶352-53. The claim that "senior management" excluded the CEO and CFO (MTD 17) is premature and wrong; the Executive Defendants' own statements touted their personal knowledge of the "actual case reserves." "[G]ood faith reliance" on actuaries is also a premature defense. *See In re New Oriental Educ. & Tech. Grp. Sec. Litig.*, 988 F. Supp. 2d 406, 426 (S.D.N.Y. 2013).

Second, after James River canceled the Uber contract, management deliberately suppressed the reserves—and all requests to increase reserves—across the entire Uber book. ¶¶136-48. As the *St. Amand* witnesses testified, all requests for a reserve increase to $250,000 or more had to be approved by Schmitzer, who routinely denied them. ¶137. Further, the Company dramatically

23

slashed reserve authority levels throughout the entire claims department. ¶¶139-40. James River's extraordinary steps to suppress reserves include the creation of the secret PLM email portal in October 2019, where all requests to increase reserves were required to be "funneled" and thus not documented in the claims file so that the adjuster's belief that reserves were inadequate, and management's routine denials of the requested increases, would be shielded from discovery by third parties, including potential buyers and litigants. ¶340. "Evidence of concealment is strongly indicative of scienter." *Brown v. China Integrated Energy, Inc.*, 875 F. Supp. 2d 1096, 1124 (C.D. Cal. 2012); *accord Vanderhoef v. China Auto Logistics Inc.*, 2020 WL 5105243, at \*3 (D.N.J. Aug. 31, 2020); *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 39 2d 512, 548 (S.D.N.Y. 2011).

Defendants claim that "use of a portal for review of case reserves" does not "tie these allegations to the Reserve Committee," or the Executive Defendants. MTD 24, 27. But the SAC alleges that Schmitzer, who was on the Reserve Committee and reported directly to James River's CEO, managed and monitored the portal, almost always denied reserves, and after October 2019, "weighed in more aggressively on reserve increase requests'" ¶¶341-42. It is implausible that Schmitzer would have imposed such draconian measures without the knowledge of the Executive Defendants who sat alongside him on the Committee tasked with monitoring and approving the reserves. ¶342. Contrary to Defendants' contention (MTD 27), the SAC alleges that the portal was used both to suppress the reserves and hide that suppression. ¶¶141-43, 146-47, 340.[21]

Third, Uber comprised over 25% of James River's total premiums and was its "largest account" and "largest client." ¶¶49-50, 53, 355-59; *see MicroStrategy*, 115 F. Supp. 2d at 639 ("significance of the [] contracts" supports scienter). Further, Defendants specifically touted the

---

[21] *In re Triangle Cap. Corp. Sec. Litig.*, 988 F.3d 743, 756 (4th Cir. 2021) "stacked inference upon inference," and in *KBC Asset Mgmt. NV v. DXC Tech. Co.*, 19 F.4th 601, 609 (4th Cir. 2021) ("*DXC*"), there were no allegations that defendants "were aware of the problems alleged."

importance of Uber, James River's reserves, and the runoff, often in direct response to analysts' questions. ¶¶54, 357, 363-64, 366; *see Kiken v. Lumber Liquidators Holdings, Inc.*, 155 F. Supp. 3d 593, 606 (2015) ("repeated public discussion" of operations "relevant to [defendants'] state of mind"); *Genworth*, 103 F. Supp.3d at 785 (that defendants "spoke repeatedly about the purported breadth and depth of the Company's review" of its reserves supports scienter); *KBC Asset Mgmt NV v. 3D Sys. Corp.*, 2016 WL 3981236, *9 (D.S.C. July 25, 2016) (scienter with respect to "core operations" was "bolstered" by allegations that executives were "'specifically asked, directly and repeatedly' about these core operations").

Defendants claim (MTD 26) the core operations doctrine "has been rejected by the Fourth Circuit," but their cited authority expressly recognized that "core-operations allegations are relevant to the court's holistic analysis of scienter." *See DXC*, 19 F. 4th at 612; *see also Genworth*, 103 F. Supp. 3d at 784 (core operations "relevant to the Court's holistic analysis"). Defendants rely heavily on *DXC* throughout their brief, but that case concerned "broad corporate strategies," not reserves, which are inherently a core component of an insurance company. *DXC*, 19 F. 4th at 612. Further, *DXC* contained no allegations that the defendants were "aware of the problems alleged," and a "plausible—and largely uncontested—innocent narrative" existed that "DXC unexpectedly stumbled." *Id.* at 613. Here, the allegations go far beyond a generic core operations theory. The SAC contains particularized allegations concerning the Executive Defendants' direct personal involvement in the Uber relationship and reserve monitoring processes—reinforced by their own statements—and Defendants' proffered non-culpable narrative is wildly implausible.

