# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
# RICHMOND DIVISION

|  |  |
|---|---|
| *In re James River Group Holdings, Ltd. Securities Litigation* | 3:21-cv-00444-MHL |

## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
## <u>DEFENDANTS' MOTION TO DISMISS</u>

<table>
<tr>
<td>

Maeve O'Connor (*pro hac vice*)
Susan Reagan Gittes (*pro hac vice*)
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022
Telephone: (212) 909-6000
Facsimile: (212) 521-7715
mloconnor@debevoise.com
srgittes@debevoise.com

</td>
<td>

By: /s/ *Carter Burwell*
Carter Burwell (Va. Bar No. 88177)
DEBEVOISE & PLIMPTON LLP
801 Pennsylvania Avenue N.W., Suite 500
Washington, D.C. 20004
Telephone: (202) 383-8000
Facsimile: (212) 521-7715
cburwell@debevoise.com

*Counsel for Defendants*

</td>
</tr>
</table>

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................. 1

I.   The Opposition Effectively Concedes That Plaintiffs Cannot Meet the Stringent Standard Imposed by Omnicare as to Statements About Reserve Estimates. .................... 3

II.  Plaintiffs Fail to Allege Any Facts to Suggest That the Purported Misstatements Concerning the Process for Estimating Reserves Were Actually False. ........................... 6

    A.   Plaintiffs Fail to Plead Any Misstatement About the Process of Estimating Loss Reserves .................................................................................................... 7

    B.   Defendant D'Orazio's Statement Is Not an "Admission." ..................................... 8

    C.   Plaintiffs' Remaining Attempts to Manufacture a Misstatement Fail. ................. 10

III. Defendants' Statements Regarding GAAP and Sarbanes-Oxley Are Not Actionable. ....................................................................................................................... 13

IV.  The Safe Harbor Applies to Defendants' Forward-Looking Statements. ....................... 14

V.   The SAC Fails to Plead a Strong Inference of Scienter. .................................................. 16

VI.  The SAC Fails to Plead Corporate Scienter. .................................................................... 19

VII. The SAC Should Be Dismissed With Prejudice. ............................................................. 20

CONCLUSION ........................................................................................................................... 20

i

# TABLE OF AUTHORITIES

**Cases**

*Black v. Martek Biosciences Corp.*,
2006 WL 8435572 (D. Md. June 14, 2006)................................................................17

*City of Dearborn Heights v. Align Tech.*,
856 F.3d 605 (9th Cir. 2017) .........................................................................................6

*Cozzarelli v. Inspire Pharms.*,
549 F.3d 618 (4th Cir. 2008) .......................................................................................20

*Einhorn v. Axogen, Inc.*,
42 F.4th 1218 (11th Cir. 2022) .....................................................................................15

*Freudenberg v. E*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010)...........................................................................10

*In re 2U, Inc. Secs. Class Action*,
2021 WL 3418841 (D. Md. Aug. 5, 2021) ....................................................................17

*In re Acceptance Ins. Cos. Sec. Litig.*,
423 F.3d 899 (8th Cir. 2005) ..........................................................................................9

*In re AmTrust Fin. Servs., Inc. Secs. Litig.*,
2019 WL 4257110 (S.D.N.Y. Sept. 9, 2019)................................................................13

*In re BioScrip, Inc. Secs. Litig.*,
95 F. Supp. 3d 711 (S.D.N.Y. 2015)...............................................................................4

*In re Braskem S.A. Secs. Litig.*,
246 F. Supp. 3d 731 (S.D.N.Y. 2017)...........................................................................14

*In re Genworth Fin. Inc. Secs. Litig.*,
103 F. Supp. 3d 759 (E.D. Va. 2015) ..............................................................10, 13, 15

*In re PEC Sols., Inc. Secs. Litig.*,
418 F.3d 379 (4th Cir. 2005) .......................................................................................14

*In re PEC Sols. Secs. Litig.*,
2004 WL 1854202 (E.D. Va. May 25, 2004) ...............................................................14

*In re PMA Cap. Corp. Sec. Litig.*,
2005 WL 1806503 (E.D. Pa. July 27, 2005)................................................................10

*In re Triangle Cap. Corp. Secs. Litig.*,
988 F.3d 743 (4th Cir. 2021) .......................................................................................19

*In re Under Armour Secs. Litig.*,
  342 F. Supp. 3d 658 (D. Md. 2018) ..................................................................................18

*In re Under Armour Secs. Litig.*,
  409 F. Supp. 3d 446 (D. Md. 2019) ..................................................................................20

*Katyle v. Penn Nat'l Gaming, Inc.*,
  637 F.3d 462 (4th Cir. 2011) ............................................................................................20

*KBC Asset Mgmt. NV v. DXC Tech. Co.*,
  19 F.4th 601 (4th Cir. 2021) ...........................................................................16, 17, 18, 19

*Marsh Grp. v. Prime Retail, Inc.*,
  46 F. App'x 140 (4th Cir. 2002) ..................................................................................14, 15

*Matrix Cap. Mgmt. Fund, LP v. BearingPoint, Inc.*,
  576 F.3d 172 (4th Cir. 2009) ......................................................................................18, 20

*Nolte v. Cap. One Fin. Corp.*,
  390 F.3d 311 (4th Cir. 2004) ........................................................................................3, 7

*Omnicare, Inc. v. Laborers Dist. Council*,
  575 U.S. 175 (2015)...........................................................1, 3, 4, 5, 6, 8, 11, 12, 13

*Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*,
  918 F.3d 312 (4th Cir. 2019) ......................................................................................11, 15

*Proter v. Medifast, Inc.*,
  2013 WL 1316034 (D. Md. Mar. 28, 2013)......................................................................18

*Tchrs' Ret. Sys. of LA v. Hunter*,
  477 F.3d 162 (4th Cir. 2007) ..............................................................................................7

*Smith v. Circuit City Stores, Inc.*,
  286 F. Supp. 2d 707 (E.D. Va. 2003) ..........................................................................13, 14

