IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

IN RE JAMES RIVER GROUP HOLDINGS,
LTD. SECURITIES LITIGATION

Civil No. 3:21cv444 (DJN)

**MEMORANDUM OPINION**

Lead Plaintiffs Employees' Retirement Fund of the City of Fort Worth d/b/a Fort Worth Employees' Retirement Fund ("Fort Worth") and The City of Miami General Employees' & Sanitation Employees' Retirement Trust ("Miami") (together, "Plaintiffs"), bring this action against Defendant James River Group Holdings, Ltd. ("James River" or "the Company") and Defendants Robert ("Bob") P. Myron ("Myron"), J. Adam Abram ("Abram"), Frank N. D'Orazio ("D'Orazio") and Sarah C. Doran ("Doran") (together, the "Executive Defendants"). Plaintiffs bring this action on behalf of themselves and similarly situated persons and entities who purchased or otherwise acquired James River common stock between February 22, 2019, and October 25, 2021. (ECF No. 69, at 1.) Plaintiffs allege violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Securities Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder. This matter now comes before the Court on Defendants' Motion to Dismiss the Second Amended Complaint with prejudice, (ECF No. 71), pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4.

For the reasons set forth below, the Court will DENY Defendants' Motion to Dismiss.

## I.   BACKGROUND

This securities fraud action arises out of Defendants' alleged series of fraudulent statements regarding the Company's financial position and their alleged systemic policy of under-reserving. Defendants' alleged fraud deceived investors, inducing Plaintiffs to purchase the Company's common stock at an artificially inflated price and thereby leading Plaintiffs to suffer losses when the facts of the Company's finances came to light.

### A.   Factual Background

At this stage, the Court must accept as true the facts set forth in the Second Amended Complaint (ECF No. 69). *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Against this backdrop, the Court accepts the following facts as alleged for purposes of resolving the instant motion.

The Second Amended Complaint alleges that the Richmond, Virginia-based insurance company James River, along with the Executive Defendants, made false statements of material fact, or omitted to state material facts that would have made their statements not misleading, to deceive investors into purchasing the Company's common stock at artificially inflated prices. (Second Amended Complaint ("SAC") (ECF No. 69) at ¶ 397–99.) The core of the fraud, the SAC alleges, consisted of Defendants' deception of investors regarding James River's financial reserves set aside for insurance claims, as well as the Company's related internal controls and financial statements. (*Id.* ¶ 399.) Defendants exhibited a pattern of "pervasive and fundamental deficiencies in James River's reserves and reserve setting process." (*Id.* ¶ 24.)

In 2014, the Company launched a specialty insurance product through its Excess and Surplus ("E&S") Line for the rideshare company Uber, offering insurance coverage for Uber drivers during periods when drivers were logged into the Uber app but not actively transporting passengers. (*Id.* ¶ 1.) The Company's E&S Line specialized in supplying insurance products

2

that standard insurance policies would not cover due to unique characteristics and risks, with the

E&S Line accounting for 70 percent of the Company's net written premiums between 2018 and

2020. (*Id.*) James River's Uber–related business, based in the Company's Commercial Auto

Division, comprised over 25 percent of the Company's total consolidated gross written

premiums for 2018 and 2019. (*Id.* ¶ 3.) Defendants represented to investors that they were

"comfortable with [the Company's] loss reserves," and external financial analysts appeared to

credit these assurances, with one analyst reporting that "'stability in the commercial auto

reserves is key to [James River's] stock's performance in the near/immediate term.'" (*Id.*)

(emphases from SAC removed here, and in subsequent excerpts, for readability). Plaintiffs

pinpoint February 22, 2019 — when then-Chief Executive Offer ("CEO") Defendant Myron

announced Uber's renewal of its contract with James River and stated that the Company had a

"long and collaborative relationship" with its "largest account" — as the start of the Class

Period. (*Id.* ¶ 54.)

   On October 8, 2019, James River announced the early termination of the Uber contract,

because the contract had "'not met [James River's] expectations for profitability.'" (*Id.* ¶ 4.)

Along with this announcement, the Company disclosed an adverse charge of $55–60 million that

Defendants attributed largely to the Uber contract, resulting in a $25.2 million quarterly net loss

(the Company's largest as of that date). (*Id.*) James River then put the Uber contract into

"runoff", a winddown process in which the Company still was liable for processing and paying

claims that had accrued through 2019. (*Id.*) Following the Uber announcement, Defendant J.

Adam Abram (the Company's founder and former CEO) stated on an investor call on November

7, 2019, that the Company terminated the Uber contract due to excessive risk and that

"'candidly, in some years we mispriced the risk.'" (*Id.* ¶ 59.) Amid concern from analysts about

3

the Company's future performance, Defendants represented in annual reports throughout the "Class Period" (i.e., between February 22, 2019, and October 25, 2021) that the Company established, monitored and adjusted reserves based on a process that included, for all Uber claims, "'individual case-basis valuations'" that leveraged "'historical information'" and James River's "'past experience'" while making modifications for "'current developments'" and "'anticipated trends.'" (*Id.* ¶ 5.)

Specifically, Defendant Abram told investors on a November 7, 2019 call that the reported reserves reflected a "a historically well-informed judgment." (*Id.* ¶ 363.)  On the same call, Defendant Doran responded to a question about the adverse charge on Commercial Auto losses by stating that James River had "standard practices and procedures" around reserves, adding that "we're doing a deep dive every single quarter . . . And we are certainly watching it very carefully and very closely, especially around claims and further development and behavior of that." (*Id.* ¶ 364.)  In addition, Defendant Abram stated during the Company's April 30, 2020 earnings call that the Uber account runoff was "going well," as James River was "settling commercial auto claims at a rapid pace for amounts that are consistent with our held reserves," while Defendant Doran stated that the runoff was "performing well within our expectations." (*Id.* ¶ 62.)  And on a February 26, 2021 earnings call, Defendant D'Orazio described the Company's reserve process as involving a "'claims audit'" by the "'senior claims leadership team'" reviewing "'a healthy sampling of the open files,'" claiming he was "'comfortable'" with the Company's overall group reserve position as of Q1 2021. (*Id.* ¶ 352–53.)

However, James River's troubles stemming from the Uber contract fallout continued. Eighteen months after the Company placed the Uber contract into runoff following the contract's early termination, James River announced a new $170 million charge "'primarily driven'" by

4

Uber-related losses. (*Id.* ¶ 7.) This $170 million charge extinguished the Company's profit for the previous two years, accounting for over 50 percent of the Commercial Auto Division's $337 million net reserves. (*Id.*) Financial analysts calculated that the $170 million charge translated into the Company under-reserving each Uber-related claim by an average 40 percent. (*Id.*)

Seeking to halt the financial impact of the $170 million charge, James River simultaneously announced a dilutive secondary offering of stock, with a $31.00 offering price, a 34 percent discount on the previous trading day's closing price. (*Id.* ¶ 8.) Following the Company's announcement of the $170 million charge and dilutive secondary offering, James River's share price dropped over 26 percent in one trading day. (*Id.*) At the same time as the $170 million charge announcement, Defendant Frank D'Orazio (the Company's CEO) stated on May 5, 2021 that James River had "'meaningfully changed our actuarial methodology' because 'using only our own loss experience in our paid and incurred reserve projections rather than the array of inputs that we had used in prior quarters, and giving greater weight to incurred methods would give us a better and more conservative estimate of ultimate losses on this account.'" (*Id.* ¶ 9.) D'Orazio stated that "[w]e got it wrong" with respect to reserves. (*Id.*) The Company announced an additional Uber-related loss of $29.6 million on October 26, 2021, with James River's stock dropping more than 16 percent that day. (*Id.* ¶ 10.) Accordingly, over the course of the Class Period, James River's investors saw the Company lose over $450 million in shareholder market capitalization. (*Id.*)

Plaintiffs allege that during the Class Period, Defendants made fraudulent, material statements in the Company's regularly submitted financial disclosure statements. Specifically, Defendants represented in each 10-K form during the Class Period that the Company "'continually monitor[ed] reserves using new information'" and "'a variety of statistical

5

techniques and adjust'" reserve estimates "'as experience develops or new information becomes known'", including through "'individual case-basis valuations'" to set reserves. (*Id.* ¶ 119.) The 10-K forms also informed investors that "'every known claim ha[d] a specific case reserve established against it which management believes is adequate to resolve the claim and pay attendant expenses based on information available at the time.'" (*Id.*) The Company stated that its reserves were "reasonable" and "appropriate," and set in accordance with generally accepted accounting principles ("GAAP"). (*Id.* ¶¶ 235, 255–56, 266–67.) The Executive Defendants also signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley") attesting to the fact that, "to [their] knowledge," the SEC filings "fairly" presented, "in all material respects, the financial condition and results of operations of the Company." (*Id.* ¶ 368.) Plaintiffs allege that Defendants' compliance certifications with respect to GAAP and Sarbanes-Oxley constituted material misstatements. (*Id.* ¶¶ 235–43; 275–92; 305–06.)

To support their allegations that the above statements constituted fraud, Plaintiffs present the interview statements of fifteen former James River employees. These individuals all worked on the Company's Uber account, and several reported directly to the Company's senior management. (*Id.* ¶ 11.) Former claims examiners from this group of interviewees stated that "'there was no methodology for calculating reserves'", and that the reserve-setting process was "'willy nilly'" and generally based on a "gut feeling . . . we would guess." (*Id.* ¶ 12.) According to a former examiner for bodily injury claims who worked on the Uber account, James River used de minimis "placeholder" reserves that frequently were as little as $1.00, with about 65 percent of bodily injury reserves set at the $1.00 placeholder during this former examiner's first year with the Company. (*Id.* ¶ 13.) Relatedly, a former manager interviewed by Plaintiffs stated that the Company "put caps on reserves irrespective of the injuries," while another former

6

manager described James River's cap on reserves as putting the Company "'in a hole from the beginning with Uber.'" (*Id.*) An additional former manager described the corporate culture as "incredible," because he had "never worked in an environment where we bent the truth," as James River "put caps on reserves irrespective of the injuries." (*Id.*)

Additionally, former employees described the Company's persistent practice of deliberately overpaying on Uber claims "to avoid embarrassing Uber during litigation or at trial," with multiple claims examiners stating that James River would pay out over ten times the reasonable value of a claim (without increasing the reserve for the claim) "to appease Uber" and help the client "avoid any negative publicity." (*Id.* ¶ 14.) Former employees also stated the Company hired unqualified claims examiners, assigned them hundreds of claim files and failed to provide them with adequate training. (*Id.* ¶ 15.) Plaintiffs' interviewees stated that the claims department suffered from a high turnover rate, exacerbating the Company's "inability to properly process, reserve for, and settle the massive influx of Uber claims." (*Id.*)

Plaintiffs also leverage deposition testimony from three former James River employees and internal Company documents that arose in unrelated insurance bad faith litigation against the Company. *See Mark A. St. Amand v. James River Ins. Co., et al.*, Case No. 2:20–cv–01666 (D. Nev.) ("St. Amand") (asserting claims for breach of contract and breach of the covenant of good faith and fair dealing); (*Id.* ¶ 16). The *St. Amand* case concerned the Company's treatment of an Uber driver's car accident insurance claim that involved over $1 million in medical bills and additional charges related to months of lost wages. (SAC ¶ 16). In a deposition, James River's former Vice President of Claims, Anita Rogers, testified that, while she was the Company's designated employee for managing large-exposure Uber claims, "she could not 'recall' and did not 'know' of any policies or procedures to set, monitor, or adjust the reserves for Uber–related

7

claims during her entire eight-year tenure at the Company." (*Id.* ¶ 17.) Rogers also testified that she could not recall any training for claims examiners on how to set a reserve, and that, though she reported to the Company's c-suite of senior management, she did not receive training before handling claims files. (*Id.* ¶ 18.)

Other deponents in the *St. Amand* case testified that James River's senior executives intentionally kept reserves low. Two individuals who worked as claims managers during parts of the Class Period "testified that James River's reserving process was predicated entirely on keeping reserves artificially low, that employees received little to no training on reserving, and that the Company maintained no established policies or procedures for the setting, monitoring, or adjusting of reserves." (*Id.* ¶ 20.) Plaintiffs argue that without such policies or procedures, Defendants lacked any factual basis to represent to investors that claims had "specific" and "adequate" reserves that relied on "information available at the time," and therefore misled investors. (*Id.* ¶ 21.) For the Uber claim at issue in the *St. Amand* case, James River allegedly waited months to set any reserve for the claim, ultimately setting an initial reserve at a $2,500 level for an accident that had over $ 1 million in medical costs and then waiting over a year to increase the reserve, despite an injury report indicating that a "'significant'" reserve increase would be necessary. (*Id.* ¶ 22.)

Plaintiffs assert that "James River's most senior officers knew of the pervasive and fundamental deficiencies" in the Company's reserve process, as the Executive Defendants sat on the Reserve Committee that reviewed and approved loss reserves, and as they repeatedly told investors "that the Company's most senior officers were directly responsible for reviewing and establishing the Company's loss reserves," including conducting claims audits, receiving a "healthy sampling of the open files" and approving loss adjustment expenses. (*Id.* ¶ 24.)

