**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | |
|---|---|
| IN RE JAMES RIVER GROUP HOLDINGS, LTD. SECURITIES LITIGATION | Case: 3:21-cv-00444-DJN<br><br>CLASS ACTION |

**MEMORANDUM OF LAW IN SUPPORT OF LEAD PLAINTIFFS' MOTION FOR**
**FINAL APPROVAL OF SETTLEMENT AND PLAN OF ALLOCATION**

**TABLE OF CONTENTS**

I.      INTRODUCTION ...................................................................................................... 1

II.     THE PROPOSED SETTLEMENT WARRANTS FINAL APPROVAL .......................... 3

        A.      Legal Standard ............................................................................................ 3

        B.      The Settlement is Fair and Reasonable and Should Be Approved ........................ 5

                1.      The Settlement Was Achieved After Extensive Litigation.......................... 5

                2.      The Settlement Is the Result of Good Faith, Arm's-Length
                        Negotiations with the Assistance of an Experienced Mediator ................ 12

                3.      The Action Was Litigated and Settled by Counsel with Significant
                        Experience in Securities Class Action Litigation .................................... 14

        C.      The Settlement Is Adequate and Should Be Approved ....................................... 16

                1.      The Strength of Plaintiffs' Case and the Difficulties of Proof and
                        Defenses Plaintiffs Would Encounter at Trial Support Final
                        Approval ............................................................................................... 16

                2.      The Costs and Delay of Continued Litigation Support Final
                        Approval ............................................................................................... 22

                3.      The Proposed Settlement Falls Well Within the Range of Approval ....... 23

                4.      The Reaction of the Settlement Class Supports Final Approval............... 24

        D.      Additional Factors Support Final Approval of the Settlement ............................ 25

III.    THE COURT SHOULD CERTIFY THE SETTLEMENT CLASS ............................... 27

IV.     THE PLAN OF ALLOCATION SHOULD BE APPROVED....................................... 27

V.      CONCLUSION....................................................................................................... 29

i

## TABLE OF AUTHORITIES

**CASES**                                                                                                            **Page(s)**

*Brown v. Transurban USA, Inc.*,
318 F.R.D. 560 (E.D. Va. 2016) .................................................................................................. 6, 11

*Cheng Jiangchen v. Rentech, Inc.*,
2019 WL 5173771 (C.D. Cal. Oct. 10, 2019) ................................................................................ 25

*Chrismon v. Pizza*,
2020 WL 3790866 (E.D.N.C. July 7, 2020) .............................................................................. 4, 20

*Christine Asia Co., Ltd. v. Yun Ma*,
2019 WL 5257534 (S.D.N.Y. Oct. 16, 2019) ................................................................................ 19

*Commissioners of Pub. Works of City of Charleston v. Costco Wholesale Corp.*,
2024 WL 1004697 (D.S.C. Mar. 8, 2024) ..................................................................................... 13

*D&M Farms v. Birdsong Corp.*,
2021 WL 1256905 (E.D. Va. Apr. 5, 2021) ..................................................................................... 5

*Dijkstra v. Carenbauer*,
2016 WL 6804980 (N.D.W. Va. July 12, 2016) ............................................................................ 12

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005) ....................................................................................................................... 19

*Fosbre v. Las Vegas Sands Corp.*,
2017 WL 55878 (D. Nev. Jan. 3, 2017) .................................................................................... 17, 21

*Herrera v. Charlotte School of Law, LLC*,
818 F. App'x 165 (4th Cir. 2020) ................................................................................................... 11

*Hicks v. Stanley*,
2005 WL 2757792 (S.D.N.Y. Oct. 24, 2005) ............................................................................... 13

*HsingChing Hsu. v. Puma Biotechnology, Inc.*,
2019 WL 11637311 (C.D. Cal. May 22, 2019) ............................................................................. 21

*Hubbard v. BankAtlantic Bancorp, Inc.*,
688 F.3d 713 (11th Cir. 2012) ....................................................................................................... 22

*In re Allergan PLC Sec. Litig.*,
2022 WL 17584155 (S.D.N.Y. Dec. 12, 2022) ........................................................................ 17, 20

*In re Barclays Bank PLC Sec. Litig.*,
2017 WL 4082305 (S.D.N.Y. September 13, 2017) ...................................................................... 21

ii

*In re Biolase, Inc. Sec. Litig.*,
  2015 WL 12720318 (C.D. Cal. Oct. 13, 2015)...........................................................24

*In re Bos. Sci. Corp. Sec. Litig.*,
  708 F. Supp. 2d 110 (D. Mass. 2010) ........................................................................21

*In re CRM Holdings, Ltd. Sec. Litig.*,
  2012 WL 1646888 (S.D.N.Y. May 10, 2012) ...........................................................17

*In re James River Group Holdings, Ltd. Sec. Litig.*,
  2023 WL 5538218 (E.D. Va. Aug. 28, 2023)...............................................................8

*In re Jiffy Lube Sec. Litig.*,
  927 F.2d 155 (4th Cir. 1991) ......................................................................................4

*In re MicroStrategy, Inc. Sec. Litig.*,
  148 F. Supp. 2d 654 (E.D. Va. 2001) ........................................................................14

*In re Mylan N.V. Sec. Litig.*,
  666 F.Supp.3d 266 (S.D.N.Y. 2023)..........................................................................20

*In re Novatel Wireless Sec. Litig.*,
  830 F. Supp. 2d 996 (S.D. Cal. 2011)........................................................................21

*In re Omnicom Grp., Inc. Sec. Litig.*,
  541 F. Supp. 2d 546 (S.D.N.Y. 2008)........................................................................21

*In re Oracle Corp. Sec. Litig.*,
  2009 WL 1709050 (N.D. Cal. June 19, 2009)............................................................21

*In re Pfizer, Inc. Securities Litigation*,
  2014 WL 3291230 (S.D.N.Y. July 8, 2014)...............................................................20

*In re PPDAI Grp. Inc. Sec. Litig.*,
  2022 WL 198491 (E.D.N.Y. Jan. 21, 2022) ..............................................................23

*In re REMEC Inc. Sec. Litig.*,
  702 F. Supp. 2d 1202 (S.D. Cal. 2010)......................................................................21

*In re Retek Inc. Sec. Litig.*,
  621 F. Supp. 2d 690 (D. Minn. 2009).........................................................................17

*In re Signet Jewelers Ltd. Sec. Litig.*,
  2020 WL 4196468 (S.D.N.Y. July 21, 2020) ............................................................17

*In re Snap Inc. Sec. Litig.*,
  2021 WL 667590 (C.D. Cal. Feb. 18, 2021)..............................................................23

*In re Star Scientific, Inc. Sec. Litig.*,
    2015 WL 12866962 (E.D. Va. June 26, 2015) ........................................................ 26

*In re Tesla Inc., Sec. Litig.*,
    2023 WL 4032010 (N.D. Cal. June 14, 2023) ................................................. 21, 22

*In re The Mills Corp. Sec. Litig.*,
    265 F.R.D. 246 (E.D. Va. 2009) ........................................................... 5, 6, 7, 14

*In re Valeant Pharms. Int'l, Inc. Third-Party Payor Litig.*,
    2022 WL 525807 (D.N.J. Feb. 22, 2022) ............................................................ 12

*In re Willis Towers Watson PLC Proxy Litig.*,
    2020 WL 5361582 (E.D. Va. Sept. 4, 2020) ........................................................ 14

*In re Wilmington Tr. Sec. Litig.*,
    2018 WL 6046452 (D. Del. Nov. 19, 2018) ........................................................ 15

*In re Xerox Corp. Sec. Litig.*,
    935 F. Supp. 2d 448 (D. Conn. 2013) ................................................................. 21

*In re: Genworth Fin. Sec. Litig.*,
    210 F. Supp. 3d 837 (E.D. Va. 2016) ........................................................ *passim*

*Karp v. First Connecticut Bancorp, Inc.*,
    535 F. Supp. 3d 458 (D. Md. 2021) .................................................................... 20

*Khoja v. Orexigen Therapeutics, Inc.*,
    2021 WL 5632673 (S.D. Cal. Nov. 30, 2021) .................................................... 12

*Lea v. Tal Educ. Grp.*,
    2021 WL 5578665 (S.D.N.Y. Nov. 30, 2021) .................................................... 19

*Medoff v. CVS Caremark Corp.*,
    2016 WL 632238 (D.R.I. Feb. 17, 2016) ........................................................... 24

*Murphy v. Precision Castparts Corp.*,
    2021 WL 2080016 (D. Or. May 24, 2021) ......................................................... 20

*Perrin v. Sw. Water Co.*,
    2014 WL 10979865 (C.D. Cal. July 2, 2014) .................................................... 21

*Phillips v. Triad Guaranty Inc.*,
    2016 WL 1175152 (M.D.N.C. Mar. 23, 2016) ............................................ *passim*

