**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

|  |  |
|---|---|
| IN RE JAMES RIVER GROUP HOLDINGS, LTD. SECURITIES LITIGATION | Case: 3:21-cv-00444-DJN <br><br> <u>CLASS ACTION</u> |

**JOINT DECLARATION OF REBECCA E. BOON AND DAVID R. KAPLAN IN SUPPORT OF (I) LEAD PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT AND PLAN OF ALLOCATION, AND (II) LEAD COUNSEL'S <u>MOTION FOR ATTORNEYS' FEES AND LITIGATION EXPENSES</u>**

## TABLE OF CONTENTS

TABLE OF EXHIBITS ........................................................................................................... iii

I.      INTRODUCTION ....................................................................................................... 2

II.     PROSECUTION OF THE ACTION........................................................................... 7

        A.      Background.................................................................................................... 7

        B.      Appointment of Lead Plaintiffs and Lead Counsel, Lead Counsel's
                Extensive Investigation and Filing of the Amended Complaint and
                Operative Second Amended Complaint, and the Court's Motion to Dismiss
                Decision ........................................................................................................ 8

                1.      The Appointment of Lead Plaintiffs, Lead Counsel, and Liaison
                        Counsel ............................................................................................. 8

                2.      The Investigation and Filing of the Amended Complaint and
                        Operative Complaint......................................................................... 8

        C.      Defendants' Motion to Dismiss .................................................................. 11

        D.      Discovery .................................................................................................... 14

                1.      The Pursuit of Extensive Document and Written Discovery from
                        Defendants and Third Parties.......................................................... 15

                2.      Lead Plaintiffs' Review of Defendants' and Third Parties'
                        Documents and Other Materials ..................................................... 20

                3.      Defendants' Discovery Requests to Lead Plaintiff.......................... 23

                4.      Analysis of Document Discovery and Preparation of Deposition
                        Plan ................................................................................................. 23

                5.      Expert Discovery ............................................................................ 24

        E.      Mediation and Settlement ........................................................................... 26

III.    RISKS OF CONTINUED LITIGATION.................................................................. 29

        A.      General Risks in Prosecuting Securities Class Actions ............................... 30

        B.      Specific Risks Concerning this Action ....................................................... 34

                1.      Risks Associated with Proving Falsity and Materiality................... 35

                2.      Risks Associated with Proving Scienter ......................................... 36

                3.      Risks Associated with Proving Loss Causation and Damages ........ 37

i

   4. Risks After Trial ..................................................................................... 39

  C. The Settlement Amount Compared to the Likely Maximum Damages that Could Be Proved at Trial ....................................................................... 40

IV. LEAD PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE OF NOTICE...................................... 41

V. ALLOCATION OF THE PROCEEDS OF THE SETTLEMENT.................................. 43

VI. THE FEE AND EXPENSE APPLICATION ..................................................... 47

  A. The Fee Application............................................................................... 47

   1. Lead Plaintiffs Have Authorized and Support the Fee Application ......... 48

   2. The Time and Labor of Plaintiffs' Counsel .............................................. 49

   3. The Skill and Experience of Plaintiffs' Counsel....................................... 50

   4. Standing and Caliber of Defendants' Counsel.......................................... 51

   5. The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk Contingent Cases ............................... 51

   6. The Reaction of the Settlement Class to the Fee Application .................. 53

  B. The Litigation Expense Application ....................................................... 53

VII. CONCLUSION................................................................................................ 56

**TABLE OF EXHIBITS**

**Exhibit 1**    Declaration of Jed D. Melnick in Support of Final Approval of Settlement

**Exhibit 2**    Declaration of Linda Webb, Executive Director of the Employees' Retirement Fund of the City of Fort Worth d/b/a Fort Worth Employees' Retirement Fund, in Support of (I) Lead Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation; and (II) Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses

**Exhibit 3**    Declaration of Edgard Hernandez, Pension Administrator of The City of Miami General Employees' & Sanitation Employees' Retirement Trust, in Support of (I) Lead Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation; and (II) Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses

**Exhibit 4**    Cornerstone Reports

    **Exhibit 4A**    Cornerstone Research, Securities Class Action Filings: 2023 Year in Review (2024)

    **Exhibit 4B**    Cornerstone Research, Securities Class Action Settlements: 2023 Review and Analysis (2024)

**Exhibit 5**    Declaration of Adam D. Walter Regarding: (A) Mailing of the Notice and Claim Form; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion Received to Date

**Exhibit 6**    Declaration of Adam D. Walter Regarding Defendant's Notice of Compliance with 28 U.S.C. § 1715(b)

**Exhibit 7**    Summary of Plaintiffs' Counsel's Lodestar and Expenses

    **Exhibit 7A**    Declaration of Rebecca E. Boon on Behalf of Bernstein Litowitz Berger & Grossmann LLP in Support of Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses

    **Exhibit 7B**    Declaration of David R. Kaplan on Behalf of Saxena White P.A. in Support of Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses

    **Exhibit 7C**    Declaration of Steven J. Toll on Behalf of Cohen Milstein Sellers & Toll PLLC in Support of Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses

**Exhibit 7D**    Declaration of Robert D. Klausner on Behalf of Klausner Kaufman Jensen & Levinson LLP in Support of Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses

**Exhibit 8**    Breakdown of Plaintiffs' Counsel's Expenses by Category

**Exhibit 9**    Compendium of Unpublished Authority

Rebecca E. Boon and David R. Kaplan declare as follows:

1.    I, Rebecca E. Boon, am a partner in the law firm Bernstein Litowitz Berger & Grossmann LLP ("BLB&G"), counsel for Lead Plaintiff The City of Miami General Employees' & Sanitation Employees' Retirement Trust ("Miami"), and co-Lead Counsel for the proposed Settlement Class in the above-captioned action ("Action").

2.    I, David R. Kaplan, am a Director at the law firm Saxena White P.A. ("Saxena White," and together with BLB&G, "Lead Counsel"), counsel for Lead Plaintiff the Employees' Retirement Fund of the City of Fort Worth d/b/a Fort Worth Employees' Retirement Fund ("Fort Worth," and together with Miami, "Lead Plaintiffs"), and co-Lead Counsel for the proposed Settlement Class in the Action.

3.    We submit this Joint Declaration in support of Lead Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation ("Settlement Motion") and Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses ("Fee and Expense Motion"). The following statements are based on our personal knowledge, our direct involvement in this litigation, and information provided by other Lead Counsel attorneys working under our supervision, and if called on to do so, we could and would testify competently thereto.[1]

---

[1] All capitalized terms that are not otherwise defined herein shall have the meanings provided in the Stipulation and Agreement of Settlement dated December 22, 2023 (ECF No. 114-1) (the "Stipulation"), which was entered into by and among (i) Lead Plaintiffs, on behalf of themselves and the Settlement Class, and (ii) Defendant James River Group Holdings, Ltd. ("James River" or the "Company") and Defendants Robert P. Myron, J. Adam Abram, Frank N. D'Orazio, and Sarah C. Doran (collectively, the "Individual Defendants," and together with James River, "Defendants," and, together with Lead Plaintiffs, the "Parties"). Unless otherwise noted, all emphasis is added, and all internal quotation marks and citations are omitted.

1

## I.    INTRODUCTION

4.    The proposed Settlement before the Court provides for the resolution of all claims in the Action in exchange for a cash payment of $30 million, plus interest, for the benefit of the Settlement Class.  The Settlement Amount has been paid into an escrow account and is earning interest.  As detailed below, the Settlement provides a significant benefit to the Settlement Class by conferring a substantial, certain, and immediate recovery while avoiding the risks of continued litigation, including the risk that the Settlement Class could recover nothing or less than the Settlement Amount after years of additional litigation, appeals, and delay.

5.    The proposed Settlement is the result of extensive efforts by Lead Plaintiffs and Lead Counsel over two and a half years, which included, among other things:

- conducting an extensive investigation into the alleged fraud, including interviews of over 100 former employees of James River, at least fifteen of whom provided Lead Plaintiffs with detailed, substantive information that was critical to Lead Plaintiffs' allegations and included in the Amended Complaint and Second Amended Complaint (the "Complaint"); consultation with accounting experts with experience in the insurance industry; a thorough review of publicly available information about James River, including James River's filings with the U.S. Securities and Exchange Commission ("SEC"), analyst reports, conference call transcripts, and news articles; and a careful examination of documentary and testimonial evidence from a bad faith litigation against James River;

- drafting and filing the highly detailed Amended Class Action Complaint based on Lead Counsel's detailed factual investigation and consultation with several experts;

- drafting and filing the operative 146-page Second Amended Complaint following the discovery of additional facts through a review of documentary and testimonial evidence from the *St. Amand* bad faith litigation against James River;

- successfully opposing Defendants' motions to dismiss each of the two complaints, including the operative Second Amended Complaint (the opposition to which was accompanied by more than 1,400 pages of exhibits) under the exacting pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Federal Rule of Civil Procedure 9(b);

- consulting with numerous experts, including financial experts, accounting experts, and multiple insurance industry experts;

2

- engaging in comprehensive discovery efforts under the time pressures of the "Rocket Docket" expedited case schedule, including negotiating a joint discovery plan, protective order, and ESI protocol, and preparing and responding to extensive discovery requests, including requests for the production of documents and interrogatories, and serving document subpoenas on four non-parties;

- obtaining over 1,600,000 pages of documents from Defendants and third parties, identifying and analyzing thousands of highly relevant documents contained in the productions, and preparing numerous memoranda and chronologies concerning the relevant evidence to support the claims alleged;

- working on numerous expert reports that were due to be served within weeks of reaching the Settlement, including on merits issues and class certification/market efficiency;

- participating in two mediation sessions with Jed D. Melnick, Esq. of JAMS, a highly-experienced mediator and special master in complex shareholder litigation, which included the exchange of detailed mediation statements supported by discovery documents, sworn witness testimony, and applicable law, and continuing mediation discussions under Mr. Melnick's oversight before the Parties accepted his mediator's recommendation; and

- drafting and negotiating a Term Sheet, the Stipulation setting out the terms of the Settlement, and related documentation.

6. As a result of these efforts, Lead Plaintiffs and Lead Counsel were well informed of the strengths and weaknesses of the claims and defenses in the Action at the time they achieved the proposed Settlement. Indeed, the $30 million settlement represents between 13% and 25% of investors' realistically recoverable damages under Lead Plaintiffs' expert's analysis (depending on whether Defendants prevailed on certain of their anticipated loss causation and damages arguments). Defendants have vigorously denied that they made any false or misleading statements and omissions regarding James River's loss reserves and have asserted that the Company's loss reserves were estimated in good faith by its actuaries and reviewed biannually by external actuaries. Moreover, neither the SEC nor any other regulatory body has opened any form of investigation or inquiry into the falsity of Defendants' public statements or taken any public

enforcement action against the Company.  In light of the substantial recovery and the significant continuing risks of litigation, Lead Plaintiffs and Lead Counsel believe that the proposed $30 million Settlement here is an excellent result for the Settlement Class.

7.      The Settlement was achieved only after arm's-length negotiations between the Parties, including two mediation sessions with Jed D. Melnick, a highly experienced mediator in complex litigation.  As described further below, the mediation process involved significant disputed issues and hard-fought, arm's-length negotiations.  In advance of each mediation session, Lead Plaintiffs submitted detailed mediation statements to Defendants and Mr. Melnick, including supporting exhibits compiled from documents produced in discovery.  No agreement was reached at either session.  In fact, the Parties only reached an agreement in principle to settle the Action for $30 million following the conclusion of the second mediation session, when the Parties accepted Mr. Melnick's mediator's recommendation.

8.      Mr. Melnick has submitted a Declaration in support of the Settlement in which he describes the Parties' mediation efforts, including his observation that the "negotiations between the Parties were vigorous and conducted at arm's-length and in good faith," Declaration of Jed D. Melnick ("Melnick Decl."), attached hereto as Exhibit 1, at ¶ 14, and his belief that that the Settlement "represents a well-reasoned and sound resolution of highly uncertain litigation." *Id*. at ¶ 15.

9.      In addition, Lead Plaintiffs Fort Worth and Miami are sophisticated pension funds that actively participated in the Action and closely supervised the work of Lead Counsel.  *See* Declaration of Linda Webb, Executive Director of Fort Worth ("Webb Decl."), attached hereto as Exhibit 2, at ¶¶ 3-8; Declaration of Edgard Hernandez, Pension Administrator of Miami ("Hernandez Decl."), attached hereto as Exhibit 3, at ¶¶ 3-4.  Lead Plaintiffs' representatives were

actively involved in overseeing the litigation and settlement negotiations, and Lead Plaintiffs fully endorse the approval of the Settlement. *See* Webb Decl. ¶¶ 3, 7(f), 9-11; Hernandez Decl. ¶¶ 3-5. Fort Worth's and Miami's close attention to and oversight of this Action, as well as their approval of the Settlement, support the reasonableness of the Settlement. In enacting the PSLRA, Congress expressly intended to give control of securities class actions to sophisticated investors and noted that increasing the role of institutional investors in class actions would ultimately benefit shareholders and assist courts by improving the quality of representation in this type of case. H.R. Conf. Rep. No. 104-369, at *34 (1995), reprinted in 1995 U.S.C.C.A.N. 730, 733.