Fourth, the sheer magnitude of the $170 million reserve charge reinforces scienter. *See Genworth*, 103 F. Supp. 3d at 786; *MicroStrategy*, 115 F. Supp. 2d at 636 (collecting cases). In James River's 17-year history it "***never reported a loss of this magnitude before***." ¶59. The charge

25

represented over 50% of the entire Commercial Auto Division's net reserves, exceeded all reserve developments in E&S in the prior two years combined, and wiped out every penny of profit reported over the Class Period. ¶¶64, 70, 321. Each Uber claim was under-reserved by 40%. ¶66.

Fifth, D'Orazio admitted the $170 million charge was needed because *for years* Defendants used the "*wrong*" reserves methodology that did not primarily consider James River's *"own loss experience."* ¶322; *see Freedman v. Value Health, Inc.*, 958 F. Supp. 745, 758 (D. Conn. 1997) (pairing "admission" that company "blew it" in conducting due diligence together with "magnitude of the problems" to show scienter). Further, James River's past Uber loss experiences, including adverse reserve developments in 2017-20—and the need to cancel the purportedly highly profitable Uber contract in the first place—raised "red flags" that bolster scienter. ¶¶360-61; *see Plymouth Cnty. Ret. Sys. v. Evolent Health, Inc.*, 2021 WL 1439680, at *36 (E.D. Va. Mar. 24, 2021) ("red flags" that are "coupled with" "significant problems" support scienter).

Finally, Defendants were motivated to commit fraud. During the runoff, Myron and Doran each sold over 20% of their shares, reaping over $3.5 million. ¶¶347-49; *see 3D Sys. Corp.*, 2016 WL 3981236, at *10 (crediting insider trading). Defendants argue that stock sales "standing alone" do not support scienter and the "lengthy" class period diminishes any inference. MTD 27. But courts have credited similar percentages and, in any event, the stock sales here do not "stand alone." *See In re Orbital Scis. Corp. Sec. Litig.*, 58 F. Supp. 2d 682, 686 (E.D. Va. 1999) (crediting 15%). Further, the sales were suspiciously timed, not made pursuant to Rule 10b5-1 plans (¶¶346-50),[22] and a 15-month class period is not "unusually long." MTD 27. The *Yates* class period was a full year longer. 744 F.3d at 891.

---

[22] *Compare with DXC*, 19 F.4th at 610-12 (10b5-1 plan weakens inference); *Yates*, 744 F.3d at 890-91 (involving 10b5-1 plans).

Defendants were also motivated to keep reserves inappropriately low because they were trying to sell the Company, but unable to "because of the Uber account." ¶¶344-45.[23]

### 2.     The FE Allegations Reinforce A Strong Scienter Inference

Defendants contend that the scienter allegations fail because the FEs were not involved "in estimating the Company's loss reserves" and did not have "direct contact" with the Executive Defendants. MTD 25. But the FEs *were* involved in estimating loss reserves because, in James River's own words, "We estimate the [loss] reserve using *individual case-basis valuations* of reported claims," plus the Reserve Committee received "[i]nput" from the "*claims department.*" ¶54; Ex. 2 at 69. In any event, "direct contact" with the Executive Defendants is not required. *See In re 2U, Inc., Sec. Class Action*, 2021 WL 3418841, at *13 (D. Md. Aug. 5, 2021) (crediting FEs "who did not necessarily have direct interactions with the Executive Defendants").[24]

Defendants assert that the SAC "fail[s] to specify precisely when or how each [Executive] Defendant" knew the reserves were deficient. MTD 25. As to "when," the reserves were deficient throughout the Class Period. The contract was unprofitable for years; the Executive Defendants knew of the materially understated reserves prior to the cancellation, were focused on Uber, and intensified scrutiny post-cancellation. ¶¶64, 106-07, 113-14, 337-43; *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 488 (S.D.N.Y. 2004) ("absolute precision" not required). As for "how," Plaintiffs amply allege scienter for each Defendant, as summarized above.