*TransEnterix Inv. Grp. v. TransEnterix, Inc.*,
  272 F. Supp. 3d 740 (E.D.N.C. 2017)................................................................................15

*Woolgar v. Kingstone Cos., Inc.*,
  477 F. Supp. 3d 193 (S.D.N.Y. 2020)..................................................................................9

*Yates v. Mun. Mortg. & Equity, LLC*,
  744 F.3d 874 (4th Cir. 2014) .........................................................................16, 17, 18, 19

**Statutes**

15 U.S.C. § 78u–5(c)(2)(B) ............................................................................................15

**PRELIMINARY STATEMENT**

Plaintiffs' Opposition demonstrates the Second Amended Complaint's ("SAC") utter failure to plead particularized facts sufficient to demonstrate an actionable misstatement, a strong inference of scienter, or loss causation. Nor could it, as nothing in the Opposition ("Opp.") can cure the SAC's fundamental flaw: Plaintiffs fail to allege any facts regarding the Company's overall loss reserves or the process by which they were estimated, and likewise plead no facts to plausibly connect any Defendant to any of the purported problems with the estimation of individual case reserves under the Company's novel Uber business. Plaintiffs' newly-added allegations from the *St. Amand* litigation only serve to underscore the absence of any factual allegations about the loss reserves at the center of their claims. The Opposition fails to identify any case that survived a motion to dismiss in these circumstances, and Plaintiffs' claims must be dismissed because they cannot meet the high bar imposed by *Omnicare* and the PSLRA.

None of Plaintiffs' efforts to avoid dismissal can salvage their claims. While Plaintiffs do not dispute that the reserve estimates at the heart of the SAC are statements of opinion under *Omnicare*, Plaintiffs barely even attempt to meet *Omnicare*'s exacting standard for such statements, offering mere conclusory assertions of omissions and purportedly "embedded" facts that fall far short of what the Supreme Court has instructed is required to render an opinion statement actionable. Instead, Plaintiffs try to save their claims by asserting that their case is really about a handful of alleged misstatements regarding the *process* for estimating loss reserves, as opposed to the adequacy of reserves estimates. This pivot cannot save the SAC, however, because Plaintiffs fail to plead any facts whatsoever about the reserve estimation process, much less facts plausibly alleging that any statement about that process was false. Plaintiffs rely heavily on the scattered accounts of claims staff who believed reserves for individual claims they managed should have been higher to assert that the Company systemically "disregarded" its own experience in

1

estimating overall loss reserves. (Opp. 18.) But Plaintiffs plead no facts to connect those scattered accounts to the Company's overall "experience" across hundreds of thousands of claims, let alone any facts to connect these purported issues to the Company's estimation of overall loss reserves for current and *future* claims in its actuarial judgment.

Plaintiffs' other attempts to plead a false statement of fact with regard to the Company's process for estimating reserves fare no better. For example, Plaintiffs' attempt to mischaracterize Defendant D'Orazio's May 2021 statement as an "admission" that Defendants knew their prior estimates were false is not even credible (Opp. 16). Far from "admitting" anything, D'Orazio's statement described the Company's decision to revise the methodology for estimating reserves in its actuarial judgment based on newly received information. Nothing in his statement suggested that the Company did not believe its earlier estimates when they were made or refused to take experience into account before May 2021. D'Orazio's description of the Company's decision to take a different approach based on new data cannot support a claim for securities fraud.

Plaintiffs' Opposition makes clear that Plaintiffs' claims are subject to dismissal for the additional reason that Plaintiffs fail to plead facts coming close to the requisite "strong inference" of scienter. While Plaintiffs repeatedly protest that they are not pleading fraud by hindsight, the Opposition makes clear that Plaintiffs do exactly that, arguing that because Defendants' loss reserves estimates did not turn out as expected, their earlier statements *must have been* fraudulent. The Fourth Circuit has rejected this theory time and again, holding that Plaintiffs must plead that the opinions were knowingly false *when made*, which the SAC fails to do. And as Plaintiffs cannot dispute, neither the FEs nor the witnesses from the *St. Amand* litigation contend that any Defendant was aware of their purported concerns with regard to case reserves, which is fatal to their claims under Fourth Circuit law. Plaintiffs' vague reference to "senior management" falls far short of

2

what the Circuit requires and cannot obscure their failure to plead actual facts regarding any Defendant. At most, Plaintiffs' allegations portray a claims department struggling to manage a growing line of business; they do nothing to suggest that Defendants intentionally misled investors. For these and other reasons described below, this Court should dismiss the SAC with prejudice.

**I.      The Opposition Effectively Concedes That Plaintiffs Cannot Meet the Stringent Standard Imposed by *Omnicare* as to Statements About Reserve Estimates.**

As Plaintiffs cannot dispute, Fourth Circuit precedent makes clear that reserve estimates are quintessential statements of opinion evaluated under *Omnicare*. *See Nolte v. Cap. One Fin. Corp.*, 390 F.3d 311, 314–15 (4th Cir. 2004); *see also Omnicare, Inc. v. Laborers Dist. Council*, 575 U.S. 175 (2015).[1] The SAC spends paragraph after paragraph confirming that Plaintiffs are challenging those reserve estimates based on nothing more than hindsight, claiming that the Company's "key financial measures" from the fourth quarter of 2018 through the first quarter of 2021 (¶¶ 162–234) were knowingly misstated because the Company ultimately raised its reserves. The SAC similarly relies extensively on Defendants' clear statements of opinion, such as their belief that the Company's loss reserve estimates were "reasonable," that "every known claim has a specific case reserve . . . which management believes is adequate . . . based on information available at the time," and that the Company seeks to "estimate the amount of future obligations, especially reserves for losses and loss adjustment expenses, in a consistent and appropriate fashion" (¶¶ 246–47, 255–56, 266–67).