8

Plaintiffs also point to interviews with former James River employees who described how reports on Uber–related reserves regularly went to James River Insurance's CEO, Richard Schmitzer. (*Id.*) Moreover, one quality assurance team employee described "focus audits on Uber reserves" that began in 2018 and showed that "most of the files were being under-reserved," with these audit results subsequently going to the "c-suite because the results were shared with Uber." (*Id.* ¶ 111.) The SAC contends that after the Company terminated the Uber contract in 2019, senior management implemented practices "to systematically suppress reserves across the entire Uber book" in what Plaintiffs allege was an attempt to keep reserves "as low as possible." (*Id.* ¶ 25.) Plaintiffs point to statements by the fifteen former employees they interviewed, along with testimony from the *St. Amand* litigation, that the Company required employees who sought reserve increases of $250,000 or more for Uber claims to elevate their requests to Schmitzer, "who routinely refused to approve such requests." (*Id.* ¶ 26.) The SAC alleges that senior executives implemented strict caps on — and in some cases removed — claims department personnel's authority to increase reserves on claims, requiring claims examiners to send all requests for reserve increases to a new "PLM" email portal secretly operated by Schmitzer, Anita Rogers and Courtenay Warren (another E&S Line claims senior executive). (*Id.*) Former employees stated that the Company instructed frontline claims handlers "to not mention the PLM system in their notes" so that subsequent denials of reserve increases had no documentation and thereby could not be discoverable in litigation. (*Id.*)

Relying on deposition testimony from the *St. Amand* litigation, Plaintiffs highlight that James River was allegedly seeking a sale of the Company while the alleged conduct concerning the Uber contract was ongoing. (*Id.* ¶ 27.) Plaintiffs argue that James River's interest in a sale spurred Defendants' "deliberate suppression of reserves" to obscure the extent of the Company's

Uber–related liabilities.  (*Id.*)  The SAC also points to "suspiciously timed" sales by Defendants

Bob Myron and Sarah Doran, who each sold between 21 percent and 25 percent of their James

River common stock holdings in the period between the cancellation of the Uber contract and the

Company's disclosure of a $170 million adverse charge primarily attributable to the Uber

contract.  (*Id.* ¶ 346.)  In Plaintiffs' view, these stock sales bolster an inference of scienter on the

part of Defendants, as Myron and Doran possessed material non–public information about the

Company's inadequate reserves.  (*Id.* ¶ 350.)

In sum, Plaintiffs allege that Defendants' "knowledge of James River's pervasive and

fundamental reserving deficiencies for the Uber policy, and their knowing failure to correct

them," resulted in material under-reserving of the Uber account and ultimately in the Company

incurring over $200 million in adverse charges.  (*Id.* ¶ 28.)  The revelations of the adverse

charges in turn precipitated a series of substantial drops in James River's value to shareholders:

the stock dropped nearly 23 percent on October 8, 2019 (the day the Company announced the

termination of the Uber contract); over 26 percent following the May 5, 2021 announcement of

the $170 million adverse charge from Uber; and over 16 percent on October 26, 2021 (when the

Company announced $29.6 million in further losses related to Uber) (*Id.* ¶¶ 4, 8, 10.)

      **B.**    **Procedural History**

           **1.**    **Motion to Dismiss Second Amended Complaint**

On July 9, 2021, Plaintiffs filed their Complaint (ECF No. 1), raising two counts for

relief based on the above allegations.  On August 5, 2021, the Court granted Defendants' Motion

for Extension of Time to Answer the Complaint.  (ECF No. 15.)  On November 19, 2021,

Plaintiffs filed their First Amended Complaint, adding Miami as a Lead Plaintiff.  (ECF No. 41.)

Before the Court ruled on Defendants' January 18, 2022 Motion to Dismiss the First Amended

Complaint (ECF No. 53), Plaintiffs filed a Notice of Intent to Amend the Complaint on July 13, 2022, stating that they discovered "new facts" that "only recently emerged, and were not known at the time" that Plaintiffs filed the First Amended Complaint. (ECF No. 63.)  In justifying their Intent to Amend the Complaint, Plaintiffs explained that this new information came to light from unrelated bad–faith litigation against Defendant James River's specialty insurance operating subsidiary (the "St. Amand litigation"). (ECF No. 65.)  The Court granted Plaintiffs' Motion to Amend on September 9, 2022. (ECF No. 68.)  Plaintiffs subsequently filed the SAC on August 25, 2022 (ECF No. 69).  Defendants filed the instant Motion to Dismiss the SAC with prejudice on October 24, 2022 (ECF No. 71), along with their Memorandum in Support (ECF No. 72).  On November 7, 2022, Plaintiffs filed their Opposition to the Motion to Dismiss the SAC (ECF No. 74), and on November 14, 2022, Defendants filed their Reply (ECF No. 75), rendering Defendants' Motion to Dismiss ripe for review.  On June 23, 2023, the Court reassigned the case to the undersigned in the interest of judicial efficiency. (ECF No. 80.)

## II.    STANDARD OF REVIEW

A motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of a complaint or counterclaim; it does not serve as the means by which a court will resolve factual contests, determine the merits of a claim or address potential defenses. *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992).  In considering a motion to dismiss, the Court accepts the plaintiff's well–pleaded allegations in the complaint as true and views the facts in the light most favorable to the plaintiff. *Mylan Lab'ys, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Under the Federal Rules of Civil Procedure, a complaint or counterclaim must state facts sufficient to "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests[.]'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). As the Supreme Court opined in *Twombly*, a complaint or counterclaim must state "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action," though the law does not require "detailed factual allegations." *Id.* (citations omitted). Ultimately, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," rendering the right "plausible on its face" rather than merely "conceivable." *Id.* at 555, 570. Thus, a complaint or counterclaim must assert facts that are more than "merely consistent with" the other party's liability. *Id.* at 557. The facts alleged must be sufficient to "state all the elements of [any] claim[s]." *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003) (citing *Dickson v. Microsoft Corp.*, 309 F.3d 193, 213 (4th Cir. 2002) and *Iodice v. United States*, 289 F.3d 270, 281 (4th Cir. 2002)). Federal Rule of Civil Procedure 9 normally governs the pleading standards in fraud cases, requiring that a party "state with particularity the circumstances constituting fraud or mistake," but "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

Additionally, plaintiffs bringing a securities fraud action must satisfy the PSLRA, whose heightened pleading standard requires that "any private securities complaint alleging that the defendants made a false or misleading statement must:  (1) 'specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading,'; and (2) 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Klein v. Altria Grp., Inc.*, 525 F. Supp. 3d 638, 656 (E.D. Va. 2021) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007)). And though

12

courts reviewing a 12(b)(6) motion usually "'take into account the set of facts that could be proved consistent with the allegations of a complaint, even though such facts have not been alleged in the complaint, the PSLRA modifies this scheme (1) by requiring a plaintiff to plead facts to state a claim and (2) by authorizing the court to assume that the plaintiff has indeed stated all of the facts upon which he bases his allegation of a misrepresentation or omission.'" *Klein*, 525 F. Supp. 3d at 656 (quoting *Teachers' Retirement Sys. of Louisiana v. Hunter*, 477 F.3d 162, 172 (4th Cir. 2007).

The Court will therefore accept all factual allegations in the SAC as true and consider the entire complaint and other sources that courts generally review for 12(b)(6) motions, including documents the complaint incorporates by reference, and "matters which are the proper subject of judicial notice." *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 473 (4th Cir. 2011) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007)).

### III.   ANALYSIS

Plaintiffs assert two causes of action: (1) one count against James River and Executive Defendants Myron, Abram, D'Orazio and Doran for violations of Section 10(b) of the Exchange Act and SEC Rule 10b–5; and (2) one count against Executive Defendants Myron, Abram, D'Orazio and Doran for violations of Section 20(a) of the Exchange Act. The Section 20(a) claims derive from the Section 10(b) claims and, therefore, the Court begins with the Section 10(b) claims.

#### A.   Section 10(b) and Rule 10b–5 Claims

Section 10(b) of the Exchange Act forbids the "use or employ, in connection with the purchase or sale of any security . . . , any manipulative or deceptive device or contrivance of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public

13

interest or the protection of investors." 15 U.S.C. § 78j(b).  SEC Rule 10b-5, promulgated under

§ 10(b), makes it unlawful:

> (a) To employ any device, scheme, or artifice to defraud;
> (b) To make any untrue statement of a material fact or to omit to state a material
> fact necessary in order to make the statements made, in the light of the
> circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would
> operate as a fraud or deceit upon any person, in connection with the purchase or
> sale of any security.

17 C.F.R. § 240.10b-5.  The Supreme Court has "implied a private cause of action from the text

and purpose of [Section] 10(b)" to parties that buy or sell securities and thereby suffer injury

from a violation of Section 10(b).  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37

(2011).

To state a Section 10(b) and Rule 10b–5 claim, plaintiffs must allege "(1) a material

misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the

misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the

misrepresentation or omission; (5) economic loss; and (6) loss causation."  *Id*. at 37–38.

Defendants contend that Plaintiffs have failed to adequately plead three of these

elements:  (1) an actionable misrepresentation or omission, (2) scienter and (3) loss causation.

The Court will examine each in turn.

### 1.    Material Misrepresentation or Omission

"To prevail on a [Section] 10(b) claim, a plaintiff must show that the defendant made a

statement that was 'misleading as to a material fact.'"  *Matrixx Initiatives*, 563 U.S. at 38

(quoting *Basic, Inc. v. Levinson*, 485 U.S. 224, 238 (1988)).  Complaints basing claims on

alleged misrepresentations or omissions must "specify each statement alleged to have been

misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding

the statement or omission is made on information and belief, the complaint shall state with

particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b). However, "it is not

enough that a statement is false or incomplete, if the misrepresented fact is otherwise

insignificant." *Basic*, 485 U.S. at 238. The Supreme Court has held that a statement satisfies the

materiality requirement when there exists "a substantial likelihood that the disclosure of the

omitted fact would have been viewed by the reasonable investor as having significantly altered

the 'total mix' of information available." 485 U.S. at 231–32. "Materiality is an objective

concept, involving the significance of an omitted or misrepresented fact to a reasonable

investor." *Longman v. Food Lion, Inc.*, 197 F.3d 675, 682–83 (4th Cir. 1999).

> The Fourth Circuit assesses materiality using the following standard:
>
> [A] fact stated or omitted is material if there is a substantial likelihood that a
> reasonable purchaser or seller of a security (1) would consider the fact important
> in determining whether to buy or sell the security or (2) would have viewed the
> total mix of information made available to be significantly altered by disclosure of
> the fact.

*Id.* at 683. Of course, Section 10(b) and Rule 10b–5 "do not create an affirmative duty to

disclose any and all material information." *Singer v. Reali*, 883 F.3d 425, 440 (2018). However,

"disclosure of material information is required when necessary to make statements made, in light

of the circumstances in which they were made, not misleading." *Id.* "Indeed, 'failure to disclose

negative information about the products at issue can create a misleading impression to investors

about the success of the company.'" *Klein*, 525 F. Supp. 3d at 659 (citing *Kiken v. Lumber*

*Liquidators Holdings, Inc.*, 155 F. Supp. 3d 593, 604 (E.D. Va. 2015)).

Plaintiffs argue that they satisfy the actionable misrepresentation prong of a Section 10(b)

and Rule 10b–5 claim, because Defendants allegedly misrepresented their reserves as well as the

reserve-setting process itself. In their instant Motion, Defendants counter with three principal

objections, which the Court addresses below:  (1) the alleged misstatements constitute inactionable statements of opinion (Mem. in Supp. of Defendants' Mot. to Dismiss ("Def.'s Mem.") at 13) (ECF No. 72); (2) Plaintiffs improperly plead "fraud by hindsight" (*id.* at 20); and (3) many challenged statements qualify for protection under the PSLRA's safe-harbor provision for inactionable forward-looking statements (*id.* at 22).

### a.    Statements of Opinion

Defendants first argue that the alleged misstatements regarding James River's underreported reserves constitute inactionable statements of opinion, citing *Nolte v. Cap. One Fin. Corp.*, 390 F.3d 311, 315–16 (4th Cir. 2004), for the proposition that reserve estimates constitute statements of opinion.  (Def.'s Mem., at 13.)  If misstatements qualify as opinions, Defendants only face liability if the opinions reflect "'embedded'" false facts or omit material facts "'that cannot be squared.'"  *Boykin v. K12, Inc.*, 54 F.4th 175, 183 (4th Cir. 2022) (citing *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 184–85, 191 (2015)).  Plaintiffs counter that James River's underreported reserves constitute misstatements of facts, rather than opinions, because the reserve estimates arose from a "process" the Company failed to follow, and because Defendants "knew that, even if followed, the reserve process was based on erroneous inputs."  (Mem. of Law in Opp. to Defendants' Motion to Dismiss ("Pl.'s Mem.") at 17–18 (ECF No. 74) (citing *Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*, 363 F. Supp. 3d 476, 496–97 (D. Del. 2019), which found that reported reserves did not constitute opinions, because "systemic" reserve policies resulted in the disclosed dollar amounts being "artificially understated").)