*Plymouth Cnty. Ret. Sys. v. GTT Commc'ns, Inc.*,
    2021 WL 1659848 (E.D. Va. April 23, 2021) ................................................ 8, 14

*Plymouth Cnty. Ret. Sys. v. Patterson Companies, Inc.*,
    2022 WL 2093054 (D. Minn. June 10, 2022)........................................................... 15

*Robinson v. Carolina First Bank NA*,
    2019 WL 2591153 (D.S.C. June 21, 2019)................................................... 16, 22, 26

*Sheet Metal Workers Local 19 Pension Fund v. ProAssurance Corp.*,
    600 F. Supp. 3d 1189 (N.D. Ala. 2021)................................................................... 16

*Sims v. BB&T Corp.*,
    2019 WL 1995314 (M.D.N.C. May 6, 2019) ............................................................ 4

*Smith v. Res-Care, Inc.*,
    2015 WL 6479658 (S.D.W. Va. Oct. 27, 2015) ........................................... 5, 22, 26

*Solomon v. American Web Loan, Inc.*,
    2020 WL 3490606 (E.D. Va. June 26, 2020) ................................................ 5, 9, 16

*Thorpe v. Walter Inv. Mgmt. Corp.*,
    2016 WL 10518902 (S.D. Fla. Oct. 17, 2016)......................................................... 24

*Vataj v. Johnson*,
    2021 WL 5161927 (N.D. Cal. Nov. 5, 2021) .......................................................... 23

**RULES**

Fed. R. Civ. P. 23................................................................................................... *passim*

Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, Lead Plaintiffs Employees' Retirement Fund of the City of Fort Worth d/b/a Fort Worth Employees' Retirement Fund ("Fort Worth") and The City of Miami General Employees' & Sanitation Employees' Retirement Trust ("Miami") (collectively "Lead Plaintiffs"),[1] on behalf of themselves and all other members of the Settlement Class, respectfully submit this memorandum of law in support of their motion for final approval of the proposed Settlement of the above-captioned class action (the "Action") and approval of the proposed plan of allocation of the net proceeds of the Settlement (the "Plan of Allocation").

## I.      **INTRODUCTION**

As detailed in the Stipulation, Lead Plaintiffs and Defendants[2] have agreed to the Settlement, which resolves all claims asserted in the Action, the dismissal with prejudice of the Second Amended Complaint filed on September 9, 2022 (the "Complaint") (ECF No. 69), and the release of all Released Claims, in exchange for a non-reversionary, all-cash payment of $30,000,000, to be paid on behalf of Defendants.  The terms of the Settlement are set forth in the Stipulation, which was previously filed with the Court.  ECF No. 114-1.

---

[1] All capitalized terms used and not otherwise defined in this Memorandum have the meanings ascribed to them in the Stipulation and Agreement of Settlement (the "Stipulation" or "Settlement Agreement") previously filed with the Court (ECF No. 114-1).  Unless otherwise noted, all emphasis is added, and all internal marks and citations are omitted.

[2] Defendants are James River Group Holdings, Ltd. ("James River" or the "Company") and Robert P. Myron, Adam Abram, Frank N. D'Orazio, and Sarah C. Doran (collectively, the "Individual Defendants," and together with James River, "Defendants," and, together with Lead Plaintiffs, the "Parties").

1

As detailed in the accompanying Joint Declaration filed herewith,[3] Lead Plaintiffs and Lead Counsel engaged in extensive litigation efforts over two and a half years, including:

(i)      conducting a thorough investigation of the claims, which included: speaking with over 100 former James River employees, at least fifteen of whom provided Lead Plaintiffs with detailed, substantive information that was critical to Lead Plaintiffs' allegations and included in the Complaint; contacting 250 additional individuals who may have had relevant information; and reviewing documentary and testimonial evidence from an insurance bad faith litigation against James River, which the Court repeatedly cited in denying in its entirety Defendants' motion to dismiss the Complaint (¶¶ 5, 23-24, 29, 36);

(ii)     filing two highly detailed amended complaints incorporating the results of Lead Plaintiffs' ongoing investigation and consultation with several experts, and fully briefing motions to dismiss each of these complaints (¶¶ 5, 19, 23-34);

(iii)    surviving Defendants' motions to dismiss under the exacting pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Federal Rule of Civil Procedure 9(b) (¶¶ 5, 36);

(iv)     consulting with numerous experts, including financial experts, accounting experts, and multiple insurance industry experts (¶¶ 5, 25-26, 65-69);

(v)      engaging in comprehensive discovery efforts under the time pressures of the "Rocket Docket" expedited case schedule, including obtaining over a million pages of documents produced by Defendants and multiple subpoenaed non-parties, and identifying and analyzing thousands of highly relevant documents contained in the productions (¶¶ 5, 42-63);

(vi)     working on numerous expert reports that were due to be served within weeks of reaching the Settlement, including on merits issues and class certification/market efficiency (¶¶ 5, 65-69);

(vii)    submitting detailed mediation statements before Jed D. Melnick, Esq., a highly experienced mediator of complex shareholder litigation, setting forth Lead

---

[3] The "Joint Declaration" or "Joint Decl." is the Joint Declaration of Rebecca E. Boon and David R. Kaplan in Support of (I) Lead Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation, and (II) Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses. The Joint Declaration is an integral part of this submission. For the sake of brevity in this memorandum, the Court is referred to it for a detailed description of, *inter alia*, the factual and procedural history of the Action (¶¶ 5, 15-79); the nature of the claims asserted (¶¶ 15-18); the negotiations leading to the Settlement (¶¶ 5, 7, 70-76); the risks and uncertainties of continued litigation (¶¶ 80-107); and the services Lead Counsel provided for the benefit of the Settlement Class (¶¶ 134-135). Unless otherwise noted, citations to "¶" in this memorandum refer to paragraphs in the Joint Declaration, and exhibits referenced herein are attached to the Joint Declaration.

2

Plaintiffs' positions on highly disputed issues in the case supported by discovery documents, sworn witness testimony, and applicable law (¶¶ 5, 70);

(viii)   engaging in two formal mediation sessions before Mr. Melnick, and continued mediation discussions under Mr. Melnick's oversight before the Parties accepted his mediator's recommendation (¶¶ 5, 7, 70-73); and

(ix)   drafting and negotiating a Term Sheet, the Stipulation setting out the terms of the Settlement, and related documentation (¶¶ 5, 74-75).

Accordingly, at the time the Settlement was reached, Lead Counsel had a well-developed understanding of the strengths and weaknesses of the claims and defenses. Moreover, the $30 million Settlement is an outstanding result, as it secures for Settlement Class Members between 13% and 25% of their potential recoverable damages—representing a recovery that is substantially higher than the typical securities class action recovery in similar cases.

In light of the substantial recovery for the Settlement Class and the risks of continued litigation, as discussed further below and in the Joint Declaration, Lead Plaintiffs respectfully submit that the Settlement is fair, reasonable, and adequate, and warrants final approval by the Court. Additionally, Lead Plaintiffs request that the Court approve the proposed Plan of Allocation, which was set forth in full in the Notice to Settlement Class Members. The Plan of Allocation, which was developed by Lead Counsel in consultation with Lead Plaintiffs' damages expert, provides a reasonable and equitable method for allocating the Net Settlement Fund among Settlement Class Members who submit valid claims. The Plan of Allocation is fair and reasonable and should likewise be approved.

## II.   **THE PROPOSED SETTLEMENT WARRANTS FINAL APPROVAL**

### A.   **Legal Standard**

Courts in the Fourth Circuit have long recognized a "a strong judicial policy in favor of settlement, in order [to] conserve scarce resources that would otherwise be devoted to protracted

3

litigation." *Chrismon v. Pizza*, 2020 WL 3790866, at *4 (E.D.N.C. July 7, 2020). "This is particularly true in class actions." *Sims v. BB&T Corp.*, 2019 WL 1995314, at *3 (M.D.N.C. May 6, 2019).

Pursuant to Rule 23(e)(2), a class action settlement should be approved if the Court finds it "fair, reasonable, and adequate." Traditionally, the Fourth Circuit has instructed courts to analyze the "fairness" and "adequacy" factors set forth in *In re Jiffy Lube Sec. Litig.*, 927 F.2d 155 (4th Cir. 1991) ("*Jiffy Lube*") when making this determination. The *Jiffy Lube* <u>fairness factors</u> are:

(1) the posture of the case at the time settlement was proposed;
(2) the extent of discovery conducted;
(3) the circumstances surrounding settlement negotiations; and
(4) the experience of counsel in the area of law.

*In re: Genworth Fin. Sec. Litig.*, 210 F. Supp. 3d 837, 839-40 (E.D. Va. 2016) (Gibney, Jr., J.).