10. Lead Plaintiffs and Lead Counsel believe that the Settlement is in the best interests of the Settlement Class. Due to their substantial efforts, Lead Plaintiffs and Lead Counsel are well-informed of the strengths and weaknesses of the claims and defenses in the Action, and they believe that the Settlement represents an excellent outcome for the Settlement Class.

11. As discussed in further detail below, the proposed Plan of Allocation, which was developed with the assistance of Lead Plaintiffs' damages expert, provides for the equitable distribution of the Net Settlement Fund to Settlement Class Members who submit Claim Forms that are approved for payment by the Court. The proposed Plan of Allocation provides for distribution to eligible claimants on a *pro rata* basis, fairly based on losses attributable to the wrongdoing alleged in the operative Complaint.

12. Lead Counsel worked diligently and efficiently to achieve the proposed Settlement in the face of significant risks. Lead Counsel prosecuted this case on a fully contingent basis and advanced all litigation-related expenses, and thus bore substantial risk of an unfavorable result. For their efforts in achieving the Settlement, Lead Counsel are applying for an award of attorneys'

fees for all Plaintiffs' Counsel[2] in the amount of 25% of the Settlement Fund, applied net of Litigation Expenses awarded.  The requested fee has been endorsed by Lead Plaintiffs, and is reasonable and well within the range of fees that courts in this Circuit and elsewhere have awarded in securities class actions and other complex class actions with comparable recoveries on a percentage basis.  In addition, the requested fee represents a slightly negative 0.99 multiplier of Plaintiffs' Counsel's lodestar, which supports approval and is well below the range of multipliers typically awarded in class actions like this one with significant contingency risks.

13.    Lead Counsel's Fee and Expense Motion also seeks payment of Litigation Expenses incurred by Plaintiffs' Counsel in connection with the institution, prosecution, and settlement of the Action, and payments to Lead Plaintiffs for their costs and expenses directly related to their representation of the Settlement Class, as authorized by the PSLRA.

14.    For all of the reasons discussed in this Declaration and in the accompanying motions and declarations, including the quality of the result obtained and the numerous significant litigation risks discussed fully below, Lead Plaintiffs and Lead Counsel respectfully submit that the Settlement and the Plan of Allocation are "fair, reasonable, and adequate" in all respects, and that the Court should approve them under Federal Rule of Civil Procedure 23(e).  For similar reasons, and for the additional reasons discussed below, we respectfully submit that Lead Counsel's request for attorneys' fees and expenses is also fair and reasonable and should be approved.

---

[2] Plaintiffs' Counsel are Lead Counsel BLB&G and Saxena White, Liaison Counsel, Cohen Milstein Sellers & Toll PLLC ("Cohen Milstein"), and additional counsel for Lead Plaintiff Miami, Klausner Kaufman Jensen & Levinson LLP ("Klausner Kaufman").

## II.    PROSECUTION OF THE ACTION

### A.    Background

15.    James River is an insurance company whose largest and most important client was the rideshare company Uber Technologies, Inc. ("Uber").  In 2014, James River began providing a specialty insurance product designed to cover Uber drivers while they were logged into the Uber app but not actively transporting passengers.  Due to the specialty nature of the coverage, the policy was provided through James River's Excess and Surplus Line ("E&S").  The E&S Line was vital to James River's financial health—accounting for 70% of James River's net written premiums between 2018 and 2020.

16.    In this Action, Lead Plaintiffs alleged that, from February 22, 2019 through October 25, 2021, inclusive (the "Class Period"), Defendants made materially false and misleading statements and omissions to investors regarding James River's process of reserving for losses, the adequacy of James River's reserves, the handling of claims under the Company's major contract with Uber, and the Company's compliance with GAAP and its internal controls.

17.    Specifically, Lead Plaintiffs alleged that James River was forced to take massive reserve charges on the Uber account due to James River's fundamental and systematic reserving failures, which Defendants knew contradicted their public statements during the Class Period; that former James River employees recounted that, unbeknownst to investors, James River had no reserve methodology at all, except to keep the reserves low; that James River systematically under-reserved on Uber claims; that James River would overpay on Uber claims specifically to avoid embarrassing Uber during litigation or at trial; and that James River knowingly hired adjusters with no claims experience and provided them with no training to accurately set reserves.

18.    Lead Plaintiffs further alleged that the price of James River common stock was artificially inflated as a result of Defendants' allegedly false and misleading statements, and that

7

the price of the stock declined when the truth was revealed through a series of disclosures from

October 8, 2019 through October 26, 2021. *See* Complaint (ECF No. 69), at ¶¶ 371-83.

> **B.    Appointment of Lead Plaintiffs and Lead Counsel, Lead Counsel's Extensive Investigation and Filing of the Amended Complaint and Operative Second Amended Complaint, and the Court's Motion to Dismiss Decision**

> **1.    The Appointment of Lead Plaintiffs, Lead Counsel, and Liaison Counsel**

19.    On July 9, 2021, after conducting an initial investigation into the truthfulness of

James River's public statements to investors regarding the adequacy of its reserves and reserve

setting process, Fort Worth brought a class action in the United States District Court for the Eastern

District of Virginia (the "Court") against James River and certain of its officers, alleging violations

of the Securities Exchange Act of 1934 (the "Exchange Act").

20.    Shortly thereafter, Fort Worth and Miami, and their respective counsel, Saxena

White and BLB&G, agreed to join together to prosecute the Action on behalf of the Class.

21.    On September 7, 2021, Fort Worth and Miami moved for appointment as lead

plaintiffs in the Action pursuant to the PSLRA and for appointment of their selected counsel as

lead counsel and liaison counsel.  ECF Nos. 16-19.

22.    On September 22, 2021, the Court (the Honorable M. Hannah Lauck presiding)

granted the motion and appointed Forth Worth and Miami as Lead Plaintiffs, approved Saxena

White and BLB&G as Lead Counsel, and approved Cohen Milstein Sellers & Toll PLLC as

Liaison Counsel.  ECF No. 20.

> **2.    The Investigation and Filing of the Amended Complaint and Operative Complaint**

23.    Lead Counsel undertook an extensive investigation into the alleged fraud and

potential claims that could be asserted by Lead Plaintiffs in the Action.  This investigation began

with Fort Worth's initial investigative efforts which led to the filing of the initial complaint and

8

continued through preparation of the Amended Complaint operative Second Amended Complaint. The investigation included a careful review and analysis of: (i) James River's public filings with the SEC; (ii) James River press releases and other public statements; (iii) transcripts of James River investor conference calls; (iv) research reports by financial analysts and news reports concerning James River; (v) other publicly available sources; (vi) consultations with relevant experts and consultants; (vii) communications with over a hundred former employees of James River and other sources; and (viii) data reflecting the price of James River common stock.

24.     In connection with the investigation, prior to drafting the Amended Complaint, Lead Counsel and their in-house investigators located former employees of James River who might have relevant information pertaining to the claims asserted in the Action.  This included contacting over 350 former James River employees in total who were believed to have potentially relevant information.  Lead Counsel and/or their in-house investigators spoke to over 100 of these individuals.  Lead Counsel ultimately included detailed information received from 15 of these former James River employees in the Complaint, which described in detail how James River's reserves were materially understated and not calculated in accordance with GAAP and James River had no reserve methodology except to keep reserves low.

25.     In connection with the preparation of the Complaint, Lead Counsel consulted with Brian Duffy, CPA of Marcum LLP, who has substantial experience in providing consulting services in the area of forensic accounting in connection with securities actions.  Lead Counsel consulted with Mr. Duffy about, among other things, Generally Accepted Accounting Principles ("GAAP") and SEC requirements concerning financial reporting, internal controls, and the determination of loss reserves.

26.    Lead Counsel further consulted with Global Economics Group, LLC, a firm that specializes in the application of economics, finance, statistics, and valuation principles to questions that arise in a variety of contexts, including securities class actions. Lead Counsel consulted with Global Economics Group, LLC about, among other things, the impact of Defendants' alleged misstatements on the market price of James River's common stock and the damages suffered by James River shareholders.

27.    On November 19, 2021, Lead Plaintiffs filed and served their Amended Class Action Complaint for Violations of the Federal Securities Laws asserting claims against all Defendants under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and against the Individual Defendants under Section 20(a) of the Exchange Act. ECF No. 41. Among other things, the Amended Complaint alleged that Defendants made materially false and misleading statements about James River's reserving processes, the adequacy of James River's reserves, James River's compliance with GAAP, and the effectiveness of the Company's internal controls. The Amended Complaint further alleged that the price of James River's common stock was artificially inflated as a result of Defendants' allegedly false and misleading statements and declined significantly when the truth was revealed.

28.    On January 18, 2022, Defendants moved to dismiss the Amended Complaint. ECF Nos. 53-55. Briefing ensued and was complete as of April 4, 2022. ECF Nos. 57-58, 60.

29.    Before the Court ruled on the motion to dismiss the Amended Complaint, Lead Counsel's continuing investigative efforts revealed additional supporting documentary evidence and sworn deposition testimony from an insurance bad faith litigation against James River's specialty insurance operating subsidiary, captioned *St. Amand v. James River Insurance Company, et al.*, Case No. 2:20-cv-01666 (D. Nev.). This documentary evidence included the lengthy claims

file underlying the *St. Amand* matter, in which the plaintiff was an Uber driver who suffered extremely serious bodily injuries requiring extensive medical care at costs well in excess of the reserves set by James River's claims department.  This testimony was provided by former and current James River employees—including key executives and managers such as James River's former Senior Vice President and Chief Claims Officer, its former Vice President of Claims, and its former Assistant Director of Litigated Claims (among others)—all of whom provided sworn testimony relevant to both the allegations in *St. Amand* and this Action.

30.    On July 13, 2022, Lead Plaintiffs filed a Notice of Intent to Amend the Complaint due to the discovery of these new facts, which corroborated and supported their claims.  ECF No. 63.  On August 25, 2022, Lead Plaintiffs filed a motion seeking leave to file a Second Amended Class Action Complaint for Violations of the Federal Securities Laws, which Defendants did not oppose.  ECF Nos. 64-66.  A draft of the proposed Second Amended Complaint was included as an exhibit to Plaintiffs' motion.  ECF No. 66-1.

31.    On September 9, 2022, the Court granted Lead Plaintiffs' motion and instructed the clerk to file the Second Amended Complaint on the docket, which the clerk did that day.  ECF Nos. 68-69.  The operative 146-page Second Amended Complaint asserted the same claims against the same Defendants as the Amended Complaint.  ECF No. 69.  The Second Amended Complaint added sworn deposition testimony from three additional James River claims personnel and internal James River claim documents created during the Class Period, which were produced in the insurance bad faith litigation described above.  *See generally*, Complaint ¶ 16.

C.    **Defendants' Motion to Dismiss**

32.    On October 24, 2022, Defendants filed their 30-page motion to dismiss the Second Amended Complaint, together with an accompanying declaration attaching 38 exhibits totaling more than 1,400 pages.  ECF Nos. 71-73.  In their motion, Defendants attacked all parts of the

11

Second Amended Complaint as inadequate to plead securities fraud.  In particular, Defendants argued that:

- Lead Plaintiffs failed to allege an actionable misstatement or omission, including because the alleged misstatements regarding loss reserves were non-actionable statements of opinion, and Lead Plaintiffs failed to plead facts demonstrating that any of alleged misstatements were not genuinely believed when made;

- several of the alleged misstatements were also non-actionable under the PSLRA's safe harbor because they were forward-looking in that they addressed whether reserves would be adequate to cover future losses and were accompanied by meaningful cautionary language;

- the former employees that Lead Plaintiffs relied on to establish falsity and scienter were "low-level" claims employees handling individual Uber claims and setting case reserves not tied to the Company's actuarial process for estimating overall loss reserves, and instead showed that case reserves were subject to multiple layers of review, that the Company had an approval process for increasing such reserves, and that the Company's Reserve Committee reviewed and monitored loss reserves and data from the Uber account;

- Lead Plaintiffs' other scienter allegations concerning the core operations theory, alleged violations of Sarbanes-Oxley and GAAP, stock sales by individual Defendants, and rumors of plans to sell the Company failed because Lead Plaintiffs lacked any particularized allegations regarding Defendants' knowledge and because the stock sales by two individual Defendants comprised 25% or less of each Defendant's holdings;

- the more compelling inference to be drawn from Lead Plaintiffs' scienter allegations was that Defendants engaged in a good-faith exercise of actuarial judgment to estimate overall losses for the entirely new kind of insurance provided under the Uber account and that over time those estimates simply turned out to be inadequate; and

- the Section 20(a) claims should be dismissed for failure to plead an underlying violation.