It is wildly implausible to infer a "prudent process for setting case reserves" (MTD 25)

---

[23] In *Phillips v. LCI Intern., Inc.*, 190 F.3d 609, 620-21 (4th Cir, 1999), plaintiffs relied on motive allegations "common to every merger." In *Chubb*, facts were "attributed to no source." 394 F.3d 126 at 155. Contrary to Defendants' implication (MTD 28), scienter does not require admissible evidence. *See In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996, 1004 (N.D. Cal. 2008).
[24] *See Epstein*, 203 F. Supp. 3d at 666 (crediting FEs without direct contact); *Black v. Martek Biosciences Corp.*, 2006 WL 8435572, at *5 (D. Md. June 14, 2006) (same); *see also Novak*, 216 F.3d at 314.

when the overriding methodology was to artificially suppress reserves, the Company was ultimately forced to take a $170 million charge, and the CEO admitted it had been using a blatantly improper methodology for five full years. ¶¶76-103. The contention that the reserve process allegations amount to a "suggest[ion] that the claims department could have been better managed" (MTD 26) is belied by the consistent, cross-corroborating allegations that James River maintained systemic, **top-down** policies and practices designed to artificially **suppress** loss reserves.[25]

### 3.    The Complaint Adequately Alleges James River's Corporate Scienter

Because the Executive Defendants acted with scienter, the SAC adequately alleges James River's scienter. *See Genworth*, 103 F. Supp. 3d at 783. Further, "[s]cienter of a lower-level employee can be imputed to the corporation . . . where, as here, that lower-level employee fraudulently furnishes information for a public statement and in so doing, intends to cause, and causes, a corporate officer to make a misrepresentation to investors." *Knurr v. Orbital ATK Inc.*, 294 F. Supp. 3d 498, 515 (E.D. Va. 2018). Schmitzer, Warren, and Rogers furnished information for the publicly-stated reserves and reserve methodology by personally reviewing and approving the reserves. ¶¶113, 137, 139, 142. Indeed, Schmitzer was a member of the Reserve Committee. ¶310. Rogers "monitored reserves in the department as a whole," conducted "informal file audits" and reviewed files, including "whether or not the reserves were accurately set." ¶313. FE3, FE10, and FE11 confirmed that reserves over a certain threshold were sent to Schmitzer, Warren, and Rogers for their approval. *Id.* Slaughter and Belcher further testified that post-termination, scrutiny by Schmitzer, Warren, and Rogers increased. ¶¶337-343. Finally, Schmitzer, Warren, and Rogers

---

[25] In *Yates*, internal disagreement concerning whether the accounting was flawed supported the inference that defendants were "simply in over [their] head." 744 F.3d at 893. In *Matrix Cap. Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 184 (4th Cir. 2009), the "timeline [of] allegations" did not support the inference that the defendants were aware of the company's problems when approving financial statements. Here, by contrast, the Complaint is replete with allegations supporting Defendants' scienter during the Class Period.

managed the PLM portal through which all requests for reserve increases were required to be sent and were "almost always denied." ¶341. The scienter of these high-ranking officers is imputed to James River. *Knurr*, 294 F. Supp. 3d at 515.

### 4.     The Opposing Inference Of Non-Fraudulent Intent Is Not Compelling

Defendants urge the Court to adopt an implausible narrative that "James River wrote a novel insurance policy for the rideshare industry, was taken aback when it proved more costly than expected, tried to put the matter behind it, and yet still had difficulty containing the losses." MTD 29. This not what happened, nor what Plaintiffs have alleged. To the contrary, as analysts specifically noted, a new CEO came in and quickly determined that prior management had materially and dramatically understated reserves, and for years had been using a completely "wrong" reserve methodology that largely ignored the company's own experiences and losses. That is the exact opposite of what Defendants had repeatedly told investors during the Class Period.

The notion that Defendants were completely ignorant of massive liability implicating James River's most important client defies "common sense and logic." *MicroStrategy,* 115 F. Supp. 2d at 636-37, 639. First, James River executives celebrated the companies' "long and collaborative relationship" over *five years*. Second, while ridesharing was perhaps a "novel" industry, the types of claims insured under the policy—car accidents—were not. Third, the Uber contract "had been unprofitable for years" before being cancelled. ¶105. Thereafter, the reserving problems only intensified. ¶¶337-43. Fourth, the sheer magnitude of the $170 million charge, which erased two years of profits and exposed a "night and day difference" for Uber reserves, eviscerates any "innocent" explanation. *See MicroStrategy*, 115 F. Supp. 2d at 636-37.

Here, even more than in *MicroStrategy*, the facts "compel an inference that fraud or recklessness was afoot." *Id.* The notion that an insurance company could somehow "mistakenly" ignore a half-decade of claims experience involving its single largest client and get its fundamental

29

business operations "wrong" defies credulity. *See* MTD 29.[26] The more plausible inference is that, after incurring enormous losses under the Uber policy for years, implementing systemic policies to hide the exposure, and bringing in a new CEO whose self-professed goal was to "eliminate the overhang" of Uber (¶67), James River was forced to take a belated charge and concede that it had knowingly or recklessly used the "wrong" reserve methodology. Defendants cannot hide behind boilerplate disclosures (MTD 28). Nothing had changed in the underlying insurance, claims experience, or liabilities that would necessitate such a massive and sudden increase. *See Winslow*, 2011 WL 7090820, at *16 (rejecting reserve warnings that did not disclose "conditions that then existed"). Plaintiffs detail a systemic, intentional effort to convince investors that James River was healthy and profitable, and that the runoff and losses were under control, when none of this was remotely true—facts analysts explicitly recognized. ¶¶58, 72.