Notwithstanding that the adequacy of loss reserves is the gravamen of the SAC, the Opposition barely mentions *Omnicare* and largely tries to avoid its application. Plaintiffs spend

---

[1] Contrary to Plaintiffs' claim (Opp. 17), *Nolte* did not rely on any concession that statements about reserve adequacy are opinions; *Nolte* instead held that statements "about the adequacy of . . . loan loss reserves" were "statement[s] of opinion" and not actionable because, as here, plaintiff did not allege "that management was ever informed" of FEs' concerns.

3

just two short paragraphs arguing that Plaintiffs have pled actionable statements of opinion, all but conceding they fail to meet *Omnicare*'s high bar.  (Opp. 18.)  Plaintiffs' meager attempt to argue that (unspecified) misstatements regarding the "adequacy of reserves" are actionable boils down to conclusory arguments that (i) the Company's reserve estimates contained "embedded"—yet unstated—alleged misstatements regarding the *process* for estimating loss reserves and (ii) purportedly material "facts" were omitted from statements about reserve estimates, including that the Company did not "primarily rely" on past experience in estimating overall loss reserves, implemented "systemic policies" to keep "reserves" low, and failed to use "current information" in estimating reserves.  These half-hearted efforts fail to meet *Omnicare*'s high bar.

First, Plaintiffs' extraordinary argument that the Company's reserve estimates contain implied statements about the estimation process that take them outside of *Omnicare* would quickly swallow *Omnicare* entirely, and Plaintiffs cite no authority for such an expansive interpretation. (Opp. 18.)  In any event, Plaintiffs' arguments are premised on allegedly misstated or omitted "facts" about how the Company estimated **loss reserves**; however, as described below, Plaintiffs offer no facts whatsoever about such reserves or the process by which they are estimated, including whether and to what extent the Company took its own historical experience into account.  Plaintiffs cannot credibly claim to have identified purportedly "embedded" or "omitted" facts about the Company's loss reserves where they offer no facts whatsoever about such reserves or the process to estimate them.  *See In re BioScrip, Inc. Secs. Litig.*, 95 F. Supp. 3d 711, 739 (S.D.N.Y. 2015) ("Allegations premised on the testimony of confidential sources must show that individual defendants actually possessed the knowledge highlighting the falsity of public statements").  The Opposition confirms this failure, as Plaintiffs do not contend that a single FE was an actuary or provided any facts about loss reserves or IBNR reserves for future claims; indeed, none indicated

4

that they even knew IBNR reserves existed. (*See* Opp. 14 (FEs principally were "frontline claims personnel"); SAC ¶¶ 115–49 (allegations related to named FEs with no suggestion that they played a role in setting IBNR reserves)). Plaintiffs cannot satisfy *Omnicare*'s demanding standard when they have failed to plead any particularized factual allegations regarding the process for estimating loss reserves, the actual topic of the challenged statements.[2]

Second, Plaintiffs' conclusory attempts to allege that the Company purportedly omitted "particular (and material) facts going to the basis" for its loss reserves estimates that render those estimates misleading are unsupported by any well-pleaded facts. *See Omnicare*, 575 U.S. at 194. Plaintiffs' effort to link scattershot allegations about the claims handling process from FEs and the *St. Amand* litigation to the process for estimating overall loss reserves—for example, arguing that the FEs showed "direct management involvement in suppressing [case] reserves" (Opp. 15 (citing SAC ¶¶ 78, 83–87, 110, 112 (allegations about the director of claims, officers in the claims department, and low-level managers)))—cannot satisfy *Omnicare*'s exacting standard. Plaintiffs allege no facts, much less the "particular" facts required, to support any connection between the facts pled regarding case reserves and the actuarial process for estimating loss reserves.

Plaintiffs' allegations boil down to the claim that certain former employees who worked on individual claims under the Uber account believed that case reserves for certain claims should be higher and that members of the claims department—not the Individual Defendants—perceived what Plaintiffs claim was "systemic under-reserving." (Opp. 16.) But *Omnicare* explicitly rejected a similar attempt to render statements of opinion actionable without allegations that the *speaker* omitted material facts within her possession. *See* 575 U.S. at 189 (speaker can be held liable for

---

[2] Plaintiffs also ignore that loss reserves are estimated based on complex factors, including historical data, trends in claim frequency and severity, economic and social trends, and regulatory changes. Ex. 2 at 18.

factual omissions only if that factual information is in the speaker's "possession at the time"). Plaintiffs have failed to meet their burden to identify allegedly omitted facts known to any speaker with specificity, and the Opposition's reliance on lawyer's argumentation to obfuscate their failure to plead such facts falls far short of this high bar.[3]  *See City of Dearborn Heights v. Align Tech.*, 856 F.3d 605, 617 (9th Cir. 2017) (allegations insufficient to plead falsity under *Omnicare* where sources did not "participate[]" in or have knowledge of the challenged accounting practice).

## II.    Plaintiffs Fail to Allege Any Facts to Suggest That the Purported Misstatements Concerning the Process for Estimating Reserves Were Actually False.

Recognizing that the majority of the alleged misstatements are not actionable under *Omnicare*, Plaintiffs focus on a handful of alleged misstatements that they claim fall outside of *Omnicare* because they concern the *process* for estimating reserves, including the allegations that (i) Defendants said they relied on "past experience" in estimating reserves when in fact they "disregarded" such experience; (ii) Defendant D'Orazio's statements in May 2021 somehow conceded that the Company knew its prior methodology was wrong but used it anyway; and (iii) Defendants falsely described case reserves because they did not actually make an "individual case-basis valuation" for each known claim, and misrepresented the status of the "run off" of the Uber block. (Opp. 18–19)  But Plaintiffs fail to plead any facts demonstrating that any alleged statement about process was actually false, as required to plead an actionable misstatement of fact.