Plaintiffs point to James River's reported reserves as misstatements of fact, along with Defendants' statements that the Company's loss reserve estimates were "reasonable," that "every

16

known claim has a specific case reserve . . . which management believes is adequate . . . based on information available at the time," and that the Company seeks to "estimate the amount of future obligations, especially reserves for losses and loss adjustment expenses, in a consistent and appropriate fashion." (SAC ¶¶ 246–47, 255–56, 266–67.) Plaintiffs also fault Defendants for statements about the reserve-setting process, including that the reserve statements drew from "past experience" and "historically well-informed judgment," alleging that the Company's actual methodology "minimized past loss experience and disregarded known facts on claims." (Pl.'s Mem. at 18, summarizing SAC ¶¶186–87, 192.)

For false statements, especially those future–looking regarding "contingent or speculative information or events, materiality will depend upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity." *Hillson Partners Ltd. P'ship v. Adage, Inc.*, 42 F.3d 204, 209 (4th Cir. 1994) (cleaned up). Therefore, materiality "is a fact–specific inquiry." *Basic*, 485 U.S. at 240. Though "the line between opinion and fact is not invariably clear, opinion is subject to reasonable disputation in a way that a false statement of fact is not." *Boykin*, 54 F.4th at 183. Mere business "puffery," for example, lacks the materiality essential to a securities fraud allegation. *Howard v. Haddad*, 962 F.2d 328, 331 (4th Cir. 1992). Statements relating to strong finances and future developments, such as "healthy growth," "achieving our objectives" and "competitive advantages" constitute paradigmatic examples of non–material business puffery, which cannot be actionable under securities laws. *In re Cable & Wireless, PLC*, 321 F. Supp. 2d 749, 767–68 (E.D. Va. 2004). However, in some contexts "when [puffery] is both factual and material, it may be actionable." *Longman*, 197 F.3d at 683. The Fourth Circuit has distinguished between "allegedly false predictions [which] are not material," and "expressions of

17

belief or opinion concerning *current* facts" which may be material. *Raab v. Gen. Physics Corp.*, 4 F.3d 286, 290 (4th Cir. 1993). And this Court has found that where "particularized and current representations" about a business' operations "constitute more than a 'rosy affirmation' or optimistic future projection," such statements qualify as actionable. *SS Richmond LLC v. Harrison*, 2022 WL 16835870, at *11 (E.D. Va. Nov. 9, 2022).Applying *Boykin*, Executive Defendants' statements expressing a *belief* that reserve estimates were "reasonable" and "adequate" hew closer to an opinion. *Compare Boykin*, 54 F.4th at 183–84 (describing opinions as often containing prefatory "we believe" or "I think" phrasing) *with In re Marriott International, Inc.*, 31 F.4th 898, 902 n.1 (4th Cir. 2022) (concluding that defendant company's "statement that data security was 'critically important' to it . . . amounts to little more than puffery"). Courts expect that reasonable investors should understand statements of personal belief in their full context. *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 322 (4th Cir. 2019). But as the Fourth Circuit noted in *Boykin*, opinions can still be actionable where they reflect "embedded" false facts or omit material facts "that cannot be squared." *Id.* (citing *Omnicare*, 575 U.S. at 184–85, 191). Accordingly, to determine whether Defendants' statements of opinion that reserves were "reasonable" and "adequate," the Court examines whether Plaintiffs have plausibly alleged that these statements contained "embedded" false facts or omitted irreconcilable, material facts.

The Court finds that Plaintiffs have done so here. Leveraging interviews with former employees and the *St. Amand* litigation testimony, the SAC alleges that while Defendants grounded their statements of opinion about the Company's reserves on "historically well-informed judgment," (SAC ¶¶ 60, 352, 363), along with "past experience," (SAC ¶¶ 119, 245), James River in fact "had no reserve methodology except to keep reserves low," (SAC ¶¶ 76–78);

lacked policies or procedures for untrained handlers for claims from the Company's largest client account (Uber), (SAC ¶¶ 119–35); systemically under-reserved Uber claims by capping the claims and refusing to increase them based on new information, (SAC ¶¶ 79–88); and consistently overpaid on Uber claims expressly to avoid embarrassing the Company's most important client, (SAC ¶¶ 89–92). The pattern of systemic, purposeful under-reserving that Plaintiffs allege "cannot be squared" with Defendants' stated opinions that reserves qualified as "reasonable" and "adequate," thereby making those statements of opinion actionable. *Boykin*, 54 F.4th at 183; *see also In re Genworth Fin. Inc. Sec. Litig.*, 103 F. Supp. 3d 759, 776–77 (E.D. Va. 2015) (finding that while statements about the adequacy of reserves constituted statements of opinion, they nonetheless were actionable, as plaintiffs plausibly pled that insurance executives knew that figures used to calculate the company's reserves relied on outdated data). And unlike in *Boykin*, where the defendant company's upbeat opinion of its future performance in a relevant 10-K filing corresponded with "ample disclosures" in the filing, 54 F.4th at 184, Defendants did not disclose the alleged systemic suppression of Uber reserves to investors at the time that they made the relevant statements of opinion.[1]

In their reply, Defendants point out that under *Omnicare*, liability cannot attach to such alleged misstatements unless the speakers know of the factual *omissions* when they made the statements at issue. (Defendants' Reply Br. in Further Supp. of Their Mot. to Dismiss ("Def.'s Reply Br.") at 5–6 (ECF No. 75) (citing *Omnicare*, 575 U.S. at 189).) In Defendants' telling, "Plaintiffs have failed to meet their burden to identify allegedly omitted facts known to any speaker with specificity." (Def.'s Reply Br. at 6.) The Court thus examines what the SAC

---

[1]     The Court addresses the disclosures that Defendants *did* make in the Court's discussion of Defendants' safe-harbor provision defense *infra*.

plausibly contends that Defendants *knew* of the alleged material facts that "cannot be squared" with their statements of opinion regarding James River possessing "adequate" and "reasonable" reserves. Plaintiffs make much of Defendant D'Orazio's statements on the May 5, 2021 analyst call that James River "got it wrong" with respect to the reserve process and that the Company had since "meaningfully changed our actuarial methodology" in a manner that was "significant." (SAC ¶¶ 67–68.) The Court agrees with Defendants that this specific piece of evidence, by itself, fails to indicate how and whether Defendants did not believe their earlier estimates. *See, e.g., Woolgar v. Kingstone Cos., Inc.*, 477 F. Supp. 3d 193, 225 (S.D.N.Y. 2020) (a later revision of reserve estimates, standing alone, cannot serve as a reasonable basis for concluding that defendants did not actually believe prior reserves qualified as adequate).

The SAC, however, does more. Plaintiffs highlight that the Company's disclosure filings informed investors of Executive Defendants' personal involvement in reviewing and approving the Company's reserves for losses and adjustment expenses, with the Reserve Committee including, at various times in the Class Period, Defendants Myron, Abram, D'Orazio and Doran. (SAC ¶¶ 308–10.) In addition, the Company's 10-K forms described the Reserve Committee as "continually" monitoring reserves "using new information on reported claims and a variety of statistical techniques" and stated that the group adjusted its estimates "as experience develops or new information becomes known." (*Id.* ¶ 311.) The SAC further includes Abram's November 2019 statement that "[w]e look at the actual case reserves" and make "a historically well-informed judgment," (*id.* ¶ 363); Doran's statement (made on the same earnings call) that the Company examined its Commercial Auto book "with monthly actuarial data and then we're doing a deep dive every single quarter," (*id.* ¶ 364); and Plaintiffs' interview with a former James River employee who stated that Uber reserve audit reports — which showed systemic under-

reserving of Uber claims — went to the Company's "c-suite" of senior executives, including the Company's president, (*id.* ¶ 110–11.)

While each of the Executive Defendants' statements that they closely examined the reserves and made historically informed judgments do not individually establish that Defendants lacked an actual *belief* in the reserve estimates' accuracy when they made the challenged statements, they give weight to Plaintiffs' contention of Defendants' heavy involvement with the reserve-setting process. Evaluated in conjunction with the former James River employee's statements that the "c-suite" received audit reports showing under-reserving of Uber claims, (SAC ¶ 111),[2] *and* with the SAC's allegations from former employees that the Company systemically and purposely under-reserved Uber claims (the Company's largest client account) while lacking formal policies or trainings for unqualified claims examiners, the SAC presents a deeper picture of Defendants' alleged "actual or constructive knowledge" of James River's reserving problems during the Class Period. *Genworth*, 103 F. Supp. 3d at 777. Indeed, the 10-K statements that the Reserve Committee "continually" monitored reserves "using new information" implicates the senior managers, including the Executive Defendants who sat on this committee, in "concrete, present–tense" claims made to assure investors of the Company's

---

[2]     The SAC does not define who belonged to James River's "c-suite." However, the term is a commonly used moniker for the highest tier of executives in a company. *See, e.g.,* CFI Education Inc., *What is the C-Suite?* (January 24, 2021), https://perma.cc/9WN5-ADKQ ("The C-suite, also called the C-level, is used to categorize the most senior executives of an organization. C-suite comes from the titles of top executives, which typically start with the letter 'C.'"); Boris Groysberg, et al., *The New Path to the C-Suite*, Harv. Bus. Rev. (March 2011) (available at https://perma.cc/75XH-KE5Z) (listing seven "C-level jobs" within a company's "C-suite" as "CIO, chief marketing and sales officer, **CFO**, general counsel, chief supply-chain-management officer, chief human resource officer, and **CEO**") (emphasis added). All Executive Defendants served as either the CEO or the CFO of the Company. The SAC therefore plausibly alleges that they belonged to James River's "c-suite" for purposes of receiving the audit reports indicating under-reserving of Uber claims.

position. *SS Richmond LLC*, 2022 WL 16835870, at \*11. Defendants' argument that the Court should dismiss the SAC on grounds that the challenged statements constitute inactionable opinions therefore do not pass muster at this stage of the litigation, as the relevant statements support Plaintiffs' contention that Defendants "knew, or were reckless in not knowing, that the Company . . . was understating its reserves by material amounts and inflating [James River's] earnings." *Genworth*, 103 F. Supp. 3d at 777.

In addition to faulting Defendants' statements about the reserves' adequacy and the reserve-setting process, Plaintiffs further contend that the Company's publicly reported reserves themselves qualify as material misstatements, because they arose from Defendants' failure to adhere to a stated methodology. (Pl.'s Mem. at 17, citing *Underland v. Alter*, 2011 WL 4017908, at \*9 (E.D. Pa. Sept. 9, 2011)). Defendants disagree, citing *Nolte*, 390 F.3d at 315–16, where the Fourth Circuit held that corporate executives' statements that a bank possessed sufficient loss reserves constituted opinions. (Def.'s Reply Br. at 3.) But in *Nolte*, the court examined "positive public remarks about [the bank's] capitalization" and noted that the shareholders in that suit "allege that [the bank's] management lied to investors when it *opined* that [the bank] maintained sufficient capital and loan loss reserves." *Nolte*, 390 F.3d at 315–16 (emphasis added). Defendants therefore do not demonstrate that the Fourth Circuit has determined that publicly reported, mathematical reserve estimates themselves always qualify as opinions. As the Parties disagree over whether these calculated reserves sprung from "erroneous inputs" (Pl.'s Mem. at 18) and/or a process that the Company failed to follow and misrepresented to investors, the Court declines to resolve this factual question at the current stage of the litigation. *Genworth*, 103 F. Supp. 3d at 776. And to the extent that reserve estimates *do*

constitute opinions under *Boykin*, Plaintiffs have plausibly alleged that they still qualify as actionable, as explained *infra*.

Defendants also argue the SAC fatally blurs the distinction between loss reserves (for Uber policies overall) and case reserves (set aside for individual claims), rejecting Plaintiffs' reliance on former employees' opinions about individual claims. (Def.'s Mem. at 14.) Plaintiffs counter by drawing attention to the James River SEC filings' explanation that the Company incorporated "individual case-basis valuations" into the overall loss reserves, as well as Executive Defendants' statements that senior management conducted a quarterly "deep dive" into reserves, "especially around claims," and that reserve-setting began by "look[ing] at the actual case reserves." (Pl.'s Mem. at 13.) Accepting all factual allegations in the SAC as true when evaluating a motion to dismiss, the Court refrains from engaging "in a factual dispute at this stage of the litigation regarding how [James River] calculated its reserves." *Genworth*, 103 F. Supp. 3d at 776. Because Plaintiffs have alleged that — partially based on Defendants' own statements — individual case reserves served as the basis for the Company's overall loss reserves, the Court declines to dismiss the case at this stage by nitpicking the Parties' factual dispute regarding the exact ways in which James River incorporated case reserves into loss reserves.