The *Jiffy Lube* <u>adequacy factors</u> are:

(1) the relative strength of the plaintiffs' case on the merits;
(2) the existence of any difficulties of proof or strong defenses the plaintiffs are likely to encounter if the case goes to trial;
(3) the anticipated duration and expense of additional litigation;
(4) the solvency of the defendant[] and the likelihood of recovery on a litigated judgment; and
(5) the degree of opposition to the settlement.

*Id*. at 841.

In 2018, Rule 23(e) was amended to include factors for courts to consider when approving a class settlement, but the "goal of this amendment [was] not to displace any [circuit's unique] factor[s]." Fed. R. Civ. P. 23(e)(2) Advisory Committee Notes to 2018 Amendment. Indeed, courts in this District recognize that "because [the Fourth Circuit's] factors for assessing class-action settlements almost completely overlap with the new Rule 23(e)(2) factors, the outcome[s]

4

[are] the same under both our factors and the Rule's factors." *D&M Farms v. Birdsong Corp.*, 2021 WL 1256905, at *3 (E.D. Va. Apr. 5, 2021) (Jackson, J.).[4]

The Settlement in this Action easily satisfies each of the factors set forth in *Jiffy Lube* and Rule 23(e).

### B.    The Settlement is Fair and Reasonable and Should Be Approved

#### 1.    The Settlement Was Achieved After Extensive Litigation

The first and second *Jiffy Lube* fairness factors analyze whether the case progressed far enough to ensure that "the parties did not settle prematurely," and that they were fully informed as to "the strengths and weaknesses of their own and their adversaries' claims and defenses." *Smith v. Res-Care, Inc.*, 2015 WL 6479658, at *5-6 (S.D.W. Va. Oct. 27, 2015); *see Solomon v. American Web Loan, Inc.*, 2020 WL 3490606, at *4 (E.D. Va. June 26, 2020) (Morgan, Jr., J.) (explaining that "in cases where 'several briefs have been filed and argued, courts should be inclined to favor the legitimacy of a settlement'") (citing *In re The Mills Corp. Sec. Litig.*, 265 F.R.D. 246, 254 (E.D. Va. 2009) (O'Grady, J.)).

Here, Lead Counsel and Lead Plaintiffs "had more than a sufficient opportunity to appreciate and develop the merits of their case" such that the case was "well-enough developed"

---

[4] As amended, Rule 23(e) requires consideration of whether:

> (A) plaintiffs and counsel have adequately represented the class;
> (B) the settlement was negotiated at arm's-length;
> (C) the relief for the class is adequate, taking into account:
>     (i) the costs, risks, and delay of trial and appeal,
>     (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims,
>     (iii) the terms of any proposed fee award, including timing of payment, and
>     (iv) any agreement required to be identified under Rule 23(e)(3); and
> (D) the proposal treats class members equitably relative to each other.

*See* Fed. R. Civ. P. 23(e)(2).

to warrant final approval.  *See In re Mills*, 265 F.R.D. at 254 (granting final approval where plaintiffs filed multiple complaints, overcame motions to dismiss, and conducted significant discovery)*; see also Brown v. Transurban USA, Inc.*, 318 F.R.D. 560, 572 (E.D. Va. 2016) (Cacheris, J.) (granting final approval where settlement occurred prior to the completion of formal discovery); *Phillips v. Triad Guaranty Inc.*, 2016 WL 1175152, at *2 (M.D.N.C. Mar. 23, 2016) (granting final approval where settlement occurred prior to formal discovery).  At the time the Parties agreed to the Settlement, Lead Plaintiffs had a well-developed understanding of the strengths and weaknesses of their positions.  Indeed, Fort Worth conducted the initial investigation which led to the filing of the initial complaint on July 9, 2021.  ¶ 19; ECF No. 1.  Shortly thereafter, Fort Worth and Miami and their respective counsel, Saxena White P.A. ("Saxena White") and Bernstein Litowitz Berger & Grossmann LLP ("BLB&G"), agreed to join together to prosecute the Action on behalf of the class.  ¶ 20.  On September 22, 2021, the Court appointed Fort Worth and Miami as co-Lead Plaintiffs, Saxena White and BLB&G as co-Lead Counsel, and Cohen Milstein Sellers & Toll PLLC as Liaison Counsel.  ECF No. 20.

Lead Counsel thoroughly investigated the Amended Class Action Complaint for Violations of the Federal Securities Laws (the "AC"), which was filed on November 19, 2021.  ECF No. 41.  Indeed, prior to drafting the AC, Lead Plaintiffs located and spoke with over 100 former James River employees,[5] interviewing dozens of these individuals—fifteen of whom provided detailed facts and information pled in the AC.  ¶¶ 5, 24.  In addition, Lead Counsel conducted an in-depth review of James River's (i) SEC filings, press releases, investor conference calls, and other public statements, (ii) research reports by securities and financial analysts discussing and analyzing James River's business operations and results, and (iii) data reflecting the price of James River common

---

[5] Lead Plaintiffs also contacted over 250 other individuals believed to have relevant information.

stock, all in consultation with forensic and economic experts.  Thereafter, the Parties fully briefed Defendants' motion to dismiss the AC.  ECF Nos. 53-55, 57-58, 60.

Before the Court ruled on the motion to dismiss the AC, Lead Counsels' continuing investigative efforts revealed supporting additional evidence and testimony from an insurance bad faith action against James River's specialty insurance operating subsidiary, styled *St. Amand v. James River Insurance Company, et al.*, Case No. 2:20-cv-01666 (D. Nev.).   ¶¶ 29-30. Accordingly, on August 25, 2022, Lead Plaintiffs moved for leave to file a Second Amended Class Action Complaint for Violations of the Federal Securities Laws (the "SAC" or the "Complaint"). ECF Nos. 64-66.  On September 9, 2022, the Court granted this motion, and the SAC was made effective.  *See* ECF Nos. 68, 69.  The Parties then fully briefed Defendants' motion to dismiss the SAC.  ECF Nos. 71-73, 74, 75.[6]  On August 28, 2023, the Court issued an Order and accompanying 59-page Memorandum Opinion fully denying Defendants' motion to dismiss the SAC and sustaining all alleged misstatements and corrective disclosures in the Complaint in their entirety. ECF Nos. 81, 82.  Accordingly, the first *Jiffy Lube* factor supports final approval.

The second *Jiffy Lube* factor requires an evaluation of the extent of discovery that has taken place.  *See Genworth*, 210 F. Supp. 3d at 840.  This factor assesses whether plaintiffs' counsel has had time "to appreciate the full landscape of their case when agreeing to enter into this Settlement." *In re Mills*, 265 F.R.D. at 254.  Through their extensive investigation, voluminous discovery, and regular consultations with experts in multiple disciplines—and as demonstrated in their filings with the Court and submissions to Mr. Melnick—Lead Plaintiffs and Lead Counsel were clearly

---

[6] On June 23, 2023, the case was reassigned to the Honorable David J. Novak.  ECF No. 80.

"well-informed of the strengths and weaknesses of the merits of the case." *Phillips*, 2016 WL 1175152, at *2.[7]

Indeed, even before formal discovery opened, Lead Plaintiffs had amassed a substantial amount of information from their extensive informal discovery efforts, which provided a host of information informing Lead Plaintiffs about the strengths and weaknesses of their case. For example, in addition to thoroughly reviewing all relevant public information—including Defendants' statements to investors and related analyst and market commentary—Lead Plaintiffs interviewed and obtained relevant information concerning the claims and allegations at issue from dozens of percipient witnesses, including over 100 former James River employees. The accounts of fifteen of these former employees are described and quoted in the AC, and the Court cited such information in sustaining the adequacy of the allegations. SAC ¶¶ 75-114; *see In re James River Group Holdings, Ltd. Sec. Litig.*, 2023 WL 5538218, at *10 (E.D. Va. Aug. 28, 2023) (Novak, J.) (crediting former employee accounts). Further, Lead Plaintiffs obtained sworn deposition testimony provided by numerous other former and current James River employees—including key executives and managers such as James River's former Senior Vice President and Chief Claims Officer, its former Vice President of Claims, and its former Assistant Director of Litigated Claims

---

[7] Lead Counsels' ability to successfully plan and expeditiously obtain extensive discovery from Defendants and numerous non-parties within a short time period was facilitated by its prior, successful experience with this District's "Rocket Docket" case schedules. *See*, *e.g.*, *In re Willis Towers Watson plc Proxy Litig.*, Case No. 1:17-cv-01338-AJT-JFA, ECF No. 345 (E.D. Va. May 21, 2021) (Trenga, J.) (granting final approval of $75 million recovery for investor class where BLB&G prosecuted the case under a 6-month discovery period); *Genworth*, 210 F. Supp. 3d at 846 (granting final approval of $219 million recovery for investor class where BLB&G prosecuted the case under a 10-month discovery period); *Plymouth Cnty. Ret. Sys. v. Evolent Health, Inc.*, Case No. 1:19-cv-01031-MSN-TCB, ECF No. 256 (E.D. Va. Nov. 18, 2022) (Nachmanoff, J.) (granting final approval of $23.5 million recovery for investor class where Saxena White prosecuted the case under a 4-month discovery period); *Plymouth Cnty. Ret. Sys. v. GTT Commc'ns, Inc.,* 2021 WL 1659848, at *1 (E.D. Va. April 23, 2021) (Hilton, J.) (granting final approval of $25 million recovery where Saxena White prosecuted the case under a 4½ month discovery period).