33.    On November 7, 2022, Lead Plaintiffs filed their opposition to Defendants' motion.

ECF No. 74.  In summary, Lead Plaintiffs' opposition argued that:

- the Complaint sufficiently alleged that Defendants made materially false and misleading statements concerning James River's reserving process, the adequacy of reserves, the status of the runoff, and the Company's compliance with GAAP and internal controls, including because the former employee accounts and *St. Amand* evidence demonstrated that James River lacked any policies or procedures

12

for setting reserves and that senior management took deliberate and systematic steps to suppress Uber claim reserves;

- the PSLRA's safe harbor did not apply to any of the misstatements because the statements were not forward-looking and James River's boilerplate disclosures did not disclose that factors other than past loss experience were considered in setting reserves;

- the Complaint's allegations of scienter—including senior management's review of case reserves, management's deliberate and systemic efforts to suppress reserves and hide requests for increases using a secret system known as the "PLM portal," Defendant D'Orazio's admission that James River used a deficient reserve methodology that disregarded James River's actual loss experience, and James River's taking of a $170 million charge—were corroborated by *St. Amand* testimony about how high-level executives implemented steps to systemically suppress reserves and avoid documentation of reserve increase denials and the accounts of former employees who were involved in handling Uber claims; and

- the Complaint pleaded Section 20(a) control person claims as to all of the Individual Defendants.

34.    On November 14, 2022, Defendants filed a reply in further support of their motion to dismiss. ECF No. 75. Defendants' reply reiterated the arguments made in their motion to dismiss and responded to the arguments in Lead Plaintiffs' opposition brief.

35.    On June 23, 2023, the case was reassigned to the Honorable David J. Novak. ECF No. 80.

36.    On August 28, 2023, the Court entered a Memorandum Opinion and Order denying Defendants' motion to dismiss the Second Amended Complaint and sustaining all alleged misstatements and corrective disclosures in the Complaint in their entirety. ECF No. 81. The Court found that Lead Plaintiffs adequately alleged actionable misrepresentations under the exacting pleading requirements of the PSLRA and Federal Rule of Civil Procedure 9(b), rejecting all of Defendants' arguments to the contrary. The Court upheld the statements regarding the Company's purported compliance with GAAP and Sarbanes-Oxley, explaining that Lead Plaintiffs plausibly alleged that the Company kept reserves artificially low following a pattern of

13

significantly higher losses from Uber-related claims. The Court also found that Lead Plaintiffs sufficiently pled scienter, crediting the Complaint's allegations concerning the individual Defendants' personal involvement with the Company's Uber claims, the secret PLM portal for reserve increase requests, the central importance of Uber, and the magnitude of James River's Uber-related losses, including the $170 million adverse reserve charge, and the stock sales of two individual Defendants.

37.     On October 6, 2023, Defendants filed their answer to the Second Amended Complaint. ECF No. 108. Defendants strongly denied all allegations against them, as well as any liability to Lead Plaintiffs and the class, and asserted 23 affirmative defenses, including (among other things) that (i) Defendants provided accurate and complete disclosures and fully satisfied their disclosure obligations as a matter of law, including expressly and timely disclosing the uncertain nature of the type of insurance that James River provided to Uber and its actuarial process; (ii) the alleged misstatements were opinions and James River accurately disclosed the basis of those opinions; (iii) Defendants were not liable because they did not act with scienter; and (iv) there was no loss causation or damages.

**D.     Discovery**

38.     After the Court entered its Order denying Defendants' motion to dismiss the Second Amended Complaint, the Parties promptly began negotiating a proposed pretrial schedule.

39.     On September 7, 2023, the Court held a pretrial conference, during which the Parties presented their proposed pretrial schedule. At the conference, the Court did not accept the Parties' proposed deadlines and set forth much more aggressive deadlines for discovery and pretrial motions.

40.     On September 8, 2023, the Court entered the Scheduling and Pretrial Order. ECF No. 95. Among other things, all expert disclosures (including opposition and rebuttal disclosures)

14

were to be completed by December 6, 2023, and all discovery (including both fact and expert discovery) was to be completed by January 5, 2024—just four months later. In addition, all *Daubert* motions were due by January 12, 2024, dispositive motions were due by January 15, 2024, and non-dispositive motions were due by March 24, 2024. The Court set a final pretrial conference for April 12, 2024, jury selection for April 19, 2024, and opening statements and testimony to begin on April 23, 2024—just three months after the close of all fact and expert discovery.

41.     After the Court entered its Order denying Defendants' motion to dismiss, Lead Plaintiffs promptly drafted a proposed Stipulated Protective Order for discovery materials and a stipulation regarding the production of electronically stored information ("ESI"). The Parties finalized the two documents after several weeks of negotiations. The Parties submitted the protective order to the Court on October 5, 2023 (ECF No. 106), which the Court entered on October 6, 2023 (ECF No. 107). The Parties finalized the ESI protocol on October 17, 2023.

### 1.     The Pursuit of Extensive Document and Written Discovery from Defendants and Third Parties

42.     Against this backdrop, discovery in the action commenced in September 2023, immediately after the Court decided Defendants' motion to dismiss.

43.     On September 25, 2023, the Parties exchanged Initial Disclosures pursuant to Rules 23 and 26 of the Federal Rules of Civil Procedure. Due in part to Lead Plaintiffs' extensive investigation into the claims alleged in the Complaint, at the very outset of discovery, Lead Plaintiffs were able to identify 11 current and former James River employees who Lead Plaintiffs believed were likely to have discoverable information concerning the allegations in the Complaint. Defendants identified just 10 current and former James River employees, seven of which Lead Plaintiffs had also identified in their Initial Disclosures, thus requiring Lead Plaintiffs to conduct extensive additional discovery to identify additional relevant individuals and documents.

44.     On September 11, 2023, three days after the Court entered the Scheduling and Pretrial Order, Lead Plaintiffs served their first requests for the production of documents on Defendants, which included forty-three individual requests, including certain with multiple subparts.  In general, Lead Plaintiffs requested that Defendants produce documents concerning, among other things, (i) the contract under which James River provided insurance to Uber, (ii) claims made under the Uber contract and the loss reserves for such claims, (iii) the establishment and use of the secret PLM portal for through which reserve increase requests were sent, (iv) bad faith claims handling threatened or asserted against James River relating to the Uber contract, and (v) all documents, communications, and data considered by James River when determining its reserves.  Because Lead Plaintiffs needed certain documents from prior to the Class Period to effectively litigate the case, Lead Plaintiffs sought documents from a time period of approximately five years and four months, extending from January 1, 2017 through April 25, 2022.

45.     On September 26, 2023, Defendants served their responses and objections to Lead Plaintiffs' first requests for production.  Defendants' responses and objections largely consisted of requests to meet-and-confer in response to Lead Plaintiffs' document requests.

46.     On September 21, 2023, Lead Plaintiffs served their first set of interrogatories on Defendants.  Lead Plaintiffs' interrogatories focused on identifying (i) details about claims made under the Uber contract, including, among other things, the reserve and reserve change history (including the dates and amounts of each reserve increase, decrease, or denial and the identities of the individuals who approved or denied the reserve change request), (ii) details about bad faith insurance claims filed against James River relating to the Uber contract, including, among other things, the nature of the allegations and resolution of the case, (iii) assumptions, data, and methodology used to calculate or perform testing of reserves, and (iv) details about the PLM portal,

including, among other things, when and why it was established.  The interrogatories also focused on identifying individuals, departments, and committees who were involved in the reserve-setting practices applicable to the Uber contract and those that were involved in the decision to adjust or increase reserves in connection with the adverse charges announced by the Company during the Class Period.

47.     On October 9, 2023, Defendants served responses and objections to Lead Plaintiffs' first set of interrogatories.  Lead Plaintiffs carefully reviewed Defendants' responses to the interrogatories to tailor Lead Plaintiffs' discovery efforts and shape and inform Lead Plaintiffs' factual and expert analyses.

48.     In the weeks after the discovery requests were served, Lead Counsel engaged in numerous meet-and-confers and extensive negotiations with Defendants' counsel over the scope, pace, and adequacy of Defendants' discovery responses, including relating to search terms to be used, custodians whose documents should be searched, the applicable timeframe, and non-custodial documents.

49.     In connection with these and other discovery negotiations, the Parties had several significant discovery disputes.  While the Parties ultimately reached multi-faceted agreements concerning the search terms to be used, custodians, applicable timeframe, and non-custodial documents, other disputes over remained.  In particular, Lead Plaintiffs sought the production of claims files, including the reserve and reserve change history for each claim made under the Uber contract involving underinsured motorists, uninsured motorists, or bodily injury.  Such information was relevant to Lead Plaintiffs' claims that Defendants systematically suppressed James River's reserves.  Despite Lead Plaintiffs' compromise proposal for certain claims files identified by Lead Plaintiffs, Defendants refused to search for and produce such standalone claims files, arguing

17

(among other things) that the production of such information would be unduly burdensome, as the production of such information would require a large amount of manual work to be able to produce reviewable content. Defendants further argued that such information would require further review by Defendants for personal identifiable information and privilege, adding to Defendants' burden. At the time the Parties reached an agreement in principle to settle the Action, Lead Plaintiffs were preparing a motion to compel Defendants to produce the claims files.

50. In addition to this and other discovery disputes, during the course of the Parties' negotiations over the scope of document discovery, it became clear that Defendants would be unable to substantially complete their document productions in advance of the deadline for Lead Plaintiffs' opening expert reports under the Scheduling Order. In October 2023, Defendants informed Plaintiffs that they had assembled "a team of 175 document review attorneys" and were "onboarding 50 more" to conduct privilege, confidentiality, and responsiveness reviews in order to comply with case schedule and Plaintiffs' comprehensive discovery requests. ECF No. 110. Despite assembling this exceedingly large, dedicated team of document review attorneys, Defendants soon informed Lead Plaintiffs that it was "practically impossible to substantially complete" the production of documents under the operative case schedule. *Id.* at 2.

51. Accordingly, on October 27, 2023, the Parties filed a joint motion to permit a 30-day extension of the discovery deadlines pursuant to the Court's Scheduling and Pretrial Order. ECF No. 110.

52. On October 31, 2023, the Court granted in part the requested extensions, modifying the deadlines under the prior Scheduling Order. *See* ECF No. 111. Pursuant to the Court's Order, the deadline for opening expert reports was December 22, 2023, the deadline for opposing expert reports was January 10, 2024, the deadline for rebuttal expert reports was January 24, 2024, and

18

the deadline for the close of discovery, *Daubert* motions, and dispositive motions was February 2, 2024. *Id.*  All other deadlines remained in effect.  *Id.*  The Parties did not request, and the Court did not change, the trial date, and the Parties continued diligently preparing for an April 2024 trial.

53.    During this time, Lead Counsel also pursued discovery from multiple third parties who Lead Counsel determined were likely to have relevant information.  Thus, in addition to seeking discovery from Defendants, Lead Plaintiffs served subpoenas on four third parties: Uber, Ernst & Young LLP, Willis Towers Watson US LLC, and ReSource Pro LLC.  After negotiations regarding the scope and pace of their productions, Lead Plaintiffs ultimately obtained and reviewed over 6,700 pages of documents from third parties.  These documents proved important to Lead Plaintiffs' prosecution of the action.  For example, documents from Uber helped bolster evidence supporting Lead Plaintiffs' falsity and scienter allegations, including that James River's systemic reserving deficiencies were specifically identified by Uber throughout the Class Period, and were well known to senior James River personnel.

54.    Ultimately, after weeks of negotiations and numerous meet-and-confers, Lead Plaintiffs succeeded in obtaining a large volume of documentary evidence from Defendants and third parties.  Between October 6, 2023, and November 15, 2023, Defendants made eleven rolling productions of documents—nearly two productions a week—producing a total of nearly 250,000 documents.  In total, at the time the Action settled, Defendants and third parties had together produced over 1.6 million pages of documents, and were in the process of producing further documents to Lead Plaintiffs.  As Lead Counsel received documents, they reviewed and analyzed those documents through regular team meetings, running targeted searches aimed at locating the most relevant documents, analyzing the document trail on several key issues, and creating timelines of events and memoranda concerning key themes germane to the case.  The magnitude

19

and complexity of the documents was substantial, and included, among other things, emails, presentations, spreadsheets, claims materials, internal financial and actuarial analyses, and board materials.