### C.      The Complaint Adequately Alleges Control Person Liability

The Complaint alleges a Section 10(b) primary violation, and Plaintiffs therefore overcome Defendants' only challenge to Section 20(a) liability. *Genworth*, 103 F. Supp. 3d at 790.[27]

## IV.     CONCLUSION

For the foregoing reasons, Defendants' motion should be denied. Should the Court grant the motion in part or in full, Plaintiffs request leave to amend. *See* Fed. R. Civ. P. 15(a)(2); *Pittston Co. v. U.S.*, 2001 WL 34148374, at *2 (E.D. Va. Oct. 31, 2001).

---

[26] Defendants claim they tried to "keep investors updated about the Uber contract's weaknesses" (MTD 28), but Uber-related reserves were repeatedly ***reduced*** during the runoff. ¶¶64-65. The purported "breadth of Defendants' disclosures" (MTD 26) similarly does nothing to support Defendants' competing inference, for the reasons discussed at Section III.A.5.

[27] Defendants' loss causation argument relates to the October 2021 disclosure, but that disclosure revealed the Uber contract was ***still*** negatively impacting the Company's bottom line nearly ***six months*** after the $170 million charge. ¶73. At most, this is a question of fact. *See Sjunde AP-Fonden v. Goldman Sachs Group, Inc.,* 2021 WL 2659797, at *17 (S.D.N.Y. June 28, 2021). *Katyle v. Penn Nat. Gaming, Inc.*, 637 F.3d 462, 478 (4th Cir. 2011) (MTD 30) did not "even purport to reveal some then-undisclosed fact."

Dated: November 7, 2022

Respectfully submitted,

By: /s/ *Steven J. Toll*
Steven J. Toll (Va. Bar No. 15300)
Daniel S. Sommers
**COHEN MILSTEIN SELLERS
& TOLL PLLC**
1100 New York Avenue, Suite 500
Washington, D.C. 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
stoll@cohenmilstein.com
dsommers@cohenmilstein.com

*Liaison Counsel for the Class*

**BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP**
John C. Browne (*pro hac vice*)
Rebecca E. Boon (*pro hac vice*)
Benjamin W. Horowitz (*pro hac vice*)
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
johnb@blbglaw.com
rebecca.boon@blbglaw.com
will.horowitz@blbglaw.com

*Attorneys for Lead Plaintiff City of Miami
General Employees' and Sanitation
Employees' Retirement Trust and Lead
Counsel for the Class*

**SAXENA WHITE P.A.**

Steven B. Singer (*pro hac vice*)
10 Bank Street, 8th Floor
White Plains, NY 10606
Telephone: (914) 437-8551
Facsimile: (888) 631-3611
ssinger@saxenawhite.com

Maya Saxena
Joseph E. White, III (*pro hac vice*)

31

Jonathan Lamet (*pro hac vice*)
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Telephone: (561) 394-3399
Facsimile: (561) 394-3382
msaxena@saxenawhite.com
jwhite@saxenawhite.com
jlamet@saxenawhite.com

David R. Kaplan (*pro hac vice*)
Hani Y. Farah (*pro hac vice* forthcoming)
12750 High Bluff Drive, Suite 475
San Diego, CA 92130
Telephone: (858) 997-0860
Facsimile: (858) 369-0096
dkaplan@saxenawhite.com
hfarah@saxenawhite.com

*Attorneys for Lead Plaintiff Employees'
Retirement Fund of the City of Fort Worth
dba Fort Worth Employees' Retirement Fund
and Lead Counsel for the Class*

**KLAUSNER KAUFMAN JENSEN
& LEVINSON LLP**
Robert D. Klausner
Stuart A. Kaufman
7080 Northwest 4th Street
Plantation, Florida 33317
Telephone: (954) 916-1202
Facsimile: (954) 916-1232
bob@robertdklausner.com
stu@robertdklausner.com

*Additional Counsel for Lead Plaintiff the City
of Miami General Employees' and Sanitation
Employees' Retirement Trust*

32

**CERTIFICATE OF SERVICE**

I hereby certify that on November 7, 2022, I caused the foregoing to be electronically filed with the Clerk of Court via CM/ECF, which will send a notice of electronic filing to all registered users.

/s/ Steven J. Toll
Steven J. Toll