### A.    Plaintiffs Fail to Plead Any Misstatement About the Process of Estimating Loss Reserves.

Plaintiffs' claim that the Company's process for estimating reserves was falsely described

---

[3] Likewise, while the SAC describes audit reports allegedly presented to unnamed executives regarding reserves on individual claims, Plaintiffs fail to allege that any Defendant received or reviewed any report at any time, let alone allege what any report said, how many claims they related to, or how the unspecified claims discussed in the alleged report would have affected the Company's overall loss reserves.  (Opp. 16 (citing SAC ¶¶ 109–11).)

badly misstates the facts actually pled.  As described above, Plaintiffs' argument fails for the threshold reason that they allege no facts regarding the process for estimating loss reserves; Plaintiffs cannot credibly argue that the Company made misstatements about a process they fail to plead a single fact about.  *See Tchrs.' Ret. Sys. of LA v. Hunter*, 477 F.3d 162, 179 (4th Cir. 2007) (disregarding account of FE with no "access to information" about practice at issue).

While Plaintiffs do not dispute that they pled facts only about case reserves for individual claims (Opp. 13), Plaintiffs nonetheless claim based on FE allegations that the Court can conclude that the Company failed to account for "experience" in estimating loss reserves. (*See, e.g.*, Opp. 11–12.)  But Plaintiffs offer no factual basis for this leap, nor could they: individual case reserves estimated by "frontline claims staff" are not the same as the Company's historical experience across hundreds of thousands of open and closed claims, and Plaintiffs' attempt to conflate the two concepts without any well-pleaded facts falls flat.  Plaintiffs' selective quotations from Rogers, Slaughter, and Belcher add nothing to the analysis, because their statements all relate to whether case reserves were adequate.  (Mot. at 17.)  Nor do Plaintiffs allege that they conveyed any concerns to Defendants or that Defendants were otherwise aware of such concerns; Plaintiffs' vague references to "senior management" (Opp. 16) are not enough, and the SAC "fails to plead falsity with requisite particularity." *Nolte*, 390 F.3d at 316.

Even accepting Plaintiffs' theory that case reserves have some (unspecified) relation to the Company's experience as that term is used in the Company's disclosures, Plaintiffs' own allegations demonstrate that experience *was* taken into account and not "uniformly" disregarded under purported "policies" and "procedures" applied to all case reserves, as Plaintiffs claim.  (Opp. 11–12, 15.)  For example, Plaintiffs rely on the allegation that the Company reduced **proposed increases to case reserves**, but that allegation makes clear — contrary to Plaintiffs' theory — that

7

such increases *were* permitted based on case-specific facts. (Opp. 15 n.9.) Similarly, Plaintiffs point to the allegation that Company "policy" set case reserves for a newly-reported claim at a one-dollar initial "placeholder" (while also alleging that the "placeholder" in the *St. Amand* case was $2,500). (Opp. 12.) But setting an initial "placeholder" reserve does not mean that amount was maintained over time; indeed, the SAC makes clear that the case reserve on Mr. St. Amand's claim was increased substantially after the appropriate paperwork was submitted. SAC ¶ 159.

Not one former employee relied on in the SAC suggests that case reserves could not be increased; at most, Plaintiffs' allegations suggest that some claims employees were purportedly dissatisfied that reserves on the claims they managed were not increased to the amounts they wanted and that some staff believed that it took too much paperwork to increase reserves. *Omnicare* requires the pleading of specific facts, not conclusory (and contradictory) assertions, and the facts pled do not plausibly indicate that the process for estimating loss reserves disregarded the Company's aggregated experience as of any particular time period. 575 U.S. at 194. Lawyers' argumentation aside, Plaintiffs cannot manufacture a misstatement based on conclusory arguments when they pled no facts about how experience, or any specific case reserve, factored into the estimation of loss reserves.

## B.    Defendant D'Orazio's Statement Is Not an "Admission."

Apparently recognizing the weakness of the allegations of their FEs, Plaintiffs resort to distorting the May 2021 statement of Defendant D'Orazio announcing an increase in reserves and a modification of the methodology for calculating reserves to "us[e] only our own loss experience" to estimate loss reserves. Plaintiffs contend that D'Orazio's comment that the Company's earlier estimates "got it wrong" somehow "admitted" that the Company had not used historical data in its earlier reserve estimates and thus knowingly misled investors when telling them that it had

8

incorporated historical data into its calculations.  (Opp. 16; *see* Ex. 31 at 2–3.[4])  But D'Orazio's statement was not an "admission"; rather, he explained that the Company had previously used a mix of its own data along with data from others in the industry (Ex. 31 at 2), consistent with the Company's earlier disclosures that it estimated loss reserves using *both* "our own data and industry data."  *See* Ex. 2 at 71; Ex. 10 at 72; Ex. 18 at 75.  D'Orazio's statement announced, based on new information received in the first quarter of 2021, that the Company would begin to use "only our own loss experience . . . rather than the array of inputs that we had used in prior quarters" and that they believed this new methodology "would give us a better and more conservative estimate of ultimate losses on this account."  Ex. 31 at 2.  This comment only reinforces the judgment-based nature of estimating reserves for *future* losses: the Company weighs different factors and inputs in its actuarial judgment and adjusts its approach if necessary based on newly received data.

Most importantly, D'Orazio's statement says nothing to suggest that Defendants did not *believe* their prior reserve estimates when made.  *See* Ex. 31 at 3.  "That defendants later decided to revise the amount of loss reserves that [they] deemed adequate provides absolutely no reasonable basis for concluding that defendants did not think reserves were adequate at the time of the challenged statements."  *Woolgar v. Kingstone Cos., Inc.*, 477 F. Supp. 3d 193, 225 (S.D.N.Y. 2020); *see id.* at 225 n.13 (collecting cases).  "Plaintiffs['] assertions about the Company's loss reserves mimic the typical type of 'fraud by hindsight' theory that courts have been unwilling to entertain."  *Id.* at 225–26; *see also In re Acceptance Ins. Cos. Sec. Litig.*, 423 F.3d 899, 903 (8th Cir. 2005) (declining to construe statement that reserves would need to be increased as admission that defendants had *known* reserves were previously deficient).