### b.    "Fraud by Hindsight"

Defendants next argue that Plaintiffs' SAC fails to plead misrepresentation, because Plaintiffs rely on a theory of "fraud by hindsight" by alleging that "Defendants' statements *must have been* false, simply because the Company's results were ultimately worse than expected." (Def.'s Mem., at 20, citing *Tchrs.' Ret. Sys. of LA v. Hunter*, 477 F.3d 162, 183 (4th Cir. 2007) (rejecting a "fraud by hindsight" theory and affirming dismissal for failing to allege falsity)

(emphasis in the original).) The Fourth Circuit has recently reiterated that plaintiffs cannot plead "fraud by hindsight." *Boykin*, 54 F.4th at 185. At the same time, courts "must be cautious" about dismissing a case due to "fraud by hindsight," given that doing so results in ending the litigation without additional fact development. *Ollila v. Babcock & Wilson Enterprises, Inc.*, 2018 WL 792069, at \*4 (W.D.N.C. Feb. 8, 2018) (citing *Genworth*, 103 F. Supp. 3d at 777, and finding that plaintiffs plausibly alleged statements' misleading nature "due to then-existing material facts that contradicted such statements," including that "defendants stated that a 'strong backlog' was providing momentum and growth going forward, but plaintiff alleges defendants were aware of significant, undisclosed problems and delays").

Here, Defendants argue that the Company's statements from its 10-K forms in the Class Period "that it monitored reserves, estimated losses for each individual claim, and based those estimates in part on historical information" cannot serve as the basis for misrepresentation, as "the Company never represented that it only used its own historical data to set reserves." (Def.'s Mem., at 20.) Indeed, the Company's disclosure forms noted that James River used its own data and "industry data" for reserving practices. (ECF Nos. 73–2 at 71, 73–10 at 72, 73–18 at 75). In Defendants' telling, the Company's May 2021 announcement that it would place more weight on its own loss data in relation to other factors that previously accorded greater weight does not mean the Company's earlier descriptions of its reserves approach were knowingly false. *Id.*

But the SAC does more. Instead, Plaintiffs leverage testimony from the *St. Amand* litigation to note that multiple James River employees in managerial roles, including Ingrid Slaughter (James River's former Assistant Director of Litigated Claims and a lead employee on the Uber account) and Brianna Belcher (Claims Manager and Litigation Claims Adjuster and an employee who worked on the Uber account), testified that "senior management knew of systemic

under-reserving and enforced the policies." (Pl.'s Mem. at 16.)[3]  The SAC also points to *St. Amand* litigation testimony from the Company's former VP of Claims that she was not aware of any "policies and procedures in place that were used on how to set a reserve," including but not limited to Uber–related claims. (SAC ¶¶ 121–22.)  Furthermore, a former employee interviewed by Plaintiffs stated that audit reports showing the systemic under-reserving of Uber claims went to the Company's "c-suite" of senior executives, reinforcing Defendants' own statements that "senior management" specifically "reviewed" and "monitored" case reserves, at least quarterly, as part of the "Reserve Committee." (*Id.* ¶¶ 106–07, 109–11.)

Accordingly, Plaintiffs go beyond simply laying out the prior reserve estimates; they allege that Defendants received information regarding the reserve process and policies (or lack thereof), including audit reports indicating the systemic under-reserving of Uber claims, thereby illustrating "why, given [their] possession of this information, [Defendants'] statements about the adequacy of [James River's] reserves were misleading." *Genworth*, 103 F. Supp. 3d at 777. Where Plaintiffs' allegations "set forth in very clear and specific terms" such information, they do not assert "fraud by hindsight." *Id.* And though Defendants make much of the fact that the SAC's audit report descriptions do not specify which James River executives received those reports, (Def.'s Reply Br. at 6 n.3), the SAC details that multiple Executive Defendants themselves previously emphasized their familiarity with the reserves process in remarks to

---

[3]      For instance, the SAC highlights testimony from Slaughter and Belcher regarding James River's alleged efforts to under-reserve following the early termination of the Uber contract: "Belcher explained that *any* request for a reserve increase to $250,000 or more now had to be approved by James River's CEO," while both employees testified that "these requests were routinely refused." (SAC ¶ 137.)  What's more, both employees testified that, among other practices, all requests to increase reserves above a newly lowered level "were required to be routed through a new and secret PLM email portal" controlled by Anita Rogers (James River's former VP of Claims) and Courtenay Warren (another E&S Line claims senior executive). *Id.*

investors:  Defendant Doran referred in the November 2019 earnings call to senior management making a quarterly reserves "deep dive . . . especially around claims", while Defendant Abram described the mechanics of the reserve process as beginning with "look[ing] at the actual case reserves."  (SAC ¶ 352.)  Defendants' attack on Plaintiffs' allegations as "fraud by hindsight" does not persuade the Court.

<b>c.      Statements regarding GAAP and Sarbanes-Oxley</b>

Defendants also take issue with Plaintiffs' allegations that the Company violated GAAP and Sarbanes-Oxley, pointing out that Accounting Standard Codification ("ASC") 944–40–30–1 specifies that companies should comply with GAAP by "using past experience adjusted for current trends, and any other factors that would modify past experience."  (Def.'s Mem. at 21.) In Defendants' view, companies' ability under GAAP to use factors *beyond* historical experience means that Plaintiffs fail to plausibly plead that James River's statements about GAAP compliance, (SAC ¶¶ 235, 273), were false or misleading.  (Def.'s Mem. at 21.)  In response, Plaintiffs characterize past experience settling similar claims as the "primary" data point that GAAP required James River to use to reasonably estimate loss reserves.  (Pl.'s Mem. at 19.)

The PSLRA pleading standards "are heightened for allegations of GAAP violations," because "GAAP is a term of art encompassing a wide range of acceptable procedures." *Genworth*, 103 F. Supp. 3d at 780 (citing *Smith v. Circuit City Stores, Inc.*, 286 F. Supp. 2d 707, 719 (E.D. Va. 2003)).  This heightened standard requires that Plaintiffs must plead facts that demonstrate the application of a specific accounting principle to the relevant conduct.  *Id.*  The Court agrees with Defendants that Plaintiffs have not adequately established why James River needed to use its historical data as the "primary" input to calculate reserves, and as Defendants note, Plaintiffs fail to cite any caselaw for their proposition.  (Def.'s Reply Br. at 13 n.6.); *see*

26

*Genworth*, 103 F. Supp. 3d at 780 (rejecting as "conclusory" plaintiffs' contention that a GAAP rule's requirement of "regular" estimate evaluations equated to a need for "frequent" evaluations).

Nonetheless, "GAAP requires 'liability for unpaid claims' to be 'adjusted for current trends,' ASC 944–40–30–1, and insurance entities must 'adjust the additional liability balance' to account for 'other evidence [which] suggests that earlier assumptions should be revised,' ASC–944–40–35–9." *Genworth*, 103 F. Supp. 3d at 781 (holding that plaintiffs plausibly pled a GAAP–related claim related to ASC 944–40–30–1 and ASC–944–40–35–9 where defendant insurance company "relied on 'old data not reflective of current reality'"); *see also In re MicroStrategy, Inc. Sec. Litig.*, 115 F.Supp. 2d 620, 636–37 (E.D.Va. 2000) (finding that "pervasiveness" of alleged GAAP violations supported securities fraud allegations, as "common sense and logic dictate that the greater the magnitude of a restatement or violation of GAAP, the more likely it is that such a restatement or violation was made consciously or recklessly").

Here, Plaintiffs plausibly allege that after a pattern of significantly higher losses from Uber–related claims, the Company "kept its reserves artificially low from the moment a claim was filed and then refused to increase those reserves based on its past loss experience with similar claims." (SAC ¶ 281.) And as with *Genworth*, Plaintiffs provide tables listing the reported amounts and adjusted amounts for specific financial measures, including losses and loss adjustment expenses, pretax income, net income and basic earnings per share, and therefore "illustrate the approximate amount by which [James River] allegedly materially misstated key financial figures during the Class Period." *Genworth*, 103 F. Supp. 3d at 781; (SAC ¶¶ 224–34). Accepting Plaintiffs' factual allegations as true and drawing all reasonable inferences in their favor, the Court finds that the SAC plausibly alleges Defendants' reliance on data "not reflective

27

of current reality," and by extension demonstrate why ASC 944–40–30–1 applies. *Genworth*, 103 F. Supp. 3d at 781.

Defendants cite *In re PEC Sols., Inc. Sec. Litig.*, 418 F.3d 379, 389 (4th Cir. 2005) for the proposition that alleging GAAP violations simply piggybacks on Plaintiffs' other inadequate theories. But *In re PEC Sols.* dealt with conclusory allegations that defendants' misapplication of accounting principles, *on their own*, pointed to an inference of scienter, a premise that the Fourth Circuit rejected. 418 F.3d at 389. Furthermore, scienter constitutes a separate pillar of a Section 10(b) and Rule 10b–5 claim. *Matrixx Initiatives*, 563 U.S. at 37–38. And with respect to the material misrepresentation prong, Plaintiffs allege that while Defendants represented in their 10-Ks throughout the Class Period that James River's reserve estimates "are based on historical information" and that "[t]he procedures we use to estimate loss reserves assume that past experience . . . is an appropriate basis for predicting future events," (SAC ¶ 279), Defendants actually "had no reserve methodology except to keep reserves low," (*Id.* ¶ 282).

Indeed, the SAC alleges that, among other practices to systemically keep reserves low, "James River directed its claims adjusters to stay within well–defined reserve limits, regardless of new facts impacting the expected claims exposure." (*Id.*) As with *Genworth*, where the utter failure to incorporate new experience weighed in favor of a GAAP violation, 103 F. Supp. 3d at 781, Plaintiffs have plausibly alleged that Defendants' GAAP certifications constituted an actionable misstatement.

Defendants also contend that Plaintiffs have failed to plausibly allege that Defendants falsely certified internal controls to comply with Sarbanes-Oxley, arguing that Plaintiffs "simply rely upon the fact that the Company later adjusted its reserve methodology and irrelevant [former employee] accounts" and therefore do not plausibly show that Defendants' internal control

certifications were false when made. (Def.'s Mem. at 22.) Defendants cite the Fourth Circuit's observation that certifying financial statements for Sarbanes-Oxley compliance "does not provide any 'independent support' for the inference that Defendants knowingly engaged in wrongdoing." (*Id.*, citing *Cozzarelli v. Inspire Pharms., Inc.*, 549 F. 3d 618, 628 n.2 (4th Cir. 2008).) In response, Plaintiffs distinguish their SAC from *Cozzarelli* by arguing that they do not rely "on the bare allegation" that Defendants lied on their Sarbanes-Oxley certification. (Pl.'s Mem. at 22 n.17.) Rather, Plaintiffs contend, Defendants' reporting of reserves that they calculated in violation of GAAP offers a basis for concluding that Defendants falsely certified the reliability of their internal controls. (Pl.'s Mem. at 20 n.16.)

Central to the parties' internal controls dispute lies the question of whether independent auditor certification of the Company's internal controls matters at the motion to dismiss stage. Defendants assert that independent auditors' conclusion that James River's internal controls were effective and that reserve estimates were reasonable "is highly probative and may be considered" at the motion to dismiss stage. (Def.'s Reply Br. at 14 n.7, citing *Smith*, 286 F. Supp. 2d at 719 (dismissing allegations of accounting fraud under the PSLRA where plaintiffs failed to challenge independent auditors' opinion that a company's financial statements complied with GAAP), and this Court's opinion in *In re PEC Sols. Secs. Litig.*, 2004 WL 1854202, at *12 (E.D. Va. May 25, 2004) (same).) Plaintiffs argue that auditor signoff does not factor into this stage of the litigation, citing *In re New Oriental Educ. & Tech. Grp. Sec. Litig.*, 988 F. Supp. 2d 406, 426 (S.D.N.Y. 2013) (concluding that at the motion to dismiss stage, "there is no way to determine what disclosures were made to the auditors and what considerations led the auditors to certify the financial statements," so "reliance on an independent accountant cannot completely absolve the defendants").

Courts in this District have held that the failure to challenge independent auditors'

conclusions regarding a company's financial statements weakens allegations that defendants

violated GAAP. *Smith*, 286 F. Supp. 2d at 719. Plaintiffs' citation to an out-of-circuit district

court opinion suggesting the contrary therefore does not persuade the Court to wholly disregard

independent auditor signoff at the motion to dismiss stage. However, while "the mere

misapplication of accounting principles by an independent auditor does not establish scienter," *In*

*re PEC Sols.*, 418 F.3d at 389, certain "egregious GAAP violations" may help a securities fraud

complaint survive at the motion to dismiss stage. *Id.* at 389–90 (A "'plaintiff must also allege

facts tending to show that . . . no reasonable accountant would have made the same decisions if

confronted with the same facts . . . In other words . . . a plaintiff must allege other facts

indicating that the *nature* of those violations was such that scienter is properly inferred'").

Here, as explained above, Plaintiffs go beyond conclusory allegations that Defendants

violated GAAP or maintained inadequate internal controls. Instead, Plaintiffs leverage

interviews with the former claims adjusters and claims managers, along with the *St. Amand*

litigation testimony, to allege that, among other practices, James River systematically kept

reserves for the Uber account low, refused to update reserves based on new information,

continually overpaid on Uber claims and knowingly hired claims adjusters with no experience.