(among others)—as well as other highly relevant evidence developed in the related *St. Amand* bad faith litigation. The evidentiary record in *St. Amand* further informed Lead Plaintiffs' understanding of the strengths and weaknesses of the case.

Once Lead Plaintiffs defeated Defendants' second motion to dismiss, the SAC was established as the operative complaint and the PSLRA automatic discovery stay was lifted, which allowed Lead Plaintiffs to obtain even more highly probative evidence bearing on their appreciation of "the full landscape of their case." *Solomon*, 2020 WL 3490606, at *4. Indeed, after the discovery stay lifted, Lead Plaintiffs promptly drafted a proposed Stipulated Protective Order for discovery materials and a stipulation regarding the production of electronically stored information, which the Parties finalized after several weeks of negotiation. *See* ECF No. 107. After the Initial Pre-trial Conference on September 7, 2023, the Court issued a scheduling order on September 8, 2023, which, pursuant to the Eastern District of Virginia's expedited scheduling, required that discovery be completed very quickly. Specifically, the Court's September 8, 2023 scheduling Order called for the close of fact and expert discovery four months later (January 5, 2024) and set a trial date three and a half months after that (April 23, 2024). ECF No. 95. Notably, the operative case schedule was approximately ***half*** that set in the *Altria* matter, another recent securities fraud class action litigated before this Court. *See Klein v. Altria Group, Inc.*, Case No. 3:20-cv-00075-DJN, Docket Nos. 173, 194 (E.D. Va. 2021). Thereafter, Lead Plaintiffs aggressively pursued discovery by: (1) serving document requests and interrogatories on Defendants; (2) serving document subpoenas on multiple third parties, including Uber, Willis Towers Watson, Ernst & Young, and ReSource Pro; and (3) noticing the depositions of the Individual Defendants and several key witnesses. ¶¶ 44, 46, 53, 64.

9

Lead Plaintiffs' expeditious discovery efforts proved extraordinarily fruitful. After Lead Plaintiffs served the above-referenced discovery, the Parties engaged in extensive discovery efforts, including frequent negotiations regarding the proper scope of discovery and specific deadlines for Defendants' rolling document production. By the end of October 2023, Defendants claimed to have assembled "a team of 175 document review attorneys" and were "onboarding 50 more" to conduct privilege, confidentiality, and responsiveness reviews in order to comply with the case schedule and Lead Plaintiffs' comprehensive discovery requests. Despite assembling this large, dedicated team of document review attorneys, Defendants soon informed Lead Plaintiffs that there was so much responsive material that it was "practically impossible to substantially complete" their production of documents under the operative case schedule. ¶ 50. Thus, on October 27, 2023, the Parties filed a Joint Motion for Extension of Time to Complete Discovery. ECF Nos. 109-110. The Court entered an Order modifying the discovery deadlines on October 31, 2023, which, among other things, provided for the close of fact and expert discovery on February 2, 2024, and set that same date as the deadline for dispositive and *Daubert* motions. ECF No. 111. Significantly, however, the Parties did ***not*** request and the Court did not change the trial date, and instead assiduously prepared for an April 2024 trial.

Indeed, between October 6, 2023, and November 15, 2023, Defendants made eleven rolling productions of documents—nearly two productions a week—producing a total of nearly 250,000 documents comprising over 1.6 million pages. ¶ 54. Utilizing their own staff attorney review teams, Lead Plaintiffs conducted closely supervised reviews of the documents as they were produced (aided by senior attorneys and advanced e-discovery tools), provided relevant documents to their experts to conduct their analyses, and, in consultation with their experts, analyzed the relevant evidence and drafted additional necessary discovery requests. ¶¶ 55-58, 65-69. Lead

Plaintiffs also regularly consulted with their experts—who spanned multiple disciplines, including insurance claims-handling customs and practices, actuarial science, accounting, and finance/econometrics—as the experts began preparation of their substantive reports.  ¶¶ 65-69. Throughout this time, Lead Plaintiffs also negotiated with multiple third parties regarding the scope and pace of their productions, and ultimately obtained and reviewed over 6,700 pages of documents from third parties, including key documents from Uber.  Like Defendants' voluminous production, these non-party productions contained numerous highly relevant documents, which further informed Lead Plaintiffs' understanding of the strengths and weaknesses of their claims. Furthermore, Lead Plaintiffs responded to Defendants' requests for production and produced over 6,300 pages of documents to Defendants.  ¶¶ 60-62.  Thus, by the time the Parties began mediation in November 2023, Lead Plaintiffs had undertaken extensive formal and informal discovery efforts, and had marshalled an extraordinary amount of evidence enabling them to evaluate the strengths and weaknesses of the case.

Accordingly, this Action progressed materially from its inception, allowing the Parties to thoroughly vet the merits of their claims and defenses through contentious motion practice and comprehensive fact and expert discovery, lending significant weight to Lead Plaintiffs' determination that the Settlement is fair and adequate.  *See e.g., Herrera v. Charlotte School of Law, LLC*, 818 F. App'x 165, 177 (4th Cir. 2020) (affirming fairness of settlement where the parties had engaged in "a year and a half of litigation involving significant motions practice and discovery"); *Brown*, 318 F.R.D. at 572 ("plaintiffs have conducted sufficient [] discovery and investigation to . . . evaluate [fairly] the merits of Defendants' positions during settlement negotiations").

11

### 2.    The Settlement Is the Result of Good Faith, Arm's-Length Negotiations with the Assistance of an Experienced Mediator

"Absent evidence to the contrary, the Court should presume that settlement negotiations were conducted in good faith and that the resulting agreement was reached without collusion." *Dijkstra v. Carenbauer*, 2016 WL 6804980, at *2 (N.D.W. Va. July 12, 2016) (citing Newberg on Class Actions § 11.28 at 1159 (3d ed. 1992)).  Here, the Settlement negotiations involved an intensive mediation process, including multiple detailed written submissions and presentations addressing contested issues concerning class certification, liability, and damages.  ¶¶ 5, 70-73. Significantly, these negotiations were overseen by Jed D. Melnick, Esq., of JAMS, an "experienced, neutral mediator" who has mediated over one thousand disputes with an aggregate value in the billions of dollars.[8]  *See Khoja v. Orexigen Therapeutics, Inc.*, 2021 WL 5632673, at *4 (S.D. Cal. Nov. 30, 2021); *In re Valeant Pharms. Int'l, Inc. Third-Party Payor Litig.*, 2022 WL 525807, at *2 (D.N.J. Feb. 22, 2022) (settlement approved where "Plaintiffs and [Defendant] ultimately agreed to mediate their claims before Jed Melnick of JAMS, a 'nationally recognized alternative dispute resolution firm'").

Specifically, on November 3, 2023, after the Parties had exchanged hundreds of thousands of documents, the Parties held an in-person, full-day mediation session before Mr. Melnick.  ¶¶ 70-71.  In advance of this mediation session, the Parties submitted detailed mediation statements with numerous exhibits of evidentiary support addressing all the key disputes in this Action.  This mediation session concluded without a resolution of the Action.  On November 15, 2023, the Parties remotely participated in a second formal half-day mediation session before Mr. Melnick, again submitting written statements and additional exhibits supporting their respective positions,

---

[8] *See* https://www.jamsadr.com/melnick/ (biography of Jed D. Melnick, Esq.).

and responding to the other side's positions and evidence.  While the session was productive, it did not result in a resolution of the Action.  ¶¶ 72-73.  With the aid of Mr. Melnick, the Parties continued their discussions over the following days.  During this time, Lead Plaintiffs continued to seek the maximum recovery possible for the Settlement Class.  Ultimately, the Parties accepted Mr. Melnick's mediator's recommendation and agreed in principle to settle this Action for $30 million in cash, and then negotiated and agreed to a term sheet setting forth the key terms of the settlement, which they executed on December 7, 2023.  ¶¶ 73-74.  The Parties' participation in this intensive, extensive, arm's length mediation process before a highly experienced neutral strongly supports the fairness and reasonableness of the resultant Settlement.