### 2. Lead Plaintiffs' Review of Defendants' and Third Parties' Documents and Other Materials

55. With the deadlines for expert reports on the horizon, as part of their discovery efforts, Lead Counsel assembled a team of 14 staff attorneys, not including senior attorneys and e-discovery specialists, who were aided by sophisticated e-discovery tools. This team included many lawyers who have worked with Lead Counsel for years and have substantial experience in other significant class actions. Their biographies, as included within the Lead Counsel firm resumes, are attached hereto in Exhibits 7A-4 and 7B-3. As explained below, this team was integral in helping Lead Counsel review and analyze the documentary record, conduct legal research, assist in the preparation of Lead Plaintiffs' experts, and compile the strongest evidentiary support for Lead Plaintiffs' claims.

56. Throughout this process, Lead Counsel ensured that the review and analysis of documents was conducted efficiently. Lead Counsel eschewed a "linear" review, whereby Lead Plaintiffs' review team would attempt to review each and every document Defendants and third parties produced. Instead, Lead Plaintiffs constructed a highly focused process by creating targeted searches to strategically identify documents likely to be related to key themes that were relevant to specific claims at issue in the case. Lead Plaintiffs developed this process by closely reviewing notes from the pre-Complaint investigation and numerous other materials, such as information provided by Defendants in their interrogatory responses and during the course of meet-and-confers and information provided by Lead Plaintiffs' experts. Lead Counsel further continuously updated the search protocols as they discovered more information throughout the

20

course of discovery. Thus, Lead Counsel took significant steps to ensure that their review of materials produced in this litigation was highly focused and efficient and would not waste time or other resources.

57.    As part of this process, Lead Counsel reviewed, analyzed, and categorized the documents in the case's electronic database. Before beginning, Lead Counsel developed a review protocol, issue "tags," and guidelines for identifying "Hot" documents, as well as a written manual with guidelines for the review and "coding" of documents. Using these tools, Lead Counsel tasked their attorneys with reviewing documents, with the documents most likely to be "Hot" put into prioritized batches for review. Lead Counsel's review and analysis of those documents included substantive analytical determinations as to the importance and relevance of each document— including whether each document was "Hot," "Highly Relevant," "Relevant," or "Irrelevant." For important case documents, attorneys documented their substantive analysis of the documents' relevance and import by making notations on the document review system, explaining what portions of the documents were important, how they related to the issues in the case, and why the attorney believed that information to be significant. Attorneys also "tagged" the specific issues that were involved in each document, such as the Uber policy, reserves methodology and adjustments, financial reporting, PLM portal, staffing and turnover, and training.

58.    In addition to regular communications that occurred throughout the review process, attorneys who primarily focused on the document review participated in weekly meetings with the full litigation team. In advance of these meetings, "Hot" documents and documents that raised questions for discussion that had recently been reviewed and analyzed were compiled and circulated to the broader team. At the meetings, Lead Counsel discussed those documents, including the reasons they were identified as "Hot," attorneys asked questions and discussed

similar documents that had been reviewed, and the team generated ideas for research projects and work product following up on open issues.  These efforts ensured that the entire litigation team learned of and understood the documentary evidence being developed, provided an opportunity for Lead Counsel to further refine their legal and factual theories, focused the document-review team on developing other supporting evidence, and enabled Lead Counsel to ensure that documents were reviewed consistently, meaningfully, and within the demanding timeframe of the case schedule set by the Court.  Lead Counsel also often conducted follow-up research and drafted analyses concerning topics of interest that arose at these meetings.  In total, Lead Counsel's team research concerned dozens of discrete issues, including in-depth analyses regarding, among other things, the history of the Uber contract, changes to James River's reserve methodology, actuarial analyses of James River's reserves performed internally or externally by third parties, and claims handling manuals, policies, and training materials.

59.    At the outset of Lead Counsel's document review efforts, Lead Counsel determined that it would be most efficient to utilize in-house litigation support resources at BLB&G, which provided a far more cost-effective document review platform and algorithm-based "technology-assisted review" ("TAR") (also known as "predictive coding") than those provided by third-party vendors.  The TAR software enabled Lead Counsel to further streamline the review by "learning" the coding of documents as they were reviewed and applying that information to subsequently prioritize further review.  While Lead Counsel could not rely on this algorithm to identify all of the necessary documents to prosecute this Action, it did use the algorithm to further streamline their review and to prioritize the review of documents most likely to be relevant to the claims at issue in the case.

### 3.    Defendants' Discovery Requests to Lead Plaintiff

60.    Defendants served their first set of document requests to Lead Plaintiffs, comprising 28 document requests, on October 13, 2023.  Lead Plaintiffs responded and objected to those requests on October 27, 2023.

61.    Prior to even being served with Defendants' discovery requests, Lead Plaintiffs began gathering potentially relevant and responsive materials.  Lead Counsel worked with Fort Worth and Miami to gather these potentially relevant and responsive discovery materials and conducted a comprehensive collection.  Lead Counsel then reviewed those documents carefully. After this review, Lead Counsel subsequently produced the relevant, responsive, nonprivileged documents in Lead Plaintiffs' possession.

62.    Lead Plaintiffs collectively made three productions of documents from October 27, 2023 through October 28, 2023.  In total, Lead Plaintiffs produced over 6,300 pages of documents to Defendants.

63.    Defendants served their first set of interrogatories to Lead Plaintiffs, comprising ten individual requests (certain with multiple subparts), on November 8, 2023.  Lead Plaintiffs were in the process of preparing their answers to those interrogatories at the time the Settlement was reached.

### 4.    Analysis of Document Discovery and Preparation of Deposition Plan

64.    The Parties reached a settlement in principle shortly before Lead Plaintiffs were scheduled to take their first fact depositions.  Up to that point, however, Lead Plaintiffs had engaged in a substantial amount of preparation for depositions in the case.  Indeed, Lead Plaintiffs had begun preparing a full deposition program, including the identification of deponents, serving notices of depositions for certain deponents, secured dates for certain depositions, and were in the process of negotiating dates for others.  To build an efficient and effective deposition program,

Lead Counsel constructed "key players" lists compiled from various sources, including: (i) the investigation in connection with the Complaint, (ii) document searches, including analyses of Hot documents, and (iii) Defendants' interrogatory responses.  As a result of these efforts, Lead Plaintiffs noticed seven depositions of Individual Defendants and several key witnesses to take place in November and December 2023 and had plans to notice additional depositions before the agreement in principle to settle was reached.

### 5.    Expert Discovery

65.    Lead Plaintiffs also undertook extensive work with experts in connection with their investigation, discovery, and overall prosecution of the case.  Lead Counsel worked with experts closely throughout each step of the litigation to analyze the strengths and weaknesses of the case. This process involved careful analysis of Defendants' public statements to investors and the movement of the Company's stock price in response to specific disclosures, crafting targeted discovery requests to Defendants and non-parties, careful analysis the documents produced by Defendants and third parties in response to Lead Plaintiffs' discovery, as well as critical and strategic thinking about how best to use the evidence gathered throughout discovery to survive summary judgment and prove Lead Plaintiffs' claims at trial.  Lead Plaintiffs consulted with their experts extensively before serving written discovery, provided relevant documents to their experts to conduct their analyses, and, in consultation with their experts, analyzed the relevant evidence and drafted additional discovery requests to serve on Defendants.  Lead Plaintiffs regularly consulted with their experts as they began preparation of their substantive reports.

66.    Soon after discovery commenced, Lead Plaintiffs worked closely with Harris L. Devor, CPA and Brian Duffy, CPA, who had previously consulted with Lead Plaintiffs prior to the filing of the Complaint.  Mr. Devor and Mr. Duffy provided Lead Plaintiffs with background information concerning GAAP and SEC requirements for financial reporting, internal controls,

and the determination of loss reserves.  At the time the settlement was reached, Mr. Devor and Mr. Duffy were in the process of putting together an expert report concerning James River's processes for determining the Company's loss reserves and loss adjustment expenses, as well as alleged material weaknesses and deficiencies in James River's internal controls over financial reporting and financial statements.

67.     Lead Plaintiffs also retained Kim E. Piersol, an actuary with decades of industry experience who previously served as Senior Vice President & Chief Actuary for Crum & Forster Insurance Companies and Chief Actuary for CNA Insurance Companies.  Mr. Piersol provided Lead Plaintiffs with background information concerning actuarial processes in the commercial auto industry.  Mr. Piersol was in the process of advising Lead Plaintiffs concerning the impact of James River's systemic reserve suppression practices upon James River's actuarial processes at the time the Parties reached an agreement to settle the case in principle.

68.     Lead Plaintiffs further retained Amy E. Johnson, an insurance coverage, bad faith, and insurer customs and practices attorney, certified mediator, and former Director of Property & Casualty Claims for a national insurance provider, with over twenty years of insurance coverage experience, insurance claim practices and standards and claims handling.  Ms. Johnson provided Lead Plaintiffs with background information concerning industry customs and practices regarding reserving practices in the commercial auto insurance industry.  Ms. Johnson was in the process of drafting an expert report concerning James River's compliance with industry customs and practices with respect to its reserving processes, training, and maintenance of artificially low loss reserves at the time the Parties reached an agreement to settle the case in principle.

69.     Lead Plaintiffs also worked closely with Chad W. Coffman, CFA, a financial economist and experienced testifying expert, to analyze market efficiency and damages issues.

25

Mr. Coffman and his team were in the process of putting together expert reports concerning market efficiency (in connection with Plaintiffs' forthcoming motion for class certification) and damages suffered by the proposed Class at the time the Parties reached an agreement to settle the case in principle.

### E. Mediation and Settlement

70. In September 2023—with fact discovery well underway, and expert reports and depositions on the horizon—the Parties agreed to attempt to resolve this case through private mediation. The Parties retained Jed D. Melnick, Esq., a highly experienced mediator in complex securities and shareholder litigation, to act as mediator for the Action. On November 3, 2023, counsel for the Parties participated in a full-day mediation session in White Plains, New York before Mr. Melnick. Lead Plaintiffs' representatives communicated with Lead Counsel and were updated on the progress of the Parties' negotiations throughout the mediation process.

71. In advance of the November 3, 2023 session, the Parties exchanged and submitted detailed mediation statements to Mr. Melnick addressing all the key disputes in this Action and appending numerous exhibits. Lead Plaintiffs further submitted a response to Defendants' mediation statement in advance of the session. Through this briefing, and during the first mediation session, it was clear that there were numerous disagreements between the Parties regarding issues of liability and damages, and the Parties remained far apart in their views of the claims and potential damages. As a result, counsel engaged in extensive discussions at the November 3, 2023 mediation session, but no agreement was reached.

72. After the conclusion of the first session, the Parties agreed to engage in a second half-day session before Mr. Melnick on November 15, 2023. Prior to this mediation session, Lead Plaintiffs submitted a follow-up written submission to Defendants and Mr. Melnick, and included

supporting exhibits compiled from documents produced in the course of discovery.  Defendants also submitted a response to Lead Plaintiffs' follow-up submission.

73.     During the November 15, 2023 mediation session, held via Zoom, the Parties again engaged in robust negotiations regarding their respective positions in the litigation.  These negotiations were extremely hard fought, and no agreement was reached during the formal mediation session that day.  In fact, it was only after further settlement discussions overseen by Mr. Melnick, that Mr. Melnick proffered a mediator's recommendation which the parties accepted, thereby agreeing in principle to settle the Action for $30 million.  The Parties subsequently began negotiations regarding the principal non-financial terms of the potential settlement.

74.     The Parties' agreement in principle was memorialized in a term sheet that was fully executed on December 7, 2023 (the "Term Sheet").  The Term Sheet set forth, among other things, the Parties' agreement to settle and release all claims against Defendants in the Action in return for a cash payment of $30,000,000 for the benefit of the Settlement Class, subject to certain terms and conditions and the execution of a customary "long form" stipulation and agreement of settlement and related papers.

75.     Following the execution of the Term Sheet, the Parties negotiated the final terms of the Settlement and drafted the Stipulation and Agreement of Settlement and related settlement papers.  On December 22, 2023, the Parties executed the Stipulation, which embodies the final and binding agreement to settle the Action.  *See* ECF No. 114-1.  That same day, the Parties also executed a confidential Supplemental Agreement which provides that Defendants have the option to terminate the Settlement if persons who request exclusion from the Settlement Class exceed a certain threshold.  *See* Stipulation ¶ 38.