Once D'Orazio's comments are placed in proper context, it is clear why Plaintiffs' reliance

---

[4] "Ex. __" refers to the exhibits attached to the Declaration of Susan Gittes, ECF No. 73.

on *Genworth* is inappropriate.  (Opp. 11, 17–18.)  In *Genworth*, the court denied a motion to dismiss based on particularized factual allegations that the defendants made false factual statements about their review of the company's insurance reserves—including that they had conducted a "thorough review" of reserves in 2013 and were using current claims data to estimate reserves.  *In re Genworth Fin. Inc. Secs. Litig.*, 103 F. Supp. 3d 759, 772–75 (E.D. Va. 2015).  But the *Genworth* defendants expressly acknowledged the falsity of those statements in a subsequent investor conference where they stated they had not done a "deep review" since 2012 and had not used current claims data.  *Id.* at 773.  Unsurprisingly, such allegations were sufficient to plead that the defendants' factual statements were false when made given that defendants admitted that they knew no such review had occurred.  *Id.* at 773–74.  In sharp contrast to *Genworth*, Plaintiffs point to *no* similar factual allegation—much less any "admission"—here.[5]

### C.      Plaintiffs' Remaining Attempts to Manufacture a Misstatement Fail.

Plaintiffs likewise fail to plead facts suggesting that any statements regarding case reserves or the status of the run-off of the Uber block were actually false or misleading.  <u>First</u>, Plaintiffs try to manufacture a factual misstatement by cutting and pasting different statements about the Company's process for estimating case reserves, claiming that Defendants falsely stated that the Company used "individual case-basis evaluations" that evaluated each specific claim to establish a specific case reserve which management believes is "adequate to resolve the claim."  (Opp. 12.)  However, Plaintiffs omit the surrounding context for such statements, which explained that case

---

[5] Unlike Plaintiffs' allegations here, Plaintiffs' out-of-circuit cases (Opp. 11) involved particularized factual allegations of knowing misrepresentations regarding reserves.  *See, e.g.*, *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 177 (S.D.N.Y. 2010) (defendants admitted internally "that the Company was experiencing losses and expected more losses . . ., but Defendants made the opposite representations to the public"); *In re PMA Cap. Corp. Sec. Litig.*, 2005 WL 1806503, at \*3, 6, 15 (E.D. Pa. July 27, 2005) (defendants represented reserves were adequate despite outside auditors' advice that reserves were insufficient, and auditors were fired).

reserves "[a]s a general rule" are estimated based on "**information [then] available**," which "**management believes**" is enough to resolve the claim.  Ex. 2 at 19, Ex. 10 at 19, Ex. 18 at 20. The Company was expressing its *opinion* that a case reserve would be adequate to pay a claim based on then-available information, while explaining some of the reasons that losses could vary. That is a classic statement of opinion that must be evaluated under *Omnicare*, a standard Plaintiffs all but concede they cannot meet.  *See also* SAC ¶¶ 245, 254, 265 (expressing *opinion* that process for estimating loss reserves provided "an appropriate basis for predicting future events"); *see id.* ¶¶ 247, 256 (expressing *opinion* that "reserve estimates are reasonable" and that the Company sought to estimate future losses "in a consistent and appropriate fashion").

Plaintiffs' selective quotations attempt to reduce the Company's process for estimating loss reserves to a mechanical one, such that allegedly deficient case reserves necessarily mean overall reserves were understated (Opp. 13), but fail to point to any statement made about the estimation of case reserves that was false.  As Plaintiffs' own allegations emphasize, the Company *did* undertake a case-by-case evaluation of claims reported to the Company, consistent with their public statements (SAC ¶¶ 87, 107; *see* Opp. 13).  While the FEs may disagree with the Company's handling of such evaluations, the Company never suggested that case reserve estimates from "frontline claims" staff (Opp. 14) would be accepted without further review or application of the Company's judgment based on a global view of its overall experience and expectations of future claims.  To the contrary, the Company made clear that "[w]e keep the settlement authority of front-line adjusters low to ensure the practice of having two or more members of the department participate in the decision as to whether to settle or defend."  Ex. 2 at 13, Ex. 10 at 13, Ex. 18 at 14; *see Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 322 (4th Cir. 2019) ("A reasonable investor is expected to understand a statement of opinion in its full context

11

and there will only be liability for the omission of material facts that cannot be squared with such a fair reading."). Moreover, the Company's disclosures made clear that estimating loss reserves was a complex statistical process and not the sort of thing that the FEs (who were claims staff, not actuaries) would be aware of. *See* Ex. 2 at 18, Ex. 10 at 18, Ex. 18 at 19 (loss reserves were estimated based on Company's statistical "judgment"). Plaintiffs ask this Court to ignore the full context of these statements and adopt their incorrect view that because the FEs contended that case reserves on claims they managed should have been set higher, the Company misled the market as to how such reserves were estimated, which simply does not follow.

Second, Plaintiffs' claim that the Company's statements about the status of the run-off of the Uber block were false suffers from the same core defects. As above, Plaintiffs' efforts to cast these statements as factual to avoid *Omnicare*'s standard fails: statements about the Company's *belief* that the run-off was going well—for example, statements in August 2019 that we are "comfortable with our loss reserves" (Opp. 9)—are classic opinion statements. To the extent any part of such statements are plausibly factual, Plaintiffs fail to demonstrate how such statements are false. For example, Plaintiffs claim that statements that the Company was "watching" the run-off "closely," that the run-off was progressing consistent with the Company's expectations, and settling claims at a "rapid pace" that is "consistent with held reserves" (*id.* at 9, 19) were false based on the conclusory claim the run-off was a "disaster." (*Id.* at 19.) But again, Plaintiffs' allegations do not support the Opposition's description: only a small number of FEs said anything about the Company's handling of claims in 2020, when the purportedly false statements were made. (SAC ¶¶ 83, 88.) That "frontline" claims staff believed they should have greater authority to increase case reserves says nothing about Defendants' opinions on the Company's run-off at the time of the challenged statement, let alone how the Company viewed reserves overall.