(SAC ¶ 180.) The systemic pattern of under-reserving that Plaintiffs allege goes to the *nature* of

the GAAP violations, rather than simply stating that Defendants did not follow adequate

procedures. In their Reply, Defendants argue that "Plaintiffs offer no allegations regarding [the]

internal controls or that Defendants did not believe that their certifications were accurate," citing

*In re Braskem S.A. Secs. Litig.*, 246 F. Supp. 3d 731, 757–58 (S.D.N.Y. 2017). (Def.'s Reply Br.

at 14.) But *In re Braskem* featured a distinguishable situation: there, plaintiffs' complaint lacked

"any concrete factual allegations" that the company in question "had deficient internal controls governing its financial reporting" or, for that matter, that the financial reports themselves "were in any way inaccurate." 246 F. Supp. 3d at 758.

By contrast, the SAC contains concrete factual allegations regarding James River's internal controls (or alleged lack thereof) and financial reporting problems. Slaughter (James River's former Assistant Director of Litigated Claims) and Belcher (Claims Manager and Litigation Claims Adjuster) testified that the Company "routinely refused" reserve increase requests (SAC ¶ 137) and opened a secret email portal to suppress documentation of reserve increase denials (*id.* ¶ 340), while former employees stated that James River lacked policies or procedures for claims handlers and supervisors for Uber–related claims (the Company's largest client during the Class Period) (*Id.* ¶¶ 119–35). Accordingly, though the independent auditors' assessment somewhat bolsters Defendants' position, 286 F. Supp. 2d at 719, Plaintiffs allege facts tending to show the systemic nature of internal control violations. *In re PEC Sols.*, 418 F.3d at 389–90. Auditor signoff is thus not dispositive here.

### d.    Safe Harbor Provision

Defendants next argue that many of the SAC's challenged statements qualify as forward-looking statements which the PSLRA's "safe harbor" provision shields as inactionable. (Def.'s Mem. at 22.) The "safe harbor" provision, 15 U.S.C. § 78u-5(c), protects certain forward-looking statements, such as certain projections of "future economic performance," made with "meaningful cautionary language and without actual knowledge of falsity." *Boykin*, 54 F.4th at 184. Other protected statements include "plans and objectives for future operations" and "assumptions underlying statements about future financial, economic or operational performance," including a company's statement that the business anticipates "preliminary

positive trend[s]" to "continue." *Employees' Ret. Sys. of the City of Baton Rouge & Par. of E. Baton Rouge v. MacroGenics, Inc.*, 61 F.4th 369, 389 (4th Cir. 2023). While the safe harbor provision does not extend to assertions of present fact, certain present–tense phrases (such as "are on track" or that a likely change in market dynamics "positions us well") can still qualify as forward-looking. *Boykin*, 54 F.4th at 184.

This Court has determined, however, that where a complaint presented adequate evidence that defendants knew that an insurance company used outdated data to calculate its claim reserves, a question of fact existed as to whether meaningful cautionary language accompanied the company's statements regarding its *future* reserves. *Genworth*, 103 F. Supp. 3d at 789–90. In *Genworth*, the Court examined several "mixed present/future" statements, including defendants' representations that "reserves are adequate" and that "Genworth holds more than adequate reserves to satisfy policyholder claims." *Id.* at 788. After first concluding that the safe harbor provision does not protect such mixed statements to the extent that they refer to *present* facts, the Court then held that to the extent plaintiffs alleged that the adequacy-of-reserves comments related to *future* events, the statements qualified as forward-looking. *Id.* at 789.

But the Court's safe-harbor analysis did not end there. Rather, the Court assessed whether "meaningful cautionary language" accompanied these forward-looking statements, finding that because plaintiffs adequately alleged that the company's risk disclosures (1) failed to warn investors that the company used "stale" data, (2) did not conduct a reserve review the company had "touted" and (3) knowingly did not incorporate important new data about the average duration of claims, a question of fact existed regarding whether defendants knew whether the "potential" identified risks had already occurred. *Id.* at 790. Accordingly, the Court denied defendants' motion to dismiss with respect to these statements. *Id.* at 790–91.

Here, Defendants argue that since many of the statements at issue in the SAC relate to the adequacy of James River's reserves, they are forward-looking, because they forecast whether the Company's reserves will adequately cover future losses. (Def.'s Mem. at 22–24, citing *Marsh Grp. v. Prime Retail, Inc.*, 46 F. App'x 140, 146 (4th Cir. 2002).) In *Marsh*, the Fourth Circuit held that projections of dividends, including company executives' expressions of "commitment" to paying future dividends, related to "future economic performance" and therefore fell under the PSLRA's safe harbor. 46 F. App'x at 146–47; *see also Malone v. Microdyne Corp.*, 26 F.3d 471, 479–80 (4th Cir.1994) (holding that statement of "comfort" with analysts' earnings estimates was immaterial, forward-looking statement). Plaintiffs counter that Defendants' statements that James River's reserves "are reasonable" and touting "the progress we are making in the run–off" do not qualify as forward-looking, because they relate to the Company's present financial state. (Pl.'s Mem. at 21.)

Plaintiffs' focus on Defendants' present-tense phrasing mischaracterizes the safe-harbor provision as construed by the Fourth Circuit, which noted in *Marsh* that "[a]ll projections can be characterized as presently held beliefs." *Marsh*, 46 F. App'x at 146. As Defendants correctly point out, statements about the adequacy of James River's reserves relate to the adequacy of the Company's protection against *future* losses. (Def.'s Reply Br. at 14); *see also Hillson*, 42 F.3d at 213 (statements that a project was "on schedule" and "on track" for increased earnings were future-looking). But this question concerns insurance reserves, which this Court already found in that case to be mixed present/future statements. *Genworth*, 103 F. Supp. 3d at 788. The statements regarding the adequacy of James River's reserves and the "progress [that the Company is] making in the run–off," (SAC ¶¶ 247, 256, 259, 266–67), constitute both "predictions of future events" *and* "assertions about present facts, namely that Defendants

33

believed at the time the statements were made that [James River's] current reserves were adequate." *Genworth*, 103 F. Supp. 3d at 788.

Unlike in *Boykin*, where an executive's comment that a changing market trend "positions us well," *Boykin*, 54 F.4th at 184, the challenged statements here do not merely concern present-tense phrasing of solely future-focused projections. Accordingly, the safe-harbor provision does not necessarily apply, and the Court must determine whether Plaintiffs have created a question of fact as to whether Defendants made the challenged statements with "meaningful cautionary language." *Boykin*, 54 F.4th at 184; *Genworth*, 103 F. Supp. 3d at 789.

Defendants highlight that the reserves statements included words of caution, such as the 2018 10-K's identification of risk factors including "the inherent uncertainty of estimating reserves and the possibility that incurred losses may be greater than our loss and loss adjustment expense reserves," as well as a set of warnings about reserve calculations. (ECF No. 73–2 at 2, 38.) The Company represented in its 2018 10-K that:

> Reserves do not represent an exact calculation of liability. Rather, reserves represent an estimate of what we expect the ultimate settlement and administration of claims will cost us, and our ultimate liability may be greater or less than current reserves. These estimates are based on our assessment of facts and circumstances then known, as well as estimates of future trends in claim severity, claim frequency, judicial theories of liability and other factors. These variables are affected by both internal and external events that could increase our exposure to losses, including changes in actuarial projections [and] claims handling procedures . . . We continually monitor reserves using new information on reported claims and a variety of statistical techniques.

(*Id.* at 38.) Furthermore (and of pertinence to James River's Uber account), the Company stated in this filing that James River "regularly enter[s] new lines of insurance, and as a consequence, [the Company] sometimes [has] to make estimates of future losses for risk classes with which [it does] not have a great deal of experience." (*Id.*) Plaintiffs counter by citing this Court's conclusion in *Genworth* that cautionary language fails to be "meaningful" if Defendants knew

34

the "potential" risks had already materialized.  (Pl.'s Mem. at 21, citing *Genworth*, 103 F. Supp.3d at 790.)

While strong cautionary language undermines securities fraud claims,[4] district courts in the Fourth Circuit have hesitated to rule on the adequacy of cautionary language at the motion to dismiss stage.  *See Ollila*, 2018 WL 792069, at *5 (holding that "while some statements may indeed have appropriate cautionary language or be entirely forward-looking, the Court declines to examine them in full at this stage, as 'the adequacy of cautionary language is a question of fact, and, typically, is not a question to be resolved on a motion to dismiss'") (quoting *Lefkoe v. Jos. A. Bank Clothiers*, 2007 WL 6890353, at *5 n.10 (D. Md. Sept. 10, 2007)); *see also Genworth*, 103 F. Supp. 3d at 790 (declining at the motion to dismiss stage to determine whether defendants' cautionary language qualified as "meaningful," because plaintiffs created a question of fact as to whether defendants knew that "potential" risks had already materialized on the basis of using "stale" data for calculating reserves).  General warnings may not negate materiality, but specific warnings "tailored to address the alleged misrepresentation or omission may negate their materiality when the total mix of information would not be significantly altered by the disclosures sought by the plaintiffs." *Paradise Wire*, 918 F.3d at 319.

Defendants' cautionary language noted that the Company "regularly enter[s] new lines of insurance" and therefore must estimate future losses "for risk classes with which [they did] not have a great deal of experience." (ECF No. 73–2 at 38.)  Considering that insurance offerings for ride–sharing app companies constituted a nascent market when James River began its Uber

---

[4]     *See, e.g., Boykin*, 54 F.4th at 182 n.1 (holding that the defendant company maintained "strong cautionary language," because its 10-K filings "acknowledged at length" the company's susceptibility to cyberattacks, a risk "that is common to many businesses and not something of which a reasonable investor would have been unaware").

contract in 2014, the 2018 10-K's warning about new lines of insurance, along with some of the other cautionary language, could perhaps qualify as "meaningful" on first impression. But this language came from James River's 10-K *in 2018*, years after the Company entered into the Uber contract and hence years into the period in which James River would have accrued comprehensive data about claims related to such a significant client account. (SAC ¶ 1.) Indeed, Plaintiffs allege that Defendants engaged in an ongoing pattern of risk–enhancing conduct throughout the Class Period, including "systematically" under-reserving Uber claims, lacking any "reserve methodology except to keep reserves low," and "knowingly" hiring claims adjusters with no experience. (*Id.* ¶ 166.)

Moreover, the SAC alleges that while Defendants represented that reserve procedures leveraged "past experience" and that the Company "continually monitor[s] reserves using new information on reported claims," (*id.* ¶¶ 119, 245), James River in fact lacked policies or procedures for setting reserves, (*id.* ¶¶ 127–28), and senior management artificially suppressed Uber–related reserves. (*Id.* ¶¶ 76, 78.) Accordingly, Plaintiffs' allegations regarding James River's systemic failures to establish, maintain or update reserve-setting procedures align with the pattern of alleged conduct that this Court has found sufficient to create a question of fact about whether cautionary language qualified as meaningful: failure to warn investors about using outdated data, failing to conduct a reserve-process review that a company had touted and knowingly failing to incorporate new data about claims. *Genworth*, 103 F. Supp. 3d at 790.

Though the 10-K warnings address the general topic (reserves) at issue in the SAC, the disclosures sought by Plaintiffs — including that James River allegedly did not primarily use "past experience" in setting reserves, lacked polices or procedures for reserves and systematically under-reserved claims for the Company's largest client — would plausibly alter

the "total mix of information" available to an insurance business' investors. *Paradise Wire*, 918 F.3d at 319. This alleged fact pattern differs from an online learning company warning specifically of the well-known risk of cyberattacks, *Boykin*, 54 F.4th at 182 n.1, or of a company providing statements "tailored precisely to address the alleged misrepresentation or omission." *Paradise Wire*, 918 F.3d at 319 (citing *Gasner v. Bd. of Sup'rs of the Cty. of Dinwiddie*, 103 F.3d 351, 359–60 (4th Cir. 1996)).

The factual allegations also differ from the context of a disappointing merger, which the Fourth Circuit recently addressed in *San Antonio Fire & Police Pension Fund v. Syneos Health Inc.*, 75 F.4th 232 (4th Cir. 2023). There, plaintiffs brought a securities fraud lawsuit predicated on a company's alleged misrepresentations regarding the expected performance of a company with which it merged. *Id.* at 239–40. The suit failed to survive the motion to dismiss stage, partially because the defendant company had provided sufficiently tailored and specific warnings about its assumptions. *Id.* at 245–46. In affirming the district court's dismissal, the Fourth Circuit noted that investors received numerous warnings, including:

> that the [company's] projections may be inaccurate, that the success of [the merging company's] commercial business was not assured; that [the merging company] had struggled to achieve profitability and might do so again; that [the merging company's] success depended on other companies' expenditure on commercialization services, which could decline; and that [the merging company] was in a highly competitive space which could hinder its commercial business.