Moreover, the fact that the case did not settle at the formal mediation sessions held on November 3 and November 15, 2023, shows that Lead Plaintiffs refused to settle "on the quick and cheap," but instead pressed for the maximum recovery possible.  Indeed, after engaging in two failed mediation sessions, the Parties continued the arm's length negotiations under Mr. Melnick's supervision, which helped pave the way for them to ultimately resolve this Action for the significant $30 million Settlement Amount.  *See Commissioners of Pub. Works of City of Charleston v. Costco Wholesale Corp.*, 2024 WL 1004697, at *4 (D.S.C. Mar. 8, 2024) (granting final approval where "the proposed settlements were the result of extensive communication between the Parties for over two years," including multiple mediations, and were not an "extremely expedited settlement of questionable value"); *Hicks v. Stanley*, 2005 WL 2757792, at *5 (S.D.N.Y. Oct. 24, 2005) ("A breakdown in settlement negotiations can tend to display the negotiation's arms-length and non-collusive nature.") (citation omitted).

In sum, in light of the intensive mediation efforts undertaken by experienced counsel and assisted by an experienced mediator in this Action, *Jiffy Lube* fairness factor three ("the

13

circumstances surrounding settlement negotiations") and Rule 23(e)(2)(B) (whether "the settlement was negotiated at arm's-length") both strongly support approval of the Settlement.

### 3.    The Action Was Litigated and Settled by Counsel with Significant Experience in Securities Class Action Litigation

The fourth *Jiffy Lube* fairness factor weighs the experience of counsel in the particular field of law. *Genworth*, 210 F. Supp. 3d at 841. Indeed, "concerns of collusion" are minimized where both sides' counsel are "nationally recognized members of the securities litigation bar." *Phillips*, 2016 WL 1175152, at *3. Moreover, Courts recognize that the opinion of experienced and informed counsel favoring a settlement should be afforded substantial consideration in determining whether a class settlement is fair and adequate. *See In re MicroStrategy, Inc. Sec. Litig.*, 148 F. Supp. 2d 654, 665 (E.D. Va. 2001) (Ellis, J.).

Here, Lead Counsel are highly experienced and well-respected in the field of securities class action litigation and have extensive track records of successfully prosecuting actions on behalf of shareholder classes in this District and nationwide. *See* Exs. 7A-4 and Ex. 7B-3 (Lead Counsel firm resumes); *see also, e.g., In re Mills,* 265 F.R.D. at 266 (granting final approval to $202.75 million settlement—the second largest recovery ever obtained in a securities class action in Virginia—in which BLB&G served as co-lead counsel); *Genworth,* 210 F. Supp. 3d at 846 (granting final approval to $219 million PSLRA settlement—the largest recovery ever obtained in a securities class action in Virginia—in which BLB&G served as co-lead counsel); *In re Willis Towers Watson PLC Proxy Litig.*, 2020 WL 5361582, at *15 (E.D. Va. Sept. 4, 2020) (Trenga, J.) (appointing BLB&G as class counsel and noting that "the Court has no doubt that Plaintiff's counsel will ably and vigorously prosecute this action on behalf of the Class"; the case subsequently settled for $75 million); *GTT,* 2021 WL 1659848, at *5 (granting final approval to $25 million PSLRA settlement and finding that Saxena White "conducted the litigation and

14

achieved the [s]ettlement with skill, perseverance and diligent advocacy, and with considerable challenges from formidable opposition"); *In re Wilmington Tr. Sec. Litig.*, 2018 WL 6046452, at *8 (D. Del. Nov. 19, 2018) (granting final approval to $210 million PSLRA settlement and noting Saxena White and BLB&G are "highly experienced attorneys" and that "[t]he significant amount of recovery in the settlement agreements attests to their efficiency"); *Plymouth Cnty. Ret. Sys. v. Patterson Companies, Inc.*, 2022 WL 2093054, at *2 (D. Minn. June 10, 2022) (granting final approval to $63 million PSLRA settlement and noting that Saxena White "conducted the Litigation and achieved the Settlement with skill, perseverance, and diligent advocacy").

Additionally, Lead Plaintiffs were able to achieve this outstanding Settlement notwithstanding the highly skilled defense mounted by preeminent international law firm, Debevoise & Plimpton LLP, which has more than 900 lawyers in nine offices across three continents.[9]  Defendants' local counsel, McGuire Woods LLP, is also a large and prominent international law firm, with approximately 250 lawyers at its largest office in Richmond.[10]  *See Genworth*, 210 F. Supp. 3d at 841 ("defendants' law firms are also national firms with deep experience in securities litigation, further demonstrating the fairness of the Settlement").  Indeed, Defendants' litigation team included some of these firms' most experienced securities litigators, including the Co-Chair of Debevoise & Plimpton's Securities Litigation Practice and the Chair of the firm's Insurance Litigation Practice.[11]

The skill and experience of Lead Counsel and their vigorous prosecution of the Action also strongly support a finding that "class representatives and class counsel have adequately

---

[9] *See* https://www.debevoise.com/aboutus/overview.
[10] *See* https://www.mcguirewoods.com/about-us/#who-we-are.
[11] *See* www.debevoise.com/maeveoconnor (biography of Maeve O'Connor).

represented the class." Fed. R. Civ. P. 23(e)(2)(A).[12]  Lead Plaintiffs Fort Worth and Miami have claims that are typical of and coextensive with those of other Settlement Class Members, and have no interests antagonistic to the interests of other members of the Settlement Class.  Accordingly, Rule 23(e)(2)(A) also strongly supports approval of the Settlement.

### C.     The Settlement Is Adequate and Should Be Approved

#### 1.     The Strength of Plaintiffs' Case and the Difficulties of Proof and Defenses Plaintiffs Would Encounter at Trial Support Final Approval

Turning to *Jiffy Lube*'s adequacy factors, the first and second *Jiffy Lube* adequacy factors "require the Court to examine how much the class sacrifices in settling a potentially strong case in light of how much the class gains in avoiding the uncertainty of a potentially difficult case." *Robinson v. Carolina First Bank NA*, 2019 WL 2591153, at \*10 (D.S.C. June 21, 2019).  This inquiry is essentially the same as Rule 23(e)(2)(C), which looks to whether "the relief provided for the class is adequate, taking into account … (i) the costs, risks, and delay of trial and appeal."

Courts around the country recognize securities class actions as "notably difficult and notoriously uncertain." *Phillips*, 2016 WL 1175152, at \*4.  Complex securities fraud class actions such as this one present myriad risks that a plaintiff must overcome to ultimately secure a recovery. *See, e.g., Genworth*, 210 F. Supp. 3d at 844 ("[S]ecurities fraud cases require significant showings of fact in order to prevail before a jury, and elements such as scienter, reliance, and materiality of misrepresentation are notoriously difficult to establish").  Moreover, cases from around the country underscore that securities fraud cases based on statements concerning the sufficiency of loss reserves are among the most challenging types of securities fraud cases for investors.  *See, e.g., Sheet Metal Workers Local 19 Pension Fund v. ProAssurance Corp.*, 600 F. Supp. 3d 1189, 1224

---

[12] The adequacy requirement is met when "(1) the named plaintiff does not have interests antagonistic to those of the class; and (2) plaintiff's attorneys are 'qualified, experienced, and generally able to conduct the litigation.'"  *Solomon*, 2020 WL 3490606, at \*2.

(N.D. Ala. 2021) (dismissing "the bulk of the plaintiffs' §10(b) claims predicated on [improper insurance] loss reserves," and finding that "[a]t best, most of these allegations amount to claims that ProAssurance and its executives could have done a better job at estimating losses"); *In re Signet Jewelers Ltd. Sec. Litig.*, 2020 WL 4196468, at **9-10 (S.D.N.Y. July 21, 2020) (granting final approval of PSLRA settlement in case arising out of allegedly fraudulent loan loss reserves, and listing a host of arguments defendants would have made supporting their reserving methods and statements); *see also In re CRM Holdings, Ltd. Sec. Litig.*, 2012 WL 1646888, at *28 (S.D.N.Y. May 10, 2012) (dismissing securities fraud claim and noting "[i]nsurance reserves are, by their nature, extremely conjectural, and may need adjustment as time passes and their accuracy can be tested in retrospect").  Underscoring these risks was the fact that no regulatory body sought to bring any enforcement action against James River.