76.    On December 22, 2023, Lead Plaintiffs submitted the Parties' Stipulation to the Court as part of their motion for preliminary approval of the Settlement.  ECF Nos. 114-15.

77.    On January 5, 2024, the Court entered an Order (a) scheduling a hearing concerning "the sufficiency of the notice that Lead Plaintiffs propose to send to potential class members, particularly the sufficiency of the records that Defendant James River Group Holdings, Ltd. . . . has maintained regarding its shareholders" and (b) requesting briefing from Lead Plaintiffs concerning "the quality and adequacy of the recordkeeping regarding potential class members and the likelihood that notice of the settlement will reach as many class members as possible."  ECF No. 117.

78.    On January 16, 2024, Lead Plaintiffs filed a supplemental memorandum of law in response to the Court's January 5, 2024 Order.  ECF No. 118.  The supplemental memorandum provided more detail about how Lead Plaintiffs would provide notice of Settlement including by (i) notifying record shareholders identified by James River, (ii) notifying all beneficial owners of James River common stock identified by brokers and other nominees, and (iii) providing notice in the *Wall Street Journal*, *PR Newswire*, and over the Internet.  *Id.*

79.    On January 26, 2024, the Court held a hearing on Lead Plaintiffs' motion for preliminary approval of the Settlement, during which the Court granted preliminary approval of the Settlement.  That same day, the Court entered its Order Preliminarily Approving Settlement and Authorizing Dissemination of Settlement Notice (ECF No. 119) ("Preliminary Approval Order"), which, among other things: (1) preliminarily approved the Settlement; (2) approved the form of Notice, Summary Notice, and Claim Form, and authorized notice of the Settlement to be given to potential Settlement Class Members through mailing of the Notice and Claim Form, posting the Notice and Claim form on a Settlement website, and publication of the Summary

Notice in *The Wall Street Journal* and over the *PR Newswire*; (3) established procedures and deadlines by which Settlement Class Members could participate in the Settlement, request exclusion from the Settlement Class, or object to the Settlement, the proposed Plan of Allocation, and/or the fee and expense application; and (4) set a schedule for the filing of opening papers and reply papers in support of the proposed Settlement, Plan of Allocation, and the Fee and Expense Motion. The Preliminary Approval Order also scheduled the Settlement Hearing for May 24, 2024 at 11:00 a.m. to determine, among other things, whether the Settlement should be finally approved.

## III.    RISKS OF CONTINUED LITIGATION

80.    The Settlement provides a substantial and certain benefit to the Settlement Class in the form of a $30 million cash payment. Lead Plaintiffs and Lead Counsel believe that the proposed Settlement is an excellent result for the Settlement Class.

81.    As explained below, Lead Plaintiffs faced significant risks with respect to proving liability and recovering full damages in this case. To prevail in this case, Lead Plaintiffs had the burden to convince a jury by a preponderance of the evidence of each of the elements of their claims, including that (i) Defendants made misstatements, (ii) the misstatements were material, (iii) the misstatements were made with scienter (*i.e.*, knowingly or with deliberate recklessness), (iv) investors relied upon the misstatements, and (v) Defendants' fraud caused investors' losses.

82.    Moreover, absent a settlement, Lead Plaintiffs would still need to prevail at several additional stages of the litigation, including moving for class certification, defeating Defendants' anticipated motion for summary judgment, and prevailing at trial. At each of these stages, Lead Plaintiffs would have faced significant risks related to establishing liability and full damages, including, among other things, overcoming Defendants' falsity, scienter, and loss causation challenges. Even after a trial, Lead Plaintiffs would have faced post-trial motions, including a

29

potential motion for judgment as a matter of law, as well as further appeals that might have prevented Lead Plaintiffs from successfully obtaining a recovery for the Settlement Class.

83.    The Settlement Amount—$30 million in cash, plus interest—represents a significant recovery for the Settlement Class.  As discussed below, it also represents a significant portion of the recoverable damages in the Action as determined by Lead Plaintiffs' damages expert—particularly after considering Defendants' substantial arguments with respect to liability and damages.  These arguments created a significant risk that, after years of protracted litigation, Lead Plaintiffs and the Settlement Class would have achieved no recovery at all, or a smaller recovery than the Settlement Amount.

### A.    General Risks in Prosecuting Securities Class Actions

84.    In recent years, securities class actions have become riskier and more difficult to prove given changes in the law, including numerous United States Supreme Court decisions.  For example, data from Cornerstone Research shows that, in each year from 2014 through 2020, ***approximately half of all securities class actions filed were dismissed***.  *See* CORNERSTONE RESEARCH, SECURITIES CLASS ACTION FILINGS: 2023 YEAR IN REVIEW (2024), attached hereto as Exhibit 4A, at 19.

85.    Even when they have survived motions to dismiss, securities class actions are often defeated either at the class certification stage, in connection with *Daubert* motions, or at summary judgment.  For example, class certification has been denied in numerous cases in recent years, as the standards applicable to class certification become more rigorous.  *See, e.g., Arkansas Teacher Ret. Sys. v. Goldman Sachs Group, Inc.*, 77 F.4th 74, 105 (2d Cir. 2023) (decertifying class after a decade of litigation); *In re Kirkland Lake Gold Ltd. Sec. Litig.*, 2024 WL 1342800, at *12 (S.D.N.Y. Mar. 29, 2024) (denying motion for class certification); *In re Finisar Corp. Sec. Litig.*, 2017 WL 6026244, at *9 (N.D. Cal. Dec. 5, 2017) (Davila, J.), *reconsideration denied*, 2018 WL

30

3472334 (N.D. Cal. Jan. 18, 2018), *and leave to appeal denied, Oklahoma Firefighters Pension & Ret. Sys. v. Finisar Corp.*, 2018 WL 3472714 (9th Cir. July 13, 2018); *Gordon v. Sonar Cap. Mgmt. LLC*, 92 F. Supp. 3d 193, 205 (S.D.N.Y. Mar. 19, 2015); *Sicav v. James Jun Wang*, 2015 WL 268855 (S.D.N.Y. Jan. 21, 2015); *IBEW Local 90 Pension Fund v. Deutsche Bank AG*, 2013 WL 5815472, at *22 (S.D.N.Y. Oct. 29, 2013); *George v. China Auto. Sys., Inc.*, 2013 WL 3357170, at *13 (S.D.N.Y. July 3, 2013); *Colman v. Theranos, Inc.*, 325 F.R.D. 629, 651 (N.D. Cal. 2018); *Smyth v. China Agritech, Inc.*, 2013 WL 12136605 (C.D. Cal. Sept. 26, 2013); *In re STEC Inc. Sec. Litig.,* 2012 WL 6965372, at *7 (C.D. Cal. Mar. 7, 2012).

86.     Multiple securities class actions also recently have been dismissed at the summary judgment stage.  *See, e.g.*, *Karp v. First Conn. Bancorp, Inc.*, 535 F. Supp. 3d 458, 475 (D. Md. 2021), *aff'd*, 69 F.4th 223 (4th Cir. 2023) (granting summary judgment after approximately three years of litigation); *In re Mylan N.V. Sec. Litig.,* 666 F. Supp. 3d 266, 328 (S.D.N.Y. 2023) (granting summary judgment after approximately six years of litigation); *In re Allergan PLC Sec. Litig.*, 2022 WL 17584155, at *7 (S.D.N.Y. Dec. 12, 2022) (granting summary judgment after approximately four years of litigation); *Murphy v. Precision Castparts Corp.*, 2021 WL 2080016, at *6 (D. Or. May 24, 2021) (granting summary judgment after approximately five years of litigation); *In re Barclays Bank PLC Sec. Litig.*, 2017 WL 4082305, at *25 (S.D.N.Y. Sept. 13, 2017) (summary judgment granted in 2017 after eight years of litigation); *In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 554-55 (S.D.N.Y. 2008), *aff'd* 597 F.3d 501 (2d Cir. 2010) (summary judgment granted after six years of litigation and millions of dollars spent by plaintiffs' counsel); *see also In re Xerox Corp. Sec. Litig.*, 935 F. Supp. 2d 448, 496 (D. Conn. 2013), *aff'd* 766 F.3d 172 (2d Cir. 2014); *Fosbre v. Las Vegas Sands Corp.*, 2017 WL 55878, at *28 (D. Nev. Jan. 3, 2017), *aff'd sub nom.*, *Pompano Beach Police & Firefighters' Ret. Sys. v. Las Vegas Sands*

31

*Corp.*, 732 F. App'x 543 (9th Cir. 2018); *Perrin v. Sw. Water Co.*, 2014 WL 10979865, *9 (C.D. Cal. July 2, 2014); *In re Novatel Wireless Sec. Litig.*, 830 F. Supp. 2d 996, 1015 (S.D. Cal. 2011); *In re Oracle Corp. Sec. Litig.*, 2009 WL 1709050, at *34 (N.D. Cal. June 19, 2009), *aff'd*, 627 F.3d 376 (9th Cir. 2010); *In re Bos. Sci. Corp. Sec. Litig.*, 708 F. Supp. 2d 110, 113 (D. Mass. 2010), *aff'd sub nom. Mississippi Pub. Emps.' Ret. Sys. v. Bos. Sci. Corp.*, 649 F.3d 5 (1st Cir. 2011); *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202 (S.D. Cal. 2010).

87.    Even cases that have survived summary judgment have been dismissed prior to trial in connection with *Daubert* motions.  *See, e.g., Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse First Boston*, 853 F. Supp. 2d 181, 196, 198 (D. Mass. 2012), *aff'd*, 752 F.3d 82 (1st Cir. 2014) (granting summary judgment *sua sponte* in favor of defendants after finding that plaintiffs' expert was unreliable).

88.    Even when securities class action plaintiffs are successful in certifying a class, prevailing at summary judgment, and overcoming *Daubert* motions, there remain significant risks that a jury will not find the defendants liable or award expected damages.  *See, e.g., HsingChing Hsu. v. Puma Biotechnology, Inc.*, 2019 WL 11637311, at *1 (C.D. Cal. May 22, 2019) (jury verdict in favor of defendants on three of four of alleged misstatements, reducing potential damages to only 5% or less of claimed damages); *In re Tesla Inc., Sec. Litig.*, 2023 WL 4032010, at **2-5 (N.D. Cal. June 14, 2023) (jury verdict for defense delivered in securities class action involving Elon Musk's tweets about taking Tesla private, even though the court had already found the tweets were false and Musk acted recklessly in issuing them, and the same conduct had resulted in SEC charges and a settlement).  Further, post-trial motions, based on a complete record, also present substantial risks.  For example, in *In re BankAtlantic Bancorp, Inc. Securities Litigation*, a jury rendered a verdict in plaintiffs' favor on liability in 2010.  2011 WL 1585605, at *6 (S.D.

Fla. Apr. 25, 2011). In 2011, the district court granted defendants' motion for judgment as a matter of law and entered judgment in favor of the defendants on all claims. *Id*. at \*38. In 2012, the Eleventh Circuit affirmed the district court's ruling, finding that there was insufficient evidence to support a finding of loss causation. *See Hubbard v. BankAtlantic Bancorp, Inc.*, 688 F.3d 713, 725 (11th Cir. 2012).

89. There is also the risk that an intervening change in the law can result in the dismissal of a case after significant effort has been expended. The Supreme Court has heard numerous securities cases in recent years, often announcing holdings that dramatically changed the law in the midst of long-running cases—including after trial. *See Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, No. 22-1165, 601 U.S. ___ (2024); *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175 (2015); *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258 (2014); *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135 (2011); *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247 (2010) ("*Morrison*"). As a result, many cases have been lost after thousands of hours have been invested in briefing and discovery. For example, in *In re Vivendi Universal, S.A. Securities Litigation*, after a verdict for class plaintiffs, the district court granted judgment for defendants following a change in the law announced in *Morrison*, dismissing claims that had been proven at trial for the vast majority of the class. 765 F. Supp. 2d 512, 524-25, 533 (S.D.N.Y. 2011) *aff'd*, 838 F.3d 223 (2d Cir. 2016). Changes in the law at the Circuit level have similarly upended pending cases; for example, in *Murphy v. Precision Castparts Corp.*, the court reconsidered its denial of summary judgment and granted it for defendants based explicitly on an intervening Ninth Circuit decision. 2021 WL 2080016, at \*6.

90. In sum, securities class actions face serious risks of dismissal and non-recovery at all stages of the litigation. *See, e.g., In re Genworth Financial Sec. Litig.*, 210 F. Supp. 3d 837,

33

844 (E.D. Va. 2016) ("[S]ecurities fraud cases require significant showings of fact in order to prevail before a jury, and elements such as scienter, reliance, and materiality of misrepresentation are notoriously difficult to establish").