12

### III.   Defendants' Statements Regarding GAAP and Sarbanes-Oxley Are Not Actionable.

Plaintiffs' arguments regarding Defendants' compliance with GAAP and statements regarding internal controls fare no better.  Plaintiffs' claim that GAAP required that historical data be the "primary" basis to estimate loss reserves.  (Opp. 19.)  But the GAAP provision they cite, ASC 944-40-30-1, requires only that a company estimate losses "using past experience adjusted for current trends, **and any other factors that would modify past experience**."  SAC ¶ 277 (emphasis added).  The SAC does not plead facts to plausibly suggest—nor could it—that Defendants *ignored* past experience when setting loss reserves; rather, Plaintiffs' real dispute is whether the Company placed sufficient weight on its historical experience as compared to other factors in exercising its actuarial judgment, which GAAP leaves to the Company and its auditors. *See Smith v. Circuit City Stores, Inc.*, 286 F. Supp. 2d 707, 719 (E.D. Va. 2003) ("GAAP is a term of art encompassing a wide range of acceptable procedures").[6]  Contrary to Plaintiffs' claim (Opp. 19), the GAAP provisions at issue require the application of reasoned judgment after considering multiple factors and are thus opinions subject to challenge only under *Omnicare*.  *See In re AmTrust Fin. Servs., Inc. Secs. Litig.*, 2019 WL 4257110, at *14 (S.D.N.Y. Sept. 9, 2019) (when "the relevant accounting guidance called for the exercise of judgment, then the resulting data would be a statement of opinion").

The Opposition likewise confirms Plaintiffs' failure to plead any facts to suggest that Defendants knowingly violated GAAP by failing to reasonably estimate loss reserves in the exercise of the Company's actuarial judgment pursuant to ASC 450-20-25-2, as Plaintiffs fail to

---

[6] Plaintiffs cite only one case (*Genworth*) sustaining a claim under ASC 944-40-30-1, and it did so for reasons not present here (Opp. 19).  Given the unique facts of that case (described above), the court found defendants may have violated GAAP by knowingly failing to adjust the company's reserves "for current trends" because defendants were aware that the claims duration data used was out of date and thus that reserves were understated.  103 F. Supp. 3d at 776–77, 781.  Plaintiffs cite *no* case for the proposition that the "primary" input must be a Company's historical data.

13

identify any allegation to suggest that the Defendants disbelieved their own reserve estimates or failed to disclose particularized facts within their possession rendering any opinion misleading. *See* Mot. at 21–22; *see also In re PEC Sols., Inc. Secs. Litig.*, 418 F.3d 379, 389–90 (4th Cir. 2005). Plaintiffs' conclusory assertion that Defendants falsely certified the accuracy of the Company's internal controls fares no better; Plaintiffs offer no allegations regarding those internal controls or that Defendants did not believe that their certifications were accurate. *See In re Braskem S.A. Secs. Litig.*, 246 F. Supp. 3d 731, 757–58 (S.D.N.Y. 2017) (rejecting theory that internal control certifications were false where allegations regarding "the company's deficient financial controls and accounting were wholly conclusory").[7]

## IV.    The Safe Harbor Applies to Defendants' Forward-Looking Statements.

Plaintiffs likewise cannot avoid the application of the Safe Harbor for forward-looking statements by mischaracterizing the Defendants' statements or claiming that the cautionary language accompanying them was insufficient: these arguments are squarely foreclosed by Fourth Circuit precedent. *Marsh Grp. v. Prime Retail, Inc.*, 46 F. App'x 140, 146–47 (4th Cir. 2002); *see* Opp. 20–21. Statements that management is "confident" about loss reserves and believes those reserves to be "reasonable" are necessarily forward-looking because they are projections that the reserves will be adequate to cover *future* losses. *See* Mot. at 23; *see also, e.g.*, SAC ¶¶ 247, 256, 259, 266–67 (collecting similar statements). Plaintiffs' argument that these remarks are statements of the Company's "present" condition—and thus not subject to the Safe Harbor—fails under the

---

[7] Contrary to Plaintiffs' argument (Opp. 20 n.16), the Company's independent auditors' conclusion that internal controls were effective (Mot. 22 n.3) and that reserve estimates were reasonable (Mot. 9) is highly probative and may be considered on a motion to dismiss. *See Smith*, 286 F. Supp. 2d at 719 (dismissing securities claim based in part on "independent auditors' opinions"); *In re PEC Sols. Secs. Litig.*, 2004 WL 1854202, at *12 (E.D. Va. May 25, 2004), *aff'd*, 418 F.3d 379 (4th Cir. 2005) (same).

Fourth Circuit's holding that "statements of present belief regarding future events" retain their forward-looking character. *Marsh Grp.*, 46 F. App'x at 147; *see also TransEnterix Inv. Grp. v. TransEnterix, Inc.*, 272 F. Supp. 3d 740, 758 (E.D.N.C. 2017) ("The Fourth Circuit has rejected attempts to color forward-looking statements as 'present intentions' in a bid to alter their forward-looking nature."); *Einhorn v. Axogen, Inc.*, 42 F.4th 1218, 1223 (11th Cir. 2022) (statement with "present-tense observations" still protected so long as its "conclusion" is "forward looking.").[8]

Moreover, while Plaintiffs claim that Defendants' risk disclosures were not "meaningful" because Defendants allegedly knew that the risk that reserves could be underestimated "had already been realized" (Opp. 21), they point to no concrete allegation that any such risk *had* materialized or that Defendants were aware of it when they made the cautionary statements, as described above.  Defendants' disclosures regarding its reserve estimates were significantly more detailed than what the Fourth Circuit has required (Mot. 23), and this Court should therefore reject Plaintiffs' attempt to evade the application of the Safe Harbor.[9]  These warnings were more than sufficient to place investors on notice of the risk of "more inherent severity" from the Uber account that ultimately materialized.  Ex. 31 at 2; *see also Paradise Wire*, 918 F.3d at 319 (disclosure that "there can be no assurance that the [projections] will be realized or that [the company's] future financial results will not materially vary from the [projections]" was sufficiently cautionary).