*Id.* at 246. Accordingly, the Fourth Circuit concluded that if investors had learned earlier in the process that a certain factor "was not the best indicator of future commercial revenue" and that the merging company had yet to notch a large contract that year, these revelations would not have significantly altered the total mix of information available to investors when approving the merger. *Id.* The warnings in *San Antonio* concerned one business merging with another — a context in which expected future earnings inevitably entail speculation and some amount of risk.

37

*See, e.g., In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 543 F. Supp. 3d 96, 118 (D. Md. 2021) (defendant's optimistic projections about the post-merger performance of company constituted business puffery not actionable under securities laws).

Here, Plaintiffs allege that an insurance company that purported to use "past experience" and "new information on reported claims" in fact maintained *no* established policies or procedures for keeping track of reserves, and in fact systematically worked to suppress reserves during the Class Period. Unlike in *San Antonio* or *In re Marriott*, James River did not simply give investors an overly upbeat projection of how a future merger could work out for investors' bottom lines. Taking Plaintiffs' factual allegations as true, the Company continued throughout the Class Period to mislead investors about the ongoing operations of the reserve-setting process and resulting reserve estimates for its existing insurance business. This Court therefore declines to determine at the motion to dismiss stage whether Defendants' cautionary language was sufficiently meaningful, as Plaintiffs have created enough of a dispute here to generate a question of fact. *Genworth*, 103 F. Supp. 3d at 790.

Furthermore, Plaintiffs meet the particularity requirement of the PLSRA and Rule 9(b) for securities fraud claims. Pursuant to 15 U.S.C. § 78u-4, the SAC's allegations specify each statement alleged to have been misleading, including the publicly reported reserves during the Class Period, along with Defendants' earnings call statements related to the Company's stated reserves. (SAC ¶¶ 163–65, 168–69, 172–74, 177–79, 182–85, 188–91, 194–96, 199–202, 204, 207–11, 214–16, 219–21, 235, 237–40, 244–47, 250–51, 253–56, 259, 262, 265–67.) Moreover, the SAC alleges "the reason or reasons why the statement is misleading." § 78u-4(b)(1). Plaintiffs allege that the statements misled them as the reserves were materially understated, "had no reserve methodology except to keep reserves low," systemically under-reserved Uber claims,

deliberately overpaid on Uber claims, knowingly hired claims adjusters with no claims experience, lacked policies or procedures for the reserve process and did not base reported reserves on past loss experience with similar claims. (SAC ¶ 166, *et seq.*) Finally, Plaintiffs plausibly posit Executive Defendants' knowledge of the alleged falsity, as they expressed their personal involvement with the reserve process and served on the committee responsible for determining, monitoring and approving reserves. (SAC ¶¶ 106–09.) Thus, Plaintiffs pleaded materiality of false statements or omissions with particularity. The Court now turns to whether Plaintiffs sufficiently pled scienter.

### 2.    Scienter

Defendants also claim that the Court must dismiss the SAC, because they have failed to adequately allege that they acted with scienter. (Def.'s Mem. at 4.) "To establish liability under § 10(b) and Rule 10b-5, a private plaintiff must prove that the defendant acted with scienter, 'a mental state embracing intent to deceive, manipulate, or defraud.'" *Tellabs*, 551 U.S. at 319. The PSLRA requires plaintiffs pleading securities fraud to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

With respect to mental state, "negligence is not enough[,]" because "[a] plaintiff must show either 'intentional misconduct' or such 'severe recklessness' that the danger of misleading investors was 'either known to the defendant or so obvious that the defendant must have been aware of it.'" *Cozzarelli*, 549 F.3d at 623. "The inference that the defendant acted with scienter need not be irrefutable, i.e., of the 'smoking–gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs*, 551 U.S. at 324. "To evaluate the strength of the scienter inferences, courts engage in a comparative analysis." *Zak v. Chelsea Therapeutics Int'l Ltd.*, 780

F.3d 597, 606 (4th Cir. 2015). In particular, "[a] complaint adequately pleads scienter under the PSLRA only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inferences one could draw from the facts alleged." *Matrixx Initiatives*, 563 U.S. at 48 (internal citation omitted). The Court must review "all of the allegations holistically." *Id.* Indeed, "[t]he inquiry is whether all of the facts alleged, *taken collectively*, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 182 (4th Cir. 2009) (quoting *Tellabs*, 551 U.S. at 310) (emphasis added). Plaintiffs offer a plethora of reasons for inferring scienter, each of which the Court considers below.

### a.    Defendants' Personal Involvement

Plaintiffs argue that Executive Defendants' "personal involvement" in the reserve-setting process supports an inference of scienter, highlighting that Executive Defendants sat on the Reserve Committee and pointing to the SAC's inclusion of statements from Defendant Abram that "[w]e look at the actual case reserves"; from Defendant Doran that regarding Uber reserves, "we are certainly watching it very carefully and closely, especially around claims"; and from Defendant D'Orazio that he was "comfortable" with the "reserve position" after a "claims audit by our senior claims leadership team." (Pl.'s Mem. at 22–23.) In response, Defendants characterize as "conclusory" the notion that Executive Defendants were personally involved in the reserve process, contending that oversight of James River's overall loss reserves does not equate to a plausible allegation of any Defendant's actual awareness of "scattered complaints" from former claims personnel regarding individual case reserves. (Def.'s Reply Br. at 16.) And securities fraud plaintiffs must show that Defendants "knew the missing information" and

recognized that such information was relevant but "went ahead and left the information out anyway, with the intent to mislead Plaintiffs — or at least with a reckless disregard for the risk that leaving the information out" would mislead. *San Antonio*, 75 F.4th at 242.

Executives' "personal involvement" in the review of a relevant business unit can support an inference of scienter. *Genworth*, 103 F. Supp. 3d at 785 ("While the fact that the Individual Defendants held senior executive positions alone may not be compelling, this fact augments the other allegations of intimate involvement pleaded elsewhere," including defendants' "personal involvement" with a committee tasked with close oversight of the business unit with alleged reserving problems). However, as the Fourth Circuit recently noted, "general due diligence" into a company's operations "does not support the inference that Defendants learned any specific information" that would be misleading if withheld from investors. *San Antonio*, 75 F.4th at 242.

Here, the question therefore becomes whether Executive Defendants' personal involvement with the Company's Uber claims rose beyond "general due diligence," i.e., to the level of supporting an inference that each Executive Defendant knew about the alleged systemic problems with the Uber reserves. Defendant Myron served as the Company's CEO from January 2017 to August 2019, (SAC ¶ 35), while Defendant Abram was CEO from August 2019 through October 2020, (*id.* ¶ 37), Defendant D'Orazio served as CEO from November 2020 through the end of the Class Period, (*id.* ¶ 39), and Defendant Doran served as Chief Financial Officer ("CFO") through the entire Class Period, (*id.* ¶ 41). All four Executive Defendants therefore participated in the Reserve Committee, which monitored and approved reserves. (*Id.* ¶¶ 310–11.) The Reserve Committee incorporated "input" from the "claims department" and exercised its judgment "to supplement the actuarial recommendations," (ECF No. 73–2 at 69), while 10-K filings stated that "senior management" conducted reviews "at least quarterly" of "individual

case-basis valuations" regarding "specific case reserve[s]". (SAC ¶¶ 54, 255, 312.) Defendants argue that Plaintiffs fail to show that the general phrase "senior management" included the Executive Defendants, (Def.'s Mem. at 17–18), and though that question remains unanswerable before discovery, the Executive Defendants themselves addressed questions on earnings calls regarding reserves for James River's Commercial Auto Division (which included the Uber account). Defendant Doran stated on the Nov. 7, 2019 earnings call that "we're doing a deep dive every single quarter" and "are certainly watching it very carefully and very closely," and Defendant Abram described the Company's reserve process as "[w]e look at the actual case reserves." (SAC ¶¶ 352, 363–64.)

Moreover, the Company's 2018 10-K underscored the Reserve Committee's specific role in setting *Commercial Auto Division reserves*, stating that "[t]he Reserve Committee believes that using judgment to supplement the actuarial recommendations is necessary to arrive at a best estimate given the nature of the business that we write and the limited operating experience of . . . the commercial auto underwriting division." (ECF No. 73–2 at 69.) Former employees alleged that James River's "c-suite" of top executives received audit reports showing under-reserving of Uber claims. (SAC ¶ 111.) Assessing "all of the allegations holistically," *Matrixx Initiatives*, 563 U.S. at 48, the Court concludes that Executive Defendants' personal involvement in the Reserve Committee, along with their public statements to investors regarding the "quarterly" and "careful[]" review of reserves and importance of case reserves to overall loss reserves — at a time when Uber constituted James River's "largest account" — support a reasonable inference that "Defendants possessed knowledge of the true state of affairs of the [Uber reserve situation], and thus had knowledge that their representations were misleading." *Genworth*, 103 F. Supp. 3d at 785 (finding that where individual defendants participated in a committee that met regularly to

42

conduct a close review of the business unit with allegedly flawed reserves, the Court could "reasonably infer" individual defendants' knowledge of relevant information); *see also Ollila*, 2018 WL 792069, at \*3 ("While plaintiff may not be able to show smoking gun documentation that defendants . . . explicitly knew of these issues as they made public statements, plaintiffs have sufficiently alleged that they had *access to information* on such issues") (emphasis added).

### b.  Schmitzer's Conduct and the Email Portal

Drawing from their interviews with former James River claims personnel and the testimony of senior claims managers in the *St. Amand* litigation, Plaintiffs also contend that Richard Schmitzer, James River Insurance's CEO and a Reserve Committee member who reported directly to the Company's CEO, "routinely denied" requests for a reserve increase to $250,000 or more, all of which were subject to his approval.  (SAC ¶ 137.)  Plaintiffs allege that Schmitzer upped his aggressive scrutiny of Uber reserve increase requests after the Company terminated the Uber account in October 2019 and almost always denied these requests.  (Pl.'s Mem. at 24, citing SAC ¶¶ 341–42.)  Plaintiffs spotlight the testimony of Slaughter (former Assistant Director of Litigated Claims, who worked exclusively on the Company's Uber account and supervised nearly 100 Uber claims managers) and Belcher (a former claims manager) corroborating other former employees' accounts that James River opened a "secret" PLM portal in October 2019 for all reserve increase requests.  (Pl.'s Mem. at 24, citing SAC ¶ 340.)  In Plaintiffs' telling, Slaughter's and Belcher's testimony that "claims handlers were specifically instructed not to mention the PLM system in their notes" to prevent documentation of the reserve increase request, (SAC ¶ 340), provides inculpatory evidence of concealment.  (Pl.'s Mem. at 24, citing *Brown v. China Integrated Energy, Inc.*, 875 F. Supp. 2d 1096, 1124 (C.D. Cal. 2012) for the proposition that "evidence of concealment is strongly indicative of scienter.")

43

Defendants reply that the SAC fails to allege that any individual Defendant was aware of Schmitzer's conduct or the secret email portal. (Def.'s Reply Br. at 16–17.) To Defendants, the use of an email portal to manage case reserves does not constitute an improper business practice, while Plaintiffs' allegations about Schmitzer's micromanaging of case reserves fail to demonstrate either that Defendants recognized overall loss reserves as false or that any named Defendant was involved with Schmitzer's conduct. (Def.'s Reply Br. at 17.)

Whether Plaintiffs' allegations regarding Schmitzer's conduct and the PLM email portal support an inference of scienter turns on whether the SAC sufficiently ties these allegations to Defendants. And "general allegations based on corporate positions are insufficient to satisfy the PSLRA's particularity requirement." *Knurr v. Orbital ATK Inc.*, 294 F. Supp. 3d 498, 507 (E.D. Va. 2018). But while Plaintiffs argue that "[i]t is implausible that Schmitzer would have imposed such draconian measures without the knowledge of the Executive Defendants who sat alongside him on the Committee tasked with monitoring and approving the reserves," (Pl.'s Mem. at 24), the Court "cannot impute factual knowledge to individuals merely based on their professional position." *San Antonio*, 75 F.4th at 242–43 (courts weighing a securities fraud claim "may not stack inference upon inference to satisfy the [§ 10(b)] pleading standard"). The mere fact that Schmitzer served alongside the Executive Defendants on the Reserve Committee does not establish that these *individual* Defendants knew *specifically* about the secret email portal or Schmitzer's systemic denials of reserves. Indeed, given Slaughter's testimony that "[w]e were told not to talk about" the PLM email portal, (SAC ¶ 147), the innocent inference that the Executive Defendants did not know about the email portal qualifies as "at least as compelling" as the fraudulent inference. *Boykin*, 54 F.4th at 186.