Here, as detailed in the Joint Declaration, while Lead Plaintiffs strongly believe that their claims have merit, Defendants lodged numerous credible defenses, each of which presented serious risks and easily could have resulted in either a substantially lesser recovery, or no recovery at all.  ¶¶ 91-108.  Critically, Lead Plaintiffs would be required to prove all elements of their claims, while Defendants would need to only succeed on one defense to potentially defeat the entire Action.  *See e.g., In re Allergan PLC Sec. Litig.*, 2022 WL 17584155, at *7 (S.D.N.Y. Dec. 12, 2022) (granting summary judgment in a securities class action where "Plaintiff has not produced sufficient evidence to show that a genuine issue of material fact remains on the elements of (i) a misrepresentation or omission (falsity); (ii) materiality; and (iii) loss causation"); *Fosbre v. Las Vegas Sands Corp.*, 2017 WL 55878, at *28 (D. Nev. Jan. 3, 2017) (granting summary judgment in securities action due to, *inter alia*, lack of falsity and scienter); *In re Retek Inc. Sec. Litig.*, 621

17

F. Supp. 2d 690, 708-09 (D. Minn. 2009) (granting summary judgment in a securities action where plaintiffs failed to present evidence of loss causation).

Defendants continuously and vehemently denied all of Lead Plaintiffs' allegations, and presented challenging arguments regarding falsity, scienter, and loss causation. At summary judgment or at trial, Defendants likely would have argued that documentary evidence and testimony showed that their statements about the reserves for the Uber account were not false or misleading when made, because they were projections and statements of opinion based on reasonable calculations and assumptions made by the Company's actuaries. Even though Lead Plaintiffs believe they had credible counterarguments, it is uncertain that Lead Plaintiffs could convince the Court or a jury, particularly considering the complexity and subjectivity of the underlying calculations. *See Genworth*, 210 F. Supp. 3d at 841-42 ("plaintiffs at trial would bear the burden of conveying complex information to a jury using financial records, complicated accounting principles, and expert testimony. The plaintiffs would also need to prove that the statements made were in fact false, as opposed to mere projections not subject to liability . . . The high risk faced by taking the case to a jury verdict demonstrates the adequacy of this [] settlement").

With respect to scienter, Defendants likely would have argued that the Individual Defendants lacked the requisite scienter for securities fraud because the Company had a formal process for estimating reserves, employed external actuarial consultant Willis Towers Watson, and the Company's financial statements and actuarial conclusions were audited by Ernst & Young, a "Big Four" accounting firm. Therefore, Defendants would argue they had a reasonable basis on which to make the statements. *See Genworth*, 210 F. Supp. 3d at 841-42 (noting "the defendants employed a nationally-recognized auditor, KPMG, who found no violations of Generally Accepted

18

Accounting Principles ('GAAP') in Genworth's financial statements," and "[e]ven with a strong case, the plaintiffs nonetheless face a large risk before a jury").

Further, even if Lead Plaintiffs ultimately prevailed in proving materiality, falsity, and scienter, this Action would have involved significant risks to establishing loss causation and damages. *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345-46 (2005) (plaintiffs bear the burden of proving "that the defendant's misrepresentations 'caused the loss for which the plaintiff seeks to recover'").

Defendants would likely have argued, among other things, that the final corrective disclosure (which caused James River's stock price to decline by over $6 per share) did not reveal any new information about the alleged reserving problems for the Uber account. Indeed, Defendants would likely have argued that the information about the loss portfolio transfer relating to the Uber claims discussed in the Company's October 26, 2021 press release, was already known to the market because the Company previously announced the loss portfolio transfer and its financial ramifications on September 30, 2021. *See, e.g., Christine Asia Co., Ltd. v. Yun Ma*, 2019 WL 5257534, at *13 (S.D.N.Y. Oct. 16, 2019) ("While Plaintiffs proceeded as though they had the better arguments, the risk remained that Defendants could have defeated loss causation, or significantly diminished damages"). Defendants could have raised this argument as early as the class certification stage and would not have needed to wait until summary judgment or trial. If Defendants were successful, this argument would have significantly narrowed both the size of the class and the extent of recoverable damages in the case. *See, e.g., Lea v. Tal Educ. Grp.*, 2021 WL 5578665, at *10 (S.D.N.Y. Nov. 30, 2021) ("[c]ourts generally acknowledge that a [pending] contested motion to certify a class" supports settlement because of a "risk that class certification might be denied").

19

Thus, while Lead Plaintiffs believe they had credible counterarguments on each of these essential elements, and would have obtained class certification in full, there is no guarantee that the Court or a jury would have credited Lead Plaintiffs' counterarguments, and the substantial Settlement avoids such significant risks. *See, e.g., Chrismon*, 2020 WL 3790866, at *5 ("[i]f settlement has any purpose at all, it is to avoid a trial on the merits because of the uncertainty of the outcome").

Further, even if Lead Plaintiffs were able to develop a strong liability case, there is the risk that the court could dismiss the lawsuit for failure to provide reliable expert testimony regarding loss causation and damages, including the amount of artificial inflation in James River's stock price attributable to each of the alleged misstatements. *See, e.g.*, *Karp v. First Connecticut Bancorp, Inc.*, 535 F. Supp. 3d 458, 473 (D. Md. 2021), *aff'd*, 69 F.4th 223 (4th Cir. 2023) (granting summary judgment in favor of defendants based on plaintiffs' lack of expert opinion on loss causation); *In re Mylan N.V. Sec. Litig.*, 666 F.Supp.3d 266, 292 n.3, 303, 320, 323, 326 (S.D.N.Y. 2023) (granting summary judgment for defendants and discrediting or refusing to consider plaintiffs' expert reports on competition, market allocation, price fixing, scienter, and loss causation); *In re Pfizer, Inc. Securities Litigation*, 2014 WL 3291230, *3 (S.D.N.Y. July 8, 2014), *vacated on other grounds*, 819 F.3d 642 (2d Cir. 2016) (granting summary judgment in favor defendants after excluding plaintiffs' loss causation and damages expert because "Plaintiffs' failure to proffer admissible loss causation and damages evidence is fatal to Plaintiffs' claims.").

Lead Plaintiffs also faced the risk that summary judgment could be granted in Defendants' favor, despite their efforts and the efforts of Lead Counsel over the two and a half years that this Action was pending. *See, e.g., In re Allergan PLC Sec. Litig.*, 2022 WL 17584155 (S.D.N.Y. Dec. 12, 2022) (granting summary judgment after approximately four years of litigation); *Murphy*

20

*v. Precision Castparts Corp.*, 2021 WL 2080016, at *6 (D. Or. May 24, 2021) (granting summary judgment after approximately five years of litigation); *In re Barclays Bank PLC Sec. Litig.*, 2017 WL 4082305 (S.D.N.Y. September 13, 2017) (summary judgment granted in 2017 after eight years of litigation); *In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 554-55 (S.D.N.Y. 2008), *aff'd* 597 F.3d 501 (2d Cir. 2010) (summary judgment granted after six years of litigation and millions of dollars spent by plaintiffs' counsel); *see also In re Xerox Corp. Sec. Litig.*, 935 F. Supp. 2d 448 (D. Conn. 2013), *aff'd* 766 F.3d 172 (2d Cir. 2014); *Fosbre v. Las Vegas Sands Corp.*, 2017 WL 55878 (D. Nev. Jan. 3, 2017), *aff'd sub nom.*, *Pompano Beach Police & Firefighters' Ret. Sys. v. Las Vegas Sands Corp.*, 732 F. App'x 543 (9th Cir. 2018); *Perrin v. Sw. Water Co.*, 2014 WL 10979865 (C.D. Cal. July 2, 2014); *In re Novatel Wireless Sec. Litig.*, 830 F. Supp. 2d 996, 1015 (S.D. Cal. 2011); *In re Oracle Corp. Sec. Litig.*, 2009 WL 1709050 (N.D. Cal. June 19, 2009), *aff'd*, 627 F.3d 376 (9th Cir. 2010); *In re Bos. Sci. Corp. Sec. Litig.*, 708 F. Supp. 2d 110, 113 (D. Mass. 2010), *aff'd sub nom. Mississippi Pub. Emps.' Ret. Sys. v. Bos. Sci. Corp.*, 649 F.3d 5 (1st Cir. 2011); *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202 (S.D. Cal. 2010) (all granting summary judgment in Defendants' favor).

Moreover, even if the case were prosecuted through trial, the jury could have returned a partial verdict, which may have substantially reduced the Class's recoverable damages. *See, e.g., HsingChing Hsu. v. Puma Biotechnology, Inc*., 2019 WL 11637311, at *1 (C.D. Cal. May 22, 2019) (jury verdict in favor of defendants on three of four of alleged misstatements, reducing potential damages to only 5% or less of claimed damages); *In re Tesla Inc., Sec. Litig.*, 2023 WL 4032010 (N.D. Cal. June 14, 2023) (jury verdict for defense delivered in securities class action involving Elon Musk's tweets about taking Tesla private, even though the court already found the tweets were false and Musk acted recklessly in issuing them, and same conduct had resulted in

21

SEC charges and a settlement). There could also be a risk that a favorable verdict could be disturbed or overturned on appeal, even years later. *See Hubbard v. BankAtlantic Bancorp, Inc.*, 688 F.3d 713, 725 (11th Cir. 2012) (affirming district court's decision to set aside jury verdict in plaintiffs' favor and entering judgment as a matter of law in defendants' favor on all claims, finding evidence was insufficient to support a finding of loss causation).