## B.    Specific Risks Concerning this Action

91.    While Lead Plaintiffs believe that their claims have merit, Lead Plaintiffs faced substantial risks that Defendants would succeed in eliminating all or part of the case in connection with class certification, summary judgment, pre-trial motions, at trial, or on post-trial appeal.

92.    From a "big picture" perspective, such risks were heightened here because this case lacked certain obvious indicia of fraud that could have provided significant tailwinds for Lead Plaintiffs' discovery efforts and overall case.  In particular, no regulatory body, including the SEC, has opened any form of investigation or inquiry into the falsity of Defendants' public statements or taken any public enforcement action against the Company.  Nor, for that matter, has any whistleblower stepped forward publicly disseminating information supporting Lead Plaintiffs' allegations.  Thus, Lead Plaintiffs faced an uphill battle in successfully pleading and prosecuting securities fraud class claims in this context.  In the face of this challenge, Lead Plaintiffs and Lead Counsel committed significant resources to this case and achieved success.  As set forth in more detail below, Lead Plaintiffs faced substantial challenges to proving liability and significant damages.

93.    Although Lead Counsel respectfully submit that, by the time of the mediation, ample discovery had been taken to allow all parties to reasonably assess the fairness of the proposed Settlement, they were also aware that additional discovery, including deposition discovery of Defendants, still remained to be completed absent the Settlement.  In addition, formal expert discovery on hotly contested liability issues had not yet begun, and the Parties faced the further risks and expense of complex class certification briefing, summary judgment motions, and

34

trial.  Accordingly, although both sides were able to present information that supported their respective claims and defenses, there was clearly a substantial risk as to how the further testimony of fact and expert witnesses would ultimately play out.  In light of these risks, the significant, immediate benefit of the $30 million Settlement is a particularly strong result for the Settlement Class.  *See, e.g., 1988 Tr. for Allen Child. Dated 8/8/88 v. Banner Life Ins. Co.*, 28 F.4th 513, 526 (4th Cir. 2022) ("Approving this settlement now avoids protracted litigation costs and risks to the settlement class and provides them with immediate recovery.").

### 1.    Risks Associated with Proving Falsity and Materiality

94.    The heart of this case concerns whether Defendants made materially false and misleading statements and omissions to investors regarding James River's reserving process, the adequacy of James River's reserves, the status of the Uber contract's placement in "runoff," and James River's compliance with GAAP and the Company's internal controls.  In their motion to dismiss, Defendants argued that the alleged statements were neither false nor material to investors.  Defendants would have remained free to relitigate virtually any of their arguments at summary judgment or trial, where the applicable standards would likely have been more challenging for Lead Plaintiffs.

95.    To begin, Defendants likely would have argued that the statements concerning the Company's loss reserves were inactionable projections and statements of opinion because they concerned the adequacy of the Company's reserve estimates.  Defendants likely would have argued that the Company's loss reserves were estimated in good faith by actuaries and also reviewed by external actuaries biannually.  In support of these contentions, Defendants likely would have pointed to their public filings, which included a description of the Company's actuarial process and disclosed that a variety of different factors and inputs were weighed in the Company's actuarial judgment, including trends in claim frequency and severity, emerging economic and

social trends, changes in the regulatory and litigation environment, and discussions with third-party actuarial consultants. Relatedly, Defendants likely would have argued that Lead Plaintiffs' allegations concerned the "case" reserves on individual claims, which Defendants argued were distinct from the "loss" reserve estimates recorded on the Company's balance sheet. Even though Lead Plaintiffs believe they had credible counterarguments, it is uncertain that Lead Plaintiffs could convince the Court or a jury, particularly considering the complexity of the underlying calculations. *See Genworth,* 210 F. Supp. 3d at 841-42 ("[P]laintiffs at trial would bear the burden of conveying complex information to a jury using financial records, complicated accounting principles, and expert testimony. The plaintiffs would also need to prove that the statements made were in fact false, as opposed to mere projections not subject to liability. . . . The high risk faced by taking the case to a jury verdict demonstrates the adequacy of this [] settlement").

96.    While Lead Plaintiffs believe they had significant arguments supported by discovery to make in response, there was a significant risk that the Court or a factfinder could have credited Defendants' positions at either summary judgment or trial. Underscoring this risk was the fact that, even as of the date the Settlement was reached, no regulatory body had sought to bring any enforcement action against James River—or even launch an investigation.

97.    In sum, there was a significant risk that Lead Plaintiffs would not be able to establish the material falsity of some or all of the challenged statements at trial. Had that happened, recovery for Lead Plaintiffs and the Settlement Class would have either been severely reduced or eliminated entirely.

### 2.    Risks Associated with Proving Scienter

98.    Even if Lead Plaintiffs had been able to establish falsity and materiality, they would have faced significant risk in establishing Defendants' scienter.

36

99.     Defendants likely would have argued that the Individual Defendants lacked the requisite scienter for securities fraud because the Company had a formal process for estimating reserves, employed external actuarial consultant Willis Towers Watson, and had Ernst & Young, a "Big Four" accounting firm, audit the Company's financial statements and actuarial conclusions. Therefore, Defendants would argue they had a reasonable basis on which to make the statements. *See Genworth,* 210 F. Supp. 3d at 841-42 (noting "the defendants employed a nationally-recognized auditor, KPMG, who found no violations of Generally Accepted Accounting Principles ('GAAP') in Genworth's financial statements," and "[e]ven with a strong case, the plaintiffs nonetheless face a large risk before a jury"). Moreover, Defendants would argue that Lead Plaintiffs' allegations are consistent with the Company's public disclosures, which repeatedly disclosed the Company's purported process for setting case reserves, and thus undercut any inference that Defendants knew or should have known that overall loss reserves were understated.

100.    Had Lead Plaintiffs failed to create a triable issue regarding scienter at summary judgment, or failed to prevail on establishing scienter at trial, the Settlement Class would not be able to recovery anything in this Action.

### 3.     Risks Associated with Proving Loss Causation and Damages

101.    Even if Lead Plaintiffs had successfully established Defendants' material misrepresentations and scienter, they would still have faced meaningful challenges in establishing loss causation and damages in this Action.

102.    For example, Defendants likely would have argued that the final corrective disclosure did not reveal any new information about the alleged reserving problems for the Uber account. Defendants likely would have argued that the loss portfolio transfer discussed in the Company's October 26, 2021 press release was already known to the market because the Company previously announced the loss portfolio transfer and its financial ramifications on September 30,

2021. Notably, Defendants could have raised this argument at the class certification stage and would not need to wait until summary judgment or trial.

103. Moreover, Defendants could have also argued that the nature of the alleged misstatements here were too generic to support price impact (as required for class certification) or that the alleged corrective disclosures did not sufficiently "correct" any false impression created by the alleged false statements (as required for loss causation). Following the Parties' briefing on the motion to dismiss, the Second Circuit issued its decision in *Arkansas Teacher Retirement System v. Goldman Sachs Group, Inc.*, decertifying a previously certified class on the ground that Goldman's allegedly false statements were too "generic" to support price impact, and there was an "insufficient link between the corrective disclosures and the alleged misrepresentations." 77 F.4th 74, 96-105 (2d Cir. 2023). Here, Defendants could have relied on the *Goldman* decision at the class certification stage to argue that Defendants' statements concerning James River's process of reserving for losses and the adequacy of James River's reserves (among other things) were too generic, and the subsequent disclosures concerning the adverse charges and loss portfolio transfer insufficiently "corrective" of those generic statements, to support price impact or loss causation— arguments that, if accepted, could have eliminated any recovery whatsoever.

104. Along similar lines, Defendants likely would have also argued that not all of the declines in the price of James River common stock following the four corrective disclosures were recoverable as damages. To advance this argument, Defendants could have introduced expert testimony about the level of artificial inflation in the stock that could be attributed to the misrepresentations, and that would likely have played out in a hotly-contested and difficult-to-predict "battle of the experts" at summary judgment or trial. If accepted, this argument would have reduced damages substantially, or eliminated them entirely.

### 4.      Risks After Trial

105.    Even if Lead Plaintiffs overcame all the above risks and prevailed at trial, Defendants would have appealed any judgment in Lead Plaintiffs' and the class's favor.  Such an appeal could have taken years and presented additional risk.

106.    Moreover, even if a judgment in Lead Plaintiffs' favor was affirmed on appeal, Defendants could then have challenged the reliance and damages of each class member, including Lead Plaintiffs, in an extended series of individual proceedings.  That process could have taken multiple additional years, and could have severely reduced any recovery to the class as Defendants "picked off" class members.  For example, in *In re Vivendi*, the district court acknowledged that in any post-trial proceedings, "Vivendi is entitled to rebut the presumption of reliance on an individual basis," and that "any attempt to rebut the presumption of reliance on such grounds would call for separate inquiries into the individual circumstances of particular class members."  765 F. Supp. 2d at 583-84.  Over the course of several years, Vivendi indeed successfully challenged several class members' damages in individual proceedings.  In addition, as noted above, there was the risk of an intervening change in the law that could have impacted Lead Plaintiffs' claims.

107.    Thus, even if Lead Plaintiffs and the class prevailed at trial, the subsequent processes of an appeal, challenges to individual class members, and intervening changes in the law could have severely reduced or even eliminated any recovery—and, at minimum, could have added several years of further delay.

108.    The Settlement eliminates these significant litigation risks and provides a substantial and certain recovery for the Settlement Class.

**C.    The Settlement Amount Compared to the Likely Maximum Damages that Could Be Proved at Trial**

109.    The Settlement Amount—$30 million in cash, plus interest—represents an excellent recovery for the Settlement Class.  Indeed, the $30 million Settlement is a very favorable result when it is considered in relation to the maximum amount of damages that could be reasonably established at trial, in the event that Lead Plaintiffs prevailed on class certification and liability issues, including falsity and scienter, at summary judgment.  Assuming Lead Plaintiffs prevailed on all class certification and liability issues, their damages expert determined that the *maximum* realistic recoverable damages at trial would be approximately $238 million.  Importantly, this estimate assumes Lead Plaintiffs' complete success in establishing Defendants' liability on the remaining claims, and that the trier of fact would reject Defendants' loss causation and damages arguments.  Moreover, Lead Plaintiffs' damages expert calculated that, assuming Defendants prevailed on certain of their anticipated loss causation and damages arguments, damages could be reduced to as little as $120 million, if any at all.

110.    Thus, the $30 million Settlement represents a recovery of 13% to 25% of realistically recoverable damages, which is a substantial higher level of recovery than typically seen in comparable cases.  *See, e.g., Farrar v. Workhorse Group Inc.*, 2023 WL 5505981, at *7 (C.D. Cal. July 24, 2023) ("Indeed, a 3% recovery is within the range of the percentages of recovery approved in other securities class action settlements") (collecting cases and authorities); *In re PPDAI Grp. Inc. Sec. Litig.*, 2022 WL 198491, at **12-13 (E.D.N.Y. Jan. 21, 2022) (approving securities class action settlement representing "6.4% of the maximum estimated aggregate damages [of] $140,000,000, assuming Plaintiffs can prove all their relevant causation arguments" as "within the range of reasonableness."); *Vataj v. Johnson*, 2021 WL 5161927, at *6 (N.D. Cal. Nov. 5, 2021) (Gilliam, Jr. J.) (approving settlement recovering "slightly more than 2%

40

of [] estimated damages" as consistent with the "average recovery that the parties identified in other securities class action settlements"); *In re Snap Inc. Sec. Litig.*, 2021 WL 667590, at \*1 (C.D. Cal. Feb. 18, 2021) (approving settlement "represent[ing] approximately 7.8% of the class's maximum potential aggregate damages" and noting that it is "similar to the percent recovered in other court-approved securities settlements"); *Thorpe v. Walter Inv. Mgmt. Corp.*, 2016 WL 10518902, at \*3 (S.D. Fla. Oct. 17, 2016) (approving settlement representing 5.5% of the maximum damages and noting that the settlement is "an excellent recovery, returning more than triple the average settlement in cases of this size"); *In re Biolase, Inc. Sec. Litig.*, 2015 WL 12720318, at \*4 (C.D. Cal. Oct. 13, 2015) (settlement recovery of 8% of estimated damages "equals or surpasses the recovery in many other securities class actions"). Indeed, the $30 million Settlement is approximately *3 to 6 times* greater than the 4% median recovery in similarly-sized securities class action settlements. *See* CORNERSTONE RESEARCH, SECURITIES CLASS ACTION FILINGS: 2023 REVIEW AND ANALYSIS (March 6, 2024), attached hereto as Exhibit 4B, at 6, 20.

111. Given the meaningful litigation risks, and the immediacy and amount of the $30 million recovery for the Settlement Class, Lead Plaintiffs and Lead Counsel believe that the Settlement is an excellent result; fair, reasonable, and adequate; and in the best interest of the Settlement Class.