---

[8] Plaintiffs cite *Genworth* to suggest that loss reserves are not projections if "they are directed to the then-present state of the Company's financial condition."  (Opp. 21 (citing 103 F. Supp. 3d at 789)).  But this passage characterized *other* cases; *Genworth* recognized that the "plain meaning" of the Safe Harbor covers statements of a company's present characterization of future financial results and statements about the "adequacy" of reserves can "encompass[] a representation of future events" and "may be deemed forward-looking."  103 F. Supp. 3d at 788–89.

[9] Defendants' oral forward-looking statements incorporated these written disclosures by reference, as the Safe Harbor permits.  15 U.S.C. § 78u–5(c)(2)(B); *see, e.g.*, Ex. 28 at 2.

**V.     The SAC Fails to Plead a Strong Inference of Scienter.**

Plaintiffs' Opposition likewise demonstrates that they have failed to plead particular facts demonstrating the "strong inference" of scienter required by the Fourth Circuit.  Lacking such facts, Plaintiffs resort to the conclusory assertion that their allegations show that the Individual Defendants "were personally involved in the reserving process." (Opp. 22.)  But as discussed in Defendants' Motion (at 17–18), Plaintiffs mix apples and oranges: general allegations that Defendants oversaw *overall* loss reserves provide no basis to conclude that any Defendant was aware of the scattered complaints of a small group of "frontline claims personnel" regarding *individual* case reserves.  Plaintiffs fail to allege any fact to suggest that Defendants believed case *or* overall reserves were inadequate, much less that any intended to deceive investors; Plaintiffs lack even "vague and conclusory" allegations about the Defendants' "state of mind," *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 887 (4th Cir. 2014).

Plaintiffs' failure to plead any facts connecting any purported criticisms of the process for handling individual claims to any Defendant likewise forecloses any argument that Defendants recklessly failed to anticipate that reserves would need to be increased because of such alleged concerns.  As the Fourth Circuit recently reaffirmed, the FE allegations "do not raise a strong inference of scienter because the former employees . . . do not allege that they passed their concerns on to [defendants] or that the individual Defendants were otherwise aware of the problems alleged." *KBC Asset Mgmt. NV v. DXC Tech. Co.*, 19 F.4th 601, 609 (4th Cir. 2021).  "This general lack of direct contact with Defendants weakens the inference of scienter, as [Defendants] may have been unaware of the problems, the causes of the problems, or the extent of the problems." *Id.*

The FE allegations—including from the *St. Amand* litigation, such as the supposedly "secret" PLM email portal (Opp. 19)—cannot cure Plaintiffs' failure to plead scienter, as Plaintiffs do not allege that any Defendant was aware of any of these supposed "facts."  Nor is there anything

16

improper in any event about using an email portal to make decisions on case reserves; the securities laws were not enacted to micromanage companies' business practices.  Plaintiffs' heavy reliance on a handful of allegations about Richard Schmitzer, who reported to James River's CEO and was on the Reserve Committee—claiming that he monitored case reserves and sometimes disagreed with more junior employees' requests to increase case reserves (Opp. 24)—does nothing to demonstrate that loss reserves overall were known to be false, and Plaintiffs have no facts to connect second-hand allegations about Schmitzer to any named Defendant.  Plaintiffs' cited cases involved allegations of *direct* contact with the individual defendants, allegations entirely absent here.  Opp. 27.[10]  Plaintiffs have no such facts here and cannot meet the PSLRA's high bar by claiming it is "implausible" that Defendants were not involved.  (Mot. 27; Opp. 24.)

Plaintiffs' remaining efforts to plead scienter impermissibly depend on a theory of fraud by hindsight, pointing to the size of the Uber account and the magnitude of the eventual reserve charge.  (Opp. 19, 24–25.)  The Fourth Circuit has repeatedly "reject[ed]" the argument that defendants "must have acted intentionally or recklessly" when a loss arose merely because those defendants were "senior executives" or because the losses occurred in a "core business of the Company."  *Yates*, 744 F.3d at 890; *see also KBC Asset Mgmt.*, 19 F.4th at 612.  While Plaintiffs seek to distinguish *KBC* by arguing that it involved "broad corporate strategies"—which in their view might not have commanded the attention of executives (Opp. 25)—the facts of *KBC* support no such distinction, as that case concerned the company's implementation of a corporate strategy that ultimately required the decrease of financial projections by "an estimated $800 million[.]" 19

---

[10] *See In re 2U, Inc. Secs. Class Action*, 2021 WL 3418841, at *12 (D. Md. Aug. 5, 2021) (crediting FEs with "specific knowledge that [defendants] were aware of the declining [] projections and had concerns about them"); *Black v. Martek Biosciences Corp.*, 2006 WL 8435572, at *5 (D. Md. June 14, 2006) (FE alleged management "knew" statements were false).

F.4th at 606.  Plaintiffs' attempts to bolster their "magnitude" allegations by pointing to analyst commentary stating that the reserve increases purportedly indicated that Uber claims were under-reserved by 40% (Opp. 26) is more fraud by hindsight and does not suggest that prior estimates were not believed to be accurate when made.  *See In re Under Armour Secs. Litig.*, 342 F. Supp. 3d 658, 692 (D. Md. 2018) ("magnitude" of missed financial projection did not support scienter where lower revenue could have been caused by "external forces rather than fraud").  In any event, this purported calculation does not account for the unknown number of claims not yet reported to the Company, underscoring the inherent uncertainty in estimating IBNR reserves for *future* claims.