44

However, though the Court finds Plaintiffs have not plausibly alleged that Schmitzer's actions or the creation of the "secret" PLM email portal support a strong inference of scienter with respect to the *Executive Defendants*, these allegations support scienter as applied to the *Company* itself. As this Court has held, "[s]cienter of a lower–level employee can be imputed to the corporation . . . where, as here, that lower–level employee fraudulently furnishes information for a public statement and in so doing, intends to cause, and causes, a corporate officer to make a misrepresentation to investors." *Knurr*, 294 F. Supp. 3d at 515. Serving on the Reserve Committee alongside the Executive Defendants, Schmitzer helped personally review and approve the Company's reserves, shaping the information flow for the publicly stated reserves. (SAC ¶¶ 113, 137, 139, 142, 310.) In addition, Plaintiffs' interviews with former employees, along with the *St. Amand* litigation testimony, yielded allegations that three senior managers — Schmitzer, Warren and Rogers — managed the secret PLM email portal and systemically denied reserves. (*Id.* ¶341.) Accordingly, the Court finds that the scienter of these individuals, who occupied influential corporate positions regarding reserve setting and approvals, can be imputable to James River as a corporate Defendant, as their allegedly deliberate suppression of reserves (including via the email portal) subsequently shaped the publicly available information regarding the Company's reserves. *Knurr*, 294 F. Supp. 3d at 515.

### c.     Uber as Largest Client and "Core Operations"

In addition, Plaintiffs posit "core operations" allegations to support scienter, highlighting that Uber constituted the Company's "largest account" during the Class Period and noting Defendants' statements about the central importance of Uber, the runoff process and reserves themselves. (SAC ¶¶ 54, 357, 363–64, 366.) To Plaintiffs, James River's relatively small size relative to its insurance industry peers amplified Defendants' focus on the Company's most

profitable account.  (SAC ¶ 358.)  Defendants disagree, arguing that the Fourth Circuit has

rejected the "core business operation" theory.  (Def.'s Mem. at 26–27, citing *KBC Asset Mgmt.*

*NV v. DXC Tech. Co.*, 19 F.4th 601, 612 (4th Cir. 2021).)  Plaintiffs posit the winning argument

on this point, as Defendants mischaracterize the Fourth Circuit's holding.

      In *KBC Asset Mgmt.*, the Fourth Circuit rejected plaintiffs' argument for inferring

scienter from statements concerning a company's entry into a new sector and investments in

human capital after executives stated that those issues qualified as "key concerns for the

company." *KBC Asset Mgmt.*, 19 F.4th at 612.  But "[e]ven if such broad corporate strategies

can constitute core operations," the Fourth Circuit held, "no core-operations inference can be

appropriately drawn," because plaintiffs failed to present particularized allegations regarding

defendants' *knowledge* of problems related to these areas and simply alleged scienter based on

part of the business plan "not going smoothly." *Id*.  Inferring that officers possess "knowledge of

key facts" merely because the knowledge "relates to the business's core operations are not

enough, standing alone, to support a strong inference of scienter." *Id*.

      The Fourth Circuit therefore did not per se reject the core-operations theory of scienter;

the court cautioned against labeling "broad corporate strategies" as core operations or relying on

core-operations allegations *alone* to infer scienter. *Id*.  And since *KBC Asset Mgmt.*, a district

court within the Fourth Circuit has cited the decision in inferring scienter *partially* based on core

operations. *See Sinnathurai v. Novavax, Inc.*, 2022 WL 17585715, at *20 (D. Md. Dec. 12,

2022) ("In evaluating the various indicia of scienter, the Court may question whether,

'evaluating the complaint holistically, the combined allegations can do what their individual

parts failed to do.'") (quoting *KBC Asset Mgmt.*, 19 F.4th at 613); *id*. at *22 ("Although not

sufficient to establish scienter by itself, the fact that the subject of the alleged fraud was a core

business or operation of the company is relevant to the analysis of scienter because under such circumstances it would be fair to infer that the company officers responsible for public statements were aware of facts relating to that activity"). Where a certain product is "so critical" to a company's success, a complaint can establish that the product constitutes a "core operation," elevating the plausibility that senior officers "were aware of the facts underlying the allegedly false statements and material omissions." *Id.* at *22. The Court thus considers the "core operations" allegations as part of its "holistic analysis of scienter," in conjunction with looking for particularized allegations of Defendants' "actual exposure" to the relevant corporate problems. *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 890 (4th Cir. 2014).

Uber's status as the Company's "largest account" and "largest client," combined with Defendants' statements that they were "watching" Uber reserves "very carefully and very closely" and "doing a deep dive every single quarter," (SAC ¶¶ 60, 49–50, 53, 60, 352, 355–59), elevates Plaintiffs' core-operations allegations above the "broad corporate strategies" at issue in *KBC Asset Mgmt.*, 19 F.4th at 612. *See Genworth*, 103 F. Supp. 3d at 784 (finding that the long-term insurance division qualified as a core operation where a director declared that the division was one of the company's two "core sets of businesses" and that long-term care comprised the company's "core business"). Far from a "broad corporate strategy," like a move into the "digital space," *KBC Asset Mgmt.*, 19 F.4th at 612, James River's financial health as an insurance company "depends on the adequacy of [its] reserves." *Genworth*, 103 F. Supp. 3d at 766. And as explained *supra*, Plaintiffs have posited plausible allegations regarding Defendants' knowledge of the Uber reserve problems, predicated on their statements regarding their personal involvement with the reserve-setting process and their work on the Reserve Committee. Plaintiffs' core-operations point enhances the plausibility of the SAC's scienter argument.

47

### d.    Magnitude of Losses

Plaintiffs also point to the magnitude of James River's Uber–related losses as reinforcing scienter, highlighting that the $170 million adverse reserve charge constituted the Company's largest to date, accounting for over 50 percent of the Commercial Auto Division's net reserves and totaling three times the Company's reported profit for the prior 2.5 years. (SAC ¶¶ 64, 70, 321.) Defendants reply that magnitude-based scienter allegations fail, because they fail to indicate that Defendants believed that prior reserve estimates were inaccurate. (Def.'s Reply Br. at 18.) In support of their position, Defendants cite *In re Under Armour Secs. Litig.*, 342 F. Supp. 3d 658, 692 (D. Md. 2018), which held that the "magnitude" of a company's miss of its quarterly financial projections, without more, did not support a strong inference of scienter, given the external, non-fraudulent factors that could have impacted the disappointing earnings.

But a retail company's failure to achieve sales projections does not equate to an insurance company's failure to maintain adequate reserves on an *ongoing* basis; to hold otherwise would be to credit Defendants' fraud-by-hindsight argument that the Court has already found lacking. And this Court has found that the "magnitude of the discrepancy" in an insurance company's under-reserving can support scienter allegations. *Genworth*, 103 F. Supp. 3d at 786 (quoting *MicroStrategy*, 115 F. Supp. 2d at 631, for the rule that substantial "overstatements of revenue tend to support the conclusion that defendants acted with scienter"). As part of the holistic mix, the magnitude of the discrepancy supports the plausibility of Plaintiffs' scienter allegations here.

### e.    Motives

Defendants also take issue with Plaintiffs' arguments regarding the SAC's two proffered motives for the alleged fraud: a sale of the Company and stock sales by Executive Defendants. First, Defendants lambaste Plaintiffs' assertion that Defendants' interest in selling James River

(an allegation drawn from testimony in the *St. Amand* litigation from former James River claims

officer Ingrid Slaughter, SAC ¶ 344) reinforces scienter, citing *Phillips v. LCI Int'l*, 190 F.3d

609, 622–23 (4th Cir. 1999).  (Def.'s Mem. at 28.)[5]  In *Phillips*, the Fourth Circuit rejected

plaintiffs' contention that a corporate executive's motivation in making a challenged statement

was to ensure the successful merger, deeming this argument to be "speculation," because

plaintiffs relied on the idea that the executive wished to retain his position in the post–merger

entity.  *Phillips*, 190 F.3d at 622–23.  Holding that "[a]llegations that 'merely charge that

executives aim to prolong the benefits they hold' are, standing alone, insufficient to demonstrate

the necessary strong inference of scienter," the Fourth Circuit added that the allegations seemed

"totally without logical basis," because the executive's challenged statement allegedly helped

*decrease* the stock price of the relevant company.  *Id.*  Given that the executive in question

possessed millions of the company's shares (and presumably therefore would want these shares

to *increase* in value), the Fourth Circuit concluded that plaintiffs' contention that the executive's

statements aimed to further his own interests made no logical sense.  *Id.*  Rather, "a claim of

motive based on the benefit a defendant derives from an increase in the value of his holdings"

---

[5]     Defendants also cite the Third Circuit's holding in *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 155 (3d Cir. 2004) that "[g]eneric and conclusory allegations based upon rumor or conjecture are undisputedly insufficient to satisfy the heightened pleading standard" of the PSLRA, asserting that Plaintiffs' reliance on confidential witnesses (the former claims personnel) for the allegation that Defendants sought to sell the Company fails to support scienter. (Def.'s Mem. at 28.)  But in *Chubb*, plaintiffs relied on confidential witnesses who either worked in irrelevant business segments not at issue in the complaint or who did not work in the company at all.  394 F.3d at 155.  Here, Plaintiffs state that the former claims personnel directly handled Uber claims and provide numerous supporting details regarding their roles and responsibilities. *See, e.g.,* SAC ¶¶ 76-78.  The Court further addresses arguments regarding confidential witnesses *infra*.

must point to "some sale of 'personally–held stock' or 'insider trading'" by the defendant. *Id.* Mere interest in retaining a position in a post–merger entity does not suffice. *Id.*

Here, unlike in *Phillips*, Plaintiffs have pointed to stock sales by two Defendants (and with a fact pattern outside the realm of mergers). The SAC highlights that Defendants Myron and Doran each sold over 20 percent of their James River shares during the Class Period, including sales of substantial stock in the months between the cancellation of the Uber contract and the Company's announcement of the $170 million adverse charge that sent James River stock tumbling. (SAC ¶¶ 346–49.) In Plaintiffs' telling, these sales, made while Defendants possessed material non–public information regarding the extent of the Uber–related losses, bolster a strong inference of scienter by providing an additional motive. (*Id.* ¶ 350.)

Defendants denounce Plaintiffs' stock-sale motive argument, asserting that stock sales of 25 percent or less by two Executive Defendants during a thirty-two-month class period, standing alone, fail to support a strong inference of scienter. (Def.'s Mem. at 28.) In support of their position, Defendants cite *KBC Asset Mgmt.*, 19 F.4th at 611, where the Fourth Circuit held that plaintiffs did not show why the court should treat an executive's sale of 17 percent of his corporate stock shares differently from a 13 percent stock sale that the Fourth Circuit had previously deemed "de minimis" and insufficient to justify a strong inference of scienter. *KBC Asset Mgmt.*, 19 F.4th at 611. Moreover, the executive in *KBC Asset Mgmt.* had sold a *larger* share of stock outside the class period, lessening the inference of scienter. 19 F.4th at 611. Here, however, Defendants do not point to stock sales *outside* the Class Period to lessen a scienter inference. In fact, the SAC states that neither Myron nor Doran sold James River common stock shares in the three years before the Class Period. (SAC ¶ 346.)

50

Accordingly, the Court generally considers whether the "timing and amount" of Defendants' stock trades appears sufficiently "unusual or suspicious" to support an inference of scienter. *KBC Asset Mgmt.*, 19 F.4th at 611. Factors to consider in resolving this question include the profit a seller of securities made, the amount (and percentage of one's holdings) sold and the number of "insiders" involved in the sale(s). *Yates*, 744 F.3d at 890. Courts within the Fourth Circuit have applied varying judgments as to whether stock sales' timing and amount qualify as sufficiently "unusual or suspicious" to bolster scienter allegations. *Compare KBC Asset Mgmt.*, 19 F.4th at 611 (rejecting 17 percent as insufficient) *with Sinnathurai*, 2022 WL 17585715, at *23 (finding sales by two executives of nearly $600,000 and over $22.5 million, respectively, in the days and weeks before an adverse corporate announcement supported inference of scienter); *see also Yates*, 744 F.3d at 890–91 (concluding that an inference that relevant trades were innocent trumped an inference of scienter where (1) the number of insiders (six) trading during the class period was "relatively small," (2) plaintiffs did not allege "that the insiders timed the sale to take advantage of any particular disclosure," (3) "sales occurred at fairly regular intervals and amounts compared to earlier periods," (4) insiders sold their shares pursuant to non–discretionary Rule 10b5-1 trading plans, and (5) the forty-four-month class period constituted an "inordinately long period").

Here, Myron's and Doran's stock sales each constituted over 20 percent of their shares, generating $2.9 million and $702,423.29 in proceeds, respectively, during the Class Period. (SAC ¶¶ 346–49.) Myron sold 65,000 shares on August 4, 2020 — between the cancellation of the Uber contract and the Company's $170 million adverse charge announcement — and Doran sold 14,012 shares on November 17, 2020 (also between the contract cancellation and adverse charge disclosure). (*Id.*) The two Defendants' sales comprised 21 percent and 25 percent of

51

their James River holdings.  And neither Defendant sold James River common stock shares in the three years preceding the Class Period, nor did either Defendant sell the stock pursuant to Rule 10b5-1 plans, which allow corporate insiders to sell shares at predetermined times and amounts to lessen an inference of fraudulent purpose.  (*Id.* ¶ 346); *Yates*, 744 F.3d at 891.