### 2.    The Costs and Delay of Continued Litigation Support Final Approval

"[I]n a case such as this, a fully contested class action lawsuit would be expected to take significant time to resolve at the District Court level and additional time would result from any appeals." *Robinson*, 2019 WL 2591153, at *10. Here, the remaining cost and duration of pursuing this Action would be substantial and warrant approval of the Settlement.

The Settlement brings to a close litigation that could have lasted several more years and incurred significant additional costs—including the expenses of vendors and experts, Defendants' Counsel's fees, the value of Lead Counsel's billed time, and substantial judicial resources—which could very easily have totaled in the tens of millions of dollars.[13]  *See Smith*, 2015 WL 6479658, at *6 (finding plaintiffs understandably abided by the aphorism that "a bird in [the] hand is worth

---

[13] Although, to Plaintiffs' knowledge, James River faces no immediate insolvency risk, it is worth noting that the Company's stock price traded above $50 for portions of the Class Period, but currently trades below $10 a share. Furthermore, A.M. Best credit rating agency downgraded the Company's credit rating after the May 7, 2021 corrective disclosure alleged in the Complaint. Moreover, in November 2023, the Company announced that it was selling its reinsurance subsidiary, JRG Reinsurance Company Ltd., for 0.75x of its book value, and the Company recently obtained a court order directing the purchaser to complete the acquisition.  *See* http://investors.jrgh.net/news-releases/news-release-details/james-river-granted-motion-ordering-fleming-complete-its-pending.  Furthermore, in November 2023, the Company's board of directors "initiated an exploration of strategic alternatives," including a potential sale of the entire Company.   *See* http://investors.jrgh.net/news-releases/news-release-details/james-river-board-directors-announces-exploration-strategic; *see also Genworth*, 210 F. Supp. 3d at 842 (given defendant company's precipitous share price decline, credit downgrades, and billions of dollars of debt, the settlement "protects the plaintiffs from non-recovery in the chance of a large jury verdict rendering [the company] insolvent").

two in the bush" by settling and foregoing costly, and uncertain relief in exchange for a substantial, guaranteed, and immediate result).

### 3. The Proposed Settlement Falls Well Within the Range of Approval

The proposed $30 million Settlement is an excellent recovery for the Settlement Class and falls well within the range of what is fair, reasonable, and adequate. Indeed, the Settlement Amount represents at least 13% of the Settlement Class's maximum potential recoverable damages of $238 million—which Lead Plaintiffs' expert calculated under a standard trading model accepted by courts in securities cases—and assumes that Lead Plaintiffs would fully prevail at class certification, summary judgment, and trial on all of their loss causation and damages arguments. Moreover, Lead Plaintiffs' damages expert calculated that, assuming Defendants prevailed on their anticipated loss causation and damages arguments, damages could be reduced to as little as $120 million (if any at all)—in which case the Settlement would represent a recovery of approximately 25%. Accordingly, the Settlement represents a recovery of 13% to 25% of realistic damages, which is substantially higher than the level of recovery typically seen in comparable cases. *See, e.g., In re PPDAI Grp. Inc. Sec. Litig.*, 2022 WL 198491, at *12 (E.D.N.Y. Jan. 21, 2022) (approving securities class action settlement representing "6.4% of the maximum estimated aggregate damages [of] $140,000,000, assuming Plaintiffs can prove all their relevant causation arguments" as "within the range of reasonableness."); *Vataj v. Johnson*, 2021 WL 5161927, at *6 (N.D. Cal. Nov. 5, 2021) (approving settlement recovering "slightly more than 2% of [] estimated damages" as consistent with the "average recovery that the parties identified in other securities class action settlements"); *In re Snap Inc. Sec. Litig.*, 2021 WL 667590, at *1 (C.D. Cal. Feb. 18, 2021) (approving settlement "represent[ing] approximately 7.8% of the class's maximum potential aggregate damages" and noting that it was "similar to the percent recovered in other court-

23

approved securities settlements"); *Thorpe v. Walter Inv. Mgmt. Corp.*, 2016 WL 10518902, at *3 (S.D. Fla. Oct. 17, 2016) (approving settlement representing 5.5% of the maximum damages and noting that the settlement was "an excellent recovery, returning more than triple the average settlement in cases of this size"); *Medoff v. CVS Caremark Corp.,* 2016 WL 632238, at *6 (D.R.I. Feb. 17, 2016) (approving settlement recovering 5.33% of maximum damages and noting that it was "well above the median percentage of settlement recoveries in comparable securities class action cases"); *In re Biolase, Inc. Sec. Litig.*, 2015 WL 12720318, at *4 (C.D. Cal. Oct. 13, 2015) (settlement recovery of 8% of estimated damages "equals or surpasses the recovery in many other securities class actions").

### 4.    The Reaction of the Settlement Class Supports Final Approval

Here, 37,794 Notice Packets were mailed to potential Settlement Class Members and nominees. Ex. 5, at ¶ 11. Additionally, the Summary Notice was published in *The Wall Street Journal* and transmitted over the *PR Newswire*. *Id*. at ¶ 13. While the May 3, 2024 deadline for opting out of or objecting to the Settlement has not yet passed, as of the date of this filing, Lead Counsel have received only a single opt-out request (from an individual who claims to have "purchased and sold approximately 50 shares" of James River stock during the Settlement Class Period), and no objections to any aspect of the Settlement, the Plan of Allocation, or the request for attorneys' fees and reimbursement of Litigation Expenses. *Id.* at ¶ 17; Joint Decl. ¶ 117.

Furthermore, and, importantly, "the Lead Plaintiffs in the case are sophisticated institutional investors managing [m]illions of dollars in pensioners' investments and experienced in the world of securities laws."[14] *Genworth*, 210 F. Supp. 3d at 842. Indeed, "[t]he active

---

[14] Lead Plaintiffs have significant experience in obtaining settlements on behalf of investor classes. *See, e.g.*, *Fort Worth Employees' Retirement Fund v. J.P. Morgan Chase & Co.*, Case No. 1:09-cv-03701-JPO-JCF, ECF No. 381 (S.D.N.Y. Dec. 4, 2015) ($388 million settlement); *In re*

participation by the Lead Plaintiffs in the negotiation process further weighs in favor of approving the Settlement." *Id.* Here, Lead Plaintiffs closely supervised, carefully monitored, and were actively involved in all material aspects of prosecuting and settling the Action. For example, Lead Plaintiffs regularly communicated with Lead Counsel regarding the progress of the case; reviewed court filings and other material documents throughout the case; participated in discussions regarding litigation strategy and significant developments in the Action; and worked with counsel to respond to discovery requests, including producing thousands of documents. See Exs. 2 and 3.

## D.    Additional Factors Support Final Approval of the Settlement

With respect to the manner in which the Settlement will be distributed, the proposed Plan of Allocation easily satisfies Rule 23(e)(2)(D) because it treats all Settlement Class Members equally. As set forth in Section IV below, the Net Settlement Fund will be allocated to Authorized Claimants on a pro rata basis based on the relative size of their Recognized Claims.

Further, the Settlement readily meets the requirements of Rule 23(e)(2)(C).[15] The Notice complied in all respects with the requirements set forth in the Stipulation and the Preliminary Approval Order. ¶¶ 112-116. Indeed, the Court-approved Notice contained all the information required by Rule 23(c)(2)(B), the PSLRA, 15 U.S.C. §78u-4(a)(7), and easily satisfies due process standards because it sufficiently apprised the Settlement Class of "the nature of the action, the definition of the Class, the Class's claims [], the Settlement's terms, how Class Members could

---

*Venator Materials PLC Sec. Litig.*, Case No. 4:19-cv-03464, ECF Nos. 127, 128 (S.D. Tex. Sept. 15, 2033) (Lead Plaintiff Miami, $19 million settlement); *In re Henry Schein, Inc. Sec. Litig.*, Case No. 1:18-cv-01428-MKB-VMS, ECF No. 89 (E.D.N.Y. Sept. 16, 2020) (Lead Plaintiff Miami, $35 million settlement).