## IV. LEAD PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE OF NOTICE

112. The Court's Preliminary Approval Order directed that the Notice of (I) Pendency of Class Action and Proposed Settlement; (II) Settlement Hearing; and (III) Motion for Attorneys' Fees and Litigation Expenses (the "Notice") and Proof of Claim and Release Form ("Claim Form") be disseminated to the Settlement Class. The Preliminary Approval Order also set a May 3, 2024 deadline for Settlement Class Members to submit objections to the Settlement, the Plan of

Allocation, and/or the Fee and Expense Motion or to request exclusion from the Settlement Class, and scheduled the Settlement Hearing for May 24, 2024.

113.    Pursuant to the Preliminary Approval Order, Lead Counsel instructed A.B. Data, Ltd. ("A.B. Data"), the Court-approved Claims Administrator, to begin disseminating copies of the Notice and the Claim Form by mail and to publish the Summary Notice.  The Notice contains, among other things, a description of the Action, the Settlement, the proposed Plan of Allocation, and Settlement Class Members' rights to participate in the Settlement, object to the Settlement, the Plan of Allocation and/or the Fee and Expense Motion, or exclude themselves from the Settlement Class.  The Notice also informs Settlement Class Members of Lead Counsel's intent to apply for an award of attorneys' fees in an amount not to exceed 25% of the Settlement Fund, and for Litigation Expenses in an amount not to exceed $800,000.  To disseminate the Notice, A.B. Data obtained information from James River and from banks, brokers, and other nominees regarding the names and addresses of potential Settlement Class Members.  *See* Declaration of Adam D. Walter Regarding: (A) Mailing of the Notice and Claim Form; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion Received to Date ("Walter Decl."), attached hereto as Exhibit 5, at ¶¶ 5-11.  A.B. Data also disseminated notice pursuant to the Class Action Fairness Act, 28 U.S.C. § 1715 et seq. ("CAFA") on behalf of Defendants.  *See* Declaration of Adam D. Walter Regarding Defendant's Notice of Compliance with 28 U.S.C. § 1715(b), attached hereto as Exhibit 6.

114.    A.B. Data began mailing copies of the Notice and Claim Form (together, the "Notice Packet") to potential Settlement Class Members and nominee owners on February 16, 2024. *See* Walter Decl. ¶¶ 5-7.  As of April 18, 2024, A.B. Data had disseminated a total of 37,794 Notice Packets to potential Settlement Class Members and nominees.  *Id*. at ¶ 11.

115.    On March 4, 2024, in accordance with the Preliminary Approval Order, A.B. Data caused the Summary Notice to be published in *The Wall Street Journal* and to be transmitted over the *PR Newswire*.  *Id.* at ¶ 13.

116.    Lead Counsel also caused A.B. Data to establish a dedicated settlement website, www.JamesRiverSecuritiesLitigation.com, to provide potential Settlement Class Members with information concerning the Settlement and access to copies of the Notice and Claim Form, as well as the Stipulation, Preliminary Approval Order, and operative Complaint.  *See* Walter Decl. ¶ 14. That website became operational on February 16, 2024.  *Id.*  Lead Counsel also made copies of the Notice and Claim Form and other documents available on their own websites, www.blbglaw.com and www.saxenawhite.com.

117.    As set forth above, the deadline for Settlement Class Members to file objections to the Settlement, Plan of Allocation, and/or Fee and Expense Motion, or to request exclusion from the Settlement Class is May 3, 2024.  To date, only one request for exclusion has been received from a potential Settlement Class Member who claimed to have "purchased and sold approximately 50 shares" of James River common stock during the Settlement Class Period,.  *See* Walter Decl. ¶ 17.  In addition, no objections to the Settlement, Plan of Allocation, or Lead Counsel's Fee and Expense Motion have been received.  Lead Counsel will file reply papers on or before May 17, 2024 that will address any objections that may be received.

## V.    ALLOCATION OF THE PROCEEDS OF THE SETTLEMENT

118.    Pursuant to the Preliminary Approval Order, and as set forth in the Notice, Settlement Class Members who wish to participate in the distribution of the Net Settlement Fund must submit a valid Claim Form with all required information postmarked (if mailed) or submitted online no later than June 25, 2024.  As set forth in the Notice, the Net Settlement Fund will be

distributed among Settlement Class Members who submit eligible claims according to the plan of allocation approved by the Court.

119.   Lead Counsel consulted with Lead Plaintiffs' damages expert in developing the proposed plan of allocation for the Net Settlement Fund (the "Plan of Allocation").  Lead Counsel believe that the Plan of Allocation provides a fair and reasonable method to equitably allocate the Net Settlement Fund among Settlement Class Members who suffered losses as result of the conduct alleged in the Action.

120.   The Plan of Allocation is set forth at pages 13 to 17 of the Notice.  *See* Walter Decl., Ex. A at pp. 13-17.  As described in the Notice, the objective of the Plan of Allocation is to distribute the Settlement proceeds equitably among those Settlement Class Members who suffered economic losses as a proximate result of the alleged wrongdoing.  The calculations under the Plan of Allocation are intended as a method to weigh the claims of Settlement Class Members against one another for the purposes of making an equitable allocation of the Net Settlement Fund.  *See* Notice ¶ 79.

121.   In developing the Plan of Allocation, Lead Plaintiffs' damages expert calculated the estimated amount of artificial inflation in the per-share price of James River common stock which allegedly was proximately caused by Defendants' alleged materially false and misleading statements and omissions during the Class Period.  *See* Notice ¶ 80.  In calculating the estimated artificial inflation, Lead Plaintiffs' damages expert considered the price changes in James River common stock in reaction to certain public announcements allegedly revealing the truth concerning Defendants' alleged misrepresentations and material omissions, adjusting for price changes that were attributable to market or industry factors.  *Id*.

122. Lead Plaintiffs allege that Defendants made false statements and omitted material facts during the Class Period (February 22, 2019 through October 25, 2021, inclusive), which had the effect of artificially inflating the prices of James River common stock, and that corrective information was released to the market on October 8, 2019, November 6, 2019, May 5, 2021, and October 26, 2021, which removed the artificial inflation from the price of James River common stock on October 9, 2019, November 7, 2019, May 6, 2021, and October 26, 2021. In order to be eligible under the Plan of Allocation, a Settlement Class Member that purchased or otherwise acquired James River common stock during the Class Period must have held those shares through at least one of the dates where new corrective information was released to the market and partially removed the artificial inflation from the price of James River common stock. *See* Notice ¶¶ 82, 84.

123. Recognized Loss Amounts are calculated under the Plan of Allocation for each purchase or acquisition of James River common stock during the Class Period that is listed on a Claimant's Claim Form and for which adequate documentation is provided. In general, Recognized Loss Amounts under the Plan are calculated as the lesser of: (a) the difference between the amount of alleged artificial inflation at the time of purchase or acquisition and the time of sale, or (b) the difference between the purchase price and the sale price for the shares. *See id*. For shares sold prior to the close of trading on October 8, 2019, the Recognized Loss Amount is zero, because those shares were sold before first alleged corrective disclosure and thus were not damaged by the alleged fraud. *Id*. at ¶ 84.A. In addition, consistent with PSLRA, Recognized Loss Amounts for shares of James River common stock sold during the 90-day period after the end of the Class Period, or held to the end of that 90-day period, are further limited to the difference

between the purchase price and the average closing price of the stock during that period.  *Id.* at ¶¶ 84.C.(ii), 84.D.(ii).

124.   The sum of a Claimant's Recognized Loss Amounts for all of his, her, or its purchases of James River common stock during the Class Period is the Claimant's "Recognized Claim."  Notice ¶ 85.  The Plan of Allocation also limits Claimants' Recognized Claim based on whether they had an overall market loss in their transactions in James River common stock during the Class Period.  A Claimant's Recognized Claim will be limited to the amount of his, her, or its market loss in James River common stock transactions during the Class Period, and Claimants who have an overall market gain are not eligible for a recovery.  *Id*. at ¶¶ 92-93.

125.   The Net Settlement Fund will be allocated to Authorized Claimants on a *pro rata* basis based on the relative size of their Recognized Claims.  Notice ¶ 94.  If an Authorized Claimant's *pro rata* distribution amount calculates to less than ten dollars, no payment will be made to that Authorized Claimant.  *Id*. at ¶ 95.  Those funds will be included in the distribution to the Authorized Claimants whose payments exceed the ten-dollar minimum.

126.   One hundred percent of the Net Settlement Fund will be distributed to Authorized Claimants.  If any funds remain after the initial *pro rata* distribution, as a result of uncashed or returned checks or other reasons, subsequent cost-effective distributions to Authorized Claimants will be conducted.  Notice ¶ 96.  Only when the residual amount left for re-distribution to Settlement Class Members is so small that a further re-distribution would not be cost effective (for example, where the administrative costs of conducting the additional distribution would largely subsume the funds available), will those funds be donated to one or more non-sectarian, not-for-profit, 501(c)(3) organizations to be selected by Lead Counsel and approved by the Court.  *See id*.

127.    In sum, the Plan of Allocation was designed to fairly and rationally allocate the proceeds of the Net Settlement Fund among Settlement Class Members based on damages they suffered on purchases of James River common stock that were attributable to the misconduct alleged in the Action.  Accordingly, Lead Counsel respectfully submit that the Plan of Allocation is fair and reasonable and should be approved by the Court.  To date, no objections to the proposed Plan of Allocation have been received, and there has been only one request for exclusion by an individual who claims to have purchased only about 50 shares of the Company's stock.

## VI.    THE FEE AND EXPENSE APPLICATION

128.    In addition to seeking final approval of the Settlement and approval of the Plan of Allocation, Lead Counsel are applying to the Court, on behalf of Plaintiffs' Counsel, for an award of attorneys' fees of 25% of the Settlement Fund, applied net of Litigation Expenses awarded (the "Fee Application").  Lead Counsel also request payment for litigation expenses incurred by Plaintiffs' Counsel in connection with the prosecution and settlement of the Action in the amount of $603,965.20.  Lead Counsel further request reimbursement to Lead Plaintiffs of a total of $17,754.55 in costs and expenses that Lead Plaintiffs incurred directly related to their representation of the Settlement Class, as permitted by the PSLRA, 15 U.S.C. § 78u-4(a)(4).  The requested attorneys' fees, litigation expenses, and PSLRA awards are to be paid from the Settlement Fund.  The legal authorities supporting the requested fee and expenses are discussed in the memorandum in support of the Fee and Expense Motion.  The primary factual bases for the requested fee and expenses are summarized below.

### A.    The Fee Application

129.    For their efforts on behalf of the Settlement Class, Lead Counsel are applying for a fee award to be paid from the Settlement Fund on a percentage basis.  As set forth in the accompanying memorandum in support of the Fee and Expense Motion, the percentage method is

the appropriate method of fee recovery because it aligns the lawyers' interest in being paid a fair fee with the interest of the Lead Plaintiffs and the Settlement Class in achieving the maximum recovery in the shortest amount of time required under the circumstances and taking into account the litigation risks faced in a class action. Use of the percentage method has been recognized as appropriate by the Fourth Circuit in comparable cases where an all-cash common fund has been recovered.

130. Based on the quality of the result achieved, the extent and quality of the work performed by Plaintiffs' Counsel, the significant risks of the litigation, and the fully contingent nature of the representation, Lead Counsel respectfully submit that the requested fee award is reasonable and should be approved. As discussed in the memorandum in support of the Fee and Expense Motion, a 25% fee award is fair and reasonable for attorneys' fees in common fund cases such as this and is well within the range of percentages awarded in securities class actions in this District and Circuit with comparable settlements.

### 1. Lead Plaintiffs Have Authorized and Support the Fee Application

131. Lead Plaintiffs Fort Worth and Miami are sophisticated institutional investors that closely supervised and monitored the prosecution and settlement of the Action. *See* Webb Decl. (Ex. 1), at ¶¶ 4-8; Hernandez Decl. (Ex. 3), at ¶¶ 3-4. Lead Plaintiffs fully support Lead Counsel's requested fee. Lead Plaintiffs believe that it is fair and reasonable in light of the result obtained for the Settlement Class, the substantial risks in the litigation, and the work performed by Plaintiffs' Counsel. *See* Webb Decl. ¶ 9; Hernandez Decl. ¶ 5. Lead Plaintiffs' endorsement of Lead Counsel's fee request further demonstrates its reasonableness and should be given weight in the Court's consideration of the fee award.