Nor does Plaintiffs' mischaracterization of D'Orazio's statement announcing that the Company was revising its method for estimating reserves establish scienter. (*See* Opp. 26; Ex. 31 at 3.)  The Company's decision to increase its reserve estimates and change its actuarial methodology, which sought to predict *future* losses, "does not compel an inference of wrongful intent" with respect to its *prior* estimation of reserves.  *Yates*, 744 F.3d at 887; *see also Matrix Cap. Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 183 (4th Cir. 2009) (company's statement that inaccurate financial statements resulted from improper "tone at the top" was not an admission of scienter).  Rather, the candor of D'Orazio's statement "lend[s] weight to an inference that contemporaneous financial statements were made in good faith," especially where, as here, the estimates involved an entirely new business that was particularly challenging to estimate.  *See id.* at 187–88 (declining to infer scienter).

Finally, Myron and Doran's sales of stock during the "unusually long" 32-month class period do not make up for Plaintiffs' failure to plead scienter.  *Yates*, 744 F.3d at 891.  Contrary to Plaintiffs' claims (Opp. 26), the Fourth Circuit has held that the sale of 17% of stock was insufficient to demonstrate scienter.  *KBC Asset Mgmt.*, 19 F.4th at 611 (citing *Proter v. Medifast,*

18

*Inc.*, 2013 WL 1316034, at *21 n.20 (D. Md. Mar. 28, 2013) (collecting cases of "similar or greater sales percentages that did not give rise to a strong inference of scienter")).[11]

Considering Plaintiffs' scienter allegations holistically does not change the conclusion. At most, they suggest that the FEs believe that Defendants "made unwise business decisions" or mismanaged Uber claims, which the Fourth Circuit has made clear is insufficient to "support a strong inference of scienter." *KBC Asset Mgmt.*, 19 F.4th at 610. The far more plausible inference is that the Company wrote a novel insurance policy, faced unexpectedly high claims, and struggled to estimate the liability for future claims. *See Yates*, 744 F.3d at 887. Plaintiffs have no response to the Fourth Circuit's holding that when, as here, "defendants disclose risks and newly discovered weaknesses to investors this counts against an inference of scienter." *KBC Asset Mgmt.*, 19 F.4th at 613; *see* Mot. at 29–30. Defendants repeatedly disclosed that the Uber claims were proving costlier than anticipated and that it would increase loss reserves. *See* Mot. at 7–8. "While Defendants shared with investors their optimism" that the Uber claims would stabilize, there was no "guarantee[]" that would occur, which is "precisely what Defendants disclosed." *In re Triangle Cap. Corp. Secs. Litig.*, 988 F.3d 743, 756 (4th Cir. 2021). Plaintiffs cannot "use the benefit of 20-20 hindsight to turn management's business judgment into securities fraud." *Id.* at 755.

## VI.   The SAC Fails to Plead Corporate Scienter.

Plaintiffs also fail to allege that the Company acted with scienter. Their arguments that the Individual Defendants had the requisite scienter (*see* Opp. 28–29) fail for the reasons stated above, and Plaintiffs fail to plead particularized factual allegations that any non-Defendant authorized any

---

[11] Plaintiffs no longer contend that signing Sarbanes-Oxley certifications supports scienter. (Mot. 27–28; Opp. 20 n.17 ("the SAC does not rely on GAAP or SOX for scienter")). And Plaintiffs have no meaningful response to the argument that the Fourth Circuit has rejected attempts to infer scienter based on the possibility of a merger—allegations that are concededly based here on a rumor from an FE in no position to know whether it was true. (Mot. 28.)

19

challenged statements as required to plead corporate scienter. *See Matrix Cap.*, 576 F.3d at 190.

Plaintiffs similarly fail to allege that Schmitzer, Warren, or Rogers "furnished" information that

was incorporated into the challenged statements. (Opp. 28.)  They allege only that these individuals

"reviewed" or "monitored" the adequacy of certain *case reserves*, not that they had anything to do

with the overall loss reserves that are at issue in this case.  (*Id.*)  Nor do Plaintiffs allege that these

employees provided *any* information to anyone responsible for authorizing the Company's

statements before they were made.  *See In re Under Armour Secs. Litig.*, 409 F. Supp. 3d 446,

462–63 (D. Md. 2019) (corporate scienter cannot be based on "senior management" who did not

"provide[] information that was used in a misleading public statement" or were not otherwise

"involved with the issuance of misstatements").[12]

## VII.    The SAC Should Be Dismissed With Prejudice.

Plaintiffs request leave to amend in a single sentence in the event that this Court grants the

motion to dismiss.  (Opp. 30.)  Plaintiffs have already amended twice, and in light of their failure

to explain how they would remedy the "fundamental deficiencies in plaintiffs' theory of liability,"

the Court should dismiss the SAC with prejudice.  *Cozzarelli v. Inspire Pharms.*, 549 F.3d 618,

630 (4th Cir. 2008).

**CONCLUSION**

For the reasons stated above and in Defendants' motion to dismiss, the SAC should be

dismissed with prejudice.

---

[12] The Opposition also confirms that Plaintiffs fail to plead loss causation based on the Company's October 26, 2021 press release.  Plaintiffs claim the release showed that "the Uber contract was *still* negatively impacting the Company's bottom line" (Opp. 30) is based on a misunderstanding of the September 2021 transaction, which transferred the liability for all remaining Uber claims to a reinsurer in exchange for a fixed payment.  *See* Ex. 23 at 8, 10; Ex. 24.  Nothing changed in October 2021; the Company reiterated that it had entered into the "previously announced" transaction (Ex. 24); this was not a "corrective disclosure" providing "new facts" that could demonstrate loss causation.  *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 473 (4th Cir. 2011).

Dated: Washington, D.C.
      November 14, 2022

Maeve O'Connor (*pro hac vice*)
Susan Reagan Gittes (*pro hac vice*)
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022
Telephone: (212) 909-6000
Facsimile: (212) 521-7715
mloconnor@debevoise.com
srgittes@debevoise.com

By: /s/ *Carter Burwell*
Carter Burwell (Va. Bar No. 88177)
DEBEVOISE & PLIMPTON LLP
801 Pennsylvania Avenue. N.W., Suite 500
Washington, D.C. 20004
Telephone: (202) 383-8000
Facsimile: (212) 521-7715
cburwell@debevoise.com

*Counsel for Defendants*