Applying the factors that courts in the Fourth Circuit have used to resolve this question, the Class Period's duration supports Defendants here:  though not as lengthy as the "inordinately long" forty-four-month *Yates* class period, this case's thirty-two-month period edges closer to *Yates* than to the eight-month period in *Sinnathurai*, 2022 WL 17585715, at *1.  The fact that the SAC identifies only two of four Executive Defendants as the sellers of allegedly suspicious transactions also cuts against Plaintiffs. *See In re Mun. Mortg. & Equity, LLC, Sec. & Derivative Litig.*, 876 F. Supp. 2d 616, 641 (D. Md. 2012) (finding the fact that only three of six individual defendants sold shares during the class period supported defendants' position on this point).

But other factors weigh in favor of Plaintiffs:  the SAC alleges that because Myron and Doran sold their shares in the months prior to the Company's disclosure of the Uber contract's unprofitability and the understated reserves, at a time when Defendants possessed this non–public information, these sales qualified as "suspiciously timed."  (SAC ¶ 350); *Sinnathurai*, 2022 WL 17585715, at *23 (finding that "[p]articularly where the allegations support the inference that [individual defendants] timed at least one sale to take advantage of the fact that adverse information was soon to be disclosed, the facts relating to stock sales provide further support for an inference of scienter").  Furthermore, neither Defendant sold James River common stock in the *three years* before the Class Period.  *Id.* (scienter inference bolstered where neither relevant defendant had sold shares *one year* before the relevant sale during the class period).  The sale profits, amounts and percentages fall into the gray zone that courts have treated

differently, but the 25 percent and 21 percent shares of the two Defendants' James River stockholdings are higher than those rejected in *KBC Asset Mgmt.*, 19 F.4th at 611. Lastly, neither Defendants made the relevant sales pursuant to a Rule 10b5-1 trading plan. *Compare with KBC Asset Mgmt.*, 19 F.4th at 611 (holding that even where 10b5-1 trading plans *did* exist, the lack of evidence on when defendants entered into the plans prevented the court from concluding that the plans mitigated the "suggestion of motive" for "suspicious trading").

Moreover, the stock sales do not, as Defendants contend in their Motion, "stand alone" to support a strong inference of scienter. (Def.'s Mem. at 28.) Rather, the sales stand alongside the *additional* motive suggested by Plaintiffs — based on testimony from the Company's former Assistant Director of Litigated Claims — that Defendants repeatedly tried to sell James River during the Class Period but were unable to do so due to the Uber account's problems. (SAC ¶ 344.) Whereas the *absence* of a plausible motive "weighs heavily" against inferring scienter, *San Antonio*, 75 F.4th at 242, the Court considers allegations of motive as part of its "holistic analysis." *Klein*, 525 F. Supp. 3d at 666. Plaintiffs have advanced two motives here, and as discussed above, more of the suspicious–sale factors support Plaintiffs' position than Defendants', while the allegation regarding Defendants' failed attempts to sell the Company comes from a former James River officer. Taking these allegations together and accepting them as true, a reasonable person would deem Plaintiffs' suggestion of motive to defraud investors at least as strong as the innocent inference that Defendants made a couple stock sales unrelated to their knowledge of soon–to–be–released information about the Uber account.

Defendants further argue that Plaintiffs improperly rely on confidential witnesses to bolster an inference of scienter, contending that the former employees whom the SAC partially relies upon lack insight into James River's loss reserves process and do not assert any direct

involvement with the Executive Defendants. (Def.'s Mem. at 25.) Plaintiffs respond by pointing to James River's 10-K filing statements that "We estimate the [loss] reserve using individual case-basis valuations of reported claims," and that the Reserve Committee received "[i]nput" from the "claims department." (Pl.'s Mem. at 27, citing SAC ¶ 54 and ECF 73–2 at 69.)

Where a complaint relying in part on confidential witnesses lists the dates of these individuals' employment, "the various positions they held, the duties that they fulfilled, where they worked, with whom they conversed and to whom they reported," this information "allows the Court to assess what information the confidential witnesses had available to them and properly weigh the inferences derived from the confidential witnesses' allegations." *Klein*, 525 F. Supp. 3d at 667. Here, the SAC details the former James River employees' employment dates and roles and responsibilities, along with their interactions with directors and senior claims managers (such as the former Vice President of Claims, Anita Rogers) who in turn reported to the Company's C-suite. (SAC ¶¶ 76–90.) The anonymous former employees' accounts also corroborate testimony from *known* individuals in the *St. Amand* litigation. (SAC ¶¶ 83–84, 86, 113–14, 136–48.) Accordingly, "given the particularity with which Plaintiffs describe the confidential witnesses," the Court finds Defendants' critique of the confidential witnesses to be unpersuasive at the motion to dismiss stage. *Klein*, 525 F. Supp. 3d at 667.

### f.    D'Orazio's May 2021 Statements

The Court also addresses whether Defendant D'Orazio's May 5, 2021 announcement to investors supports an inference of scienter. D'Orazio stated that the Company incurred a $170 million adverse charge from the Uber account, as James River had used the "wrong" reserve methodology and would begin estimating loss reserves for Uber "using only our own loss experience in our paid and incurred reserve projections rather than the array of inputs that we had

used in prior quarters." (SAC ¶¶ 67–68.) To Plaintiffs, D'Orazio's statement constituted an admission that the Company had misled investors, bolstering an inference of scienter. (Pl.'s Mem. at 26.) To Defendants, this characterization distorts D'Orazio's statement, because the then-CEO simply was announcing an update to the Company's reserve process to incorporate new data, rather than indicating Defendants did not actually believe their prior statements. (Def.'s Mem. at 9–10.) While the Court has already rejected Defendants' argument that the SAC fails by pleading "fraud by hindsight," the role of D'Orazio's statements with respect to *scienter* merits attention. Where corporate executives later acknowledge that they did not conduct the "deep review" that they had previously touted and did not actually use current claims data for insurance reserves after purporting to have done so, such disclosures may support an inference of scienter. *Genworth*, 103 F. Supp. 3d at 772–75.

But here, D'Orazio's statement simply informed investors that the Company would henceforth use a differently weighted mix of factors, rather than admitting that a specific event — such as a particular "deep review" — did not in fact happen after previously stating it had. *Id.* at 773–74. Plaintiffs cite one opinion to support their contention that D'Orazio's May 2021 statement bolsters an inference of scienter: *Freedman v. Value Health, Inc.*, 958 F. Supp. 745, 758 (D. Conn. 1997) (finding that where executives later admitted "shortcomings" in due diligence, together with the "magnitude of the problem" and a separate "admission" that company "blew it," earlier statement that the company conducted a "full review" was plausibly misleading). (Pl.'s Mem. at 26.) Defendants reply by citing *Woolgar*, 477 F. Supp. 3d at 225 ("That defendants later decided to revise the amount of loss reserves that [they] deemed adequate provides absolutely no reasonable basis for concluding that defendants did not think reserves were adequate at the time of the challenged statements.") (Def.'s Reply Br. at 9.)

55

Though neither out–of–circuit decision binds the Court, *Woolgar* illustrates that by itself, a statement informing investors that a company would incorporate new information into its reserving process does not incur securities fraud culpability.  D'Orazio's statement no doubt contributed to alarms among investors about the Company's reserve process.  (SAC ¶ 67–73.)  But to suggest that D'Orazio's comments amounted to an outright admission that Defendants intentionally misled investors strays into asserting that Defendants "could not have actually believed that [] loss reserves were adequate because they later increased reserves." *Woolgar*, 477 F. Supp. 3d at 225.  Permitting Plaintiffs to prevail on this point would enable disappointed investors to cry fraud whenever an insurance company's shares drop in value following a company's prudent decision to upwardly revise reserves in response to newly accessible information.  The passage of numerous months between D'Orazio's touting of the reserve process, (SAC ¶ 352–53), and his May 2021 announcement also counts against inferring scienter on this basis. *San Antonio*, 75 F.4th at 244 (concluding that a "months–long gap" between allegedly false and truthful statements qualified as "too wide to support an inference of scienter").  And as the Fourth Circuit stated, "[s]ecurities fraud liability cannot be 'predicated solely on an overly optimistic view of a future which may, in fact, encounter harsh economic realities down the road.'" *San Antonio*, 75 F.4th at 247.

However, taking allegations holistically, *Matrixx Initiatives*, 563 U.S. at 48, and accepting them as true, a reasonable person would deem the inference of scienter at least as strong as the opposing inference. *See Sinnathurai*, 2022 WL 17585715, at *24 (citing *KBC Asset Mgmt.*, 19 F.4th at 613, and concluding that "[a]lthough each of the four categories of Plaintiffs' scienter evidence may be insufficient by itself to establish a strong inference of scienter, the Court must consider them together and assess the totality of the circumstances"); *see also KBC*

*Asset Mgmt. NV v. 3D Sys. Corp.*, 2016 WL 3981236, at *8 (D.S.C. July 25, 2016) (finding that holistic analysis of core operations allegations, defendants' executive-level positions, defendants' close involvement in relevant corporate activities and defendants' stock scales, supported a strong inference of scienter).  Accordingly, Plaintiffs have adequately alleged the scienter element at the motion to dismiss stage.

### 3.    Loss Causation

Defendants further claim that Plaintiffs fail to adequately allege the loss causation element of securities fraud, because of Plaintiffs' "failure to allege any material misstatement or omission." (Def.'s Mem. at 30 n.5.)  Because the Court has found that Plaintiffs have plausibly alleged a material misstatement or omission, Defendants' contention on this point is unavailing.

Defendants also take issue with a particular piece of loss-causation evidence, asserting that Plaintiffs cannot leverage the October 26, 2021 press release stating that James River would transfer Uber claims to a reinsurer as proof of a corrective disclosure sufficient to establish loss causation.  (*Id.*) "Under the corrective disclosure theory, plaintiffs can allege 'that the defendant company itself made a disclosure that publicly revealed for the first time that the company perpetrated a fraud on the market by way of a material misrepresentation or omission.'" *Klein*, 525 F. Supp. 3d at 667 (quoting *Singer*, 883 F.3d at 441–42).  Courts examining the corrective disclosure theory of loss causation must determine "whether a misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Singer*, 883 F.3d at 446.  Corrective disclosure statements must have "present[ed] facts to the market that are new," *Katyle*, 637 F.3d at 473, and Defendants argue that the October 26, 2021 press release fails this standard, because the Company had already disclosed that Uber claims would transfer to a reinsurer.  (Def.'s Mem. at 30, citing ECF No. 73–23, 73–24.)

Plaintiffs note, however, that unlike in *Katyle*, where the Fourth Circuit concluded the purported corrective-disclosure statement did not "even purport to reveal some then-undisclosed fact," 637 F.3d at 473, the October 26, 2021 press release *did* reveal additional impacts from the Uber reserves to James River's bottom line. (Pl.'s Mem. at 30 n.27.) Indeed, the press release disclosed an additional $29.6 million in "impacts" from the Uber account, leading to a plunge in James River's stock. (SAC ¶ 73.) Though Defendants contest the degree to which this press release presented new facts to the market, the Court refrains from making factual determinations with respect to loss causation at the motion to dismiss stage. *Klein*, 525 F. Supp. 3d at 669; *see also Kiken v. Lumber Liquidators Holdings, Inc.*, 155 F. Supp. 3d 593, 609 (E.D. Va. 2015) ("With respect to loss causation, so long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings where the plaintiff's case can be rejected on evidentiary grounds"). Accordingly, the Court declines at this stage of the litigation to resolve the parties' factual dispute regarding the press release's impact, as Plaintiffs have advanced a theory of loss causation based on the Company's gradual disclosures related to James River's Uber reserves "that is not facially implausible." *Kiken*, 155 F. Supp. 3d at 609; *see also Katyle*, 637 F.3d at 472 (holding that "loss causation may be pleaded on the theory that the truth gradually emerged through a series of partial disclosures and that an entire series of partial disclosures prompted the stock price deflation").

## B.  Section 20(a) Claims

Defendants also argue that Plaintiffs have failed to allege a claim for control person liability under § 20(a). (Def.'s Mem., at 30.) Pursuant to § 20(a) of the Exchange Act:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . unless the controlling person

acted in good faith and did not directly or indirectly induce the act or acts constituting the violation of the cause of action.

15 U.S.C. § 78t(a). Plaintiffs pleading a prima facie case of § 20(a) "must allege: (1) a predicate violation of § 10(b) and (2) control by the defendant over the primary violator." *In re Mut. Funds Inv. Litig*., 566 F.3d 111, 129–30 (4th Cir. 2009). Defendants' arguments here hinge on their contention that Plaintiffs have failed to allege a predicate violation of § 10(b). (Def.'s Mem., at 30.) Because the Court finds that Plaintiffs have plausibly alleged a predicate violation of § 10(b), and as Defendants do not contest control over the primary violator (James River), the control person claims survive.

## IV.    CONCLUSION

For the reasons set forth above, the Court will DENY Defendants' Motion to Dismiss (ECF No. 71).

An appropriate Order shall issue.

Let the Clerk file a copy of this Memorandum Opinion electronically and notify all counsel of record.

_____/s/_____
David J. Novak
United States District Judge

Richmond, Virginia
Date: August 28, 2023