[15] With respect to Rule 23(e)(2)(C)(iv), the Parties entered into a Supplemental Agreement under which Defendants may terminate the Settlement if requests for exclusion from the Settlement Class reach a certain threshold—generally called a "blow provision"—that is standard in securities class actions. *See Cheng Jiangchen v. Rentech, Inc.*, 2019 WL 5173771, at *7 (C.D. Cal. Oct. 10, 2019) ("This type of agreement is common in securities fraud actions and does not weigh against [settlement] approval.").

receive a payment, how to opt out of the Settlement, how to object to the Settlement, the details of the fairness hearing, the binding effect of the judgment," and other pertinent information. *See Robinson*, 2019 WL 2591153, at \*3; *see also In re Star Scientific, Inc. Sec. Litig.*, 2015 WL 12866962, at \*3 (E.D. Va. June 26, 2015) (Gibney, Jr., J.) (approving similar notice program in securities class action). The Notice also provided information on how to submit a Claim Form and informed potential Settlement Class Members of the avenues available to them to obtain additional information necessary to make an informed decision, including by contacting the Court-appointed Claims Administrator or Lead Counsel. *See Smith*, 2015 WL 6479658, at \*3 (approving notice providing a toll-free number for inquiries, counsel's contact information, and instructions on how to file a claim).

Further, the Claims Administrator has mailed approximately 37,794 copies of the Notice Packet, published the Summary Notice, and has maintained the website dedicated to the Action, which provides all information and documentation pertinent to the Settlement. Ex. 5, at ¶¶ 11, 13-14; *see also Phillips*, 2016 WL 1175152, at \*\*1, 5 (publication of summary notice in *Investor's Business Daily* and via *PR Newswire*, establishment of website, and mailing notice to thousands of potential class members constituted sufficient notice).[16] This combination of individual mail to all Settlement Class Members who could be identified with reasonable effort (effectuated via Defendants' list of James River shareholders of record during the Class Period and the Claims Administrator's list of over 4,000 brokers, dealers, and banks in the United States and internationally), supplemented by notice in an appropriate widely-circulated publication,

---

[16] With respect to Rule 23(e)(2)(C)(iii), the terms of the proposed award of attorneys' fees were fully disclosed in the Notice and are highly reasonable in light of the work performed and the results obtained, as set forth in Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses filed concurrently herewith.

26

transmitted over a newswire, and published via the Internet, was "the best notice … practicable under the circumstances." Fed. R. Civ. P. 23(c)(2)(B).

### III.    THE COURT SHOULD CERTIFY THE SETTLEMENT CLASS

The Court's Order Preliminarily Approving Settlement and Authorizing Dissemination of Settlement Notice (the "Preliminary Approval Order") conditionally certified the Settlement Class under Rule 23(e)(1)(B)(ii) for purposes of the Settlement. *See* Preliminary Approval Order (ECF No. 119) at 2-3, ¶¶ 1-2 ("the Court finds that each element required for certification of the Settlement Class pursuant to Rule 23 of the Federal Rules of Civil Procedure has been met or will likely be met"). Nothing has occurred since then to cast doubt on the propriety of class certification for settlement purposes, and no objections to certification have been received. For all the reasons stated in the Preliminary Approval Order and Lead Plaintiffs' Memorandum of Law in Support of Their Unopposed Motion for Preliminary Approval of Class Action Settlement (ECF No. 115), Lead Plaintiffs respectfully request that the Court grant final certification to the Settlement Class under Rules 23(a) and (b)(3).

### IV.    THE PLAN OF ALLOCATION SHOULD BE APPROVED

The objective of a plan of allocation is to provide an equitable method for distributing a settlement fund among eligible class members. A plan of allocation should be approved when it "accounts for when claimants purchased their securities and for how long they held the stock, considerations that have been approved by courts in this district." *Genworth*, 210 F. Supp. 3d at 843. The Plan of Allocation, which is set forth in the Notice disseminated to the Settlement Class pursuant to the Preliminary Approval Order, also warrants the Court's approval.

Here, the Plan of Allocation was developed by Lead Plaintiffs in consultation with their damages expert after careful consideration of Lead Plaintiffs' theories of liability and alleged

27

damages under the Exchange Act. ¶¶ 118-126. In developing the Plan, Lead Plaintiffs' expert calculated the estimated amount of artificial inflation in the price of James River's common stock during the Settlement Class Period by considering how the stock price changed after the announcement of each alleged corrective disclosure, and adjusting for price changes that were attributable to market or industry forces. *See* Notice ¶ 80. Under the Plan of Allocation, a Recognized Loss Amount will be calculated for each purchase or acquisition of publicly traded James River common stock by an eligible Settlement Class Member in order to derive the amount of each Authorized Claimant's Recognized Claim, and the Net Settlement Fund will be allocated to Authorized Claimants on a *pro rata* basis based on the relative size of their respective Recognized Claims. *See* Notice ¶¶ 83-97.

The Net Settlement Fund, as in the vast majority of securities class action settlements, will be distributed to Authorized Claimants with the assistance of an established and experienced claims administrator. Here, the Court-appointed Claims Administrator, A.B. Data, Ltd. ("A.B. Data"), is employing a well-tested protocol for the processing of claims in securities class actions. Namely, a potential Settlement Class Member will submit, either by mail or online, the Court-approved Claim Form. Based on the trade information provided by claimants, the Claims Administrator will determine each claimant's eligibility to participate by, among other things, calculating their respective "Recognized Claims" based on the Court-approved Plan of Allocation, and ultimately determining each eligible claimant's pro rata portion of the Net Settlement Fund. *See* Notice ¶¶ 83-85, 94. Lead Plaintiffs' claims will be reviewed in the same manner. Claimants will be notified of any defects or conditions of ineligibility and be given the chance to remedy any deficiencies or contest the rejection of their claims. Stipulation ¶ 27(d). Any claim disputes that cannot be resolved will be presented to the Court for a final determination. *Id*.

After the Settlement reaches its Effective Date (Stipulation ¶ 34) and the claims process is completed, Authorized Claimants will be issued payments. If there are unclaimed funds after the initial distribution, and it would be feasible and economical to conduct a further distribution, the Claims Administrator will conduct a subsequent distribution of remaining funds (less the estimated expenses for the additional distribution, Taxes, and unpaid Notice and Administration Expenses). Additional distributions will proceed in the same manner until it is no longer economical to make further distributions. Thereafter, any *de minimis* residual will be donated to an appropriate nonprofit organization unaffiliated with any of the parties or their counsel, and subject to the approval of the Court. Accordingly, the proposed Settlement satisfies Rule 23(e)(2)(C)(ii).

Courts routinely approve substantially similar methods of distributing recoveries in securities class actions such as this one, and Lead Plaintiffs respectfully submit that this Court should approve the Plan of Allocation submitted here. *See, e.g., Phillips*, 2016 WL 1175152, at *4.

## V.    CONCLUSION

For the reasons discussed above and in the Joint Declaration, Lead Plaintiffs respectfully request that the Court grant final approval of the Settlement and the Plan of Allocation.

DATED: April 19, 2024                    Respectfully submitted,

By: */s/ Steven J. Toll*
Steven J. Toll (Va. Bar No. 15300)
Daniel S. Sommers
S. Douglas Bunch
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Avenue, Suite 500
Washington, D.C. 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
stoll@cohenmilstein.com
dsommers@cohenmilstein.com
dbunch@cohenmilstein.com

29

*Liaison Counsel for Lead Plaintiffs and the Settlement Class*

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
Salvatore J. Graziano (*pro hac vice*)
Rebecca E. Boon (*pro hac vice*)
Jeremy P. Robinson (*pro hac vice*)
Emily A. Tu (*pro hac vice*)
Chloe Jasper (*pro hac vice*)
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
salvatore@blbglaw.com
rebecca.boon@blbglaw.com
jeremy@blbglaw.com
emily.tu@blbglaw.com
chloe.jasper@blbglaw.com

*Attorneys for Lead Plaintiff Miami and Lead Counsel for the Settlement Class*

**SAXENA WHITE P.A.**
David R. Kaplan (*pro hac vice*)
Emily R. Bishop (*pro hac vice*)
505 Lomas Santa Fe Dr.
Suite #180
San Diego, CA 92075
Telephone: (858) 997-0860
Facsimile: (858) 369-0096
dkaplan@saxenawhite.com
ebishop@saxenawhite.com

Maya Saxena
Joseph E. White, III (*pro hac vice*)
Jonathan Lamet (*pro hac vice*)
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Telephone: (561) 394-3399
Facsimile: (561) 394-3382
msaxena@saxenawhite.com
jwhite@saxenawhite.com
jlamet@saxenawhite.com

Steven B. Singer (*pro hac vice*)

30

10 Bank Street, 8th Floor
White Plains, NY 10606
Telephone: (914) 437-8551
Facsimile: (888) 631-3611
ssinger@saxenawhite.com

*Attorneys for Lead Plaintiff Fort Worth and*
*Lead Counsel for the Settlement Class*

**KLAUSNER KAUFMAN JENSEN**
**& LEVINSON LLP**
Robert D. Klausner
Stuart A. Kaufman
7080 Northwest 4th Street
Plantation, Florida 33317
Telephone: (954) 916-1202
Facsimile: (954) 916-1232
bob@robertdklausner.com
stu@robertdklausner.com

*Additional Counsel for Lead Plaintiff Miami*

31