### 2. The Time and Labor of Plaintiffs' Counsel

132. The time and labor expended by Plaintiffs' Counsel in pursuing this Action and achieving the Settlement support the reasonableness of the requested fee. Attached hereto as Exhibits 7A through 7D are declarations in support of Lead Counsel's motion for attorneys' fees and litigation expenses on behalf of each of the Plaintiffs' Counsel firms: (a) co-Lead Counsel BLB&G; (b) co-Lead Counsel Saxena White; (c) Liaison Counsel Cohen Milstein; and (d) additional counsel for Lead Plaintiff Miami, Klausner Kaufman (the "Fee and Expense Declarations"). Each of the Fee and Expense Declarations includes a schedule summarizing the lodestar of the firm and the litigation expenses it incurred. The Fee and Expense Declarations indicate the amount of time spent on the Action by the attorneys and professional support staff of each firm and the lodestar calculations from its inception through April 5, 2024, based on their current hourly rates. The Fee and Expense Declarations were prepared from contemporaneous daily time records regularly maintained and prepared by the respective firms, which are available at the request of the Court. The first page of Exhibit 7 is a chart that summarizes the information set forth in the Fee and Expense Declarations, listing the total hours expended, lodestar amounts, and litigation expenses for each Plaintiffs' Counsel firm and gives totals for the numbers provided.

133. As set forth in the Fee and Expense Declarations, Plaintiffs' Counsel have collectively expended 11,303.75 hours in the prosecution of this Action, with a total lodestar of $7,423,241.25. If the Court awards the Litigation Expenses requested, the requested fee of 25% of the Settlement Fund, net of Litigation Expenses, will be $7,344,570.00 plus interest. Accordingly, the requested fee represents a slightly negative 0.99 multiplier of Plaintiffs' Counsel's lodestar.

134. As described above in greater detail, the work that Plaintiffs' Counsel performed in this Action included: (i) conducting an extensive investigation into the claims asserted, including

through a detailed review of public documents and interviews with over 100 witnesses believed to potentially have information about the claims at issue in the Action; (ii) researching and drafting a detailed consolidated Amended Complaint based on this investigation; (iii) drafting a revised operative Second Amended Complaint based on sworn testimony and documentary evidence from a separate litigation against James River; (iii) fully briefing Lead Plaintiffs' opposition to Defendants' motions to dismiss the Amended Complaint and Second Amended Complaint; (iv) conducting extensive fact discovery, which included preparing and responding to requests for the production of documents and interrogatories; serving document subpoenas on four non-parties; (v) reviewing a substantial part of the over 1.6 million pages of documents obtained from Defendants and third parties; (vi) consulting extensively throughout the litigation with a variety of experts and consultants, including experts in the areas of financial economics, accounting, actuarial science, and the insurance industry; and (vi) engaging in extensive arm's-length settlement negotiations to achieve the Settlement, including two mediation sessions with Mr. Melnick.

135.    As detailed above, throughout this case, Plaintiffs' Counsel devoted substantial time to the prosecution of the Action.  We maintained control of and monitored the work performed by other lawyers at Lead Counsel.  While we both personally devoted substantial time to this case, other experienced attorneys at our firms were involved throughout the litigation.  More junior attorneys and paralegals also worked on matters appropriate to their skill and experience level. Throughout the litigation, Plaintiffs' Counsel maintained an appropriate level of staffing that avoided unnecessary duplication of effort and ensured the efficient prosecution of this litigation.

### 3.    The Skill and Experience of Plaintiffs' Counsel

136.    The skill and expertise of Lead Counsel and the other Plaintiffs' Counsel also support the requested fee.  As demonstrated by their firm resumes attached as Exhibits 7A-4, 7B-3, 7C-3, and 7D-2 hereto, Lead Counsel are among the most experienced and skilled law firms in

50

the securities litigation field, with a long and successful track record representing investors in such cases. Liaison Counsel Cohen Milstein is also highly skilled and extremely knowledgeable counsel. We believe Plaintiffs' Counsel's skill and their willingness and ability to prosecute the claims vigorously through trial, if necessary, added valuable leverage in the settlement negotiations.

### 4. Standing and Caliber of Defendants' Counsel

137. The quality of the work performed by Plaintiffs' Counsel in attaining the Settlement should also be evaluated in light of the quality of their opposition. Defendants were represented by attorneys from Debevoise & Plimpton—a large, highly experienced, and highly skilled international law firm that zealously represented its clients. Defendants' local counsel, McGuireWoods LLP, is also a large and prominent international law firm, which maintains its largest office in Richmond, Virginia. In the face of this skillful and well-financed opposition, Lead Counsel were nonetheless able to develop a case that was sufficiently strong to persuade Defendants to settle the case on terms that will significantly benefit the Settlement Class.

### 5. The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk Contingent Cases

138. The prosecution of these claims was undertaken entirely on a contingent-fee basis, and the considerable risks assumed by Plaintiffs' Counsel in bringing this Action to a successful conclusion are described above. Those risks are relevant to the Court's evaluation of an award of attorneys' fees. Here, the risks assumed by Plaintiffs' Counsel, and the time and expenses incurred without any payment, were extensive.

139. From the outset, Plaintiffs' Counsel understood that they were embarking on a complex, expensive, lengthy, and hard-fought litigation with no guarantee of ever being compensated for the substantial investment of time and the outlay of money that vigorous

51

prosecution of the case would require. In undertaking that responsibility, Lead Counsel were obligated to ensure that sufficient resources (in terms of attorney and support staff time) were dedicated to the litigation, and that Lead Counsel would further advance all of the costs necessary to pursue the case vigorously on a fully contingent basis, including funds to compensate vendors and consultants and to cover the considerable out-of-pocket costs that a case such as this typically demands. Because complex securities litigation generally proceeds for several years before reaching a conclusion, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis. Indeed, Plaintiffs' Counsel have received no compensation during the nearly three-year duration of this Action and no reimbursement of out-of-pocket expenses, yet they have devoted more than 11,300 hours and incurred more than $600,000 in expenses in prosecuting this Action for the benefit of James River investors.

140. Plaintiffs' Counsel also bore the risk that no recovery would be achieved. As discussed above, from the outset this case presented a number of significant risks and uncertainties.

141. As noted above, the Settlement was reached only after Lead Counsel had overcome Defendants' motion to dismiss the Second Amended Complaint and conducted substantial fact discovery. However, had the Settlement not been reached when it was and this litigation continued, Lead Counsel would have been required to complete fact discovery (including taking depositions of the Individual Defendants and several other James River officers and third parties); conduct substantial expert discovery; move for class certification; oppose Defendants' anticipated motion for summary judgment; and prepare and take the case to trial. Moreover, even if the jury returned a favorable verdict after trial, it is likely that any verdict would be the subject of post-trial motions and appeals.

52

142.    Lead Counsel's persistent efforts in the face of significant risks and uncertainties have resulted in a significant and certain recovery for the Settlement Class.  In light of this recovery and Plaintiffs' Counsel's investment of time and resources over the course of the litigation, Lead Counsel believe the requested attorneys' fees are fair and reasonable and should be approved.

### 6.    The Reaction of the Settlement Class to the Fee Application

143.    As noted above, as of April 18, 2024, over 37,000 Notice Packets had been sent to potential Settlement Class Members advising them that Lead Counsel would apply for attorneys' fees in an amount not to exceed 25% of the Settlement Fund.  *See* Walter Decl. ¶ 11 and Ex. A (Notice ¶¶ 5, 59).  In addition, the Court-approved Summary Notice has been published in *The Wall Street Journal* and transmitted over the *PR Newswire*.  *See* Walter Decl. ¶ 13.  To date, no objections to the request for attorneys' fees have been received, and there has been only one request for exclusion by an individual who claims to have purchased only a small number of shares.

144.    In sum, Lead Counsel accepted this case on a contingency basis, committed significant resources to it, and prosecuted it without any compensation or guarantee of success. Based on the favorable result obtained, the quality of the work performed, the risks of the Action, and the contingent nature of the representation, Lead Counsel respectfully submit that the requested fee is fair and reasonable.

### B.    The Litigation Expense Application

145.    Lead Counsel also seek payment from the Settlement Fund of $603,965.20 for litigation expenses reasonably incurred by Plaintiffs' Counsel in connection with the prosecution and resolution of the Action (the "Expense Application").

146.    From the outset of the Action, Plaintiffs' Counsel have been aware that they might not recover any of their expenses (if the litigation was unsuccessful), and, further, if there were to be reimbursement of expenses, it would not occur until the Action was successfully resolved, often

a period lasting several years. Plaintiffs' Counsel also understood that, even assuming that the case was ultimately successful, reimbursement of expenses would not necessarily compensate them for the lost use of funds advanced by them to prosecute the Action. Consequently, Plaintiffs' Counsel were motivated to, and did, take significant steps to minimize expenses whenever practicable without jeopardizing the vigorous and efficient prosecution of the case.

147.    As set forth in the Fee and Expense Declarations included in Exhibit 7, Plaintiffs' Counsel have incurred a total of $603,965.20 in unreimbursed litigation expenses in connection with the prosecution of the Action. The expenses are summarized in Exhibit 8, which identifies each category of expense, *e.g.*, expert fees, mediation fees, on-line legal and factual research, e-discovery/document management costs, copying costs, and travel costs, and the amount incurred for each category. These expenses are reflected on the books and records maintained by Plaintiffs' Counsel, which are prepared from expense vouchers, check records, and other source materials and are an accurate record of the expenses incurred. These expenses are recorded separately by Plaintiffs' Counsel and are not duplicated by the firms' hourly rates.

148.    Of the total amount of expenses, $422,722.93, or approximately 70%, was expended for the retention of experts. As discussed above, Lead Counsel consulted with experts in the areas of financial economics, accounting, actuarial science, and the insurance industry during its investigation and the preparation of the Complaint and during the course of discovery. These experts' advice was instrumental in Lead Counsel's appraisal of the claims and in helping achieve the favorable result.

149.    The cost of on-line factual and legal research was $68,367.07, which accounts for approximately 11% of the total expenses.

54

150. Lead Plaintiffs' share of the mediation costs paid to JAMS for the services of Mr. Melnick and his assistants were $28,800.63 or 5% of the total expenses.

151. Another significant cost was the expense of e-discovery, including document storage, management and related support, which included the costs of creating and maintaining the database containing the documents produced in the Action. These e-discovery/document management costs in total came to $46,467.28, or approximately 8% of the total expenses.

152. The other expenses for which Plaintiffs' Counsel seek payment are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour. These expenses include, among others, court fees, copying costs, travel costs, service of process costs, postage, and delivery expenses.

153. In addition, Lead Plaintiffs seek reimbursement of a total of $17,754.55 for the reasonable costs and expenses that they incurred directly in connection with their representation of the Settlement Class, based on the substantial time dedicated to the Action by their employees. Specifically, Lead Plaintiff Fort Worth seeks $15,879.55 for 141 hours dedicated to the case by its General Counsel and other employees. *See* Webb Decl. (Ex. 2), at ¶ 11. Lead Plaintiff Miami seeks $1,875.00 for 15 hours devoted to the case by its Pension Administrator and other employees. *See* Hernandez Decl. (Ex. 3), at ¶ 10. Such payments are expressly authorized and anticipated by the PSLRA, as more fully discussed in the Fee Memorandum at 4, 9.

154. The Notice informed potential Settlement Class Members that Lead Counsel would be seeking reimbursement of Litigation Expenses in an amount not to exceed $800,000, which might include PLSRA awards for Lead Plaintiffs. Notice ¶¶ 5, 59. The total amount requested, $621,719.75, which includes $603,965.20 for Plaintiffs' Counsel's litigation expenses and $17,754.55 for Lead Plaintiffs' requested PSLRA awards, is well below the $800,000 that

55

Settlement Class Members were advised could be sought.  To date, no objection has been raised as to the maximum amount of expenses set forth in the Notice.

155.    The expenses incurred by Plaintiffs' Counsel and Lead Plaintiff were reasonable and necessary to represent the Settlement Class and achieve the Settlement.  Accordingly, Lead Counsel respectfully submit that the application for payment of Litigation Expenses from the Settlement Fund should be approved.

156.    Attached hereto as Exhibit 9 is a compendium of true and correct copies of the unpublished opinions and authority cited in the Settlement Motion and Fee and Expense Motion.

## VII.    CONCLUSION

157.    For all the reasons set forth above, Lead Plaintiffs respectfully submit that the Settlement and the Plan of Allocation should be approved as fair, reasonable, and adequate.  Lead Counsel further submit that the requested fee in the amount of 25% of the Settlement Fund, net of Litigation Expenses, should be approved as fair and reasonable, and the request for payment of total Litigation Expenses in the amount of $621,719.75 should also be approved.

We declare, under penalty of perjury, that the foregoing is true and correct.

_____          _____
       Rebecca E. Boon                                David R. Kaplan

56